# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>       Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |
| STREAM TV NETWORKS, INC. and TECHNOVATIVE MEDIA, INC.,<br><br>       Plaintiffs,<br><br>v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS VI, LLC, HAWK INVESTMENT HOLDINGS LIMITED, ARTHUR LEONARD ROBERT "BOB" MORTON, SEECUBIC, INC., ALASTAIR CRAWFORD, KRZYSZTOF KABACINSKI, KEVIN GOLLOP, ASAF GOLA, JOHN DOE(S), JANE DOE(S), DELAWARE and OTHER LAW FIRMS representing and acting in concert with John Doe(s) and/or Jane Doe(s), INVESTMENT BANKS employed by John Doe(s) and/or Jane Doe(s), PATRIC THEUNE, and SEECUBIC B.V.,<br><br>       Defendants. | Adv. No. 23-00057 |

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015).  The location of  the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

**MEMORANDUM IN SUPPORT OF DEBTORS' MOTION FOR A
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND
<u>PERMANENT INJUNCTION</u>**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT .................................................................................. 1

II. SUMMARY OF FACTS .......................................................................................... 3

III. ARGUMENT AND APPLICABLE LEGAL STANDARD ................................... 7

    A. Likelihood of Success on the Merits ............................................................. 8

    B. Likelihood of Irreparable Harm..................................................................... 10

    C. Balance of Equities and Hardships.................................................................13

    D. Public Interest.................................................................................................14

IV. RELIEF REQUESTED ..........................................................................................15

V. CONCLUSION ...................................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Anderson v. Davila,
  125 F.3d 148 (3d Cir. 1997)....................................................................................10

Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc.,
  145 F. Supp. 3d 311 (D. Del. 2015)..........................................................................11

Benisek v. Lamone,
  138 S. Ct. 1942 (2018)..............................................................................................8

Bestway Inflatables & Materials Corp. v. Mills,
  2022 U.S. Dist. LEXIS 77826 (E.D. Pa. Apr. 28, 2022) .........................................11

City of Los Angeles v. Lyons,
  461 U.S. 95 (1983)....................................................................................................10

CrowdStrike, Inc. v. NSS Labs. Inc.,
  2017 U.S. Dist. LEXIS 19777 (D. Del. Feb. 13, 2017) ...........................................14

In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,
  2011 WL 1980610 (D. Del May 20, 2011)................................................................8

EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.,
  594 F. Supp. 2d 570 (E.D. Pa. 2009) .......................................................................12

Fres-co Sys. USA v. Hawkins,
  690 Fed. Appx. 72 (Fed. Cir. 2017)..........................................................................15

Highmark, Inc. v. UPMC Health Plan, Inc.,
  276 F.3d 160 (3d Cir. 2001)......................................................................................8

Hope v. Warden York County Prison,
  956 F.3d 156 (3d Cir. 2020)......................................................................................8

Hybritech Inc. v. Abbott Labs,
  849 F.2d 1446 (Fed. Cir. 1988).................................................................................14

i4i Ltd P'ship v Microsoft Corp.,
  598 F.3d 831 (Fed. Cir. 2010)...................................................................................14

Nat'l Reprographics, Inc. v. Strom,
  621 F. Supp. 2d 204 (D.N.J. 2009) ..........................................................................14

Oakwood Labs. LLC v. Thanoo,
    999 F.3d 892 (3d Cir. 2021)...........................................................................13

Pappan Enters. v. Hardee's Food Sys.,
    143 F.3d 800 (3d Cir. 1998)...........................................................................11

Rajan v. Crawford, No. 22-1719,
    2022 WL 16646690 (3d Cir. Nov. 3, 2022).................................................1, 10

Reilly v. City of Harrisburg,
    858 F.3d 173 (3d Cir. 2017)..........................................................................9, 10

Robert Bosch LLC v. Pylon Mfg,
    659 F.3d 1142 (Fed. Cir. 2011).......................................................................13

Stein v. Lee Eye Ctr., Inc.,
    2021 U.S. Dist. LEXIS 232579 (W.D. Pa. Dec. 6, 2021).................................10

Trump v. Int'l Refugee Assistance Project,
    137 S. Ct. 2080 (2017)......................................................................................8

United States Security and Exchange
    Comm. Admin. File No. 3-15500 ......................................................................5

