# **EXHIBIT D**

## PRAYER FOR RELIEF

WHEREFORE, SeeCubic respectfully requests the Court to enter judgment in its favor and grant the following relief:

1.      Dismissing the Complaint with prejudice;

2.      Denying Plaintiff's demand for relief in the Complaint;

3.      Awarding SeeCubic attorney's fees, costs and expenses in connection with this litigation to the extent permitted by law; and

4.      Granting SeeCubic such other and further relief as the Court may deem just, reasonable, and proper.

## COUNTERCLAIMS

Without admitting any of Rembrandt 3D Holding Ltd.'s ("Rembrandt") allegations above, and without prejudice to pleading further Counterclaims as the facts may warrant, Counterclaim-Plaintiff SeeCubic, Inc. ("SeeCubic") hereby asserts the following counterclaims against Counterclaim-Defendant Rembrandt as follows:

### NATURE OF THE CASE

1.      Upon information and belief, Rembrandt never had any protectable trade secrets.

2.      Rembrandt claims that its "trade secrets" were first misappropriated and publicly disclosed in 2012 by Stream TV Networks Inc. ("Stream")—long before SeeCubic even existed. Rather than taking action to protect its prized "trade secrets," Rembrandt not only sat on its hands but proceeded to publicly disclose its "trade secrets" to numerous individuals and companies over several years.

3.      A decade later, fueled by an apparent vendetta against SeeCubic and its Chief Executive Officer, Shadron Stastney, Rembrandt began to wield its long-abandoned and baseless

claims of trade secret misappropriation to prevent SeeCubic from collecting on valid debts owed to it by Stream, its Dutch subsidiary, SeeCubic BV ("SCBV"), and others.    Rembrandt intentionally interfered, and continues to intentionally interfere, with SeeCubic's business relations causing great harm to SeeCubic. For instance, Rembrandt threatened the independent director of SCBV with baseless litigation against himself personally, his law firm, and SCBV, with "damages" north of $1.2 billion. Not surprisingly, Rembrandt's threats caused the independent director to resign.  They also thwarted SeeCubic's attempts at recovering the money it was owed.

4.      Rembrandt also filed frivolous trade secret misappropriation claims in this Court to further impede SeeCubic's business relations.

5.      By way of these Counterclaims, SeeCubic requests that the Court put an end to Rembrandt's unlawful campaign against SeeCubic, declare that SeeCubic has not misappropriated any of Rembrandt "trade secrets," and award damages for Rembrandt's tortious interference and unfair competition.

### PARTIES

6.      SeeCubic is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 667 Madison Avenue, New York, New York, 10055.

7.      Upon information and belief, Rembrandt is a corporation organized and existing under the laws of the Island of Nevis with a registered address at Suites 5&6 Horsfords Business Centre, Long Point Road, Nevis, West Indies.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over the tortious interference and unfair competition claims based on diversity pursuant to 28 U.S.C. 1332.  SeeCubic is a Delaware corporation and

Rembrandt is a Nevis corporation and damages exceed $75,000. The Court also has jurisdiction over those claims pursuant to 28 U.S.C. §1367.

9.      The Court has subject matter jurisdiction over the declaratory judgment claims pursuant to 28 U.S.C. §§ 2201-02.

10.     The Court has personal jurisdiction over Rembrandt because it has purposefully availed itself of the benefits and protections of the laws of the State of Delaware and voluntarily subjected itself to the Court's jurisdiction by filing the Complaint (D.I. 1) against SeeCubic in this District.

11.     Venue for the counterclaims is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### A.  SeeCubic has not misappropriated Rembrandt's "alleged" trade secrets.

12.     On February 21, 2023, Rembrandt filed the above-captioned action against SeeCubic alleging that SeeCubic misappropriated Rembrandt's alleged trade secrets and that Rembrandt was, therefore, entitled to an injunction (D.I. 1).  Rembrandt's claims are without merit because Rembrandt does not have any protectable trade secrets, SeeCubic has not misappropriated Rembrandt's purported trade secrets, and Rembrandt's claims are time barred.

### 1.  Mr. Roelen and "the Team" misappropriate the alleged trade secrets over a decade ago and Mr. Blumenthal fails to take reasonable steps to prevent it.

13.     Upon information and belief, Rembrandt's founder, Stephen Blumenthal ("Mr. Blumenthal"), founded a company called 3DFusion in December 2007.  (D.I. 1, Ex. 1 ("SDNY"), ¶11.)  That same month, Mr. Blumenthal allegedly "contacted the key technology experts" that worked at Philips's incubator 3DSolution – i.e., "(the 'Team')" – "to join 3DFusion" as "independent contractors."  (D.I. 15, Ex. 2 ("Decl.") ¶23.)

