**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.<br>and Technovative Media, Inc.,<br><br>Debtors.[1] | Chapter 11<br><br>Bankr. Case No. 23-10763 (MDC) |
| Stream TV Networks, Inc., *et al.*<br><br>Plaintiffs<br>v.<br><br>Shadron L. Stastney, *et al.*<br><br>Defendants. | Adv.  Case No. 23-00057 (MDC) |

**SEECUBIC, INC.'S MEMORANDUM OF LAW IN OPPOSITION
TO DEBTORS' MOTION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**

---

[1]      The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT................................................................................8

RELEVANT BACKGROUND...........................................................................10

    A.    Stream And Technovative Do Not Own The Ultra-D Intellectual Property ..........10

    B.    At Various Times, Ultra-D Has Incorporated Technology That Was
Developed By Third Parties....................................................................12

        1.    Certain Of Stream's Indirect Subsidiaries Have A Non-Exclusive
License From Philips ....................................................................12

    C.    Rembrandt's Technology Is No Longer Used In Ultra-D ....................................13

    D.    SeeCubic Does Itself Not License Or Sublicense Any Ultra-D Intellectual
Property..........................................................................................14

    E.    SeeCubic Returned Stream's Assets .....................................................16

    F.    The Parties Are Engaged In An Ongoing Dispute In The Netherlands .................17

    G.    The Present Motion.............................................................................19

LEGAL STANDARD .......................................................................................20

ARGUMENT .................................................................................................21

I.    THE MOTION SUFFERS FROM A NUMBER OF THRESHOLD
FUNDAMENTAL FLAWS THAT WARRANT DENIAL IN ITS TOTALITY ...............21

    A.    The Motion Is A False Crisis ................................................................21

    B.    The Motion Is An Attempt At Overreach.................................................22

        1.    The Debtors Requested Relief Is Overbroad And, In Some
Instances, Cannot Be Granted.....................................................22

        2.    The Motion Seeks Extraordinary Relief Against A Number Of
Defendants Who Have Not Been Properly Served And Who May
Not Have Notice Of The Motion .................................................23

    C.    The Motion Is Unmoored From The Complaint's Asserted Causes Of
Action............................................................................................25

II.    DEBTORS HAVE NOT SHOWN A REASONABLE LIKELIHOOD OF
SUCCESS ON THE MERITS OF ANY CLAIM............................................................26

A.     SeeCubic Is Not Violating The Intellectual Property Rights Of Stream Or Any Other Party ..........................................................................................26

    1.     The Motion Fails As A Matter Of Law On Any Intellectual Property-Based Claims For Several Reasons ............................................26

       (a)     The Debtors Do Not Own The Ultra-D Intellectual Property........26

       (b)     Stream Does Not Have Standing To Assert Rights For Philips ..................................................................................................27

       (c)     Stream Does Not Have Standing To Assert Rights For Rembrandt, Which Filed Its Own Intellectual Property Case Seeking A TRO And Failed..................................................................28

       (d)     The Conduct Debtors Complain Of In The Motion Is Occurring At SCBV, Not SeeCubic, And SCBV Is Outside Of This Court's Jurisdiction..........................................................28

    2.     Debtors Do Not Meet Their Burden Of Showing A Likelihood Of Success On The Merits Of Any Intellectual Property Claim Because The Weight Of The Evidence Disproves Debtors' Factual Assertions......................................................................................29

       (a)     The Philips License Permits Sublicensing.....................................29

       (b)     SeeCubic Does Not Itself Grant—Does Not Intend to Grant—Any Licenses Or Sublicenses Related to Ultra-D, Philips, Or Rembrandt ..................................................................30

       (c)     All Customer Contracting Occurs At The SCBV Level ................30

B.     Debtors Cannot Show A Likelihood Of Success On The Merits Of Any Claim Related To Control Of The Dutch Entities....................................................31

C.     Debtors' Claims With Respect To Broadly Described Assets Also Fail ................33

    1.     Debtors Make No Showing Of Likelihood Of Success On The Merits ........................................................................................33

    2.     SeeCubic Has Returned Stream's Assets In Compliance With The Court Of Chancery's Orders .....................................................35

III.     DEBTORS HAVE NOT CARRIED THEIR BURDEN TO DEMONSTRATE THAT THEY WILL BE IRREPARABLY HARMED ABSENT A TRO ..........................35

A.     Debtors Fail to Affirmatively Demonstrate Any Non-Speculative, Affirmative Evidence Of Irreparable Harm ...........................................................36

      B.      Debtors Could Be Made Whole With Money Damages ........................................39

IV.    DEBTORS CANNOT PREVAIL ON EITHER BALANCE OF THE
       HARDSHIPS OR BENEFIT TO THE PUBLIC INTEREST FACTORS ........................39

CONCLUSION ...........................................................................................................................41

# TABLE OF AUTHORITIES

**CASES**                                                                                                   **PAGE(S)**

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994)................................................................30

*Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc.*,
    145 F. Supp. 3d 311 (D. Del. 2015)..................................................30

*Azure Networks, LLC v. CSR PLC*,
    771 F.3d 1336 (Fed. Cir. 2014).......................................................20

*Ball v. Famiglio*,
    396 F. App'x 836 (3d Cir. 2010) ...............................................13, 17

*Bestway Inflatables & Materials Corp. v. Mills*,
    2022 U.S. Dist. LEXIS 77826 ........................................................30

*Campbell Soup Co. v. ConAgra, Inc.*,
    977 F.2d 86 (3d Cir. 1992)..............................................................27

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)........................................................................21

*Clarity Sports Int'l LLC v. Redland Sports*,
    400 F. Supp. 3d 161 (M.D. Pa. 2019) .............................................26

*Danziger & De Llano, LLP v. Morgan Verkamp LLC*,
    948 F.3d 124 (3d Cir. 2020).............................................................16

*Easter v. City of Dallas Probate Division*,
    No. 21-CV-0860-D (BH), 2022 WL 2975349 (N.D. Tex. June 27, 2022).......................20

*Ellakkany v. Common Pleas Court of Montgomery Cnty.*,
    658 F. App'x. 25 (3d Cir. 2016) .....................................................12

*EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.*,
    594 F. Supp. 2d 570 (E.D. Pa. 2009) .............................................29

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
    765 F.3d 205 (3d Cir. 2014)............................................................12

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988)......................................................31, 32

*Greene v. Bradley*,
   No. 4:21-CV-00026, 2021 WL 1978439 (M.D. Pa. May 18, 2021)................................18

*Herley Indus., Inc. v. R Cubed Engineering, LLC*,
   No., 2021 WL 229322 (E.D. Pa. Jan. 22, 2021) ................................................19

*Hope v. Warden York County Prison*,
    956 F. 3d 156 (3d Cir. 2020)................................................................12

*In re M.T.G.*,
   646 B.R. 1 (Bankr. E.D. Mich. 2022) .......................................................20

*In re Stream TV Networks, Inc.*,
   No. 23-10763 (Bankr. E.D. Pa. Mar. 28, 2023) ..............................................4

*Jones v. GEICO Choice Ins. Co.*,
   617 F. Supp. 3d 275 (E.D. Pa. 2022) .......................................................26

JSG Trading Corp. v. Tray-Wrap, Inc.,
    917 F.2d 75 (2d Cir. 1990)................................................................31

*Knit With v. Knitting Fever, Inc.*,
   Nos. 08-4221, 08-4775, 2010 WL 2788203 (E.D. Pa. July 13, 2010)...........................17

*Kos Pharm., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)................................................................33

*Marxe v. Jackson*,
   833 F.2d 1121 (3d Cir. 1987)...............................................................28

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)........................................................................12

*Nagy v. Riblet Prods. Corp.*,
   79 F.3d 572 (7th Cir. 1996) ...............................................................27

*Nutrasweet Co. v. VitMar Enters.*,
   176 F.3d 151 (3d Cir. 1999)................................................................13

*Omni Capital Int'l v. Rudolf Wolff Co.*,
   484 U.S. 97 (1987).........................................................................16

*Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*,
   143 F.3d 800 (3d Cir. 1998)................................................................30

*Phillips v. Selig*,

959 A.2d 420 (Pa. Super. 2008) .......................................................................27

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 1999) ..............................................................13, 31, 32

*Roe v. Wyndham Worldwide, Inc.*,
Civil Action 18-1525-RGA-SRF (D. Del. Aug. 21, 2023) ...............................16

*Phyllis Schlafy Revocable Tr. V. Cori*,
No. 4:16CV01631 JAR, 2016 WL 6611133 (E.D. Mo. Nov. 9, 2016) ..............19

*Power Integrations, Inc. v. Silane Semiconductors North America, Inc.*,
No., 2020 WL 3508078 (D. Del. June 29, 2020) .............................................19

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
279 A.3d 323 (Del. 2022) .................................................................................33

*Texas v. Seatrain Int'l, S. A.*,
518 F.2d 175 (5th Cir. 1975) .............................................................................32

*Ultrapure Sys. Inc. v. Ham-Let Grp.*,
921 F. Supp. 659 (N.D. Cal. 1996) ..................................................................20

*W. Chester Design Build, LLC v. Moses*,
No. CV 22-1911, 2022 WL 15524950 (E.D. Pa. Oct 27, 2022) .......................26

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008) ..............................................................................................13

## **STATUTES AND RULES**

Fed. R. Civ. P. 4(f)(1) ...............................................................................................17

Fed. R. Civ. P. 4(f)(2)(A) ..........................................................................................17

Fed. R. Civ. P. 4(f)(2)(C)(ii) ......................................................................................17

Fed. R. Civ. P. 4(f)(3) ...............................................................................................17

Fed. R. Civ. P. 4(l)(2) ...............................................................................................16

## **<u>PRELIMINARY STATEMENT</u>**

Debtors Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc.

