# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-10763 (MDC) |
| STREAM TV NETWORKS, INC. and TECHNOVATIVE MEDIA, INC.,<br><br>  Plaintiffs,<br>  v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS VI, LLC, HAWK INVESTMENT HOLDINGS LIMITED, ARTHUR LEONARD ROBERT "BOB" MORTON, SEECUBIC, INC., ALASTAIR CRAWFORD, KRZYSZTOF KABACINSKI, KEVIN GOLLOP, ASAF GOLA, JOHN DOE(S),<br><br>  Defendants. | Adv. Case No. 23-00057 (MDC) |

## DECLARATION OF SHADRON L. STASTNEY

I, Shadron L. Stastney, hereby declare and state as follows:

1. I am the Executive Chairman of SeeCubic, Inc. ("**SeeCubic**"). I am authorized to submit this declaration on behalf of SeeCubic. I am over eighteen years of age and am competent to testify.

2. I submit this declaration in support of SeeCubic's Opposition to Debtors Stream TV Networks, Inc.'s ("**Stream**") and Technovative Media, Inc.'s ("**Technovative**;" with Stream,

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

"**Debtors**") September 30, 2023, Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (the "**Motion**").

**Background**

3. From 2011 to 2020, Stream borrowed tens of millions of dollars from SLS Holdings VI, LLC ("**SLS**"), of which I am a principal, and Hawk Investment Holdings Ltd. ("**Hawk**;" together, the "**Secured Creditors**") on a secured basis. With interest, those loans are valued at well in excess of $150 million. In exchange for the loans and pursuant to several security agreements and pledge agreements, Stream granted SLS and Hawk security interests in substantially all of its assets, which are defined under the operative documents as "**Collateral.**"[2]

4. The Stream corporate family is a development-stage business with no commercialized products and that has only ever had minimal revenue. The primary and most valuable assets associated with the Stream family is the "Ultra-D" technology (namely, the intellectual property rights in that technology and prototypes in development). The Ultra-D technology has been developed, and continues to be developed, by a group of subsidiaries (and key employees) in the Netherlands including Ultra-D Coöperatief U.A. ("**Coop**"), Stream T.V. International B.V., and SeeCubic B.V. ("**SCBV**"). SCBV and the other Dutch subsidiaries (together, the "**Dutch Entities**") are indirect subsidiaries of Debtor Technovative, Inc. ("**Technovative**"), which is itself a subsidiary of Stream. The stock of Technovative, among other entities, was part of the Collateral.

---

[2] SeeCubic was created by the Secured Creditors to (i) receive the Collateral after Stream defaulted and (ii) continue to oversee and support the Dutch Entities' development of Ultra-D. If and when SeeCubic gains possession and ownership of the Collateral following resolution of the various legal proceedings between the parties, SeeCubic intends to pursue a business model whereby—through its subsidiaries—it licenses the Ultra-D technology to other entities.

**Stream And Technovative Do Not Own The Ultra-D Intellectual Property**

5.    Debtors do not themselves own the intellectual property associated with Ultra-D.

6.    Stream is a holding company (**Ex. 1**) that owns none, or virtually none—of the intellectual property related to Ultra-D.  Similarly, Technovative is a holding company, not an operating company.  (*Id.*)  It holds no intellectual property related to Ultra-D.

7.    Instead, the intellectual property associated with Ultra-D is owned largely by SCBV, with other pieces owned by Ultra-D Ventures, C.V. ("**Ventures**") and the other Dutch Entities.  (**Ex. 2**.)  Ventures is SCBV's immediate parent company, and an indirect subsidiary of both Stream and Technovative.  (Ex. 1.)

**Debtors' Motion Misstates Many Facts About The Various Licenses Related To Ultra-D**

8.    I understand that the Debtors make a number of assertions in the Motion (and declarations filed with it) about certain licenses and alleged licensing activities.  Many of these are incorrect.