Varentec, Inc. v. Gridco, Inc.,
    2016 U.S. Dist. LEXIS 137302 (D. Del. 2016) ...............................................15

Winter v Natural Resources Defense Council,
    555 U.S. 7 (2008)...............................................................................................8

**Statutes**

11 U.S.C. § 541.....................................................................................................9

1118 U.S.C. § 1832(A)(1).......................................................................................9

Debtors, Stream TV Networks, Inc. ("Stream" or the "Company") and Technovative Media, Inc. ("Technovative") (jointly, "Debtors"), respectfully file this brief in support of their Motion for the entry of a Temporary Restraining Order and, pending a hearing thereon, the entry of a Preliminary Injunction and a Permanent Injunction against Defendants (1) Shadron L. Stastney ("Stastney"); (2) SLS Holdings VI, LLC ("SLS"); (3) Hawk Investment Holdings Limited ("Hawk"); (4) Arthur Leonard Robert "Bob" Morton ("Morton"); (5) SeeCubic, Inc. ("SCI"); (6) Alastair Crawford ("Crawford"); (7) Krzysztof Kabacinski ("Kabacinski"); (8) Kevin Gollop ("Gollop"); (9) Asaf Gola ("Gola"); (10) "John Doe(s);" (11) "Jane Doe(s);" (12) Delaware and other law firms representing and acting in concert with "John Doe(s)" and/or "Jane Doe(s);" (13) investment banks employed by the Debtors or "John Doe(s)" and/or "Jane Doe(s)"; (14) Patric Theune ("Theune"); and (15) SeeCubic B.V. ("SCBV") (collectively, the "Defendants").

Debtors incorporate by reference the entirety of their Original Complaint and accompanying exhibits filed contemporaneously herewith and aver as follows.  In support of this Motion, Debtors offer the Declarations of Mathu Rajan and Charles M. Robertson.

## **PRELIMINARY STATEMENT**

This case arises from Defendants' scheme to defraud the shareholders and creditors of Stream, and in so doing, plunder the Company to create a multi-million-dollar windfall for themselves while rendering the Company's reorganization and equitable treatment of creditors practical impossibilities.  The Defendants (many of whom were board members or officers of Stream, and some who are yet to be identified) conspired to take over the assets of the Company in breach of their fiduciary, contractual, and other duties.

Debtors' Motion seeks an Order enjoining Defendants and all persons acting on their behalf from using Stream-owned glasses-free 3D assets and technology license rights to benefit Stream's

1

competitors, pending entry by the Court of a final judgment in this action.  In addition, Debtors seek an Order enjoining Defendants from causing the breach of Stream's glasses-free 3D technology licensing agreements by wrongfully sub-licensing such technology, thereby subjecting Stream to irreparable harm.  Third, Debtors seek an Order enjoining Defendants from exercising control over any subsidiary of Debtors and confirming Stream's right to exercise control of all of its subsidiaries by appointing directors at Stream's sole discretion.  Debtors just learned that (1) SCI is currently working with twelve or thirteen customers using the glasses-free 3D technology that Stream developed, (2) SCI has or will sub-license the glasses-free 3D technology to these companies as part of SCI's business model, (3) Stastney has been appointed director of Debtors' subsidiaries that hold Stream's intellectual property and valuable computer source code, and (4) SCI distributed a private placement memorandum and subscription agreement with an effective date of October 1, 2023, seeking to raise funds based on its control of Stream's technology and containing demonstrably false claims.  Stastney recently asserted SCI obtained its right to use Stream's glasses-free 3D technology through a sublicense SCI obtained from Stream's Dutch subsidiary, SCBV.  Any such issuance of a sublicense, whether to SCI or its customers, is a direct violation of the technology license Stream obtained from Koninklijke Philips Electronics N.V. ("Philips") through Stream's subsidiary, Ultra-D Ventures C.V ("UDV").  The Philips license, which is foundational to Stream's glasses-free 3D technology, specifically prohibits sub-licensing. Debtors seek to enjoin this wrongful conduct.