14.     Upon information and belief, the Team "included Walther Roelen [("Mr. Roelen"),] a former 3DSolutions 3DTV lens designer[,] and Bart Barenbrug [("Mr. Barenbrug",] a former 3DSolutions senior software engineer." (*Id.*, ¶27.)

15.     In September 2010, Mr. Blumenthal "officially hired [Mr.] Roelen as the General Director (CEO) of the 3DFusion EU" and engaged Mr. Barenbrug who "collaborated with [Mr. Blumenthal] for the next 14 months, working on some 30 projects while negotiating his employment 3DFusion EU B.V. contract." (*Id.*, ¶33.)  Mr. Roelen, "as the General Director" of 3DFusion EU, "handled all confidential documents," (*id.*, ¶37), and "had the overall responsibility of getting the Team to sign employment contracts since June 2010."  (SDNY, ¶79.)

16.     According to Rembrandt's pleading, in September 2009 the Team "orally agreed to keep 3DFusion's proprietary information confidential" pending written NDAs (SDNY, ¶37), which were executed ten months later in October 2010 (*id.*, ¶81).

17.     Upon information and belief, the NDAs that Messrs. Roelen and Hans Zuidema ("Mr. Zuidema") (former Chief Technology Officer of "Stream's European subsidiary") signed were fundamentally flawed and allowed for the disclosure of Mr. Blumenthal's purported trade secrets.  Specifically, Rembrandt alleges that Mr. "Roelen inserted a clause in his [October 2010] NDA stating that the NDA 'will be terminated if on January first of 2011 there is no employment contract or other similar agreement between any of the 3DFusion [sic] companies and recipient." (*Id.*, ¶82).  Mr. Roelen put a similar clause in the NDA signed by Mr. Zuidema.

18.     Upon information and belief, because Mr. Blumenthal made the decision not to employ Messrs. Roelen or Zuidema, their NDAs terminated on January 1, 2011 – a mere three months after they were signed.  Upon information and belief, neither Mr. Blumenthal, 3DFusion, nor Rembrandt attempted to negotiate a different or better NDA with Messrs. Roelen or Zuidema.

19.     Rembrandt asserts that after Mr. Roelen's NDA expired, he allegedly misappropriated Rembrandt's trade secrets.  In January 2011, "after the expiration of his NDA with 3DFusion, i.e., in or about January 2011" Mr. Roelen "accepted an employment offer directly from Stream."  (D.I. 1, Ex. 22 ¶30.)

20.     Once at Stream, Mr. "Roelen and Stream's agents or affiliates" purportedly took advantage of the expired NDAs and "misused and/or misappropriated 3DFusion's proprietary information."  (SDNY, ¶79.)

21.     Mr. Blumenthal claims that he learned of this purported misappropriation "for the first time" over eleven years ago while "attending the Consumer Electronics Show ('CES') at Las Vegas, Nevada in January 2012."  (Decl., ¶65.)  Specifically, Mr. Blumenthal allegedly "observed W. Roelen working at Stream's exhibit booth" exhibiting technology that allegedly "belonged to 3DFusion."  *Id.*  Tellingly, neither Rembrandt, Mr. Blumenthal, nor 3DFusion took any action against Mr. Roelen to protect these purported trade secrets from further disclosure.

22.     In 2017, Mr. Blumenthal allegedly discovered that Messrs. "Roelen and Barenbrug filed a US patent application" in 2015 claiming priority to an earlier Dutch application with a filing date of "October 11, 2012."  (SDNY, ¶114.)  These two applications purportedly "disclose[d] [Mr. Blumenthal's] Confidential Information in violation of their NDA."  (*Id.*)  For example, Rembrandt alleges that "at least paragraphs [0076], [0077], [0081] and [0082]" disclose "the border-blending and depth smoothing functions or features" that Rembrandt considers confidential.  (*Id.*; Ex. 22, ¶33.)

### 2. Purported trade secrets were disclosed to third parties whom Rembrandt did not allege had an obligation to keep the information confidential

23.     On Oct. 27, 2010 "at a 3D Technology conference (i.e., the Kagan 3D Technology Conference) . . .  in New York City," Mr. Blumenthal allegedly invited "Mr. Jeffrey Katzenberg

of DreamWorks, Mr. John Landau of [Lucasfilm], and other video pioneers" to his "Waldorf suite for a full demonstration of the 3DFusion technology." (D.I. 1, Ex. 22, ¶27.) Thereafter, Mr. Blumenthal demonstrated his allegedly confidential technology to "Sony, Dreamworks, Intel, Technicolor, Sony, Pixar, Variety magazine and other west coast media companies." (*Id*.) Upon information and belief, neither Mr. Blumenthal nor 3DFusion entered into an NDA with any of these entities prior to revealing the confidential information to them, and these entities did not otherwise have an obligation to keep Mr. Blumenthal's information confidential.