("Technovative") ask this Court to enter the extraordinary remedy of a temporary restraining

order ("TRO") or preliminary injunction (the "Motion," ECF No. 30).[2]  Debtors do not come

close to meeting their burden of demonstrating entitlement to such relief.

At a high-level, and as a threshold matter, the Motion itself is facially defective in many

ways as a matter of law:

- In shotgun pleading style, the Motion frequently refers to and seeks to enjoin the alleged conduct of "Defendants"—a group of 15 individuals and entities across multiple countries—in many instances making no specific allegations against certain Defendants;

- Relatedly, the Motion seeks to enjoin "Defendants," but there is no indication that all Defendants—particularly the foreign Defendants—have even been properly served with the Summons and Complaint, much less the Motion;

- The Motion seeks an end-run around the jurisdiction and rulings of other courts.  For example, Debtors ask this Court to insert itself into the parties' dispute in the Netherlands concerning who the director of the Dutch Subsidiaries is under Dutch law—over which this court has already determined it lacks jurisdiction and in which a Dutch court has issued *several* rulings that would be contradicted by Debtors' proposed relief; and

- The Motion is almost entirely untethered to the Complaint in this action.  The Motion fails to even specifically identify causes of action for which Debtors assert that they have a likelihood of success on the merits in order to support the Motion—much less cite any case law and facts that might actually *demonstrate* a likelihood of success on the merits.

These defects alone should result in denial of the Motion.

On the substance, the Motion fares no better.  The Motion's allegations cover a grab-bag

of topics, none of which is sufficient to support Debtors' request for relief.  The primary thrust of

---

[2]      Hereinafter, unless otherwise specified, citations to "Mot." refer to Debtors'
Memorandum of Law, ECF No. 30-1.

Debtors' allegations is that SeeCubic, Inc. ("SeeCubic") is currently—and plans to in the future—infringe upon or misappropriate the intellectual property rights of (i) Debtors; (ii) non-party Koninklijke Philips Electronics N.V. ("Philips"); and (iii) non-party Rembrandt 3d Holdings Ltd. ("Rembrandt").  According to the Debtors, SeeCubic currently is or plans to improperly use, license, or sub-license technology belonging to Debtors, Philips, and Rembrandt.  But this premise is faulty, because among other things:

- Debtors have been making related allegations for *months* and yet only sought emergency relief now, undercutting any notion that relief is immediately necessary;

- The Motion's overwhelming theme is that SCI is or is threatening to misuse intellectual property belonging to Philips and Rembrandt.  As a matter of law, as non-exclusive licensees, Debtor ***does not have standing*** to enforce or vindicate any intellectual property rights held by these third parties; and

- Indeed, Rembrandt is already separately actively litigating intellectual property claims against SeeCubic.  Just two months ago, Rembrandt sought its own TRO and preliminary injunction—and was denied.  Debtors cannot and should not be able to obtain relief on behalf of a third-party that another court already found the third-party was not entitled to.

Debtors attempt to solve these fundamental standing problems by arguing that SeeCubic's actions somehow may cause Debtors to breach Debtors' own licenses with Philips and Rembrandt.  According to Debtors, Debtors would be harmed if they committed such a breach.  This effort fails.  The Motion does not substantiate this argument with *any* statements of fact or legal authorities that would support the proposition that any actions by *SeeCubic* can or would be attributed to Debtors by Philips, Rembrandt, or the Court.  Debtors do not control SeeCubic.  Debtors do not have influence over SeeCubic.[3]

---

[3] To the extent that Philips or Rembrandt have concerns about SCI's conduct, Philips and Rembrandt may assert their rights in the appropriate forum.  Indeed, as the Court is aware, Rembrandt *already* has brought suit against SCI in the District of Delaware and is actively litigating that case.

Debtors' intellectual property-based arguments also fail because the weight of the evidence supports SeeCubic. Debtors' central premise—that SeeCubic has, is, or intends to license or sublicense the intellectual property of Debtors, Philips, or Rembrandt—is simply wrong. Rather, licensing for Ultra-D, including any sub-licensing to the extent it exists, is done by SeeCubic B.V. ("SCBV"), a non-Debtor, indirect subsidiary which owns most of the intellectual property associated with Ultra-D. Other examples abound. For instance, Debtors assert that sublicensing is not permitted under the Philips license. Debtors ignore, however, a 2014 amendment to that license which expressly permits sublicenses.

The Motions' remaining allegations and arguments are likewise both legally and factually deficient. Debtors sprinkle the Motion with allegations concerning SeeCubic's alleged failure to return assets following the Delaware Supreme Court Opinion, and SeeCubic's purported interference with the Debtors' governance over SCBV and the other Dutch Entities (defined below). SeeCubic has, however, returned Stream's assets and this Court has already stated that it "does not have jurisdiction over" SCBV. (A court that does have jurisdiction over SCBV, however, recently sided with SeeCubic—a decision Debtors seek to have this Court undo.) There is simply no basis for Debtors to obtain a TRO on these topics.

Whichever the theory, Debtors fail to meet their burden to show a TRO is warranted.

## RELEVANT BACKGROUND

### A.      Stream And Technovative Do Not Own The Ultra-D Intellectual Property

Between 2011 and 2020, Stream borrowed tens of millions of dollars from SLS Holdings VI, LLC ("SLS") and Hawk Investment Holdings Ltd. ("Hawk"; together, the "Secured Creditors") on a secured basis. With interest, those loans are valued at well in excess of $150 million. In exchange for the loans and pursuant to several security agreements and pledge

10

agreements, Stream granted SLS and Hawk security interests in substantially all of its assets, which are defined under the operative documents as "Collateral."

The Stream corporate family is a development-stage business with no commercialized products and that has only ever had minimal revenue. Stastney Decl. ¶ 4. The primary and most valuable assets associated with the Stream family of companies is the "Ultra-D" technology (namely, the intellectual property rights in that technology and prototypes in development). *Id.* The Ultra-D technology has been developed, and continues to be developed, by a group of subsidiaries (and key employees) in the Netherlands including Ultra-D Coöperatief U.A. ("Coop"), Stream T.V. International B.V., and SeeCubic B.V. ("SCBV"). *Id.* SCBV and the other Dutch subsidiaries (together, the "Dutch Entities") are indirect subsidiaries of Debtor Technovative, Inc. ("Technovative"). Ex. 1.[4]

Stream is a holding company (*id.*)[5] that owns none, or virtually none—of the intellectual property related to Ultra-D. Stastney Decl. ¶ 6; *see also* Ex. 2 (list of patents filed by Debtors listing entities *other than* Debtors as the owners of the patents); Aug. 17, 2023 Hr'g Tr., *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa.) ("*Current Chapter 11 Cases*"), at 163-64 (M. Rajan testimony that Stream does not own any of the Ultra-D patents). Similarly, Technovative is a holding company, not an operating company. (Ex. 1.) It holds no intellectual property related to Ultra-D. *Id.* Instead, the intellectual property associated with Ultra-D is

---

[4]    Citations to "Ex. __" are to the exhibits to the Declaration of Shadron L. Stastney, filed herewith.

[5]    *See also* Decl. of M. Rajan, *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. Mar. 28, 2023), ECF No. 48 ¶ 23.

owned largely by SCBV, with other pieces owned by Ultra-D Ventures, C.V. ("Ventures") and the

other Dutch Entities.  Stastney Decl. ¶ 7; Ex. 1.[6]

### B. At Various Times, Ultra-D Has Incorporated Technology That Was Developed By Third Parties

#### 1. Certain Of Stream's Indirect Subsidiaries Have A Non-Exclusive License From Philips

The Ultra-D technology was originally developed by Philips in the Netherlands starting

in the early 2000s; Philips owned numerous patents, trade secrets, know-how, and other

intellectual property associated with Ultra-D.  Stastney Decl. ¶ 9.  Stream created SCBV as a

subsidiary so that the Philips engineering team that had been working on Ultra-D could continue

their work after Philips decided to exit the 3D business.  *Id.*; *see also* Aug. 15, 2023 Hr'g Tr.,

*Current Chapter 11 Cases*, at 134-35 (M. Rajan).

The Ultra-D technology still utilizes certain aspects of technology that were developed by

Philips and in which Philips has intellectual property rights.  In 2011, Philips granted Coop a

non-exclusive license to use its intellectual property to develop, manufacture, and sell Ultra-D

products (the "Philips License," Ex. 3).  While the Philips License did not permit Coop to

sublicense the Philips intellectual property, the Philips License did allow "Affiliates" of the

parties to that license to use the Philips intellectual property.  *Id.* ¶¶ 2.1-2.3.  "Affiliates" was

defined to include, among other things, any entity owned or controlled by Coop or any entity

owned or controlled by an entity that owned or controlled Ultra-D.  *Id.* ¶ 1.7.  Coop, itself largely

a holding company, is the parent company of SCBV.  Ex. 1.  Accordingly, SCBV was permitted

under the original Philips License to use the Philips intellectual property as it continued to

---

[6]     Ventures is SCBV's immediate parent company, and an indirect subsidiary of both
Stream and Technovative.  (Ex. 1.)

develop Ultra-D; neither Coop nor SCBV, however, could sublicense the Philips technology to an unaffiliated third party.  Stastney Decl. ¶ 10.