9.    The Ultra-D technology was originally developed by Philips in the Netherlands starting in the early 2000s; Philips owned numerous patents, trade secrets, know-how, and other intellectual property associated with Ultra-D.  Stream created SCBV as a subsidiary so that the Philips engineering team that had been working on Ultra-D could continue their work after Philips decided to exit the 3D business.  That formation was funded by the Secured Creditors.

10.    The Ultra-D technology still utilizes certain aspects of technology that were developed by Philips and in which Philips has intellectual property rights.  In 2011, Philips granted the Coop a non-exclusive license to use its intellectual property to develop, manufacture, and sell Ultra-D products (the "**Philips License**," **Ex. 3**).  While the Philips License did not permit  Coop to sublicense the Philips intellectual property, the Philips License did allow

3

"Affiliates" of the parties to that license to use the Philips intellectual property. "Affiliates" was defined to include, among other things, any entity owned or controlled by Coop or any entity owned or controlled by an entity that owned or controlled Ultra-D. Coop, itself largely a holding company, is the parent company of SCBV. Accordingly, SCBV was permitted under the original Philips License to use the Philips intellectual property as it continued to develop Ultra-D; neither Coop nor SCBV, however, could sublicense the Philips technology to an unaffiliated third party. The acquisition of the Philips License was funded by the Secured Creditors.

11. In 2014, the Philips License was amended (the "**Philips License Amendment**," **Ex. 4**). Raja Rajan signed on behalf of the Coop and Ventures. Among other things, the Philips License Amendment added Section 2.15(a) to the Philips License, "Parallel License Arrangements." This provision was added specifically to permit sublicensing, stating in relevant part that,

> The Parties both acknowledge that for certain applications and uses of 3D technology, third party users may need to obtain a license under the Intellectual Property Rights related to 3D display technology, conversion and rendering technology and 3D video format of ULTRA-D ("ULTRA D Technology") and under intellectual property rights related to 3D display technology of Philips ("Philips Technology"). The Parties both confirm their willingness to offer licenses under said respective intellectual property rights with respect to such applications and uses to third party users, on reasonable conditions.

12. The Philips License, including the Philips License Amendment, currently is owned by Ventures as licensee—not Debtors. Patents related to Ultra-D derived from the Philips technology are also currently owned by Ventures. Know-how, copyrights, and other intellectual property related to Ultra-D derived from the Philips technology are currently owned by SCBV.

13. During certain periods, the Ultra-D technology utilized certain technological features in which Rembrandt 3D Holdings Ltd. ("**Rembrandt**") claims intellectual property rights. Whether any or all of those claims are valid remains a disputed issue, since most or all of

4

that technology was previously developed or known. Furthermore, since at least 2020, the Ultra-D technology in development by SCBV no longer uses any of the features covered by Rembrandt's claimed intellectual property rights.

14. Nonetheless, Rembrandt filed suit in the District of Delaware against SeeCubic, among others, for misappropriation of trade secrets relating to work being done by SCBV. (**Ex. 5**, **6**.) Rembrandt sought a temporary restraining order and preliminary injunction in the summer of 2023 in that case. SeeCubic argued, among other things, that Rembrandt was not entitled to either form of relief because it had not demonstrated irreparable harm and could be compensated with money damages for any harm. (**Ex. 7**.) The Court agreed with SeeCubic and denied Rembrandt's motion on August 1, 2023. (Ex. 5 at 6.)

15. SCBV issues licenses to the Ultra-D technology in the ordinary course, which incorporate sublicenses in the Philips technology. It has done so since at least 2014. These licenses, however, are end-user licenses granted to customers who have purchased or have been given demonstrator units; these are akin to the end-user license that a consumer obtains when they purchase a copy of Microsoft Word. They are not licenses to further develop, use, or commercialize the Ultra-D technology.

16. SeeCubic has an end-user license from SCBV. It does not have any other licenses from SCBV. As a result, it does not sublicense the Ultra-D technology.

**Debtors Mischaracterize How Projects With Customers And Potential Customers For Ultra-D Are Structured**

17. The Motion relies on the premise that SeeCubic itself does or intends to enter into agreements with customers to sell or license Ultra-D technology to them. That is incorrect.