SCI's use of Stream's technology license and its intent to issue sublicenses to its customers presents a serious and immediate threat of irreparable harm to Stream.  Stream's licenses specifically prohibit sublicensing, so even if Stream's subsidiary, SCBV, were able to issue a license on behalf of the parent, it would be breaching the licenses.  The licenses cost Stream over

$10,000,000 in minimum fees and royalties and Stream's competitor, SCI, is effectively taking the technology, which may cause Stream to lose the millions of dollars that Stream has invested in the upfront fees.  If SCI and SCBV are allowed to violate the terms of Stream's licenses, there exists the possibility that the licensors will revoke the licenses, depriving Stream of the opportunity to use and monetize its own glasses-free technology in which it has invested in excess of $160 million over a period of more than ten years.  Further, as the technology progresses it is not at all clear that Stream would be able to obtain new licenses at all and certainly not on as favorable of terms.

## SUMMARY OF FACTS

Stream is a new media company founded in 2009 with a mission to advance the evolution of display technology from a flat 2D world to an immersive world of 3D where viewers do not need special glasses or goggles.  Through its global engineering teams, Stream developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D").  Ultra-D is a proprietary and trade secret combination of hardware and software that creates a natural, comfortable, and immersive glasses-free 3D viewing experience.  From its inception to 2020, Stream grew to over 100 employees and consultants worldwide and focused its efforts on further developing its Ultra-D technology for implementation into the devices of major industry brands selling TVs, tablets, laptops, and mobile phones.  The Company added product engineering teams in California, USA; Dusseldorf, Germany; Bangalore, India; and Beijing, China while simultaneously putting significant effort into business development and customer acquisition.  Technovative, a wholly owned subsidiary of Stream, is a holding company that owns directly or indirectly all the remaining entities in the Stream global group, which subsidiaries own or hold rights in both proprietary and licensed technology.

Stream's Ultra-D technology was developed, in part, based on certain intellectual property including a portfolio of glasses-free 3D patents licensed from Philips pursuant to a Technology License Agreement dated December 8, 2011.  A true and correct copy of the Technology License Agreement is attached hereto as Exhibit A.  The agreement expressly provides that, "[s]ubject to full and unconditional compliance by ULTRA-D and its Affiliates with its obligations under this Agreement, Philips hereby grants to ULTRA-D and [its] Affiliates, a worldwide, non-exclusive, **non-transferable license** under the Licensed Software **without the right to grant sublicenses**." Technology License Agreement at 2.2 (emphasis added).

Other foundational IP "building blocks" were licensed from Rembrandt 3D Holdings Ltd. ("Rembrandt").  Stream has a technology license from Rembrandt which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D solution.  A true and correct copy of the May 23, 2021 settlement agreement granting the Rembrandt license to Stream is attached hereto as Exhibit B.  A separate License Covenant executed on August 14, 2023 specifically prohibits issuing a license of any kind for Rembrandt IP to SCI, Hawk, Stastney himself, SLS, Morton, Crawford, or any associated entity.  A true and correct copy of the August 14, 2023 License Covenant is attached hereto as Exhibit C.  Furthermore, this license cannot be issued to a current or former subsidiary of Stream.  Id.  The license allows Stream's subsidiaries to use Rembrandt IP for Stream-directed projects, but the license does not allow Stream's subsidiaries to use the Rembrandt IP for their own projects or for projects that benefit third parties other than Stream.  Even though Stream has communicated this limitation to SCBV on multiple occasions, SCBV continues to work on non-Stream projects using the Rembrandt IP.  Worse still, SCBV refuses to even identify the projects it is working on.

4

Stastney was an insider of Stream[2] by virtue of his position as a director of Stream and as Stream's chief financial officer. Stastney is currently the managing member of SLS and the chairman and chief executive officer of SCI.

On June 28, 2023, during the pendency of these bankruptcy cases and despite specific instructions from this Court to take no action without court approval, Stastney, SLS, SCI, and Hawk proceeded with litigation against Mathu Rajan, Stream's director and CEO, in Amsterdam Court. Defendants succeeded in having Mr. Rajan removed as director of Stream's Dutch subsidiary companies, blocking Stream's ability to direct the research and development activities of its global staff, blocking Stream's access to technology demonstrator units historically used to generate sales and new business development, impacting Stream's ability to fulfill customer orders, and harming Stream's reputation among its investors, customers, and strategic partners.