24.    Upon information and belief, in February 2016, after 3DFusion defaulted on a loan, Mr. Blumenthal obtained all of 3DFusion's assets from a "lender," including all purported trade secrets and "all causes of action of 3DFusion." (D.I. 1, Ex. 22, ¶36; SDNY, ¶119.)    Upon information and belief, the lender did not have an obligation to keep this technology secret.

25.    Upon information and belief, as of at least 2017, well prior to Stream licensing Rembrandt's alleged trade secrets in 2021, Stream licensed Rembrandt's purported technology to third party IZON TV without permission from Rembrandt. IZON, in turn, sold "commercial displays and mobile devices incorporating the Ultra-D technology." (SDNY ¶¶131-133.) Upon information and belief, Rembrandt knew about this alleged misappropriation of its purported trade secrets, but never sued Stream or IZON TV for trade secret misappropriation or sought an injunction preventing further disclosure. Upon information and belief, IZON TV and its customers who purchased "commercial displays and devices" did not have an obligation to keep the technology secret.

### 3.    Stream purportedly misappropriates the alleged trade secrets, and Rembrandt does not file an action for misappropriation or seek an injunction preventing further disclosure.

26.    Upon information and belief, after Stream signed an NDA in June 2010, 3DFusion "provided Stream" and the Rajans – who purported to be "potential investors" – with "all of the

Confidential Information that had been developed by [Mr.] Blumenthal and the Team." (SDNY, ¶53.)

27.    Upon information and belief, on September 8, 2010, Mr. Blumenthal visited Stream's offices and fully demonstrated his technology, including "all aspects of the workflow, of conversion, of optimization and correction of the artifacts in the 3DASD video content" and the "2d switchable technology." (*Id*., ¶68.)  At the end of this meeting, "Mathu Rajan [allegedly] said to Blumenthal: 'Now I can do what you do. What do I need you for?' (*Id*.)

28.    Upon information and belief, in September 2010, Messrs. Blumenthal and Roelen met with Corning Glass with the "objective" to "share 3DFusion Intellectual Property and *Trade Secret concepts* with Corning and to explore Corning's ability to make certain improvements in the 2d switchable lens design." (SDNY, ¶97.)  Mr. Blumenthal allegedly "disclosed substantial Confidential Information to [Mr.] Roelen" at this meeting, who, "in violation of his agreement," then disclosed the information to Stream, who in turn incorporated "the Confidential Information in their products and technology." (*Id*., ¶98.)  Upon information and belief, in following the termination of his employment, Mr. Roelen continued to have further meetings with Corning to discuss Mr. Blumenthal's alleged confidential information, purportedly in violation of "confidentiality obligations owed to 3DFusion." (*Id*., ¶101.)

**4.    Rembrandt files suit against Stream in 2017 but does not assert trade secret misappropriation or seek an injunction preventing further disclosure of its purported secrets.**

29.    In January 2017, Rembrandt filed suit against Stream in the New York State Supreme Court for Stream's purported breach of an alleged "Confidentiality Agreement."

30.    Stream removed the state action to the United States District Court for the Southern District of New York.

41

31.    On June 23, 2017, Rembrandt amended its complaint against Stream to include three counts of patent infringement. Rembrandt did not assert a trade secret misappropriation claim or seek an injunction preventing Stream from further misappropriating its purported trade secrets. (D.I. 1, Ex. 1.)

32.    Rembrandt later dropped its patent infringement claims, and its related request for an injunction directed solely at those patent claims, leaving only its contract claims.

33.    Stream and Rembrandt mediated these contract claims on April 12, 2019.

34.    Mr. Stastney attended that mediation as Stream's then-CFO.

35.    The parties signed a non-binding term-sheet at that mediation.

36.    Schedule A to that non-binding term sheet purported to give Stream a license to certain "trade secrets." The term sheet did not state that those purported trade secrets were otherwise valid.

37.    The non-binding term sheet indicated that neither Stream nor Rembrandt would file a trade secret misappropriation claim against each other.