In 2014, the Philips License was amended (the "Philips License Amendment," Ex. 4).  Raja Rajan signed on behalf of Coop and Ventures.  *Id.*  Among other things, the Philips License Amendment added Section 2.15(a) to the Philips License, "Parallel License Arrangements."  This provision was added to permit sub-licensing, stating in relevant part that,

> The Parties both acknowledge that for certain applications and uses of 3D technology, third party users may need to obtain a license under the Intellectual Property Rights related to 3D display technology, conversion and rendering technology and 3D video format of ULTRA-D ("ULTRA D Technology") and under intellectual property rights related to 3D display technology of Philips ("Philips Technology").  The Parties both confirm their willingness to offer licenses under said respective intellectual property rights with respect to such applications and uses to third party users, on reasonable conditions.

The Philips License, including the Philips License Amendment, currently is owned by Ventures as licensee—not Debtors.  Stastney Decl. ¶ 12.  Patents related to Ultra-D derived from the Philips technology are also currently owned by Ventures.  *Id.*; *see also* Ex. 2.  Know-how, copyrights, and other intellectual property related to Ultra-D derived from the Philips technology are currently owned by SCBV.  Stastney Decl. ¶ 12.

## C.    Rembrandt's Technology Is No Longer Used In Ultra-D

During certain periods, the Ultra-D technology utilized certain technological features in which Rembrandt holds intellectual property rights.  Stastney Decl. ¶ 13.  Since at least 2020, however, the Ultra-D technology in development by SCBV no longer uses any of the features covered by or subject to Rembrandt intellectual property rights.  *Id*.

Nonetheless, Rembrandt filed suit in the District of Delaware against SeeCubic, among others,[7] for misappropriation of trade secrets relating to work being done by SCBV.  Ex. 5, 6. Rembrandt sought a temporary restraining order and preliminary injunction in the summer of 2023 in that case.  *See* Ex. 5 at 4 (indicating filing of motion).  On August 1, 2023, the court denied Rembrandt's motion, finding that Rembrandt had not met its burden to show that it would be irreparably harmed absent preliminary relief.  *Id.* at 6-7.  In particular, the court found that the injury asserted by Rembrandt could be remedied by monetary compensation, such as through the purchase of a license from Rembrandt by SeeCubic.  *Id.*

### D.    SeeCubic Does Not Itself License Or Sublicense Any Ultra-D Intellectual Property

SeeCubic was created by the Secured Creditors to (i) receive the Collateral after Stream defaulted and (ii) continue to oversee and support the Dutch Entities' development of Ultra-D. Stastney Decl. ¶ 4 n.2.  If and when SeeCubic gains possession and ownership of the Collateral following resolution of the various legal proceedings between the parties, SeeCubic intends to pursue a business model whereby—through subsidiaries like SCBV—it licenses the Ultra-D technology to other entities. *Id.*[8]

To date, SeeCubic has *not* entered into any agreements with a customer (or potential customer) that would in any way grant (or purport to grant) a license of any kind related to Ultra-

---

[7]    Stream has a non-exclusive license to use Rembrandt's intellectual property; it is thus not a defendant in Rembrandt's Delaware suit.  *See* Sept. 22, 2023 Hr'g Tr., *Current Chapter 11 Cases*, at 33-34 (C. Michaels).)

[8]    SeeCubic is currently engaged in fundraising pursuant to a bridge loan agreement and subscription agreement which have been sent to SeeCubic shareholders.  Stastney Decl. ¶ 28. These agreements correctly state that there is no litigation pending against SeeCubic that SeeCubic "would expect to have a Material Adverse Event."  (Ex. 10.)  SeeCubic has explained to investors and potential investors the status of the parties' various litigations.

D. Stastney Decl. ¶ 18. Likewise, SeeCubic has *not* entered into any agreements with a customer (or potential customer) that would in any way grant (or purport to grant) a sublicense to any third-party technology related to Ultra-D—including any Philips or Rembrandt technology. *Id*. SeeCubic does not currently intend to license or sublicense any Ultra-D technology to any third party—including but not limited to any technology covered by Philips' intellectual property rights. *Id*.

While SeeCubic has not entered into any agreements that may involve a license to Ultra-D, SCBV has. Stastney Decl. ¶ 19. This is consistent with past practice at SeeCubic, which long pre-dated SeeCubic's existence or the parties' dispute. *Id*. Specifically, SCBV has granted end-user licenses to parties receiving demonstration units. Stastney Decl. ¶ 15. SeeCubic has such a license from SCBV. Stastney Decl. ¶ 16.

In recent years, SCBV has continued this activity. Debtors are well-aware of this fact. On October 17, 2022, Hawk filed suit against Stream and Technovative in the Court of Chancery (the "225 Action"). Stastney Decl. ¶ 19. On October 20, 2022, the Court of Chancery appointed a receiver to oversee Technovative (the "Receiver") and ensure that it operated only in the ordinary course. *Id*. Because Technovative is the indirect parent of SCBV, the Receiver also oversaw SCBV until he was displaced by Debtors' bankruptcy filing. *Id*. During the pendency of the receivership, the Receiver allowed both Stream and SeeCubic to propose projects and customer agreements related to Ultra-D. Ex. 8; Stastney Decl. ¶ 19. The benefits of any projects were to stay with SCBV, and any customer agreements were to be with SCBV as the counterparty. *Id*.[9]

---

[9]    This was because the indirect ownership of SCBV may ultimately stay with Stream or transfer to SeeCubic as a result of the parties' dispute. Whoever ultimately prevails, any value and benefits of projects utilizing SCBV's time, resources, and technology would not be wasted

*(cont'd)*

This structure persisted after the Receiver's displacement.  In June 2023, a Dutch court appointed an independent director to serve as the board for all of the Dutch Entities.  Stastney Decl. ¶ 20; *see* pp. 13-15, *infra*, for discussion of the Dutch legal proceedings).  The independent director, with input from both SeeCubic/Stastney and Stream/Rajan, implemented a protocol for operating SCBV while the parties' dispute remains pending similar to the protocol used by the Receiver.  Ex. 9; Stastney Decl. ¶ 20.

### E.    SeeCubic Returned Stream's Assets

Between December 8, 2020, and September 30, 2022, pursuant to orders issued by the Delaware Court of Chancery in 2020 and 2021, SeeCubic owned Technovative, its subsidiaries (including the Dutch Entities), and the other Collateral.  Stastney Decl. ¶ 37.  After certain of the Court of Chancery's earlier orders were overturned by the Delaware Supreme Court in 2022, SeeCubic transferred the equity of Technovative to Stream by updating Technovative's ledger to reflect Stream as the entity's owner.  Stastney Decl. ¶ 37.  Because most of the Stream corporate family's assets are in the Dutch Entities (*see* pg. 7, *supra*), which sit below Technovative, the transfer of the Technovative shares effectuated a transfer of substantially all of the Collateral back to Stream.  On October 3, 2022, ownership of the Technovative shares was vested in Stream in an order issued by the Court of Chancery.  Stastney Decl. ¶ 37.

In various other orders between June and October 3, 2022, the Court of Chancery directed SeeCubic to return specific other items of the Collateral to Stream, which had been raised by Stream in dozens of requests from counsel—even after Stream gained control of Technovative.  Stastney Decl. ¶ 38.  As is extensively documented, SeeCubic returned—or

---

on projects for the non-prevailing party.  Instead, it would stay with SCBV and ultimately benefit the prevailing party.  Stastney Decl. ¶ 19.

facilitated the return of—these items to Stream.  *Id*. (describing transfer of servers, websites,

email, demonstrator units, and other electronics); Exs. 19-26.

>     **F.     The Parties Are Engaged In An Ongoing Dispute In The Netherlands**

Since the fall of 2022, the parties have disputed whether Mr. Stastney or Mr. Rajan is,

under Dutch law, the proper and legal director of the Dutch Entities.  The dispute was not active

while the Receiver oversaw Technovative and the Dutch Entities.  After the Receiver was

displaced by Debtors' bankruptcy filing, the dispute once again came to the forefront.  In early

April 2023, SeeCubic, the Secured Creditors, and Mr. Stastney filed an action in the Netherlands

to adjudicate the issue.  Stastney Decl. ¶ 30.  Debtors are not parties to that action; Mr. Rajan is.

*Id*.  Although in mid-April 2023 this Court directed that the parties standstill on their activities in

the Netherlands, in late April, this Court made clear that it lacked jurisdiction over the Dutch

Entities.  *Id*.  Based on their conduct, all parties—including Debtors and Mr. Rajan—believed

that they could then resume activity in the Netherlands and actively advanced their disputes.

Stastney Decl. ¶ 31.

In June 2023, after an in-person hearing, the Dutch court entered an order finding that (i)

Mr. Rajan was an unfit director, (ii) it was disputed who had the right to appoint the new director,

which was subject to ongoing litigation in the US, and (iii) as a result, the Netherlands court

would need to appoint the director.  Ex. 16; Stastney Decl. ¶ 31.  Mr. Rajan did not appeal.