18. Dating back to at least October 2022, any contracts, arrangements, licenses, or other agreements for Ultra-D products or technology are between customers (or potential

5

customers) and SCBV—*not* SeeCubic. In other words, SeeCubic is not a party to any contract with a customer or potential customer to sell, license, sublicense, or otherwise use Ultra-D (or any embedded technologies).

19. Debtors are well-aware that SCBV is the only entity with whom customers and potential customers have agreements. On October 17, 2022, Hawk filed suit against Stream and Technovative in the Court of Chancery (the "**225 Action**"). On October 20, 2022, the Court of Chancery appointed a receiver to oversee Technovative (the "**Receiver**") and ensure that it operated only in the ordinary course. Because Technovative is the indirect parent of SCBV, the Receiver also oversaw SCBV until he was displaced by Debtors' bankruptcy filing. During the pendency of the receivership, the Receiver allowed both Stream and SeeCubic to propose projects and customer agreements related to Ultra-D. (**Ex. 8**; **Ex. 27**.) The benefits of any projects were to stay with SCBV, and any customer agreements were to be with SCBV as the counterparty. This was because the indirect ownership of SCBV may ultimately stay with Stream or transfer to SeeCubic as a result of the parties' dispute. Whoever ultimately prevails, any value and benefits of projects utilizing SCBV's time, resources, and technology would not be wasted on projects for the non-prevailing party. Instead, it would stay with SCBV and ultimately benefit the prevailing party.

20. This structure persisted after the Receiver's displacement. In June 2023, a Dutch court appointed an independent director to serve as the director for all of the Dutch Entities. (*See* below for further explanation of the Dutch proceedings.) With the full knowledge of myself and Mathu Rajan and based on input from both, that independent director implemented a protocol for operating SCBV while the parties' dispute remains pending similar to the protocol used by the Receiver. (**Ex. 9**.)

6

**Debtors Mischaracterize My Testimony In The Netherlands**

21.     In the Motion and declarations filed with it, the Debtors make numerous assertions purporting to summarize or quote testimony I gave in a hearing in a proceeding in the Netherlands.  There is no transcript available at this time.  Debtors have mischaracterized my testimony in several ways.

22.     I understand that Debtors have asserted that on September 13, 2023, at a hearing in an Amsterdam court (the "**Dutch Hearing**"), I stated SeeCubic is "currently working with twelve or thirteen customers using the glasses-free 3D technology developed by Stream," implying that SeeCubic is currently permitting these customers to use Ultra-D.  That is not accurate.  I referenced that SeeCubic and SCBV are in communication with *potential* partners.  I also stated that SCBV currently has three active projects.

23.     I also understand that Debtors have asserted that at the Dutch Hearing, I testified that SeeCubic has or intends to sublicense Ultra-D technology to third parties.  That is also not accurate.  As with my previous testimony in this Court, I explained that SeeCubic has an end-user license from SCBV.

24.     Moreover, SeeCubic has not sublicensed any Ultra-D technology—including but not limited to any technology covered by Philips' intellectual property rights—to any third party. SeeCubic itself does not currently intend to sublicense any Ultra-D technology—including but not limited to any technology covered by Philips' intellectual property rights—to any third party.

25.     I also understand that Debtors have asserted that at the Dutch Hearing, I testified that "SeeCubic is in direct competition with Stream, though it is using a completely different business model; Stream intends to sell components to its customers whereas SeeCubic intends to

7

license the technology to its customers." Again, this is not an accurate characterization of my testimony.