More recently, Stastney testified during a September 13, 2023, summary proceeding in Amsterdam Court on behalf of plaintiffs there which included himself; SLS; SCI; and Hawk. See Exhibit D, Declaration of Mathu Rajan in Support of Motion for Temporary Restraining Order ("Rajan Decl."), ¶ 2; Exhibit E, Declaration of Charles M. Robertson in Support of Motion for Temporary Restraining Order ("Robertson Decl."), ¶ 7. Stastney testified that SCI is currently working with twelve or thirteen customers using the glasses-free 3D technology developed by Stream. Exh. D, Rajan Decl., ¶ 3; Exh. E, Robertson Decl., ¶¶ 6, 10. Stastney further testified that the glasses-free 3D technology is being or will be sub-licensed to these companies as part of SCI's business model. Exh. D, Rajan Decl., ¶ 4; Exh. E, Robertson Decl., ¶ 7. Stastney also testified

---

[2] Stastney was the Chief Financial Officer of Stream from December 2018 until February 2020. He was a Stream director from 2011 to 2014, when he resigned because the Securities and Exchange Commission levied nearly $3 million against him in disgorgement, penalties, and interest and barred him from certain fiduciary roles in an action captioned *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sept. 18, 2013). Stastney later re-engaged with Stream as a Vice Chairman of its Board of Directors from September 2018 until his resignation on January 30, 2020.

that SCI obtained its rights to use Stream's glasses-free 3D technology through a sublicense it obtained from Stream's Dutch subsidiary, SCBV.  Exh. D, Rajan Decl., ¶ 5; Exh. E, Robertson Decl., ¶ 8.  As noted above, any issuance of a sublicense, whether to SCI or its customers, is a direct violation of the technology license Stream obtained from Philips through Stream's subsidiary, Ultra-D Ventures C.V.  Exh. D, Rajan Decl., ¶ 6; Exh. E, Robertson Decl., ¶ 9.  The Philips license, which is foundational to Stream's glasses-free 3D technology, specifically prohibits sub-licensing.  Id.  That is precisely why Stream's business model is based on the sale of components, not the licensing of technology.  Exh. E, Robertson Decl., ¶ 9.  SCI's unauthorized use of the Philips technology, as embedded in the Stream technology, violates the Philips license and presents potential of irreparable harm to Stream should Philips decide to revoke its license.  Id.

Stastney openly admitted in Amsterdam Court that SCI is in direct competition with Stream, though it is using a completely different business model; Stream intends to sell components to its customers, whereas SCI intends to license the technology to its customers.  Exh. D, Rajan Decl., ¶ 7; Exh. E, Robertson Decl., ¶ 7.  SCI's use of Stream's license from Philips – and worse still, its intent to issue sublicenses to its customers – presents a serious and immediate threat of irreparable harm to Stream.  If SCI is allowed to violate Stream's license from Philips, it is possible that Philips will revoke the license, depriving Stream of the opportunity to use and monetize its own glasses-free technology in which it has invested in excess of $160 million over a period of more than ten years.  Exh. D, Rajan Decl., ¶ 9; Exh. E, Robertson Decl., ¶ 12.  Stastney's open admissions in Amsterdam Court clearly demonstrate the ongoing and unauthorized use of Stream's technology by SCI and underscore the necessity for Stream to obtain injunctive relief.

Stastney's testimony occurred after an independent director appointed by the Amsterdam Court, Jasper Berkenbosch ("Berkenbosch"), had resigned.  Berkenbosch's resignation appears to have been triggered by the August 7, 2023 notice he received from Rembrandt that SCBV's activities,[3] as authorized by Berkenbosch, constituted active misappropriation of Rembrandt's technology.  See Exhibit F, 08/07/23 email from C. Michaels to J. Berkenbosch, et al.  Following Berkenbosch's resignation and Stastney's September 13, 2023 testimony, by an order dated September 20, 2023, the Amsterdam Court appointed Stastney as temporary director of the Stream Dutch Entities, giving him the ability to control Stream's technology and continue marketing it in competition with Stream.  Exhibit G, 09/20/23 Order, at 16; Exh. E, Robertson Decl., ¶ 11. Stastney will retain his directorship until such time as a United States court confirms Stream's right to appoint its own director.  Id.

If Defendants are not enjoined from using Stream's Bankruptcy Assets and from offering the licensed technology and source code to others in violation of the terms of the Philips and Rembrandt licenses, Debtors will suffer irreparable harm; the threatened harm to Debtors outweighs any harm that the temporary restraining order may do to the Defendants; there is a substantial likelihood that Debtors will prevail on the merits of their claims at trial; and granting the temporary restraining order will serve the public interest.