38.    Rembrandt later moved to enforce that term sheet on Stream. On November 4, 2020, the SDNY court denied Rembrandt's motion, finding that the "Settlement Term Sheet is not an enforceable contract for the settlement of this litigation or for the sale of goods."

**5.    Rembrandt hatches plan to interfere with SeeCubic's business and unfairly compete with SeeCubic.**

39.    On information and belief, shortly after SeeCubic was formed in 2020, Rembrandt concocted a scheme to prevent SeeCubic from recouping at least $37 million in investments in, and loans made to, Stream's subsidiaries Ultra-D Coöperatief U.A., SCBV, and Stream TV International B.V.

40.     After Mr. Stastney left the company, Stream began to experience serious financial difficulties. On February 24, 2021, Stream filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court"). *In re: Stream TV Networks, Inc.*, No. 21-10433-KBO (Bankr. D. Del.). SeeCubic, seeking to collect on Stream's debt to it, moved to dismiss this filing.

41.     Unable to bind Stream (or anyone else) to the non-binding term sheet, and knowing that Stream had no assets, money, or ability to perform the terms contained therein even if they were enforceable (which they were not), Rembrandt hatched a plan whereby it could use Stream's situation to its advantage and foot someone else with the bill for Stream's purported contractual breach.

42.     On April 20, 2021, the Chief Financial Officer ("CFO") of Rembrandt and its Delaware subsidiary, Rembrandt 3D Corp., Christopher Michaels, sent emails to counsel for Stream and its creditors. (D.I. 1 at Ex. 19-20 ("April 20 Correspondence")); *In re: Stream TV Networks, Inc.*, No. 23-10763-mdc, D.I. 325 (Bankr. E.D. Pa.).

43.     In Mr. Michaels's April 20 Correspondence, Rembrandt made clear that it intended to block any transfer of assets to SeeCubic. Rembrandt also threatened Stream and its creditors to make sure they fell in line, stating that "Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business." (D.I. 1 at Ex. 19-20 at 3.)

44.     After years of litigating against Stream, Rembrandt now saw a partnership with Stream as the only way it could collect on Stream's contractual breach. Rembrandt announced its plan to Stream and other creditors of Stream as follows:

> Ironically, if Stream TV performs its agreement with Rembrandt, Stream TV would have a license ***and be in a position to claim that the Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization***

> *plan to allow it to proceed under license from Rembrandt to pay*
> *off the creditors.*
>
> We certainly contend that our IP rights are worth far more than
> Stream TV's liabilities and were clearly not transferred to SeeCubic
> in the Delaware action, *so it seems that about the only asset Stream*
> *TV would have to oppose SeeCubic's motion to dismiss is to argue*
> *that it has a license from Rembrandt that dominates the assets that*
> *would be transferred to SeeCubic and that Stream TV has a going*
> *concern value based on the value of the licensing rights purchased*
> *from Rembrandt.*

*Id.* (emphasis added).

45. Soon thereafter, on May 17, 2021, the Delaware Bankruptcy Court granted
SeeCubic's motion to dismiss, finding that Stream had "no assets, operations, and current ability
to satisfy such claims" and that the petition was filed in bad faith. *In re: Stream TV Networks, Inc.*,
No. 21-10433-KBO, D.I. 200, at 13:5-15; 19:8-16 (Del. Bankr. May 17, 2021) (TRANSCRIPT).
Upon information and belief, Stream then took Rembrandt up on its previously offered plan to
keep assets away from SeeCubic.

46. On May 23, 2021, Rembrandt, Stream, and the Rajans entered into the Final
Settlement Agreement. (D.I. 1, Ex. 2.) Upon information and belief, when Rembrandt signed the
Final Settlement Agreement, it knew that Stream had no ability to perform the terms of that
agreement. Section 22 of the Final Settlement Agreement states that "[t]his Agreement shall be
**binding on, and shall be enforceable against, and shall inure the benefit of** the Parties to this
Agreement **and their respective [ ] subsidiaries**." (D.I. 1, Ex. 2 at § 22.) In other words, the Final
Settlement Agreement purports to grant Stream's subsidiaries, including SCBV, a license
commensurate in scope with Stream's purported license.

47. That same day, Stream filed a second petition for bankruptcy, this time under
Chapter 7. *In re: Stream TV Networks, Inc.*, No. 21-10848-KBO, D.I. 1 at 3 (Bankr. D. Del.)

("Second Bankruptcy Action").  In its petition, Stream included the Final Settlement Agreement with Rembrandt as a debt, with a claim amount of $1,528,000 (almost a hundred times less than the $1.2-1.5 billion that Rembrandt later threatened SeeCubic and its business partners with).