Stastney Decl. ¶ 31.

The Netherlands court appointed an independent director, who set a protocol for SCBV's

operations in consultation with both parties.  Ex. 9; Stastney Decl. ¶ 31.  After threats from

Debtors and Rembrandt, the independent director soon resigned.  Ex. 28; Stastney Decl. ¶ 32.  As

a result of the vacuum created by his resignation and the continued uncertainty over who was the

director of the Dutch Entities, in August 2023, SeeCubic, the Secured Creditors, and

Mr. Stastney again sought the assistance of the Dutch court.  Stastney Decl. ¶ 32.

The Dutch court held a hearing on September 13, 2023.  Stastney Decl. ¶ 33.  Mr. Rajan

appeared via Zoom and testified for several hours; Mr. Stastney appeared in-person and testified.

*Id*.  The Motion relies heavily on Messrs. Rajan and Robertson's characterization of

Mr. Stastney's testimony.  Mot. at 5.  The Motion's purported summary of Mr. Stastney's

testimony is inaccurate in multiple ways:

- Debtors assert that Mr. Stastney identified a sales pipeline of "twelve to thirteen customers" that SeeCubic was "working with."  Mr. Stastney testified that SCBV currently has three active projects and that SeeCubic and SCBV were in communication with other *potential* partners.  Stastney Decl. ¶ 22.

- Debtors assert that at the Dutch hearing, Mr. Stastney testified that SeeCubic has or intends to sublicense Ultra-D technology to third parties.  Mr. Stastney explained that SeeCubic has an end-user license from SCBV.  Stastney Decl. ¶ 23.

- Debtors assert that Mr. Stastney testified that "SeeCubic is in direct competition with Stream, though it is using a completely different business model; Stream intends to sell components to its customers whereas SeeCubic intends to license the technology to its customers."  Mr. Stastney, however, explained how there is *no* competition because all are projects run through SCBV: either Stream or the Secured Creditors will ultimately end up as the indirect owner of SCBV and will benefit from whatever projects SCBV is engaged in.  Stastney Decl. ¶ 25-27.

On September 20, 2023, the Dutch court issued its ruling, reaffirming its prior findings

that (i) Mr. Rajan was an unfit director, (ii) it was disputed who had the right to appoint the new

director, which was subject to ongoing litigation in the US, and (iii) as a result, the Netherlands

court would need to appoint the director.  Ex. 18.  The court considered an alternative option

presented by Mr. Rajan, but ultimately selected Mr. Stastney to serve as director of the Dutch

Entities while the parties' disputes are pending.  Stastney Decl. ¶ 34.  As the court-appointed

director of the Dutch Entities, in addition to general obligations under Dutch law for corporate

directors, Mr. Stastney is required to adhere to the protocol put in place by the prior independent

director regarding SCBV.  Ex. 9.  The protocol requires Mr. Stastney to consider in good faith

and on a neutral basis any projects for SCBV suggested by either Stream or SeeCubic.

Mr. Stastney is currently adhering to the protocol and will continue to do so.  Stastney Decl. ¶

35.

> **G.**     **The Present Motion**

On September 30, 2023, a full seven weeks after they filed their Complaint in this action,

Debtors filed the Motion.  The Motion requests that the Court enter a TRO—an extraordinary

remedy—with respect to a variety of conduct the Debtors assert that SeeCubic and the other

Defendants are engaging in improperly and to the irreparable detriment to the Debtors.

The Motion largely focuses on licenses and related intellectual property the Debtors

allege (i) belong to Stream and/or Philips and Rembrandt and (ii) that SeeCubic is using in

violation of intellectual property rights and licensing agreements.  Mot. at 2, 4, 9; ECF Nos. 30-

5, 3-6.  The Debtors also weave in broad claims pertaining to SeeCubic's alleged failure to return

assets following the Delaware Supreme Court Opinion as well as SeeCubic's purported

interference with the Debtors' governance over SCBV and the other Dutch Entities.  Mot. at 9–

10.  The risk of permitting these violations to continue, the Debtors argue, is an uncertain

millions of dollars in lost investment, the vague possibility that the license providers revoke the

licenses, and nebulous damage to Stream's reputation.  Mot at 10–13.  Ultimately, the Motion

seeks a remedy that is incredibly broad.  The Debtors' Proposed Order (ECF No. 30–11) granting

the Motion provides sweeping injunctions against Defendants with respect to the "Stream

Bankruptcy Assets" generally, governance at SCBV, and purported interference with the licenses

and related intellectual property.

**LEGAL STANDARD**

A "[p]reliminary injuncti[on] . . . is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). A TRO is usually used as a means of preserving the status quo, *Hope v. Warden York County Prison*, 956 F. 3d 156, 160 (3d Cir. 2020), and "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ("TRO") or preliminary injunction. *See Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 F. App'x. 25, 27 (3d Cir. 2016) (applying one standard to a motion for both a TRO and preliminary injunction). For either form or relief, the movant bears the burden of establishing "a likelihood of success on the merits and that they likely face irreparable harm in the absence of the injunction. As these elements suggest, there must be 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Ball v. Famiglio*, 396 F. App'x 836, 837 (3d Cir. 2010) (citing *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)). The Debtors also bear the burden of showing that "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

Moreover, the movant must be able to demonstrate that *each* factor is present and warrants granting the motion. *Nutrasweet Co. v. VitMar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999) (emphasis added). The first two factors—likelihood of success on the merits and irreparable harm—are "gateway" factors. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 1999).

20

## ARGUMENT

I. **THE MOTION SUFFERS FROM A NUMBER OF THRESHOLD FUNDAMENTAL FLAWS THAT WARRANT DENIAL IN ITS TOTALITY**

Debtors have not carried their burden to establish that all of the factors support issuance of a TRO or preliminary injunction. *See* Parts II-IV, *infra*. As an initial matter, however, a number of threshold, fundamental flaws that permeate the Motion also warrant denial.

### A.    The Motion Is A False Crisis

Debtors attempt to cast the issues by their motion as an emergency necessitating the drastic remedy of a TRO, based on information they purportedly "just learned." Mot. at 2. Not so. Debtors first raised the allegations that they now contend warrant expedited relief almost immediately upon filing their Current Chapter 11 Cases in mid-March 2023. In particular, in March and April 2023, Debtors made a series of filings alleging that: (i) SeeCubic unlawfully retained and used—and continues to retain and use—Stream's assets following the Delaware Supreme Court's June 2022 opinion invalidating the Omnibus Agreement[10]; and (ii) SeeCubic's use of these assets is not licensed by certain third parties.[11,12] The Motion raises the *same fundamental allegations*. Mot. at 2, 4, 9, 10. Moreover, Debtors waited seven weeks between

---

[10]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Hawk Motions

[11]    *E.g.*, Declaration of Mathu Rajan*, Current Chapter 11 Cases*, ECF No. 48 (Mar. 28, 2023) ¶¶ 92-94, 103; Emergency Motion for Sanctions for Violation of the Automatic Stay, *id.*, ECF No. 49 (Mar. 28, 2023); Motion for Sanctions for Violation of the Automatic Stay, *id.*, ECF No. 76 (Apr. 5, 2023); Supplement to Motion to Stay, *id.*, ECF No. 90 (Apr. 7, 2023); Supplement to Motion for Sanctions for Violation of the Automatic Stay, *id.*, ECF No. 98 (Apr. 11, 2023).

[12]    SeeCubic disputes that it has failed to return assets to Stream as ordered by the Delaware Court of Chancery.

filing the Complaint and filing this Motion, raising doubts as to the urgency of the relief and the irreparable nature of the harm.

Debtors' apparent justification that they "just learned" of the [violations] following Mr. Stastney's September 13 testimony in the Netherlands, (Mot. at 2), is not compelling because Mr. Stastney provided testimony on these topics in June 2023. Specifically, in June 2023, during the hearing on the Hawk Motions, Shadron Stastney—SeeCubic's CEO—testified that SCBV, was engaged in ongoing work on proof of concept projects with SeeCubic for SeeCubic customers. *See* June 28, 2023, Hr'g Tr., *Current Chapter 11 Cases*, at 76-77. Debtors cross-examined Mr. Stastney at length on June 28 and 29. As part of that cross-examination, Debtors elicited testimony that Stream and SeeCubic are in the same line of business. *Id.* at 176-77. Debtors also questioned Mr. Stastney about their allegations that SeeCubic (i) has not returned Stream's assets and (ii) lacked necessary licenses. *Id.* at 205-06.

**B.  The Motion Is An Attempt At Overreach**

Several aspects of the Motion make clear that it is an attempt by Debtors to overreach the permissible bounds for obtaining a TRO or injunction and hamstringing SeeCubic's operations.

**1.  The Debtors Requested Relief Is Overbroad
And, In Some Instances, Cannot Be Granted**

Debtors' Proposed Order (ECF No. 30-11) is exceedingly overbroad, seeking to enjoin "Defendants" from a slew of purported conduct—even where the Motion makes no specific factual allegations concerning most of those Defendants. *See generally* Mot. Aside from that overall fundamental flaw, many of the specific proposed provisions should concern the Court. For example, Debtors seek to restrain SeeCubic and Mr. Stastney from "directing or otherwise contacting employees of Stream [or] Stream's Netherlands subsidiaries . . ." ECF No. 30-11 at 3. This is an express request to use this Court to end-run the September 20, 2023 order from the

Netherlands court, which appointed Mr. Stastney as director of the Dutch Entities after considering other options—including one presented by Stream.