26. I explained that SeeCubic—unlike Stream—is the only party incentivized to see SCBV succeed under any scenario. Absent repayment in full of the secured debt, the Secured Creditors are entitled to own and control SCBV because of Stream's defaults on the secured debt and SCBV's status as part of the Collateral. Currently, however, Stream is the indirect owner of SCBV. I explained that SeeCubic has an incentive to ensure that SCBV succeeds right now *regardless of business model or ownership*. For example, if the Secured Creditors take possession of the Collateral—as they are entitled to—SeeCubic will be the indirect parent of SCBV and would have an obvious interest in its success. However, even if Debtors remain in bankruptcy, the Secured Creditors, and through them SeeCubic, are also incentivized to see SCBV succeed as the Secured Creditors in Stream. As a result, notwithstanding that Stream and SeeCubic do have different business models, SeeCubic is open to SCBV taking on any project that makes economic sense, since at the end of the day, any success of SCBV is good for the Secured Creditors.

27. In other words, I did not state that SeeCubic is directly competing with Stream. If Stream prevails, everything SCBV has done benefits Stream, and indirectly the Secured Creditors and SeeCubic. If the Secured Creditors prevail, everything SCBV has done directly benefits the Secured Creditors and SeeCubic.

28. I understand that Debtors also assert that SeeCubic is currently fundraising using a private placement memorandum that Debtors allege states that SeeCubic "falsely state[s] . . . that there is no litigation pending against it or involving any of its assets or involving any of its officers or directors." SeeCubic is not currently fundraising with a private placement

8

memorandum. SeeCubic is seeking to raise funds under a bridge loan agreement and subscription agreement. (**Ex. 10**.) Debtors' characterization of the agreements is also incorrect: it ignores that the documents state that there is no litigation "that would be expected to have a Material Adverse Effect." Moreover, SeeCubic has explained to investors and potential investors the status of the parties' various litigations. These agreements were sent to SeeCubic shareholders.

**Debtors' Characterization Of The Sequence Of Events Related To The Dutch Proceedings Is Misleading**

29. I understand that Debtors assert that SeeCubic (and others) failed to follow this Court's orders by pursuing proceedings in the Netherlands. The Debtors' description is misleading, failing to account for further statements of the Court and Mr. Rajan and Stream's own conduct.

30. In early April 2023, the Secured Creditors, SeeCubic, and I filed an action in the Netherlands to adjudicate issues of Dutch corporate law (the "**April Dutch Proceedings**"). The ultimate issue in the Dutch Proceedings is who—between Mr. Rajan and myself—is the director of the Dutch Entities. (Debtors are *not* parties to the Dutch Proceedings, though Mr. Rajan is.) In mid-April 2023, in an initial conference in the Debtors' bankruptcy case, this Court directed that the parties take no actions with respect to entities and assets in the Netherlands, including asking that a forthcoming hearing in the April Dutch Proceedings be put on hold. We heeded that directive, successfully obtaining a continuance of the hearing. (**Ex. 11**, **12**.) Thereafter, in late April 2023, this Court told the parties during a Zoom hearing that it did not have jurisdiction over the Dutch Entities or the parties' dispute in the Netherlands.[3]

---

[3] *See* Apr. 25, 2023 Hr'g Tr., *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa.) at 275:5-11 ("I don't have jurisdiction over [SCBV]."), 257:22-258:1, 260:3-7; SeeCubic's Notice Regarding Proceedings In The Netherlands, *id.*, ECF No. 286 (July 7, 2023).

31. Thereafter, all parties evidently believed that we were no longer prohibited from taking action in the Netherlands and the April Dutch Proceedings proceeded with the consent and participation of both sides. The April hearing in the Dutch Proceedings was rescheduled for June 2023 without objection from Mr. Rajan, who filed with the Dutch court a response to the writ of summons (i.e. complaint). (**Ex. 13**.) In June 2023, just prior to the rescheduled hearing, Mr. Rajan purported to execute new corporate resolutions making him the sole director of the Dutch Entities. (**Ex. 14**, **Ex. 15**.) Mr. Rajan's counsel appeared at the hearing in Amsterdam, as did a former Stream employee. On June 28, 2023, the Dutch court determined that (i) Mr. Rajan was an unfit director, (ii) it was disputed who had the right to appoint the new director, which was subject to ongoing litigation in the US, and (iii) as a result, the Netherlands court would need to appoint the director. (**Ex. 16**.) The Netherlands court appointed an independent director, who set a protocol for SCBV's operations in consultation with both parties. (Ex. 9.) Mr. Rajan did not appeal the Dutch court's order. On June 29, 2023, the Secured Creditors notified this Court of the results of those proceedings.