### ARGUMENT AND APPLICABLE LEGAL STANDARD

Debtors seek a temporary restraining order and preliminary injunction to prevent Defendants from using or licensing Stream's technology prior to an adjudication of Debtors' rights.  "The primary purpose of a temporary restraining order and/or preliminary injunction is to

---

[3] SCBV is a limited liability company formed under the laws of the Netherlands to conduct research and development activities for the benefit of Debtors.  SCBV is ultimately 100% owned by Stream.

preserve the status quo until a decision can be made on the merits." See Hope v. Warden York County Prison, 956 F.3d 156, 160 (3d Cir. 2020); Benisek v. Lamone, 138 S. Ct. 1942, 1945 (2018) (citing University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  Note also that the purpose of the preliminary injunction "is not to conclusively determine the rights of the parties . . . but to balance the equities as the litigation moves forward."  Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017).  If the Defendants were to use or license Stream's technology, it would effectively moot the Court's authority to decide in Stream's favor, irrespective of Stream's proof and rights of ownership.

The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction.  In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 2011 WL 1980610, at *1 (D. Del May 20, 2011).  The Supreme Court identified a four-part balancing test in Winter v Natural Resources Defense Council, 555 U.S. 7 (2008).  "A party seeking a TRO must establish (1) a likelihood of success on the merits, (2) that denial of injunctive relief will likely result in irreparable harm, (3) that granting the temporary restraining order will not result in irreparable harm to the defendants, and (4) that granting the TRO is in the public interest."  See Hope, 956 F.3d at 160.  The facts set forth in the Original Complaint and this Motion satisfy the standards for issuing temporary restraining orders and a preliminary injunction.

A.    **Likelihood of Success on the Merits**

A party must demonstrate that they are likely to succeed on the merits of their underlying cause of action.  See Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) (to establish a reasonable probability of success on the merits such that a TRO should issue, a "plaintiff need only prove a *prima facie* case, not a certainty that [it] will win."); see also Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017) (noting movant must "demonstrate that it can

win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not).").  Debtors have demonstrated such likelihood of success.

SCI's ongoing and current improper uses of Stream's technology and trade secrets is confirmed by the Declarations of Mr. Rajan and Mr. Robertson and the exhibits attached hereto. See, e.g., Exh. D, Rajan Decl., ¶ 3; Exh. E, Robertson Decl., ¶¶ 7-11; see also 1118 U.S.C. § 1832(A)(1); Exh. A, Technology License Agreement at 2.2; Exhibit C, Rembrandt Licensing Covenant at Section B: License Restrictions.  Such property belongs to the Debtors' estates, including but not limited to Stream's Intellectual Property Rights to the Ultra-D technology, Stream's Ultra-D demonstrators, and use of Stream's Bonding Equipment.  Stream's Assets have been determined, via final orders in the underlying state court litigation, to belong to the Debtors' bankruptcy estates as per 11 U.S.C. § 541.  In addition, there can be no dispute that Defendants have attempted to usurp Stream's ownership of its own subsidiaries by directing the workflow and preventing Stream from utilizing its own subsidiary companies such as SCBV.  See, e.g., Exh. D, Rajan Decl., ¶ 4; Exh. E, Robertson Decl., ¶¶ 5, 7-11.  Additionally, Defendants and their affiliates unquestionably have used Debtors' assets to generate new business relationships, investment, customer contracts, and strategic relationships that would be assets of Debtors' estates had they not been unduly deprived of their assets due to the improvident PI Order in Chancery Court.  To reiterate, upon remand, following the Delaware Supreme Court reversal in 2022, the Chancery Court ordered that all assets be surrendered to Stream, which still has not occurred to this date. Exh. E, Robertson Decl., ¶ 13.

All Defendants received copies of the Delaware Supreme Court opinion of June 15, 2022, and corresponding mandate of July 1, 2022; they are aware that Stream's Trade Secrets were misappropriated and cannot properly be retained, disclosed, or used by them.  Despite the clear

9

mandate of the Delaware Supreme Court and demands from Debtors to return all of Stream's Trade

Secrets to Debtors in both title and possession, and to discontinue all use of such information and

assets, Defendants have not done so.  Id.  Defendants have falsely represented that they returned

all of Debtors' confidential information and assets, yet their use of such information and assets

continues despite more than a year of Debtors' attempts to enforce the Delaware Supreme Court

mandate to return all Stream assets in both title and possession.  Based on these facts, the likelihood

of Debtors' success on the merits of their underlying causes of action is clear.[4]