48.    The Delaware Bankruptcy Court dismissed Stream's Second Bankruptcy Action on June 10, 2021 with prejudice, finding that the action was "another attempt by the parties to circumvent [the Court's prior] dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court, and essentially get another bite of the appl[e]."  *Id.* at D.I. 37 at 63:25-64:3, 65:2-6 (TRANSCRIPT).  Stream was further prohibited from filing another bankruptcy action for twelve months.  *Id.* at D.I. 37 at 65:2-4.

49.    On March 15, 2023, Stream filed its *third* petition for bankruptcy—this time trying a new venue in the United States District Court for the Eastern District of Pennsylvania.  *In re: Stream TV Networks, Inc.*, No. 23-10763-mdc (Bankr. E.D. Pa.).  These bankruptcy proceedings are ongoing as of the date of this filing.  In those proceedings, SeeCubic has filed a claim in the amount of "no less than" $37 million for its investment in, and loans made to, SCBV.

50.    Rembrandt and Stream have since amended the Final Settlement Agreement. For instance, in an August 14, 2023 email that Stream sent to an unknown distribution list, Stream noted that "***Rembrandt 3D Holdings LTD***, which owns certain underlying intellectual property contained in the Ultra-D™ technology, ***has expanded its license arrangement with Stream to prevent certain Stream competitors from entering the market***. . . Rembrandt has agreed to ***permanently block its technology and withhold licenses from*** [among others]. . . SeeCubic, Inc., . . . Shadron Stastney . . . [and] [a]ny entity to which Shadron Stastney . . . [is] associated." (Ex. A (emphasis added).)

**6.    Rembrandt files this meritless trade secret misappropriation action.**

51.     On February 21, 2023 – eleven years after Rembrandt admittedly became aware of Stream's misappropriation of its purported trade secrets – Rembrandt finally brings a trade secret misappropriation claim.  But this action was not against Stream, the alleged contract-breacher and now partner, but against SeeCubic.

52.     It is not clear what Rembrandt is purporting to claim as its trade secrets. This is because, upon information and belief, Rembrandt has no protectable trade secrets regarding the technology at-issue in this case.

53.     Rembrandt admits in its Complaint that some of these purported trade secrets have already been disclosed in patents. *See* (D.I. 1, ¶50 (Mr. "Blumenthal's **patented** 'adjustability' solution cured the flawed half a billion dollar Philips technology and made it a marketable product") (emphasis added), ¶54 ("The 3DFusion **patent filing** and thus R3D's technology provided the 'adjustability' key, whose essential foundation components opened the door for all future advancements") (emphasis added)).

54.     The purported trade secrets in Schedule A of the April 9, 2019 Term Sheet between Stream and Rembrandt are also vague, cover patented technology, or were otherwise known to others in the industry.

<div style="border:1px solid black; padding:10px;">

**SCHEDULE A**

1.  Knowhow and trade secrets related to methodology for:
a.  efficiently converting, correcting and optim   ng a 2D+Depth video for playback on a 3D autostereoscopic as    iated with the Phi  p  technology
b.  utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
c.  utilizing the On Screen Display functions of Borders and "Liveliness."
2.  Trademarks
3.  the patents asserted in Remb  andt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

</div>

(D.I. 1, Ex. 5, Sch. A.)

46

55.     For instance, the <u>first</u> identified category of "efficiently converting, correcting and optimizing a 2d+ Depth video for playback on a 3D autosteroscopic associated with the Philip technology" does not explain even in general terms the method by which the "converting, correcting and optimizing" occur.

56.     This same concept also appears to be discussed in the patents assigned to Mr. Blumenthal and Rembrandt.  For example, in U.S. Patent No. 9,521,390 ("the '390 Patent"), Mr. Blumenthal describes his patented invention as follows:

> Accordingly, the inventive techniques close the loop, and allow ***the use of a conventional 3DVC server to convert 2D content media not only into a 2D+Depth format***, utilizing one or more DBIR techniques, but to also ***automatically convert 2D content media into highly desirable and commercially viable stereoscopic 3D medial content*** that is necessary for all 3D glasses-based display systems, large and small, thereby enabling a highly attractive and cost effective solution to be offered during the inevitable transition between from 3D glasses-based display systems to ASD systems.

(D.I. Ex. 12, col. 12, ll. 16-26.)

57.     Rembrandt admits that this "secret" was allegedly "based on the technology included in a patent application filed by Mr. Blumenthal." (D.I. 19, Ex. 6 at 17-18.)