Similarly, the Motion seeks to have this Court enter a TRO that would grant Debtors the relief they are prospectively seeking in other pending cases. Specifically, the Motion seeks to enjoin Defendants "from interfering with Stream's exclusive right to appoint directors of all of its subsidiaries," including the Dutch Entities. (*Id.* at 4.) As the Court is aware, the question of who can appoint directors at Technovative—and who is the board of Technovative—is the fundamental inquiry at issue in the 225 Action. And as to the Dutch Subsidiaries, that very question is the subject of the Dutch proceedings—and about which the Court has stated is not subject to its jurisdiction. Apr. 25, 2023 Hr'g Tr., *Current Chapter 11 Cases*, at 275:5-11 ("I don't have jurisdiction over [SCBV]."), 257:22-258:1, 260:3-7.

### 2.    The Motion Seeks Extraordinary Relief Against A Number Of Defendants Who Have Not Been Properly Served And Who May Not Have Notice Of The Motion

Debtors seek a TRO and preliminary injunction against "Defendants," many of whom have not been properly served and therefore are not properly before this Court—and who likely do not have notice that Debtors are currently seeking to restrain them. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l v. Rudolf Wolff Co.*, 484 U.S. 97, 104 (1987). Debtors bear the burden of establishing personal jurisdiction. *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020).[13]

---

[13]    SCBV does not satisfy this test. SCBV is a Dutch entity without substantial connection to Pennsylvania. Even if its parent has the requisite connection, courts in this circuit recognize that "jurisdiction is a stream, not a two-way street." *Roe v. Wyndham Worldwide, Inc.*, Civil Action 18-1525-RGA-SRF, at *12 (D. Del. Aug. 21, 2023) (quotation omitted). While a foreign parent company may have contact with a state forum through its direction of a subsidiary,

*(cont'd)*

Here, many of the Defendants are foreign entities or individuals.  Compl ¶¶ 21-24, 27,

33-34.  Debtors contend that they served these entities via "Registered Mail (1st Class)."  ECF

No 14.  Debtors have not filed on the docket or otherwise provided *any* evidence that delivery

was ever made or that signature was requested (or obtained) as is required by Rule 4(l)(2).  *See*

Fed. R. Civ. P.  4(l)(2) (providing that where Service is made outside of the United States it must

be proved "as provided in the applicable treaty or convention or . . . by a **receipt signed by the**

**addressee, or by other evidence satisfying the court that the summons and complaint were**

**delivered to the addressee**") (emphasis added).[14]

---

"jurisdiction cannot travel from a Delaware parent to a foreign subsidiary because the foreign subsidiary would have no expectation of being subjected to litigation in Delaware." *Id*.

[14]    Moreover, Rule 4(f) provides that service upon an individual in a foreign country may be effectuated by "any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention." Fed. R. Civ. P. 4(f)(1).  The Hague Convention, however, "does not itself affirmatively authorize international mail service." *Knit With v. Knitting Fever, Inc.*, Nos. 08-4221, 08-4775, 2010 WL 2788203, at *7 (E.D. Pa. July 13, 2010) (quoting *Brockmeyer v. May*, 383 F.3d 798, 803-04 (9th Cir. 2004)).  Thus, to determine whether Rule 4(f) permits service by way of mail of an individual residing outside of the United States, the Court must determine first whether Rule 4(f) expressly provides for such service and whether such service is permissible under local law.

The *Knit With* Court identified and evaluated the three potential provisions of Rule 4(f) that could "potentially authorize serving an international defendant by use of registered mail: Rule 4(f)(2)(C)(ii); Rule 4(f)(3); and Rule 4(f)(2)(A)." *Knit With*, 2010 WL 2788203, at *8.  While Rule 4(f)(2)(C)(ii) provides for service by mail, such service is only effective where the plaintiff uses "any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt." Fed. R. Civ. P. 4(f)(2)(C)(ii).  Like in *Knit With*, this provision is inapplicable here, given that the mailing at issue was not made by the Clerk's office.  Rather, here, an individual acting on counsel's behalf purported to mail the summons and a copy of the Complaint to Defendants.  Nor does Rule 4(f)(3) render the attempt at service effective here, as the rule allows for service "by other means not prohibited by international agreement, *as the court orders.*" Fed. R. Civ. P. 4(f)(3) (emphasis added).  As the court noted in *Knit With*, this provision is a "catch-all provision that enables the court on *ex parte* motion to devise a method of service responsive to the unique facts of the case." *Knit With*, 2010 WL 2788203, at *9 (citing Fed. R. Civ. P. 4(f)(3) advisory committee's notes).  To obtain authorization to utilize an alternative means of service, a plaintiff must seek and obtain prior court approval." *Id.* (quoting

*(cont'd)*

### C.      The Motion Is Unmoored From The Complaint's Asserted Causes Of Action

The Motion is also fundamentally flawed because it is unmoored from the Complaint's cause of action.  Debtors bear the burden to establish a connection between the Motion and the underlying cause of action.  *See, e.g., Ball*, 396 F. App'x at 837.  ("A preliminary injunction is an extraordinary remedy and the party seeking it must show . . . 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'"); *Greene v. Bradley*, No. 4:21-CV-00026, 2021 WL 1978439 at *2 (M.D. Pa. May 18, 2021) (same).

Here, the Motion is almost completely untethered to Debtors' Complaint.  Although Debtors acknowledge that they must show a likelihood of success on the merits of their underlying claims, *nowhere* in the Motion do the Debtors identify which of the *nineteen* causes of action in the Complaint underlies their Motion.  And Debtors make no attempt to show that they will succeed on the merits of each of their nineteen causes of action.  Rather, Debtors' assert *ipse dixit* that they "have demonstrated such likelihood of success," and assert a grab-bag of alleged facts without citation to any case law supporting their contention that those facts meet the elements of any of their causes of action.  Mot. at 9.  The Motion leaves SeeCubic—and the other Defendants—to largely make assumptions as to which of their myriad claims Debtors are arguing support their Motion.

---

*Brockmeyer*, 383 F.3d at 806).  Here, Debtors failed to do so.  Lastly, Rule 4(f)(2)(A) provides for service "as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction."  Fed. R. Civ. P. 4(f)(2)(A).  The foreign jurisdictions at issue here do not permit service by mail.  For example, "England does not permit service by mail on an English defendant in an action filed in its own courts."  *Knit With*, 2010 WL 2788203, at *11.

## II. DEBTORS HAVE NOT SHOWN A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY CLAIM

### A. SeeCubic Is Not Violating The Intellectual Property Rights Of Stream Or Any Other Party

While the Motion does not affirmatively identify which of Debtors' myriad causes of action Debtors assert they are likely to succeed upon, the thrust of Debtors' Motion is that "Defendants" are somehow violating (i) Stream's intellectual property rights and/or (ii) those of Philips and Rembrandt.  The Debtors do not even make an argument that they are likely to succeed on the merits of their claims for trade secret misappropriation under federal and Pennsylvania law.  If they did, however, that argument would fail.

#### 1. The Motion Fails As A Matter Of Law On Any Intellectual Property-Based Claims For Several Reasons

##### (a) The Debtors Do Not Own The Ultra-D Intellectual Property

To the extent Debtors assert that SeeCubic violates any of the *Debtors'* intellectual property rights, Debtors' claims fail because the *Debtors* do not themselves own the intellectual property associated with Ultra-D.  *See* pp. 8, *supra*.  Instead, the intellectual property—including patents, know-how, and copyrights, among others—associated with Ultra-D is owned largely by SCBV, with other pieces, including some of the patents related to Ultra-D, owned by Ventures and the other Dutch Entities.  *See* pp. 8, *supra*.[15]

---

[15]    To the extent Debtors contend that their claim is premised on Debtors' ownership of trade secrets, they have not met their burden to show a likelihood of success on the merits for any trade secret misappropriation claims.  To demonstrate a likelihood of success on the merits under the Defend Trade Secrets Act ("DTSA"), and Pennsylvania law, Debtors must show "(1) the existence of a protectable trade secret; (2) misappropriation of those trade secrets by Defendants; and (3) damages.  *Phyllis Schlafy Revocable Tr. V. Cori*, No. 4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016) (cited with approval by *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020)).  Debtors fail in numerous respects.  Indeed, the Motion makes *no effort* to establish a likelihood of success, doing nothing more than conclusorily asserting that "Stream's technology and trade secrets" belongs the

*(cont'd)*

**(b)** __Stream Does Not Have Standing To Assert Rights For Philips__

To the extent that the Motion purports to assert that SeeCubic is violating or threatens to

violate any of Philips intellectual property (Mot. at 6, 10), Debtors do not have standing to assert

any rights on behalf of Philips.  Debtors (through Ventures) have a *non-exclusive* license to use

Philips intellectual property.  Ex. 3 at ¶ 2.2.  It is well-settled that a non-exclusive licensee does

---

Debtors' estates.  Mot. at 9.  The Motion also conclusorily asserts that "Defendants" have
misused those trade secrets.  *Id.*  But the Motion does not, for example, cite any cases supporting
the notion that the "Trade Secrets" defined in the Complaint are protectable, nor does it cite any
cases supporting the notion that Defendants' conduct constitutes misappropriation.