32. In August 2023, due to threats from Stream and Rembrandt, the independent director resigned. (**Ex. 17**; **Ex. 28**.) Mr. Rajan then purported to execute new corporate resolutions naming Thomas Park as director of the Dutch Entities, notwithstanding that the Dutch court's ruling specifically prohibited this. In order to again clarify who was the director of the Dutch Entities, the Secured Creditors, SeeCubic, and I filed another action in the Netherlands (the "**August Dutch Proceedings**"). Mr. Rajan again filed a written response.

33. At the Dutch Hearing on September 13, 2023, Mr. Rajan appeared via Zoom for several hours and testified. I also testified. Stream and Mr. Rajan took the position that an independent director was no longer acceptable, and that only the appointment of Mr. Park was

10

acceptable. The Secured Creditors sought first, an appointment of a new independent director, or failing that, my appointment as director.

34. On September 20, 2023, the Dutch court issued its ruling, reaffirming its prior findings that (i) Mr. Rajan was an unfit director, (ii) it was disputed who had the right to appoint the new director, which was subject to ongoing litigation in the US, and (iii) as a result, the Netherlands court would need to appoint the director. (**Ex. 18**.) The court determined that because Mr. Park was put in place by Mr. Rajan, he was not likely to conduct himself any differently than Mr. Rajan. The court also determined that any new independent director would likely encounter the same issues with Stream and Rembrandt as the previous independent director had. The court thus appointed me as director of the Dutch Entities.

35. As the court-appointed director of the Dutch Entities, in addition to general obligations under Dutch law for corporate directors, I am required by the Dutch court's order to adhere to the protocol put in place by the prior independent director regarding SCBV. (Ex. 9.) I am required to consider in good faith and on a neutral basis any projects for SCBV suggested by either Stream or SeeCubic, and to abide by confidentiality requirements. I am currently adhering to the protocol and will continue to do so.

**SeeCubic Has Returned Stream's Assets In Conformance With The Court Of Chancery's Orders**

36. I understand that Debtors allege in their Motion (and elsewhere in this case) that SeeCubic has failed to return certain of Stream's assets to it since June 2022. This is not accurate. In a process overseen by the Delaware Court of Chancery, SeeCubic has returned Stream's assets in compliance with that court's orders.

37. Between December 8, 2020, and September 30, 2022, pursuant to orders issued by the Delaware Court of Chancery in 2020 and 2021, SeeCubic owned Technovative and

11

(through the corporate chain) its subsidiaries, including the Dutch Entities. After certain of the Court of Chancery's earlier orders were overturned by the Delaware Supreme Court in 2022, SeeCubic transferred the equity of Technovative to Stream by updating Technovative's ledger to reflect Stream as the entity's owner. On October 3, 2022, ownership of the Technovative shares was vested in Stream in an order issued by the Court of Chancery.

38. In various other orders between June and October 3, 2022, the Court of Chancery directed SeeCubic to return specific other items of the Collateral to Stream, which had been raised by Stream in dozens of requests from counsel—even after Stream gained control of Technovative. Among other things:

(a) **Servers.** On October 4, 2022, Stream provided 45 minutes' notice that its vendor, Epiq, would be appearing at MotivIT, LLC to copy certain Dell PowerEdge M640 servers. Within hours, SeeCubic, through its counsel, instructed MotivIT to permit Epiq, on behalf of Stream, to copy the servers. (**Ex. 19**.)

(b) **Demonstrator Displays and Other Electronics**. On October 5, 2022, Stream sent SeeCubic a letter demanding, among other things, that its agents be permitted, the next day, to retrieve demonstrator displays and other assets such as laptops located in London, New York, and San Ramon, California. (**Ex. 20**.) SeeCubic worked to coordinate the transfer of these assets expeditiously. (**Ex. 21**.) Stream's demand was vague in many respects, failing to identify how many displays they believe were its property, among other things.