**B.      Likelihood of Irreparable Harm**

Debtors must next establish that irreparable harm is likely if the Court does not grant the

preliminary injunction.  In order to show irreparable harm, the moving party must establish that

the harm is imminent and probable.  Anderson v. Davila, 125 F.3d 148, 164 (3d Cir. 1997).  This

requires evidence of "a real and immediate threat of future injury by the defendant."  City of Los

Angeles v. Lyons, 461 U.S. 95, 107 (1983).  "[T]he movant must show 'that it is more likely than

not to suffer irreparable harm in the absence of preliminary relief.'"  Stein v. Lee Eye Ctr., Inc.,

2021 U.S. Dist. LEXIS 232579, at *5-6 (W.D. Pa. Dec. 6, 2021); Reilly v. City of Harrisburg, 858

F.3d 173, 179 (3d Cir. 2017).  Stream has invested more than $160 million in developing its Ultra-

D glasses-free 3D technology and has now secured initial purchase orders totaling $138.6

million.  Exh. E, Robertson Decl., ¶ 12.  However, SCI's unauthorized use of the Philips

technology, as embedded in the Stream technology, violates the Philips license and presents a real

---

[4] Debtors anticipate Defendants will argue, as they have unsuccessfully in the past, that Debtors' claims against them
are precluded based on the ruling of the Delaware Chancery Court, which Defendants contend prohibit Debtors from
challenging the validity of the Omnibus Agreement.  The Court should reject this argument, which already has been
rejected by two other Pennsylvania courts.  See Rajan v. Crawford, No. 22-1719, 2022 WL 16646690, at *2 (3d Cir.
Nov. 3, 2022); Exhibit H, 04/19/23 Opinion, at 4 ("Collateral estoppel does **not** bar Plaintiff's claims.") (emphasis
added).

and immediate threat of irreparable harm to Debtors should Philips decide to revoke its license. Exh. D, Rajan Decl., ¶¶ 6-9; Exh. E, Robertson Decl., ¶ 9.

Furthermore, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enters. v. Hardee's Food Sys., 143 F.3d 800, 805 (3d Cir. 1998). "[T]he possibility of lower quality or otherwise unusable imitation products can cause irreparable harm to a company's reputation." Bestway Inflatables & Materials Corp. v. Mills, 2022 U.S. Dist. LEXIS 77826, at *9 (E.D. Pa. Apr. 28, 2022); see Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc., 145 F. Supp. 3d 311, 319-20 (D. Del. 2015). SCI is creating confusion in the marketplace by using Stream's own technology to compete with Stream. Exh. E, Robertson Decl., ¶ 12. Stastney openly admitted in Amsterdam Court that SCI is in direct competition with Stream, though it is using a completely different business model; Stream intends to sell components to its customers, whereas SCI intends to license the technology to its customers. SCI is damaging Stream by offering licenses to the same customer base that Stream is approaching for component sales. Approaching the same customer base with different pricing and business models is causing irreparable harm to Stream. Exh. D, Rajan Decl., ¶¶ 6-9; Exh. E, Robertson Decl., ¶ 12.

Finally, SCI falsely has stated in a private placement memorandum ("PPM") there is no litigation pending against it or involving any of its assets or involving any of its officers or directors. Exhibit I, SeeCubic, Inc. Proposed Terms for Bridge Loan Agreement Valid 10/1/23, at 7, section 5.f. Having sent the PPM to Stream's own shareholders, attempting to raise money to use Stream's own technology to compete against Stream, Stastney and SCI are lying to and damaging Stream's shareholders, destroying the reputation of the Debtors' technology and ruining Debtors' reputation by associating Debtors' technology with these outlandish and clearly

11

fraudulent claims.  Such conduct must be stopped immediately before Debtors suffer irreparable harm.

In <u>EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.</u>, 594 F. Supp. 2d 570 (E.D. Pa. 2009), a pharmaceutical company reserved an option to purchase the exclusive license to commercialize a collagen sponge from its developers and was granted a preliminary injunction.  The court found that both the opportunity to buy, or the right to review the option before it went to its final phase before the Food and Drug Administration would lead EUSA to a loss that would constitute irreparable harm.  <u>Id</u>. at 581.