58.     The <u>second</u> category in the term sheet – "utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of a 'lightfield' and 3d content artefact correction" – is also vague and appears to be the same technology Mr. Roelen allegedly stole and disclosed to Stream, and in turn made public in patent applications and products sold to the public more than a decade ago:

> o   During an October 8, 2010 meeting with Stream, [Mr.] Blumenthal allegedly "explained how the ***lens design for the 3DASD*** monitors was critical to matching the content to, and went over the ***2d switchable technology***," which allegedly caused Rajan to ask "Now I can do what you do. What do I need you for?" (SDNY, ¶68). [Mr.] Blumenthal later alleged that Stream did indeed steal and publicly disclose his alleged confidential technology.  (D.I. 1, Ex. 22, ¶¶44

47

(Stream "attempt[ed] to patent my technology as their own")).

    o   [Mr.] Blumenthal allegedly developed "lens design aspects of the 3D lenticular lens, which [Mr.] Blumenthal had been working on with Corning . . . which were believed to be essential to the proper implementation of the product." (SDNY, ¶94). [Mr.] Blumenthal had a September 3 meeting with Corning and [Mr.] Roelen, an "objective" of which "was to share 3DFusion Intellectual Property and **Trade Secret concepts** with Corning and to explore Corning's ability to make certain improvements in the **2D switchable lens design** and manufacturing. During the course of this meeting [Mr.] Blumenthal and Corning disclosed substantial Confidential Information to [Mr.] Roelen." (*Id.*, ¶97). Rembrandt alleges that "subsequent to this meeting with Corning Glass, [Mr.] Roelen in violation of his agreement with and or obligations owed to 3DFusion disclosed the Confidential Information to Stream who then utilized and/or incorporated the Confidential Information in their products and technology." (*Id.*, ¶98). [Mr.] Roelen also "had subsequent meetings [with Corning] to discuss this technology after he terminated his employment . . . in violation of the NDAs that [Mr.] Roelen was subject to." (*Id.*, ¶101).

59.    Rembrandt explained that this "switchable lens" is allegedly used "to neutralize depth map ghosting artifacts" (D.I. 19, Ex. 6 at 20-21), but the concept of using a "display" to correct "ghosting artifacts" was already disclosed in Rembrandt's patents.

60.    The <u>third</u> category in the term sheet – "using the On Screen Display function of Borders and 'Liveliness'" – is just as vague as the other categories. It also appears to be the same technology Rembrandt alleges Messers. Roelen and Barenbrug stole and published in a patent application. As [Mr.] Blumenthal stated:

    I also learned in or about 2017 that [Messrs.] Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled 'Depth Adjustment of an Image Overlay in a 3D Image' on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose **the Confidential Information in violation of their NDAs** such as, for example, **the border-blending and depth smoothing functions** or features described in a least paragraphs [0076], [0077], [0081], and [0082] of the 14/428,866 application.

(D.I. 1, Ex. 22, ¶33.)

61.     The final Settlement Agreement and Mutual Release between Rembrandt, Stream, and the Rajans dated May 23, 2021 ("Settlement Agreement") did not include a provision requiring the parties to keep the other's alleged trade secrets confidential. (D.I. 1, Ex. 2.)  It also did not include any provision stating that the purported trade secrets identified in Schedule A were otherwise valid.

62.     On information and belief, Rembrandt did not have any protectable trade secrets regarding the technology at-issue in this case when it filed this action.

63.     For at least these reasons, Rembrandt's claims against SeeCubic are without merit and are nothing more than another attempt to hinder SeeCubic's ability to obtain what is rightfully owed to it and impede SeeCubic's business.

**B.    Rembrandt continues to tortiously interfere with SeeCubic's Business Relations and unfairly compete with SeeCubic.**

64.     On June 29, 2023, in Dutch proceedings concerning the control over SCBV, the Dutch court appointed Jasper Berkenbosch ("Mr. Berkenbosch") of the law firm Jones Day as an independent director of SCBV pending resolution of Stream's third bankruptcy filing.

65.     Rembrandt, a non-party to the Dutch proceedings, saw yet another opportunity to prevent SeeCubic from recovering on debts owed to it.

66.     On July 27, 2023, after learning that the independent director of SCBV was finalizing a contract with a confidential customer for the purchase of certain 3-D televisions, and despite knowing that SCBV's employees believed that "the IP which Rembrandt claims to have a patent on, is not used in this product," Rembrandt's CFO, Mr. Michaels, emailed Mr. Berkenbosch demanding that SCBV not make any product "other than for Stream or Rembrandt" and that "all revenue from sales of any product or services that include Rembrandt IP go to the entity that is paying Rembrandt."  (Ex. B at 9.)  He also misleadingly claimed that "Rembrandt has litigated its

IP rights and claims in six different courts to date" and that Rembrandt's settlement with Stream resolving its **contractual claims** was a result of "litigating whether Rembrandt's **trade secrets** had been incorporated into Stream's products." (*Id.* at 8-9.)