"A plaintiff must identify the trade secret with enough particularity as to separate the
trade secret from matters of general knowledge in the trade or of special knowledge of persons
skilled in the trade." *Herley Indus., Inc. v. R Cubed Engineering, LLC*, No., 2021 WL 229322 at
*4 (E.D. Pa. Jan. 22, 2021) (citation omitted).  The Debtors do not have a cognizable claim for
trade secret misappropriation because they cannot sufficiently identify any trade secrets.
Through a sweeping "Trade Secrets" definition in the Complaint, Debtors can only point to a
non-exhaustive laundry-list of items without specifying what is simply "proprietary" or
"confidential" information and what is a "trade secret."  *See Power Integrations, Inc. v. Silane
Semiconductors North America, Inc.*, No., 2020 WL 3508078 (D. Del. June 29, 2020) (holding
that definition of trade secrets substantially similar to Debtors' definition here was insufficient).

Moreover, Debtors cannot show misappropriation.  To the extent, for example, that the
Complaint alleges that SeeCubic obtained any of Debtors' alleged trade secrets between
December 2020 (when the Court of Chancery issued its injunction) and June 2022 (when the
Court of Chancery's injunction was vacated)—and it does (*see, e.g.*, ¶¶ 257-62)—there has been
no misappropriation.  SeeCubic obtained and used the Collateral—which includes Debtors'
intellectual property—by virtue of the Court of Chancery's December 8, 2020 preliminary
injunction and order. (¶ 94.)  This cannot constitute misappropriation.  For purposes of
intentional torts and similar claims, actions taken in conformance with a court order have
repeatedly been held to be privileged, justified, and *not* unlawful.  *E.g.*, *Easter v. City of Dallas
Probate Division*, No. 21-CV-0860-D (BH), 2022 WL 2975349, at *11 (N.D. Tex. June 27, 2022)
(property transferred pursuant to court order could not be subject of conversion claim).  This is
so *even if*, as here, the relevant court order is later vacated.  *See In re M.T.G.*, 646 B.R. 1, 178-79
(Bankr. E.D. Mich. 2022) (no violation of automatic stay where the actions complained up "were
authorized by the Court's order *at the time they took such actions*.  The actions of Taunt and his
attorneys did not retroactively become stay violations when the Court vacated those orders many
years later.") (emphasis in original).

Finally, Debtors cannot show damages as a result of any misappropriation that rise
beyond speculation.  For example, Debtors do not identify any customers they have lost, any
specific harm to their goodwill, any customer confusion, etc.  This is insufficient.

*not* have standing to enforce the licensor's intellectual property rights.  *E.g., Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007) (contrasting an exclusive licensee with a non-exclusive licensee and concluding that "an infringement action brought by a bare licensee must be dismissed"); *Ultrapure Sys., Inc. v. Ham-Let Grp.*, 921 F. Supp. 659, 665 (N.D. Cal. 1996) (citation omitted) ("Where the license is non-exclusive the licensee does not have standing to bring an infringement action.").

> **(c)** **Stream Does Not Have Standing To Assert**
> **Rights For Rembrandt, Which Filed Its Own**
> **<u>Intellectual Property Case Seeking A TRO And Failed</u>**

Likewise, to the extent the Motion purports to assert that SeeCubic is violating or threatens to violate any of Rembrandt's intellectual property rights, Mot. at 4, it fails for the same reason: Stream's license from Rembrandt is non-exclusive.  *See* pg. 10, n.7, *supra*.  Moreover, Rembrandt is *already suing* SeeCubic for alleged misappropriation of its rights, *see* pg. 10, *supra*, and Stream cannot duplicatively assert those rights here.  Indeed, Rembrandt recently sought a TRO and preliminary injunction against SeeCubic in that case—and lost.  *See* pg. 10, *supra*.  Debtors cannot seek to remedy Rembrandt's loss here by improperly seeking a second bite at the apple on Rembrandt's behalf.

> **(d)** **The Conduct Debtors Complain Of In**
> **The Motion Is Occurring At SCBV, Not SeeCubic,**
> **<u>And SCBV Is Outside Of This Court's Jurisdiction</u>**

To the extent that the Motion asserts that SCBV is violating the rights of Debtors, Philips, or Rembrandt, it fails for the additional reason that this Court lacks jurisdiction over SCBV.  As described above, Debtors have proffered no evidence that SCBV has been served with the Summons and Complaint—much less the Motion.  *See* pg. 20, *supra*.  Until and unless service occurs, no personal jurisdiction exists.  Moreover, this Court has already stated that it lacks jurisdiction over SCBV (*see* pg. 20, *supra*); the law of the case doctrine "posits that when a court

decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (citation omitted).

Moreover, because SCBV is located in the Netherlands, any intellectual property rights Debtors contend SCBV infringed or misappropriated cannot be litigated here.  To the extent any rights are created under U.S. law—for example, as a result of U.S. patents—SCBV's actions in the Netherlands cannot form the basis for an infringement claim.  35 U.S.C. § 271(a).  The same is true to the extent SeeCubic takes any action abroad.  To the extent that the intellectual property rights at issue are creations of foreign law—as many of the Philips and Ultra-D patents are (Ex. 2; Ex. 3)—those rights must be enforced in their respective jurisdictions.  *See, e.g.*, *Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007) (district court erred by permitting plaintiff to amend complaint to add claims for infringement of foreign patents).

**2.      Debtors Do Not Meet Their Burden Of Showing A Likelihood Of
Success On The Merits Of Any Intellectual Property Claim Because
The Weight Of The Evidence Disproves Debtors' Factual Assertions**

Independently dispositive, Debtors fail to meet their burden to demonstrate a likelihood of success on the merits of any intellectual property claim because the weight of the evidence—much of it ignored by Debtors—disproves the factual premises of the Motion.

**(a)      The Philips License Permits Sublicensing**

One of the fundamental premises of the Motion is Debtors' assertion that SeeCubic and SCBV are "wrongfully sub-licensing . . . technology" under the Philips License.  Mot. at 2. Debtors conveniently ignore the Philips License Amendment, however, which specifically permits sub-licensing.  *See* pg. 9, *supra*; Ex. 4.  Sublicensing, therefore, is not "wrongful."

**(b)** **SeeCubic Does Itself Not Grant—Does Not
Intend To Grant—Any Licenses Or Sublicenses
Related To Ultra-D, Philips, Or Rembrandt**

Debtors' fundamental premise—that SeeCubic is currently or will license or sublicense

any technology (Mot. at 2)—is also incorrect because SeeCubic has not and does not itself intend

to license or sublicense any technology related to Ultra-D, Philips, or Rembrandt.  *See* pgs. 10-

12, *supra*.  Rather, SeeCubic is the *licensee* on a license from SCBV to use certain demonstrator

units incorporating SCBV's Ultra-D technology.  *See* pg. 11, *supra*.  As was SCBV's typical and

long-standing practice with other third parties, this license is an end-user license—and nothing

more.  *See* pg. 11, *supra*.  Such a license is akin to the end-user license that a consumer obtains

when they purchase a copy of Microsoft Word; it gives permission to personally use the

technology.  SeeCubic, pursuant to that license, has properly used and shown demonstrator

units—not purported to license or sublicense any technology.

**(c)** **All Customer Contracting Occurs At The SCBV Level**

Debtors also rely on the premise that SeeCubic, in sub-licensing the Ultra-D

technology—which SeeCubic is not, in fact, doing or intends to do—is soliciting and contracting

with customers.  Mot. at 2.  This is also incorrect.  Dating back to at least October 2022, any

contracts, arrangements, licenses, or other agreements for Ultra-D products or technology are

between customers (or potential customers) and SCBV—*not* SeeCubic.  *See* pgs. 10-12, *supra*.

In other words, SeeCubic is not a party to any contract with a customer or potential customer to

sell, license, or otherwise use Ultra-D.  *See* pg. 11, *supra*.[16]

---

[16]    Debtors' contentions to the contrary rely on a mischaracterization of Mr. Stastney's
testimony in the Netherlands.  Mr. Stastney testified that SCBV has three active projects and that
SeeCubic and SCBV are in discussions with potential partners.  *See* pgs. 14-15, *supra*.

Debtors' argument here also rests on the theory that the Debtors and SeeCubic are competing for customers, which is not the case. As was made clear while the Receiver was overseeing SCBV as part of the 225 Action, any projects were for the benefit of SCBV, and any customer agreements involving Ultra-D were to be with SCBV as the counterparty. Because indirect ownership of SCBV, which turns on the outcome of the 225 Action, may stay with Stream or may transfer to SeeCubic, all value in the interim period would stay with SCBV (and then ultimately inure to the party prevailing in the 225 Action). *See* pgs. 14-15, *supra*. The same protocol was adopted by the independent director at SCBV and remains in place today. *See* pg. 15, *supra*.