(i) On October 10, SeeCubic's counsel provided Stream's counsel with the credentials to access the storage unit in San Ramon, California which housed both demonstrator displays and other electronic equipment like laptops. (**Ex. 22** at 3-4.)

(ii) Also on October 10, SeeCubic confirmed that demonstrator units in London could be retrieved on October 11 from a storage facility. SeeCubic agents waited all day but Stream never appeared. On October 12, Stream demanded to pick up these assets that same day. On October 13, Stream appeared to retrieve the assets but without the proper equipment or a place to store the units (it had rented a storage unit at the same facility, but that space was too small to house all of the units), even though SeeCubic's counsel had informed Stream's counsel that the dozens of units would require a truck and loading equipment to move. It was not until October 18 that Stream appeared at the storage unit with the proper equipment to move the items and an adequate place to store them. SeeCubic also arranged for Stream to pick up demonstrators in New York. (**Ex. 23**.)

(c) **Technovative Books and Records**. On October 7, 2022, at Stream's request, SeeCubic provided Stream with Technovative's books and records. (**Ex. 24**.)

(d) **Email Data.** SeeCubic transferred the streamtvnetworks.com and ultra-d.com domains on July 25, 2022, which gave Stream the ability to use emails at those domains on a go-forward basis. (**Ex. 25**.) SeeCubic later facilitated the transfer of (i) the @streamtvnetworks.com and @ultrad.com domains and (ii) data stored on FileShare, Sharepoint and OneDrive cloud servers, with the exception of data that was generated after December 2020 by SeeCubic employees other than SeeCubic B.V. In early October, SeeCubic transferred historical emails from those domains, which Stream could view, download or transfer as it wishes. (**Ex. 26**.)

(e) **Websites**. On October 13, 2022, SeeCubic transferred the information it was able to gather about thirteen websites that Stream requested. On October 15, 2022, SeeCubic transferred information about an additional thirteen websites. (Ex. 26.) Stream can use the

13

usernames and passwords that SeeCubic has transferred to change the login credentials of the websites to exercise control over those sites. The three remaining websites that Stream has requested—seecubic.com, seecubic.eu, and seecubic.nl—are SeeCubic's main sites. Stream was not actively using all of these websites prior to December 8, 2020, but they redirected to Stream's website, and it would cause confusion and irreparable harm to SeeCubic should Stream change or deactivate these websites. Other than raising it in various pleadings in the last several months, Stream did not follow-up on these three websites.

(f) **Bonding Equipment.** The bonding equipment is, and has been, under the control of SCBV—not SeeCubic. I understand that possession of the bonding equipment is currently subject to a separate mediation between the parties.

### SeeCubic Would Be Harmed By The Entry OF A TRO Or Preliminary Injunction

39. SeeCubic would face significant hardship if the Motion is granted.

40. Debtors' Proposed Order essentially seeks to enjoin SeeCubic from conducting *any* activities related to Ultra-D. While SeeCubic conducts business unrelated to Ultra-D, much of SeeCubic's business would be paralyzed if, for example, it cannot contact SCBV as the order requests. ECF No. 30-11 ¶ D.

41. More significantly, entry of a TRO or injunction would also harm SeeCubic because it has an interest in the Secured Creditors' rights to the Collateral. As explained above, the value of the Collateral largely lies with SCBV and the success of SCBV is therefore critical to the value of the Collateral. Debtors Proposed Order, however, would cripple SCBV. For example, Debtors seek to enjoin SCBV from contacting *its own employees*. *Id.* ¶ D. More broadly, Debtors would have the Court enjoin SCBV from engaging in its ordinary business activities. *Id.* at 2-4. For example, Debtors seek to enjoin SCBV from using Ultra-D

demonstration samples—which are owned by SCBV and used to conduct business. *Id.* ¶ B. The destruction of value to the Collateral were an injunction to issue as Debtors request is self-evident and likely catastrophic.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of October, 2023.

_____
Shadron L. Stastney