The facts in this case are comparable to the conditions in <u>EUSA Pharma (US), Inc.</u>, where a company's own contract rights were ignored.  The Defendants' interference with both the Philips and the Rembrandt licenses could lead the parties to consider the purported sublicenses from SCBV to SCI as a breach of contract.  This would certainly constitute irreparable harm if two massive contracts were impaired because of the legally impossible and unlicensed use of the licensed technology.

Moreover, the industry is a competitive one.  In losing the benefits of the licenses to direct competitors, who are also using knowledge of the trade gleaned from working at Stream, there is a huge risk, and therefore a likelihood of irreparable harm, that the business suffers financial loss and harm to its market share from what is, at its core, theft of Stream's technology.  There is also the issue of Stream's reputational harm if other companies believe that they are being granted sublicenses when it is expressly forbidden by the licensors.  If the technology is Stream's and another company is using it improperly or cheapening the product, that is further evidence of the need for injunctive relief in the form of a temporary restraining order.  Monetary damages cannot cure reputational harm, that is an area where equitable relief is most appropriate.

In 2021, the Third Circuit heard the case <u>Oakwood Labs, LLC v. Thanoo</u> which sheds light on the court's consideration of Federal Trade Secret laws. <u>Oakwood Labs. LLC v. Thanoo</u>, 999 F.3d 892 (3d Cir. 2021). This case is factually comparable to the instant case as Oakwood's former Vice President at a pharmaceutical company became employed by a competitor and provided them with significant trade secrets in the form of how to produce very complicated drugs, in violation of his NDA. The court went on to conclude, "the loss of exclusivity is not the only harm. There are other, if not yet fully realized, injuries. [The competitor's] rapid market entry into a sector of the pharmaceutical industry with few competitors may well deprive Oakwood of market share. Utilizing Oakwood's trade secrets provides [the competitor] a jumpstart in an industry it would otherwise not have competitively joined for another decade. [The competitor] will avoid substantial research and development costs that Oakwood has already invested in its own product development." <u>Id</u>. at 914.

Defendants un-enjoined use or licensing of Debtors' technology, including their trade secrets, to others would destroy Debtors' advantage in the marketplace, moot Debtors' underlying causes of action and force Debtors to compete against their own technology. Such competition is clear and satisfactory evidence of irreparable harm. <u>See</u> <u>Robert Bosch LLC v. Pylon Mfg</u>, 659 F.3d 1142, 1152-1154 (Fed. Cir. 2011).

**C.**    **Balance of Equities and Hardships**

Once the Debtors have shown the likelihood of success and irreparable harm, they must show the balance of both equities and hardships is in their favor. Equities refers to Debtors' need and interest in obtaining an injunction and the burden the injunction would place on the Defendants. <u>Hybritech Inc. v. Abbott Labs</u>, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

"The 'balance of hardships' assesses the relative effect of granting or denying an injunction on the parties." i4i Ltd P'ship v Microsoft Corp., 598 F.3d 831, 863 (Fed. Cir. 2010). Here, the balance of hardships tips decidedly in Debtors' favor.  The need for Debtors to obtain the injunction is obvious.  The use or licensing of its technology when Debtors are likely to show their ownership would destroy its value to the Debtors and allow Defendants to benefit by their unlawful misappropriation of Debtors' technology.  That injury to Debtors far outweighs any harm to Defendants.  Simply put, Defendants suffer no hardship by being enjoined from misappropriating Debtors' technology.

**D.    Public Interest**

Finally, the Debtors must show the preliminary injunction is in the public interest.  To meet this element, the public has to have an interest or a concern in the outcome of the case. Specifically, the Third Circuit directs that courts should consider if doing so would be in the public interest.  CrowdStrike, Inc. v. NSS Labs. Inc., 2017 U.S. Dist. LEXIS 19777, at *17 (D. Del. Feb. 13, 2017).  Furthermore, "[t]he public has a clear interest in safeguarding fair commercial practices and in protecting employers from the theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." Nat'l Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (quoting Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 542 A.2d 879, 894 (N.J. 1988)).

Here, Stream needs an Order that enjoins SCI, and all those acting in concert with it, from using the glasses-free 3D technology in any way during the pendency of the bankruptcy and until it is specifically awarded such right by a U.S. court. Exh. E, Robertson Decl., ¶ 13.  Stream also needs an order for a return of assets by SCI to Stream, including all business assets seized by

14

SCI from Stream pursuant to the Omnibus Agreement of May 6, 2020 as well as all glasses-free

3D demonstrator units, regardless of when they were created, because they contain Stream's

technology.  Id.