67.     On August 7, 2023, three days after this Court denied Rembrandt's Motion for Preliminary Injunction (D.I. 26), Rembrandt's CFO, Mr. Michaels, penned another email to Mr. Berkenbosch, taking an even more aggressive approach. In that email, Rembrandt lodged several threats to Mr. Berkenbosch and Jones Day in an apparent attempt to convince Mr. Berkenbosch to step down from the board. (Ex. B at 4-7). The threats included, but were not limited to:

a. "You and Jones Day will be liable for the damages of your misappropriation." (*Id.* at 5.)

b. "You and Jones Day are taking on immense liability at the encouuagement [sic] of people that are showing up in court and arguing that it isn't them conducting the misappropriation but rather the director in the Netherlands and the judge even noted it his decision." (*Id.*)

c. "To be clear, I am hereby putting you personally and Jones Day on notice of Rembrandt's claim and that use of Rembrandt technology will trigger at a minimum the value of the license with Stream." (*Id.*)

d. Mr. Michaels threatened Mr. Berkenbosch and Jones Day with damages in the range of "$1.2-1.5 billion" even though Stream told the Bankruptcy Court that its agreement with Rembrandt was worth roughly $1.5 million – one hundred times less. (*Id.*)

e.  "Our license fee is roughly ½ of your firm's annual revenue and Seecubic, BV has almost no assets or revenue, so as a practical matter your firm is the only entity that can afford to pay the license fee."  (*Id.*)

f.  "We are also considering petitioning for a FRCP Rule 27 pre-litigation deposition of Jones Day . . . or adding Jones Day, and/or other Seecubic [sic] BV employees to the pending Delaware action or a new action in the Southern District of New York."  (*Id.* at 6)

68.  Upon information and belief, Rembrandt made these threats despite knowing that the Final Settlement Agreement between Stream and Rembrandt states that "[t]his Agreement shall be binding on, and shall be enforceable against, and shall inure the benefit of the Parties to this Agreement *and their respective [ ] subsidiaries*."  (D.I. 1, Ex. 2 at § 22.)  In other words, SCBV, as Stream's subsidiary, has a license commensurate in scope with the license that Stream purportedly has.

69.  Jones Day, on behalf of Mr. Berkenbosch, responded that same day, noting that SCBV employees were "urg[ing] the director to cooperate with delivery of the samples they have been working on over the last years." (Ex. B at 3.)

70.  Despite these pleas, Mr. Michaels followed up his threats with inappropriate requests for discovery from Mr. Berkenbosch and Jones Day purportedly *for the above-captioned matter* without a valid subpoena or request made pursuant to the Hague Convention.  (*Id.* at 1.) This included a demand for "the names" and "any information regarding the individuals" at SCBV who saw through Rembrandt's baseless trade secret claims for what they were and advised the independent director that the proposed contract with the confidential customer did not involve Rembrandt IP.  (*Id.*)  Mr. Michaels attempted to justify the request for information, which

presumably would send confidential information directly to Rembrandt's **executives**, as proper under District of Delaware "local rule 26.2" without the need for a protective order.  (*Id.*)

71.    Mr. Michaels concluded his email as follows:

I am asking your firm and the independent director to provide such information ahead of seeking such a petition, but we will use failure to provide the information as grounds for our petition for a pre-litigation deposition.

(*Id.* at 1.)

72.    Ultimately, Rembrandt's threats worked to the great detriment of SeeCubic, as Mr. Berkenbosch subsequently resigned as SCBV's independent director.

73.    Thanks to Rembrandt's efforts, to this day control over SCBV remains unresolved and the debt owed to SeeCubic remains unpaid.

## COUNT I
### Declaratory Judgment of No Misappropriation of Trade Secrets

74.    SeeCubic incorporates all other allegations in these Counterclaims.

75.    Rembrandt's trade secret misappropriation claims in this action have created an actual case or controversy between the parties concerning Rembrandt's claims that its alleged trade secrets were misappropriated.

76.    Rembrandt has no protectable trade secrets.

77.    SeeCubic has not misappropriated any of Rembrandt's purported trade secrets.

78.    Rembrandt also did not exercise reasonable efforts to keep its information confidential as Rembrandt allowed the public disclosure of its trade secrets for nearly twelve (12) years before filing a misappropriation claim.