As a result, there is no competition—the customers are all customers of SCBV, and whichever party prevails in the parties' dispute will benefit from those agreements.[17]

### B.    Debtors Cannot Show A Likelihood Of Success On The Merits Of Any Claim Related To Control Of The Dutch Entities

The Debtors sprinkle allegations regarding their lack of control of the Dutch Entities throughout the Motion—notwithstanding that such allegations are not clearly tied to any cause of action in the Complaint. *See, e.g.*, Mot. at 9. Debtors make no attempt to establish a likelihood

---

[17]    Again, Debtors' argument relies on a mischaracterization of Mr. Stastney's testimony. Mr. Stastney did not testify that the parties are in competition. He explained that SeeCubic— unlike Stream—is the only party incentivized to see SCBV succeed under any scenario. Absent repayment in full, the Secured Creditors are entitled to own and control SCBV because of Stream's defaults on the secured debt and SCBV's status as part of the Collateral. Currently, however, Stream is the indirect owner of SCBV. I explained that SeeCubic has an incentive to ensure that SCBV succeeds right now *regardless of business model or ownership*. For example, if the Secured Creditors take possession of the Collateral—as they are entitled to—SeeCubic will be the indirect parent of SCBV and would have an obvious interest in its success. However, even if Debtors remain in bankruptcy, the Secured Creditors, and through them SeeCubic, is also incentivized to see SCBV succeed as the Secured Creditors in Stream. As a result, notwithstanding that Stream and SeeCubic do have different business models, SeeCubic is open to SCBV taking on any project that makes economic sense, since at the end of the day, any success of SCBV is good for the Secured Creditors. *See* pgs. 14-15, *supra*.

of success on the merits of whatever claim they assert this control issue implicates.  Instead, the

Motion makes only the conclusory allegation that "there can be no dispute that Defendants have

attempted to usurp Stream's ownership of its own subsidiaries by directing the workflow and

preventing Stream from using its own subsidiary companies such as SCBV."  *Id.*

Moreover, particularly given this failure, Debtors' invocation of the Dutch control issues

appears to be nothing more than an attempt to end-run other courts.  Control of the Dutch

Entities has long been in dispute and is the subject of legal proceedings in the Netherlands.  *See*

pg. 13, *supra*.  The Dutch court determined in June and September 20, 2023, that Mr. Rajan was

an unfit director, appointing first an independent director and then Mr. Stastney as director of the

Dutch Entities.  *See* pg. 15, *supra*.  Dissatisfied with that outcome, Debtors try to use this Motion

to bring those same claims—of Dutch law—back to life.

In any event, Debtors could not show a likelihood of success on the merits of any claim

related to the Dutch Entities because, again, their factual premises are incorrect.  The Debtors

claim that "On June 28, 2023, during the pendency of these bankruptcy cases and despite

specific instructions from this Court to take no action without court approval, [SeeCubic and

other Defendants] proceeded with litigation against Mathu Rajan, Stream's director and CEO, in

Amsterdam."  Mot. at 5.  Debtors conveniently ignore the Court's later statements stating it had

no jurisdiction over SCBV—and their own conduct actively pushing forward the parties'

disputes in the Netherlands, including participation in the court cases.  *See* pg. 13, *supra*.

Debtors also elect not to acknowledge that Mr. Rajan has been actively advancing his interests in

the Netherlands following the parties' understanding that they could resume activity in the

Netherlands.  Stastney Decl. ¶31-32.

Additionally, far from a "usurpation," Mr. Rajan's displacement as director of the Dutch

Entities in favor of an independent director and later Mr. Stastney was an action of the Dutch

court. At two hearings, the Dutch court heard evidence—including from Mr. Rajan directly—

and determined that it was in the best interest of the Dutch Entities that Mr. Rajan be removed.

*See* pgs. 14-15, *supra*. Additionally, Mr. Stastney is not free to do as he pleases at the Dutch

Entities: by order of the Dutch court, he is subject to the protocol established by the independent

director. *See* pg. 15, *supra*.

Similarly, Debtors seek to have this Court determine issues of Delaware law at issue in

the 225 Action. As the Court is well-aware, directorship of Technovative is *the* subject of the

225 Action, which was stayed upon the filing of the Current Chapter 11 Cases. *See* pgs. 11-12,

19, *supra*.

### C.    Debtors' Claims With Respect To Broadly Described Assets Also Fail

The Motion and Proposed Order are also peppered with allegations concerning

SeeCubic's alleged retention and use of "Stream's Bankruptcy Assets." Mot. at 16, 17. Once

again, Debtors do not attempt to show the likelihood of success on the merits on any of their

claims to support their request for a TRO on these allegations, leaving SeeCubic to guess.

### 1.    Debtors Make No Showing Of Likelihood Of Success On The Merits

Debtors' claims regarding miscellaneous other assets and requests for injunctions related

thereto are almost identical to Count II (Injunctive Relief) in Debtors' Complaint; the only

difference is that the Motion adds four additional injunction requests. *Compare* Compl.

¶ 138(a)–(h) *with* Motion at 16(a)–17(l). This suggests that the Debtors intend the underlying

cause of action for this TRO/preliminary injunction claim to be Count II. However, injunctive

relief is not a cognizable cause of action under either Pennsylvania or federal law. *See Jones v.*

*GEICO Choice Ins. Co.*, 617 F. Supp. 3d 275, 287 (E.D. Pa. 2022) ("the count for injunctive

relief must also be dismissed because injunctive relief is a remedy, not an independent cause of action"). As a result, Debtors cannot establish that they are likely to succeed on the merits of a cause of action for injunctive relief, and the Motion must be denied as to those claims.

Debtors implicitly reference Count VII (Tortious Interference). Mot. at 16 ("Debtors seek an order "enjoining SeeCubic … from intimidating or otherwise tortiously interfering with Stream's business relationships."). Debtors also fail to establish that they will succeed on the merits of a tortious interference cause of action. Again, they proffer nothing more than conclusory allegations—not even a single case citation.

To state a claim in Pennsylvania for tortious interference with prospective contractual relations, a plaintiff must allege (i) the existence of a prospective relationship, (ii) purposeful action by the defendant specifically intended to prevent a prospective relation from occurring, (iii) the absence of privilege or justification on the part of the defendant; (iv) damage to the plaintiff, and (v) a reasonable likelihood that the relationship would have occurred but for defendants interference. *See Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 178 (M.D. Pa. 2019). "A prospective contractual relation is something less than a contractual right, something more than a mere hope." *W. Chester Design Build, LLC v. Moses*, No. CV 22-1911, 2022 WL 15524950, at *3 (E.D. Pa. Oct. 27, 2022) (citation omitted).

The Motion and the Complaint fail to satisfy this burden in multiple respects. Among other things, Debtors fail to allege an actual or prospective contract with which SeeCubic has interfered because Debtors cannot point to a prospective contractual relation that goes beyond "mere hope." With respect to Google, a previous order for two sample units is not sufficient to indicate an actual, contractual engagement for the future. Compl. ¶ 40; *Phillips v. Selig*, 959 A.2d 420, 428-29 (Pa. Super. 2008). Similarly, with respect to any agreements with Bosch, the

Complaint does not allege that *Debtors*—Stream and Technovative—had *any* existing or prospective agreement with Bosch.  Rather, the Complaint concedes that an entirely different company, Stream TV International, B.V., was the signatory to the contract.  (Compl. ¶ 41.). Debtors likewise fail to allege that SeeCubic took any action with the intent of harming Debtors. *E.g.*, *Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 575-76 (7th Cir. 1996) (affirming dismissal where there was nothing that "suggests [defendants] acted for any reason other than the proper one of increasing the corporation's profits and prospects").

### 2.    SeeCubic Has Returned Stream's Assets In Compliance With The Court Of Chancery's Orders

As Mr. Stastney attests to in detail in the Stastney Declaration, the Debtors' allegations in this Motion and throughout the Current Chapter 11 Cases more generally regarding SeeCubic's purportedly wrongful retention of various Stream assets are unfounded.  As described above, SeeCubic long-ago returned assets such as demonstrator units and electronics, Stream's emails and websites, and servers.  *See* pgs. 12-13, *supra*.

## III.    DEBTORS HAVE NOT CARRIED THEIR BURDEN TO DEMONSTRATE THAT THEY WILL BE IRREPARABLY HARMED ABSENT A TRO

To demonstrate irreparable harm, the movant has the burden of identifying a potential harm that cannot be "redressed by a legal or an equitable remedy following a trial."  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citations omitted) ("The preliminary injunction must be the only way of protecting the plaintiff from harm.").  "The requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it."  *Id.* at 91–92 (internal quotation marks and citation omitted).  In particular, a movant must establish more than a "risk of irreparable harm."  *Id.* (citation omitted).  Rather, a successful preliminary injunction motion requires "*affirmative evidence* indicating that he or she will be irreparably harmed should that

relief be denied." *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987) (listing cases) (emphasis added).

### A. Debtors Fail to Affirmatively Demonstrate Any Non-Speculative, Affirmative Evidence Of Irreparable Harm

To show the requisite degree of harm, a successful preliminary injunction motion requires "*affirmative evidence* indicating that he or she will be irreparably harmed should that relief be denied." *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987) (listing cases) (emphasis added). Debtors have failed to do so.

*Marxe* is instructive. In that case, the plaintiff brought employment discrimination claims and moved for a TRO to prohibit the defendant from terminating her employment during the litigation because it would discourage other employees from testifying on her behalf, impairing access to critical evidence. *Id.* at 1124. The court denied the motion, explaining that her allegations were insufficiently specific because the plaintiff did not identify any particular witness or provide any evidence of factors that would impact their likelihood of testifying candidly, such as the nature of the work environment, the nature of the alleged incident, the potential witnesses knowledge thereof, or the relationship between the plaintiff and these potential witnesses. *Id.* at 1126.