  It is not possible to argue that protecting the trade secrets and technology of companies

from misappropriation and sale or transfer to foreign companies is not in the public interest.

American companies spend billions of dollars each year developing technologies and have a

rightful expectation that the laws and courts will protect them in the event of an unlawful effort

to steal and sell those technologies.  Debtors spent years and substantial funds developing their

3D no-glasses technology and it is in the public interest that technology be protected from

unlawful misappropriation by the Defendants.  This Court should note that these four standards

are not prerequisites but instead are balanced by the Court; if the showing in one area is

particularly strong, an injunction may issue even if the showings in other areas are rather weak.

See Varentec, Inc. v. Gridco, Inc., 2016 U.S. Dist. LEXIS 137302 at *9-10 (D. Del. 2016) (citing

Hybritech Inc. v. Abbot Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988)); see also Fres-co Sys. USA

v. Hawkins, 690 Fed. Appx. 72, 75 (Fed. Cir. 2017).  Debtors submit that all four criteria have

been clearly and strongly  established.

## **RELIEF REQUESTED**

  For the foregoing reasons, Debtors move this Court for the entry of the Temporary

Restraining Order and, pending a hearing thereon, the entry of a preliminary injunction and

permanent injunctions against Defendants.  Debtors move this Court for a Temporary Restraining

Order in the form attached hereto as Exhibit J, effective for a period of fourteen days, prohibiting

Defendants from  using,  licensing,  transferring,  selling,  assigning,  dissipating,  concealing,

encumbering, impairing, or otherwise disposing of Stream's Bankruptcy Assets.  Specifically Debtors seek an order:

a. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to use Ultra-D demonstration samples to secure investment or customer contracts for either themselves or their subsidiaries;

b. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to use Stream's Bankruptcy Assets for their own benefit and to the exclusion of Stream;

c. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from directing or otherwise contacting employees of Stream, Stream's Netherlands subsidiaries, including but not limited to Stream's Netherlands R&D subsidiary SCBV, or interfere, in any manner, with Stream's operation of its business and that of its subsidiaries;

d. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to exercise control over various Stream-owned websites, including www.seecubic.com which was registered and is owned by Debtors;

e. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from publishing statements that Stream Bankruptcy Assets do not belong to Stream or which damage or otherwise interfere with Stream's business;

f. Enjoining SCI, the other Defendants, and their employees, agents, or assignees from intimidating or otherwise tortiously interfering with Stream's business relationships;

16

g.  Enjoining SCI, the other Defendants, and their employees, agents or assignees from exercising any possession, dominion, or control over any of the Stream Bankruptcy Assets;

h.  Enjoining SCI from seeking to raise funds based on its control of Stream's technology;

i.  Enjoining SCI from sending funds raised through false pretext to Stream's Netherlands subsidiaries thereby involving Stream's subsidiaries in SCI's ill-gotten gains;

j.  Enjoining SCI, the other Defendants, and their employees, agents or assignees from interfering with Stream's exclusive right to appoint directors of all its subsidiaries;

k.  Enjoining SCI, the other Defendants, and their employees, agents or assignees from claiming ownership or control of Stream's technology and derivatives thereof; and

l.  Enjoining SCBV from entering into any contractual agreements with customers, strategic partners, or any other entity without the express written approval of Stream.

Further, Debtors move this Court to enter a preliminary injunction ordering that relief requested in the Temporary Restraining Order stay effective until the trial of this matter.  Debtors also move this Court to enter a permanent injunction ordering that relief and spirit of the relief requested in the Temporary Restraining Order remain in effect permanently.

## **CONCLUSION**

WHEREFORE, Debtors pray that the Court enter a temporary restraining order, preliminary injunction, and permanent injunctions against Defendants.

Dated: September 30, 2023          Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander *pro hac vice*
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

Bennett G. Fisher (*pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza #1400
Houston, TX 77046
Telephone: (346) 241-4095
Facsimile: (713) 759-6830
Bennett.Fisher@lewisbrisbois.com

-and-

Keith Kodosky
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
600 Peachtree Street, NE, Suite 4700
Atlanta, GA 30308
Telephone: (404) 991-2183
Facsimile: (404) 467-8845
Keith.Kodosky@lewisbrisbois.com

*(pro hac to be filed)*

*Counsel to the Debtors*