79.    Rembrandt's trade secret claims are time-barred pursuant to 6 *Del. C.* § 2006 as the first misappropriation and public disclosure by a third party occurred in 2012.

80.    Rembrandt's claims are also barred by the doctrine of laches.

81.    SeeCubic is entitled to a declaratory judgment that SeeCubic has not misappropriated any purported trade secrets of Rembrandt.

## COUNT II
### Tortious Interference with Existing and Prospective Business Relations

82.    SeeCubic incorporates all other allegations in these Counterclaims.

83.    Rembrandt has continually interfered with SeeCubic's efforts to collect on the debts owed to it by SCBV, Stream, Ultra-D Coöperatief U.A., Stream TV International B.V., and others. Rembrandt has also interfered with SeeCubic's business and its relationships with potential customers more generally.

84.    SeeCubic had a valid business relationship or expectancy with SCBV and others.

85.    Rembrandt has blocked SeeCubic from recovering on at least $37 million in debt from SCBV and establish control over SCBV, which has been grossly mismanaged financially by Stream for many years.

86.    Rembrandt had knowledge of SeeCubic's valid business relationship or expectancy with SCBV and others, and had knowledge of the debt owed to SeeCubic, at the time of its unlawful interference.

87.    Rembrandt intentionally interfered with SeeCubic's valid business relationships or expectancy with SCBV and others by bringing frivolous claims of trade secret misappropriation against SeeCubic and otherwise interfering with SeeCubic's ability to conduct business.

88.     Rembrandt has used the Settlement Agreement with Stream to make baseless claims against SeeCubic, SCBV, and others, all in attempting to prevent SeeCubic from obtaining what it is owed.

89.     Stream was induced by Rembrandt to enter into the Settlement Agreement to prevent SeeCubic from obtaining any Stream assets.

90.     Rembrandt's interference has greatly harmed SeeCubic.

### COUNT III
### Unfair Competition

91.     SeeCubic incorporates all other allegations in these Counterclaims.

92.     Rembrandt has engaged in unfair competition by wrongfully interfering with SeeCubic's efforts to collect on the debts owed to it by SCBV, Stream, Ultra-D Coöperatief U.A., Stream TV International B.V., and others.

93.     SeeCubic had a valid business relationship or expectancy with SCBV and others.

94.     Rembrandt has blocked SeeCubic from recovering on at least $37 million in debt from SCBV and establish control over SCBV, which has been grossly mismanaged financially by Stream for many years.

95.     Rembrandt had knowledge of SeeCubic's valid business relationship or expectancy with SCBV and others, and had knowledge of the debt owed to SeeCubic, at the time of its unlawful interference.

96.     Rembrandt intentionally interfered with SeeCubic's valid business relationships or expectancy with SCBV and others.

97.      Rembrandt has used the Settlement Agreement with Stream to make baseless claims against SeeCubic, SCBV, and others, all in attempting to prevent SeeCubic from obtaining what it is owed.

98.     Stream was induced by Rembrandt to enter into the Settlement Agreement to prevent SeeCubic from obtaining any Stream assets.

99.     Rembrandt's interference and unfair competition has greatly harmed SeeCubic.

## JURY DEMAND

100.    SeeCubic demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

101.    WHEREFORE, SeeCubic respectfully asks that the Court enter judgment against Rembrandt as follows:

a.    A declaration that SeeCubic has not misappropriated Rembrandt's purported trade secrets;

b.    An injunction enjoining Rembrandt and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with it, from engaging in further acts of tortious interference and unfair competition;

c.    An award to SeeCubic for its damages, costs, expenses, and pre-judgment and post-judgment interest for Rembrandt's tortious interference and unfair competition;

d.    An award of punitive damages for Rembrandt's tortious interference and unfair competition;

e.    Reasonable attorneys' fees and costs against Rembrandt; and

f.    For any and all other relief to which SeeCubic may show itself to be entitled.

GREENBERG TRAURIG, LLP

*/s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)
Lisa Zwally Brown (#4328)
Renée Mosley Delcollo (#6442)
GREENBERG TRAURIG, LLP
222 Delaware Ave., Suite 1600
Wilmington, DE 19801
Phone: (302) 661-7000
Fax: (302) 661-7360
schladweilerb@gtlaw.com
brownli@gtlaw.com
renee.delcollo@gtlaw.com

*Counsel for Defendant SeeCubic, Inc.*

Dated: August 18, 2023