Debtors attempt to prove irreparable harm here with similarly vague, speculative, and conclusory allegations. For example, Debtors repeatedly assert that SeeCubic's use of the Ultra-D "presents *potential* of irreparable harm to Stream should Philips decide to revoke its license." Mot. at 6 (emphasis added). However, Debtors do not detail the likelihood of this harm—or offer any evidence suggesting that it is anything but a mere possibility.[18] Debtors do not, for

---

[18] Debtors' contention that they have been or will somehow be harmed by SeeCubic's fundraising documents does not make sense. First, Debtors inaccurately state that SeeCubic has

*(cont'd)*

example, offer any evidence concerning whether Philips likely believes SeeCubic has violated

any of its rights, whether Philips would be averse to amending the agreement to permit additional

use of its intellectual property, whether the technology has any value or functionality without the

Philips license, and the nature of the relationship between Philips and the parties, among other

factors.[19]

Similarly, while Debtors assert that they are at risk of losing investments or customer

confusion, these allegations are conclusory and unsupported. Debtors allege Stream has made

investments "in excess of $160 million," that the licenses cost Stream "over $10,000,000 in

minimum fees and royalties," and that Stream has "initial purchase orders totaling $138.6

million." Mot. at 3, 5, 6. With respect to the investments and license costs, Debtors do not

specify how these funds were spent, which investments it would be unable to recuperate without

---

a private placement memorandum in use currently. Mot. at 2. It does not. The document to
which Debtors appear to refer is a bridge loan agreement. (Ex. 10.) Second, Debtors
mischaracterize the statements in the actual motion, Mot. at 11, ignoring that the documents
state that there is no litigation "that would be expected to have a Material Adverse Effect."
Finally, the document was sent to SeeCubic's shareholders. Ultimately, Debtors fail to explain
how their reputation is harmed or they suffer any injury because of SeeCubic's statements about
SeeCubic's business.

[19]     Debtors' reliance on *EUSA Pharma (US), Inc. v. Innocoll Pharm. Ltd.*, 594 F. Supp. 2d
570 (E.D. Pa. 2009), to argue that the possibility of a third party revoking its license is
irreparable harm, is misplaced. *EUSA* dealt with the imminent termination of an option that is
distinguishable from the potential revocation of a license in this case. In *EUSA*, at the time the
plaintiff requested a TRO, defendant had already "declared a plan" to not recognize plaintiff's
option. *Id.* at 580-81. The Court held that the imminency of the threat was critical to its finding
of irreparable harm. Moreover, in EUSA the Court found that damages could not be quantified
monetarily because the option also allowed the plaintiff to oversee the development of the asset it
question and "EUSA could never recoup the opportunity to guide the development . . . and
calculating a damage award to compensate EUSA for this loss would be speculative." *Id.* at
581. In contrast, the Debtors' harms are not immediate or certain. Unlike the defendant in
*EUSA*, third parties have not stated their intent to revoke any licenses. Moreover, even if a third
party revoked its license, monetary damages for license registration and fees could remedy
Debtors harms.

a TRO, whether the entire value of these investments would be lost absent the TRO, or the likelihood that the third parties would revoke their licenses without a TRO.  And with respect to the alleged purchase orders, while Debtors allege possible customer confusion, they do not provide any evidence as to whether any specific customers have expressed confusion, whether specific customers are likely to cancel their orders due to such confusion, or the value of these specific at-risk purchase orders.  Debtors cannot satisfy their burden to provide specific, affirmative evidence of irreparable harm that necessitates a TRO with these vague allegations.

Debtors likewise fail in asserting reputational harm.  As with the other asserted harms, Debtors provide no affirmative evidence supporting their vague, speculative assertion that there is "potential" reputational harm.  This is insufficient to establish irreparable harm.  *Acierno v. New Castle Cnty.*, 40 F.3d 645 (3d Cir. 1994) (citing *Morton v. Beyer*, 822 F.2d 364, 372 n.13 (3d Cir. 1987).  Even if Debtors' had proffered evidence, as a matter of law, potential reputational harm is only considered irreparable in the trademark infringement context.  *Acierno*, 40 F.3d at n. 11.  Debtors have not asserted a trademark infringement claim; this potential harm is thus irrelevant here.[20]

---

[20]     Debtors rely exclusively on inapplicable trademark infringement cases to support their argument that potential reputational harm is sufficient to show irreparable harm.  *See Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (finding potential reputational harm was irreparable harm because "the likelihood of confusion was inevitable because the identical trademark was being used simultaneously by both [parties.]"); *Bestway Inflatables & Materials Corp. v. Mills*, 2022 U.S. Dist. LEXIS 77826, *9-10 (finding potential reputational harm because Defendant's use of a nearly identical mark caused one customer to purchase defective products from Defendant, thinking those products were from Plaintiff.); *Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc.*, 145 F. Supp. 3d 311, 391-20 (D. Del. 2015) (finding Defendant's use of Plaintiff's purple marks on its pills would likely cause customer confusion, putting Plaintiff's reputation at risk.).

### B.   Debtors Could Be Made Whole With Money Damages

Moreover, Debtors' purported harm is not irreparable because they can be compensated by money damages.  The moving party bears the burden of showing that money damages would be inadequate to remedy the alleged harms.  Debtors insist that they will suffer irreparable harm, but "[t]he availability of adequate monetary damages belies a claim of irreparable injury." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); see also JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) ("Where money damages are adequate compensation a preliminary injunction should not issue.").

Here, the only potential harms that Debtors state with any specificity are harms that could be remedied through money damages, such as recuperating investments, license fees, or lost purchase orders.  *See* pgs. 35-36, *supra*.  That type of monetary distress is not enough for their requested extraordinary relief, as the Third Circuit has explained "that purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement."  *Frank's*, 847 F.2d at 102.  Moreover, the Delaware District Court rejected a very similar argument in Rembrandt's motion for a TRO and preliminary injunction against SeeCubic for allegedly violating the *very same intellectual property*, finding no irreparable harm because "Plaintiff noted that Defendants' purchase of a license would be a potential remedy."  Ex. 5 at 6-7.

### IV.   DEBTORS CANNOT PREVAIL ON EITHER BALANCE OF THE HARDSHIPS OR BENEFIT TO THE PUBLIC INTEREST FACTORS

Debtors have not satisfied their burden with respect to either (i) likelihood of success on the merits or (ii) irreparable harm.  The Court can and should end its inquiry there, as "a movant for preliminary equitable relief *must* meet the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (emphasis added), as amended (June 26, 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).  It is only "*[i]f* these

gateway factors are met, [that] a court *then* considers the remaining two factors." *Reilly*, 858

F.3d at 179 (emphasis added).

If the Court does reach these last two factors, it is clear that they, too, point towards

denial of the Motion.  First, Debtors cannot show "that the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the party or parties opposed."

*Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 179 (5th Cir. 1975).  Despite asserting these claims

over and over again, including in the Current Chapter 11 Cases, Debtors insist that there is now

an emergency.  False crisis aside, as discussed above, Debtors face "no actual or imminent harm

which cannot otherwise be compensated by money damages."  *Frank's*, 847 F.2d at 103; *see*

Part III, *supra*.  SeeCubic, in contrast, is staring down an overbroad restraining order that could

harm its business because Debtors' Proposed Order essentially seeks to enjoin SeeCubic from

conducting *any* activities related to Ultra-D.  Entry of a TRO would also harm SeeCubic because

it has an interest in the Secured Creditors' right to the Collateral.  As explained above, the value

of the Collateral largely lies with SCBV and the success of SCBV is critical to the value of the

Collateral.  Debtors Proposed Order, however, would enjoin SCBV from engaging in its ordinary

business activities.  ECF No. 30-11 at 2-4.  For example, Debtors seek to enjoin SCBV from

using Ultra-D demonstration samples—which are owned by SCBV.  *Id.* ¶ B.  Likewise, Debtors

seek to enjoin SCBV from contacting *its own employees*.  *Id.* ¶ D.  The destruction of value to

the Collateral were an injunction to issue is self-evident.

Debtors have failed to establish any wrongdoing by SeeCubic.  The public has an interest

in ensuring that temporary restraining orders continue to be an extraordinary remedy that are not

issued as a matter of right.  The "extraordinary remedy" of preliminary injunctive relief "should

be granted only in limited circumstances."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708

(3d Cir. 2004) (citation omitted).  Those circumstances are missing here.  In other words, they should be reserved for true irreparable harm imposed or threatened by an unscrupulous actor. There is no such harm here.  As SeeCubic has argued numerous times over the history of the Current Chapter 11 Cases, and as other parties have identified in prior procedural history**,** the Debtors utilize a "litigation chaos" tactic.  *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 329 (Del. 2022) (citing *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820 at *1 (Del. Ch. Dec. 8, 2021)) ("From there on, '[c]reating litigation chaos seemed to be one of the Rajans' strategies'").  The Court should decline to entertain this approach here.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied as to SeeCubic.

Dated: October 5, 2023                        Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP**

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 206047)
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Justin M. Winerman (admitted *pro hac vice*)
Rebecca L. Ritchie (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0549
Facsimile: (312) 407-8641

- and -

Eben P. Colby (admitted *pro hac vice*)
Marley Ann Brumme (admitted *pro hac vice*)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Facsimile: (617) 573-4822

*Counsel for SeeCubic, Inc.*