## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |
| STREAM TV NETWORKS, INC. and<br>TECHNOVATIVE MEDIA, INC.,<br><br>Debtors,<br>v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS<br>VI, LLC, HAWK INVESTMENT HOLDINGS<br>LIMITED, ARTHUR LEONARD ROBERT<br>"BOB" MORTON, SEECUBIC, INC.,<br>ALASTAIR CRAWFORD, KRZYSZTOF<br>KABACINSKI, KEVIN GOLLOP, ASAF<br>GOLA, JOHN DOE(S), JANE DOE(S),<br>DELAWARE and OTHER LAW FIRMS<br>representing and acting in concert with John<br>Doe(s) and/or Jane Doe(s), INVESTMENT<br>BANKS employed by John Doe(s) and/or Jane<br>Doe(s), PATRIC THEUNE, and SEECUBIC<br>B.V.,<br><br>Defendants. | Adv. No. 23-00057 |

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PREMANENT INJUNCTION

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession, (collectively, "Debtors"), in accordance with this Court's imploring supplemental authority and reasoning in connection with the instant matter, respectfully submit this *Supplemental Memorandum of Law in Support of Debtors' Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction* ("Motion"), and in support state:

A.    **ARGUMENT**

1.    **A Temporary Restraining Order Is Warranted Based On Debtors' Misappropriation of Trade Secrets Claims.**

The Court should find that the verified facts in the Complaint and Debtors' exhibits and other evidence establish more than a reasonable probability of success on the merits such that Debtors' Motion for a TRO should be granted.  *See N. Am. Dental Mgmt. v. Phillips*, Civil Action 23-1202, 2023 U.S. Dist. LEXIS 122070 (W.D. Pa. Jul 14, 2023) (finding all four elements satisfied and necessitated granting a TRO in favor of plaintiff).

*First*, in order to establish a reasonable probability of success on the merits such that a TRO should issue, a "plaintiff need only prove a *prima facie* case, not a certainty that [it] will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 226 F.3d 160, 173 (3d Cir. 2001); *see also Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n.3 (3d Cir. 2017) ("[The court does] not require at the preliminary stage a more-likely-than-not showing of success on the merits because a likelihood of success on the merits does not mean more likely than not." (internal quotation marks and citation omitted)).

Defendant SeeCubic, Inc.'s ("SCI") argument that "preliminary relief such as a temporary restraining order or preliminary injunction is unwarranted . . . because monetary damages can later be paid to address the alleged harm[,]" [SCI Opposition to Expedited Hearing Motion, at 6], clearly misses the mark. Pennsylvania courts have issued injunctions barring defendants from using misappropriated trade secrets in the manufacture of products,[2] and have enjoined the disclosure and use of trade secrets by former employees even in the absence of a confidentiality agreement.[3] Here, Defendant Shadron L. Stastney ("Stastney") had access to, and is still in possession of, Debtors' Confidential Information and Trade Secrets, and Stastney is now working for a competitor of Stream but cannot do so without inevitably calling upon or using Debtors' Confidential Information and Trade Secrets, in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831 *et seq*., and the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stats. Ann. § 5301 et seq. Stastney also continues to violate promises contained in his employment contract as former CFO with Stream.[4] Stastney has committed various wrongful acts including, but not limited to, misappropriating Debtors' Confidential Information and Trade Secrets and violating his employment contract and the confidentiality/non-solicitation provisions, rendering Defendant liable to Debtors for unfair competition under Pennsylvania law. Given Debtors' allegations, at this juncture, the Court should find that Debtors have established more

---

[2] *See Capital Bakers, Inc. v. Townsend*, 231 A.2d 292 (Pa. 1967); *Wexler v. Greenberg*, 160 A.2d 430 (Pa. 1960).

[3] *See Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272 (Pa. Super. Ct. 1997).

[4] Stastney signed an employment contract with Stream in the fall of 2015. A true and correct copy of the contract is attached as Exhibit "A." Pursuant to Section 8 of the agreement, titled "Restrictive Covenants and Confidentiality; Injunctive Relief.", Stastney promises to keep secret all Confidential Information of the Company and not, directly or indirectly, either during the term of his employment or at any time thereafter while such Confidential Information remains confidential, disclose or disseminate to anyone or make use of, for any purpose whatsoever except for the benefit of the Company in the course of his employment, any Confidential Information, and acknowledges injunctive relief may be available to remedy the problem. *Id*.

than a reasonable probability of success on the merits of their trade secrets misappropriation, breach of contract, tortious interference, breach of fiduciary duty and other claims.

*Second*, Debtors' evidence demonstrates that a TRO is necessary to prevent immediate and irreparable harm to Debtors.  Debtors have shown sufficiently that, absent a TRO, Defendants are likely to harm Debtors by continuing to misappropriate their Information and Trade Secrets for the benefit of Stastney's new employer and him.  *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992) (noting that "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm"); *Healthcare Servs. Grp., Inc. v. Fay*, 597 Fed.Appx. 102, 103-04 (3d Cir. 2015) ("'[T]he threat of the unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business'" establishes irreparable harm, (quoting *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164,1167 (Pa. 1977))); *Masure v. Massa*, 692 A.2d 1119, 1122 (Pa. Super. Ct. 1997) (holding that the plaintiff "suffered irreparable injury as the number of lost customers cannot be accurately calculated").

The evidence introduced by Debtors' Motion demonstrates that Defendants have "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 524 (E.D. Pa. 2018).  Stastney has just been appointed director of Stream's Netherlands subsidiaries, has tasked himself with approving projects proposed by Debtors, and "remains in a position to take advantage of [Debtors'] trade secret[s]." *Id*.  Thus, Debtors have carried their burden of showing that they stand to suffer immediate irreparable harm from Defendants' actual or threatened misappropriation of their trade secrets. *Id*.[5]

---

[5] SCI's citations to *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 248 (M.D. Pa. 1995) and *Rembrandt 3D Holdings Ltd. v. Technovative Media, Inc.*, No. 23-cv-00193 (D. Del. Aug. 1, 2023), ECF No. 26, are inapposite.  What was at

4

Moreover, harm resulting from loss of or injury to market reputation, credibility, investor attractiveness, business opportunities, and goodwill is irreparable. *See Par Pharm., Inc. v. Quva Pharma, Inc.*, 764 F.App'x 273, 279–90 (3d Cir. 2019) (noting the difficulty in calculating damages); *BP Chems. Ltd v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) (finding injunctive relief proper where a witness testified about illegally obtained trade secrets and the "damage that would be done to [the company's] reputation, credibility and ability to license its technology . . . giving rise to the public perception that [the company] was unable to protect its proprietary trade secrets.") (relying on *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (holding that injury to goodwill is irreparable); *MCS Indus. v. At Home Stores, LLC*, 2022 U.S. Dist. LEXIS 161874, at *3 (E.D. Pa. Sep. 8, 2022) ("In the patent arena, '[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.'") (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)); *Razor Tech., LLC v. Hendrickson*, 2018 U.S. Dist. LEXIS 74918, at *29 (E.D. Pa. May 3, 2018) (noting irreparable harm is typically "loss of control of reputation, loss of trade, loss of good will"); *Ilapak, Inc. v. Young*, 2020 U.S. Dist. LEXIS 94550, at *15-17 (E.D. Pa. May 29, 2020) (emphasizing that in competitive industries with similar products and clients "reputations and goodwill matter"); *see also Middle E. Forum v. Reynolds-Barbounis*, 2021

---

stake in *Mettler-Toledo*, where plaintiff failed to persuade the court that it had a protectible trade secret or right of confidentiality in the customer information which it sought to prevent defendant from using and had not, therefore, established a likelihood that it will succeed on the merits, *id.*, was the possibility that customers would shift their business from plaintiff to defendant during the pendency of the action. As the *Mettler-Toledo* court observed, "[i]f that occurs and if plaintiff prevails on the liability issues at trial, damages can be readily ascertained by reviewing the customer lists and receivables of both for the Harrisburg area and determining which customers shifted their business from Mettler-Toledo to PIS during the interim period." *Id.* Conversely, Debtors here face a clearly different form of irreparable harm, *i.e.*, potential revocation of the technology licenses issued by Philips and Rembrandt. In *Rembrandt 3D Holdings Ltd.*, Rembrandt understood from the assurances made by Defendant SCI's counsel that SCI would honor the automatic stay and cease making efforts to take control of the Defendant SCBV and, based on that understanding, Rembrandt took the extraordinary step of informing the Delaware District Court that the basis for its TRO motion was moot. With Defendant Stastney recently having been appointed director of Stream's Netherlands subsidiaries, at Defendants' urging, the circumstances have changed drastically.

U.S. Dist. LEXIS 4350, at *17 (E.D. Pa. Jan. 8, 2021) ("[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued 'to restrain one from doing what he is not attempting and does not intend to do.'") (citing *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

Here, Defendants' surreptitious conduct and expressed plans and intentions threaten the Stream license arrangements such that Defendants threaten not only imminent, but current and ongoing irreparable harm to Stream's marketplace reputation, credibility, customer goodwill, and future business opportunities.  Defendants' conduct, as Stastney's own testimony evinces, threatens to—and does currently—undermine and usurp Stream's current and future ability to license its underlying technology and products.

Moreover, Debtors' claim for immediate injunction relief does not rest on mere apprehension of potential harm to their trade, reputations, and customer goodwill.  Stastney has already expressly testified that, through his controlled entity, SCI, has, and will continue, to undermine and threaten Debtors with irreparable harm.  Defendants' conduct, if not enjoined, imminently threatens to—and does now currently—interfere with and disrupt Stream's market participation, reputation, and investor attractiveness.  Stastney's own testimony in the Netherlands proceeding regarding his intentions and plans make such irreparable reputational harm not only imminent but present and ongoing at this very moment.

In *Fres-co Systems USA, Inc. v. Hawkins*, 690 Fed.Appx. 72, 75-76 (3d Cir. 2017), the Third Circuit addressed a situation similar to this case.  There, the district court found that a former employee would "likely use his specialized and confidential knowledge to the detriment of Fres-co .... and [the employee's] interference with Fres-co's client relationship would cause immediate irreparable harm to Fres-co." *Id*. at 76.  The Third Circuit agreed with the district court that this

was irreparable harm because damages could not be "adequately ascertained or compensated by money damages." *Id*. The Third Circuit reasoned: "Given the substantial overlap (if not identity) between [the employee's] work for Fres-co and his intended work for Transcontinental-same role, same industry, and same geographic region-the District Court was well within its discretion to conclude [the employee] would likely use his confidential knowledge to Fres-co's detriment." *Id*.

The Court should find that *Fres-co's* logic applies here. The fact remains that Stastney took confidential information from Stream and would likely use the specialized and confidential knowledge and information at his job at SCI and/or in his role as director of SCBV. Stastney's SCI and SCBV positions have the same qualities and similar responsibilities as his position with Stream, they are in the same industry, and are openly competing within the same geographic region. Therefore, the Court should find that Stream would suffer irreparable harm if Stastney is permitted to use the confidential information gained from Stream in his position with SCI and/or SCBV. *See also, e.g., Nat'l Bus. Servs. v. Wright*, 2 F.Supp.2d 701 (E.D.Pa. 1998) (it is in the public interest to protect against the misappropriation and wrongful use of confidential information in order to discourage unfair business competition).

**Third**, the Court should find that the balance of harms clearly and strongly weighs in favor of Debtors. Stastney will not be entirely prevented from working, as he will only be prohibited from competing directly with Debtors and using Debtors' Confidential Information and Trade Secrets which, in any event, he has no right to use for the benefit of anyone but Debtors. In contrast, if the Court were to deny the TRO, Debtors may be harmed by having their Confidential Information and Trade Secrets used by Defendants and/or revealed to their competitors. *See Fisher Bioservs., Inc. v. Bilcare, Inc.*, No. Civ.A. 06-567, 2006 WL 1517382, at *21 (E.D. Pa., May 31, 2006) (enforcing an agreement that precluded an employee from using confidential information

and soliciting business opportunities from customers); *Nat'l Bus. Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 709 (E.D. Pa. 1998) (finding that the balance of harms weighed in favor of the employer because the employee would still be able to earn a livelihood); *CentiMark Corp. v. Lavine*, No. Hcv757, 2011 WL 3209106, at *5 (W.D. Pa. July 28, 2011) (noting that numerous courts that have enforced restrictive covenants against an employee have found that "regardless of the relative wealth of the employer and employee, the harm to the employer trumps the harm to the employee") (internal quotation marks and citations omitted)).

*Fourth*, the Court should find that the granting of a TRO in this case is in the public interest. "[T]he public has a clear interest in ensuring fair business practices and safeguarding trade secrets." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 Fed.Appx. 273, 280 (3d Cir. 2019). Additionally, "restrictive covenants serve important business interests in today's economy," and they "have developed into important business tools to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them." *Quaker Chemical Corp. v. Varga*, 509 F.Supp.2d 469, 481 (E.D. Pa. 2007); *Victaulic v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007) (internal quotation marks and citations omitted). Thus, the public interest is best served here by enforcing such important business tools. *See Wright*, 2 F.Supp.2d at 709; *N. Am. Dental Mgmt. v. Phillips*, Civil Action 23-1202, 2023 U.S. Dist. LEXIS 122070 (W.D. Pa. Jul 14, 2023).

## 2. A Temporary Restraining Order Is Warranted Based On Debtors' Lender Liability Claims.

The concept of lender liability sounds in a variety of causes of action at common law and has long been recognized by state courts. Among the causes of action that can lead to a finding of lender liability are: favoring certain loans over others, and meddling with financing in such a way that loan repayments favor the creditor over others (*Sheils v. Bartles*, 295 A.3d 302, 307 (Pa.

Commw. Ct. 2023) (interference with loan disbursements), conspiring to compete against a loan recipient or a corporation in which the competing individual is an officer or a director (*Steelvest, Inc. v. Scansteel Serv. Ctr.*, 807 S.W.2d 476, 483-484 (Ky. 1991) (Courts recognize the policy that "safeguarding society's interest in fostering free and vigorous competition in the economic sphere" is a vital goal but that this does not safeguard "serious employee misconduct" nor does it provide a shield for activities that run contrary to the duty of "honesty and fair dealing"—especially for a corporate insider), tortious interference with contracts (*Sheils*, 295 A.3d at 307) (Plaintiffs sued certain defendants for interfering with contracts); *NVent, LLC v. Hortonworks, Inc.*, 2017 Del. Super. LEXIS 52, *24, *25 n.99-100 (Del. Super. Feb. 1, 2017) (Davis, J.) ("Lender liability claims . . . . involve a lender and some type of cause of action other than breach of contract [such as] lender liability negligence . . . fraud . . . vicarious liability, etc." and they may arise where a lender "participates in the borrower's business beyond the domain of the usual money lender"), and other unfair or otherwise malicious acts that are not in the spirit of honest competition (*Steelvest*, 807 S.W.2d at 483-484).

Alongside state courts taking action against lender wrongdoing, bankruptcy courts have long held that there is an umbrella of actions that can be taken against lenders when they act beyond the pale of reasonable and acceptable behavior.  Deterring malefactors and bad behavior is the goal.  *WorldClass Processing, Inc. v. AT&T Capital Corp. (In re WorldClass Processing, Inc.)*, 346 B.R. 132 (Bankr. W.D. Pa. 2006).  Many bankruptcy courts determine lender liability in the following manner:

> Lender liability is established by application of the instrumentality doctrine, which requires: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of

a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id*. at 141-42 (citing *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Serv. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 512 (Bankr. S.D.N.Y. 1999)).

While courts have held that a creditor or lender merely "taking an active part in the management of the debtor corporation" is not enough to "automatically constitute control," that is far from the case here, where SCI, Hawk and SLS have taken significant and critical steps over the course of *years* to meddle in the affairs of the Debtors and impair their ability to engage in vigorous competition. *Id*. at 142. Many other courts have held similarly, going back nearly to the inception of the Bankruptcy Code. *See, e.g. In re American Lumber Co.*, 5 B.R. 470, 477-78 (D. Minn. 1980) (discussing lender wrongdoing and noting that equitable subordination is one method of deterring lender wrongdoing and that acting in a way that both "preempt[ed] from general unsecured creditors any portion of the value of the inventory and equipment" of the debtor and "enhance[d] the value of defendant's previously existing security interest in the accounts receivable and contract rights" was an absolute abuse of the lender-debtor relationship);[6] (*In re Giorgio*, 862 F.2d 933, 939 (1st Cir. 1988) (collecting cases on lender wrongdoing and noting that corporate insiders and fiduciaries should not be allowed to obtain unfair advantages or agglomerate assets to themselves or otherwise meddle with property, loans, or rights; the court also stated that misrepresenting a debtor's financial situation could lead to a finding of lender liability (understood in the broad sense of a constellation of claims against a lender's inequitable conduct));[7] *In re*

---

[6] The court took the position that, broadly speaking, a lender cannot meddle in or otherwise damage or seek to repurpose loans, banks accounts, and/or other property in a way would harm the debtor or otherwise give itself an advantage over other creditors and parties in interest or give it what could be called "control" over a debtor.

[7] The cases collected are significant, but it is worth noting (and citing, here) that the cases *Giorgio* collects all share flavors of the wrongdoing afoot in the present case, and while too numerous to list individually in the main text of this pleading without becoming distracting, they are as follows, noting that lender liability, and its preferred remedy, equitable subordination (usually with injunctive relief) typically involve "corporate insiders or fiduciaries who have

*Beverages International, Ltd.*, 50 B.R. 273, 282 (Bankr. D. Mass. 1985) ("Where a creditor has

taken control of the debtor, he assumes the fiduciary duties of management and a duty to deal fairly

with other creditors. . . . the creditor's duty of fair dealing is increased in the precise degree that

the creditor has power and control over the debtor's affairs"); *In re T.E. Mercer Trucking Co.*, 16

B.R. 176, 190 (Bankr. N.D. Tex. 1981) ("creditor control" of a debtor must be deterred at all costs

and is an important point of inquiry for lender liability, of any stripe, particularly where lenders

have engaged in conduct beyond the pale of acceptable debt collection practices, noting the

particularly egregious lender contracts, which essentially gave the lender control over the debtor,

including requiring a lender-designated member to sit on board who had complete veto power over

the debtor's day to day activities).

These collected ranges of cases are instructive.  There, as here, there has been incredible

power exerted over the Debtors, up to and including the securing of the since-voided Omnibus

Agreement, which essentially made the Debtors a thrall of SCI, Hawk and SLS.  When this

wrongful act was voided by the Delaware Supreme Court, they undertook actions to attempt to

dodge or otherwise ignore the unwinding of the Omnibus Opinion.  Shadron Stastney's recidivistic

activities in favor of Hawk, SCI and others require that this Court consider lender liability as a

---

obtained unfair advantages over other creditors through, for example, fraud. *See, e.g.*, *Pepper v. Litton*, 308 U.S. 295 (1939) *superseded by statute on other grounds* (insider obtained state court judgment as part of a plan to keep an insolvent corporation's assets from creditor); *In re Multiponics*, 622 F.2d 709, 715-20 (5th Cir. 1980) (unfair self-dealings and contribution to undercapitalization by insider). Where a bankruptcy court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors. *In re Bowman Hardware & Electric Co.*, 67 F.2d 792, 795 (7th Cir. 1934) (creditor's request that bankrupt not disclose existing loan between them supported subordinating creditor's claim to that of another creditor who relied on the bankrupt's false financial statement); *In re Osborne*, 42 B.R. 988, 999 (W.D. Wis. 1984) (creditor misrepresented debtor's financial situation to another creditor so that the other creditor would continue to give the debtor credit); *In re Just for the Fun of It of Tennessee, Inc.*, 7 B.R. 166, 180 (Bankr. E.D. Tenn. 1980) (contractor filed false notice of completion, on which other creditors relied when granting additional credit to bankrupt); *see also In re Teltronics Services Inc.*, 29 B.R. 139, 170 (Bankr. E.D.N.Y. 1983) (creditor in control of debtor considered an insider for purposes of equitable subordination); *In re Mercer Trucking Co.*, 16 B.R. 176 (Bankr. N.D. Tex. 1981) (same); *In re American Lumber Co.*, 5 B.R. 470, 478 (D. Minn. 1980) (same)."

serious question permeating these Chapter 11 Cases and also require the imposition of injunctive relief to impede the quotidian wrongdoing.

Furthermore, lenders can be held liable and face substantial damages if they maliciously attempt collateral seizure schemes or exercise excessive control over a debtor's business affairs.

In *Tazewell Oil Company, Inc. v. United Virginia Bank*, 243 Va. 94, 413 S.E.2d 611, 617 (1992), the plaintiff sued three banks for various acts of creditor misconduct resulting in the wrongful destruction of the plaintiff's business, the wrongful seizure of the plaintiff's inventory, and the wrongful dishonor of plaintiff's checks.  Plaintiff settled with two of the banks and obtained a jury verdict against the third bank.  *Id*. at 617.  Recognizing that a lender has the burden of proof in showing the "commercial reasonableness of its handling of loan collateral, the Virginia Supreme Court refused to rehear its judgment affirming a trial court's treble damage award of $900,000 under the state's conspiracy statute.  The court held that there was sufficient evidence to support a finding of malicious attempt regarding a collateral seizure scheme between two lenders. *Id*.  The court found "[t]here is credible evidence to support a finding that [one of the banks] acted in concert with [another of the banks] and agreed, associated, or combined for the purpose of willfully and maliciously damaging Tazewell in its trade or business."  *Id*. at 619.  The court also found the record showed that one of the banks intended to forestall a chapter 11 filing and that its actions exhibited a willful disregard for Tazewell's rights.  The court concluded the bank's protestations that it was "merely attempting to collect its debts" rang hollow in light of the extensive and unusual actions it undertook in concert with the second bank to eliminate any ability of Tazewell to continue operating or to file a reorganization plan under chapter 11 by removing Tazewell's access to cash flow, inventory, or other financing.  *Id*.

Similarly, an approximately $13 million judgment was awarded against a lender that had commenced judicial foreclosure proceedings as part of a strategy to increase the borrower's debt and to ultimately take over the security at a bargain sum. *See Wells Fargo Realty Advisers, Inc. v. Alpert,* No. 90 CV 564 (Colo. Dist. Ct., June 17, 1992) (unpublished opinion). The trial court also found willful, wanton, and reckless disregard on the part of the lender and awarded $100,000 in punitive damages. *Id.*

Finally, in *Bailey Tool & Mfg. Co. v. Republic Bus. Credit (In re Bailey Tool & Mfg. Co.),* 2021 WL 6101847 (Bankr. N.D. Tex. Dec. 23, 2021) ("*Bailey*"), the Dallas bankruptcy court found a lender squarely at fault for its borrower's bankruptcy and subsequent liquidation and liable to the borrower's estate under various breach of contract, tort, and bankruptcy theories. The lender's damages were substantial, including the full enterprise value of the debtor's legacy business and anticipated new business, lost profits, all of the debtor's administrative expenses, punitive damages, attorneys' fees, and more. The lender was also liable to the owner/guarantor for additional amounts, including exemplary damages. *Bailey* illustrates that lender liability may arise when a lender exceeds the bounds of permissible control and contributes to a borrower's demise.

A.    Lender Liability (Torts Claims)

The *Bailey* court noted that "[i]f a lender exercises excessive control over a borrower . . ., a lender can assume the role of fiduciary rather than creditor." However, even absent a fiduciary duty, "if a lender takes a particularly active role in the business decisions of the borrower" it "may become liable for tortious interference." The *Bailey* Court failed to find a fiduciary duty, but found the Bank committed two torts against the debtor under Texas law, which governed tort claims given the parties' relationship to Texas:

First, the Bank committed fraud (fraudulent misrepresentations), including in misrepresenting to the company that it was in an "over-advanced" position, which was not

true.  The Court awarded damages equal to the Company's enterprise value.  Second, the Bank was liable for tortious interference with the Company's business and contractual relations, including "overreaching" acts that drove away customers and made it impossible for the company to fill customer orders.  As damages, the Court awarded substantial lost profits of over $2 million.

The Court further held that the Bank willfully violated the automatic stay by, among other things, demanding that customers pay the Bank and refusing to turn over cash it held.  *Cf. City of Chicago v. Fulton*, 141 S. Ct. 585 (2021) (holding retention of estate property after the filing of a bankruptcy petition does not violate §362(a)(3) of the Bankruptcy Code).  As damages for the Bank's "willful conduct," the Court awarded actual damages equal to the debtor's chapter 11 administrative expenses (almost $500,000) plus punitive damages of triple that amount (another almost $1.5 million).

B.    The Banks Claims:  Equitable Subordination and Claim Objection

The *Bailey* Court noted the standards of equitable subordination under section 510(c) of the Bankruptcy Code:  (i) the claimant engaged in some sort of inequitable conduct, (ii) the conduct resulted in an unfair advantage or injury to creditors, and (iii) subordination is not inconsistent with the Bankruptcy Code.  As a result of the Bank's numerous misdeeds, the *Bailey* Court held that the Bank's claims (if any) would be subordinated to all other class of creditors (and classes of interests).  In addition, without much discussion, the *Bailey* Court held that all of the Bank's claims should be "disallowed entirely" in light of the Bank's misconduct.

C.    Liability to the Owner

With respect to the Owner, the *Bailey* Court found the Bank (i) violated the Texas statute against homestead liens, (ii) violated a Texas statute relating to fraud in a real estate transaction, and (iii) committed negligent misrepresentation.  For his part, the Owner was awarded damages equal to the lost value of his homestead plus exemplary damages and attorney's fees.

14

3. **<u>Debtors' Motion is timely</u>.**

Finally, SCI argues "expedited treatment is not warranted because the TRO Motion raises the same issues that Debtors have pursued for more than a year, and Debtors point to no reason warranting the Court's immediate attention right now."  SCI Opposition to Expedited Hearing Motion, at 4.  But Defendants misplace their opposition based on untimeliness.

As a threshold inquiry, the timeframe of Stream's instant request for immediate injunctive relief accords with both the adversary proceeding and the ongoing threat of further imminent irreparable harm.  The mere passage of time after filing a complaint does not preclude subsequent injunctive relief.  *See SI Handling Systems v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985) ("We do not, however, think it is important whether the movant considered a preliminary injunction necessary at the time of filing the complaint.").  Indeed, "[t]he relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued."  *SI Handling*, 753 F.2d at 1264; *CT Install America, LLC v. Boryszewski*, 2023 U.S. Dist. LEXIS 79511, at *7–8 (E.D. Pa. May 8, 2023) (collecting Third Circuit authority discussing delays between the filing of the complaint and seeking injunctive relief and noting that irreparable harm is the deciding factor for the implementation of injunctive relief); *BP Chems. Ltd v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) ("[A] delay caused by a plaintiff's good faith efforts to investigate" the scope or severity of enjoinable conduct "does not preclude a finding of irreparable harm") (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995)); *Middle E. Forum v. Reynolds-Barbounis*, 2021 U.S. Dist. LEXIS 4350, at *17-18 (E.D. Pa. Jan. 8, 2021) (assessing irreparable harm and noting "[t]he relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued.").

After the Delaware Supreme Court ordered the Omnibus Agreement unwound and invalidated Vice Chancellor Laster's opinion in the Chancery Court, the Debtors had every reason to believe that their property would be returned and they would be allowed to run their businesses as going concerns. It was only later that the Debtors discovered that their property had not been returned, including the Bonding Equipment, laptops, email accounts, server, and other valuable properties (the "Property"). The outright refusal to return the Property was part of a multi-layered plan to impair the function of the Debtors in such a manner that they would have no ability to actually operate and would capitulate to SCI, Hawk and SLS. Additionally, the Debtors did not have reason to file for injunctive relief until after their discovery of Hawk's attempts to essentially use SCI as a means of competing with them. Any delay in the Debtors' filing for injunctive relief, even were there a delay, is immaterial, as the opportunity to impose injunctive relief against Stastney, SCI, Hawk, and SLS exists *now* and is the only method of remedying their continuing and insidious attempts to impair the Debtors' operations.

Moreover, SCI's argument overlooks this Court's instruction at the April 14, 2023 hearing to "file something" if "[e]verything [does not] stand[] still" in the Netherlands "[a]nd if somebody believes that somebody is moving something[.]" Exhibit "B," Transcript of April 14, 2023 Hearing, at 182:24-183:1. As this Court expressly stated:

> How are they going to go to Dutch court and oppose something that's before me? I'm leading this. I got a problem with that. That's what [Defendants are] saying that Mr. Rajan's trying to take our assets and turn it over and he shouldn't be and we want you to stop him. No, no, no, no, no. You're not going over there with that claim. That claim is here.

*Id.*, at 116:20-25.

> Now, I don't appreciate people going to another jurisdiction and to get another court to decide that they own it and that nothing should happen and no direction should be made with respect to the turnover or release of that equipment. Because that's

exactly what you guys have asked for.    I'm reading it and I don't appreciate that. **That's not going to happen**.

*Id.*, at 117:7-13 (emphasis added).

I want the matters in the Netherlands, which is scheduled for next week to just hold on a minute, because I'm concerned that this is going to have some impact on what I'm doing.  It's going to have some impact on whether the Debtor believes to have their rights here in this Court, and it belongs to them here.  And I need to protect those rights with respect to their ability to control these things.

*Id.*, at 181:7-13.

And it says Stream and Rajan brothers refuse to accept that control of the company lies with the financiers.  Counsel, who's to tell them that?  You haven't foreclosed on your security interest in the control or any of that.    I'm a little concerned why [Defendants] would go say that and somebody would allege all of that.    That's all disputed, and you agree you haven't foreclosed on the ownership interest.

So maybe you might have foreclosed on your interest in the assets, but I haven't heard anybody say that [Defendants] foreclosed on the ownership interest of the Debtors and actually, they're in this Court.    I don't know how [Defendants] could be in the Netherlands saying something to the contrary.    I'm a little concerned about that.

*Id.*, at 129:3-15.

So I don't know what to tell them, except they need to hold on.    Mr. Rajan, I don't want you doing anything.    Nobody's to do anything, except somebody's got to figure out how to pay these people or you're not going to -- you're going to be fighting over nothing.  **Nobody is to transfer assets, nobody's to take technology. Nobody could take trade.    Nothing.    Everything stands still**.

**And if somebody believes that somebody is moving something, file something.** Because no.  You can't come to bankruptcy and say I'm going to -- anybody.  Even the people in -- you know, I don't know.    I don't know if I have jurisdiction over people over whatever assets are over there.    That asset we're talking about right now is in China.    So I'm not uncomfortable, I don't feel – I'm comfortable saying just everybody stop.    Don't do anything until we can get at least to find out, one, is this a legitimate filing.    Legitimate meaning authorized.    I don't mean -- and also, who has what.    What assets that -- you know, if the Debtor believes that they have the exclusive right to appoint somebody, and that's the asset that belongs to the estate, I don't want anybody saying anything about it.    **I get to say something first.    So everything is stayed.    Nobody is to touch anything.**    And you guys try to work on the issue with respect to the bonding equipment.

*Id.*, at 182:18-183:16 (emphasis added).

Likewise, at the hearing held on June 29, 2023, the Court reiterated to the parties:

You guys better go back and look at what I said on that first day about actions in the Netherlands.   I -- and I had hoped because I actually went and read the transcript.   Believe it or not, I do do things when I go back there other than yell about people calling me.   I read the transcript.   I actually have it in front of me. **And I said you guys better not do anything in the Netherlands; nothing's going to happen.   Don't do anything.**   Did they file a new action?   Or did they continue in the one that was existing at the time?

Exhibit "C," Transcript of June 29, 2023 Hearing, at 177:2-10 (emphasis added).

I'm hoping it was just the Court on its own decided to do that.   **And I want everybody to know that, if it was not, there are going to be some serious consequences.**   Because I was clear that nothing was to go before that --my -- if that Court, I understand that the Netherlands have control over all of their corporations.   And they can -- and I understood that they could, on their own, say, "Hey, we're going to -- we're going to take over these companies."   Because you're not filing your reports, you're not doing this, you're not doing whatever.   That was what was represented to me on the first date or whenever we had the little hearing.   And I --which was to stay the action in the Chancery Court and that I understand in the pleadings the Debtor had said there was a pending action in there.   And I said, "Don't do anything in there.   It is a stay.   Don't do anything."   So that's why I'm trying to figure out how this [Amsterdam Court] order [removing Mathu Rajan as director of Stream's Netherlands subsidiaries] came to be.   That's all.   It could have been the Court just decided on its own that this stuff was in here and I'm going to rule.   I don't know what happened.   I just want somebody to tell me what –

*Id.*, at 177:19-178:12 (emphasis added).

And if it has anything to go against what I said, I'm going to be very unhappy.

*Id.*, at 178:24-25.

And if [the Amsterdam Court] did it on [its] own, okay.   But what you told me at the beginning was because there was a whole new director and Mr. Rajan wasn't there.   Stream had no involvement now in running SeeCubic B.V.   And that automatically set off something from me.   And again, I went back, and I pulled the transcript off and I have it right in front of me.   I'm not going to go read it, but I just wanted to make sure what I said, which is a totally different issue.

*Id.*, at 179:2-9.

But it is what it is.   He's there by virtue of some connection with Stream or whatever.   It didn't matter.   **I said don't do anything, when they did, consequences**.

*Id.*, at 179:19-21 (emphasis added).

Having completely disregarded this Court's repeated direction that they "better not do anything in the Netherlands" or else there would be "some serious consequences," by requesting of the Amsterdam Court on September 12, 2023 that Defendant "Stastney [be] appointed as director A of Dutch SeeCubic Entities[,]"[8] Defendants cannot rightfully be heard to argue that "Debtors point to no reason warranting the Court's immediate attention right now." SCI Opposition to Expedited Hearing Motion, at 4.

**WHEREFORE**, Debtors respectfully request that the Court enter an order scheduling a hearing on Debtors' Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction at such other time as the Court's calendar permits.

Dated: October 14, 2023.        Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander *pro hac vice*
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

---

[8] Exhibit "D," SCI Writ Amendment, at 9.

Bennett G. Fisher (*pro hac vice*)
**Lewis Brisbois Bisgaard & Smith, LLP**
24 Greenway Plaza #1400
Houston, TX 77046
Telephone: (346) 241-4095
Facsimile: (713) 759-6830
[Bennett.Fisher@lewisbrisbois.com](mailto:Bennett.Fisher@lewisbrisbois.com)

-and-

Keith Kodosky
**Lewis Brisbois Bisgaard & Smith, LLP**
600 Peachtree Street, NE, Suite 4700
Atlanta, GA 30308
Telephone: (404) 991-2183
Facsimile: (404) 467-8845
[Keith.Kodosky@lewisbrisbois.com](mailto:Keith.Kodosky@lewisbrisbois.com)

*(pro hac to be filed)*

*Counsel to the Debtors*

# EXHIBIT A

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement"), made as of this 1st day of December, 2018, is by and between **STREAM TV NETWORKS, INC.,** a Delaware corporation (the "Company"), and **Shad L. Stastney**, an individual (the "Employee").

## B A C K G R O U N D :

**WHEREAS,** the Company is engaged in the business of developing and marketing glasses-free technologies and electronic devices and related products; and

**WHEREAS,** the employee is one of the early investors in and board members of the Company and the Company has determined that it needs the specific expertise and experience of Employee to fill needs in the business;

**WHEREAS,** the Company desires to employ the Employee as an executive for the Company and the Employee desires to accept such employment on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Employment</u>.  The Company hereby employs the Employee as the Chief Financial Officer of Company and Employee hereby accepts such employment, upon the terms and subject to the conditions hereinafter set forth.

2. <u>Term</u>.  The term of employment of the Employee under this Agreement shall commence on the 1st day of December, 2018 and shall continue, unless earlier terminated in accordance with the provisions of Sections 6 or 7 hereof, until December 31, 2021 the "Initial Term"). This Agreement shall continue in full force and effect for consecutive one-year periods after the expiration of the Initial Term (each, a "Renewal Term"), unless either party shall give the other party at least 120 days prior written notice before the commencement of any such Renewal Term of such party's intention to terminate this Agreement. Notwithstanding anything to the contrary, a party's expression of non-renewal is not a termination of this Agreement. The Initial Term, together with each Renewal Term, is hereinafter referred to as the "Term."

3. <u>Office and Duties</u>.

    (a)  During the Term hereof, the Employee shall serve as Chief Financial Officer for the Company and shall perform such duties as are customary of such a position in a company of similar stage in the United States and such other duties as may from time to time be assigned to him by the Chief Executive Officer or the Board of Directors.

    (b)  During the term hereof, the Employee shall use his best efforts to carry out his duties and responsibilities hereunder.  Provided that such activities do not materially interfere with the performance of Employee's duties hereunder, nothing herein shall prohibit Employee

from (i) engaging in educational, charitable, civil, fraternal or trade group activities; (ii) investing his assets in entities or business ventures other than the Company, with customary oversight thereof; (iii) attending educational classes; and/or (iv) undertaking other consulting projects or serving on the board of other Companies.

(c)  The Employee represents and warrants to the Company that he is not subject to or a party to any employment agreement, non-competition covenant, non-disclosure agreement or other agreement, covenant, understanding or restriction which would prohibit the Employee from executing this Agreement and fully performing his duties and responsibilities hereunder, or which would in any manner, directly or indirectly, limit or affect the duties and responsibilities which may now or in the future be assigned to the Employee.

4.  <u>Compensation</u>.   As compensation for services to be rendered hereunder by the Employee, the Company agrees to pay or provide to the Employee:

(a) <u>Salary</u>.  For his services hereunder, the Company shall pay Employee $360,000 per annum, payable in accordance with the Company's standard payroll procedures and according to the board resolution effectuating this contract.

(b)  <u>Annual Bonus.</u>  The Company will pay an annual target bonus to Employee upon the basis of successful performance and which, if awarded, will be paid in the following year as one third (1/3) on or before March 31, one third (1/3) on or before June 30, and the balance on or before September 30th.  The target bonus shall be fifty percent (50%) of the Employee's cash salary.

(c)  <u>Equity Rights.</u>  The Employee maybe granted rights to the Company's equity in stock options, as and when granted to employees after the current grant.  The amount of those grants shall be determined by the Board of Directors.

(d). <u>Change of Control</u>.  Upon the occurrence of a Change of Control, (i) all warrants, equity grants and/or restricted Units granted to Employee by the Company which have not vested will immediately vest and become exercisable, and (ii) and all amounts of accrued but unpaid salary will become immediately due and payable. For  the purposes of this provision, a Change of Control will mean the occurrence of any of the following events: (i) an acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation but excluding any merger effected exclusively for the purpose of changing the domicile of the Company), or (ii) a sale of all or substantially all of the assets of the Company (collectively, a Merger), so long as in either case (x) the Company's members of record immediately prior to such Merger will, immediately after such Merger, hold less than 50% of the voting power of the surviving or acquiring entity, or (y) the Company's members of record immediately prior to such Merger will, immediately after such Merger, hold less than 60% of the voting power of the surviving or acquiring entity and a majority of the members of the Board of Directors or Managers of the surviving or acquiring entity immediately after such Merger were not members of the Board of Directors of the Company immediately prior to such Merger.  Notwithstanding anything to the

Stastney Employment Agreement

contrary herein, any third party capital investment into the Company, an initial public offering, or any other capitalization effort by the Company shall not be deemed a change of control.

(a) Medical.  Upon commencement of employment hereunder, the Employee shall be entitled to coverage under the Company's group medical, health and dental insurance plans in accordance with the terms and practices then in effect including the requirements of the Company's provider.  The Employee shall be entitled to elect family coverage for eligible family members at such time as coverage is made available by the Company for its employees and under such terms to employees in the same category as Employee.

(b) Other Benefits.  The Employee will be eligible to participate in the Company's 401(k) plan and any other benefit plans when they are developed and offered to other employees.   Employee will be entitled to personal, sick and holiday time in accordance with company policies.

5. Expenses.  It is contemplated that in connection with employment hereunder, the Employee may be required to incur reasonable business, entertainment and travel expenses other than what is covered by the car and gas expense allowance.  The Company agrees to reimburse the Employee in full for such reasonable and necessary business, entertainment and travel expenses incurred or expense by him in connection with the performance of his duties hereunder; provided, the Employee submits to the Company vouchers or expense statements satisfactorily evidencing such expenses as may be reasonably required by the Company, and such expenses are in accordance with any corporate policy with respect thereto. All necessary business, entertainment and travel expenses must be approved prior to incurring them as provided in the Company's policy. All such expenses will be reimbursed to Employee according to its practices applicable to all other senior executive officers of the Company.

6. Death and Disability.

(a) The term of employment of the Employee shall terminate immediately upon the death of the Employee.  At the option of the Company, in the event of any physical or mental incapacity or disability which has rendered the Employee unable, with reasonable accommodation, to perform the services required of him under this Agreement (the "Disability") for a period of 60 days during any period of 12 consecutive months, the Company shall have the right to terminate the Employee's employment upon 30 days' prior written notice to the Employee at any time after the end of such 60-day period.  If requested by the Company, such Disability shall be subject to verification by a qualified physician (Board certified to the extent certification is available in light of the nature of the Employee's Disability) reasonably selected by the Company.  During any period of Disability prior to termination, the Employee shall continue to be compensated as provided herein (less any payments due the Employee under Disability benefit programs paid for by the Company including social security disability, worker's compensation disability or retirement benefits).

(b) In the event of the death of the Employee during the period of employment or in the event of the termination of this Agreement by the Company because of the Disability of the Employee, the Employee shall be entitled to receive the compensation specified in Paragraph 4 earned by the Employee through the date of death or termination, bonus compensation to

3

which the Employee is entitled for and in respect of the preceding fiscal year if not theretofore paid, and any benefits referred to in Paragraph 4 hereof to which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted.  The Company thereafter shall have no further obligations under this Agreement except for its obligation to pay any vested Employee benefits referred to in Paragraph 4 hereof.

      7.  <u>Termination of Employment</u>.

      (a)  The Company may terminate this Agreement with cause immediately upon written notice to the Employee.  "Termination for cause" shall mean discharge by the Company on the following grounds:

      (i)    The Employee's conviction in a court of law of any felonious crime or offense, which conviction makes him unfit for continuing employment, prevents him from effective management of the Company or materially adversely affects the reputation or business activities of the Company.

      (ii)    Dishonesty or willful misconduct which materially adversely affects the reputation or business activities of the Company and which continues after written notice thereof to the Employee, substance abuse for which the Employee fails to undertake and maintain treatment within 15 days after requested by the Company, or willful misappropriation of the Company's funds.

      (iii)    The Employee's (a)  refusal to perform his duties in accordance with the terms of this Agreement or to carry out in all material respects the lawful directives of the Company or (b) breach of any of the express covenants herein including those of confidentiality or non-competition; provided that discharge pursuant to this subparagraph (iii) shall constitute discharge for cause only if the Employee has first received written notice from the Company stating with specificity the nature of such failure or refusal, the Employee has failed to cure such failure or refusal to perform within thirty (30) days after receiving such notice and, if requested by the Employee within 10 days after the expiration of such 15 day period, the Employee is afforded a reasonable opportunity to be heard before the Board.

      (iv)    Upon such termination for cause, the Employee shall lose all right, title and interest in and to all payments required to be made in accordance with the provisions of this Agreement, and the Company shall have no further obligation to the Employee hereunder, except for compensation pursuant to Paragraph 4 to which the Employee is entitled through the date of termination, bonus compensation to which the Employee is entitled for and in respect of the preceding fiscal year if not theretofore paid, and any benefits referred to in Paragraph 4 hereof to which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted. However, if the termination is under 7(iii)(a) above only, Employee shall be entitled to 60 days of payment of "salary" in effect at the time pursuant to section 4 (a) above.

      The Company may terminate the Employee without cause at any time subject to the advance notice provisions contained herein, and which may be waived by either party hereto in exchange for full pay to the Employee for such period.  In the event of termination of the Employee

without cause at any time prior to the end of the then current Term, the Company shall pay or provide to the Employee (in addition to the Base Salary, bonus and other compensation to which the Employee shall have earned and the benefits the Employee shall be entitled to pursuant to Paragraph 4 hereof through the date of such termination and any benefits referred to in Paragraph 4 hereof in which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted), (i) the base salary then in effect pursuant to the provisions of Paragraph 4(b) hereof for an additional twelve (12) month period (except, in the case of such a termination within 12 months before or after a Change of Control, in which case base salary shall be paid for the greater of (i) an additional twelve (12) month period, or (ii) the remaining Term, payable in accordance with the Company's normal payroll practices ("Severance"), and (ii) the benefits referred to in Paragraphs 4 (c) relating to equity rights for the entire balance of the Term shall accelerate to immediate vesting. Additionally, during this period of Severance, Employee shall be entitled to continue participating in the Company's group medical, health and dental plans on the same terms as though he was an active employee. Upon the expiration of such Severance period, Employee shall then be entitled to elect COBRA continuation coverage under the relevant plans maintained by the Company at that time. For purposes of this section, it shall be deemed a "termination without cause" if the Company relocates its operations for which Employee is responsible and causes Employee to travel more than one (1) additional hour of travel to work and does not make arrangements for Employee to work remotely. It shall be deemed a constructive "termination without cause" if the Employee's job requirements are significantly changed to be inconsistent with what would be common in industry for Employee's job title. Severance shall also be paid for the cash salary for Employee and the right to elect continuing coverage of health insurance in the manner it was being carried by Employee for twelve (12) months after any non-renewal on the Initial Term or Renewal Term herein. Non-renewal at the election of the employee shall not give entitlement to Severance.

8. <u>Restrictive Covenants and Confidentiality; Injunctive Relief</u>.

     (a) The Employee agrees, as a condition to the Company agreeing to employ the Employee and to the performance by the Company of its obligations hereunder, particularly its obligations under Paragraph 4 hereof, that during the Term of this Agreement and three thereafter, the Employee shall not, without prior written approval of the Company, directly or indirectly through any other person, firm or corporation, whether individually or in conjunction with any other person, or as a director, officer, employee, agent, consultant, representative, partner or holder of any interest in any other person, firm, corporation or other association:

     (i) solicit, entice or induce any person who presently is or at any time during the term hereof shall be an employee of the Company to become employed by any other person, firm or corporation or to leave their employment with the Company, and the Employee shall not approach any such employee for such purpose or authorize or knowingly approve the taking of such actions by any other person, or

     (ii) compete with, or encourage or assist others to compete with, or solicit orders or otherwise participate in business transactions in competition with, the business engaged in by the Company at any time during the term of the Employee's employment (unless

5

such business shall have been abandoned by the Company). The restriction contained in this subparagraph 8(a)(iii) shall apply anywhere within the United States and Canada.

Nothing in the foregoing shall prohibit the Employee from engaging in any business that is not in competition with the Company, or investing in the securities of any corporation having securities listed on a national securities exchange or traded on the NASDAQ automated quotation system, provided that such investment does not exceed 5% of any class of securities of any Company engaged in business in competition with the Company, and provided that such ownership represents a passive investment and that neither the Employee nor any group of persons including him, in any way, either directly or indirectly, manages or exercises control of any such corporation, guarantees any of its financial obligations, otherwise takes any part in its business, other than exercising his rights as a shareholder, or seeks to do any of the foregoing.

(b) The Employee acknowledges that during the term of his employment, he will have access to confidential information of the Company, including information about "Developments" (as defined in Paragraph 9 below), business plans, costs, customers, profits, markets, sales, products, software, key personnel, pricing policies, operational methods and other business affairs and methods and other information not available to the public or in the public domain (hereinafter referred to as "Confidential Information").  In recognition of the foregoing, the Employee covenants and agrees that, except as required by his duties to the Company, the Employee will keep secret all Confidential Information of the Company and will not, directly or indirectly, either during the term of his employment hereunder or at any time thereafter while such Confidential Information remains confidential, disclose or disseminate to anyone or make use of, for any purpose whatsoever except for the benefit of the Company in the course of his employment, any Confidential Information, and upon termination of his employment, the Employee will promptly deliver to the Company all tangible materials and objects containing Confidential Information (including all copies thereof, whether prepared by the Employee or others) which he may possess or have under his control.  The term "Confidential Information" shall not include any information which can be demonstrated (i) to be generally known in the industry or to the public other than through breach of the Employee's obligations hereunder, (ii) to have been in the Employee's possession prior to his employment with the Company and not assigned to the Company, or (iii) to have been disclosed to the Employee by an independent third party not under any obligation of confidentiality.  Notwithstanding anything to the contrary, Employee shall be entitled to provide confidential information to a government body or in a legal proceeding pursuant to and the extent as required by a lawful subpoena or Court order.

(c) The Employee acknowledges that the restrictions contained in this Paragraph 8 are reasonable and necessary to protect the legitimate business interests of the Company and that the Company would not have entered into this Agreement in the absence of such restrictions. By reason of the foregoing, the Employee agrees that if he violates any of the provisions of this Paragraph 8, the Company would sustain irreparable harm and, therefore, irrevocably and unconditionally (i) agrees that in addition to any other remedies which the Company may have under this Agreement or otherwise, all of which remedies shall be cumulative, the Company shall be entitled to apply to any court of competent jurisdiction for preliminary and permanent injunctive relief and other equitable relief, (ii) that such relief and any other claim by the Company pursuant hereto may be brought in the United States District Court for the Eastern District of Pennsylvania, or if such court does not have subject matter jurisdiction or will not

accept jurisdiction, in any court of general jurisdiction in Pennsylvania; (iii) consents to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iv) waives any objection which the Employee may have to the laying of venue of any such suit, action or proceeding in any such court.  The Employee also irrevocably and unconditionally consents to the service of any process, pleadings, notices or other papers in a manner permitted by the notice provisions hereof.  In the event that any provisions of this Paragraph 8 hereof should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law.

      (d) The Employee agrees that the Company may provide a copy of this Paragraph 8 to any business or enterprise (i) which the Employee may directly or indirectly own, manage, operate, finance, join, control or participate in the ownership, management, operation, financing, or control of, or (ii) with which he may be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise, or in connection with which he may use his name or permit his name to be used; provided, however, that this provision shall not apply as to subparagraph (a) or (b) after expiration of the time periods set forth therein or with respect to any activities, entities or persons excluded by the terms hereof.  The Employee will provide the names and addresses of any of such persons or entities as the Company may from time to time reasonably request.

      (e) In the event of any breach or violation of the restriction contained in subparagraph (a) above, the period therein specified shall abate during the time of any violation thereof and that portion remaining at the time of commencement of any violation shall not begin to run until such violation has been fully and finally cured.

      9.  Ownership of Inventions and Ideas.  The Employee acknowledges that the Company shall be the sole owner of all the results and proceeds of the Employee's service hereunder, including but not limited to, all patents, patent applications, patent rights, formulas, copyrights, inventions, developments, discoveries, other improvements, data, documentation, drawings, charts, and other written, audio and/or visual materials relating to equipment, methods, products, processes, or programs in connection with or useful to the Company's business (collectively, the "Developments") which the Employee, by himself or in conjunction with any other person, may conceive, make, acquire, acquire knowledge of, develop or create during the term of the Employee's employment hereunder, free and clear of any claims by the Employee (or any successor or assignee of him) of any kind or character whatsoever other than the Employee's right to compensation hereunder.  The Employee acknowledges that all copyrightable Developments shall be considered works made for hire under the Federal Copyright Act.  The Employee hereby assigns and transfers his right, title and interest in and to all such Developments, and agrees that he shall, at the request of the Company, execute or cooperate with the Company in any patent applications, execute such assignments, certificates or other instruments, and do any and all other acts, as the Board of Directors of the Company from time to time reasonably deems necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend the Company's right, title and interest in or to any such Developments.

10. <u>Survival</u>.  The provisions of Paragraphs 8 and 9 shall survive the termination of this Agreement for any reason whatsoever.

11. <u>Miscellaneous</u>.

(a)  Any notice authorized or required to be given or made by or pursuant to this Agreement shall be made in writing and shall be deemed given upon  receipt if delivered personally or by facsimile transmission and followed promptly by mail, or three days after the date mailed by registered or certified  mail (return receipt requested), postage prepaid, to the parties  at the following addresses (or at such other address for a party  as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

If to Employee:
Shad Stastney
392 Taylors Mills Road
Marlboro, NJ 07746


If to the Company:
Stream TV Networks, Inc.
Att : Raja Rajan
2009 Chestnut Street
Philadelphia, PA 19103


or to any other address or addressee as any party entitled to receive notice under this Agreement shall designate, from time to  time, to the other in the manner provided in this subparagraph (a) for the service of notices.  Any notice delivered to the party hereto to whom it is addressed shall be deemed to have been given and received on the day it was received; provided, however, that if such day is not a business day then the notice shall be deemed to have been given and received on the business day next following such day.

(b)  This Agreement cancels and supersedes any and all prior agreements and understandings between or among any or all of the parties hereto with respect to the employment by or obligations of the Employee to any thereof.  This Agreement constitutes the entire agreement among the parties with respect to the matters herein provided, and no modification or waiver of any provision hereof shall be effective unless in writing and signed by the parties hereto.

(c)  All of the terms and provisions of this Agreement shall be binding and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, except that the duties and responsibilities of the Employee hereunder are of a personal nature and shall not be assignable or delegable in whole or in part by the Employee.

(d)  If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such

invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

(e)  No remedy conferred upon any party by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity. No delay or omission by any party in exercising any right, remedy or power hereunder or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by the party possessing the same from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

(f)  This Agreement may be executed in several counterparts, each of which is an original.  It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

(g)  In the event of a lawsuit by either party to enforce any provisions of this Agreement, the prevailing party shall be entitled to recover reasonable costs, expenses and attorneys' fees from the other party.

(h)  The validity, interpretation, construction, performance and enforcement of this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first written above.

STREAM TV NETWORKS, INC.

By:_____
   Name:   Mathu Rajan

_____
Shad L. Stastney

**Exhibit D**

(Board Fees)

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : |
|  | : Case No.  23-10764 |
|  | :          23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
|  | : Philadelphia, Pennsylvania |
| A) Emergency Motion For Entry Of | : April 14, 2023 |
| An Order Enforcing The Automatic | : 12:42 p.m. |
| Stay And For Sanctions For | : |
| Willful Stay Violation Filed By | : |
| Stream Tv Networks, Inc. | : |
| Represented By Rafael X. | : |
| Zahralddin | : |
|  | : |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                   Rafael X. Zahralddin, Esq.
                                  Lewis Brisbois
                                  500 Delaware Avenue, Suite 700
                                  Wilmington, DE 19801
                                  302-985-6004

                                  Vincent F. Alexander, Esq.
                                  Lewis Brisbois Bisgaard & Smith
                                  110 SE 6th Street, Suite 2600
                                  Fort Lauderdale, FL 33301
                                  954-728-1280

For SeeCubic:                     James J. Mazza, Jr., Esq.
                                  Skadden Arps Slate Meagher &
                                  Flom, LLP
                                  155 North Wacker Drive
                                  Chicago, IL 60606-1720

                                  Joseph Oliver Larking, Esq.
                                  Skadden Arps Slate Meagher &
                                  Flom, LLP
                                  920 North King Street
                                  One Rodney Square
                                  Suite 7th Floor
                                  Wilmington, DE 19801

|  | Marley Ann Brumme, Esq. |
|--|--|
|  | Eben P. Colby, Esq. |
|  | Skadden Arps Slate Meagher & Flom, LLP |
|  | 500 Boylston Street, 23rd Floor |
|  | Boston, MA 021116 |
|  | 617-573-4800 |
| For Hawk Investment Holdings Ltd: | Steven Caponi, Esq. |
|  | K&L Gates |
|  | 600 N. King Street, Suite 901 |
|  | Wilmington, DE 19801 |
|  | 302-416-7080 |
|  | Aaron Rothman, Esq. |
|  | Margaret R. Westbrook, Esq. |
|  | K&L Gates LLP |
|  | 300 South Tryon Street, Suite 1000 |
|  | Charlotte, NC 28202 |
|  | 704-331-7400 |
| For Rembrandt 3D Corp: | Andrew DeMarco, Esq. |
|  | Devlin Law Form, LLC |
|  | 1526 Gilpin Avenue |
|  | Wilimington, DE 19806 |
|  | 302-449-9010 |
| For the United States Trustee: | Kevin P. Callahan, Esq. |
|  | John Henry Schanne, Esq. |
|  | Office of The United States Trustee |
|  | Robert N.C. Nix Federal Building |
|  | 900 Market Street, Suite 320 |
|  | Philadelphia, PA 19107 |
|  | 202-934-4154 |

Proceedings recorded by electronic sound recording; transcript produced by TheRecordXchange.

1

<u>APRIL 14, 2023</u>

1

2        THE COURT:  All right.  So this is the matter of

3    Stream TV Networks and Technovative Media, Inc.  There are two

4    matters presently scheduled before the Court today.  One is the

5    Debtor's emergency motion for issuing an order enforcing the

6    stay for other turnover and sanctions.  And there is an

7    emergency motion to dismiss the Hawk Investment Holdings, to

8    dismiss this debt as paid or convert, or in the alternative, to

9    appoint a Chapter 11 Trustee.

10        So let's start first with entering appearance for the

11   attorneys who are going to participate in the two matters.

12   Let's start first with the attorneys who are going to

13   participate in the Debtor's motion with respect to the stay and

14   turnover.  Counsel for the Debtor?

15        MR. ALEXANDER:  Good morning, Your Honor.  Or good

16   afternoon, now.  Vincent Alexander, A-L-E-X-A-N-D-E-R.  And

17   also Rafael Zahralddin, it's Z-A-H-R-A-L-D-D-I-N, of Lewis

18   Brisbois Bisgaard & Smith on behalf of the Debtors.  And that's

19   the counsels who will be speaking today.

20        THE COURT:  Okay.  Counsel for any Respondent?

21        MR. MAZZA:  Good afternoon, Your Honor.  This is Jim

22   Mazza, M-A-Z-Z-A, from Skadden Arps.  I represent SeeCubic.

23        THE COURT:  Okay.  Is there anyone else who is

24   participating in the argument?

25        MR. LARKIN:  Good afternoon, Your Honor --

```
 1              THE COURT:  Hello?

 2              MR. LARKIN:  Good afternoon, Your Honor.  This is Joe

 3    Larkin, also from Skadden Arps.  My partner, Mr. Mazza, will be

 4    handling the argument for SeeCubic.  I just wanted to let Your

 5    Honor know that Mr. Mazza's pro hac motion was filed, and it's

 6    at docket 108 through 112.

 7              THE COURT:  And when was that filed, counsel?

 8              MR. LARKIN:  Your Honor, it was filed yesterday.

 9              THE COURT:  Oh, okay.  And do you think I need --

10    well, I'll figure it out.  Not where I want to be.  Okay.  I

11    want to be there.  Okay.  So it was filed at 108 through 112,

12    you said?

13              MR. LARKIN:  That's correct.  Mr. Mazza --

14              THE COURT:  I see --

15              MR. LARKIN:  Mr. Mazza --

16              THE COURT:  I see a motion -- uh-huh?

17              MR. LARKIN:  Mr. Mazza's pro hac motion is at docket

18    112, Your Honor.

19              THE COURT:  Okay.  So you filed several pro hac

20    motions yesterday, starting at 108 through 112.  And Mr.

21    Mazza's is actually number 112; is that correct?

22              MR. LARKIN:  That's correct, Your Honor.  That's

23    correct.  Correct.

24              THE COURT:  All right.  And counsel, do you believe I

25    need to enter an order before Mr. Mazza leads the arguments
```

1  today?

2        MR. LARKIN:  I do not, Your Honor.  I was just

3  letting you know that we filed it.

4        THE COURT:  Okay.  Okay.  Well, let me get the

5  appearance of everyone else and see if anybody else thinks to

6  the contrary.

7        Who else is here with respect to the motion

8  for -- all the Debtor's motion speaking of order for violation

9  of the stay and turnover?

10        MR. CALLAHAN:  Your Honor, Kevin Callahan and John

11  Schanne on behalf of the United States Trustees.

12        THE COURT:  Okay.

13        MR. CALLAHAN:  We're actually here on both matters.

14        THE COURT:  Okay.  Trustee.  Anyone else?  Okay.  And

15  does anybody take any position with respect to whether I need

16  to sign those pro hac -- Mr. Mazza's motion to appear pro hac

17  vice before he can appear?

18        MR. ROTHMAN:  Your Honor, I apologize.  I was

19  expecting one of my partners to speak up.  This is Aaron

20  Rothman at K&L Gates on behalf of Hawk.  My partner Steve

21  Caponi is on the line as well.

22        THE COURT:  Okay.  I'm sorry, could you state your

23  name again for the record, sir?

24        MR. ROTHMAN:  Aaron -- sorry.  Sorry, Your Honor.

25  Aaron Rothman, R-O-T-H-M-A-N.

1              THE COURT:  And who do you represent?  Hawk?

2              MR. ROTHMAN:  Hawk.  Yep.  And my partner Mr. Caponi

3    is on --

4              THE COURT:  And who else is with you?

5              MR. ROTHMAN:  Steve Caponi and Margaret Westbrook.

6              THE COURT:  Okay.  Anyone else here on any of these

7    matters?

8              We have 35 people, so there are other people just

9    observing?

10             MR. ALEXANDER:  Your Honor, this is Vincent

11   Alexander.  Would you like us to name all counsel even if

12   they're not going to be speaking today?

13             THE COURT:  You know what?  I think since we're not

14   in court, it probably makes sense.  And I will just note that

15   these are the attorneys who will be arguing with respect to the

16   motions.  And then, I'm going to put present.  And then you

17   could -- people could tell me who else is present. I mean, in

18   open court, you typically don't do it.  But it was just because

19   we're on the telephone, it would be good to know exactly who's

20   here.

21             MR. ALEXANDER:  Your Honor, on behalf of the Debtor,

22   we also have Bennett Fisher, F-I-S-H-E-R.

23             THE COURT:  And he is?

24             MR. ALEXANDER:  He's counsel at Lewis Brisbois.

25             THE COURT:  Counsel, okay.  Okay.  Who else?  Anyone

1    else?

2              MR. ALEXANDER:  Rafael, do we have any other

3    attorneys?  Do we have any other attorneys on?

4              MR. ZAHRALDDIN:  Yes, Your Honor.  I believe Karen

5    Poppel is also on the line.  She's an associate with us here at

6    Lewis Brisbois Bisgaard & Smith.  And it's P-O-P-P-E-L, Karen

7    Poppel.

8              THE COURT:  Okay.  For the Debtor.

9              MR. ZAHRALDDIN:  I believe that's it for the Debtors,

10   Your Honor.

11             MR. ALEXANDER:  For the counsel, at least.

12             THE COURT:  Okay.  Anyone else?

13             MR. ALEXANDER:  Your Honor, we also have

14   representatives of the Debtor on.

15             THE COURT:  Wait a minute.  Let's --

16             MR. ALEXANDER:  Would you like them, as well?

17             THE COURT:  Yes.

18             MR. ALEXANDER:  We have Mathu Rajan, it's R-A-J-A-N.

19   He's the CEO of the Debtors.

20             THE COURT:  Okay.  Anybody else representing the

21   Debtor?  Is there counsel and --

22             MR. ZAHRALDDIN:  Yes, Your Honor.

23             MR. ALEXANDER:  We do.

24             MR. ZAHRALDDIN:  Dan --

25             MR. ALEXANDER:  Dan --

1          MR. ZAHRALDDIN:  Dan Rink is also in-house counsel

2   for the Debtor.  He is on the line.  And that's R-I-N-K.  And

3   Mr. Bud Robertson, also an employee of the Debtor, is on the

4   line.  And I believe -- I don't recognize this name, so I'll

5   have to confirm.  But someone identified themselves as Sarah

6   Brewer (phonetic), perhaps, and indicated that they were an

7   employee of the Debtor.  But they can confirm their status.

8          MS. BREWER:  Yes, that's correct.

9          MR. ZAHRALDDIN:  Okay.

10          THE COURT:  Apparently, I was disconnected.  So where

11   I stopped at was I was asking was there anyone other than Mr.

12   Mazza and Mr. Larkin here for SeeCubic?

13          MR. ZAHRALDDIN:  Okay.  And Your Honor, I think

14   we -- did you hear us provide the names of the employees and

15   representatives from the Debtor that were here?  Or were you

16   off the line?

17          THE COURT:  Yes.

18          MR. ZAHRALDDIN:  Okay.

19          THE COURT:  No, I heard Mr. Fisher and Ms. Poppel and

20   Mr. Rajan.  Hello?

21          Counsel, I also didn't give my typical instructions,

22   which are could you please keep your telephone on mute until

23   you speak, and that when you do speak, that you first state

24   your name for the record.  I would ask that you not interrupt

25   anyone.  And everyone will get an opportunity to speak.  And I

1  would also ask that you keep your telephone on mute until you

2  do speak.

3          Okay.  So I did hear the representatives of the

4  Debtor.  And I was asking were there anyone else other than Mr.

5  Mazza and Mr. Larkin for SeeCubic?

6          MS. BRUMME:  Yes, Your Honor.  This is Marley Ann

7  Brumme, B-R-U-M-M-E.  And also with me is Eben Colby.

8          THE COURT:  And your relationship to SeeCubic?

9          MS. BRUMME:  We are both -- yes, we are both counsel

10  at Skadden.

11          THE COURT:  Okay.  Anyone else here?  Okay.  Mr.

12  Callahan, I'm assuming it's just you and Mr. Schanne, and

13  there's no one else for Hawk except Mr. Rothman, Caponi, and

14  Ms. Westbrook.  Anyone else?  Hello?  Oh, come on.

15          MR. ALEXANDER:  We can hear you, Your Honor.

16          MR. MAZZA:  We hear you, Your Honor.

17          THE COURT:  Oh, good.  I'm like, come on, don't tell

18  me I'm going to just keep getting disconnected.

19          All right.  So there's no one else for anyone

20  appearing who has not been named in connection with these two

21  matters?

22          MR. ALEXANDER:  Your Honor, there's two more.

23          MR. RILEY:  Judge, Leo Riley, an employee of

24  SeeCubic, Inc.

25          THE COURT:  I'm sorry, who else?

1           MR. RILEY:  Leo Riley, an employee of SeeCubic, Inc.

2           THE COURT:  Okay.  Anyone else?

3           MR. MAZZA:  Yes, Your Honor.

4           MR. ALEXANDER:  There's also two employees of the

5    Debtor.

6           THE COURT:  Okay.  Wait a minute.

7           MR. ALEXANDER:  Suby Joseph.

8           THE COURT:  For the Debtor?

9           MR. ALEXANDER:  Yeah.  Two more employees, Your

10   Honor.  I apologize.  Suby Joseph.  It's S-U-B-Y, J-O-S-E-P-H.

11   And Amanda Gonzalez, A-M-A-N-D-A, G-O-N-Z-A-L-E-Z.

12          THE COURT:  Okay.  Anyone else?  Anyone else?

13   Because I heard -- the last I heard other than -- was for --

14          MR. DEMARCO:  Yes, Your Honor.  I apologize.  I've

15   been trying to wait my turn to introduce myself.  My name is

16   Andrew DeMarco.  I am counsel for Creditor Rembrandt 3D.

17   That's D-E-M-A-R-C-O.  I also have with me a fact witness,

18   Chris Michaelson (phonetic), the president and CEO, Steven

19   Blumenthal (phonetic), and the in-house counsel Neil Wallace

20   (phonetic), for Rembrandt.  They are also on the line.

21          THE COURT:  Am I the only one who's getting

22   disconnected, John?

23          COURT REPORTER:  Yes, apparently.

24          THE COURT:  Apparently.  So now I have computer

25   issues and phone issues today.  Great.  If we get disconnected

1  again, I'm going to try to move to a different office and see

2  if the works.  Hopefully, I won't get disconnected again.

3         Okay.  I think where we left off was that we had the

4  appearance of all counsel and all persons who are present in

5  connection with the two matters.

6         Okay.  And so the first -- I think, have the parties

7  discussed exactly what it is or how they would like to proceed

8  today?  I know there have been numerous telephone calls to my

9  JA and my courtroom deputy regarding amending orders or

10  whatever it is the parties were looking for.  So let me lay

11  this out before I have any questions.

12         Typically, on an emergency motion, I'm going to hear

13  arguments, but I am not going to take evidence.  I typically

14  will hear the arguments and come to some sort of -- figure out

15  where there are -- what the actual disputes are.  And then, if

16  we need an evidentiary hearing, then I schedule the evidentiary

17  hearing.

18         So I'm not sure if the parties were unclear whether

19  there was going to be an evidentiary hearing today.  That is

20  not going to happen.  Because clearly, I would need more than

21  this afternoon to hear evidence in connection with just one of

22  these motions.

23         So with respect to the motion for relief, we can

24  start with that and then we can have some discussion and figure

25  out exactly where we're going with respect to, one, whether we

 1   need an evidentiary hearing.  Based on my review of those

 2   pleadings, I am going to assume that we do.  And two, what were

 3   the parties expecting in terms of getting that evidentiary

 4   hearing.  Okay.  We're going to start with the motion for the

 5   alleged violation of the stay and for turnover.

 6          Counsel for Debtor?

 7          MR. ALEXANDER:  Good afternoon again, Your Honor.

 8   Vincent Alexander on behalf of the Debtors.

 9          THE COURT:  Okay.

10          MR. ALEXANDER:  Your Honor, may I proceed?

11          THE COURT:  Yes, you may.

12          MR. ALEXANDER:  Thank you, Your Honor.  The Debtors

13   filed these cases on March 15th.  So we haven't even been in

14   these cases a full month yet.  And immediately upon the filing

15   of these cases, the Debtors were met with resistance from

16   various parties, including Hawk Investment Holdings, SLS

17   Holdings, SeeCubic, Inc., and various of their representatives,

18   including Shad Stastney, regarding the Debtors' ability to

19   regain possession of their property of the estate and also

20   operate in these bankruptcy cases.

21          And so we filed an emergency motion for violations of

22   the automatic stay.  Initially, with regards to one specific

23   piece of estate property, and that's an optical bonding

24   machine.  Before I get into that, though, I think it makes

25   sense, Your Honor, since you really haven't had a full hearing,

1   to kind of tell you what the Debtor does so you can see why

2   this bonding equipment is important to the Debtor's operations.

3          Stream was founded in -- would that be helpful to

4   Your Honor?

5          THE COURT:  Yes.  And counsel, it would also be

6   helpful if you'd give me some background because we have been

7   trying to, you know, based on the charts and the various

8   information in the motions, piece together who the various

9   entities are, their relationship.  Because I didn't get that at

10  the first hearing.

11         So if you, in the process of telling me the

12  information about Stream, to the extent relevant, how the

13  various players are involved in this matter.  Okay?

14         MR. ALEXANDER:  Absolutely, Your Honor.  I can do

15  that as we go through the process.

16         THE COURT:  Okay.

17         MR. ALEXANDER:  But Stream -- and as soon as I touch

18  on one of the entities, I'll tell you who they are and --

19         THE COURT:  Okay.

20         MR. ALEXANDER:  -- if you have any follow-up, I'd be

21  glad to add additional color and background as necessary.

22         THE COURT:  Okay.  Okay.

23         MR. ALEXANDER:  But Stream was founded in 2009 to

24  develop technology allowing consumers to view 3D content

25  without the need to wear glasses or goggles, right?  So

1   typically, when you see people utilizing 3D technology, they

2   have some type of viewer on, whether it's basic glasses or more

3   advanced type of goggles.

4         What was done, what the Debtors were doing, is they

5   trademarked what they called their Ultra-D technology.  And

6   this is a proprietary combination of hardware and software that

7   creates a, you know, as noted by the Debtor's principal, Mr.

8   Rajan, in various declarations, it creates a natural,

9   comfortable, and immersive glasses-free 3D viewing experience.

10        And so their goal --

11        THE COURT:  And what's it called again, counsel?

12        MR. ALEXANDER:  Ultra-D.

13        THE COURT:  What's the trademark?  Ultra?

14        MR. ALEXANDER:  Hyphen, D.  Capital D.

15        THE COURT:  Okay.  Okay.

16        MR. ALEXANDER:  And so as a technology itself, the

17  Ultra-D can be applied to panels, you know, of nearly any type

18  and size, and it's compatible with touchscreen features as

19  well.  So ultimately, what this means is that consumers are

20  going to be able to experience this technology on any device,

21  whether it's a television, a tablet, a smartphone, portable

22  game player, a laptop, you know, computers, you name it.

23        To the extent there's a panel or a type of screen,

24  you could apply this technology to it.  And as of the end of

25  last year, the Debtor and various of its subsidiaries have been

1    granted 128 patents in 13 patent families.

2            So as part of this process of taking this Ultra-D

3    technology and applying it to these panels, the Debtors

4    commissioned to manufacture a specialized optical bonding

5    equipment which would manufacture video panels utilizing the

6    Ultra-D technology.  If you want to think about this, what the

7    machine does is it glues a 3D lens to a video panel.  And you

8    know, this particular -- and that is the large machine that the

9    Debtors purchased and had built customized for them to bring

10   this technology to various panels.

11           Currently, this particular machine, this bonding

12   equipment is located in a warehouse in China.  There's no

13   dispute that the Debtor is the entity that bought this

14   equipment and there should be no dispute that the Debtor owns

15   this equipment and has title to this equipment.

16           But this equipment, in its current form, it needs to

17   be reassembled.  It's currently in parts.  But it was

18   previously put together and it was calibrated and optimized so

19   that the Debtor was achieving a high-yield rate of production

20   of 65-inch video panels.  And there were some of these panels

21   that were manufactured and, you know, were sold onto the market

22   in terms of that.

23           This machine is integral to the Debtor's ability to

24   operate, to be successful in this Chapter 11 case, and various

25   parties have been preventing the Debtor from obtaining this

1    equipment.  When we first filed the case, the Debtor had been

2    in year-long litigation with various entities that loaned the

3    Debtor money.  One of those entities was SLS Holdings and the

4    other was Hawk Investment Holdings.

5          You know, you'll hear lots of, you know, argument

6    about what the basis of that litigation was.  But essentially,

7    the litigation started when there were alleged defaults under

8    various loan documents with the parties.  And then, the SLS and

9    Hawk entities ultimately entered into an agreement, which is

10   called the omnibus agreement, which stripped Stream of all of

11   its assets.  Essentially, it transferred it to a new entity,

12   which is called SeeCubic, Inc.

13         And you're going to hear multiple SeeCubic entities.

14   But SeeCubic, Inc., is an entity that was created by SLS and

15   Hawk to take the Debtor's assets.  There was litigation over

16   the validity of that agreement.  And ultimately, in the

17   Delaware Chancery Court, the court ruled -- it entered a

18   preliminary injunction, you know, holding that that agreement

19   was effective, even though Stream argued that it was

20   ineffective because it required the vote of its Class B

21   shareholders before it could be effective, which it did not

22   get.  And Class B is for the most part controlled by Mr. Rajan.

23         However, they proceeded to transfer the assets

24   pursuant to that agreement.  There was a bankruptcy that the

25   Debtor filed, Stream, originally in Delaware.  And that was

1   ultimately dismissed.  And one of the primary reasons if not

2   the sole reason it was dismissed is because the bankruptcy

3   court held that the Chancery --

4           THE COURT:  Hello?  Turn your phone on mute, whoever

5   is talking.  Hello?  Turn your phone down.  Do we know who's

6   talking, that we can mute them?

7           COURT REPORTER:  I just muted him.

8           THE COURT:  Thank you.

9           MR. ALEXANDER:  The bankruptcy court ultimately

10  upheld -- or dismissed it primarily because it said that

11  agreement was valid and there was a transfer of the assets and

12  the Debtors didn't have any assets.  But to the extent that

13  issue got resolved, then maybe another bankruptcy would be

14  appropriate.

15          Fast forward a couple years.  That makes its way

16  through the appellate courts in Delaware.  And ultimately, the

17  Delaware Supreme Court, in a 5-0 opinion, determined that that

18  preliminary injunction and the final injunction and declaratory

19  judgment with respect to that omnibus agreement should not have

20  been entered because the Class B shareholder never voted to

21  approve that, and therefore, it violated Stream's charter in

22  order to authorize the transfer of the Debtor's assets.

23          So that went back down.  It was supposed to go back

24  down to the Chancery Court with all of the Debtor's assets

25  going back to Stream from this entity SeeCubic that was

1   created.  Because SeeCubic, as soon as they got that ruling

2   from the Chancery Court, they went and started taking all of

3   Stream's assets under, you know, the protection -- supposed

4   protection of this order and this agreement.

5          But that agreement ended up being void.  So they were

6   required to return all of the assets back to the Debtor.  And

7   they never did that.  You know, to this day, we're still

8   missing assets that were taken that were not returned.

9          With respect to the bonding equipment itself, what

10  they ultimately did is they tried to transfer it to other

11  entities to keep it out of the Debtor's possession.  Right?

12  They recognized that it was owned by the Debtor, but they made

13  it seem as if they put it in another entity's hands because

14  they were afraid of what might happen to it.

15         But that's not the issue.  The issue is who should

16  have possession, you know, of this bonding equipment.  And the

17  Debtor is the entity that should have possession of the bonding

18  equipment.  It's integral to its reorganization.  It's one of

19  the key pieces of technology that allows the Debtor to produce

20  these screens or these panels.

21         And so we filed it on an emergency basis because once

22  the Debtor gets this equipment, you know, there's going to be a

23  ramp up period where they need to reassemble the equipment and

24  they need to get the line up and running.  And then, they can

25  start fulfilling orders for customers.

1           Since they've been in this case, the Debtors, they've

2    already had deals with various customers in which they have

3    purchase orders for an excess of $100 million.  And so if the

4    Debtor can get through this bankruptcy case, it's going to need

5    this optical bonding equipment in order to do that.

6           And once that happens, you know, what will take place

7    is the Debtor will be able to satisfy any claims that these

8    Creditors had or have.  You know, there's going to be disputes

9    as to the amounts of the claims.  And then specific -- and also

10   disputes with respect to whether any portion or all of the Hawk

11   Investment Holding claim, you know, was converted to equity.

12          But those issues don't need to be resolved right now

13   and those claims will be dealt with as part of the claims

14   process and in the Debtor's plan.  But in order to get to that

15   point, the Debtor needs to get started because there's going to

16   be an approximately 60-day period for it to reassemble this

17   equipment and get everything up and running.

18          During that time period, it will be able to send

19   some, I guess, initial product to some of its ultimate end

20   users.  But in order to get the mass production, you know, it's

21   going to take, you know, that full 60 to 90 days to do.  So

22   every day the Debtor does not have the equipment, it pushes us

23   further behind in terms of being able to fulfill the

24   obligations in this bankruptcy case.

25          And so we've seen arguments from the other side that

1   this isn't an emergency because the Debtor has not had its

2   equipment.  But that misses the point.  The Debtor needs the

3   equipment and must have the equipment in order to be successful

4   in the case.  There's no reason for the Debtor not to have this

5   equipment and it should have been turned over immediately upon

6   the bankruptcy filing.

7            And in fact, in one of the actions that was pending,

8   there was a receiver pendent lite that was appointed over

9   Technovative.  His name was Mr. Ian Liston.  And upon the

10  filing, Debtor's counsel reached out to Mr. Liston.  And he

11  said, well, here's the location of the bonding equipment.  You

12  know, you guys are in control now, you know, go get it.

13           But when we attempted to get it, and as we outline in

14  our motion, the landlord indicated that various parties,

15  through counsel, said that the equipment couldn't be released

16  for the Debtor.  And when we dug a little deeper to figure out,

17  you know, who was making these claims and preventing the

18  release, we find out that the lease of the building is in the

19  name of SeeCubic, B.V., which is a subsidiary of the Debtors.

20  And the lease was executed by a Patrick Thune.  But Mr. Thune,

21  in collaboration with Mr. Shad Stastney, who's a representative

22  of SeeCubic, have indicated that they're not going to allow

23  Debtors to get the bonding equipment.

24           And so there's no basis at all for them to not allow

25  the Debtors access to the bonding equipment.  You know, once

1    the Debtors have the bonding equipment, they're going to set it

2    up in a facility, start doing the test runs, and get it fully

3    operational so that they can go ahead and move forward with the

4    production.

5            You know, the Debtors, based on their discussions

6    with various other end users, have been told that once they

7    actually get possession of the bonding equipment, there's going

8    to be more orders to come.  So you have these Creditors on the

9    one hand who are fighting the Debtors from getting their

10   assets, but the reason they're fighting them is because they

11   want to keep the assets for themselves and strip the Debtor of

12   all of its value and leave all of the Creditors and the Debtor

13   -- other Creditors and the Debtor holding the bag.

14           But that's not how the bankruptcy process works.  The

15   Debtors are fiduciaries for all parties, and their goal is to

16   come up with a plan.  And that's what the Debtors are doing

17   here, to come up with a plan to treat all Creditor claims.  And

18   they believe that once they get the equipment, they'll be on

19   the path to doing that.

20           You know, we've already filed redacted versions of

21   certain of the purchase orders showing that this is real and

22   the Debtor is going to be capable of -- in order for the Debtor

23   to fulfill those, it needs the bonding equipment.  Okay?

24           So that is what relates specifically to the bonding

25   equipment.  And as we dug in deeper to get the bonding

 1   equipment, Mr. Rajan actually flew over to the Netherlands.

 2   And when you talked about corporate structure and parties, Your

 3   Honor, I'm not sure how detailed you'd like me to get into the

 4   various, I guess the corporate structure.

 5           But the way it works -- and this is -- I don't know

 6   if you have access to your docket right now.  But if you look

 7   at docket entry 48-5, that lays out the structure and the

 8   ownership from Stream TV being the parent company, owning 100

 9   percent of the shares of Technovative.  And then, there's

10   another entity in between called Ultra-D Ventures, C.V.  And

11   then --

12           THE COURT:  Hold on, counsel.  Hold on.  I actually

13   have -- we have our own little chart here that --

14           MR. ALEXANDER:  Okay.

15           THE COURT:  -- we've got to make.  Stream TV is the

16   Debtor.  And then, Stream owns 100 percent of Technovative; is

17   that correct?

18           MR. ALEXANDER:  That is correct.

19           THE COURT:  And then, Technovative is the 99 percent

20   general partner of Ultra-D Ventures Curacao.  Where is that?

21   Am I pronouncing that right?

22           MR. ALEXANDER:  Yes, you are.  Correct, Your Honor.

23           THE COURT:  Well, let me -- okay.  Is that correct?

24           MR. ALEXANDER:  Yes, Your Honor.

25           THE COURT:  And then, Ultra-D Ventures is 99

```
 1   percent -- I don't know if they're a general partner or owner

 2   of Ultra-D Cooperative in the Netherlands.  Is that correct?

 3            MR. ALEXANDER:  That's correct, Your Honor.  And

 4   then, if you drop down one more, you get to the SeeCubic, B.V.

 5   entity.

 6            THE COURT:  Right.  Which is 100 percent owned by the

 7   Ultra-D Cooperative, or am I wrong about that?

 8            MR. ALEXANDER:  You are right about that, Your Honor.

 9            THE COURT:  Okay.  And then, there's a SeeCubic,

10   Limited.  That is 100 percent owned by SeeCubic, B.V.?

11            MR. ALEXANDER:  That's not on the chart I'm looking

12   at, Your Honor.  And for today's purposes, I don't --

13            THE COURT:  Well, we made our own chart.  This is my

14   chart.

15            MR. ALEXANDER:  Oh, okay.

16            THE COURT:  This is my chart.

17            MR. ALEXANDER:  Understood.

18            THE COURT:  So let's stop with your chart.

19            MR. ALEXANDER:  Okay.

20            THE COURT:  We'll stop at SeeCubic, 100 percent of

21   SeeCubic, B.V., is owned by Ultra-D Cooperative.  I want to

22   stop there because we were trying to figure -- believe it or

23   not, I do read these things.  Trying to figure out who's what.

24            Okay.  And then, we have U.S. Debtors, three Dutch

25   entities, and then we have SeeCubic entities.  Okay.  All
```

 1   right.  And we got them color-coded, which, you know, didn't

 2   come out too well.  Okay.

 3           MR. ALEXANDER:  Yeah.

 4           THE COURT:  So --

 5           MR. ALEXANDER:  And so just so you know, the --

 6           THE COURT:  I need for the --

 7           MR. ALEXANDER:  The limited entity is not related to

 8   the Debtor that you just mentioned.

 9           THE COURT:  Which one is not related to the Debtor?

10           MR. ALEXANDER:  You said SeeCubic, Limited.

11           THE COURT:  Right.  That's not related to the Debtor?

12           MR. ALEXANDER:  No.

13           THE COURT:  Okay.  Are you using --

14           MR. ALEXANDER:  It's my understanding -- it's my

15   understanding that that's one of Mr. Shad Stastney, whose of

16   SeeCubic, Inc., that's one of his U.K. entities.

17           THE COURT:  Okay.  Okay.  And to the extent this is

18   relevant to the matter before the Court today is what I am

19   trying to figure out.  I don't need to know all of these

20   different -- but only with respect -- because what the Debtor,

21   with respect to the motion to enforce stay and direct turnover,

22   has at least at some point -- or maybe in the opposition, some

23   reference to these various entities.  And I think on page 19 of

24   the opposition, there was also a chart.  Am I in the right one?

25   Let me see.

1           There was a chart on page -- yes -- 19 that -- well,

2    it looks better than my chart.

3           MR. ALEXANDER:  Which --

4           THE COURT:  Okay.

5           MR. ALEXANDER:  Your Honor, could you -- which

6    opposition?  Because there's been lots of oppositions and

7    affirmative motions filed.

8           THE COURT:  This is the Opposition --

9           MR. ALEXANDER:  What's the docket entry number?

10          THE COURT:  Yeah.  This is docket entry 105.

11          MR. ALEXANDER:  Okay.

12          THE COURT:  Which is SeeCubic's objection to the

13   Debtor's emergency motion for entry of an order.  And on page

14   19, there was also a chart that to some extent follows this --

15   but had more than what at least was on mine.

16          MR. MAZZA:  Your Honor, I'm sorry to interrupt.  This

17   is Jim Mazza from Skadden.  And I interrupt because you're

18   referring to the papers that we filed on behalf of SeeCubic.

19   So in that, that chart does indicate which entities are, you

20   know, putative Debtors and then the entities below them, which

21   are non-Debtors, down to the entities that I believe have been

22   framed by the putative Debtors as subject to this automatic

23   stay dispute.  And those are color-coded in green, beginning at

24   Cooperative.

25          THE COURT:  Okay.  Well, mine did not color-code.  So

```
 1   I have --

 2             MR. MAZZA:  Oh, I apologize.

 3             THE COURT:  No, it's not your fault.  It just didn't.

 4             MR. MAZZA:  Yeah.

 5             THE COURT:  And so there's -- yes.  I think what was

 6   missing on mine are the ones that you had in between the

 7   Technology Holdings Delaware, Media Holdings Delaware, Ultra-D

 8   Ventures C.V. Curacao is on there.  Ultra-D Cooperative, the

 9   Netherlands is there.  And then, the Stream TV Netherlands is

10   on there.  And the SeeCubic, B.V., the Netherlands is on your

11   chart.  I have SeeCubic, Limited, and I also have SeeCubic

12   India, which is not on yours.

13             So as I said, we tried to figure this out.  Not sure

14   how well we did, but we tried.  So at some point, I just want

15   the parties to at least tell me how they think they're related.

16   The Debtors think that their -- the assets are somehow related

17   to the Debtor.  Obviously, the opposition does not believe that

18   they're any way related to the Debtor, but I'll hear those

19   arguments.

20             Okay.  So Mister -- counsel for Debtor, you can

21   continue with respect to -- I think we have the corporate

22   structure, at least what I need to know at the moment just from

23   an overall basis.  I am assuming that the parties will get into

24   more detail.  Okay?

25             MR. ALEXANDER:  Thank you, Your Honor.  So in terms
```

1   of what was discovered after we filed the initial motion, and

2   as you may recall, I said that there was a, you know, a

3   receiver in place who, upon the filing of the bankruptcy,

4   recognized that he was displaced.  And the receiver was

5   directly controlling, you know, all of these subsidiaries

6   through the rights of Stream and Technovative.

7           So upon the filing, you know, all these rights vested

8   or revested in the Debtor.  And they worked with Mr. Liston,

9   who was the receiver.  He acknowledged that he was displaced.

10  He began turning over information and materials regarding, you

11  know, all of the subsidiaries, including with respect to the

12  bonding equipment.

13          And then, in order to continue using these management

14  rights and operate these subsidiaries that are integral, you

15  know, to the Debtor's business because they hold the Debtor's

16  intellectual property, Mr. Rajan flew over to the Netherlands

17  in order to assess the situation there, you know, from a

18  financial standpoint, from an employee standpoint, and also

19  determine what was going on, advise the parties of the

20  bankruptcy, advise that he was the CEO, which he is.  And he's

21  the sole director of those entities.  And that they needed to

22  start cooperating with respect to the Debtors being able to

23  proceed in the bankruptcy case and that Mr. Liston was no

24  longer involved.

25          And in fact, Mr. Liston actually sent correspondence

1  to SeeCubic, B.V., and Mr. Patrick Thune, who works at

2  SeeCubic, B.V., you know, advising them that this transition

3  was taking place.  And so there was no doubt that all of these

4  parties, you know, had knowledge of the bankruptcy cases and

5  that there's no dispute of the ownership.

6       There's never at any point, you know, been any

7  transfer of the ownership of any of these entities.  There's

8  been no foreclosure of stock interests.  None of these

9  Creditors have ever taken that step.  And so they are still

10  owned by the Debtors.

11       And so what comes along with that are the rights to

12  manage and operate these entities.  And so that's what Mr.

13  Rajan was doing when he went over there, was to assess it, take

14  control, and also to determine what type of funding was

15  necessary to keep running these entities and also determine,

16  you know, whether that lines up what the vision is going

17  forward in terms of the Debtor's operations.

18       And what Mister --

19       THE COURT:  Counsel?

20       MR. ALEXANDER:  Yes, Judge?

21       THE COURT:  Counsel?

22       MR. ALEXANDER:  Sure?

23       THE COURT:  When you say these entities, specifically

24  what entities are you referring to?

25       MR. ALEXANDER:  SeeCubic, B.V. is the specific entity

1    that he went over to the Netherlands in terms of the operations

2    of.  And that's owned by the Stream TV Network and

3    Technovative, when you follow through the chart.

4           THE COURT:  If I look at this chart and do a

5    back -- okay.  There's two different -- your chart doesn't have

6    the Delaware and the Hawk has Technology Holdings Delaware and

7    Media Holdings.  And mine just goes straight from -- and I

8    don't know which one is right, I just made my own chart --

9    Stream TV to Technovative, Technovative to Ultra-D, and Ultra-D

10   Ventures to Ultra-D Cooperative, and then Ultra-D Cooperative

11   to SeeCubic, B.V.  So we're talking about SeeCubic, B.V. is the

12   one in the Netherlands that you went over for?  Mr. Rajan went

13   over for?

14          MR. ALEXANDER:  Yeah.  That's correct, Your Honor.

15   Okay.  And so that entity.  And what they were met with was Mr.

16   Patrick Thune advising them that Mr. Stastney -- remember Mr.

17   Stastney is affiliated with SeeCubic, Inc., and those are

18   Creditors, you know, of --

19          THE COURT:  Now, wait a minute.  Could you spell that

20   for me?

21          MR. ALEXANDER:  Stastney is S-T-A-S-T-N-E-Y.

22          THE COURT:  I'm sorry, say that again.

23          MR. ALEXANDER:  His first name is Shadron.  I believe

24   I said that correctly.  It's S-H-A-D-R-O-N.  The last name is

25   Stastney, S-T-A-S-T-N-E-Y.

```
 1                THE COURT:  And he is?  And who is he again?

 2                MR. ALEXANDER:  He's a principal at SeeCubic, Inc.

 3   And also I believe affiliated with Hawk Investment Holdings.

 4                THE COURT:  Okay.  So I think you were going --

 5                MR. ALEXANDER:  I'm sorry.  He's affiliated with SLS.

 6   I apologize.

 7                THE COURT:  With SLS.

 8                MR. ALEXANDER:  SLS Holdings.

 9                THE COURT:  Wait.  S?

10                MR. ALEXANDER:  L-S, Holdings.

11                THE COURT:  Okay.

12                MR. ALEXANDER:  And those are parties, if you recall,

13   that said the Debtor had financing arrangements with Hawk

14   Investment Holdings and also SLS Holdings, I believe it's VI,

15   LLC.  None of those entities, you know, loaned money to any of

16   the subsidiary entities.  It was solely Stream TV, the Debtor.

17                THE COURT:  Okay.

18                MR. ALEXANDER:  And what Mr. Thune was telling Mr.

19   Rajan is Mr. Stastney, based on his debts with the Debtors,

20   right, so the claims that he believes he has against the

21   Debtors, you know, he's able to direct, you know, certain

22   actions at the subsidiaries.  And so they're trying to use

23   their debts against the Debtors to try and impact these

24   subsidiaries that are integral to the Debtor's reorganization

25   process and were set up for, you know, tax and research and
```

1   design purposes.

2         And so they're interfering with the Debtor's ability

3   to be able to manage these entities.  And they have no basis to

4   do that.  You know, Mr. Rajan is the CEO.  And again, there's

5   been no argument or I haven't seen anything in any of the

6   papers, you know, indicating that stock ownership was

7   transferred away from Stream TV or Technovative with respect to

8   any of the downstream entities.

9         And so upon the filing, all of that ownership

10  remained with the Debtor's estates.  And so what these parties

11  are trying to do is make an end run and try to go now at the

12  other assets.  But their only basis for attempting to do that

13  is based on their claims that they assert that they have

14  against the Debtors.

15        And so their actions are damaging the estates and the

16  abilities of the Debtor to proceed and progress in this case.

17  Because again, the SeeCubic, B.V. entity holds the R&D and

18  certain of the intellectual property that's utilized by the

19  Debtors to manufacture those panels that we discussed about

20  earlier through the use of the bonding machine.

21        So it's all interrelated in terms of the process in

22  which the Debtors are going to be able to succeed.  And so you

23  have parties that have come before this Court, you know, who

24  filed a motion to seek relief from the automatic stay to

25  proceed with a, you know, dispute in the Chancery Court in

 1   Delaware.  But then, they're taking the very action that they

 2   were seeking to obtain by seeking the relief.

 3          And so clearly, they know that the actions they're

 4   doing are improper and are a violation of the stay.  And so

 5   what we're seeking from the Court with respect to that is for

 6   them to stop interfering with the Debtor's management.  And

 7   they've even gone so far as to file a lawsuit in the

 8   Netherlands trying to strip the Debtors of their management

 9   rights with respect to SeeCubic, B.V.

10          And so the Debtor has those rights through its

11   ownership interests, you know, through the various

12   subsidiaries.  And we believe that's an intentional

13   interference with property of the estate and the Debtor's

14   ability to manage, you know, its assets.

15          And so we think it clearly falls within a violation

16   of the stay.  And so the first two violations that we have are,

17   one, with respect to the bonding equipment.  And you know,

18   quite frankly, I haven't seen anything filed which indicates

19   it's not owned by the Debtors and shouldn't be in their

20   possession.

21          And now, we have the management rights of the

22   subsidiaries that are being interfered with by the acts of, you

23   know, Mr. Stastney directing people such as Patrick Thune.  And

24   then also, you know, the filing of the lawsuit, which was

25   purportedly filed on behalf of SLS, Hawk, SeeCubic, Inc., and

1    Mr. Stastney.

2          And so if the Debtors are going to have a chance to

3    succeed in this case, you know, this interference has to stop.

4    You know, these parties are looking to steal the Debtor's

5    assets and keep them for themselves, but that's not what

6    bankruptcy is about.  It's an equitable process in which the

7    Debtors have a statutory right to attempt to reorganize.  And

8    that's what they're trying to do in this, but they need

9    possession of all of their assets and they need the

10   interference to cease.

11         The third basket, in terms of the stay relief and

12   turnover, if you recall, I previously had mentioned that

13   omnibus agreement.  And part of that agreement and the order

14   from the Chancery Court required certain assets -- and we list

15   the assets in the motion, with respect to various display

16   units, tablets, corporate laptops.  All of those ended up being

17   turned over from Stream to SeeCubic, Inc.

18         Once the omnibus agreement was determined to be void

19   and improper by the Delaware Supreme Court, those assets were

20   all supposed to come back.  The Chancery Court entered an order

21   saying all those assets needed to come back.  And to this day,

22   those assets still have not been returned to the Debtor.  And

23   we outlined, you know, the specific assets in our -- and let me

24   get the document entry number.  We believe it's 76, Your Honor.

25         THE COURT:  Let me -- I don't think I've printed out

```
 1   76, but let me look at -- motion for sanctions.  Is that the

 2   original motion?

 3            MR. ALEXANDER:  Let me double check.  Maybe that's

 4   not -- it's not.  I apologize, Your Honor.  It's not outlined.

 5   I'll get the docket entry for you that has those identified.

 6   But those are the assets that were transferred and were

 7   supposed to come back to the Debtor.

 8            THE COURT:  All right.

 9            MR. ALEXANDER:  And SeeCubic, Inc., has refused to

10   deliver them, or alternatively, account for them in terms of

11   what happened to them.  Because the response the Debtor had

12   when it sought certain of these are, well, some of those aren't

13   really property of the Debtor because maybe we made some

14   improvements to them.  Or they were returned.

15            But you know, we believe the code requires more than

16   that, and it actually requires not only the return but an

17   accounting for those assets, so.

18            THE COURT:  Okay.  And what assets are you -- what

19   docket entry number are you referring to?

20            MR. ALEXANDER:  I'm scrolling through to try and find

21   that as we talk, Your Honor.

22            THE COURT:  Is it in your supplemental, number 90?  I

23   did print 90, but not -- supplemental motion for stay for

24   turnover and sanction.

25            MR. ALEXANDER:  It may be 76, and then, number 3.
```

1          THE COURT:  Number 3?

2          MR. ALEXANDER:  So 76-3.

3          THE COURT:  Okay.  Exhibit C?

4          MR. ALEXANDER:  That's correct, Your Honor.  Where we

5   list the other Stream assets, a list of Debtor's property, you

6   know, in possession of SeeCubic, Inc.  And we go through there,

7   there's the Ultra-D -- their demonstrator samples.  We identify

8   the last location, you know, where they were at or where the

9   Debtors knew they were at.  And then, we also go through and

10  list the tablets.  To the extent that we have serial numbers,

11  we listed the serial numbers.

12          And so we provided as much information as possible so

13  that there's no misunderstanding in terms of, you know, what

14  assets are being referred to and which ones need to be turned

15  over.  And so we've identified, you know, each of those assets

16  and the reasons why those assets are important.

17          You know, putting aside the business computers, which

18  had numerous information of the Debtor's in terms of their

19  business operations on it, which they no longer have access to,

20  but the specific samples.  This is what the Debtors use when

21  they go out to pitch the product and sell it to other parties.

22          And so again, part of the equation is, is it of

23  inconsequential value.  And certainly, these are very material

24  and they allow the Debtors to go out and get more purchase

25  orders with the goal in mind of being able to deal with the

1 | debts of SLS and Hawk, you know, in this bankruptcy process.

2 | And so these are very integral to the Debtors being

3 | able to do that. And these are samples that, you know,

4 | customers want to see. I mean, they actually want to see the

5 | product work and how it works before they, you know, issue more

6 | purchase orders or for entities that the Debtors have not done

7 | business with in the past, new purchase orders.

8 | And so all of that property, you know, should be

9 | returned and turned back over to the Debtors so that they can

10 | utilize it as part of the process, in terms of reorganization.

11 | And so you know, most creditors that I see in bankruptcy cases,

12 | they want to get paid. And so in order for these Creditors to

13 | get paid, you know, they need to allow the Debtors to operate

14 | and not interfere with their operations and allow them to have

15 | all of their property in their possession.

16 | It's all going to be under this Court's, you know,

17 | jurisdiction, in terms of how the Debtor operates, reporting

18 | requirements. And so that is, you know, what we're looking to

19 | do here, is to stop the violations of the automatic stay,

20 | require property to be turned over to the Debtor. There's no

21 | good faith basis for it not to be in the possession of the

22 | Debtors. And this is very material to the Debtors.

23 | And you know, I just want to note in terms of the

24 | urgency with respect to the interference at SeeCubic, B.V., you

25 | know, they've filed a proceeding and they have a hearing set on

1   the 20th where they're trying to oust Mr. Rajan, you know, from

2   the management of that entity.  And you know, that could be

3   very detrimental because again, the Debtor then won't have

4   control over its intellectual property which it utilizes in

5   terms of creating these panels, which is has $100 million-plus

6   in orders that it's obtained since the bankruptcy cases were

7   filed.

8          So we need the actions to stop.  We need the parties

9   to comply with what the bankruptcy code requires.  And then,

10  the Debtors can go ahead and proceed with the case in an

11  orderly fashion.  And instead of focusing on, you know, where

12  are our assets, who's interfering with it, they can actually

13  focus on the restructuring part and making sure that Creditors

14  in this case and their claims ultimately get satisfied as part

15  of a plan because there should be plenty of money, based on

16  these orders, to deal with all the claims in this bankruptcy

17  case.

18         But the Debtors need the breathing spell and they

19  need to be afforded the rights under the bankruptcy code in

20  order to do that without the violations by SLS, Hawk, SeeCubic,

21  and Mr. Stastney, and their work essentially interfering in the

22  operations of the Debtor's subsidiary, SeeCubic, B.V., in the

23  Netherlands.

24         And so Your Honor, we believe that there's an urgency

25  in granting this relief and we would request that Your Honor

1   enter an order directing them to stop interfering with the

2   Debtor's management of its subsidiaries, turn over and allow

3   access to the bonding equipment, and also all of the other

4   property that's listed in 76-3.

5            THE COURT:  Okay.

6            MR. ALEXANDER:  And if Your Honor has any questions,

7   I'm happy to help clarify.  I know when we do this over the

8   phone, it's not as easy as if we're able to hand you things in

9   person.  But I'm happy to try and point you to any other

10  documents or follow-up on any questions that you may have.

11           THE COURT:  Okay.  Not at this time.  I want to hear

12  from SeeCubic.  Okay.  And you said Mr. Mazza on behalf of

13  SeeCubic?  Or did I have that backwards?

14           MR. MAZZA:  You are correct, Your Honor.  This is Jim

15  Mazza from Skadden on behalf of SeeCubic.  And if I may

16  proceed?

17           THE COURT:  Yes.

18           MR. MAZZA:  I'll respond to what Mr. Alexander went

19  through.  And I got to say, first off, there's a long history

20  here, and I know the Court has seen a lot of papers get filed

21  with that history.  And I'm not going to belabor it, but -- and

22  I think it's going to come out as more as there will actually

23  be evidence as part of this case.

24           But I think the axiom that an honest debtor is

25  entitled to the benefit of the doubt does not apply here.

1    There is history with this being the third filing, and Mr.

2    Alexander has an explanation as to why this was an okay filing.

3    I'll respond to that in due course.

4           But every one of these filings was at the eleventh

5    hour to avoid a foreclosure.  It's a textbook bad faith use of

6    the bankruptcy system, and I think Hawk's motion to dismiss,

7    convert, or have a trustee appointed is actually much more

8    relevant than the rich irony of the Debtor hauling us into

9    court to try to have to explain ourselves when they have both

10   the facts and the law completely wrong.  And it should be their

11   principal, Mr. Rajan, explaining himself as to why these cases

12   were filed and what this is really about.

13          The automatic stay issues, Your Honor, are actually

14   pretty simple when you look at the law.  And I don't think -- I

15   know this isn't an evidentiary hearing.  I know there seems

16   like there was a lot of testimony from the podium from Mr.

17   Alexander.  And what it boils down to, it's pretty simple.

18          We're looking at a few different discrete items that

19   they're making complaints about, the first of which is this

20   bonding equipment.  And I think there's enough in the record

21   that the Court can take judicial notice of to the extent

22   there's any need for facts.  But the bottom line is there's a

23   simple legal principal that applies here that the Supreme Court

24   had put in a holding very recently.  And that is the retention

25   of estate property is not a stay violation.  And that, we cited

```
1    in our papers, Fulton v. City of Chicago.

2              And that's the law, period, full stop.  I've

3    mentioned --

4              THE COURT:  Okay.  Counsel, let me ask you -- let me

5    ask you with respect to the Fulton decision.  Retention.  In

6    those cases, the -- I think it was a couple of cases -- the

7    City of Chicago had repossessed the vehicles in question.  So

8    they were rightfully in possession.  In other words, they had

9    a -- they were holding it pursuant to, I guess, their rule,

10   whatever.

11             And what I'm trying to figure out in this case, what

12   right did SeeCubic have to -- let's start with that bonding

13   equipment first.  Under what basis did SeeCubic have -- so

14   that's the first thing you have to establish, is that you had a

15   right to retain it.  So what basis did SeeCubic have to be in

16   possession of this bonding equipment?

17             MR. MAZZA:  Your Honor, let me answer that question

18   as to the facts as it relates to the bonding equipment that we

19   laid out in our papers and what has been going on in the Court

20   of Chancery.  So that bonding equipment is sitting in a

21   warehouse in a city in China, and it's been sitting there

22   inoperable for a long period of time.

23             And so SeeCubic is --

24             THE COURT:  Okay.

25             MR. MAZZA:  SeeCubic is not doing anything to
```

1  exercise any control over that equipment.  It just remains in

2  the warehouse.  And so that --

3          THE COURT:  Okay.  So why isn't it being -- no, no,

4  no.  It's more than that.  Why isn't is being released to the

5  Debtor?

6          MR. MAZZA:  So and Hawk, I know, is on the phone as

7  well.  And I think one thing that the Debtor's counsel has not

8  conveyed to the Court are discussions where the parties have

9  tried to figure out a way to consensually actually return the

10  equipment to Stream under the ordinary process of dealing with

11  adequate protection.

12          And let me tell you, Your Honor, the discussions

13  around that were pretty basic, asking the Debtor for proof of

14  insurance, method by which they would move the equipment,

15  because it's highly technical equipment, where they might

16  actually move the equipment, as far as ultimate location.

17  Those particular details have not been shared with either us or

18  Hawk as part of this discussion.

19          So really, the --

20          THE COURT:  So counsel, let me ask you this.  You

21  represent SeeCubic.

22          MR. MAZZA:  Correct.

23          THE COURT:  What is SeeCubic's interest in this

24  bonding equipment?

25          MR. MAZZA:  SeeCubic's interest in the bonding

```
 1    equipment, I think, Your Honor, there's a few points.  Again,

 2    it's sitting in a warehouse in China --

 3            THE COURT:  Counsel, I get all that.

 4            MR. MAZZA:  Correct.  Right.

 5            THE COURT:  My question is what is SeeCubic's

 6    interest in the bonding equipment and what is it based on?

 7            MR. MAZZA:  So we are a secured Creditor, along with

 8    Hawk, in connection with the bonding equipment.  And therefore,

 9    we have an interest in the Debtor providing adequate

10    protection, which, again, we tried to resolve --

11            THE COURT:  Okay.  So wait a minute, counsel --

12            MR. MAZZA:  -- resolve with the Debtor.

13            THE COURT:  Counsel.  Counsel, let me walk you

14    through this.  So you're a secured Creditor in that you have a

15    bonding equipment?

16            MR. MAZZA:  Correct.

17            THE COURT:  And when I say you, you mean SeeCubic has

18    a security interest in the bonding equipment?

19            MR. MAZZA:  That's right, Your Honor.  Your Honor,

20    this --

21            THE COURT:  SeeCubic -- wait a minute.

22            MR. MAZZA:  This --

23            THE COURT:  Hold on.  Hold on.  I mean, I'm trying to

24    get the facts, because my reading -- and that's why I'm asking

25    questions -- is that I thought -- and there's a couple of
```

1    SeeCubics.  I thought the -- which SeeCubic are you referring

2    to?  So maybe that makes a difference.

3              MR. MAZZA:  Yeah.  Yeah.  Right, Your Honor.  I can

4    see how it can get a little bit --

5              THE COURT:  So SeeCubic.  Who has a security interest

6    in the bonding?  SeeCubic, Inc.?

7              MR. MAZZA:  Correct.

8              THE COURT:  Now, I thought SeeCubic, Inc., was formed

9    to take possession pursuant to that agreement?

10             MR. MAZZA:  You're right, Your Honor.  It was the

11   acquisition vehicle through the foreclosure that previously

12   occurred.  And so --

13             THE COURT:  So how does it have a security interest?

14   It's actually, its interest in the bonding equipment arose

15   pursuant to that agreement that is now void.  At least,

16   according to the Delaware Supreme Court, that agreement is

17   ineffective and any transfer to SeeCubic would be ineffective.

18             MR. MAZZA:  Right.

19             THE COURT:  So SeeCubic's interest was pursuant to a

20   void order.  How is it a secured Creditor?

21             MR. MAZZA:  So let me peel it back a little bit

22   further, Your Honor.  So Hawk is a secured Creditor of Stream.

23   Under pledge agreements securing loans, Stream granted Hawk the

24   right to vote all of its shares in Technovative common stock

25   following an event of default.

1              After the omnibus agreement was approved, Hawk and

2     SLS made loans to SeeCubic to help grow the business.  And they

3     entered into a note and purchase agreement amongst those

4     parties, in conjunction with which Hawk and SLS --

5              THE COURT:  What parties?  Wait a minute.  What

6     parties?

7              MR. MAZZA:  Hawk, SLS --

8              THE COURT:  What parties?

9              MR. MAZZA:  Hawk, Your Honor, and SLS, who's the

10    first lien Creditor, and SeeCubic.  And they transferred their

11    rights --

12             THE COURT:  Okay.  Okay.

13             MR. MAZZA:  And they transferred their rights as

14    Creditors to SeeCubic, thereby consolidating those rights

15    within a single entity.  Pursuant to that agreement, Hawk is

16    still able to enforce and levy enforcement rights against

17    Stream because of an agreement between SeeCubic and Hawk.  So

18    that's how the interplay works between the secured Creditors.

19    And that's been already decided by the Chancery Court in a

20    collateral estoppel opinion that was issued --

21             THE COURT:  Okay.  And that had nothing to do with

22    that agreement because I understand the agreement, it was

23    pursuant to this agreement that the assets, including this

24    bonding equipment, was transferred to SeeCubic.  So right now,

25    the title to this thing belongs to the -- unless you're telling

1   me the Debtor never had title, title and ownership remains with

2   the Debtor.  And that according to -- so whatever the -- with

3   respect to -- not with the rights to who had security interests

4   or any of that other stuff.

5           MR. MAZZA:  Right.

6           THE COURT:  Transfer of the equipment -- talking

7   about the bonding equipment -- to SeeCubic was undone because

8   the court found that whatever happened with respect to that

9   agreement was not enforceable.  And so to the extent the

10  equipment had been transferred, it really has to go back to the

11  Debtor.

12          MR. MAZZA:  So --

13          THE COURT:  So the bonding equipment -- no?  Who did

14  it go back to?

15          MR. MAZZA:  Sorry.  Go ahead.

16          THE COURT:  So who did it go back to?  Who owns it

17  right now?

18          MR. MAZZA:  Yeah.  So Your Honor, it's property of

19  the estate.  So the --

20          THE COURT:  Counsel, that did not answer my question.

21  My question is who owns -- if the transfer to SeeCubic is

22  undone --

23          MR. MAZZA:  Correct.

24          THE COURT:  -- who is the owner of the bonding

25  equipment?

1                   MR. MAZZA:  Stream.

2                   THE COURT:  Okay.  So if Stream is the owner and no

3    one has repossessed or foreclosed or did anything with respect

4    to the bonding equipment -- okay?  I get you might have a

5    security interest, and I'm not saying you don't.  And if the

6    Delaware court already decided you did, that's fine.  But for

7    my purposes, if you didn't foreclose, you meaning either

8    SeeCubic, who has the rights of Hawk and SFL -- or am I

9    pronouncing right?  Is it FSL or FLS?

10                  MR. ALEXANDER:  SLS.

11                  THE COURT:  They transferred --

12                  MR. MAZZA:  SLS, Your Honor.

13                  THE COURT:  SL what?

14                  MR. MAZZA:  SLS.

15                  THE COURT:  SLS.  That's what I thought I said.  SLF.

16   I'm saying SFL.  SLS.  Whatever security interests that Hawk

17   and SLS had in the bonding equipment, they transferred those

18   rights to SeeCubic, correct?

19                  MR. MAZZA:  Correct.

20                  THE COURT:  Correct?

21                  MR. MAZZA:  Correct.  You're right.

22                  THE COURT:  And neither Hawk, SLS, or SeeCubic

23   foreclosed on that or took possession of it, because that order

24   was undone, correct?

25                  MR. CAPONI:  Your Honor, from Hawk's perspective,

1    incorrect.  But I'll let Mr. --

2           THE COURT:  Okay.

3           MR. CAPONI:  Only because you had mentioned Hawk.

4           MR. MAZZA:  Yeah.

5           THE COURT:  Well, okay.  Well, let's put it this way.

6    Did anybody foreclose on that bonding equipment?  Did anybody

7    repossess the bonding equipment?

8           MR. CAPONI:  So Your Honor, again, Steve Caponi for

9    Hawk.  Factually, what occurred, Your Honor -- and the answer

10   to your question is yes.  Factually, what occurred in the

11   connection with -- the Delaware Supreme Court invalidated the

12   omnibus agreement and directed the Court of Chancery to unwind

13   the omnibus agreement, effectively, and move assets back to

14   where they belong.

15          With respect to the piece of bonding equipment, it

16   was never, full stop, never an asset of this estate.  It was

17   always --

18          THE COURT:  Wait a minute.

19          MR. CAPONI:  Yes, Your Honor?

20          THE COURT:  Wait a minute.  I just -- I just -- Mr.

21   Mazza just said it's property of the estate.  Which one is it?

22   Who owns it?

23          MR. CAPONI:  I can only answer for my client, Your

24   Honor.  The piece of bonding equipment was always retained at

25   the SeeCubic, B.V., level.  That's where the equipment was

1   owned.  Stream was always and remains a holding company.  It's

2   only asset -- it had no operations.  Its only asset was stock

3   in Technovative and then downstream to the SeeCubic, B.V.,

4   level.

5          THE COURT:  Okay.

6          MR. CAPONI:  The way the Court of Chancery

7   effectuated the omnibus agreement, meaning when it first

8   ordered the omnibus agreement to be complied with, what

9   occurred was the stock of Technovative was moved over to

10  SeeCubic because once you took Technovative, all the operating

11  subsidiaries fell underneath that to the really only operating

12  subsidiary, which is SeeCubic, B.V.

13         So fast forward --

14         THE COURT:  Okay.  So who has --

15         MR. CAPONI:  Fast forward --

16         THE COURT:  Counsel, let's cut to the chase.

17         MR. CAPONI:  Yes.

18         THE COURT:  Who is the title owner of the bonding

19  equipment?

20         MR. CAPONI:  The title owner of the bonding equipment

21  is SeeCubic, B.V., in the Netherlands.  But Your Honor, to your

22  point about foreclosure, after the Supreme Court set aside the

23  omnibus agreement and it came back to the Court of Chancery,

24  the Vice Chancellor Lassiter (phonetic), gave Stream a 10-day

25  window to raise the funds sufficient to pay off the secured

1   debt before it would allow the secured Creditors to exercise

2   their secured Creditor rights, which included foreclosure,

3   self-help, et cetera.

4          That 10-day window expired, Stream having done

5   nothing.  Hawk, in the name of Hawk and SLS and SeeCubic --

6   again, as Mr. Mazza indicated, there was a pooling of these

7   security interests -- executed a series of documents

8   repossessing its collateral, directing that the stock in

9   Technovative be transferred over to SeeCubic.

10         That triggered the 225 action.  And the court put in

11  place the receiver to freeze everything in place.  The receiver

12  was at the Technovative level and lower.  And I think the

13  quickest way to dispose of Your Honor's question is if you

14  look, again, judicial notice, at what occurred in the Court of

15  Chancery.

16         When Stream wanted to get possession of the bonding

17  equipment, it negotiated with the receiver, who was below

18  Stream.  So if Stream had the bonding equipment, it would not

19  have been negotiating with the receiver.  It was negotiating

20  with the receiver, vis a vis Technovative, ultimately

21  controlled SeeCubic, B.V.

22         THE COURT:  Okay.

23         MR. CAPONI:  There was a motion made with the Court

24  of Chancery where the receiver -- and the Court of Chancery

25  authorized this, so this is like collateral estoppel here.  The

1   Court of Chancery authorized the receiver to permit Stream to

2   take possession of the bonding equipment.  And the order is

3   very clear, the receiver could cause SeeCubic, B.V., to turn

4   over possession of the bonding equipment -- and SeeCubic, B.V.

5   is a non-Debtor -- if certain conditions were made, which was

6   Mr. Mazza indicated, proof of insurance, putting up a bond, et

7   cetera.

8           The Debtor never did that.  So the state of play when

9   this case was filed was that the bonding equipment was still

10  resident under the ownership of SeeCubic, B.V., rights, title,

11  and interest, subject to the secured Creditor's liens.  There

12  was an opportunity for the Debtor to take possession -- oh,

13  sorry, SeeCubic, B.V., being a non-Debtor.  The Debtor could

14  take possession if it satisfied the court order.

15          It never did.  So once the bankruptcy was filed, we

16  are back to the beginning.  Stream wants an asset that the

17  right, title, and interest resides pursuant to the Court of

18  Chancery order on this point, at SeeCubic, B.V., subject to the

19  foreclosure options that my client exercised as well as a

20  secured interest.

21          THE COURT:  Okay.  So you believe that your client

22  actually foreclosed on the property and that it's not property

23  of the Debtor's estate?

24          MR. CAPONI:  Correct.  Well, it's not property of the

25  Debtor's estate, A, because it's at the SeeCubic, B.V., level,

1    which is not a Debtor or even a subsidiary of a Debtor.  It's

2    about four steps removed.  And as the Vice Chancellor --

3            THE COURT:  Well, but wait a minute.  But --

4            MR. CAPONI:  Yes, Your Honor?

5            THE COURT:  But counsel, you would also agree -- and

6    maybe I'm missing something -- that the SeeCubic, B.V., is

7    owned 100 percent by Ultra-D Cooperative, which is 99 percent

8    owned by Ultra-D Ventures, and Ultra-D Ventures is 99.9

9    percent -- Technovative is the 99.9 percent general partner.

10   So that any interest that these Debtors have -- or the only one

11   I guess would be Technovative -- have is pursuant to its

12   ownership interests in the various companies that flow down to

13   SeeCubic, B.V.?

14           MR. CAPONI:  Your Honor --

15           THE COURT:  And not directly.  And not directly.

16           MR. CAPONI:  Yes, Your Honor.  So I do not profess to

17   be a -- I'm a litigator, not a pure bankruptcy lawyer.  And so

18   I just point out that whatever the legal effect is of the

19   Debtor not putting a subsidiary into bankruptcy is for someone

20   else on this call to address.  I will only comment to the

21   extent to say that the laws in the Netherlands, which is why I

22   think there's a hearing next week.  I'm not involved in it.  I

23   don't know much.  But the law in the Netherlands is such that

24   the directors owe duties, I think, greater than to just their

25   controlling stockholder.  And that is why the controlling

1  stockholder cannot just replace necessarily a director, which

2  is what the Debtor is trying to do.

3          Again, above my pay grade to a certain extent.  But

4  this is not -- if this was in the United States, Your Honor, in

5  Delaware where I'm most familiar, yes, I would agree with you,

6  a wholly owned sub of a wholly owned, you know, sub of a wholly

7  owned sub ultimately goes back to the parent.  That apparently

8  is not the case --

9          THE COURT:  Right.  And the --

10          MR. CAPONI:  -- in the Netherlands.  And because this

11  is not a Debtor.

12          THE COURT:  But it doesn't matter that it's not a

13  Debtor.  The Debtor's interest in those entities is property of

14  the estate.

15          MR. CAPONI:  Yes, Your Honor.

16          THE COURT:  You don't disagree with that?

17          MR. CAPONI:  The Debtor does not have an interest in

18  the assets, the specific assets, of the non-Debtor entity.

19          THE COURT:  I get that.

20          MR. CAPONI:  It has an interest of in the entity.

21  Yes, I agree with you.

22          THE COURT:  I get that, counsel.  And that's what I'm

23  saying, is the Debtor's interest in the subsidiaries, as I'm

24  going to call them, is property of the estate.

25          Now, I'm a little confused because the Debtor --

1   Debtor's counsel said that the Debtor had title to and

2   purchased the bonding.  So somebody is wrong.  It can't be

3   both.  It can't be that the Debtor purchased and had title, and

4   your position, counsel, that in fact, the Debtor did not

5   purchase and that title lied with SeeCubic, B.V.

6           I don't know which one it is.  And I guess -- I mean,

7   I'm not going to decide that today.  But it goes to me trying

8   to figure out where we are and whether there's some preliminary

9   relief that I can grant pending a full-blown evidentiary

10  hearing.

11          MR. CAPONI:  Your Honor?

12          THE COURT:  But it's a --

13          MR. CAPONI:  I agree with your -- this is not

14  the -- will not be the first and last time there's a polar

15  opposite view of the facts from the Debtor and the secured

16  Creditors.  I would just say the easiest way for the Court to

17  look at this in a preliminary level -- and again, an

18  evidentiary hearing may be required -- is to look at the court,

19  which, the Court can take judicial notice of there was a

20  specific order entered in the Court of Chancery where the

21  Debtor petitioned the receiver in order to get control of this

22  asset.

23          And in that proceeding and in those orders, nowhere

24  did the Debtor argue that it had title.  Everyone acknowledged

25  title and possession belonged to SeeCubic, B.V.  I understand

1    they're changing their tune now, and we can, you know, tease

2    that out in the future for Your Honor.

3           But lastly on this point, Your Honor, my clients, as

4    the Court of Chancery noted several times, had expansive

5    self-help rights on all of the assets, top to bottom.  And we

6    exercised those rights prior to this bankruptcy.  The only

7    reason my client was funding and managing and operating

8    SeeCubic, B.V., the only reason we didn't take title to the

9    stock, et cetera, was because the Court of Chancery put the

10   receiver in place during the 225 action.  But that occurred

11   after we had already issued all the notices required under the

12   various contracts to pull the trigger on our self-help rights.

13          THE COURT:  Okay.  So that just means, as far as I'm

14   concerned, is that if you exercised -- and when you say you,

15   presumably, you mean SeeCubic, because what I'm hearing -- or

16   maybe I misunderstood, was that all of the rights for your

17   stock had been transferred to SeeCubic.  Was that correct?

18          MR. CAPONI:  That is correct, Your Honor.  And the

19   reason I refer to -- the reason everyone refers to Hawk in the

20   shorthand for SeeCubic is that SeeCubic -- sorry, SeeCubic

21   issued notes separately to Hawk.  Those notes are in default.

22   And Hawk, under those notes, is the collateral agent of

23   SeeCubic, with all of the rights to exercise all of SeeCubic's

24   rights in Hawk's own name or in the name of SeeCubic.

25          So with regard to the secured debt, it is not

1  directly owned by Hawk.  But as a result of a default under a

2  different set of notes, for all intents and purposes, Hawk is

3  the party exercising all of SeeCubic's rights.

4         THE COURT:  And does SeeCubic exercise and

5  grant -- it's going to get a little dicey, as far as I'm

6  concerned, the -- you said SeeCubic issued notes to Hawk that

7  it defaulted on.

8         MR. CAPONI:  Yes.

9         THE COURT:  And those notes to Hawk gave -- what did

10  SeeCubic give to Hawk on those notes?  In connection with those

11  notes?

12         MR. CAPONI:  Your Honor, those -- yeah.  Those notes,

13  by virtue of those notes, Hawk was the first lien secured

14  Creditor over all of the assets -- let me -- if I could step

15  back for one second.  Hawk was the primary funder of Stream and

16  had a security interest over everything at Stream.  When Hawk

17  contributed that debt and those rights to SeeCubic, one of the

18  things --

19         THE COURT:  Let me ask -- hold on a minute.

20         MR. CAPONI:  And this is shorthand.

21         THE COURT:  Hold on.

22         MR. CAPONI:  Yes.

23         THE COURT:  Hold on. Back up a minute.  You told me

24  that Stream -- Steam, right?  The Debtor Stream was just a

25  holding company and had no operations.  It was just a holding

1    company for all these other subsidiaries.

2            MR. CAPONI:  Correct.

3            THE COURT:  So what did you -- what did you fund

4    Stream TV to do?  I mean, it was a non-operating company.  What

5    did you loan -- you, meaning Hawk -- loan them money for?

6            MR. CAPONI:  Well, Stream was the primary vehicle

7    through which third parties made an -- when I refer to Stream,

8    I'm referring -- I was referring to it as the family.  But to

9    be technical, the Stream entity that is the Debtor was the

10   vehicle through which funding was raised.  That money was then

11   downstreamed to the operating entities.

12           And in certain instances, Hawk -- I'm not sure about

13   SLS, but Hawk funded directly past Stream down to the SeeCubic,

14   B.V., level as well.  And in exchange for the totality of that

15   funding -- there were 18 different notes -- when you wrap them

16   all together, Hawk had a security interest with self-help

17   rights, et cetera, over all of the assets in the Stream family,

18   from top to bottom, from the Stream parent level to the

19   SeeCubic, B.V., level, and had pledge rights and -- these are

20   very voluminous documents.

21           THE COURT:  Okay.

22           MR. CAPONI:  But when those rights were contributed

23   to SeeCubic, Hawk received a commensurate level of protection

24   at the SeeCubic level, meaning if there was a default on the

25   underlying notes or the notes between SeeCubic and Hawk, Hawk

1  would have the right to basically step in and be out back in

2  position as the first lien, you know, priority secured Creditor

3  with pledge rights and everything else.

4          And so that's what Hawk -- what SeeCubic gave to Hawk

5  in exchange for Hawk contributing the notes, among other

6  things, was the right to be what is called the collateral

7  agent.  And that is to exercise all of SeeCubic's rights under

8  those 18 notes that I referred to a minute ago.

9          THE COURT:  Okay.  So let's see if I understand it.

10 Hawk and maybe SLS contributed whatever security for all of

11 their claims against the Stream family into SeeCubic.  And in

12 exchange for that, SeeCubic also gave notes or however it was

13 documented where there was a default -- and I don't know who

14 the default would be by, because you didn't tell me that.

15 There was a default, then all the rights would then actually --

16 I'm going to use the word revest.  That might not be the proper

17 terminology.  But they would go back, revest back in Hawk,

18 correct?

19         MR. CAPONI:  Yes.  At a high level, Your Honor.  And

20 the default was if the omnibus agreement was not fully

21 implemented or invalidated, that triggered a default.  So when

22 the Supreme Court -- there was a definitive default when the

23 Supreme Court invalidated the omnibus agreement.  That then

24 triggered Hawk's rights as collateral agent.

25         THE COURT:  And it went back to -- I'm going to say

1  it went back.  So now, because that agreement is now no longer

2  effective, all of the rights that Hawk had originally rest with

3  Hawk as the collateral agent, correct?

4          MR. CAPONI:  Correct.  Yes, that's -- I think that's

5  correct.

6          THE COURT:  So what rights if any does SeeCubic have

7  at this point?

8          MR. CAPONI:  Well, the rights that Hawk is

9  exercising, those rights still belong to SeeCubic.  We are --

10  Hawk is just exercising them as the collateral agent.  So under

11  the agreement, Hawk can enforce the notes, the 18 notes, in its

12  own name or it can enforce them in the name of SeeCubic.  This

13  was litigated --

14          THE COURT:  And -- right.  And they can be enforced

15  against the entire -- I'm going to say Stream family.  Or

16  whatever collateral was pledged, correct?

17          MR. CAPONI:  Correct.

18          THE COURT:  Okay.  And that hasn't happened yet.

19          MR. CAPONI:  Well, it started, Your Honor, when,

20  after the Supreme Court decision, all the various notices to

21  exercise the pledge rights, to marshal -- there's an obligation

22  where all they need to do is issue a marshalling directive to

23  have all the assets put in one location.  And that was

24  exercised.  And so it became sort of a jump ball at that point.

25          We exercised our secured Creditor rights to take

1    possession of the collateral.  The collateral always remained

2    at SeeCubic, B.V.  That has always been the operating entity.

3    So it didn't matter when Stream had the "assets" or when

4    SeeCubic, Inc., got the assets, everyone kept SeeCubic, B.V. in

5    place.  And that was the operating entity.

6          So from my perspective, when we issued -- my client

7    issued the marshalling directives and the pledge rights under

8    its secured agreements, it took possession of those assets.

9    Title, it had not taken possession of because it had not

10   completed an Article 9 sale.  But as far as possession, 9/10ths

11   of the law possession, those assets, including the bonding

12   equipment, belonged to the secured Creditors.  I know the

13   Debtor disagrees with that, but that's our position.

14         THE COURT:  Okay.  So your position is that title was

15   with SeeCubic, B.V., and that the secured Creditor had

16   exercised his right of possession.  Okay.

17         MR. CAPONI:  Correct.

18         THE COURT:  Okay.  And so you then would be in the

19   same position as in Fulton County, where you -- you, meaning

20   SeeCubic through its collateral agent, Hawk -- had possession

21   pursuant to a secured Creditor's right.  And therefore, you

22   don't have to turn it over because you had a right.  You

23   basically were maintaining the status quo.  Is that your

24   position?

25         MR. CAPONI:  Your Honor, I think that's correct.  But

```
 1   again, I would defer to Mr. Mazza on that because I am not a
 2   bankruptcy lawyer.  He is.  And I've never read that case and I
 3   suspect he has.  But from the argument I can follow, it sounds
 4   correct.
 5           MR. MAZZA:  Yeah.  Yeah.  If I can interrupt.  And
 6   thank you, Mr. Caponi, for clarifying some of the record there
 7   with respect to what happened in the Court of Chancery.  And
 8   yeah, I agree with that position, Your Honor.
 9           THE COURT:  Okay.  Okay.  So obviously, I'm going to
10   have to have an evidentiary hearing, because the Debtor's
11   position is you didn't do that, and that the Debtor is the
12   owner.  And your position is you did exercise.  And that would
13   go to issues relating to whether there was a violation of the
14   stay or not.  Okay?
15           And also, that would go over to turnover actions,
16   because turnover actions relate to certain things.  And that
17   would also affect whether there's a turnover action.  But I
18   will say, counsel, that to the extent -- and there is a
19   distinction between, obviously, the various entities, the
20   non-Debtor various entities and the Debtor entities.
21           But I have to acknowledge and everybody has to
22   recognize that part of the Debtor's assets are its interests in
23   the companies who had interest.  It's a holding company.
24   That's how it was described.  And that the holding company's
25   interests, however they may flow, those interests are property
```

 1   of the estate.  And to the extent they're property of the

 2   estate, they're related to -- and there may be some

 3   consequences that, you know, the stay can apply to.

 4          Yes, they're not in bankruptcy.  But there are often

 5   third party beneficiaries -- I'm going to use third party, but

 6   that may not even be the correct -- but in my mind, that's how

 7   they work -- that there are related parties that may get to

 8   have the benefit of that because they serve to the benefit of

 9   the Debtor who is in bankruptcy.

10          So I'm hearing two different things.  One is that

11   this is not the Debtor's property.  This is actually property

12   of an entity that the Debtor, through one of its subsidiaries

13   or part of its family, holds title to.  That's a different

14   issue than if the Debtor actually owns it and it belongs to the

15   Debtor directly.  Those are all different things that I have to

16   consider in both whether there's a violation of the stay or

17   whether there is a turnover, whether turnover is appropriate.

18          Okay.  I get that.  And I'm sorry, because counsel, I

19   started -- I didn't ask any questions to Debtor's counsel

20   because I didn't have any conflict.  So I don't want you to

21   think that I'm just questioning you and didn't question him.

22   But I only had one side.  And now that I have a different side,

23   I'm trying to parse through the difference.  Okay?

24          I'm sorry, counsel.  Where did I -- I think I

25   interrupted you when I started asking, well, wait a minute, who

 1  owns this stuff?  You can continue with your argument, Mr.

 2  Mazza.  I apologize.  Go ahead.

 3          MR. MAZZA:  No apology needed, Your Honor.

 4  Appreciate the colloquy and Mr. Caponi helping clarify some of

 5  the issues.  Hopefully, that was helpful.  So I think we're --

 6          THE COURT:  It was very helpful.

 7          MR. MAZZA:  Where we're going next is that on Fulton,

 8  I understand what Your Honor is saying with respect to what the

 9  Supreme Court had to say there.  I think it's important in the

10  context here to understand really, I think, how the court

11  looked at why it came out, you know, the way it did as there

12  not being a stay violation in that case.

13          And that putting aside who is rightfully or not

14  rightfully possessing the property, the bottom line is if

15  somebody has property and a secured creditor has interest in

16  it, what needs to happen to the secured creditor one way or the

17  other is that it needs to get adequate protection.

18          And where I was going, Your Honor, is that we did try

19  to engage in a dialog on that discussion, based on pretty

20  simple requirements to address adequate protection, just to try

21  to reach a resolution that would be acceptable amongst the

22  parties and clearly cut against any allegation that there's

23  some kind of willful violation of the automatic stay.

24          But when counsel to Debtor can't provide us with any

25  proof of insurance, any sort of details about what they intend

1    to do to the property, that's pretty telling in our view as to

2    the gamesmanship that's going on here.  And so I think that if

3    Your Honor is thinking of any kind of interim relief at any

4    point in time here, that those are going to be important

5    requirements to include with anything that might be decided to

6    relate to the bonding equipment.  And so I really would

7    emphasize that as part of the overall package of what we're

8    looking at here.

9            And moving on from the bonding equipment, there's a

10   few things that I'll get to around sort of this urgency the

11   Debtors have tried to create around this with purchase orders

12   and the like.  And again, I know this isn't an evidentiary

13   hearing, but there's been the appearance of this entity called

14   Visual Semiconductor, Inc., which we've laid out in our papers.

15           And this entity, apparently, is a party to these

16   pressing purchase orders that the Debtors are --

17           THE COURT:  What's the name again, counsel?

18           MR. MAZZA:  Yeah.  The name --

19           THE COURT:  Visual what?

20           MR. MAZZA:  Semiconductor, Inc.  It's VSI, is the

21   acronym.

22           THE COURT:  Okay.

23           MR. MAZZA:  And so --

24           THE COURT:  Yeah.  Okay.

25           MR. MAZZA:  So this entity --

```
 1              THE COURT:  Okay.  I've heard that.

 2              MR. MAZZA:  -- it is --

 3              THE COURT:  I note VSI.  Okay.  You believe this

 4   entity is what?

 5              MR. MAZZA:  Not to be confused with VTI, which was an

 6   entity from a previous bankruptcy case that was involved in

 7   running the same kind of "cherry-picking" exercise.  And in the

 8   previous bankruptcy, when Judge Owens became wise to what was

 9   going on there, she did bar Stream from filing for bankruptcy

10   for a year.

11              And I know they're going to try and they have been

12   trying to distinguish things this time because of vindication

13   from the Delaware Supreme Court on a decision nine months ago

14   on the omnibus agreement.  But again, that's just not the full

15   record.  They didn't file for bankruptcy when that decision

16   came down.

17              No, they fought tooth and nail in litigation in the

18   Court of Chancery for nine months to evade secured Creditors

19   and their exercise of remedies that Mr. Caponi artfully went

20   through as to what was happening.  And when the shoe was about

21   to drop, they filed again.  And that's why we're here before

22   Your Honor.

23              And I would say that, you know, this alter ego, VSI,

24   which is owned and operated by, our understanding is, the

25   principal of the Debtors, Mr. Rajan.  And they've put in a
```

1   purchase order, again, that needs to be urgently performed on

2   that involves the production of 100,000 units on behalf of this

3   entity.  So Stream is obligated outside of this court approval

4   process for production of a really outlandish amount of units

5   of these particular items.

6          And so we have serious questions as to what's going

7   on with that and if that was manufactured in order to try to

8   establish that there's something going on with Creditors and

9   trying to manufacture some claims as they relate to this

10  alleged automatic stay violation, which again, we don't think

11  stands up as a matter of law.

12         THE COURT:  Counsel, I'm not sure how -- you believe

13  that -- okay.  So this VSI is party to these purchase

14  agreements.  And you believe that they're not real and that

15  they're only to support claims for violation of the stay with

16  respect to the bonding?

17         MR. MAZZA:  Well, they've certainly created a sense

18  of urgency around things that they want to perform on these

19  particular orders in emergency fashion.  And the kind of

20  numbers that are in the orders are just not -- they're just not

21  achievable in any sort of reality whatsoever.

22         So we have some serious doubts about it.  And we've

23  been in contact with, you know, engineers regarding the same.

24  And they've never heard of the kind of production that these

25  really bare bones purchase orders are indicating the Debtor

1    would try to satisfy here.

2            So it's a real headscratcher, Your Honor.  And I was

3    just putting it out there that it does bear this uncanny

4    resemblance to what they attempted to do in the first -- one of

5    the first bankruptcy cases that was duly dismissed for bad

6    faith by Judge Owens.

7            So if they're running the same scheme, which

8    apparently, they may very well be doing here, because as we

9    laid out in our papers, there are communications that are also

10   been going around about the plan to scuttle the equity interest

11   in Stream and move that all over to VIS, that again, raises

12   serious doubts about it and we've been in contact with, you

13   know, engineers regarding the same.  They've never heard of the

14   kind of -- kind of production that these really bare bones

15   purchase orders are indicating the Debtor would -- the Debtor

16   would try to satisfy here.

17           So it's a real head scratcher, Your Honor.

18           THE COURT:  Uh-huh.

19           MR. MAZZA:  And I just put it out there that it does

20   bare this uncanny resemblance to what they attempted to do in

21   the first -- one of the first bankruptcy cases that was duly

22   dismissed for bad faith by Judge Owen.  So if they're running

23   the same scheme, which apparently they may very well be doing

24   here.

25           Because as we laid out in our papers, there are

1  communications that are also -- been going around about the

2  plan to scuttle the equity interest in Stream and move that all

3  over to VSI.  That again, raises serious questions as to -- as

4  to the good faith here.

5         And if there wasn't the track record that is already

6  part of previous bankruptcy cases, maybe we might not have

7  questions.  But this is almost too coincidental, Your Honor,

8  for us to not be asking serious questions that go to, really, I

9  think Hawk's motion that's also on the docket today.

10        I think turning attention to really corporate

11  authority, and I think Your Honor focused on the right issues

12  that we laid out in our papers about who's a debtor and who's

13  not a debtor and whose interest is protected or not.

14        I think though one important point that is also in

15  Hawk's motion is that when the Technovative entity, the Debtor

16  entity was filed, there was no corporate authority for Mr.

17  Rajan to actually initiate a filing for that particular entity.

18  That corporate authority was vested in the receiver under

19  Delaware corporate law.  And so while we can't control what the

20  receiver does, Mr. Rajan can't step in and just exercise

21  corporate authority that did not exist.  He was -- he was not

22  the board.  The board was the receiver.

23        And so that is -- that filing was clearly alterverus

24  (phonetic), and so there's no -- there's been no authority to

25  file that entity.  And you know, that flows down through the

1    structure, but again, doesn't really change the answer as it

2    relates to the Dutch entities.  Because as we went through

3    those entities, none of which are debtors, they don't have the

4    automatic stay apply to them.  That's clear under the law and

5    how 362 is written, Your Honor.

6            If they had authority to file, and they didn't have

7    authority to file Technovative, as I just said, then use the

8    automatic stay if you want to put the foreign entities in the

9    bankruptcy and then you can use the stay.  But you can't -- you

10   can't use the stay when it doesn't apply.

11           Now is there a procedure, Your Honor, to extend the

12   stay to non-debtors?  Yes, there is.  Is that procedure pretty

13   hard to be able to satisfy?  Of course it is.  It's exceptional

14   circumstances that need to be established to do so.  And while

15   the circumstances are indeed exceptional here, they're

16   exceptional for all the wrong reasons and don't support

17   extension of the stay to what Mr. Rajan is trying to accomplish

18   over in the Netherlands by trying to install himself as the

19   director in that entity.

20           And it's a dispute that is a dispute of Dutch

21   corporate law that would be decided under the principals of

22   Dutch law.  So there's no impact on the Debtors.  Mr. Rajan is

23   not a debtor and these are -- this is property outside the

24   estate.

25           Because if you follow corporate form, which I know

 1   these debtors don't have a tendency to want to follow.  But

 2   there is a reason why corporate formalities and corporate form

 3   is followed that would apply here such that these entities

 4   should not -- not be -- this shouldn't be any kind of violation

 5   of the stay that's trumped up here.  Again, it's all -- it's

 6   all in the auspices of trying to have their cake and eat it too

 7   such that they don't -- they can go -- go down to non-debtors.

 8   Demand assets be returned to them and then not report back to

 9   this Court because they're not operating under any supervision

10   by this Court.

11          And that falls into the idea that these cases really

12   deserve to have a trustee appointed, whether that's a Chapter 7

13   trustee or a Chapter 11 trustee, or just be dismissed outright

14   because of the acts that have been taken here.  But again,

15   that's part and parcel of what the separate motion is.

16          But to take all of that into context and to say that

17   this amounts to violations of the automatic stay, Your Honor,

18   is just not a proper use of the automatic stay.  It's a

19   weaponization of it.  We've tried to come to the table to

20   figure things out.  They've decided they just want to litigate.

21          So if they want to litigate, that's fine.  But they

22   have to go to -- they have to come to Your Honor with more than

23   emergency motions.

24          Third Circuit law requires them to file an adversary

25   proceeding for turnover.  We still have not seen that.  They

 1    want to go through that, that's fine.

 2            We had a long colloquy with Your Honor about

 3    complicated issues, about the property, and what interest

 4    parties have in it.  There's a legitimate dispute.  They're

 5    trying to say, well, this is all willful violation of the

 6    automatic stay.  That's just not how it works, Your Honor.

 7    They've got to go through the proper procedure if it's indeed

 8    their property, if it's something that they're entitled to and

 9    creditors are not left out in a lurch, unprotected by a group

10    here that their past conduct should certainly be taken into

11    account in any decision that Your Honor is inclined to make one

12    way or the other.

13            So with that, Your Honor, I think that covers the

14    points that I wanted to make, unless you have any other

15    specific questions for me.  I'm happy to cede the podium or

16    telephonic podium over to whoever else -- I think maybe Mr.

17    Caponi might have something to add.  But that's my presentation

18    for the moment.

19            THE COURT:  Okay.  I've got -- you've answered all my

20    questions.  I may be a little more confused than when I

21    started, but all right.  I may have a better understanding, but

22    I don't have any questions at the moment.

23            MR. MAZZA:  Thank you, Your Honor.

24            THE COURT:  Okay.  And so is there anyone else -- I

25    think the only opposition that was filed was by SeeCubic for

1    the joinder.  I think that was a -- was that a joinder from

2    Hawk's right?  Or am I confusing the motions?

3            MR. CAPONI:  I think that's correct, Your Honor.

4            THE COURT:  Okay.  And --

5            MR. MAZZA:  And Your Honor, just -- I'm sorry to

6    interrupt.

7            THE COURT:  No, go ahead.

8            MR. MAZZA:  Mr. Mazza.  And we did -- the fact that

9    you mentioned a joinder.  Hawk did join in our opposition.  We

10   did join in Hawk's motion as well in our opposition, not to

11   make it more confusing than it already is.  But just wanted to

12   make it clear.

13           THE COURT:  No, I know there were -- right.  I saw

14   those joinders.  Does anybody -- is there anything else that

15   Hawk thinks that I need -- and I'm saying Hawk.  I don't know

16   if it's in its capacity for itself or it's the collateral

17   SeeCubic, whatever.  Does Hawk have anything else other than

18   what I already heard with respect to the ownership of the

19   bonding and who has what with respect to why this is not a

20   violation of the stay?

21           MR. CAPONI:  Yes, Your Honor.  The only other thing I

22   would add, Your Honor, is --

23           THE COURT:  Who's here?  How's speaking?

24           MR. CAPONI:  This is Steve Caponi, Your Honor.  I

25   apologize.

1          The only other thing that I would add is again, we

2     took discovery in the underlying 225 action, you know, which

3     ended about a week or two before the filing.  So the

4     information we have is fairly current.

5          The -- Mr. Rajan testified, I took his deposition and

6     the records bore this out, and they submitted some affidavits

7     to the Court that Stream had no operations since at least 2020.

8     Mr. Rajan testified that, again, because it was a holding

9     company.  Not only did it not have any operations, it had no

10    bank accounts.  He submitted an affidavit and he testified at

11    his deposition that starting in 2020, Stream has had no bank

12    accounts, and it had no bank accounts as to his deposition

13    about a week or two before this case -- this Chapter was filed.

14         So the notion that this was a company that has --

15    sorry, not only they had no bank accounts, Your Honor.  Had no

16    bank accounts, had no employees, had no payroll, had no

17    nothing.

18         The notion that it is on the cusp of fulfilling

19    orders for hundreds of thousands of units worth hundreds of

20    millions of dollars is a farce.  It just is.  I mean, I could

21    be more polite about it.  But it's the same story you've heard

22    over and over, and they said the same thing in the Court of

23    Chancery.  And when you ask for a purchase order, what you get

24    is a redacted document through VSI and that's what they've done

25    here.

1          So they won't tell the Court allegedly who this

2   purchase orders from because it doesn't exist.  And even if a

3   purchase order existed, it was given at an entity that has no

4   operations and no bank accounts.

5          There's been no activity in this case.  No first day

6   motions.  No -- and if you start with the proposition Stream

7   had no operating business, anything it does is outside the

8   ordinary course.

9          So entering into a distributorship agreement, for

10  lack of a better term, that was disclosed last night for the

11  first time in Mr. Rajan's affidavit, how that occurred without

12  Court approval or notice is an anathema to me.  How they could

13  be entering into purchase orders when they had not entered into

14  a purchase order with anybody for at least the prior three

15  years.  To do so without the Court approval, again, seems to be

16  a pretty blatant violation of the rule.

17         So I just say when we talk about the equipment and

18  who owns what, if you don't have a bank account for three years

19  and you don't have any assets for three years, it's kind of

20  hard to take the argument with a straight face that they're the

21  direct owners of this bonding equipment or anything else for

22  that matter.  And that's the last thing I'll say, Your Honor.

23         THE COURT:  Counsel, you said that Mr. Rajan had

24  testified that he had no operations since when?

25         MR. CAPONI:  2020, Your Honor.  When the Court of

1    Chancery --

2              THE COURT:  Okay.

3              MR. CAPONI:  -- moved the assets over to SeeCubic,

4    Mr. Rajan testified that Stream ceased all operations, had no

5    employees, what employees existed went to other entities, and

6    he was -- and there were no bank accounts.

7              Because one of the things in the 225 action, the pur

8    -- not one of the things, the thing.  Was did Stream convert

9    the debt to equity and in order to do that it needed to

10   demonstrate that it raised money, so we asked for the bank

11   accounts.  All right.  Give us your Stream bank accounts.  And

12   Mr. Rajan told the Court in an affidavit and me in a deposition

13   that once the assets were moved over into SeeCubic, Stream shut

14   down all of its bank accounts and in that day in, I think, the

15   middle of 2020, has never had a bank account.

16             THE COURT:  Well, counsel, I'm not quite sure that

17   means anything.  All the assets were turned over to SeeCubic,

18   of course they had no assets.  What are they going to have?

19   I'm not quite sure that means anything from my perspective,

20   because if you took all their assets, what do they have left?

21             MR. CAPONI:  Your Honor --

22             THE COURT:  I mean, that's a whole different issue.

23   I'm just saying, I'm not sure what you think it will -- what

24   that means here.  I don't know.

25             MR. CAPONI:  If I --

1          THE COURT:  I mean, it may not mean anything.  I'm

2    sorry, go ahead.

3          MR. CAPONI:  Yeah, sure.  Your Honor, I just want to

4    elaborate.  I'm not sure how -- that it checks a legal box.

5    The Debtors are relying very heavily on this notion that we

6    have this -- you know, we have these purchase orders, et

7    cetera.  And they're trying to portray -- no, don't try.

8    They're telling Your Honor this case was filed so that Stream

9    could reorganize and get back in production.

10          And my only point in raising it is, there was nothing

11   to reorganize because the assets never got returned.  So Stream

12   lost its assets three years ago.  Lost its bank account.  Lost

13   its employees.  Never regained them.  It may hope to get them

14   back in the future.

15          But the notion they can go from a zero asset, zero

16   bank account entity to stand in front of Your Honor today and

17   say they're on the cusp of fulfilling a $100 million order?  I

18   would just note for Your Honor, this company never turned a

19   dime in revenue or profit.  Its entire lifecycle lived off of

20   debt.

21          And we would love to see them to have this purchase

22   order.  We would love to see $100 million come in, but they

23   make the same promise over and over.

24          And I'm only just pointing out, Your Honor, you have

25   to learn how to walk before you can, you know, crawl before you

1  can walk and walk before you can run.  The testimony is on the

2  eve of this bankruptcy, this was an infant in the cradle at

3  best.  So the notion that they can now run a marathon if you

4  just give them bonding equipment is a fallacy.  That was my

5  point in raising it.

6          THE COURT:  Right.  But counsel, you also have to --

7  also admit that on the cusp of bankruptcy, they didn't have any

8  assets.  They had all gone to SeeCubic.  So how could they

9  crawl, walk, or do anything if they didn't have their assets?

10         So from my perspective is once they got it at the --

11 at least on the eve of bankruptcy, a portion had been returned,

12 perhaps not to them but to their subsidiary because that

13 agreement was undone.  So we're talking about a different

14 point, different company in terms of what I would be looking

15 at.

16         Clearly, if they didn't have their assets, they

17 weren't doing anything.  But once they were returned, they

18 weren't the same company in terms of what they were, a company

19 with mounts something being returned as to a company where

20 everything -- all assets had been taken.  I can't look at that

21 and say, well, they're trying to run now.  I don't know what

22 they're trying to -- maybe they are trying to rub because even

23 though the assets were returned, they may still be crawling.  I

24 don't know.

25         But I'm just saying it just doesn't mean what you

1  think it might mean to this Court, the fact that they didn't

2  have anything because they had been foreclosed upon, so that's

3  the only point I'm making.

4          MR. CAPONI:  Your Honor, if I could just clarify one

5  point, Your Honor, the assets have never been returned.  The

6  assets all -- the operating assets all were at the Technovative

7  level or below.  And those assets never went back -- they went

8  from SeeCubic, Inc to the receiver and they were held by the

9  receiver prior to the bankruptcy.

10          So those assets -- Stream came into the bankruptcy an

11  assetless company with the hope of getting its assets back.

12  That's just my only clarification.

13          THE COURT:  Well, wait a minute --

14          MR. CAPONI:  Your other points are well taken.

15          THE COURT:  Wait a minute.  My point is that when the

16  -- and maybe I'm misunderstanding.  When they Delaware Supreme

17  Court undid whatever it undid, who then had titles to whatever

18  these assets -- I know they weren't in your position.  If they

19  weren't owned by Stream.  It was going to be Technovative or

20  one of the other companies.  And the receiver was only for

21  Technovative.  Technovative.

22          So when that was undone, undone meaning SeeCubic

23  couldn't -- didn't have -- couldn't have taken these assets,

24  that they went back to Technovative, right.  And at the time,

25  immediately prior to bankruptcy, those assets were in control

1    by the receiver.  And once the bankruptcy was filed, they were

2    no longer controlled by the receiver, but now controlled by

3    Technovative.  That's my -- how I look at this.

4          MR. CAPONI:  Your Honor, you are correct, the way --

5    so you are correct that the assets -- the title -- as a result

6    of the supreme court decision, title to the assets always

7    resided with the non -- the predecessor to SeeCubic, and then

8    the Court of Chancery was tasked with physical possession going

9    back in an orderly fashion.

10          That physical possession going back is what I was

11   referring to, never occurred.  It went -- they stayed at the

12   entity levels and the receiver took possession of Technovative

13   and everything -- and everything below Technovative by virtue

14   of Technovative -- everything being wholly owned.

15          So yes, Your Honor is correct that as of the -- the

16   day -- the minute before the bankruptcy filing, Stream had no

17   assets.  As a result of the bankruptcy filing, the receiver is

18   out of the way and you could argue that Stream has, you know,

19   assets again.

20          THE COURT:  So Stream doesn't have anything,

21   Technovative has it.  All that Stream has is its interest in

22   Technovative.

23          MR. CAPONI:  Correct.

24          THE COURT:  The assets, whatever they are that the

25   trust -- that the receiver was in charge of remain with the

 1  receiver.  And now, once the receiver is no longer in place,

 2  then they belong to whoever.  In this case it would be either

 3  -- you were saying SeeCubic, B.V. with the receiver was in

 4  control over is no longer in control and the receiver's no

 5  longer in control, then whoever was in control before the

 6  receiver was appointed remains in control.

 7          MR. CAPONI:  Yeah, so now -- yes.

 8          THE COURT:  And you guys want to challenge that in

 9  the Netherlands, which is a whole different issue because I

10  have to find out what in counsel you acknowledge that you can

11  in fact defend the stay of third parties -- I'm going to call

12  them third parties to the extent that it's an extraordinary

13  relief, but it has been done.  I'm not saying that I would do

14  that.

15          But I have -- counsel, I think I've told you that and

16  this is my apologizing.  I had a couple emergency -- I have

17  some emergencies.  I'm going to try to see if someone else can

18  take care of my 3 o'clock responsibility.  I've got about -- is

19  that 2:58?  I've got about seven minutes to get someone.

20          I'm going to put everybody on hold.  Do not hang up.

21  And I will see if I can get someone to cover for me and then we

22  can just continue without any interruption, okay.  Hold on one

23  second.

24          MR. CAPONI:  Thank you, Your Honor.

25          THE COURT:  All right.  Now, how do I do this?

1          Okay.  Counsel, we can continue.  I think where we

2   left was Mr. Mazza was -- or maybe it was Mr. Caponi was

3   discussing their position with respect to the custom of the

4   deposition testimony of Mr. Rajan and what that meant with

5   respect to the alleged violation of the stay, and what assets,

6   and actually some other points that Mr. Caponi was trying to

7   make.

8          Is there anything else that we need with respect to

9   the parties in opposition to the motion for relief from stay?

10  Anybody else?

11         MR. DEMARCO:  Yes, Your Honor.  This is Andrew

12  Demarco from Devlin Law Firm regarding Rembrandt 3D.  We filed

13  an objection in this matter, this was DI 103.  We have concerns

14  regarding our license to our intellectual property among the

15  creditors.  We also seek --

16         THE COURT:  Wait a minute.  Wait a minute.  Wait a

17  minute, counsel.

18         MR. DEMARCO:  Absolutely.

19         THE COURT:  You filed an objection -- you filed an

20  objection to the motion for relief you're saying?  I mean, the

21  motion for violation -- alleged violation of the stay?

22         MR. DEMARCO:  We -- it is -- Rembrandt's position is

23  we do not wish any relief of the stay.

24         THE COURT:  Okay.  Wait a minute.  You filed a -- you

25  filed -- where's your filing at, counsel?

1            MR. DEMARCO:  It is docket entry 103, Your Honor.

2            THE COURT:  Oh, so yours was an objection to the

3    motion to dismiss.

4            MR. DEMARCO:  I apologize, Your Honor.

5            THE COURT:  That's okay.  I see it.  I see it.  So

6    right now, we're just looking at the motion for alleged

7    violation of the stay, but we'll get to the other stuff.  I'm

8    just trying to keep --

9            MR. DEMARCO:  I apologize.

10           THE COURT:  That's all right, counsel, because other

11   counsel actually sort of talked about  it already, so that's no

12   -- not -- I get it, because they did kind -- two counsel did --

13   did discuss briefly the motion to dismiss in connection with

14   the motion for a finding of a violation.  So I'll get to that.

15           MR. DEMARCO:  Absolutely.

16           THE COURT:  I just want to try to wrap up that.

17           MR. DEMARCO:  That's okay, Your Honor.  I'm happy to

18   sit back -- I'm happy to sit back and wait.

19           THE COURT:  All right.  Thank you, counsel.

20           Okay.  So are there any other oppositions, anyone who

21   wishes to set forth their opposition to the Debtor's request

22   for a finding that there is -- there was a violation of the

23   stay and that there is a need for turnover and for -- and they

24   were also asking for sanctions, I guess.  All right.  Anybody

25   else?

1          All right.  Hearing no response, I'm going to let --

2   is there a brief response -- brief, counsel, from debtors with

3   respect to -- I really need some clarification on this

4   ownership issue of this bonding equipment.

5          MR. ALEXANDER:  Thank you, Your Honor.  Vincent

6   Alexander on behalf of the Debtor.  Can you hear me fine, Your

7   Honor?

8          THE COURT:  Yes, I can.

9          MR. ALEXANDER:  Okay.  I just wanted to clarify a

10  couple points and it relates to the ownership of the bonding

11  equipment.

12          First, we attached to our motion the actual purchase

13  contract which shows that the purchase was in the name of

14  Stream.  So Stream is the entity that purchased the equipment.

15  There have been no --

16          THE COURT:  Okay.  Wait a minute, counsel.  Wait a

17  minute.  Where is that at?  You said you guys filed a motion,

18  then you filed your supplemental motion.  Is it in the original

19  -- attachment to your original motion?

20          MR. ALEXANDER:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. ALEXANDER:  That docket entry 49-1.

23          THE COURT:  Yeah, okay.  49-1.  Exhibit 1.  Okay.

24  Purchase agreement.  Okay.  The sales agreement between Stream

25  TV and I'm not even going to try to pronounce this name.

1          MR. ALEXANDER:  Your Honor --

2          COURT REPORTER:  This is the Court Recorder.  The

3    Judge got disconnected briefly.  She'll be back in a moment.

4          THE COURT:  Counsel, I'm back.  I guess I have to

5    have two disconnects before the phone will continue.  We're

6    going to follow a pattern here.  I have no clue what that's all

7    about.

8          So there's a sales agreement between Stream and the

9    seller which is in Nagano, Japan.  I don't even know if I'm

10   pronouncing it correct, for delivery in China from what I can

11   gather.  And that, counsel, you believe is the stay of

12   agreement for this bonding equipment?

13         MR. ALEXANDER:  That's correct, Your Honor.  And the

14   purchaser of the equipment was Stream TV Networks, Inc, who is

15   the Debtor in this bankruptcy case.

16         THE COURT:  Well, there's a little dispute because

17   the -- the -- SeeCubic says that it was actually owned by

18   SeeCubic, B.V.  I don't know if there's some other documents

19   after this, but I know --

20         MR. ALEXANDER:  They don't have any --

21         THE COURT:  What, counsel?

22         MR. ALEXANDER:  They don't have any documents

23   demonstrating -- they don't have any documents demonstrating

24   that, Your Honor.  There are no documents demonstrating the

25   transfer that they had from Stream TV Networks to SeeCubic B.V.

1  That's not a disputed issue.

2          THE COURT:  Well, they believe it's disputed.  I

3  guess I have to figure out how --

4          MR. ALEXANDER:  Well, you can believe a lot, but that

5  doesn't mean it's actually disputed.  So that's one of the

6  things that they say a lot of things in terms of counsel for

7  Hawk and SeeCubic.  But when you actually look at the

8  underlying facts, it just doesn't bear out.

9          And that also goes to the point of when you ask about

10  foreclosure and repossession, to be clear, there has been no

11  foreclosure completed by Hawk or SeeCubic with respect to any

12  assets of --

13          THE COURT:  So counsel, they -- I think they

14  acknowledged that there's been no completed foreclosure.

15          MR. ALEXANDER:  And there's --

16          THE COURT:  I think what they said is that they sent

17  notices that under the terms of their documents that

18  constituted foreclosing.  I'm assuming they did it under -- I'm

19  not going to assume anything.  They believe they had security

20  interests and that they executed and foreclosed pursuant to

21  whatever those rights were as a secured creditor.

22          I was going to say I'm assuming they did use CC

23  remedies.  But I don't know.  I could be totally wrong.  But

24  that's --

25          MR. ALEXANDER:  But no, I understand.  But they never

1   had possession of the, you know, at the time this happened,

2   they didn't have possession.  And I think Mr. Caponi even said

3   they demanded the share certificates but they never received

4   them.

5          So they never had possession of the assets and they

6   certainly today don't have possession of the bonding equipment,

7   but they're interfering with the Debtor's interest in the

8   bonding equipment.  It seems almost as if they're arguing on

9   behalf of SeeCubic B.V., but neither of them represent SeeCubic

10  B.V. with respect to the bonding equipment.  That's a

11  subsidiary of the Debtor.  So it seems a little disingenuous to

12  argue that somehow they have possession, you know, of the

13  equipment.

14         So it's not like how the supreme court case in which

15  they're citing.  There's no paths of retention because there

16  was no -- A, there was no foreclosure process, there was no

17  repossession, and they're not actually in possession.  But

18  they're interfering with the Debtor's possession and that's the

19  exact point, is that they're interfering with the Debtor's

20  possession of that bonding equipment, which is integral to the

21  reorganization process.

22         And I know Your Honor picked up on the fact that

23  there were no operations while they didn't have the assets, so

24  I'm not going to discuss that.  But prior to that point, they

25  did have contracts and they did have revenue with companies

1   like Bosh and Google.  So you know, there were instances when

2   they did sell 5,000 units, and so it's not as if this entity

3   never sold.  I mean, it has product it did ship out and it

4   wants to get back to that, but it needs possession of its

5   assets in order to do so.  So you know, this is not --

6            THE COURT:  And when you say -- so who so counsel?

7   Which entity did this --

8            MR. ALEXANDER:  Stream -- Stream TV Networks, Your

9   Honor, the Debtor.

10            THE COURT:  Okay.  Okay.  So what I'm trying to

11   figure out is the bonding equipment is actually in possession

12   of a third party?

13            MR. ALEXANDER:  That's correct.

14            MR. MAZZA:  You're right, Your Honor.  Correct.

15            THE COURT:  So it's in possession of a third party

16   who is willing to turn it over under what conditions?

17            MR. ALEXANDER:  The condition for turnover, Your

18   Honor, is that Patrick Soon (phonetic) at SeeCubic B.V., who is

19   the -- who leased the space.  Apparently, he leased the space

20   once SeeCubic entities directed the transfer of the property

21   during the time in which the omnibus agreement was in effect,

22   for him to authorize it.  And he's refused to authorize it

23   because Mr. Stastny on behalf of the secured entities has said

24   don't release it to them because it's not their property.

25            THE COURT:  So who's property is it?

1          MR. ALEXANDER:  It's the Debtor's property.

2          THE COURT:  They sent a purchase agreement.

3          MR. ALEXANDER:  Correct, Your Honor.

4          THE COURT:  Okay.  So basically a third party has it

5    and someone's told the third party -- and the third party is

6    basically to be indemnified and said you guys figure this out.

7    I'm not turning this over to that.  If there's a problem, I'm

8    stuck with it.  I get that.

9          And now if the lease by -- who was the original party

10   to the lease?

11         MR. ALEXANDER:  Well, Your Honor, if you recall, the

12   length the omnibus agreement was in effect, SeeCubic took

13   control of the Debtor's assets, including the downstream

14   entities, which would include SeeCubic B.V.  And once they took

15   control, they had SeeCubic B.V. enter into a contract with

16   entity which moved the equipment from the prior location that

17   it was being housed to this new location.

18         THE COURT:  But under the terms of the -- that

19   agreement is not affective anymore.

20         MR. ALEXANDER:  I understand, which is why the

21   Debtor --

22         THE COURT:  How do you unwind this?  So how do you un

23   -- so what was supposed to happen when this -- the assets were

24   given to -- I'm going to say given, because I'm not -- well,

25   transferred to SeeCubic.  One the Delaware Court said this is

 1   not effective because the Class B didn't sign, we have to

 2   unwind.  Because that's basically what they were saying, unwind

 3   it, okay.

 4          What did the parties -- what did unwind mean?  Undo?

 5   What do you think it meant?

 6          MR. ALEXANDER:  Well, Your Honor, SeeCubic B.V. was

 7   not a party to that agreement, so the assets should have

 8   gone --

 9          THE COURT:  I mean, not SeeCubic -- right.

10          MR. ALEXANDER:  No, no.  Understood.  I'm talking

11   about the supreme court in that litigation, so.

12          THE COURT:  Right.  SeeCubic Inc.

13          MR. ALEXANDER:  The supreme court --

14          THE COURT:  Right, right.

15          MR. ALEXANDER:  But the Supreme Court said the assets

16   are supposed to go back to Stream.  It's clear that the omnibus

17   agreement was of no effect and that it should be unwound.  And

18   then there's a Delaware Chancery Court order after that that

19   says the assets are supposed to go back to Stream.  It says

20   Stream should be entitled to have its assets so that it has the

21   opportunity to repay its creditors.  That is the -- they were

22   supposed to go back to Stream.

23          MR. MAZZA:  Your Honor, if I may just interrupt for a

24   second.  The -- there was an order entered by the chancery

25   court that said if Stream wanted to get back the bonding

1  equipment, it had to post a bond.  So that was how the state of

2  play had been set up after the supreme court issued its opinion

3  last summer, invalidating the omnibus agreement.

4          As you can imagine, the chancery court -- there were

5  practical issues in unwinding -- unscrambling the egg.  And so

6  it took, you know, quite some time to figure out how to do

7  that.  Mr. Caponi had explained that the stock was essentially

8  given back to Stream and Technovative so that they could have

9  control again.  And then the judge -- chancellor put in place

10  an injunction for Hawk to be able to exercise its remedies for

11  ten days.  And then when that expired, Hawk exercised its

12  remedies and that got the parties into this 225 action that was

13  near completion in the chancery court right before the filing

14  here.

15          So for counsel of the Debtor to say that this is all

16  supposed to be returned, the chancery court was dealing with

17  this all on remand and had a receiver in there to deal with all

18  the practical issues around it, who incidentally put a bonding

19  -- who recommended to the vice chancellor to put a bonding

20  order in place, which the vice chancellor thought was a good

21  idea, which would resemble any kind of adequate protection that

22  might happen in a bankruptcy court if this were to be turned

23  over.  And so that's where we are.

24          THE COURT:  Yes.  And now we're in bankruptcy.

25  Receiver no longer in effect.  What does that -- first of all,

 1   in bankruptcy, you're going to have to have insurance.  That's

 2   just a given.  You can't be in bankruptcy and not ensure the

 3   assets of the estate.

 4          Assuming that the bonding -- based on that purchase

 5   agreement, and counsel, you're going to have to -- I haven't

 6   seen anything from the other side to the contrary.  Because you

 7   said it was owned by SeeCubic B.V.  The only document I've had

 8   so far, and maybe you do have some and you're going to point

 9   them out to me. The purchase agreement was with Stream.  And so

10   if the purchase agreement was with Stream, I'm not quite sure

11   absent some record or document how ownership went to SeeCubic.

12   Okay?  So as far as I am concerned unless you want to show me

13   something to the contrary.  That would be assets of -- the lack

14   asset of the Debtor -- of Stream TV.

15          And so my question then becomes, okay.  If it's the

16   property of the Debtor, then yes, if you executed on it and it

17   your properly executed then you don't have to turn it over as

18   to the turnover action.  But if you didn't properly execute on

19   it, you may have two things you're facing.  Yes, you may have a

20   turnover action, but if you haven't properly exercised control,

21   you're violating the stay.

22          So the fact that on their -- on the Supreme Court

23   decision a turnover action is required, that's if you are

24   lawfully -- and you didn't use the word lawfully in possession

25   but you were in possession and you were maintaining the status

1   quo, then obviously, you didn't violate the stay.  But if

2   you're not in possession and you don't have a right to be in

3   possession, you're not maintaining the status quo.  You're

4   violating the stay.

5           I don't know which one of it is.  I don't, you know,

6   I see documents that say they own it.  And you're saying that

7   even if they own it, we executed against it so we're properly

8   exercising control over it.  But it's with a third party.

9           So my question is did you send something to the third

10  party saying we have control over this.  This is ours.  That's

11  really where this is going to go because it's no different if

12  something was with a bailiff that they have that you have to

13  send something to them saying, hey, this is mine.  Don't give

14  it to anybody else.   I don't know if you did or did not do

15  that.

16          And if you didn't do that, it seems to me on a high

17  level looking at this, you don't have a right to do anything

18  with this thing yet.  And if you don't, whether they file a

19  turnover action or not, there's some issues about whether

20  that's a violation of the stay.  I don't know.  I don't know.

21  I don't have a record.

22          And I'm -- obviously we need an evidentiary record.

23  I'm not going to sit here and say, oh, I find it without a

24  record.  But I'm just saying just from discussion with counsel,

25  logically for me, is that I see a purchase agreement and the

1   only evidence I have is this purchase agreement which is

2   between Stream and the seller from Japan who I'm not going to

3   try to pronounce, for the bonding equipment.

4          I don't have anything saying that it went to this --

5   now, maybe Stream sent it to SeeCubic B.V.  I don't know how it

6   got to SeeCubic B.V.  And what I'm hearing is that before

7   SeeCubic Inc took over, there was a lease between someone else

8   and a storage unit and it got transferred to a different one

9   under a lease that I don't know is valid or invalid or I don't

10  know what it means because SeeCubic Inc -- what is it, who

11  everything was transferred to, one says that omnibus agreement

12  was void or invalid, never had a right to do anything.

13         So you know, it gets a little complicated for me.

14  I'm trying to unwind  what does the unwinding mean.  And so

15  that's on a high level for me is what does that mean as an

16  initial -- initial matter.

17         I get the concern about insurance.  That's a

18  requirement.  So whether the chancery court ordered it, you

19  have to insure assets in bankruptcy.  So that's nonnegotiable.

20         The other issue that I think I heard was, well we

21  want to know how they're moving equipment, who's working on it,

22  and all that other stuff.  As a secured creditor, we have that

23  right to ask for that.  That has nothing to do with whether you

24  exercised your rights.  It has to do with whether the

25  collateral securing your loan is going to be protected.  That

1   has nothing to do with this claims about violating a stay or

2   any of that stuff.  That is just simple bankruptcy requirements

3   and issues.  So even if you tell us to turn it -- to release it

4   to them, that they don't have to insure this.  They should be

5   insuring it no matter where it is because it's an asset of the

6   estate, and so that's how I'm looking at this.

7            Counsel, is there anything that you have for me that

8   -- all I have is this purchase agreement that shows it was

9   owned by SeeCubic CV?  I think that's who you said owned it?

10           MR. CAPONI:  Yes, Your Honor.  Steve Caponi again.

11  Do I have anything?  No, that's what discovery is for.  We

12  don't control -- we don't have access to the records of

13  SeeCubic B.V. other than --

14           THE COURT:  Well, then on what basis then are you

15  asserting that they're the owner?

16           MR. CAPONI:  Because during the course of the --

17           THE COURT:  You're telling me -- okay.

18           MR. CAPONI:  During the course of the 225 action and

19  the receivership, Your Honor, we had multiple discussions with

20  the receiver, and if you recall, there was a motion practice

21  over who should take possession of the equipment.  And it was

22  all parties to the receiver who had access to the company and

23  the individuals, as well as Stream, all acknowledged that the

24  equipment belonged to SeeCubic B.V.

25           And that's why the court entered -- the Court of

1   Chancery entered a specific order after the receiver

2   recommended that it was appropriate for Stream to get access to

3   it if it complied with certain requirements, including posting

4   a -- I think it was a three or four-million-dollar bond, that

5   it got transferred.

6           So we litigated this issue.  Stream never once said

7   this belongs to me.  Everyone acknowledged it was in possession

8   of SeeCubic B.V.  My client never controlled SeeCubic B.V.

9           THE COURT:  In possession doesn't mean --

10          MR. CAPONI:  Sorry, owned by.

11          THE COURT:  Counsel, in the --

12          MR. CAPONI:  Owned by, Your Honor.

13          THE COURT:  Right.

14          MR. CAPONI:  Owned by SeeCubic B.V.

15          THE COURT:  Everybody acknowledged -- there's some

16  document that says we acknowledge that it's owned by SeeCubic

17  B.V. or it's in possession of SeeCubic B.V.?   Two separate

18  issues.

19          MR. CAPONI:  Owned, Your Honor, and again, this is

20  why, you know, an evidentiary hearing -- there are a lot of

21  complicated issues.  There are very divergent views as to the

22  history.  It's a long history.  You're looking at a purchase

23  order from almost a decade ago.  Two bankruptcies, you know, an

24  omnibus agreement, and multiple defaults of secured debt, you

25  know, and many years of operating this company, a lot has

1  changed.

2          Title of this as our understanding and my belief is

3  with SeeCubic B.V.  We get some targeted discovery from

4  SeeCubic B.V. and the Debtors, we'll prove it at an evidentiary

5  hearing.  And Your Honor will find out as between these two

6  parties whether there's a real purchase order or a fake order

7  or whether they're, you know, who owns this or who doesn't.

8          THE COURT:  Well, you mean you think that -- you

9  believe that this -- that what's presented here is a fake

10  purchase order?

11          MR. CAPONI:  The purchase order?  Yeah, Your Honor.

12  We absolutely believe that there is no legitimate third party

13  that ordered $100 and some million worth of TVs.

14          THE COURT:  No, no, no, no.  No, no, no, no, counsel.

15  I'm talking about this sales agreement.

16          MR. CAPONI:  No, no, the sales agreement.

17          THE COURT:  Yes.

18          MR. CAPONI:  No, no, I'm not contesting the sales

19  agreement, but it's from 2015.  A lot has transpired since then

20  and we don't -- we -- it is my understanding and I believe

21  Stream conceded this point, we were told this by the receiver

22  that -- exactly how or when or why, I don't have the answer

23  because it was never in dispute, that SeeCubic B.V. owns this

24  equipment.  That's why SeeCubic B.V. has been paying for it and

25  paying the rent on it and renting the warehouse.  No one

```
 1    contested that.  It wasn't until they filed this motion a

 2    couple days ago that I've heard a different story.  So I can't,

 3    you know --

 4            THE COURT:  But counsel, you were also -- but my

 5    concern also was that there was an original lease between

 6    somebody and someone, and then that equipment -- maybe that's -

 7    - maybe that's wrong, that the equipment was moved to a

 8    different location under a different lease by SeeCubic B.V.,

 9    right?  Or was it SeeCubic Inc?  Who has the current lease?

10            MR. CAPONI:  It's -- well, so make sure I'm

11    understanding your question, Your Honor.  The equipment is

12    owned.  It is put in a warehouse and that space is leased.  And

13    there was a -- SeeCubic B.V. had the original warehouse and I

14    believe a few months ago the owner of that warehouse was

15    converting the building or something, and SeeCubic B.V. leased

16    new space and moved the equipment into the new space.

17            THE COURT:  Okay.

18            MR. CAPONI:  So if you're referring to real property

19    lease, that was SeeCubic B.V.

20            THE COURT:  SeeCubic B.V. is the party to the lease.

21    Okay.  And the Debtor has an interest in -- the Debtor has an

22    interest -- at least Technovative has an interest in SeeCubic

23    B.V., right?

24            MR. CAPONI:  Indirectly, yes.

25            THE COURT:  What do you mean indirectly?  Don't they
```

```
 1   own the party that -- the general partner who owns the interest

 2   in the Netherlands entity that owns SeeCubic, do they not own

 3   the interest in all those things?  So yes, they're not

 4   directly, but the own the -- they're the -- 99 percent .9,

 5   they're respectively the owners of the company who -- they're

 6   the owners of the --

 7            MR. CAPONI:  Of course, Your Honor.  I just meant to

 8   insinuate --

 9            THE COURT:  Right.

10            MR. CAPONI:  -- they were not the direct owner, but

11   there are some levels in between.

12            THE COURT:  Right.

13            MR. CAPONI:  I don't recall how many, but yes,

14   ownership wise, they eventually get there.

15            THE COURT:  All right.  So what I'm trying to

16   understand is Technovative owns through its ownership interest

17   or the ownership interest of the ownership interest is saying

18   that we -- that some -- that they directed someone to allow the

19   property to be returned to or released to Stream.  And so what

20   they're saying is that our interest in this interest in this

21   interest, we -- is being interfered with and we have an

22   interest in that asset through these other parties, and that

23   someone's directing the -- someone's directing SeeCubic B.V.

24   not to release it to Stream.  Isn't that sort of what I'm

25   hearing?
```

1           MR. CAPONI:  So Your Honor, yeah.  That's -- that is

2    what the Debtor's position is.  My client, to be clear, Hawk,

3    is  not instructing anybody to do or not do anything.  We're

4    here because we were accused of hiding this equipment and we're

5    not and -- yeah.  Go ahead, Your Honor.  Sorry.

6           THE COURT:  So why isn't somebody just finding --

7    what's the problem?  Let's cut to the chase, why isn't it being

8    given to Stream?

9           Okay.  I get the insurance issue.  I get the

10   insurance.  They have to insure it.  As a secured creditor with

11   a security interest, you want something in addition, correct?

12          MR. CAPONI:  Yes, we want adequate protection.  Yes.

13          THE COURT:  Okay.  And adequate protection means that

14   you believe you have possession of it and because you have

15   possession, it shouldn't go back to them.  But I don't get how

16   the secure creditor who doesn't have possession because it's

17   with a third party and you don't control SeeCubic B.V., how you

18   get to say anything.  You can always ask for adequate

19   protection.

20          MR. CAPONI:  Your Honor --

21          THE COURT:  But I'm not quite sure how you get

22   through all of that.

23          MR. CAPONI:  Yeah, I -- Your Honor, I think maybe --

24   maybe everyone got the cart before the horse on this one.

25          THE COURT:  Yes, you did.

1              MR. CAPONI:  Okay.  Let me -- let me step back for a

2    second.  SeeCubic B.V., as far as I'm -- my client Hawk and I

3    am concerned, SeeCubic B.V. -- why is SeeCubic B.V. not turning

4    anything over?  SeeCubic B.V. is the operating entity where

5    these employees reside and this is where they get their

6    paychecks and this is their future.  They absolutely detest Mr.

7    Rajan, and don't trust him. They've been burned by him. They --

8              THE COURT:  What does that have to do with anything?

9    I mean --

10             MR. CAPONI:  It has to do with your question.  Why

11   are they not turning it over?  And why are they taking steps in

12   there?  Because they feel like their company's being fleeced by

13   this guy, not at my client's direction.  They're human beings

14   with their own brains and they're in an entity.  We're being

15   accused by the Debtor of orchestrating that.

16             What I'm saying is I'm not orchestrating it.  You

17   asked me why they're doing it.  I told you why they're doing

18   it.  Whether there's legal color to do that, that's I guess for

19   the Netherlands court and this Court to concern.  I can only

20   tell you as a secured creditor, I'm not telling them to do it.

21   I'm not violating any stay for a whole host of reasons.  And if

22   at some point that entity is told to turn it over, we want that

23   turnover to be -- only occur after we're, you know, we have

24   adequate protection.

25             I'm only responding -- this is not a turn -- as Mr.

```
 1   Mazza indicated, this is not a turnover motion.  This isn't an

 2   adversary proceeding where the Debtor --

 3           THE COURT:  Even if it is an -- even if it is or is

 4   not an adversary, you're not in possession so I'm not quite

 5   sure whether there's a motion, an adversary or whatever.  Yes,

 6   on the 7001 turnover or adversary matter.  It doesn't matter

 7   because you're not in possession.

 8           MR. CAPONI:  Your Honor, I don't know why we're here.

 9   We're not in possession.  I don't -- my client does not have

10   it.  It's not sitting on the Debtor's assets, but the Debtor

11   filed a motion accusing my client of interfering with its

12   assets.  So the Court's point --

13           THE COURT:  Because they believe --

14           MR. CAPONI:  You're right.

15           THE COURT:  Yeah.  That's because they believe --

16   whether you deny it or not, they believe that you are

17   orchestrating this.

18           MR. CAPONI:  Your Honor --

19           THE COURT:  That's how I'm seeing it.  Now, I don't

20   know who is or isn't.  You're saying you don't have -- your

21   client is not involved in this at all.  This is solely at

22   SeeCubic's direction and then you mentioned some names.  I

23   don't know who these people are, I mean, and nobody's -- I

24   heard Mr. Stastney?  Who's he?

25           MR. CAPONI:  Stastney.  Mr. Stastney was the
```

1    individual who used to be at Stream and then ran SeeCubic, Inc.

2    And Your Honor, I've had -- I, my firm, has had zero

3    communication with the individuals at SeeCubic B.V. to ask them

4    why they are doing or not doing what they're doing and I guess

5    discovery will bear that out as well, but it's not at my

6    client's direction.

7           THE COURT:  Okay.  But Mr. Stastney, did -- was part

8    of SeeCubic Inc who everything was transferred to, correct?

9           MR. CAPONI:  Correct.  And I should also mention, he

10   is, I believe, a director -- he is the director of SeeCubic

11   B.V. as well.  So I think one of the issues that the employees

12   of SeeCubic B.V. has is that Mathu Rajan proports to be the

13   director, but in the registry over there, which is the official

14   document, it's Mr. Stastney so they're questioning who they're

15   supposed to take direction from and I think that's the purpose

16   of the proceeding over there.  But I'm not involved in it.

17   That's just my understanding.

18          THE COURT:  And who filed the proceedings in the

19   Netherlands?

20          MR. CAPONI:  I don't know if Mr. Mazza knows.  I do

21   not know.

22          THE COURT:  Well, who filed the --

23          MR. MAZZA:  Yeah, this is Mr. Mazza.  It is the -- it

24   was the law firm Brisbois who brought a summary proceeding in

25   connection with the --

1              THE COURT:  On whose behalf?  Who all --

2              MR. MAZZA:  If you give me a --

3              THE COURT:  Yeah, you go ahead and I'm going to --

4     I'm going to do something in a minute.  We'll get to that.

5              MR. ALEXANDER:  Your Honor, this is Vincent Alexander

6     on behalf of the Debtors.  In terms of the lawsuit, I believe

7     what you're referencing is at docket entry  90-1.

8              COURT REPORTER:  I think the Court dropped off for a

9     minute.

10             MR. ALEXANDER:  Okay.

11             THE COURT:  Hello?  Counsel?

12             MR. ALEXANDER:  Your Honor, this is Vincent

13    Alexander, counsel for the Debtors.  The lawsuit, it's -- we

14    filed it.  It's docket entry 90-1.  And parties to that lawsuit

15    are Mr. Stastney, SOS Holdings 6, LLC, Hawk Investment Holdings

16    Limited, SeeCubic, Inc, and then some of the Stream

17    subsidiaries that are directly and indirectly controlled by the

18    Debtors.

19             So for counsel to sit here and say that their clients

20    aren't involved, it just doesn't bear out by the document that

21    they actually filed.

22             MR. MAZZA:  Your Honor, it -- Jim Mazza, here.  So

23    just to be more precise, the Dutch entities that their party

24    would be the Alterate Coopertif (phonetic), if you have the

25    chart handy, Stream TV International B.V., and SeeCubic B.V.

1   So all are non-debtor entities.  Just the --

2            THE COURT:  Counsel, I didn't ask if they were

3   debtors.  I asked who -- because counsel said we aren't

4   involved in that.  We don't know anything.  This is Mr.

5   Stastney and SeeCubic B.V. filing in the Netherlands.  And now

6   I'm hearing that it's more than that.  So of your clients all

7   so whoever involved in the litigation in the Netherlands?  Yes

8   or no?

9            MR. CAPONI:  Your Honor, this is Steve Caponi again.

10  I will take counsel's word.  It was not my understanding that

11  Hawk was involved in the Netherlands litigation.  I thought it

12  was actually filed by the employees, but again, I'm not

13  involved in it.  My client had no involvement in telling them

14  not to turn over the equipment.  If it was named as a defendant

15  in a proceeding, news to me, but okay.

16           THE COURT:  You didn't say this -- counsel, are they

17  defendants?  Plaintiffs?  I mean, if they're defendants,

18  they're defendants.  I asked who brought it.  What is this at?

19           MR. MAZZA:  I think that --

20           MR. ALEXANDER:  Your Honor, they're plaintiffs.  It's

21  documented in 90-1.

22           THE COURT:  You know what?  Where's the -- where's

23  the document.  Just point me to the document.

24           MR. ALEXANDER:  90-1.

25           THE COURT:  90 -- oh, that's the Exhibit --

```
 1   translated.  Is that what we're talking about?

 2          MR. ALEXANDER:  That's correct, Your Honor.  And

 3   that's the matter that they're trying to set for hearing -- or

 4   is set for hearing on the 20th.  And if you look on the first

 5   page, with regards to plaintiffs, if you look at 4 through 7,

 6   SeeCubic Inc is in 4, Hawk is in 5, SLS is in 6, and Mr.

 7   Stastney, individual is in 7, and they're all the plaintiffs.

 8          MR. CAPONI:  I stand corrected.

 9          THE COURT:  Okay, so the -- yeah, I mean, so --

10          MR. CAPONI:  I was unaware, Your Honor.

11          THE COURT:  Okay.

12          MR. CAPONI:  But a document is a document.  That's

13   why I deferred to --

14          THE COURT:  Right.

15          MR. CAPONI:  When you asked me, I said I'd defer to

16   Mr. Mazza because I wasn't sure, and now we have the answer.

17          THE COURT:  Yes.  So all of these entities that are

18   over here in bankruptcy saying that whatever's going on with

19   these companies that the Debtor clearly sees is a holding

20   company for all of these companies.  Nobody's disputing that.

21   Nobody's disputing that the Debtor's interest in these holding

22   companies may be something that it needs to -- assuming, and

23   I'm not making any finding.  Assuming that the Debtor gets the

24   opportunity to reorganize, the Debtor's clearly saying we need

25   these entities.
```

1          Someone's filing in the Netherlands some issues with

2    respect to these debtor's interest in these exact properties

3    that the Debtor has an interest in.  And I know it's against

4    Mr. Rajan, I think is what I can gather is that to a point

5    somebody else as they're attorney, and they want -- what do

6    they want to do?  And then they talk about Ultra-D Cooperative

7    UA having a principle business in somewhere as purportedly

8    represented by Mr. Rajan.  Okay.

9          So what are they -- what are they trying to do?  The

10   court issues --

11         MR. MAZZA:  If I may, Your Honor.  So the issue --

12         THE COURT:  Who's speaking?

13         MR. MAZZA:  It's Mr. Mazza again, Your Honor.

14         THE COURT:  Uh-huh.

15         MR. MAZZA:  So the issue is it's an issue of

16   compliance with Dutch corporate law and determination as to who

17   are the -- who is the board at these non-debtor entities.  And

18   there have been issues with regard to legal notice and the like

19   that would be applicable under Dutch law that the parties don't

20   believe have been complied with.

21         And so really what this particular proceeding was

22   brought to do was to implement a status quo so that parties

23   could figure out where to go from here.

24         What Mr. Rajan has done is held himself out through

25   what we're advised by Dutch counsel have not been acts that

1   have complied with Dutch law at these non-debtor subsidiaries

2   and therefore there's a dispute as to whether he -- as an

3   individual, has the control to hold himself out as such.

4        MR. ALEXANDER:  Your Honor, this is Vincent Alexander

5   for the Debtor.  I mean, that just really begs -- the question

6   is what do these creditors of the Debtor, what is their

7   interest at the downstream entities in terms of trying to

8   impact and effect how the Debtor runs these entities and who

9   the Debtor appoints.  I mean, it's clear that there's never

10  been any transfer of the stock ownerships.

11       And so upon the bankruptcy filing, all of these

12  management and control rights belong to these debtors, whether

13  it's Stream or Technovative, yet they're trying to usurp that

14  process by going to the Netherlands.  You know, these same

15  entities that in individual are before this Court are trying to

16  go to the Netherlands and take advantage of some proceedings

17  over there, where they can then gain control over SeeCubic B.V.

18       And if you recall, Your Honor, they're arguing that

19  SeeCubic B.V. and if you recall, Your Honor, they're arguing

20  that SeeCubic B.V. owns the bonding equipment.  So then they're

21  trying to seek and exert control over the bonding equipment.

22       And so this is all an end run around the bankruptcy

23  in terms of what they're trying to do.  And on one hand, they

24  claim that they have no knowledge of what's going on.  But then

25  when documents come out, oh, I guess that is happening.

1          That's the Debtor's concern is that they're trying to

2    strip the Debtor of its management and asset rights through its

3    subsidiaries.  And we believe that's improper and it does

4    impact the estate, and that shouldn't go forward.

5          MR. MAZZA:  And Your Honor, if I may just briefly.  I

6    think the point --

7          THE COURT:  Who is -- wait a minute.  State your

8    name.

9          MR. MAZZA:  It's Mr. Mazza.  It's Mr. Mazza again,

10   sorry, Your Honor.  Is that it's really a question of

11   compliance with Dutch law.  And I think the Debtor is taking a

12   really loose view of how things work in a way that we filed --

13   we filed for bankruptcy.  I've already gone over the argument

14   that Mr. Rajan had no authority to file Technovative.  And then

15   he wants to go down the chain and assert his authority which is

16   contested as a matter of Dutch law at a Dutch entity.

17         There are employees down there who don't know what

18   their fiduciary duties are because of the issues around --

19         THE COURT:  Well, as to the employees, their

20   fiduciary duty is to the company.

21         MR. MAZZA:  Right, right.

22         THE COURT:  So now you're stating that Mr. Rajan has

23   asserted that he's in charge.  Somebody else claims that

24   they're in charge.  And this all needs to be cleared up because

25   what?

1          MR. MAZZA:  It needs to be cleared up so -- it needs

2    to be cleared up --

3          THE COURT:  But that's to whose benefit?  To whose

4    benefit?  Because I'm not understanding why Hawk or any of the

5    other parties -- what's their interest in this?  What is the

6    interest of Hawk Investments, SLS Holdings, what is it to them

7    who controls SeeCubic B.V.?

8          MR. MAZZA:  I'm sorry, Your Honor.  Could you repeat

9    the question?

10          THE COURT:  What is it -- what is Hawk and SLS

11    Holdings, what is their interest as to who controls B.V. --

12    SeeCubic B.V.?  I guess it's current shareholders.

13          MR. MAZZA:  Well, as secured -- right.  As secured

14    creditors in the structure, Your Honor.

15          THE COURT:  Okay.  So secured creditors -- I don't

16    know Dutch law.  So secured creditors can there file to have

17    someone determine who's in charge?  Could you do that?  I guess

18    you could in Delaware.  I don't remember Delaware law 10 to 15

19    years ago.  I don't remember.

20          MR. ALEXANDER:  Your Honor, Vincent Alexander on

21    behalf of the Debtor.  To be clear, they're not secured

22    creditors of SeeCubic B.V.  They're creditors of --

23          THE COURT:  They claim that they are.

24          MR. ALEXANDER:  No, they don't.  They don't claim

25    that they are.  Their agreements are with Stream.  That's who

 1  their agreements are with.  They're agreements are with Stream.

 2           THE COURT:  Yeah, but counsel, but they said Stream

 3  assigned their interest in, I guess, including SeeCubic B.V.

 4  for security for the loans to Stream.

 5           MR. ALEXANDER:  No, I don't think any interest -- no,

 6  no interests were ever assigned.  I mean, you're saying there

 7  were pledge agreements as part of some of the instruments, but

 8  they can't effectuate those post-petition.

 9           THE COURT:  So are they or are they not creditors of

10  SeeCubic B.V.

11           MR. ALEXANDER:  They are not creditors of SeeCubic.

12  They are not creditors of SeeCubic B.V.  I haven't seen any

13  filing in which they said SeeCubic B.V. owes them any dollar

14  amount.

15           THE COURT:  Mr. Mazza, are you saying you're a

16  secured creditor?  How are you a secured creditor?

17           MR. MAZZA:  I need to -- Your Honor, we need to take

18  a look at the security documents as to how far down the pledges

19  go.  I think, though, the point is --

20           THE COURT:  What's the pledge?

21           MR. MAZZA:  I'm sorry, Your Honor?

22           THE COURT:  And the pledge agreement was a pledge of

23  what?

24           MR. MAZZA:  It would have been shares of various

25  entities in the structure.  And I think the open question is

 1  how far down does the share pledge go, so I don't know the

 2  answer to that off the top of my head.

 3          THE COURT:  So then what basis are you asserting that

 4  you're a creditor if your only interest that you know of is

 5  that Stream pledge is -- if ownership  interest in SeeCubic

 6  B.V.  That doesn't make you a creditor.  It just makes you a

 7  possible shareholder or interest or whatever it is that -- that

 8  Stream TV has when Stream TV currently owns.

 9          MR. MAZZA:  Right.

10          THE COURT:  And if you haven't foreclosed on that

11  interest, I don't know what your interest is.

12          MR. MAZZA:  You're -- yeah.

13          THE COURT:  This boggles me.  Everything about this

14  case.  And I'm not pointing at any one of you, but you know,

15  none of this makes -- is adding up.  It isn't good for anybody,

16  okay.  Because I have questions about all of the parties, all

17  of them.

18          And so I'm not understanding if you are not a secured

19  creditor in the sense that you haven't loaned money to SeeCubic

20  B.V.  They haven't put up their assets.  What the heck are you

21  guys doing in the Netherlands?

22          MR. MAZZA:  Your Honor, and I'm sorry to complicate

23  this even further.  But yes, there have been loans made to

24  SeeCubic B.V. to fund that entity so there is a direct credit

25  relationship.  So I know this isn't an evidentiary hearing and

1    there's a lot of complicated facts here, but there are direct

2    credit relationships that relate to B.V. given the funding that

3    has been made to B.V. during the course of its operations by

4    Hawk --

5           THE COURT:  You have loans and security agreements

6    with SeeCubic B.V. is what you're telling me?

7           MR. CAPONI:  Correct.  Correct, Your Honor.

8           MR. MAZZA:  I can tell you there's loans and go

9    ahead, Mr. Caponi.

10          MR. CAPONI:  Your Honor, I don't get -- to Mr.

11   Mazza's point, I don't have -- there's 20 some security

12   agreements.  Most -- during -- some of the 18 original notes

13   the money went directly to B.V., but more recently when the

14   case was back in the Court of Chancery and the receiver was

15   appointed, SeeCubic, Hawk, et cetera, funded the approximately

16   $1 million a month cash burn rate at SeeCubic B.V. directly

17   with -- from -- to SeeCubic B.V. with the receiver and there

18   were lines of credit.  I just don't know all the terms of

19   those.  But they were heavily secured, et cetera, et cetera.

20   It was effectively like a dip financing.

21          MR. ALEXANDER:  Your Honor, this is Vincent Alexander

22   for the Debtors.  That was part --

23          THE COURT:  Wait a minute.

24          MR. ALEXANDER:  That was part of the receivership.

25          THE COURT:  Right.  So the receiver, on behalf of

```
 1   SeeCubic B.V., entered into some transactions where there was

 2   money and a security interest granted.

 3            MR. CAPONI:  It was court approved, Your Honor, yes.

 4   It wasn't some sort of, you know, secretive transaction.

 5            THE COURT:  Okay.

 6            MR. CAPONI:  The stream was for their --

 7            THE COURT:  Counsel, I wasn't even suggesting it was

 8   secretive.

 9            MR. CAPONI:  No, I think the other side is.  Your

10   Honor, honestly, Stream is -- I mean, Stream is well aware of

11   this.  It was -- it was -- they were -- it was a multi-party

12   negotiated funding agreement where everyone signed off on it.

13   So it's -- I just don't happen to have all the terms, but

14   everyone's aware of it.

15            MR. ALEXANDER:  Your Honor, this is Vincent

16   Alexander.  Just to be clear, I wasn't trying to indicate that

17   I was not aware and the Debtors aren't aware that there was

18   some funding as part of the receivership, that some of these

19   entities may have done.  Which particular one, I don't know.  I

20   personally haven't seen a security agreement in terms of that

21   funding that occurred.

22            But again, that's not -- they're acting based on what

23   they believe are their rights as secured creditors and the

24   secured documents with respect to the Debtors in terms of being

25   able to control management.  That's what they're acting --
```

1    they're not acting on behalf of anything that happened in terms

2    of funding as part of the receivership.  I mean, so there's a

3    clear distinction about what they're trying to do.  So that's

4    -- that's irrelevant to what they're attempting to do.

5           MR. CAPONI:  Your Honor, again, this is Steve Caponi.

6    I'm not intimately familiar with the ins and outs of the

7    pleading in the Netherlands, so I'm not going to proport

8    otherwise.  I just want to correct counsel's statement.

9           My client is seeking to enforce all of its rights

10   however acquired, and that includes its secure creditor rights

11   at the stream level as well as the, you know, millions of

12   dollars that was more recently funded and is secured directly

13   against the assets at the B.V. level.  My client is not proud.

14   It will enforce its rights in whichever manner it can, but it's

15   enforcing all of them.

16          THE COURT:  But counsel, what I'm trying to figure

17   out how is bringing an action to have Mister -- and determine

18   that Mr. Rajan is not in charge of SeeCubic B.V. an exercise of

19   its rights in its collateral?  That's all I'm trying to figure

20   out.

21          MR. CAPONI:  Yeah, Your Honor --

22          THE COURT:  Because I'm reading this and that's what

23   this thing is trying to do.

24          MR. CAPONI:  Unfortunately, Your Honor, I can't shed

25   any light because I have no insights of -- never read the

```
 1   pleadings, not been involved in it.  I was just responding to
 2   -- it is not simply -- whatever Hawk's doing or SeeCubic,
 3   whatever's going on in the Netherlands, there are direct
 4   fundings as well as the legacy fundings, I'll call it, or the
 5   18 plus, 20 plus loans, so.
 6            THE COURT:  Yeah, so these pleadings have nothing to
 7   do with the funding.  They're not trying to foreclose on
 8   collateral.  What it relates to is whether Mr. Rajan has the
 9   authority to be in charge of this company, and I'm not quite
10   seeing how that's an exercise against collateral.  How that's a
11   foreclosure on collateral.  I don't know.
12            MR. CAPONI:  I would need to consult with Dutch
13   counsel, Your Honor, because I don't know either.  All I know
14   is -- all I know is that there's an action in the Netherlands
15   under Dutch law, and that's where my knowledge ends and we
16   would need to get some, you know, understanding from Dutch law
17   experts as to the nature of the action and the questions that
18   Your Honor has.
19            MR. MAZZA:  And if I may, Your Honor, Mr. Mazza
20   again.  So on the pledges, there is a -- and we can file a
21   supplement with the Court to provide additional information.
22   So there is a pledge and escrow agreement that is in favor of
23   SLS, the party -- secured creditor, by the Debtors Stream and
24   Technovative Technology Holdings, Delaware LLC, Ultra-D
25   Ventures CV, and down the chain to Ultra-D Cooperative.
```

1              The share pledges are 65 percent of the equity

2     interest in Technoventures B.V. and 65 percent of the equity

3     interest in SeeCubic B.V.

4              THE COURT:  Okay, counsel.  And you believe that --

5     I'm not understanding the relevance.  Hello?

6              MR. MAZZA:  I apologize, Your Honor.  There was

7     background noise.  Do you mind repeating that?

8              THE COURT:  I said, I didn't -- I'm not understanding

9     the relevance to my question of what you just said, that there

10    was a pledge of certain interest in SeeCubic B.V.

11             MR. MAZZA:  Yeah, so to close the loop on that, Your

12    Honor.  The issue regarding the contested governance down there

13    is the exercise of the pledge as it relates to those non-debtor

14    entities that is before the issue of contested governance

15    that's in the Netherlands.

16             THE COURT:  I get that, but you're saying based on

17    the pledge, your clients have a right to do that because the

18    interest was pledged?

19             MR. MAZZA:  I apologize, Your Honor.  The issue --

20    there's a pledge down there.

21             THE COURT:  Okay.

22             MR. MAZZA:  So let's take a step back.  The issue

23    before that is the status quo was that Mr. Stastney was a

24    director down there and that's what's dispute as a matter of

25    Dutch law as to whether Mr. Rajan has taken the steps in order

```
 1    to be able to take that claim as the director down at those

 2    entities.

 3              The pledge is in there.  It's not been exercised on

 4    as far as I know.

 5              THE COURT:  Right.

 6              MR. MAZZA:  But it is a non-debtor entity.  So sorry

 7    for the long-winded clarification, but that -- those are the

 8    facts and happy to --

 9              THE COURT:  But counsel --

10              MR. MAZZA:  Sure.

11              THE COURT:  But counsel, I'm not understanding -- you

12    only have a pledge.  You haven't foreclosed on the interest.

13    At what -- what basis, when I have a debtor here who clearly

14    has an interest in these entities and now their interest in the

15    -- in management or whatever it is that's going on is now being

16    callused somewhere else.  Because it clearly says -- and not

17    only that, they specifically talk about Stream's demand that

18    the bonding equipment be turned over to them.  They're opposing

19    that.

20              How are they going to go to Dutch court and oppose

21    something that's before me?  I'm leading this.  I got a problem

22    with that.  That's what they're saying that Mr. Rajan's trying

23    to take our assets and turn it over and he shouldn't be and we

24    want you to stop him.  No, no, no, no, no.  You're not going

25    over there with that claim.  That claim is here.
```

 1          Now, at the end of the day, I may say, okay.

 2   Somebody needs to figure out who has control of this, but it's

 3   not now.  Not when it's before me.  I have to first figure out

 4   who owns this thing.  Now, at the end of the day I say that

 5   SeeCubic owns it and somebody needs to figure out what to tell

 6   SeeCubic to do, we'll get there, but we're not there yet.

 7          Now, I don't appreciate people going to another

 8   jurisdiction and to get another court to decide that they own

 9   it and that nothing should happen and no direction should be

10   made with respect to the turnover or release of that equipment.

11   Because that's exactly what you guys have asked for.  I'm

12   reading it and I don't appreciate that.  That's not going to

13   happen.

14          Now, if you guys want to go over there and fight

15   about who's in charge, but I'm reading this and that's not all

16   you're trying to do.

17          MR. MAZZA:  So, Your Honor --

18          THE COURT:  It says Mathu Rajan attempts to dispose

19   of a value asset of Dutch SeeCubic operation.  He wants them to

20   turn over that bonding equipment, which is the exact issue

21   before me as to who owns it.

22          And so it's not a matter of whether Mr. Rajan is

23   going to tell somebody to turn it over.  I get to decide who

24   owns it and then if I say it belongs to Stream, what in the

25   world is going to happen in the Netherlands if they say, oh,

1    no.  We decided it belongs to SeeCubic.  You can't do that.  We

2    can't have two conflicting decisions.

3          MR. MAZZA:  Mr. Mazza, again, Your Honor.  Your

4    Honor, completely understand, I think the issue around who owns

5    it does need to be decided and I think there's confusion on

6    that point.  Is it the B.V.?  Is it Stream?  I believe there's

7    a letter from Mr. Rajan saying it's both Stream and B.V.s.

8          And I think to just deescalate the allegations around

9    stay violations, that Your Honor hit the nail on the head as to

10   how this all can be dealt with through insurance and telling

11   people where this equipment would otherwise go and we'd be sort

12   of done with it.

13         I think that Your Honor also hit the nail on the head

14   as to the corporate law dispute.  That is what it is over in

15   the Netherlands, and to the extent that that doesn't deal with

16   issues around the bonding equipment which can be dealt with in

17   a commercial fashion as already stated by Your Honor, then I

18   think we can save a lot of people a lot of time around here.

19         THE COURT:  And who was this?  Wait, who was that,

20   that proposed that?

21         MR. MAZZA:  It was Mr. Mazza again.

22         THE COURT:  Okay.  All right.

23         MR. MAZZA:  And that's what, Your Honor, we proposed

24   previously, so.

25         THE COURT:  Okay.

1               MR. CAPONI:  Steve Caponi, again, for Hawk.  Just to

2    chime in on what Mr. Mazza just said, and this gets to the

3    motion we're eventually going to get to I hope about the

4    dismissal.  I think regardless of who -- I mean, let's assume

5    -- we know at the start of this bankruptcy, this asset was

6    sitting at the SeeCubic B.V. level and it was being used and

7    housed there.  That's the ordinary course, let's just call it.

8               The problem we have with this case is there is no --

9    the Debtors are not doing anything that you normally see.  No

10   first filed -- no first day motions, no bank accounts, no dip

11   financing, no anything.

12              If this were proceeding in the ordinary course, a lot

13   of these issues would be addressed.  But the Debtor, rather

14   than teeing them up the way a debtor normally does, so for here

15   example, Mr. Rajan versus -- rather than flying to the

16   Netherlands and trying to get -- just take the equipment out,

17   should have come to Your Honor and said I want to do something

18   out of the ordinary course.  I want to take a valuable piece of

19   equipment.  I want to move it from one subsidiary and I want to

20   move it to the ownership of a different, and we would hash out

21   adequate assurance and all those kind of issues.

22              The reason this case is such a mess is because the

23   Debtor's not doing any of the normal step one, step two, step

24   three processes.  Rather it's, you know, it's reorganizing by

25   chaos.

1          And I'm happy -- from my client's perspective, Hawk,

2    I can represent to Your Honor, if we're going to tackle the

3    ownership and adequate assurances in front of Your Honor, we're

4    happy to do it.  If it's going to be a smash and grab in the

5    Netherland because that's where Mr. Rajan's doing, then we'll

6    have to do it there.

7          I mean, we want to bring order to this and we think,

8    you know, dismissal or trustee does that, and we can get to

9    that.  But Your Honor, I understand your frustration, but I

10   think it really needs to be directed at the Debtor before it

11   starts taking extraordinary actions, which this clearly is.

12         Why isn't it before Your Honor on a proper motion so

13   that all the stakeholders can be heard in an orderly fashion?

14   That's what we really were advocating for.

15         MR. ALEXANDER:  Your Honor, Vincent Alexander on

16   behalf of the Debtors.  I can briefly respond to that.

17         THE COURT:  Yes.

18         MR. ALEXANDER:  The Debtor would love to have the

19   opportunity to not deal with these other issues and focus on

20   what Mr. Caponi described as normal debtor operations.

21   However, since the petitions were filed, we've been met with

22   immediate resistance from each of the creditors with respect to

23   the simplest things of the Debtor even having access to its own

24   property.

25         Also, they talk about how -- it sounds like they're

1   trying to parse out, you know, management and equipment.  But

2   the only way you get through the management is through the

3   Debtor's management rights going down.  You can't cut through

4   the chain.  So by doing anything with regards to management in

5   the Netherlands, they're impacting the Debtor's rights here in

6   the United States, and that's exactly what they're trying to do

7   is impact the Debtor's rights.

8           The Debtors want to propose a plan and have a plan

9   that they're going to propose that's going to take care of the

10  secured creditor's claims.  But in order to do that they do

11  need their assets in order to do that.

12          You know, this isn't a bankruptcy -- I don't know the

13  word is ambush -- or chaos, I think is the word.  We would like

14  a controlled process.  But you can't hold the Debtor hostage

15  for its assets and then say, we'll give you your assets if you

16  give us something.  Right, that's not the way it works.  The

17  Debtor's entitled to its assets and issues of adequate

18  protection or anything else are dealt with in due course.  But

19  you can't tell the Debtor, you know, you need to take care of

20  all of these issues but then they don't have the ability or the

21  assets to do that.

22          So we agree.  We should be able to work out some type

23  of arrangement or agreement with regards to the equipment.  But

24  we don't think any of this usage of the equipment would be

25  outside the ordinary course because it's outside the ordinary

1   course of the business and this is the business of the Debtor.

2            So we can work out bankruptcy specific issues, but we

3   need our assets in order to do that and we need the

4   interference to stop.  And so that's what the Debtor would

5   like.  And if we can get that, then we'll be able to proceed on

6   a path here in this case in terms of all the parties working

7   together to have a successful outcome.

8            Because at the end of the day, that bonding

9   equipment, I don't know how they used the words take or -- it

10  would be under the control and the supervision of this Court.

11           So unless they -- the creditors don't respect what

12  this Court's capabilities are to do to the Debtor if the Debtor

13  doesn't comply with its requirements, then there should be no

14  issue.  It's not as if the Debtor was taking equipment and

15  transferring it to some entity that the Debtor didn't have

16  control over.  No, the Debtor said this is my property, which

17  means it's property of the estate, which means it's under the

18  supervision of this Court.

19           We want everything to be under the supervision of

20  this Court so that we can move on a path forward to get the

21  issues resolved.  But we can't keep having all of these, you

22  know, offramp litigations and disputes.  Everything should be

23  in the bankruptcy court.

24           MR. CAPONI:  Your Honor, again, Steve Caponi --

25           MR. MAZZA:  Your Honor --

1              THE COURT:  If you would --

2              MR. CAPONI:  If I could just briefly respond.

3              THE COURT:  Wait a minute.  I have a question.

4    Counsel, you would agree that with respect to the issue of

5    management of these companies, that this -- I don't think that

6    -- well, even assuming I had the ability to address that

7    because it's property that a debtor has, that there's a

8    different company of companies that the Debtors --

9              MR. ALEXANDER:  Your Honor, are you still there?

10             MR. CAPONI:  May have dropped again.

11             MR. ALEXANDER:  Okay.

12             Is Your Honor back?

13             COURT REPORTER:  No, she's not back on yet.

14             MR. ALEXANDER:  Okay.

15             COURT REPORTER:  That was her disconnecting.

16             MR. ALEXANDER:  Oh.

17             MR. CAPONI:  I think she said she has to do it twice

18   now, right?

19             COURT REPORTER:  Yeah.

20             MR. ALEXANDER:  Yes.

21             COURT REPORTER:  There's a delay, apparently.

22             THE COURT:  Well, counsel, that was -- that was hang

23   up number two, so I guess we're good for the rest of the day,

24   I'm hoping.

25             Did everybody hear what I was saying before I got

1  disconnected?

2          MR. ALEXANDER:  Your Honor, I think -- this is

3  Vincent Alexander for the Debtor.  The last thing I believe you

4  said was counsel, you would agree regarding management, and

5  then you cut off.

6          THE COURT:  Right.  That regarding management, that

7  that is the issue -- I'm not quite sure that you heard me say

8  that even if it was something that I would have jurisdiction to

9  decide, and I don't know if I do or I don't, it's a core I get

10  a final decision if it's related to, I issue a report and a

11  recommendation that goes to the district court.  Or it's

12  something that I say, even if I can hear it, I'm going to --

13  which I do with a lot of things.  For instance, I may have

14  landlord tenant issues.  I may have property disputes.  Things

15  that I'm capable of doing but I think it's more appropriate to

16  be in a court that has a familiar -- that does this on a

17  regular basis, knows what the law is as opposed to me trying to

18  interpret the law.

19          So and this goes to Mr. Alexander.  Do you not think

20  that at some point the issue of control over the subsidiaries

21  is going to have to be -- I'm going to call them subsidiaries,

22  because it's not -- it's a whole new company.  I don't know

23  what else to call them.  But of the related companies is going

24  to have to be decided at some point?

25          MR. ALEXANDER:  Your Honor, we believe that that is

1    under the jurisdiction and control of this Court because it all

2    flows down from the right that Technovative has which is before

3    this Court as a debtor.  And those are assets of this estate.

4    So those management rights are assets of this estate and we do

5    believe that the Court should do that in terms of exercising

6    control over that.

7           And with respect to -- you know, I believe they've

8    hinted and alluded to -- I think they're trying to bring in the

9    authority to file type issue.  But we'll happily address that

10   with this Court because we believe that the caselaw supports

11   that we have a valid filing and we can proceed with the

12   bankruptcy case.

13          And when you control the entity at the Technovative

14   level, you control all the downstream entities.

15          THE COURT:  Well, there's still some issue because at

16   the time of the file -- well, at the time of the filing, there

17   was a receiver who was in control, was there not?

18          MR. ALEXANDER:  There was a receiver pendent right

19   that was in place.

20          THE COURT:  Uh-huh.

21          MR. ALEXANDER:  And that --

22          THE COURT:  But that's what I -- I guess we have

23   different pronunciation.  I say pendant, you say pendant like -

24   -

25          MR. ALEXANDER:  You're much more sophisticated than I

1    am, Your Honor.

2            THE COURT:  No, I don't think it has anything to do

3    with that.  I just think it has to do with what your initial

4    language is.  I think that that sort of colors how I pronounce

5    words.

6            But with that being said is that while I may have

7    jurisdiction over the Debtor's interest and I may have the

8    authority to decide the Debtor's interest, what I'm saying it

9    may not be something I necessarily would want to decide and I

10   might defer to another court to make that decision.

11           The question is, is it now or is it later on whether

12   I would do it at all.  Because -- so that's all I'm saying.

13           MR. ALEXANDER:  Your Honor, I mean -- Vincent

14   Alexander again.  I mean, in terms of that issue, I think if

15   the authority to file issue is addressed, which is I believe a

16   core ruling and under the jurisdiction of this Court, right, is

17   the authority to file.

18           THE COURT:  Definitely.  Definitely.  That wouldn't

19   go to anybody else.

20           MR. ALEXANDER:  Yeah.  I think once --

21           THE COURT:  And I don't think that -- I don't think

22   that anybody's in the Netherlands challenging whether the two

23   companies have the right to file.  I don't think that's what's

24   going on.

25           What I think is going on and from what my reading of

1  this and it was very brief because you just pointed it out to

2  me, but I could also read the parties various pleadings was

3  that post-bankruptcy, when the receiver was in place was no

4  longer in place, then who was in charge of the subsidiaries?

5          Clearly, it would have been the -- whoever the --

6  whoever was in charge prior to -- and I say in charge, was the

7  person with the authority, prior to the Chancery Court's

8  installation of the receiver pending the litigation.

9          That -- what did that mean in terms of I don't know

10  who was in charge.  I don't know.  And then once the receiver

11  no longer has the authority, then that authority could go to

12  either the party who was there or whatever process for changing

13  that would be the appropriate way to have that done.

14          But the relevance of that is that it's kind of at

15  this point, these are entities that the Debtor needs to rely

16  upon for its success, whether that's something that needs to be

17  done now or at some point in the future, or whether it's

18  something that gets resolved in the motion to dismiss because

19  whether the authority -- and I don't know what the authority is

20  because I don't know what the different articles -- whatever

21  they're called in the Netherlands, whatever it is for formation

22  or how you operate, any of those different things, I'm not

23  quite sure what that means.  I just know that right now we are

24  in a specific place, and whether you are in my court or

25  somewhere else, whether those are issues that get immediately

1   addressed or not.

2           With respect to the Netherlands, what I gathered from

3   this summary proceeding is that the Debtor -- well, the company

4   SeeCubic wants to prevent Mr. Rajan from directing the --

5   whoever the representative of that company to execute the exact

6   document that someone says they need to do here in my Court,

7   and that Mr. Rajan is exceeding his authority.

8           Because they have it broken down into what the court

9   issued, the parties, the jurisdiction, the Rajan brothers

10  leading to intervention by funders in 2020, leading up to these

11  present invalid decisions making an attempted asset stripping.

12  That's the one that caught my -- let's see.  The unpaid

13  financiers, SLS and Hawks are in the process of forcing their

14  security issues, consistently -- consisting essentially of the

15  ownership in the country, one in the Netherlands, and now the

16  value is in danger of being impaired in the very future by the

17  person who attracted the debt investment but is not repaying

18  it.

19          So that's sort of what they said the bottom line was,

20  which you know, are you trying to exercise your rights in these

21  companies?  I don't know what they're trying to do over there.

22  But we still have a problem for this is -- it says, these

23  failure of enforcement proceeding is initiated by the

24  financiers to obtain the assets given as a security prompted

25  the independent directors of Stream to enter into an amicable

1    settlement, the omnibus agreement.  Okay.  Well, that's no

2    longer in effect.

3           And it says Stream and Rajan brothers refuse to

4    accept that control of the company lies with the financiers.

5    Counsel, who's to tell them that?  You haven't foreclosed on

6    your security interest in the control or any of that.  I'm a

7    little concerned why you would go say that and somebody would

8    allege all of that.  That's all disputed, and you agree you

9    haven't foreclosed on the ownership interest.

10          So maybe you might have foreclosed on your interest

11   in the assets, but I haven't heard anybody say that you

12   foreclosed on the ownership interest of the Debtors and

13   actually, they're in this Court.  I don't know how you could be

14   in the Netherlands saying something to the contrary.  I'm a

15   little concerned about that.

16          MR. MAZZA:  Your Honor, Mr. Mazza, again.  I don't

17   know -- I don't think that that's the -- maybe it got lost in

18   translation or something to that effect.  But I think the point

19   is that the status quo was that Mr. Rajan as of the filing of

20   these entities was not a director down properly recognized at

21   the non-debtor Dutch subs.

22          And so I think that the issue that may not be

23   elegantly presented in those Dutch pleadings is that that's

24   what's contested because the financing parties that have rights

25   against those non-debtors is -- doesn't entitle Mr. Rajan to

1   come down and declare himself the sole director.

2          So I think that's what's meant to be said and to the

3   extent it's not said that way, then it's not, I think,

4   elegantly presented.  But there's --

5          THE COURT:  But you would agree that at the time of

6   the filing, the receiver was in control of all of that.

7          MR. MAZZA:  Correct.

8          THE COURT:  And once he was no longer in control,

9   what did that mean for the Debtors, the holding company,

10  Technovative essentially is the owner of -- through its

11  ownership of various entities actually the owner.  You know,

12  what does that mean in terms of how it's affecting debtors is a

13  concern.

14          So okay, so obviously --

15          MR. MAZZA:  Your Honor, if I may --

16          THE COURT:  Uh-huh.

17          MR. MAZZA:  Right.  So and I -- I don't think -- I

18  think that the dispute in the Netherlands is that because of

19  the filing, that didn't meant that there was some

20  transformation such that Mr. Rajan legitimately became a

21  director down at the non-debtor subs.  I think that your point

22  -- there is no intent to quarrel with any of the Court's

23  jurisdiction as it relates to the Debtor entities.

24          We do think that, again, it was an alterviras

25  (phonetic) act of Technovative and that's a separate story.

 1   But I think Your Honor was honing in on how the issue really

 2   flagged down at the non-debtor sub.  It's an issue of Dutch

 3   corporate law for that court's jurisdiction to decide.  And

 4   while there may be this sort of indirect interest that rolls

 5   back up to the Debtor entities, they don't get the benefit of

 6   being able to say that I can just avoid my creditors down below

 7   that I don't file for bankruptcy, that I don't put under the

 8   supervision of the bankruptcy court in order to -- and extend

 9   the stay in that way.

10          Again, I think Your Honor, we had a colloquy earlier

11   about extending the stay and the like.  And they certainly

12   haven't done it -- done that, so.

13          THE COURT:  Hold up.  It's not even -- it's not even

14   -- counsel, I don't see it as both -- I also have the ability

15   to say this is part of the Debtor's assets, they have an

16   interest.  Don't do anything until I figure out what I want you

17   to do with it.

18          I'm not saying that the Dutch court may not have

19   jurisdiction.

20          MR. MAZZA:  Right.

21          THE COURT:  But I clearly have jurisdiction over all

22   of their interests, and the Debtors, through their entities,

23   have an interest in these companies.  So the question becomes

24   is what happens now?

25          Because as I said, one of the things they want to do

1  is to stop, and if the Court says, there.  Make a declaration

2  that in fact that bonding equipment belongs to SeeCubic B.V.

3  and no turnover and I find exact opposite, now we've got a

4  problem.  We have got a problem.

5          MR. MAZZA:  And Your Honor, I think -- okay.  I'm

6  sorry.

7          THE COURT:  Go ahead.

8          MR. MAZZA:  I was just -- I was going to say I think

9  that where you were honing in is that there is a commercial

10  resolution that could be dealt with with the bonding equipment,

11  and that would save a lot of parties a lot of time.

12          I think there's a question of who really owns that

13  bonding equipment, but really does it ultimately matter if we

14  can come up with a commercial resolution as a protection of the

15  equipment, insurance that a debtor needs that, et cetera.

16          And so to me, to escalate this to some allegations

17  around willful violations of the stay when we've come to the

18  table and unfortunately, I don't think counsel has had great

19  candor with the Court about discussions around these issues

20  which Your Honor has again pointed out.

21          And the last point I'll make on this Dutch subsidiary

22  issue, Judge Silverstein, a couple days ago, had an opinion

23  where she addressed issues regarding non-debtor subs and she

24  found that a lawsuit against a non-debtor subsidiary does not

25  violate the automatic stay if such lawsuit may impact the value

 1   of the stock that the parent debtor owns as it does not alter

 2   the estates -- bankruptcy estate's rights, liabilities, options

 3   for freedom, or action, and that ownership of the outstanding

 4   stock by the parent debtor does not confer jurisdiction to the

 5   bankruptcy court.

 6          So again, Your Honor, we completely have all

 7   deference to everything that is under your jurisdiction and

 8   what you're trying to sort out in this case and we are not

 9   looking to go afoul of anything that Your Honor wants to make

10   sure is control.  But let's take a step back as to how this all

11   came about.

12          We're in discussions, Mr. Rajan's headed over to the

13   Netherlands and is trying to take control, and frankly, parties

14   are just trying to protect their rights.  And so any guidance

15   from Your Honor would certainly be appreciated because these

16   are issues that are complicated.

17          And again, they have a commercial solution that we

18   can deal with one way or the other.  But this does not mean

19   that Mr. Rajan can just throw himself around and cloak himself

20   in the automatic stay when it simply doesn't apply.

21          THE COURT:  Right, and I get that.  Right.

22          MR. ALEXANDER:  Your Honor, this is Vincent

23   Alexander, the Debtor.  When you're done, I would like an

24   opportunity to speak.  I don't mean to cut you off.

25          THE COURT:  Right.  No, I just want to comment that,

1   right.  I don't know what rights Mr. Rajan has, doesn't have.

2   I'm sorry.  I don't know what rights -- who has what rights

3   with respect to the control over these companies or whether you

4   can or cannot replace whoever was there.  That's an issue that

5   needs to be resolved either -- because is it the Debtor's

6   interest that's being affected or whose interest?

7           And I get it, I haven't read Judge Silverstein's

8   decisions.  I don't know if they're factually the same.  I have

9   no idea what the soup was, what -- if they're exactly the same

10  or whether they were trying to foreclose on something.  I don't

11  know.

12          My concern with respect to that action with respect

13  to the secured creditors, they are secured creditors, at least

14  from what I can gather, prior to the installation of -- or the

15  appointment rather, of the -- and from what I'm gathering, and

16  I could have this factually incorrect, it was prior to the

17  appointment of the receiver during the litigation.  It does not

18  appear that SeeCubic B.V. had any direct loans or pledges or

19  anything with the creditors who brought the action in the

20  Netherlands.  At least I haven't heard any.  What I've heard is

21  -- yes?

22          MR. MAZZA:  Your Honor, Mr. Mazza again, and I know

23  there's been a lot of facts.  But yes, the B.V. equity is

24  pledged, 55 percent of it to their creditors, so.

25          THE COURT:  Right.  But it was a pledge through who?

1          MR. MAZZA:  It would have been a pledge by the owner

2    Cooperativ.

3          THE COURT:  Okay.  But that's what I'm saying.  I --

4    what I'm saying is that the ownership interest in that company

5    was pledged either by Stream or by some other entity.  So and I

6    don't know if that was prior to -- I understood that it was

7    during the receivership that loans were made, pledges were

8    made.  You're saying that there was loans to Cooperativ and

9    they pledged their interest?

10         MR. MAZZA:  Correct.  Cooperativ had pledged it's

11   interest to SLS and Hawk.  So it's set forth in I believe, is

12   that the collateral estoppel opinion written by Chancellor

13   Laster.  If I can just indulge, Your Honor.

14         "Between 2010 and 2020" -- and I'm reading from the

15   opinion,

16              "stream borrowed millions of dollars.  Stream's

17              senior secure creditors SLS Holdings 4 LLC to be

18              referred to as SLS between 2011 and 2012, Stream

19              borrowed six million from SLS under a series of

20              notes, the SLS notes.  Stream pledged all of its

21              assets as security for the SLS notes and executed a

22              security agreement that authorized SLS to levy on its

23              assets in the event of default.

24              "Seniors Streams junior creditors Hawk between 2010

25              and 2020, Stream borrowed more than 50 million from

1            Hawk plus additional millions denominated in dollars.

2            The loans are documented in a total of 18

3            substantively identical notes.

4            "In connection with the Hawk notes, Stream executed

5            18 substantially identical security agreements,

6            subject to the senior security interest held by SLS.

7            Each of the Hawk security agreements granted Hawk a

8            security interest in substantially all of Stream's

9            assets including the company shares.  Each of the

10           Hawk security agreements authorized Hawk to levy on

11           and take control of Stream's assets to satisfy Hawk

12           if Stream defaulted.

13           "Also in connection with the Hawk notes, Stream

14           executed a total of 15 substantially identical pledge

15           agreements.  Each provided if Stream defaulted on any

16           of their Hawk notes, then Hawk could vote the company

17           shares."

18           Bear with me a second, just don't fail me the rest.

19   I apologize, Your Honor.  Just one second.  The opinion's kind

20   of lengthy.

21           MR. ZAHRALDDIN:  Your Honor, this is Raphael

22   Zahralddin.  Can someone identify which date of which opinion

23   Mr. Mazza's reading from?

24           THE COURT:  Well, I don't know if it answers my

25   question.  My question is --

1          MR. MAZZA:  November 29th, 2022, is the date.

2          MR. ZAHRALDDIN:  Thank you.

3          THE COURT:  Okay.  So my question is did some -- an

4    opinion on non-opinion, did Cooperativ pledge it's interest

5    separately?

6          MR. MAZZA:  Yes.

7          THE COURT:  Not separately pledge it's interest in

8    SeeCubic as security?  Not through Stream.  Not Stream pledging

9    its interest in Cooperativ, but Cooperativ directly itself

10   getting a loan, or maybe Cooperativ in connection with Stream's

11   loan pledge their its interest.  Did each entity also pledge

12   their interest in whatever else they have?

13         MR. MAZZA:  Yes.  That's what I'm -- I'm trying to

14   find that specifically.  But if we could file a supplement to

15   the Court to provide that information, again.

16         THE COURT:  Yeah, that would be filed -- or that

17   would be fine.

18         MR. MAZZA:  Yeah, okay.  Your Honor.  Thank you.

19         THE COURT:  Okay.  So I guess we've gotten through

20   enough of -- I mean, this is colloquy.  Can you imagine what

21   trial's going to be like if we have to try this matter on

22   relief from the State.

23         So I think I sort of know where I am with that, and

24   I'll figure out what I want to do.

25         Let's talk about the motion to dismiss.  Clearly,

 1   that's going to need evidentiary hearing because I can't even

 2   do it without it.  So let's talk about that.

 3          MR. CAPONI:  Yes, this is Steve Caponi for Hawk who

 4   filed the motion.

 5          THE COURT:  Wait a minute.  Wait a minute.  Wait a

 6   minute.

 7          MR. ALEXANDER:  Mr. Caponi, I apologize.  This is

 8   Vincent Alexander.  I apologize.  I didn't mean to cut you off.

 9          THE COURT:  No, it's somebody else's fault.

10          MR. ALEXANDER:  I had asked Your Honor if I could

11   just clarify one point before you had moved on.  It's Vincent

12   Alexander on behalf of the Debtor.

13          THE COURT:  Sure.  Okay.  What was the point?  Be

14   fast.

15          MR. ALEXANDER:  I'm sorry.  It was just --

16          THE COURT:  Go ahead.

17          MR. ALEXANDER:  A, there was just one comment made

18   about candor to the Court, and I just want to let you know,

19   we're just stating the facts to Your Honor and being very

20   candid in terms of what the position is.

21          And our whole view is that the control goes

22   downstream.  So if you have control at the top, you have

23   control at the bottom.  And so our position is that if the

24   bankruptcy is authorized, the Debtors have control of all the

25   downstream entities and there shouldn't be any proceedings

1    anywhere else trying to determine the control issues because it

2    all stems from assets of the estate.

3            So we agree that we can't have parallel proceedings,

4    and we think this Court should decide those issues first.  And

5    if they want to do something in the Netherlands after this

6    Court makes a decision, then, so be it.  But those issues need

7    to get decided here first.

8            THE COURT:  Well, I'm not sure if any of it is black

9    and white is that, because whether the Debtor has control over

10   its interest in these various entities are governed and

11   controlled by separate agreements, separate laws, separate

12   everything.  So yes, I agree the Debtor has interest and that

13   interest is property of the estate.  But what that interest is,

14   is to the extent somebody who's challenging is typically

15   interest in property of the estate is determined by the

16   bankruptcy court.

17           And so I'm not sure and I'll take a good look at

18   Judge Sue's (phonetic) decision.  What does that mean if a

19   debtor has interest in a subsidiary, and there is some

20   litigation against that subsidiary.  There are cases clearly

21   where the stay is put into effect to say, we're going to just

22   put a hold on everything, until we can first get something

23   going in the bankruptcy.  But I think as an initial matter,

24   even before we get to any of that, if there is a motion to

25   dismiss on the basis that this is an unauthorized filing, which

 1    in and of itself, may take care of everything, assuming that

 2    this is -- I'm not -- I don't know if it's right or wrong.  But

 3    let's talk about that.

 4            So I get your position, counsel.  And I'm not -- you

 5    know, I'm not quite sure that even -- I'm not saying that

 6    you're not correct in that this is property of the estate and

 7    control lies with the Debtor.  But that control is not defined

 8    by bankruptcy law.  The interest of the Debtor in the property

 9    is not disputed.  No one's saying the Debtor through its

10    subsidiary doesn't have an interest, but what that interest is

11    and how you exercise that interest may be property of the

12    estate.  And I can't recall, I probably -- I think I addressed

13    that issue somewhere at some point.

14            But in interpreting that, it may not be something I

15    would want to undertake.  It would be something that I would

16    likely defer to the Netherlands, because that is more -- for

17    instance, if this was an issue of Pennsylvania corporate law,

18    Jersey corporate law, even Delaware, I mean, I took the bars

19    years ago.  I'm not saying I'm not that much of an expert, but

20    I think I would have the wherewithal to say, okay, I can figure

21    this out.  And I'll figure it out.  Sometimes when even when I

22    have jurisdiction to, "figure it out" I defer to a more

23    competent court.  So that's all I'm saying with respect to

24    that.  Okay?  All right.

25            MR. MAZZA:  Your Honor, Real quick.  And I'm sorry to

1    belabor.  Mr. Mazza again.  And as far as what's been said in

2    the Court around the buying equipment, the point I was making

3    is that, as Your Honor had suggested, if we could just come up

4    with a commercial arrangement that could be dealt with and not

5    waste the Court's time.  So that's why I made that point is

6    that counsel hadn't said anything about that.  And we wish they

7    had come to the table to be more commercial as opposed to try

8    to come up with stay violations.

9          And then just the last point that you raised

10   regarding what's going on in the Netherlands, and the courts of

11   competent jurisdictions alike, and I think this is just a

12   preview to what you're going to hear from Mr. Caponi on the

13   motion for alternative relief, but the 225 action was advanced

14   to virtually the end of the line, and then this case got filed.

15   The 225 action would have decided all these things in Vice

16   Chancellor Laster's court.

17         So in our view, while we've completely respected have

18   full deference for what Your Honor has under your jurisdiction,

19   these state law property estate issues have been really run to

20   the ground.  And for that reason, that's going to support what

21   Mr. Caponi is about to lay into.

22         THE COURT:  Okay.  All right.  Mr. Caponi.

23         MR. CAPONI:  All right, Your Honor.  I take it to

24   heart that we've been going for quite a while here.  And I

25   think we've plowed a lot of ground.  And you know,

1   there's -- the Debtor thinks it's a legitimate entity.  These

2   are organized.  We think it's a bad faith filing and an effort

3   to avoid, you know, the creditors.  And I don't want to belabor

4   that point.

5        I take Your Honor's issue regarding the need for an

6   evidentiary hearing.  And I think, you know, rather than

7   arguing the merits of the motion, we ought to focus on that

8   with one exception.  And that exception, Your Honor, would be

9   the authority to file I think it's the primary one.  There's no

10  evidence needs to be taken on that.  The Court need only look

11  at the receivership order.  Counsel, you know, we had a

12  discussion a few minutes ago about pendente lite or lite.

13       If you look at the face of the order itself, that is

14  incorrect.  The Vice Chancellor's decision, which is a reason

15  decision made it very clear that on behalf of the state of

16  Delaware, he was reclaiming the entity, control of the entity.

17  And he put the receiver in place to be the board of directors,

18  not to manage assets.  So it's not a situation where you have a

19  board of directors and then a receiver is overseeing the

20  assets.  The board was removed and replaced with the receiver.

21  And that's spelled out very clearly in the order.

22       As a result, this isn't a situation where was there a

23  constitutional infringement on the entity's right to file

24  bankruptcy?  No.  The receiver was the board and was the only

25  one able to do it.  Mr. Rajan was a third party, a stockholder

1    at best and had no authority.  So I think, Your Honor, we could

2    tee that up, and that could be resolved on the papers that

3    currently exist.

4              THE COURT:  Okay.

5              MR. CAPONI:  When you get into the -- and again, I

6    would urge the Court to read Vice Chancellor Laster's decision.

7    I'm a corporate law lawyer geek.  There's a huge distinction

8    between if you look at the order, it refers to the statutory

9    appointment of a receiver, that you would appoint for a

10   pendente lite.

11             And then it -- but it specifically says that under

12   Section 141, which is the provision of 8 Del code 141, which

13   governs the authority of a board of directors and states that

14   all corporations are managed by the board, Vice Chancellor

15   Laster says, I am vesting in this receiver all rights and

16   authority that would otherwise sit with the board of directors.

17   And I think once he did that, the only person who could file

18   bankruptcy, speaking as the board of directors, was the

19   receiver.  Not Mr. Rajan.  So we think as to Technovative,

20   that's why it's a fraudulent filing.

21             On the merits of the rest, Your Honor, I'm going to

22   take a quick stab at just saying this is the third go around.

23   Two bad faith -- you know, two filings that dismissed before.

24   Each one has a pattern, on the eve of a negative decision in

25   the Court of Chancery twice before they were dismissed.  We

1   think Your Honor could take judicial notice of all that, and

2   reach the same conclusion right now.

3          And I think that is bolstered by as I mentioned, just

4   look at the docket.  Any credible debtor would have filed first

5   day motions -- would have filed other motions, financing

6   motions, would have given the Court some indication of what it

7   is doing.  I mean, we've been here a month.  And the only thing

8   the Debtors have filed are sanctions motions, trying to reclaim

9   assets, but without dealing with insurance, and all these

10  issues that you need to do on a credible basis.

11         So I think the lack of activity speaks for itself,

12  combined that with the past history, I think, Your Honor, could

13  make a decision here.  But again, if Your Honor is more

14  comfortable with an evidentiary hearing on those aspects, and

15  would rather talk about scheduling, I think it needs to happen

16  faster and quicker.  And the Debtors are going to say August

17  and we need evidence.  No, we don't.  This needs to happen now.

18  And as I mentioned, the very first time we spoke.

19         Now, I think this is a critical point.  There's an

20  operating subsidiary that has no revenue and payroll is due.

21  My clients covered the last payroll.  And it is shocking that

22  the Debtors have not reached out.  The Debtors have not picked

23  up the phone once to talk to secured creditors, my client in

24  particular, about the assets are funding this estate.

25         There's payroll coming due.  Everyone stops getting

1  paid.  Everyone walks out the door.  All the intellectual

2  property is gone.  And there's no TVs being made and no

3  intellectual property to monetize.  The fact that this debtor

4  has done nothing to come before Your Honor and say this is what

5  our plan is to pay for those people or ask my client, under

6  what terms will you continue funding the operations is a huge

7  red flag.  And so we don't have till August.  I don't think we

8  have to the end of April, before payroll's not met.

9          THE COURT:  Well, that was -- and I'll ask this to

10 counsel.  I wanted to know who's funding these people?  I mean,

11 there's no cash collateral.  Who's funding anything?  That was

12 one of my questions.

13         MR. CAPONI:  It's been my --

14         THE COURT:  I wanted to know who was going to fund

15 them?  And how was that working?

16         MR. CAPONI:  Your Honor, as to my clients to date, we

17 have -- we funded the last payroll and left enough money there

18 when they filed the bankruptcy to cover the payroll.  So in the

19 taxes, that's presently current.  But I believe by the end of

20 April, that situation --and now payroll's due and -- did we

21 lose Your Honor?

22         THE COURT:  No, no, I'm still here.

23         MR. CAPONI:  Okay.  I heard a beep.

24         THE COURT:  Somebody else dropped off.

25         MR. CAPONI:  So Your Honor, there's a lot of pie in

1    the sky from the Debtor about they have orders and whatnot, it

2    takes cold hard cash to fund.  There it is irresponsible at the

3    highest order that the Debtor has not filed something with Your

4    Honor.  Has not reached out.  Has not even initiated a

5    discussion.  That we think is telling and explains why this is

6    a bad faith bankruptcy.

7         And we need to get clarity as to either they're going

8    to fund and they've got proof of it.  And we're not and my

9    clients secure collateral is not going to dissipate at the end

10   of the month.  Or they got to come to this Court and admit they

11   can't fund and then we can all deal with the repercussions of

12   that.  But to want to push a bad faith filing and a dismissal

13   or trustee motion out until August, this thing is going to be

14   off the cliff long before then.

15        My client filed the motion it did, because it was

16   willing to work with an independent receiver who was going to

17   preserve the assets to fund this entity.  My client most likely

18   is willing to do the same again.  Is it willing to fund an

19   entity so Mr. Rajan can run over there and download source code

20   and move equipment?  No.  So I'll stop there.

21        THE COURT:  Okay.  So not that any of these companies

22   are in bankruptcy, right?

23        MR. CAPONI:  Correct.

24        THE COURT:  I mean, who owns the -- I'm assuming

25   there's a patent, there's trademarks, there's something with

```
 1    respect to the technology.  Who owns the technology?

 2              MR. CAPONI:  Well, Your Honor, that is what led to

 3    the first motion.  Our view is it's owned at the different

 4    levels, you know, the patents are owned by whoever they were

 5    assigned.  A lot of the intellectual property belongs to

 6    SeeCubic B.V.  Stream is of the position that if it's owned by

 7    a subsidiary, no matter how far down the line, Stream has the

 8    right to go down to that subsidiary and pluck it out and bring

 9    it up to the Stream level.

10              THE COURT:  I don't know about --

11              MR. CAPONI:  And that's our -- that's our, like,

12    look, Your Honor, it's a bonding equipment issue.  As an

13    example, if Mr. Rajan was saying, SeeCubic B.V., I'd like you

14    to turn the equipment on and make some panels.  There'll be a

15    lot less heartburn on my end, and my clients' end.  Instead

16    he's saying I want you, SeeCubic B.V., to give Stream the

17    asset.  And he's been trying to do that with all the

18    intellectual property.  So my client can't fund an entity, have

19    the lights turned on and the heat and air conditioning so that

20    it's comfortable and Mr. Rajan and Stream -- I'll stop accusing

21    Mr. Rajan -- so that Stream can upstream all of the assets out

22    of that entity.

23              UNIDENTIFIED SPEAKER:  Your Honor --

24              THE COURT:  Wait a minute, wait a minute, wait a

25    minute.
```

1           UNIDENTIFIED SPEAKER:  Yes, Your Honor.  Apologies.

2           THE COURT:  Okay.  Hold on a minute.  I will say

3    this.  Bankruptcy is not a free for all where you get to do

4    things because you're in bankruptcy.  There are rules.  There

5    are just because you're in bankruptcy and you have an interest

6    in something doesn't give you the right to go do anything more

7    than what rights you had in connection with that entity.

8    Whatever those rights are, they are.  If they are -- if you

9    don't have them before bankruptcy, you surely didn't get them

10   because of the bankruptcy.

11          So whoever owns the intellectual property,

12   whoever -- whatever they are, the ownership remains.  So I'm

13   not saying that who's right who's wrong, but there is to be no

14   movement of anything with the claim that because I'm in

15   bankruptcy, I get to do it.  If it's an asset of the two

16   debtors, it remains their asset.  If it's an asset of their

17   subsidiary or whoever owned it before, they continue to own it.

18   So all of that has to be sort of sorted out.  But what you're

19   saying, counsel, is that the Delaware court has already decided

20   on all of these assets?

21          MR. CAPONI:  No, Your Honor.  I mean, on an asset-by-

22   asset basis, no.  The Delaware court and -- when I say

23   Delaware, the parties, it wasn't a -- it was a finding, but it

24   was an admission by all the parties.

25          THE COURT:  Right.

1              MR. CAPONI:  All of the hard assets, all the assets

2    of value, are at the operating subsidiary level, not even at

3    the Technovative level.  I mean, Technovative is just the choke

4    point.  It owns the stock of the company that then owns all the

5    operating subsidiaries.  So there are no assets really at the

6    upper levels.

7              But you know, Your Honor, I would be remiss if I

8    didn't mention, the Debtor never even filed an objection to the

9    pending motion.  So I know you're not -- I highly doubt your

10   Court's going to grant it on that basis.  But I will point out

11   that there was a motion filed, a serious motion, the court set

12   a deadline that passed and the Debtor never even responded.  We

13   have funding they haven't responded to.  And we have --

14             THE COURT:  I thought -- wait a minute, I just

15   printed out -- I'm printing and I can't find them.  I'm like,

16   hold on.  I thought I had -- wait a minute.  I thought I had

17   docket number -- oh, they filed an objection to request for

18   expedited consideration of the motion to dismiss.  And they

19   filed that I guess I preliminary the the intent -- to you

20   know -- then they said object.  They don't think that should be

21   different.  I guess I took that as an objection and they

22   requested a status conference instead.

23             MR. CAPONI: Your Honor had granted the motion to

24   expedite and then set, I believe Wednesday night is the date to

25   file any opposition to the motion.  And that's what I was

1  referring to.

2          THE COURT:  I filed --

3          MR. CAPONI:  That date came and went.

4          THE COURT:  Okay.

5          MR. ALEXANDER:  Your Honor, this is counsel for the

6  Debtor, Vincent Alexander.  It was a request -- an objection to

7  the request for the expedited relief.  And that's our

8  understanding in terms of what was being heard today was

9  whether or not it should be heard on an expedited basis as

10 opposed to --

11          THE COURT:  I don't think -- let me look at the

12 order.  Because I don't recall -- I don't recall any

13 discussions.  I'm not going to say what happened.  I think I

14 may have said schedule them both for the same time.  But I know

15 I wasn't going to have an evidentiary hearing.  That definitely

16 wasn't going to happen.  What did the order say?  Did we issue

17 an order and my courtroom deputy contacted you?

18          MR. ALEXANDER:  Well, an order was entered, Your

19 Honor, that set the -- today as the hearing date.  Granted the

20 motion to expedite, scheduled a hearing for today or a

21 conference for today and set Wednesday as the deadline for any

22 opposition to the substantive motion.

23          THE COURT: More -- okay, hold on.  What docket entry

24 is that?  A joinder motion to relief.  Okay.  Hearing schedule.

25 Motion to sanction.  Motion to move -- hearing rescheduled.

1    Did we put an extra order in there?  I'm just looking.

2          Counsel, what are you referring to when I set the

3    deadline to file a response?

4          MR. ALEXANDER:  Your Honor, I don't have access to

5    the docket.  I don't know if one of my colleagues on the phone

6    does, and --

7          THE COURT:  I'm seeing hearing reschedule as the

8    start time.  Oh, that was for today.  Never mind.

9          MR.ZAHRALDDIN:  Your Honor, this is Raphael

10   Zahralddin from the Debtor.  We spoke to I believe a

11   gentleman's name was John.  He was substituting for your deputy

12   and --

13      (Court and clerk confer)

14         THE COURT:  Yeah.  Okay.  87.  There we go.  Thank

15   you.  Thank you, Michael.  The Court hasn't reviewed the

16   motion.  A hearing on the motion will be held on the 14th day

17   of April.  Any responses must be filed on or before the 12th

18   day of April.  And it usually says 5 p.m., but that's missing.

19   So clearly,  I mean, I authorized it.  And we -- I discussed it

20   with Mr. Barbetta (phonetic) and told him what to put in here.

21         So clearly his response is he just didn't pick the

22   date out.  I gave him the date.  So clearly my order granted

23   the expedited.  I would have considered your objection.  And it

24   wasn't because -- I think there were numerous phone calls.  And

25   again, counsel, I'm going to admonish you.  Do not call my JA

1    or my courtroom deputies and inundate them with phone calls

2    about asking for status conference and issuing amended orders.

3    Don't do that.  If I want amended order --

4              UNIDENTIFIED SPEAKER:  Your Honor --

5              THE COURT:  Don't do that.  I mean --

6              UNIDENTIFIED SPEAKER:  Understood, Your Honor.

7              THE COURT:  I mean, I said that at the last hearing.

8    Don't do it.  You know, I don't like that they feel overwhelmed

9    and bombarded with requests that they know I'm not going to

10   give and I'm not going to do.  If I want to schedule the

11   status, I know how to schedule one.  I never -- and I'm not

12   sure where you guys are, you know, every court practices

13   differently.  But I never have an expedited hearing without --

14   and particularly if it's going to be evidentiary -- without

15   telling people ahead of time that I'm going to have it.

16             If you look at my rule, they specifically state, if

17   anything more than 30 minutes, we have to specifically schedule

18   as our trial, if it's going to be a trial more than 30 minutes,

19   I always do an -- even on an expedited basis.  If I need -- if

20   something is critical, where for instance, you know, something

21   doesn't happen in the next day, that there's going to be some

22   detriment to the Debtor, I'll have an initial hearing and do

23   some preliminary ruling, and then have a following hearing with

24   a final order, which you can do in connection with any type of

25   motion.

1             Now, obviously, with respect to a motion to dismiss,

2    I can't do that because I either dismiss it or don't, or I hear

3    enough to say, you know what?  I mean, I sua sponte appointed a

4    Chapter 11 trustee based on what I heard, but that was after

5    evidentiary hearing.  Or I issued an order saying why I

6    shouldn't appoint one, based on what I heard at some hearing.

7    But I always -- I want to give people their due process rights.

8             So unless you get an order saying we're having an

9    evidentiary hearing, you can rest assured it's going to be what

10   we're doing today is going over trying to figure out, you know,

11   even if I have an evidentiary hearing, it's not going to be on

12   the full blown because there's enough things that are clearly

13   established, and it would only be on the disputed matter.

14            So with respect to the motion to dismiss, what I'm

15   hearing from counsel is this can be disposed of, from a legal

16   perspective without any evidence.  Or when I say not any

17   evidence, presumably, they've asked for the motion to dismiss

18   and say, take judicial notice or attach a copy of the order and

19   decisions from the Chancery Court, and you can -- based on

20   this, this is the order.  Nobody's disputing that that's the

21   order.  I'm interpreting what the order means and how it

22   relates to authority to file and look at everybody's arguments.

23            I would do that before I even schedule an evidentiary

24   hearing.  Because if I find that as a matter of law it wasn't

25   authorized, then that's it.  If I find that a matter of law was

1   not precluded, then we go to an evidentiary hearing on the

2   issues of bad faith, whether it's legitimate bankruptcy

3   purpose, all those other things.

4          So don't do that.  Don't call.  And if I issue an

5   order, you can rest assured that it says what it says and I

6   know what it says.  And it means what I said.  Okay.  Now, I

7   forgot how we went off on that because I think I was -- there

8   was a reference to no response filed.  Okay.  And I did print

9   out the objection, which I saw as an objection only to the

10  expedited request.  But that can be addressed here, which is

11  the Debtors don't want it to be done on an expedited basis, the

12  relief sought, which we could address today.

13         MR. CAPONI:  Well, Your Honor --

14         THE COURT:  That's -- yes.  Who's speaking now?

15         MR. CAPONI:  Sorry.  Steve Caponi again.  What you

16  just said, one, I will make sure everyone on my end does not

17  pester your chambers.  Two, I agree with what Your Honor just

18  said wholeheartedly as a way to proceed.  I think Your Honor

19  should look at the Court of Chancery's order on whether there

20  was an authority to file Technovative.  It's a pure legal

21  issue.  Read the order.  And Your Honor will either determine

22  that the trustee has the sole authority or not.

23         And if Your Honor agrees, that solves that problem,

24  and if not, go to an evidentiary hearing.  And I think our time

25  this afternoon will be best spent on discussing a schedule for

1  that evidentiary hearing if it's necessary or putting in place

2  the hearing date, so Your Honor can, you know, have time to

3  review the current pleading on the legal issue, the parties can

4  do whatever discovery the Debtor wants.

5          But again, I would just say, there's no funding at

6  the operational level.  We're teetering on the cliff.  So I

7  would just plead for a earliest date as possible.  And note

8  that every day that goes by is to a detriment to my clients as

9  a secured creditor.  And I'll pause there to see if Your Honor

10 has any questions.

11         THE COURT:  No, I don't have any more questions or

12 comments at this time.

13         Okay.  Mister -- is it counsel for the Debtors.  Is

14 it Mr. Alexander?

15         MR. ALEXANDER:  Yeah, that --

16         THE COURT:  Okay.  Go ahead, counsel.

17         MR. MAZZA:  Just -- sorry to interrupt, Mr.

18 Alexander.  Just on the SeeCubic side, I know we joined in the

19 motion, so if I can just briefly --

20         THE COURT:  Oh, I'm sorry.

21         MR. MAZZA:  No problem.

22         THE COURT:  I apologize.  Okay, go ahead.

23         MR. MAZZA:  Mr. Mazza again, Your Honor, for

24 SeeCubic.  Just real quick, I agree with everything that Mr.

25 Caponi laid out and that set forth in the papers and this can

```
 1    be dealt with in an expeditious fashion relating to the ultra

 2    vires act issue.  But one thing as it relates to this kind

 3    of -- the bankruptcy code and requirements on hearing things,

 4    we do think this is urgent to move forward as quickly as

 5    possible, obviously, in full deference to Your Honor's

 6    schedule, a lot of complicated facts here.

 7            And the outside date under 1112(b)(3) is 45 days for

 8    this kind of motion to be adjudicated.  So and I know, again,

 9    it's very complicated, but there are issues that can be

10    addressed, I think, in a very discreet fashion to get to a

11    quick ruling here, Your Honor.  And given the issues that are

12    real as to the preservation of value for the business that have

13    been laid out in the papers and that Mr. Caponi has gone

14    through, that is something that's going to be important to the

15    secured creditors for there to be relief sooner rather than

16    later.

17            And we do think given what has been filed so far in

18    the case, or lack thereof, as far as moving forward, in a way

19    that these cases would actually be a legitimate bankruptcy

20    purpose, really, this is just a rehash of litigation, in our

21    view, and is already been set forth in Mr. Rajan's affidavit

22    that they're just seeking essentially, to convert the debt,

23    which they were essentially going to lose on in the 225 action

24    fully and finally.  And only a minor issue was left to be

25    decided on that, that this should not -- this should not
```

1   continue for much longer, given the real business exigencies

2   here and what the bankruptcy code requires, as far as this sort

3   of motion to be heard.

4          But in the meantime, as it relates to the earlier

5   motions that were before Your Honor, some maintenance of a

6   status quo that does not allow for any situation where the

7   assets do not get preserved, is of paramount importance, while

8   the Court considers the issues are in front of it.  So we'd

9   also emphasize that as being something that needs to be done in

10  order to protect creditors interests in this case.  Thank you,

11  Your Honor.

12         THE COURT:  Okay.  Anybody else with respect to the

13  motion -- in support of the motion to dismiss?  Okay.

14  Opposition to the motion to dismiss.

15         MR. ALEXANDER:  Hi, Your Honor.  Vincent Alexander on

16  behalf of the Debtor.  I'm not sure there is an order that

17  you'd like me to address the issues raised, but in terms of it

18  seems like the authority to file seems to be an issue that was

19  prominently argued on the other side, and we believe that the

20  case law supports that the Debtors did have the authority to

21  file the bankruptcy when it was filed.

22         And the case law addresses, you know, orders when

23  receivers are acquainted in terms of, you know, from state

24  courts, and whether or not an order that restricts the filing

25  of a bankruptcy is enforceable.  We believe that the order that

1    was entered by the Chancery Court restricted the ability of

2    anybody to file bankruptcy.  And therefore, that order is void

3    with respect to its treatment, and how in terms of the

4    authority to file and the authority to file bankruptcy is not

5    vested in the receiver.  But there's nowhere in the order that

6    says it is vested in the receiver.

7          What the order did is it strips the Debtor Stream

8    from its ability to file bankruptcy for Technovative, and

9    that's an unenforceable order.  We believe the state lawyer is

10   clear on that.  And we can certainly brief that issue for Your

11   Honor since that is considered a legal issue.  But we can

12   provide all the factual support for that argument, in terms of

13   legal support for that argument, in terms of whether or not the

14   Delaware order was enforceable given its impact and its

15   restriction on a fundamental right of a corporate entity, which

16   is the ability to file bankruptcy.

17         So we believe that that issue will be dispensed of,

18   and in terms -- and will ultimately show that Stream had the

19   authority to put Technovative into bankruptcy.  And this is a

20   lawful filing under the bankruptcy code and that the case

21   should have and should proceed.

22         In terms of the other arguments about funding at the

23   lower levels, Stream was prepared to fund the lower levels.

24   And in order to do that, that's one of the reasons why Mr.

25   Rajan went over to the Netherlands was to again, assess the

1   situation and the operations in the Netherlands.  Because prior

2   to the omnibus agreement and all the assets being transferred,

3   over -- improperly transferred over to SeeCubic, the Debtors

4   had no issues, you know, managing SeeCubic B.V.  What

5   ultimately happened after they lost the management rights,

6   which ultimately came back is SeeCubic multiplied the workforce

7   over there, ran up the expenses, and that's not -- and that was

8   for SeeCubic's benefit, right.

9          So what the Debtor needs to do is reassess the

10  situation over there.  It's prepared to fund whatever the

11  expenses -- the necessary expenses are over there.  But when

12  Mr. Rajan goes over there to look at the books and records and

13  talks to people, and he's denied access to the information to

14  which he's entitled, it's difficult to say you should be

15  funding something, but then you're not getting the records from

16  the entity in order to determine what the funding needs are,

17  and that you're going to have control over the entities that

18  you're funding.

19         So the Debtor is prepared to do that, but it needs to

20  know exactly what the needs are.  And it needs to stop being

21  interfered with in terms of the management, so it can determine

22  how much money it needs to put in to this bankruptcy case.  And

23  then appropriate motions will be filed with the Court.  But at

24  this point, we don't know what the numbers are.

25         We've heard you know, what a number may be, but we

 1   don't have the backup for that number.  We don't know what all

 2   the people do that are there.  We don't know whether they're

 3   necessary to stay there in terms of the operations.  And that's

 4   all the information that the Debtor needs in order to determine

 5   what the funding sources are in the Netherlands.  But the

 6   Debtor is prepared to fund the Netherlands in terms of the

 7   operations.

 8          And it's also the Debtors understanding that we

 9   believe based on discussions with the receiver, that there was

10   a delinquency in funding, possibly in excess of a million

11   dollars by the secured creditors prior to -- and when I say the

12   Hawk parties, you know, prior to the bankruptcy filing.  So we

13   don't believe under their --

14          THE COURT:  What about -- wait a minute.  What did

15   the receiver tell you when he set the funding?

16          MR. ALEXANDER:  That they were -- that the Hawk

17   parties were delinquent on their funding under a promissory

18   note.

19          THE COURT:  What promissory note?

20          MR. ALEXANDER:  That they -- when they agreed to fund

21   in the receivership to SeeCubic B.V., there was a promissory

22   note.  That's what we talked about earlier, Your Honor, at the

23   post-receivership funding that there was deficiencies in terms

24   of the amounts that were supposed to be funded.

25          THE COURT:  So there was a promissory note issued by

```
 1  SeeCubic B.V. --
 2          MR. CAPONI:  Your Honor, I'd have to see.  I think it
 3  was with the recent I have to check.
 4          MR. ALEXANDER:  That's what everybody was talking
 5  about earlier in terms of getting the actual documents.  I
 6  don't know if --
 7          THE COURT:  Counsel, can you hold one second, please?
 8          MR. ALEXANDER:  Sure, Your Honor.
 9          THE COURT:  Counsel, can you hold one second, please?
10          MR. ALEXANDER:  Yes, Your Honor.
11          MR. CAPONI:  Yes, Your Honor.
12          THE COURT:  I'm sorry, counsel.  So hold on one
13  second.  So page 20 of the motion to dismiss talks about the
14  funding?  Counsel?
15          MR. CAPONI:  Sorry, Your Honor.  What was that
16  question, Your Honor?  I didn't --
17          THE COURT:  I think page 20 of your motion to dismiss
18  talks about the funding.
19          MR. CAPONI:  I'm turning there right now.  Yes, Your
20  Honor.  So just to briefly -- my client -- the promissory
21  there was funding from SeeCubic Inc., to SeeCubic B.V. via the
22  receiver.  The funding to cover payroll, and we covered every
23  single payroll and covered all the taxes was, I think, a little
24  over $3 million.  And so the notion that it was a line of
25  credit, basically.
```

1           The receiver was able to draw down when needed and

2    the receiver -- contrary to what was just represented, the

3    receiver kept all the parties including Stream apprised of --

4    there was a budget that was put together in connection with

5    management of SeeCubic B.V.  The receiver did this with

6    SeeCubic B.V.  It has nothing to do with SeeCubic, Inc. or Mr.

7    Stastney or anything like that.  Everyone had that budget, and

8    the receiver kept everybody updated.  So Stream for many months

9    prior to the bankruptcy was well aware of the burn rate at the

10   B.V. level.

11          And you know, I can understand wanting to have more

12   information to know what your obligations are going to be going

13   forward.  But when you take ownership of something like they

14   have by filing this bankruptcy, you have an obligation to come

15   up with the funding.  Stream has $3,000, allegedly in the bank

16   account.  And the cash burn rate at SeeCubic B.V. is -- was

17   750,000 pounds, a little over a million dollars a month.

18          MR. ALEXANDER:  Your Honor, Vincent Alexander on

19   behalf of the Debtor.  But that's the whole point is we should

20   have control of it as the Debtors.  We should have access to

21   all of that information as the Debtors of the control.  And

22   once we get that, we can determine what funding is appropriate

23   and what needs are there.  So that's exactly what --

24          THE COURT:  But counsel --

25          MR. ALEXANDER:  -- the Debtor is trying to do.  We're

```
 1   trying to get --

 2             THE COURT:  But in the meantime -- counsel, in the

 3   meantime, who's funding this?  You keep saying we need to get

 4   information.  We need to do this.  You have an idea of how much

 5   is this costing.  You think it's going to be less than a

 6   million dollars a month?

 7             MR. ALEXANDER:  Yes, Your Honor, we do.

 8             THE COURT:  What was it before?

 9             MR. ALEXANDER:  It needs to be litigated.

10             THE COURT:  Well, how much do you think it was?

11             MR. ALEXANDER:  Well, I can tell you --

12             THE COURT:  Or how much do you think it's going to

13   be?

14             MR. ALEXANDER:  I can tell you, Your Honor, before

15   the SeeCubic Inc. took over, once they took over, the cost

16   tripled.

17             THE COURT:  Okay.

18             MR. ALEXANDER:  So when the Debtors were running it,

19   the costs were significantly less in terms of operating  --

20             THE COURT:  What's significant -- what is

21   significantly less?

22             MR. ALEXANDER:  I believe from a payroll and taxes

23   standpoint, it was 150,000 to $200,000 a month.

24             THE COURT:  And does the Debtor have that?

25             MR. ALEXANDER:  The --
```

1          THE COURT:  I mean, even assuming --

2          MR. ALEXANDER:  Yes.  The Debtor has the money to

3   fund that.

4          THE COURT:  Okay.  So --

5          MR. MAZZA:  So with all due respect, Your Honor --

6          THE COURT:  Counsel.  Counsel, you don't

7   get -- didn't I say don't interrupt.  You get to ask the

8   question, but not now.

9          MR. MAZZA:  Yes, sir.  Yes, ma'am.

10          THE COURT:  That's not --

11          MR. MAZZA:  I agree.  Sorry.

12          THE COURT:  All right.  Okay.  So the Debtor believes

13   that the Debtor can fund 150 and 250 a month.  Okay.

14          MR. ALEXANDER:  At least that, Your Honor.  That's

15   what they were funding before.  But if they go in there and

16   look, and it's the actual costs are higher, then we'll actually

17   do that.  But they need to know what cost --

18          THE COURT:  They need to know -- well, that's all

19   fine and well.  But what happens if this play does get -- I

20   mean, we're all -- you guys are all fighting in here.  What

21   happens if payroll is not met?  And when is payroll going to be

22   due?

23          MR. ALEXANDER:  I believe payroll is due the end of

24   this month, and it's already covered some of this month.

25          THE COURT:  And after that?

1           MR. ALEXANDER:  A payment needs to be made.  And if a

2    payment is not made, then presumably some employees will not

3    come to work.

4           THE COURT:  So?  Do you expect they're going to work

5    for free?  How many --

6           MR. ALEXANDER:  Well, I mean, if they have an

7    understanding --

8           THE COURT:  -- or how often --

9           MR. ALEXANDER:  If they understanding of how they're

10   going to get paid, I believe --

11          THE COURT:  Yes.  But they don't know -- you just

12   said you don't know who you want to keep.  You believe some

13   people are unnecessary.  How do they know about -- why is my

14   understanding I'm going to get paid if I might be the one of

15   the ones you decide you don't need.  So I don't know how that's

16   going to work.  But how often --

17          MR. ALEXANDER:  Well, they'll still get paid.  I

18   mean, I believe that they will still need to get paid pursuant

19   to the requirements of paying employees.

20          THE COURT:  Well, where is Stream getting the money?

21   You don't have any cash, and you don't -- and you're not

22   selling.  Where's the cash coming from?

23          MR. ALEXANDER:  The cash will come from VSI.  And

24   we'll have a -- we should have a --

25          THE COURT:  Who?

1          MR. ALEXANDER:  The entity called VSI.

2          THE COURT:  B?  V or B?

3          MR. ALEXANDER:  V as in Victor.

4          THE COURT:  Um-hum.

5          MR. ALEXANDER:  S as in Stream and I as in Igloo.

6          THE COURT:  And is that the company that's owned by

7   Mr. Rajan?

8          MR. ALEXANDER:  That is a company that is

9   predominantly owned -- that Mr. Rajan has an investment in as

10  well.  But there are other owners of the entity.

11         THE COURT:  And is this the same entity that has

12  these contract with the Debtor and whoever else?

13         MR. ALEXANDER:  It's a distributor.  It has a

14  distributor agreement with end users.  So they are an

15  intermediary between the Debtor and end users of the product.

16         THE COURT:  So they have a distribution agreement

17  with the end users or with the Debtor?

18         MR. ALEXANDER:  With the Debtor.

19         THE COURT:  And when was that entered into?  Hello?

20         MR. ALEXANDER:  I don't -- hello.  I don't know

21  the -- I'd have to check the date of that, Your Honor.

22         THE COURT:  And why does the Debtor need

23  distributors?  Why can't the Debtor just sell the --

24         MR. ALEXANDER:  Well, the Debtor needs -- I believe

25  the understanding of the relationship is that VSI provides

```
 1    additional resources that the Debtor doesn't have in order

 2    to --

 3              THE COURT:  What additional resources?

 4              MR. ALEXANDER:  To facilitate with the end user.

 5              THE COURT:  And what are those?

 6              MR. ALEXANDER:  I believe some of it has to do with

 7    electronic capabilities in terms of what's needed.  The chips

 8    that go into the products, they're semiconductor related issue

 9    as well.  And also VSI has relationships with certain customers

10    that Stream did not have relationships with and then there's

11    also relating to some expertise with lens films.  There's

12    hologram technology that VSI has as well.  And so all of that

13    is used in connection with the process.

14              THE COURT:  How does that make them a distributor as

15    opposed to just a simple supplier?  All right.

16              MR. ALEXANDER:  You asked me --

17              THE COURT:  And so -- um-hum.

18              MR. ALEXANDER:  No, and you asked where the money

19    would come from.  And that's where the money has come from.

20    And it's available and we'll have the appropriate documentation

21    on file when we know how much money we actually need to do it.

22    But it looks like we might just have to put a dollar amount on

23    in terms of what may be needed right now, as opposed to the

24    full amount in terms to address the issues.

25              THE COURT:  And so who's running SeeCubic B.V. right
```

1  now?

2        MR. ALEXANDER:  When you say running, Your Honor, do

3  you mean like on those grounds, like --

4        THE COURT:  I mean, who's in charge of the day-to-day

5  operations?

6        MR. ALEXANDER:  Well, Mr. Rajan pursuant to the

7  corporate records filed there, is the CEO.  There is an

8  individual and he's listed as the CEO in the corporate

9  documents filed with the government.  In terms of on the

10  ground, like actually, in the office there, I believe an

11  individual Patrick Thune, who we brought up earlier, has been

12  instructing some employees.  But he has not been listening to

13  Mr. Rajan, who is the CEO.

14        THE COURT:  Okay.  Well, who was running this before

15  bankruptcy?

16        MR. ALEXANDER:  The receiver was giving the

17  instructions.

18        THE COURT:  To who?  I'm sure he wasn't down there

19  doing it himself.

20        MR. ALEXANDER:  No.  He was -- I believe he was

21  coordinating with Mr. Thune.

22        THE COURT:  With Mr. who?

23        MR. ALEXANDER:  Mr. Thune.  Patrick Thune.

24        THE COURT:  Okay.  So --

25        MR. ALEXANDER:  And so our view is once the receiver

1    was displaced by the bankruptcy filing, aside from the fact

2    that the Debtors didn't step back in and Mr. Rajan was the CEO

3    of --

4              THE COURT:  And who -- well, who was the CEO before

5    the receiver was appointed?

6              MR. ALEXANDER:  Mr. Rajan.

7              MR. MAZZA:  Your Honor, we disagree with that.

8    That's part of the dispute that we talked at length about

9    earlier.

10             UNIDENTIFIED SPEAKER:  Mister -- I won't interrupt,

11   Your Honor.  I'll wait.

12             MR. ALEXANDER:  So Mr. Rajan was the CEO prior to the

13   receivership being appointed -- I'm sorry, the receiver being

14   appointed, not the receivership.  The receiver being appointed.

15   And so we attempted to then discuss and work on operating in

16   the Netherlands, and that's when we were hit with the

17   resistance in terms of Mr. Thune indicating that he was taking

18   direction from Mr. Stastney, but the receiver --

19             THE CLERK:  The Judge got cut off.  Sorry.

20             MR. ALEXANDER:  Okay.  Yeah.  No problem.  Thank you

21   for letting me know.

22             THE CLERK:  So that was the last thing we heard, if

23   you want to backtrack --

24             UNIDENTIFIED SPEAKER:  Your bankruptcy for now.  But

25   Matthew filed it when the receiver --

1           THE CLERK:  Someone is speaking with --

2           THE COURT:  Counsel, I'm back.  I guess I went for a

3    record of three today.

4           MR. ALEXANDER:  I --

5           THE COURT:  And now, when I came back it said I had

6    originally 35 participants, now I'm down to four.

7           MR. ALEXANDER:  The lucky four.  On a Friday

8    afternoon.

9           MR. CAPONI:  It's a Friday afternoon.

10          MR. ALEXANDER:  Yep, there you go.

11          THE COURT:  All right.  So let's try to get -- so my

12   question to Mr. Alexander was, who was the CEO before the

13   receiver was appointed?

14          MR. ALEXANDER:  It's the Debtor's position based on

15   corporate resolutions that Mr. Rajan --

16          THE COURT:  Counsel.  Counsel.  I did not ask you

17   what the Debtor -- at the time the receiver was appointed who

18   was the CEO?

19          MR. ALEXANDER:  Mathu Rajan.

20          THE COURT:  -- at the time the -- Mr. Rajan --

21          MR. ALEXANDER:  Mathu Rajan.

22          THE COURT:  -- was the CEO?

23          MR. ALEXANDER:  Mathu Rajan.

24          THE COURT:  So that's a different -- is that somebody

25   different than --

1           MR. ALEXANDER:  No.  Mr. -- I called him Mr. Rajan

2    before, but his name is Mathu Rajan.

3           THE COURT:  So at the time the receiver was

4    appointed, Mr. Mathu Rajan was the CEO?

5           MR. ALEXANDER:  That is correct.

6           THE COURT:  Okay.  And he continued to be the CEO

7    after the receiver was appointed?

8           MR. ALEXANDER:  Well, no --

9           THE COURT:  He was dismissed?

10          MR. ALEXANDER:  Yes.  He continued to be because it

11   was a status quo.  So the answer's yes.

12          THE COURT:  Okay.

13          MR. MAZZA:  Sorry to interrupt, Your Honor.  Mr.

14   Mazza again.  That's part of the dispute in the Netherlands.

15          THE COURT:  Okay.

16          MR. ALEXANDER:  But as the upstream equity holder,

17   Technovative gets to appoint all the downstream officers,

18   directors.  So that's how it works when they get to appoint the

19   downstream ones.

20          MR. MAZZA:  Right, but you have to comply with such

21   law in order to put people downstream --

22          MR. ALEXANDER:  Understood.

23          THE COURT:  Well, I don't -- listen.  I don't know

24   what you have to do, because that may override anything.  I

25   don't know.  I don't know what the point -- because when you

```
 1   sign an agreement that says we can do all of this, that may

 2   override anything else you do.  I don't know.  No clue.

 3             MR. CAPONI:  Your Honor.

 4             THE COURT:  Yes?

 5             MR. CAPONI:  Steve Caponi.  And I think, you know,

 6   given the hour and the day of the week to try to bring some

 7   closure.  I think what I heard debtors counsel agree that on

 8   the ultra vires filing issue, that's something Your Honor can

 9   address on the papers maybe with the parties filing some

10   supplemental briefing on that.  And I think that is a clear

11   path with a rare instance of agreement.

12             On the balance of the motion and whether we have an

13   evidentiary hearing or not, I think -- Your Honor, I think

14   there's also agreement that there is tremendous uncertainty

15   around whether there's going to be a funding of payroll, who

16   would do it, and how they would do it.  And even if debtor's

17   counsel is correct, that, you know, the Debtor can get the

18   money from VSI, you still then have a related party transaction

19   within it -- with an insider with an entity controlled by Mr.

20   Rajan.  That needs to get vetted and why --

21             THE COURT:  Well --

22             MR. CAPONI:  That hasn't been filed with the Court by

23   now so the parties can kick the tires on it.  I don't -- that's

24   not -- my point, Your Honor, is that's not something you file

25   the day before payroll's due.  Why is Mr. Rajan running
```

1    around --

2           THE COURT:  Well, counsel --

3           MR. CAPONI:  -- and not dealing with those important

4    issues?  That needs to get addressed.

5           THE COURT:  Well, it doesn't matter whether it's

6    inside or outside or whoever, you can't get funding without

7    filing an appropriate motion on the 354(b).  I don't care who

8    they're funding with.  And that's why I'm here.  So I don't

9    know how they plan on doing that.  And the funding is till the

10   end of the month, so somebody needs to do something.

11          I mean, at the end of the day, you know,

12   360 -- 1112(b)(3) says I shall commence the hearing not later

13   than 30 days after filing of the motion.  I don't know this

14   considered commencing the hearing and not later than 15 days

15   after commencement of such hearing.

16          I mean, I don't know how that's going to work,

17   because you could have a hearing that started today, and it

18   takes me three -- a month to finish the trial.  So I don't

19   know.  If the parties express any consent to the continuous for

20   a specific period of time, or compelling circumstances prevent

21   the Court from meeting the guidelines established via the

22   paragraph.  I'm sure there are cases that state what compelling

23   circumstances are.

24          So the best I could do is say if everybody consents

25   that we have a continued hearing to a specific time, that's

1   really going to tie my hands because I don't necessarily --

2   that now means I have to put this issue of dismissal to the

3   front of other things I'm working on to meet -- unless we do a

4   specific date by which we would have a trial, and then that

5   would give me X amount of time to rule on the legal issues.

6   And if I -- yes?

7               MR. CALLAHAN:  Your Honor, this is Kevin Callahan on

8   behalf of the United States Trustee.  I appreciate the time you

9   offer for us today.  And I appreciate counsel presenting their

10  respective positions.  The United States Trustee does not take

11  a position at this time.  However, I'm a little familiar with

12  the Court's procedures with respect to evidentiary hearings.  I

13  appreciate counsel's requests that this be heard promptly.  And

14  of course, I'm aware of the Court's busy calendar.

15              Nevertheless, I don't think counsel may be aware of

16  the Court's procedure on handling evidentiary hearings.  And

17  simply as a suggestion or an observation, it may be a good idea

18  if the Court were to let parties aware of the evidentiary

19  hearing protocol that the Court has instituted, if the hearing

20  is going to be on Zoom.  That would allow --

21              THE COURT:  Well, they put -- well, this one -- well,

22  Mr. Callahan, this one will likely not be.  This is one that I

23  likely would come into the court for.

24              MR. CALLAHAN:  Oh, that's fine.

25              THE COURT:  This is too complicated to try to do this

1    over Zoom.

2            MR. CALLAHAN:  Well, saying that, Your Honor, I

3    really appreciate that.  And I think that might be the

4    preference for most attorneys, probably most of the attorneys

5    here.  But certainly the Court's website offers suggestions on

6    how to present a briefing schedule.  And also a scheduling

7    order, which may give the parties here the opportunity to fully

8    vet their positions.

9            I noticed that there are many declarations and

10   documents attached to the pleadings.  As of right this moment,

11   they're not in evidence.  And of course, if they were to

12   be -- if counsel for both sides, were able to agree on perhaps

13   the list of the exhibits that could be admitted without

14   opposition, that would be a start.  And of course, those

15   exhibits and testimony or other evidence that would be

16   contested, at least to let all parties know what's going to be

17   argued.  I also agree, Your Honor, that what -- I'm sorry, I'd

18   also add that next week is another hearing on a motion for

19   relief.  Possibly the Court might entertain --

20           THE COURT:  Is --

21           MR. CALLAHAN:  Possibly the Court may entertain

22   consolidating the three issues that are before the Court

23   presently into one consolidated hearing.  I think that might be

24   helpful not only to the Court, but to the parties to fully

25   resolve these issues.

1          THE COURT:  Counsel, I have not even looked at my

2     schedule for next week, because my courtroom deputy is on

3     vacation.  She usually sends it to me on Friday.  And maybe she

4     did, and I just haven't seen it because it's Friday, and I

5     haven't had a chance to look at my mail.  And so let's see.

6     Okay.  I don't see any -- nope.  I don't see anything yet.

7          So thank you, Mr. Callahan, for pointing out that

8     there's another hearing in this matter next week.  But what I

9     would like to do is, if we could pick -- everybody consents to

10    a trial date, or the parties confer.  And I don't mean in

11    August, because that is not happening.  I'm talking May

12    sometime.  Because I don't want this case dragging out if it's

13    something that is not properly before me.  And so that needs to

14    be done on an -- agree on an expedited basis.

15         Because if this motion had been filed, it was filed

16    last week, we would have had our first hearing sometime in

17    maybe the end of the month, beginning of May, would have

18    scheduled a hearing sometime in June.  We a little bit above

19    that.  So I want to try to get this done sometime in May.  That

20    will give me an opportunity to have the parties submit briefs.

21    An opportunity for us to go over the legal issues.

22         Because I don't think there's a dispute that they're

23    basing -- they meaning the parties -- the moving parties in the

24    motion to dismiss, are relying on the judge or the judge's

25    decision in the chancery court, or a judge's order rather

```
 1   appointing the receiver and what that means on the Delaware law

 2   -- staying that order no matter what it said is improper

 3   because it strips the Debtors of their authority to file

 4   bankruptcy.

 5           I've looked at the issue briefly, know what the cases

 6   say.  But I don't know, the -- I mean, I know what, you know,

 7   what does that explicitly do?  You have to explicitly say you

 8   have the sole authority to file.  Nobody else can file.  I

 9   don't know, you know, for cases that I have had some exclusive

10   language.  I don't know.  I don't know what that means.  So and

11   I don't think there's any dispute that this -- that the issue

12   of the authority is relying on that order and the appointment

13   of the receiver unless somebody is telling me different.

14           So I don't think that anybody would argue that this

15   is what I need to look at in deciding whether it was authorized

16   or not.  And that whether the receiver has a way -- I don't

17   know.  And whether or whether that order in of itself

18   was -- I'm going to use the word void, because it didn't -- you

19   couldn't take away the Debtor's rights to file.  I don't know.

20   No clue.

21           And so I would need a time frame to get the briefs

22   and then schedule a trial, sometime thereafter -- two weeks

23   thereafter gives me an opportunity to read the briefs and do

24   some reading, do my own research, look at your cases, and

25   hopefully be able to render a decision and say trial will
```

1   proceed or trial is canceled.  I don't know.

2            So do the parties want to confer and try to set some

3   deadline or that they would -- that would work for them?  Or

4   they want me to set some.  I think it would make sense for the

5   parties to try to look at their schedules and come up with some

6   dates.  And if you can't, I most certainly will.  Which one do

7   you want to do?

8            MR. CAPONI:  Your Honor, this is Steve Caponi again,

9   for Hawk.  I think the -- so I appreciate the guidance you just

10  gave.  And I'm confident the parties can work out a schedule,

11  if we know what the end date is.  So if there was -- if there

12  would be a way for Your Honor just to say, here's the date in

13  May that we're going to have a hearing, I know I'm confident we

14  can work backwards and get everything to you within two weeks

15  prior to that.

16           THE COURT:  Well, counsel, I don't -- my courtroom

17  deputy is not in today.  And she is the keeper of the calendar.

18  And I --

19           MR. CAPONI:  Can you reach out on Monday?

20           THE COURT:  Yes, reach out Monday to Ms. Godfrey and

21  pull -- let me just look initially at my calendar, because as I

22  said, I would prefer to have this in person.  This is too

23  complicated to do over Zoom.  Not complicated, but I think it's

24  too many moving parts.  May.  That's Memorial Day.  We'd like

25  to have it before Memorial Day.  Up to you guys.

1              MR. CAPONI:  Yes, Your Honor.

2              THE COURT:  Not the Friday before Memorial Day.

3    What's the Monday?  The Monday is the 22nd.  I just have to

4    figure out -- counsel, just give me a minute.  I have a

5    standing appointment -- doctor's appointment every other Monday

6    for medication.  And I just have to figure out where I am in

7    that schedule.

8              Let's see.  I went on Monday.  So I think the next

9    one's the 24th.  Why doesn't it say 24th on here?  Wait a

10   minute.  Did I go on Monday?  No, because it's on Wednesday.

11   Went on the 12th.  The next one should be the 26th.  Yes.

12   Okay, hold on.  Let me calculate from there.  The 24th.  Okay,

13   I'm good if we can do the 22nd of May, because that will give

14   everybody enough time.  Or the next one would be the 20 -- no,

15   that's Memorial Day.  It would have to be --

16              MR. CAPONI:  How does the 22nd work, Your Honor?

17              THE COURT:  Let me see the 22nd, if that's a -- I

18   just my calculations.  The 22nd is fine.  That should work,

19   because I think I'm --

20              MR. CAPONI:  Is this for the -- this would be the

21   final trial date, Your Honor.  Is that what you --

22              THE COURT:  That would be the final trial date

23   on -- the problem as I see it is that we will be doing a

24   consolidated trial evidentiary record on the motion for -- and

25   that may take longer than a day.  Their motion for violation of

1   the stay, the motion to dismiss.  And I've heard Mr. Callahan

2   say there's a motion for relief.  But that might be pushing it.

3   You may just have to wait on that one.  And because I may just

4   have to wait on that.  I don't know whose motion it is.  I

5   think we may have to wait on that.  So maybe we reserve the

6   22nd the whole day.  What's on the 23rd?  And maybe the half of

7   the 23rd?  Hello?  Counsel?

8           MR. CAPONI:  Yes, Your Honor.  That works for Hawk,

9   Your Honor.

10          MR. ALEXANDER:  I'm checking with my -- this is

11  Vincent Alexander for the Debtors.  I'm checking with my side

12  regarding -- what was that date?

13          MR. MAZZA:  It works for SeeCubic, Your Honor.  Jim

14  Mazza here.

15          THE COURT:  Okay.  So that would be all day on the

16  22nd.  And on the 23rd a half a day.  I guess maybe we -- you

17  think we should reserve 24th a half a day?  Let's see what we

18  got on the calendar.  Okay.  It's a pretrial conference.  All

19  right.

20      (Court and Deputy confer)

21          THE COURT:  So we start at 12:30 on the 23rd and

22  12:30 on the 24th, to the extent we need it.  So that means

23  that I would have to have briefs two weeks before the 22nd,

24  which would mean briefs would be due on the 8th.

25          UNIDENTIFIED SPEAKER:  Okay.

1           THE COURT:  5 p.m. on the 8th, briefs.  Well, we

2    cutting it close for me trying to get a response.  that doesn't

3    give me much time to try to get an answer in -- a decision, but

4    I'm sure I'll start looking at it before that.  Okay.  Now, so

5    with respect to the motion for the stay, I want everything to

6    just wait.

7           I want the matters in the Netherlands, which is

8    scheduled for next week to just hold on a minute, because I'm

9    concerned that this is going to have some impact on what I'm

10   doing.  It's going to have some impact on whether the Debtor

11   believes to have their rights here in this Court, and it

12   belongs to them here.  And I need to protect those rights with

13   respect to their ability to control these things.

14          I will be honest.  I ultimately will not decide that.

15   I ultimately -- if that is an issue, I'm going to send you guys

16   to the Netherlands to have them because they understand --

17   unless I look at the original agreement and find that the

18   original agreements with the parties where they say they have a

19   underlying agreement where they can appoint it.  And that that

20   supersedes anything.  I could make that finding.  I don't know

21   yet.  I don't know, because you're argument was it doesn't

22   matter what they agree, they have to abide by the statute, the

23   state or the country they're in.  I don't know whether I'll

24   find that.

25          I could say well, that's superseded in this

1  agreement, gave them the authority notwithstanding anything.  I

2  don't know.  Because I don't know what it said.  So I don't

3  want -- I want everything to just stay until we can get some

4  feel for where we are on this thing.  Mr. -- nobody's turning

5  over anything.  Because I'm not quite sure how, with respect

6  to -- I'm only hearing the parties saying that they can work

7  this out with respect to turning over the bonding equipment

8  that -- you know, you got to have insurance.  And I mean,

9  that's a requirement.

10          And so I don't know, you know, if I can facilitate

11  some sort of settlement and discussion on that, purely, or if

12  you want me to refer you to one of my colleagues to try to come

13  up with a settlement with respect to that bonding equipment.

14  That's fine.  Because I think one of the big issues I can see

15  in this is in the Netherlands, was that there was some concern

16  that Mr. Rajan was having the company turn over this bonding

17  equipment, and he believed he was taking away their assets.

18          Well, I'm going to decide that.  So I don't know what

19  to tell them, except they need to hold on.  Mr. Rajan, I don't

20  want you doing anything.  Nobody's to do anything, except

21  somebody's got to figure out how to pay these people or you're

22  not going to -- you're going to be fighting over nothing.

23  Nobody is to transfer assets, nobody's to take technology.

24  Nobody could take trade.  Nothing.  Everything stands still.

25          And if somebody believes that somebody is moving

1   something, file something.  Because no.  You can't come to

2   bankruptcy and say I'm going to -- anybody.  Even the people

3   in -- you know, I don't know.  I don't know if I have

4   jurisdiction over people over whatever assets are over there.

5   That asset we're talking about right now is in China.  So I'm

6   not uncomfortable, I don't feel -- I'm comfortable saying just

7   everybody stop.  Don't do anything until we can get at least to

8   find out, one, is this a legitimate filing.  Legitimate meaning

9   authorized.  I don't mean -- and also, who has what.  What

10  assets that -- you know, if the Debtor believes that they have

11  the exclusive right to appoint somebody, and that's the asset

12  that belongs to the estate, I don't want anybody saying

13  anything about it.  I get to say something first.  So

14  everything is stayed.  Nobody is to touch anything.  And you

15  guys try to work on the issue with respect to the bonding

16  equipment.

17          UNIDENTIFIED SPEAKER:  Understood, Your Honor.

18          THE COURT:  Okay.

19          MR. ALEXANDER:  Your Honor, understood.  Your Honor,

20  one question.

21          THE COURT:  Wait a minute.  Somebody has a question.

22  Hold on.

23          MR. ALEXANDER:  To the extent -- this is Vincent

24  Alexander, Your Honor.  To the extent the parties can't come to

25  an agreement on the bonding equipment, which I'm hopeful we

1    can, did you say that one of -- either you or you can refer

2    that quickly to one of your colleagues to help facilitate that?

3            THE COURT:  I'm volunteering them.

4            MR. ALEXANDER:  Well, I hope we can come to a

5    resolution quickly on that issue.

6            THE COURT:  Right.  I would encourage you to do so

7    because I think that's the gist of all of the big problems in

8    the Netherlands and problems here.  You know, maybe you guys

9    agree that, you know, that it gets put somewhere and everybody

10   gets to use it.  I don't know.  I don't know what to tell you.

11   But I get the issue.  Okay.

12           MR. DEMARCO:  If I may, this is Andrew DeMarco with

13   Rembrandt.

14           THE COURT:  Yes.  I'm sorry.  You didn't get to say

15   anything.  I'm sorry.  Go ahead.

16           MR. DEMARCO:  I appreciate that, Your Honor.  Well, I

17   won't keep everyone here much longer.  We've covered a great

18   deal of ground.  But there were two things I simply wanted to

19   address.  In the upcoming hearing regarding the motion to

20   dismiss, I just wanted to request that Rembrandt may have some

21   time to present, you know, its arguments against that issue.

22   And I just want to raise that.

23           I also just wanted to note to Your Honor's question

24   you've been asked earlier about who owns the intellectual

25   property, and I just wanted to raise for the Court and make

 1   sure it was on the record.  That's actually a matter of dispute

 2   there is an ongoing lawsuit in the district of Delaware on that

 3   matter.

 4          It is Rembrandt's contention that Rembrandt owns the

 5   intellectual property that is at issue in the suit.  So

 6   particularly the trade secrets, that are at issue in that case.

 7   So I just want to make sure that Your Honor was aware of that.

 8   In fact --

 9          THE COURT:  The --

10          MR. DEMARCO:  I apologize, Your Honor.  You had a

11   question?

12          THE COURT:  Who -- you said there was ongoing

13   litigation.  Between who and who?

14          MR. DEMARCO:  Yes, Your Honor.  That would be a

15   Stream and Hawk.  Stream, Hawk, and Technovative.  However,

16   with the automatic stay, that has been the stay.

17          THE COURT:  Okay.  So Stream, Technovative, and Hawk

18   are the plaintiffs, defendants?  What are they?

19          MR. DEMARCO:  They are the defendants.  Rembrandt is

20   the plaintiff.

21          THE COURT:  Okay.  So Rembrandt is suing these

22   parties saying that it owns the intellectual property and is

23   suing Stream.  I'm not sure how Hawk fits in there, but

24   technically, which is the Debtors, right?  The two debtors.

25          MR. DEMARCO:  Sure.  We can get into the full details

1   probably during that motion to dismiss, but it is in our -- in

2   the objection documents that we provided.  So we can provide

3   the further detail there.  But the short version, Your Honor,

4   is Rembrandt provided a license to Stream for the underlying

5   technology.  And now, it is our understanding based on public

6   statements that have been put forth by Stream and by Hawk, that

7   they are seeking to take some of that technology claiming

8   ownership of that technology that is rightfully Rembrandt.

9   So --

10          THE COURT:  Okay.  So --

11          MR. DEMARCO:  -- to Stream.

12          MR. ZAHRALDDIN:  Your Honor, Raphael's arguing from

13  the Debtor, excuse me for one second.  Let me just give some

14  clarity.  I believe that when Technovative was sued by

15  Rembrandt, the receiver was in charge of that.  There is no and

16  there never has been any indication that we are not going to

17  follow through on our license or our license, or respect our

18  license with Philips.  So I just want to make sure that Your

19  Honor understands that issue.  And we haven't been able to

20  discuss because that action has been stayed with the

21  bankruptcy.  We haven't been able to discuss anything with

22  Rembrandt as to what's happening after the bankruptcy because

23  we've been preoccupied with these matters.  So I just wanted to

24  put that

25          THE COURT:  Okay.  Well -- okay.  Well, right.  It's

1    property of the estate and who owns it.  I get that.  Mister --

2    I'm sorry, counsel.  I didn't write your name.  You started and

3    I started writing it down and I didn't later.  What's your name

4    again?

5            MR. DEMARCO:  No worries, Your Honor.  My name is

6    Andrew DeMarco.  It's D-E-M-A-R-C-O.

7            THE COURT:  Okay.  So Mr. DeMarco, are you in favor

8    of dismissal or against dismissal?

9            MR. DEMARCO:  We are against dismissal here, Your

10   Honor.

11           THE COURT:  All right.  So then you need to

12   file -- you can file something too if you want.  You don't have

13   to.  If you want to say you're in favor and you believe it's

14   valid, you're free to file and present your arguments in

15   support.  You don't have to, but if you do, it's due by May 8th

16   at 5 p.m., and if we have a trial you are definitely -- because

17   you have filed something in opposition, you definitely can

18   present whatever evidence.  You can question.  You can argue

19   whatever you want, to the extent we have a hearing because I

20   don't know yet, on the 22nd, 23rd, and 24th.  Okay?

21           MR. DEMARCO:  Yes, Your Honor.  I appreciate that

22   greatly.

23       (Proceedings adjourned)

24

25

<u>C E R T I F I C A T E</u>

     I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/
_____
John Buckley, CET-623
Digital Court Proofreader

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                    :
IN RE:                              : Case No.  23-10764
                                    :            23-10763
STREAM TV NETWORKS, INC.   CH: 11   :
                                    : Philadelphia, Pennsylvania
A) Trial Re: Emergency Motion To    : June 29, 2023
Dismiss Case. Motion Of Hawk        : 12:52 p.m.
Holdings Ltd. (I) Pursuant To       :
Section 1112(B) Of The Bankruptcy   :
Code Either (A)(I) To Dismiss The   :
Debtors Chapter 11 Cases Or (2)     :
To Convert Such Cases To Cases      :
Under Chapter 7 Or (B) In The       :
Alternative, Pursuant To Section    :
1104(A) Of The Bankruptcy Code To   :
Appoint A Chapter 11 Trustee And    :
(Ii) To Request Expedited           :
Consideration Pursuant To Local     :
Rule 5070-I(G)Filed By Hawk         :
Investment Holdings Ltd.            :
Represented By Steven Caponi .      :
. . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:            Rafael X. Zahralddin, Esq.
                           Lewis Brisbois
                           500 Delaware Avenue, Suite 700
                           Wilmington, DE 19801
                           302-985-6004

                           Bennett G. Fisher, Esq.
                           Lewis Brisbois Bisgaard & Smith
                           24 Greenway Plaza, Suite 1400
                           Houston, TX 77046
                           346-241-0495

                           Vincent F. Alexander, Esq.
                           Lewis Brisbois Bisgaard & Smith
                           110 SE 6th Street, Suite 2600
                           Fort Lauderdale, FL 33301
                           954-728-1280

| | |
|---|---|
| For SeeCubic: | Marley Ann Brumme, Esq.<br>Eben P. Colby, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Hawk Investment Holdings Ltd: | Steven Caponi, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |
| | Thomas L. Warns, Esq.<br>K&L Gates LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>212-536-3901 |
| | Margaret R. Westbrook, Esq.<br>Aaron Rothman, Esq.<br>Jonanthan N. Edel, Esq.<br>K&L Gates LLP<br>300 South Tryon Street<br>Suite 1000<br>Charlotte, NC 28202<br>704-331-7400 |
| For the United States Trustee: | Kevin P. Callahan, Esq.<br>Office of The United States<br>Trustee<br>Robert N.C. Nix Federal<br>Building<br>900 Market Street, Suite 320<br>Philadelphia, PA 19107<br>202-934-4154 |
| For Rembrandt 3D Holding Ltd.: | Andrew Peter Demarco, Esq.<br>Devlin Law Firm LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br>Chris Michaels |

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: | | | | |
| Shadron Stastney | | | | |
| (By Mr. Colby) | | | 27 | |
| (By Mr. Alexander) | | 7 | | |
| Jung Ho Park | | | | |
| (By Mr. Alexander) | 42 | | 133 | |
| (By Mr. Caponi) | | 61 | | 139 |

```
 1  JUNE 29, 2023                                    12:52 P.M.

 2           THE COURT:  Good afternoon.

 3           MR. COLBY:  Good afternoon, Your Honor.

 4           MR. ALEXANDER:  It is a good afternoon.

 5           THE COURT:  Yes.

 6           THE BAILIFF:  You may be seated.  The Court is in

 7  session.

 8           THE COURT:  Okay.  Mr. Stastney, I think?  Oh, okay.

 9  Are we going to continue with his cross or are we not?

10           MR. ALEXANDER:  I'll continue with his cross.

11           THE COURT:  Okay.

12           UNIDENTIFIED SPEAKER:  I just wanted to provide the

13  Court with an update.

14           THE COURT:  Yes.

15           UNIDENTIFIED SPEAKER:  So earlier today in the

16  Netherlands --

17           THE COURT:  Uh-huh.

18           UNIDENTIFIED SPEAKER:  -- the Dutch Court replaced or

19  started the process of replacing Mathu Rajan with an

20  independent director to oversee SCBD.  I don't have all the

21  details on it --

22           THE COURT:  Uh-huh.

23           UNIDENTIFIED SPEAKER:  -- but I just wanted to make

24  sure the Court was aware, so we weren't accused of keeping

25  information to ourselves.
```

1          THE COURT:  And what do you believe that has to do

2     with this?

3          UNIDENTIFIED SPEAKER:  I don't know that it

4     necessarily has a lot to do other than obviously, from our

5     perspective, the operations or the working piece of Stream is

6     at that level -- it's now going to be overseen by an

7     independent.   So I assume, you know, we'll find out what it

8     means in the coming days.   But again, just because it

9     happened, I wanted --

10         THE COURT:  So it means neither party is in charge,

11    correct?

12         UNIDENTIFIED SPEAKER:  Correct.  It's an independent

13    -- it will be one, as I understand it, one director, who's an

14    independent director that's been appointed by the court.

15         THE COURT:  Which is replacing Stream's ability to do

16    whatever?

17         UNIDENTIFIED SPEAKER:  Correct.  Anybody's ability to

18    do whatever.

19         THE COURT:  Okay.

20         UNIDENTIFIED SPEAKER:  Correct.  Just wanted to share

21    that, Your Honor.  Thank you.

22         THE COURT:  Okay.

23         MR. ALEXANDER:  And I haven't seen that, Your Honor,

24    so I have no comment.

25         THE COURT:  I don't know what it has to do with me.

1          MR. ALEXANDER:  If an order has been issued -- I

2    don't know.

3          THE COURT:  I mean --

4          MR. ALEXANDER:  And I don't think that's before Your

5    Honor, but --

6          THE COURT:  Well, no, I get to the extent it may have

7    had some impact -- some consideration for my decision.  Maybe,

8    maybe not.  I don't know.  Then --

9          MR. ALEXANDER:  -- it's just not before you.  I

10   don't --

11         THE COURT:  Well, it's not that it's not before me,

12   but it may be a fact that may -- the issue of whether there's

13   an independent director may not be before me, but it's a factor

14   that's in this case.  It's a fact that's in this case.

15         MR. ALEXANDER:  My only point was, Your Honor, I

16   haven't seen what it said.  I understand what Mr. Caponi just

17   said, but I don't know.  So I'm assuming if an order is

18   entered, we can review it.

19         THE COURT:  Right, but other than that, okay.  Okay,

20   thank you for the information.  It may or may not have any --

21   if it doesn't have anything in terms that I'm not overseeing

22   that because it's in the Netherlands, so it really has no -- I

23   don't have -- I don't have any jurisdiction over SeeCubic B.V.

24   whether there's and independent director or not.  I don't have

25   any --

```
 1              MR. ALEXANDER:  No, I understand.

 2              THE COURT:  Right.

 3              MR. ALEXANDER:  I'm saying I haven't seen the order.

 4   I don't know if it has -- what impact, if any, it has on the

 5   bankruptcy case.

 6              THE COURT:  Okay.  Unless they're telling me not to

 7   do -- I don't know why they would tell me anyway because I'm

 8   not overseeing that matter.  Whatever.

 9              All right let's continue with the cross-examination.

10              No, he remained under oath.

11              MR. ALEXANDER:  Your Honor, may I proceed?

12              THE COURT:  Yes.

13                      CROSS-EXAMINATION (RESUMED)

14   BY MR. ALEXANDER:

15   Q    Good afternoon, Ms. Stastney.

16   A    Good afternoon.

17   Q    Do you have an email address that is

18   slstastney@hotmail.com?

19   A    I do.

20   Q    And you had that address in 2020?

21   A    Yeah.

22   Q    Do you also have an email address that is

23   sstastney@gmail.com?

24   A    I do.

25   Q    Did you have that email address in 2020?
```

1  A    I believe so, uh-huh.

2  Q    You're not an engineer, correct?

3  A    I'm not an engineer.

4  Q    When you were involved with Stream in terms of CFO or

5  board member, you weren't involved in the actual operations of

6  Stream, correct?

7  A    Except to the extent that those rules would require that

8  CFO or director, we'd have some oversight of that, no.

9  Q    All right.  You were involved with the finance, correct?

10 A    I was involved in the finance primarily.

11 Q    You weren't involved with the manufacturing or production

12 of any prototype samples with the Ultra-D technology, correct?

13 A    I was not at that time, no.

14 Q    You were not involved with any of the mass produced

15 displays with the Ultra-D technology, correct?

16 A    There were no displays being mass produced at that time.

17 Q    Were you involved with the production of the displays at

18 Stream at that time?

19 A    I was not involved in the production of displays at that

20 time.

21 Q    And SeeCubic, Inc. is not a manufacturing company,

22 correct?

23 A    SeeCubic, Inc. is not a manufacturing company, no.

24 Q    SeeCubic, Inc. has never manufactured any products using

25 the Ultra-D technology, correct?

1   A    That's correct.

2   Q    With regards to the bonding equipment, I believe you

3   testified that the capacity of Stream's bonding equipment was

4   10,000 units per year; do you recall that testimony?

5   A    I do.

6   Q    What bonding equipment was that based on?

7   A    The bonding equipment that was -- the only bonding

8   equipment that Stream owned.

9   Q    Which one is that?

10  A    The -- the build -- the mass -- the large bonding machine

11  from the two that Stream owns.

12  Q    You've never operated the bonding equipment though,

13  correct?

14  A    No.

15  Q    So any understanding you would have with regards to the

16  capacity you would have received from a third party, correct?

17  A    That's correct.

18  Q    And you're aware that Stream, because you were employed at

19  Stream, has two pieces of optical bonding equipment, correct?

20  A    Correct.

21  Q    There's a mass production line, which is the MPL; is that

22  right?

23  A    That's correct.

24  Q    And there's the small production line, which is the SPL?

25  A    That's correct.

```
 1  Q    And are you aware that the SPL can produce 50,000 3D

 2  modules per year?

 3  A    I am.

 4  Q    Are you aware that the MPL can produce in excess of

 5  180,000 3D modules per year?

 6  A    It depends on the size of the module.

 7  Q    Sixty-five inch?

 8  A    I don't believe that's correct for 65s.

 9  Q    Okay.  So if the -- I understand your testimony, but if

10  the MPL could produce in excess of 180,000 3D modules per year

11  of the 65 inch, it'd be able to satisfy the 100,000 unit

12  production in -- if you factor in the SPL as well -- in six

13  months or so, correct?

14          MR. COLBY:  Objection, Your Honor.  He should be

15  asking the witness about his first-hand knowledge, not if this,

16  then -- I mean, this is a math question.

17          THE COURT:  Your response?

18          MR. ALEXANDER:  I don't think just because it's a

19  math question is an objection to a question.

20          MR. COLBY:  The question was effectively, if it can

21  produce more than 100,000, then wouldn't you agree it could

22  produce more than 100,000.  And just ask the question -- ask

23  the witness what is -- what he knows and that's really all

24  that's relevant.

25          THE COURT:  Your response?
```

```
 1              MR. ALEXANDER:  I don't think that's a valid

 2   objection.  I feel like the question I asked --

 3              THE COURT:  Are you objecting on the basis that --

 4   you said it's a math problem.  What is the basis for your

 5   objection?

 6              MR. COLBY:  The basis for the objection is that he's

 7   not asking the witness for his first-hand knowledge.  He's

 8   simply providing a fact and then asking him to confirm it.

 9              THE COURT:  Okay.  And you offered him as lay expert?

10              MR. COLBY:  Hypothetical -- I'm sorry?

11              THE COURT:  You offered him as a lay expert, right?

12              MR. COLBY:  No.  He was offering lay opinion

13   testimony.

14              THE COURT:  Oh, lay opinion, I'm sorry.  I used the

15   wrong words -- lay opinion.

16              MR. COLBY:  Yeah.

17              THE COURT:  Okay.

18              MR. COLBY:  But this hypothetical I don't think is

19   asking for the witness's first-hand knowledge or even really

20   information based on his rationale perception.  It's just

21   simply giving a hypothetical and asking him to confirm it.

22              THE COURT:  So lay opinion has to only be from

23   personal information is what you're saying, right?

24              MR. COLBY:  Based on personal perceptions.

25              THE COURT:  Your response?
```

1        MR. ALEXANDER:  Your Honor, I think it's a valid

2   question that he can answer with respect to whether or not he

3   believes that based on those production numbers, if the company

4   could produce 100,000 units.  I mean, he testified that they're

5   not capable of producing 100,000 units based on the bonding

6   equipment.

7        THE COURT:  Well, based on his understanding that the

8   bonding equipment should only do 10,000 limit.  And your

9   question is if they can do more than 10,000 --

10        MR. ALEXANDER:  Well --

11        THE COURT:  -- then they could satisfy.

12        MR. ALEXANDER:  Well, his testimony was already that

13   one of the bonding equipment could be 50,000.

14        THE COURT:  Okay.  So based on the 50,000 a month, a

15   month?

16        MR. ALEXANDER:  That would be 50,000 per year with

17   that one machine.

18        THE COURT:  Okay.  But you also asked him about the

19   180,000 per year?

20        MR. ALEXANDER:  Correct, Your Honor.

21        THE COURT:  Okay.  And you're saying combined, they

22   should be sufficient.

23        THE COURT:  That was the question?

24        MR. ALEXANDER:  That's correct, Your Honor.

25        THE COURT:  All right.  Mr. Colby's standing up to

1  further articulate his objection.

2          MR. COLBY:  Yeah, I don't want to make --

3          MR. ALEXANDER:  Well, Your Honor, I'm going to

4  withdraw the question.

5          THE COURT:  Okay.  Withdraw the question, go ahead.

6          MR. ALEXANDER:  Withdrawn.  I think I have the facts

7  I need on that.

8  BY MR. ALEXANDER:

9  Q    You testified that SeeCubic controlled the Debtor's assets

10  for at least an 18-month period, correct?

11  A    Correct.

12  Q    While SeeCubic was in control of the Debtor's assets,

13  SeeCubic did not produce any 3D modules, correct?

14  A    Incorrect.

15  Q    SeeCubic, Inc. produced a 3D module?

16  A    SeeCubic, Inc. had never produced a 3D module.

17  Q    Well, that was my question.  So what was incorrect about

18  my question?

19  A    SeeCubic B.V.  You said SeeCubic.

20  Q    That's not the question.  The question is, during the time

21  when SeeCubic, Inc. held the Stream assets wrongfully, did

22  SeeCubic, Inc. produce --

23          MR. COLBY:  Objection, Your Honor.  It was pursuant

24  to a court order that was valid at the time.  It was later

25  reversed but I don't think --

```
 1              MR. ALEXANDER:  Your Honor, I don't know what the

 2   objection -- I mean, the question.

 3              MR. COLBY:  I don't think wrongfully is a necessary

 4   interjection.

 5              THE COURT:  Okay, so he's objecting to the use of the

 6   wrongfully.

 7              MR. ALEXANDER:  I can ask the question, Your Honor,

 8   and if he disagrees with the question --

 9              THE COURT:  No, no, no.  He's disagreeing with your

10   wording of the use of the wrongful provision.

11              MR. ALEXANDER:  I didn't understand the evidentiary

12   objection to that though.

13              THE COURT:  The objection was that he is objecting to

14   your characterization.  And I shouldn't be the one.  I'm only

15   telling you what I understand it to be is that he's objecting

16   to your characterization of the possession as wrongful because

17   they believe it was pursuant to a valid court order.

18              MR. COLBY:  Yeah, it's argumentative given the

19   background.

20              THE COURT:  Well, it was in possession later

21   determined to be incorrect by the lower court.  That really

22   what happened, Alexander.  Their position was later determined

23   to be improper.

24              MR. ALEXANDER:  Well, legally we believe -- the

25   Debtor believes it was wrongful the entire time, but to get rid
```

```
 1  of the argumentative objection --

 2          THE COURT:  Okay.

 3          MR. ALEXANDER:  -- I can just ask the question with

 4  regards to his possession --

 5          THE COURT:  Okay.

 6          MR. ALEXANDER:  -- on SeeCubic.

 7          THE COURT:  Which he said was for 18 months.

 8          MR. ALEXANDER:  Correct.

 9          THE COURT:  And then you asked him, during that 18

10  months, did they produce -- SeeCubic, Inc. because we're

11  talking about SeeCubic, Inc. --

12          MR. ALEXANDER:  Yes.

13          THE COURT:  -- produce anything during that --

14  produce any products because I don't even know what it is --

15  the TVs or screens or whatever.

16          MR. ALEXANDER:  The working modules.

17          THE COURT:  Did they produce any 3D modules, and he

18  said no.  Well, initially he said that's incorrect because he

19  assumed you were talking about SeeCubic B.V., which you were

20  not.  His understanding of the question was incorrect.

21          So what's your answer now, Mr. Stastney?  Did

22  SeeCubic, Inc. produce any 3D module during the 18 month that

23  it was in possession of the assets?

24          THE WITNESS:  May I clarify the question?

25          THE COURT:  There's no need to clarify.  Did
```

1   SeeCubic, Inc. produce 3D modules -- yes or no -- during the 18

2   months?

3              THE WITNESS:  I apologize.  What do you mean by

4   produce -- do the physical work of making the modules?  No.

5   SeeCubic, Inc. did not.

6              THE COURT:  Were there any other ways -- what else

7   does make mean -- produce mean?  Look, we're not going to have

8   -- I'm already starting off the day annoyed.

9              MR. ALEXANDER:  I'm trying to move through this.  I

10  know a lot of people that --

11             THE COURT:  I'm already starting off annoyed.

12             MR. ALEXANDER:  -- we'd like to try and get, so I'm

13  going to try and move as quickly as we can.

14             THE COURT:  I'm not telling you to -- you're entitled

15  to your questions, Mr. Colby is entitled to object, but this

16  useless, a word, gamesmanship -- I already told you guys

17  yesterday I'm up to here with it.  And I'm not trying to

18  prevent you guys from doing your job.  I think you're both

19  doing -- everybody here is doing a great job.  I'm just telling

20  you I -- you know, you guys are litigators.  You're used to

21  doing all this stuff.  I was a litigator.  I know the games.  I

22  know -- it's not only about games.  It's strategy -- I get it.

23             You don't need to try to strategize here.  I

24  understand what's going on.  I understand better than you guys

25  think I understand, okay?  So I'm just saying there's no need

 1  to be super litigator here, okay?  That's all I'm telling you.

 2  I'm not saying you can't do your case.  I'm just saying you're

 3  not, you know, I get -- and I'm not a jury.

 4          So I don't need all of the different things that come

 5  into the strategy of being litigators.  I'm not trying to stop

 6  you from doing your job.  But I can see what I can see.  And

 7  all of the strategy is not going to stop me from seeing what I

 8  see.  So let's just try to get to the real issues that I need

 9  to address.  And that's for everybody.  I'm not pointing a

10  finger at anybody.  I'm just saying let's just try to focus on

11  the issues, okay?

12          All right.  So no, they did not produce, make,

13  whatever words you want use, any 3D models, okay?

14          Go on, Mr. Alexander.

15  BY MR. ALEXANDER:

16  Q    While SeeCubic, Inc. was in control of the Debtor's

17  assets, SeeCubic, Inc. did not sell any 3D modules or

18  components, correct?

19  A    During that time period, that's correct.

20  Q    I believe you testified yesterday regarding a technology

21  sublicense between SeeCubic, Inc. and SeeCubic B.V.; do you

22  recall that?

23  A    I do.

24  Q    When was that license agreement entered?

25  A    I don't recall.

1    Q    Was it entered prior to execution of the omnibus

2    agreement?

3    A    I don't recall.

4    Q    Well, when was SeeCubic, Inc. formed?

5    A    Late May or early June of 2020.

6    Q    What is the date of the omnibus agreement?

7    A    May of 2020.

8    Q    So you would agree that it would have had to have been

9    entered into after the entry of the -- or the entry into the

10   omnibus agreement, correct?

11   A    Absolutely.

12   Q    What is your understanding of the scope of the license

13   agreement?

14   A    I don't know the standard scope for those license

15   agreements.

16   Q    Do you not have an understanding of what the scope is?

17   A    I have a basic understanding of what the standard scope

18   is.   It allows the user of the device to include what was

19   called Ultra-D technology for a period of time.

20   Q    What was the period of time?

21   A    I think it varies by license.

22   Q    I'm talking about this particular license.

23   A    I don't know.

24   Q    Are you aware of any restrictions on SeeCubic B.V.'s

25   ability to sublicense intellectual property to SeeCubic, Inc.

 1  or any other party?

 2  A    I am not, but I assume that if there are any that they're

 3  aware of, they abide by them.

 4  Q    So that's just an assumption on your part, correct?

 5  A    That's correct.

 6  Q    You said you don't have any knowledge of any restrictions,

 7  correct?

 8  A    That's correct.

 9  Q    Does SeeCubic, Inc. hold a license with Philips.

10  A    It does.

11  Q    Is it a direct license?

12  A    I don't know who -- I don't believe SeeCubic B.V. is the

13  licensor -- or the licensee, rather.

14        THE COURT:  Wait, who did you ask had a license with

15  Philips?

16        MR. ALEXANDER:  I asked if SeeCubic, Inc. held a

17  license with Philips.

18        THE COURT:  Okay.  And he said?

19        THE WITNESS:  No.

20        THE COURT:  Well, you originally said yes?

21        THE WITNESS:  I'm sorry, I thought you said SeeCubic

22  B.V., but if I --

23        MR. ALEXANDER:  Can I -- I don't think I did, but

24  let's just clarify the record so we get a --

25        THE COURT:  Uh-huh.

1   BY MR. ALEXANDER:

2   Q    Does SeeCubic, Inc. hold a license with Philips?

3   A    No.

4   Q    Did SeeCubic B.V. or SeeCubic, Inc. continue to use all of

5   the Philips technology during the period of time in which

6   SeeCubic, Inc. asserted ownership over Stream's assets?

7   A

8   Q    Yes.

9         THE COURT:  What was that question?  I got a yes, but

10  I didn't --

11         MR. ALEXANDER:  The question, Your Honor, was did

12  SeeCubic B.V. or SeeCubic, Inc. continue to use all of the

13  Philips technology during the period of time in which SeeCubic,

14  Inc. asserted ownership over Stream's assets.

15         THE COURT:  He just said 18 months -- my shortcut,

16  yes, okay.

17  BY MR. ALEXANDER:

18  Q    And SeeCubic, Inc.'s business plan is premised on being

19  able to license the Phillip [sic] technology, correct?

20  A    Yes.

21  Q    SeeCubic, Inc., is currently party to NDAs with SeeCubic

22  B.V. and specific clients who may be interested in the Ultra-D

23  technology, correct?

24  A    Correct.

25  Q    These agreements were not approved by Stream, correct?

```
 1   A    Correct.

 2            THE COURT:  Wait a minute.  You're going a little too

 3   fast.  What was the -- never mind.  I got the --

 4            MR. ALEXANDER:  I can take a step back and slow down,

 5   Your Honor.  I apologize.

 6            THE COURT:  All right.  We have until -- I mean, you

 7   guys want to finish today.  I'll go until 7:30 again, but

 8   that's it, unless you need tomorrow morning, which I think

 9   you're going to have some time tomorrow because I'm not sure

10   when my trial is tomorrow, but anyway.  I don't know if it's a

11   trial or it was just -- I have to look at my calendar.  Maybe

12   it was just a request to continue the trial.

13            So it must only be the motions of whether -- and then

14   is the trial the next week?  I don't know.  Don't worry about

15   it.  Okay.

16            Okay, go ahead.

17            MR. ALEXANDER:  I'm going to take a step back on

18   those questions, Your Honor --

19            THE COURT:  Okay.

20            MR. ALEXANDER:  -- so you can get them in.

21   BY MR. ALEXANDER:

22   Q    SeeCubic, Inc. is currently party to NDAs with SeeCubic

23   B.V. and specific clients who may be interested in the Ultra-D

24   technology, correct?

25   A    Correct.
```

1    Q    These agreements were not approved by Stream, correct?

2    A    With one exception, correct.

3    Q    What is the one exception?

4    A    Not -- Bosch -- the agreement with Bosch.

5         THE COURT:  B-O-S-C-H?

6         THE WITNESS:  Yes, ma'am.

7         THE COURT:  Like Bosch dishwashers?

8         THE WITNESS:  Yes, exactly, same.

9         THE COURT:  Okay.

10   BY MR. ALEXANDER:

11   Q    And is your position that SeeCubic, Inc. cannot share the

12   specific names of these clients with Stream, even though

13   SeeCubic B.V. is a subsidiary of Stream, correct?

14   A    That's correct.

15   Q    SeeCubic, Inc. is a holding company, right?

16   A    It's both operating and holding.

17   Q    SeeCubic, Inc. is not currently raising equity, correct?

18   A    Correct.

19   Q    However, SeeCubic, Inc. is still receiving money through

20   debt instruments?

21        THE COURT:  Hold on, hold on.  The next page.  So

22   they're not -- the question was, SeeCubic, Inc. was not --

23        MR. ALEXANDER:  Currently raising equity.

24        THE COURT:  The answer was no, correct?

25        MR. ALEXANDER:  Correct.

```
 1              THE COURT:  Okay.  The next question, counsel?

 2   BY MR. ALEXANDER:

 3   Q    However, SeeCubic, Inc. is still receiving money through

 4   debt instruments, correct?

 5   A    Correct.

 6   Q    SeeCubic, Inc. ceased raising equity at some point in

 7   2022, correct?

 8   A    SeeCubic, Inc. never raised straight equity and the equity

 9   that was issued was issued together with the debt instrument.

10   Q    But it did raise equity, correct?

11   A    The equity was an additional incentive with an investment

12   in debt.

13   Q    So is it just -- is it your testimony that yes, it raised

14   equity, but it did not independently raise equity without debt?

15   A    My -- my response is it raised debt and some investors

16   along with their debt investment also got equity.

17   Q    But nobody received straight equity without a debt

18   investment?

19   A    I believe that's correct.

20   Q    What is the current amount of SeeCubic, Inc.'s debt?

21   A    Approximately $180 million.

22   Q    Do you remember the discussion regarding SoftBank?

23   A    I do.

24   Q    You said that SoftBank was not a potential institutional

25   lender for Stream?
```

```
1   A     No, that's not what I said.

2   Q     That wasn't your testimony?

3   A     No.

4   Q     Okay.  What SoftBank entity were you referring to?

5   A     We, I believe, discussed two SoftBank entities -- one, a

6   very large on, which had the marquee name, SoftBank and one

7   which was -- held forth at SoftBank -- that SoftBank, but was

8   different.

9   Q     But its name was still SoftBank?

10  A     Its name was no longer SoftBank at that time.  Its name

11  had previously been SoftBank.

12  Q     Would you agree that the assets of Stream are worth more

13  as a growing concern than if liquidated?

14  A     Yeah.

15  Q     I believe that you testified that Hawk made multiple loans

16  to Stream, correct?

17  A     Correct.

18  Q     Hawk did not make one lump sum loan to Stream, correct?

19  A     Correct.

20  Q     I believe you testified that one of the issues you believe

21  is being addressed by the Chancery Court is whether Stream had

22  to raise money in one capital raise or if the equity could come

23  in overtime in order to convert the Hawk debt.  Is that

24  accurate?

25  A     Yes.
```

```
 1              THE COURT:  Wait, what was that question again?

 2              MR. ALEXANDER:  He testified that one of the issues

 3   you believe is being addressed by the Chancery Court in the 225

 4   action, is whether Stream had to raise money in one capital

 5   raise or if the equity could come in overtime in multiple

 6   raises in order to convert the Hawk debt.

 7   BY MR. ALEXANDER:

 8   Q    Is that accurate?

 9   A    Yes.

10   Q    Sitting here today, are you aware of a specific provision

11   in the conversion agreement that states that Stream needs to

12   raise the capital at one time?

13   A    The definition of -- the way that raise is defined I think

14   is the question.

15   Q    So you believe it's in the definition of raise?

16   A    The way raise is defined or interpreted in the agreement.

17   I think the -- the language that describes the capital raise

18   that would qualify.

19   Q    Okay.  Is there a definition section in the agreement

20   which indicates that?

21   A    Not that not that I'm aware of.

22              THE COURT:  The language in where -- which document?

23              THE WITNESS:  The Hawk conversion document.  Hawk

24   conversion agreement, which is not part of the loan documents.

25   It's a separate document.
```

1          MR. ALEXANDER:  Your Honor, I'd like to just take a

2     brief five-minute break to go over my notes, and I may be done

3     with my --

4          THE COURT:  Okay.

5          MR. ALEXANDER:  -- cross.

6          THE COURT:  All right, we'll take a five-minute

7     break.

8          Yes, Mr. Caponi?

9          Oh, I thought Mr. Caponi was coming to this -- to the

10    -- unless you need to --

11         UNIDENTIFIED SPEAKER:  I'll stay here.

12         THE COURT:  Okay.

13       (Recess taken)

14         THE COURT:  All right, Mr. Alexander.  If you want to

15    finish up with you?

16         MR. ALEXANDER:  I do, Your Honor.

17         THE COURT:  Okay, go ahead.

18    BY MR. ALEXANDER:

19    Q    Mr. Stastney, isn't it true that Stream was the only party

20    to a license with Rembrandt?

21    A    I don't know.

22    Q    Was it also true that Rembrandt attempted to intervene in

23    the Chancery Court action, correct?

24    A    I believe so.

25    Q    And that was denied by the Chancery Court, correct?

1   A    I believe so.

2   Q    In terms of Hawk, what is the principal amount of the Hawk

3   debt?

4   A    I don't know.

5        MR. ALEXANDER:  Your Honor, I have no further

6   questions.

7        THE COURT:  Okay.  Hold on.  I'll just finish writing

8   my notes before you redirect.

9        Okay, let's go with redirect.

10       MR. COLBY:  Thank you, thank you, Your Honor, just a

11  few quick clean-up points.

12                       REDIRECT EXAMINATION

13  BY MR. COLBY:

14  Q    About Rembrandt, do you recall yesterday Mr. Stastney

15  (sic) asked you questions, and you offered testimony about

16  litigation history between Stream and Rembrandt and other

17  parties here?

18  A    I do.

19  Q    Okay.  Were you testifying from memory during that

20  question and answer?

21  A    I was.

22  Q    Okay.

23       MR. COLBY:  If I could just show the witness a couple

24  of things to refresh the witness' recollection, I'd like to do

25  that.  They don't need to be admitted.  I just want --

1           THE COURT:  Refresh his recollection about what?

2           MR. COLBY:  Well, I want --

3           MR. ALEXANDER:  I object because there's been no

4    question that needs --

5           THE COURT:  Well, you didn't object -- I asked the

6    question.

7           MR. COLBY:  Yeah, Your Honor.

8           THE COURT:  Excuse me, I'm sorry.

9           MR. ALEXANDER:  Well, I was going to object and then

10   you -- my objection is there's no basis for refreshing

11   recollection because there's no question that has been pending.

12          MR. COLBY:  Okay, look, I mean --

13          THE COURT:  Ask him the question.

14          MR. COLBY:  Yeah.

15   BY MR. COLBY:

16   Q    Mr. Stastney --

17          THE COURT:  I'm sorry because I get that I shouldn't

18   be the one asking the questions.

19          MR. COLBY:  It's okay, it's okay.

20          THE COURT:  I just want the answer.

21          MR. COLBY:  Yeah.  Housekeeping more than anything

22   else, Your Honor.

23          THE COURT:  Okay.

24   BY MR. COLBY:

25   Q    But Mr. Stastney, when you were testifying about the

1    litigation history between -- when you were testifying about

2    the litigation history between Stream and Rembrandt, and

3    Technovative and others, you were testifying from memory,

4    correct?

5    A    Correct.

6    Q    And are you absolutely certain that your answers with

7    regard to the litigation history was 100 percent correct?

8    A    No.

9    Q    Okay.  Would it be helpful to look at the dockets to

10   refresh your recollection so you can answer those questions

11   with a higher degree of certainty?

12   A    It would.

13   Q    Okay.  I don't think there will be an objection.

14        MR. ALEXANDER:  No, Your Honor.  For the purpose that

15   he's using this --

16        THE COURT:  Okay.

17        MR. ALEXANDER:  -- I don't object.

18        THE COURT:  Go ahead.

19        MR. COLBY:  Thank you.

20        THE COURT:  You're not marking.  You expressly show

21   him --

22        MR. COLBY:  I -- for those purposes, a docket from

23   the U.S. District Court, Southern District of New York,

24   involving the Rembrandt litigation against Stream TV Networks

25   and then a docket from the U.S. District Court in the District

 1  of Delaware between Rembrandt, Technovative Media, Hawk, and

 2  SeeCubic.  Let's take a look first, if you will, Mr. Stastney,

 3  at the Southern District of New York document.

 4          THE COURT:  Whoa, whoa, whoa.  Counsel, refresh your

 5  recollection means you look at it --

 6          MR. COLBY:  Yep.

 7          THE COURT:  -- and you give it back.

 8          MR. COLBY:  Yep.  I'm not introducing it as an

 9  exhibit.

10          THE COURT:  Oh, but you want him to review it?

11          MR. COLBY:  No, I'm asking him to -- I can point him

12  to a couple things and see if it refreshes his recollection.

13  BY MR. COLBY:

14  Q   Mr. Stastney --

15          THE COURT:  He shouldn't be looking at that. Counsel,

16  my understanding of how refresh recollection happens is you ask

17  the question, and you say, okay, reading this piece -- I'm just

18  going to throw something.  It may not even be relevant.  Do you

19  recall the date that this happened.  You said it was in 2012.

20          MR. COLBY:  Yep.

21          THE COURT:  Are you sure --

22          MR. COLBY:  That's what I was about to do.

23          THE COURT:  Okay, so why don't we do that before he

24  starts looking at it.

25          MR. COLBY:  Sure.

```
 1                THE COURT:  Okay?

 2                MR. COLBY:  Sure.  That's all I was about to do.

 3   BY MR. COLBY:

 4   Q    Do you recall, Mr. Stastney, do you recall the date that

 5   the -- precisely the date that the Southern District action was

 6   filed?

 7   A    I do not.

 8   Q    Okay.  Would it help to look at the docket to determine

 9   that?

10   A    It would

11   Q    Okay.  Go ahead.  I think you can find it right at the

12   top.

13                THE COURT:  I -- because I said it.  So you can find

14   it right?

15                THE WITNESS:  It appears to have been filed --

16                THE COURT:  Whoa, whoa, whoa -- back.

17                THE WITNESS:  Okay.

18                THE COURT:  And then you say, yes, it refreshed my

19   memory.

20                THE COURT:  I mean, I know this is just technical,

21   but I want the record to be clear.

22                MR. COLBY:  Fair enough.  That's all we're going for

23   here.

24                THE COURT:  Okay.

25                THE WITNESS:  Yes, it refreshed my recollection.
```

```
 1   BY MR. COLBY:

 2   Q    Okay, so when was that action filed?

 3   A    February 6th, 2017.

 4   Q    Okay.

 5           THE COURT:  What year?

 6           THE WITNESS:  2017.

 7           THE COURT:  Okay.

 8   BY MR. COLBY:

 9   Q    And do you recall, Mr. Stastney, whether that case

10   originated in federal court?

11   A    I don't recall.

12   Q    Okay.  Would it refresh your recollection to look at the

13   docket?

14   A    It would.

15   Q    Okay.  Let's take a look at page 5 down at the bottom, the

16   bottom entry.

17   A    Okay.

18   Q    Does that refresh your recollection?

19   A    It does.

20   Q    What do you remember now?

21   A    It appears to have been removed from Supreme Court, New

22   York.

23   Q    Okay.  And do you recall the specific -- I believe you

24   previously testified there were two claims at issue here.   Do

25   you recall the specific disposition of each of those two
```

1   claims?

2   A    I do not.

3   Q    Okay.  Do you -- let's just take a look at page 17, the

4   bottom docket entry.  Does that refresh your recollection --

5   A    It does.

6   Q    -- as to which of the two claims?

7   A    As to the -- NDA violation claim.

8   Q    Okay.  As to the other claim, the intellectual property

9   based claim, what's your recollection as to how that was

10  disposed of?

11  A    I don't recall exactly.

12  Q    Okay.  Great.  Let's take a look at the District of --

13  well, let me ask you the question first and then maybe you

14  might need to take a look at the other one.  Do you recall the

15  precise file date of the District of Delaware action?

16  A    I do not.

17  Q    All right.  If it would help to look at the first page of

18  the docket to refresh your collection, please do so.

19  A    It did help.

20  Q    Okay.  When was that case filed?

21  A    February 21st, 2023.

22  Q    Okay.  Do you recall exactly who the parties were to that

23  case?

24  A    I believe I do, but I'm not sure.

25  Q    Okay.  Would it help to look at the docket?

1   A    It would.

2   Q    Go ahead.

3   A    I recall.

4   Q    Okay.  Who were the defendants in that case?

5   A    Technovative, Hawk, and SeeCubic, Inc.

6   Q    Okay.  Is Stream a defendant in that case -- do you have a

7   recollection?

8   A    It appears not to be.

9   Q    All right.  Do you remember the exact claim that was

10  asserted in that case?

11  A    I do not.

12  Q    If it would be helpful to take a look at the first docket

13  entry to refresh your recollection, please do so.  Did that

14  refresh collection?

15  A    It did.

16  Q    Okay.  What was the exact claim in that case?

17  A    Claim for injunctive relief and misappropriation of trade

18  secrets.

19  Q    Trade secrets, okay.  All right.  Thank you.  There's been

20  some testimony with Mr. Vincent (sic) about bonding equipment.

21  What's your understanding of which entity currently owns the

22  bonding equipment.

23  A    I understand the SeeCubic B.V. currently owns the bonding

24  equipment.

25  Q    Okay.  Do you recall yesterday -- actually, I think it was

1   yesterday -- in response to some of Mr. Alexander's questions,

2   you were asked about an intent to run the business or to sell

3   the business if the creditors were able to exercise their

4   rights to possess it; do you recall that testimony?

5   A    I do.

6   Q    Okay.  And if you could just remind us what -- if those

7   efforts are successful, what is your intent with respect to the

8   business?

9   A    Our intent is to run the business to maintain the value of

10  the collateral until the bankruptcy concludes its work.

11  Q    Okay.  And have you foreclosed any options that you might

12  have as a result of that bankruptcy process?

13  A    We know that we can't conduct an Article 9 sale because

14  that would only exist in the absence of a bankruptcy --

15  bankruptcy process.

16  Q    Okay, but in in terms of run the business sale or

17  something else that I may not be familiar with in terms of the

18  bankruptcy process, have you foreclosed any options?

19  A    No.

20  Q    Okay.  Do you recall some testimony with Mr. Alexander

21  about CR-11, that's the notice of Hawk exercising its property?

22  A    I do.

23  Q    And to your understanding, once that notice was sent, to

24  your understanding, who owned those voting rights associated

25  with it?

```
 1              MR. ALEXANDER:  Object, Your Honor.  I mean, his

 2    understanding --

 3              MR. COLBY:  Yes.

 4              MR. ALEXANDER:  -- is irrelevant as to the issue

 5    here.

 6              MR. COLBY:  I think it is.

 7              MR. ALEXANDER:  As he testified yesterday, he's not

 8    giving legal conclusions, so whether he believes is irrelevant.

 9              MR. COLBY:  I think it informed the subsequent

10    conduct and the litigation that we're here discussing whether

11    or not relief from stay should be granted in order to proceed.

12    So this testimony wasn't objected to yesterday, and it

13    wasn't --

14              THE COURT:  Allow it for what it's worth.

15              MR. COLBY:  Yeah, thank you.  So --

16              THE COURT:  He believed that it was --

17              MR. COLBY:  Yeah.

18    BY MR. COLBY:

19    Q    So just --

20    A    My belief that it was effective immediately, that self-

21    help.

22    Q    Okay.  To your understanding, was there anything else left

23    to do after that notice was sent before Hawk could exercise

24    those rights and actually vote those shares?

25    A    I don't believe there's anything else to do.
```

1    Q    Okay.  There was -- during the period of time that you

2    were CFO of Stream, I believe you testified Stream manufactured

3    some 3D units; do you recall that testimony?

4    A    Yes.  They didn't manufacture during the time --

5    Q    Okay.

6    A    -- but -- but prior to the time --

7    Q    Okay.

8    A    -- and when I was director.

9    Q    Okay.

10            THE COURT:  Wait a minute -- down the time because

11   I'm not understanding.

12            MR. COLBY:  Yeah.  Maybe just -- maybe just back up.

13   I've got my time periods.

14   BY MR. COLBY:

15   Q    By virtue of the experience you testified about at Stream

16   you're familiar with the cost associate -- are you familiar

17   with the costs that were associated with the production of

18   those units?

19   A    Yes, I am.

20   Q    Okay.  And I just forgot to ask this yesterday and then

21   Mr. Vincent asked you some questions, so it reminded me.

22   What's your -- to the best of your memory, what approximately

23   was the cost per unit to manufacture those units?

24   A    It was approximately $10,000 per unit to manufacture.

25   Q    Okay.  And if we could just take a look at CR-6, which was

1    the chancery court's docket.  Do you recall yesterday, you had

2    a back-and-forth with Mr. Alexander about the schedule for the

3    Chancery Court action?

4    A    Yes.

5    Q    And the status of the trial when this current bankruptcy

6    was filed?

7    A    I do.

8    Q    Okay.  Can you just take a look at the very first, the top

9    docket entry?

10         MR. ALEXANDER:  Your Honor, I'm going to object.

11   This document was admitted solely for judicial notice purposes,

12   so he shouldn't be testifying from the document.

13         MR. COLBY:  It's the same purpose that we've used it

14   before, what happened on a particular date, as recorded in --

15   the --

16         MR. ALEXANDER:  -- and it's cumulative, and it's

17   already in --

18         THE COURT:  Wait a minute.  The first objection was

19   it was judicial notice, and the only thing that I can say is it

20   says what it says.  And so the docket says what it says -- it's

21   already in evidence.  I'm not quite sure why we need to

22   testify --

23         MR. COLBY:  Just to clarify, I think after the back

24   and forth yesterday regarding the status of trial and whether

25   or not trial was scheduled or not scheduled in the order.

```
 1                    THE COURT:  He needs to clarify?  This thing says
 2    what it says.
 3                    MR. COLBY:  Okay, well, let me just ask him --
 4                    THE COURT:  Sustained as to it was admitted under
 5    judicial notice.  Now, you may have another basis, but I'm not
 6    quite sure, and I pretty much have been clear the judicial
 7    notice is for it to say what it says and that's what the
 8    document is testimony.
 9                    MR. COLBY:  Okay.
10                    THE COURT:  Okay?  So I'll sustain that.
11    BY MR. COLBY:
12    Q    Mr. Stastney, do you recall what the court of chancery did
13    upon learning of the filing of the bankruptcy in this matter?
14    A    I believe the court of chancery issued a note to the
15    parties, requesting a status update and requesting some
16    information around who was involved in that file.
17                    MR. ALEXANDER:  Objection, Your Honor.
18    BY MR. COLBY:
19    Q    What else did it do?
20                    THE COURT:  One minute -- he's objecting.
21                    MR. ALEXANDER:  Hearsay.
22                    THE COURT:  He says hearsay.
23                    MR. COLBY:  I'll withdraw the question.  No, it's --
24                    THE COURT:  It's not important.  Proceed.
25                    MR. COLBY:  Yeah.
```

1    BY MR. COLBY:

2    Q    Mr. Stastney, to your recollection, what did the courts do

3    with respect to any trial that may have been cancelled -- may

4    have been scheduled in that 225 action on the filing of the

5    Stream bankruptcy?

6    A    Stayed those -- stayed those hearings.

7    Q    Okay, okay, thank you.

8              MR. COLBY:  No more.

9              THE COURT:  So that's it?

10             MR. COLBY:  That's it.

11             THE COURT:  Any recross?

12             MR. ALEXANDER:  No, Your Honor.

13             THE COURT:  Okay.  Can you hear me now?  Sorry.  All

14   right.  So there are no more questions for Mr. Stastney at this

15   point.  Mr. Colby, are you releasing him as a witness, or you

16   reserve him for a rebuttal?  Which one is it?

17             MR. COLBY:  Your Honor, I believe we would like to

18   reserve for rebuttal if necessary.

19             THE COURT:  Okay, so you're not releasing him as a

20   witness.  You may step down, Mr. Stastney.

21             So if I recall, the next step is that the movants had

22   listed Mr. Park as a witness, but we were going to proceed with

23   Mr. Alexander calling him with direct and a cross in the

24   interest of time.  Is that correct?

25             MR. ALEXANDER:  That's my understanding, Your Honor.

1          THE COURT:  Okay.  Mr. Caponi, are you doing this

2  part of the cross-examination of Mr. Park?

3          MR. CAPONI:  I will be cross-examining Mr. Park.

4          THE COURT:  Okay.  All right, Mr. Park, you can come

5  on up.

6          THE BAILIFF:  Place your left on the bible, raise you

7  right hand.

8              JUNG HO PARK, PLAINTIFF'S WITNESS, SWORN

9          UNIDENTIFIED SPEAKER:  Please state and spell your

10  name.

11          THE COURT:  Now, you can move all that stuff, Jung.

12  I don't know whose water that it is.

13          UNIDENTIFIED SPEAKER:  Unless you want me to --

14          THE COURT:  No, absolutely not.

15          THE WITNESS:  Yes, my name is Jung Ho Park.  I'm

16  referred to as Thomas.

17          THE COURT:  Okay, can you --

18          UNIDENTIFED SPEAKER:  Spell it for us.

19          THE WITNESS:  J-U-N-G.

20          THE COURT:  Wait a minute, hold on.  G --

21          THE WITNESS:  J.

22          THE COURT:  Oh, J.

23          THE WITNESS:  J-U-N-G.

24          THE COURT:  Okay, Jung.

25          THE WITNESS:  Middle, H-O.  Last name, Park.

```
 1                 THE COURT:  Jung Ho Park.

 2                 THE WITNESS:  It's equivalent to John in Korean.

 3                 THE COURT:  And what's your known name?

 4                 THE WITNESS:  I use Thomas.  I've used that name

 5    since six years old.

 6                 THE COURT:  Okay.  All right.

 7                 THE BAILIFF:  State your address for the record,

 8    please.

 9                 THE WITNESS:  175 Buckelew Avenue, Building 2, Suite

10    6, Jamesburg, New Jersey.

11                 THE COURT:  Say that again.  175 --

12                 THE WITNESS:  Bucklelew, B-U-C-K-E-L-E-W Avenue.

13                 THE COURT:  Okay.

14                 THE WITNESS:  Building 2, Suite 6 -- or Apartment 6.

15                 THE COURT:  And then where's that?

16                 THE WITNESS:  Jamesburg, New Jersey.

17                 THE COURT:  Jamesburg?

18                 THE WITNESS:  Yes.  08831.

19                 THE COURT:  Okay.

20                 MR. ALEXANDER:  May I proceed?

21                 THE COURT:  Yes.

22                         DIRECT EXAMINATION

23    BY MR. ALEXANDER:

24    Q    Good afternoon, Mr. Park.

25    A    Good afternoon.
```

1  Q    I think we just went through this in terms of other names

2  you go by but for purpose of today, Mr. Park is okay?

3  A    Mr. Park or Thomas, either way.  That's fine.

4  Q    So Mr. Park what is your current connection, if any, to

5  Stream TV Networks, Inc., the Debtor in this case?

6  A    I've currently been, I guess, the CFO until further

7  approved by the courts.

8  Q    Before we get into your work with Stream, I just want to

9  talk a little bit about your background.

10  A    Sure.

11  Q    Please tell us about your education.

12  A    I received my BA, Bachelors of Arts in Economics and

13  English from the University of Virginia and my MBA in general

14  management/finance and strategy at the Darden School -- Darden

15  Graduate School of Business at the University of Virginia.

16  Q    And when did you receive your undergraduate degree?

17  A    1992 and 1998 for grad school, '92 undergrad.

18  Q    Do you have any other education?

19  A    There's classes I've taken at Virginia Commonwealth

20  University for economics and classes I've taken at the

21  University of Richmond for Middle East Studies.

22  Q    When you received your MBA, did you have any

23  specialization?

24  A    Specifically in corporate finance, which is -- back then,

25  they didn't have specialization in private equity, but it was

 1   investment in Bank of Private Equity and venture capital.

 2            THE COURT:  Counsel, can you hold just one second?  I

 3   need to take a two-minute break.  You can pause just a minute.

 4       (Recess taken)

 5            THE COURT:  You may be seated.  Nothing to do with

 6   you guys.  I'm just extremely annoyed, and it has nothing to do

 7   with you guys, and I will not -- but it was my grandson's camp,

 8   and he's fine.

 9            MR. ALEXANDER:  Well, that's good to hear.

10            THE COURT:  Yeah.  And counsel, I mean, not that it's

11   anybody's, but he's autistic, so that is why my level of

12   concern is pretty high.  So if something happens, I kind of

13   have to immediately address it.

14            MR. ALEXANDER:  Do what you need to do, Your Honor.

15            THE COURT:  All right.

16            MR. ALEXANDER:  May I proceed?

17            THE COURT:  Yes, go ahead.

18   BY MR. ALEXANDER:

19   Q    Did you have any employment between your undergrad and

20   your MBA?

21   A    Yes.  I actually served as a major account -- national

22   account representative, national account manager for General

23   Mills food company and also a corporate account sales for

24   Nextel Communications.

25   Q    What was your role or your duties, your job description

1  there?

2  A     Sure.  In particular for General Mills, basically

3  selling General Mills products to grocery store chains.  And

4  for Nextel Communications --

5          THE COURT:  I'm sorry -- can you say that again?

6          THE WITNESS:  Yes.  For General Mills, I was their

7  national account representative manager, selling General Mills

8  products, which are like -- cereal, to grocery store chains.

9  And then for Nextel Communications, I was one of the very early

10  sales people for the company that later became Speck

11  Communications.

12  BY MR. ALEXANDER:

13  Q    Did you have any other employment?

14  A    Small projects here and there but usually around a month

15  at time -- something very small in between.

16  Q    After receiving your MBA, describe what your employment

17  was.

18  A    Sure.  First job right out of -- day after graduation was

19  with British Petroleum.  I was considered a international

20  strategy manager on the retail side.  And so I was -- my first

21  project was the merger of BP and Amoco at the time.  And then

22  after that -- sorry?

23  Q    No, I was just listening, so I was letting you answer.

24  A    Okay.  And after the completion, I had moved on to the

25  next, Lucent Technologies -- part of the MBA rotation program

1    with finance and strategy.  And then from there, I started my

2    own company to raise venture capital.  And them, after that, we

3    had to close down in around 2001.  We moved to Michigan, where

4    I was an executive consultant for several years.  In addition,

5    I was also a CFO for a technology staffing company.

6    Q    And what year was that?

7    A    And that was roughly 2002, 2003 timeframe.

8    Q    That was with Park Consulting, LLC?

9    A    It wasn't Park Consulting, but for the CFO position, I was

10   a W-2 during that time -- or started off as a 1099 then moved

11   to a W-2 situation.

12   Q    Then, what was your employment after that?

13   A    Employment after that, we came back to the East Coast, and

14   I became a interim CFO for GAIN capital, an online retail FX

15   broker.  And then from there, I moved to Integra LifeSciences,

16   where I was director of finance responsible for accounting

17   consolidations, SEC reporting, responsible for any responses to

18   accounting statements and accounting rules for GAAP and et

19   cetera.  And from there, I moved to UBS.  And about four years

20   at UBS, four or five years.  Then, seven years a CFO for

21   multiple business lines.

22   Q    You said you served as a CFO in multiple --

23   A    Yes.

24   Q    -- business lines?

25   A    Yeah, business unit CFO for some of the different

1  products.

2  Q    Which products did you sell as CFO?

3  A    I had responsibility -- stock option as a product as a

4  separate group.  Also, we had what we call Buyside Trading

5  Group (phonetic).  And in addition, we had several other

6  structured products and so forth.  I had a team, and each one

7  of the team members were -- my team was individual accountants,

8  and I served as a CFO across all the business units.

9  Q    Like, what timeframe was that?

10 A    That was from 2006 to 2010.

11 Q    So after 2010 and your work at UBS --

12 A    2006 -- that was UBS.

13 Q    Correct.  After --

14 A    After UBS.

15 Q    Your work from 2006 to 2010 at UBS --

16 A    That is correct.

17 Q    -- what was your next employment?

18 A    After that, I went into consulting for a little bit, took

19 on several projects and then ended up with a -- again, a

20 director position at MUFG Bank of Tokyo.  And so I was there

21 for a couple years, and then went into consulting again.  And

22 then, 2017 to 2019, was offered a position as Senior Vice

23 President at Brown Brothers Harriman.

24           THE COURT:  Where?

25           THE WITNESS:  Excuse me, Brown Brothers Harriman.

```
 1              THE COURT:  Oh, okay.

 2   BY MR. ALEXANDER:

 3   Q    And how long were you at Brown Brothers Harriman?

 4   A    From 2017 to 2019, two years.

 5   Q    So we're getting closer to current, so --

 6   A    Yeah.  After that --

 7   Q    -- after Harriman --

 8   A    -- I went into my own business, but this time I also got

 9   involved in many different partnerships and so forth and

10   different companies.  So even though I started off with my own

11   company at TMCV, I also ended up being a partner in a private

12   equity firm in Europe, board members in several different

13   companies, tech companies, technology companies, and fintech

14   companies.

15   Q    And is that your current --

16   A    Stream.

17   Q    Let me finish, Mr. Park.

18   A    Sure.

19   Q    Outside of your current role with Stream, is that the

20   extent of your prior employment?

21   A    I can go into the specific.  I roughly serve on four

22   different boards, maybe a fifth one coming up very soon.

23   Q    Okay.  What types of companies are you serving?

24   A    For example, one is a fintech -- Text'nPayMe is a fintech

25   company; Mobilum Technologies.  I actually serve on the board
```

1    of directors of public traded company there.  I serve also

2    again, I'm managing -- partner managing member and board member

3    for Penton Partners.  And then, we'll go into the -- so I've

4    been offered and accepted the position of Director, Board of

5    Trustees for the Seattle School -- theological school in

6    Seattle as well.

7    Q    I believe you testified that you served as CFO.  How many

8    times have you served in the role as CFO?

9    A    Let's see.  At UBS, also at -- CFO at Anacon.  And also

10   there have been several consulting experiences as well.  And

11   also, Integra LifeSciences, I reported directly to the CFO and

12   corporate control as well.

13   Q    I went to talk about your employment with Stream.

14   A    Yes.

15   Q    Are you aware that Stream filed a motion to approve your

16   retention?

17   A    Excuse me?

18   Q    Are you aware that Stream filed a motion to approve your

19   retention?

20   A    Yes.

21   Q    When were you first introduced to Stream?

22   A    Back in February, 2001, Rafael had asked me, you know,

23   this company that's in bankruptcy at the time.  I didn't do

24   anything with it at the time.  And then, I got approached again

25   in April of 2023.

1   Q    You said 2000 and?

2   A    2021.  It was just an email, and we had a brief

3   conversation.  At the time, I couldn't do it.

4   Q    In terms of your current introduction or reintroductions

5   to Stream --

6   A    Yes.

7   Q    -- what were the circumstances surrounding the current?

8   A    I was informed that it was a company in bankruptcy,

9   Chapter 11, that was looking for capital to -- initially told

10  debtor-in-possession financing.

11  Q    And did you explore that with the Debtor?

12  A    We did.

13  Q    Did that role or the discussions ultimately change?

14  A    Yes.

15  Q    How did they change?

16  A    They felt that based on my regulatory background, which is

17  being the CFO and serving as -- also in addition my

18  capitalization skills, they felt I could come in as a CFO --

19  scheduled out toward the end of April.

20  Q    Those discussions were at the end of April 2023?

21  A    That is correct, about me coming in as CFO.

22  Q    Did you ultimately enter into an employment agreement with

23  Stream for the position of CFO?

24  A    Yes, I did.

25  Q    Who at Stream did you negotiate that agreement?

1  A    Mathu.  Mathu Rajan.

2  Q    Do you recall when that became effective in terms of your

3  employment date?

4  A    We thought on May 1.

5  Q    Had there been any time since your employment began that

6  you've been unavailable to focus solely on --

7  A    A hundred percent focus -- there was about two weeks where

8  I was on vacation in May -- from May 14th to about May 27th,

9  28th, on vacation.  But nevertheless, I was still having

10  communication with Mathu when -- when he called me.

11  Q    Is it fair to say you've been working at Stream as CFO for

12  about six or seven weeks?

13  A    Yes, that is correct.

14  Q    As CFO, what are your duties?

15  A    As the CFO for Stream?

16  Q    Let me ask it again.  As CFO of Stream, what are your

17  duties?

18  A    My responsibilities for -- the core, first one, is

19  ensuring that it raised capital.  I'm still in communications.

20  And then, ensuring that we had the books and records cleaned up

21  and recorded; create a team of accountants because we really

22  don't have one, I've been told, except for the bookkeeper.  And

23  literally recreate the entire finance accounting that we -- for

24  a company of this size going forward.

25  Q    You mentioned debtor-in-possession financing and also work

1    you've done with the company.  But can you specifically say

2    what type of work you've been able to perform thus far?

3    A    Specific for them?

4    Q    No, just for the company in general.

5    A    Just for the company overall?  Because my focus has been

6    ensuring that I am in constant communications with different

7    types of institutional investors, at the same time, starting to

8    look at some of their financial reports, account tables and

9    stuff like that, to get my understanding of where the company

10   is at -- at this point in time.

11   Q    In your view, have you been able to get fully up to speed

12   yet?

13   A    I have not.

14   Q    Why?

15   A    I still have not had time to go over the all the

16   transactions for the different legal entities.

17   Q    Why is that?

18   A    Mathu, when I came back from my trip, Mathu was overseas

19   traveling and then he got sick.

20   Q    You indicated that one of your functions as CFO is to

21   assist with obtaining financing for the Debtor.  Have you been

22   attempting to find financing for the Debtors?

23   A    I still am, yes.

24   Q    What have you done on that front?

25   A    Initiate conversations with different organizations with

```
 1   contact I have there; initiating new contacts; letting them to

 2   know what Stream TV Networks is about.

 3   Q    How many companies have you discussed financing with?

 4   A    Dip financing or capital equity raising?  I want to be

 5   very specific.

 6   Q    Well, break that up.

 7   A    Okay.

 8   Q    How many companies have you discussed dip financing?

 9   A    Dip financing, four.  And on the equity raising, four so

10   far of introductions and letting people know where I am.

11   Q    With regards to the dip financing companies --

12   A    Yes?

13   Q    -- how many of them are you still in discussions with?

14   A    I'm active in all discussions.  Even Truist, who is the

15   only one that's come back to say no to.  They are still

16   interested in us post-bankruptcy.

17             THE COURT:  Which one, I'm sorry?

18             THE WITNESS:  Truist.

19             THE COURT:  Truist?

20             THE WITNESS:  Truist Bank, yes.

21   BY MR. ALEXANDER:

22   Q    Other than Truist Bank, do you remember any other --

23   A    Yeah, Sandton.

24   Q    -- companies that you were --

25   A    Yes.  Sandton Partners is a firm that I've -- have engaged
```

1   with several times since 2019.  They're multi-international,

2   multi-billion dollar firm, excuse me, that looks for -- their

3   specialty is specialty finance, so distressed situations.

4   Q    Talking about you, specifically, since you joined

5   Stream --

6   A    Yeah.

7   Q    -- what's the size of financing or funding you have?

8   A    The size was about 25 million.  And then sometimes we

9   talked about 30, but it was mostly 25 -- 25 million in --

10  Q    Have the Debtors been able to secure dip financing yet?

11  A    No, we have not.

12  Q    Are the Debtors still attempting to obtain dip financing?

13  A    As a company right now, the focus is raising more capital

14  to not get financing now.

15  Q    The company is trying to obtain equity funding?

16  A    That is correct.

17  Q    What, if any, has your involvement been with that process?

18  A    I have my own contacts I'm going with, and Mathu has been

19  doing his financing as well.

20  Q    And when you say Mathu, who are you referring to?

21  A    Mathu Rajan.

22  Q    Would it be fair to say that your involvement initially

23  started with dip financing and has evolved --

24  A    Yes.

25  Q    -- to equity funding?

1  A    That is correct.

2  Q    Do you anticipate being involved with the equity funding

3  efforts going forward?

4  A    Yes.

5  Q    Have you heard of a company called Xiangsheng (phonetic)

6  Group Holdings, Ltd?

7  A    Yes.

8  Q    What is your understanding of Xiangsheng Group Holdings,

9  Ltd.?

10 A    It is a publicly traded entity on the Hang Seng Index of

11 Hong Kong.  Predominantly, their business is auto dealerships.

12 It appears to be on the high end.  And they -- they have

13 multiple holding company -- companies underneath that as well.

14 Q    What types of holding companies?

15 A    One of them appears to be finance arm.

16 Q    Are you aware that Stream filed, in their bankruptcy case,

17 a term sheet with Xiangsheng Group Holdings Ltd. --

18 A    That is correct.

19 Q    -- with regards to Class A Common Stock?

20 A    Yes.

21 Q    Were you involved with the negotiations regarding that --

22 A    I was not.

23 Q    Why were not involved with those negotiations?

24 A    That was strictly by Mathu Rajan.

25 Q    Okay.  Since you've come on as CFO, have you been able

1  to --

2  A    Let me clarify this quickly.  It's Mathu and whoever he

3  uses, but not my participation.

4  Q    Since you've come on as CFO --

5  A    Yes.

6  Q    -- have you been able to discuss that financing with Mr.

7  Rajan in any detail?

8  A    No, because it's going to be extensive.  I haven't had a

9  chance to do that with -- while he's in the hospital.

10  Q    Do you have experience raising capital in the United

11  States?

12  A    Yes.

13  Q    What have you experienced?

14  A    Raising capital for if -- if I have to break it down, the

15  way we do it is there's venture capital, there's private equity

16  and then there's specialty finance, specialty finance distress.

17  So I've experienced all three different types.

18         THE COURT:  What was number two, I'm sorry, venture

19  capital --

20         THE WITNESS:  We call it specialty finance with

21  distressed investing.

22         THE COURT:  There was -- but you said three.  What

23  was number two?

24         THE WITNESS:  Venture capital and private equity.

25         THE COURT:  Oh, private equity.

```
 1  BY MR. ALEXANDER:

 2  Q    Okay, what is the process?  What's entailed with that type

 3  of --

 4  A    Okay.  For -- it's very different for each one, okay, but

 5  they're starting to blur.  Venture capital, depending on the

 6  maturity of the organization, it can go from Pre-Seed to Seed

 7  round to Series A, B, C, D, then eventually a CF IPO.  Private

 8  equity is more fluid in the sense that it could -- sometimes we

 9  partner with venture capital, but most of the time I choose to

10  accelerate a company's growth or acquisition of a company, take

11  a company private, so there's a lot of room in that area, and

12  I've been involved in a little bit of all of that

13  functionality, and then specialty finance for companies that

14  are in trouble or about to go into Chapter 11.

15  Q    Mr. Park, do you also have experience raising capital debt

16  or equity outside of the United States?

17  A    Yes, I have.

18  Q    Can you describe that experience?

19  A    Raising capital where, in the Middle East; raising capital

20  in Hong Kong, Korea, sometimes Japan and mainland China.

21  Q    Does that process differ, if at all, from --

22  A    Absolutely.

23  Q    -- the United States?

24  A    Absolutely.

25  Q    And how does it differ?
```

```
 1   A    In the United States, we tend to be very more analytical

 2   in a sense that it's more structured in a sense that you go

 3   from Pre-Seed, Seed, A, so forth, in venture capital -- and the

 4   focus is on return to investors, valuations.  In Korea, for

 5   example, they're more focused on -- to start up situations.

 6   They're looking for -- most of the time, they're looking for

 7   exits where it's not an IPO, but more of being bought out by

 8   one of the other larger Korean companies. Japan, very similar

 9   to that.  In China, venture capital private equity both are

10   unique in the sense that there's a lot of government money

11   involved, unlike it here in the United States where we don't

12   have a -- a state sponsored investment fund per say, like a

13   national fund.  Every country seems to have one except for the

14   U.S.  In China in particular, they have a lot of development

15   funds.  And so their focus isn't so much a return on

16   investments, per se.  It's more of a -- a larger concern

17   instead of just a return.

18   Q    Mr. Park, you've been in the courtroom this week, correct?

19   A    Excuse me?

20   Q    You've been in the courtroom this week?

21   A    Yes.

22   Q    You've heard Mr. Stastney discuss purchase orders that

23   Stream has filed in this bankruptcy case?

24   A    Yes.

25   Q    Were you involved in the procurement of those purchase
```

1  orders?

2  A    I was not.

3  Q    But based on your experience, do you have any

4  understanding of why a customer may want to have a purchase

5  order that large?

6  A    I wasn't in charge of the purchase orders.  I was not

7  involved in getting the PO.  I was involved in finding some

8  details and that's about it.  I'm sorry, in terms of POs, in

9  the past, my experience?

10 Q    No, it's do you have an understanding as to why a customer

11 may want to have a purchase order that large fulfilled?

12 A    Yes.

13 Q    What's your understanding?

14 A    Depending on, for example, I can relate it to Mya Medical

15 (phonetic), which I'm a part of, sometimes we had to go make

16 purchase orders because they wanted to lock up our sources and

17 to be able to lock up our channels and to be able to dedicate

18 more of the volume to one particular customer.

19 Q    In terms of the business of Stream, what is your

20 understanding or what have you been able to gain as an

21 understanding of the business of Stream since you've been

22 employed as the CFO?

23 A    Stream provides the technology behind the 3D visual

24 format, which includes providing our technology that's built

25 into the -- and also -- screen as well.

1   Q    And with regards to the business of Stream, which you've

2   been involved, who would have the most knowledge regarding the

3   business of Stream?

4   A    Mathu Rajan.

5   Q    And what's his role with Stream?

6   A    Our -- he is the CEO.

7   Q    And what is your current understanding of where Mr. Rajan

8   is?

9   A    Currently, he's in the hospital -- in the hospital.

10  Q    I want to talk a little bit about maybe the plan for the

11  bankruptcy case there.  Are you assisting the Debtors with

12  everything for the bankruptcy?

13  A    Yes.

14  Q    Do you have an understanding of how the Debtors intend to

15  exit bankruptcy --

16  A    Yes.

17  Q    -- cases?  Okay.  What's your understanding?

18  A    Our understanding is that we need to provide capital

19  inside of Stream and so in order to retire debt.  And from

20  there, convert the -- some of the debt into equity.  And from

21  there, also have capital going forward for operations.

22  Q    When you say capital going forward for operations, what do

23  you mean by that?

24  A    It could be for just hiring people.  It could be for a

25  little bit of everything.

1   Q    In terms of Stream, I mean, who's the primary

2   representative at Stream who's responsible for determining the

3   strategy with regards to the exit?

4   A    I would say it's going to be both but right now until I

5   have that meeting with Mathu, it's in Mathu's hands.

6   Q    And as the CFO, do you believe it's in Stream's best

7   interest to try and exit this bankruptcy case --

8   A    Absolutely.  There's a lot of people who are interested.

9   Q    When you say there's a lot of people that are interested,

10  what do you mean?

11  A    Both the potential customers and also for investors,

12  especially on the institutional side.

13          MR. ALEXANDER:  Your Honor, I have no further direct

14  questions for Mr. Park.

15          THE COURT:  Cross, Mr. Caponi?

16          MR. CAPONI:  May I approach?

17          UNIDENTIFIED SPEAKER:  The -- witness binder for Mr.

18  Park?

19          THE COURT:  Okay.

20          MR. CAPONI:  May I proceed, Your Honor?

21          THE COURT:  Yes.

22                      CROSS-EXAMINATION

23  BY MR. CAPONI:

24  Q    Mr. Park, it's nice to see you again.  Thank you for

25  coming in today to offer some testimony.  I just want to cover

1   a few topics with you today.  I think you've covered some of my

2   initial topics, but I want to make sure I heard you correctly.

3   So you were first contacted in April of this year by Mr.

4   Zahralddin to work with the Debtor to raise capital and

5   financing; is that correct?

6   A    Yeah, Rafael, as I know him, yes.

7   Q    And then, by the end of April, you had reached an

8   agreement with Mr. Rajan that you would become the CFO?

9   A    Yes.

10  Q    And your initial efforts as the CFO were looking at dip

11  financing, but by the end of May, your focuses shifted to

12  raising capital, i.e., equity investments?

13  A    Yes.

14  Q    If you just keep you voice up a little bit, Mr. Park --

15  A    Sure.

16  Q    -- so the audio recording captures it, sorry.  Okay.  And

17  when you first joined the company in April through May, am I

18  correct you were speaking to Mr. Rajan on a daily basis?

19  A    Yes.

20  Q    And when Mr. Rajan was sick more recently, you've been

21  speaking to him roughly every other day?

22  A    Yes, fair assessment.

23  Q    And even when you were on vacation, you were in contact

24  with Mr. Rajan, correct?

25  A    Yes.

1  Q    All through May, all through May.  Up through May.

2  Q    So you're earlier in your testimony you indicated that Mr.

3  Rajan in dealing with this potential new equity investment that

4  you were not involved in it.

5  A    That's correct.

6  Q    And then you clarified and said something to the effect of

7  Mathu and whoever he uses.  Do you recall that?

8  A    Yes.

9  Q    Who were you referring to when you say whoever Mathu uses?

10  A    For that one, I'm just saying overall, I'm not saying

11  specific for Rajon. I know that since I've been on here, I've

12  had conversations with one broker, I guess, he used in the

13  past.  So from that I understand that they use several brokers.

14  Q    So it's your understanding Mr. Rajan's using different

15  brokers to look at raising capital financing for the Debtors?

16  A    Yes and plus his direct efforts as well.

17  Q    With regard to your employment currently, you are still

18  with Penton Partners, correct?

19  A    Yes.  Uh-huh.  Penton Partners.

20  Q    P-E-N-T-O-N? Did I get that right?

21  A    P-E-N-T-O-N.  Yes.

22  Q    And you currently serve on the board of around four

23  different companies, correct?

24  A    Yes.

25  Q    So you started working with Stream in April through to

 1  today, you've been in continuous contact working with Stream to

 2  raise capital and financing, correct?

 3  A    Yes.

 4  Q    With regard to the you said you had worked with Mr. Rajan

 5  and he was using other brokers and you had spoken to one.  Who

 6  was the broker that you spoke with?

 7          MR. ALEXANDER:  Your Honor, I'm going to object.

 8          THE WITNESS:  Mark Dannenburg.

 9          THE COURT:  Wait a minute.  He's objecting.

10          MR. ALEXANDER:  I'm going to object to that.  It

11  mischaracterizes the testimony.

12          THE COURT:  Okay.  Mischaracterized how?

13          MR. ALEXANDER:  He didn't testify that he has

14  actually used the brokers.  He said he was aware that they --

15          THE WITNESS:  I never used them.

16          THE COURT:  No.  No.  No.  No. The question --

17          MR. CAPONI:  I messed up using but spoken.  So I'll

18  rephrase, Your Honor.

19          THE COURT:  Okay.  Rephrase.

20  BY MR. CAPONI:

21  Q    In your testimony a few minutes ago, you indicated that

22  Mr. Rajan may have been using other brokers to raise capital,

23  correct?

24  A    That is correct.

25  Q    And that I think you said you had spoken to one?

1   A    That's correct.

2   Q    Who was the broker that you spoke with?

3   A    Mark Dannenburg.

4   Q    So it's your understanding that Mr. Rajan has been using

5   Mark Dannenburg to help raise funds or capital for the Debtors?

6   A    That is correct.

7   Q    Would you be surprised to know if I were to tell you that

8   Mr. -- in a prior hearing, Mr. Rajan indicated he did not know

9   Mr. Dannenburg?

10  A    They were in contact.

11  Q    I'll withdraw the question.

12  A    No.

13          THE COURT:  There's no question.  You don't have to

14  answer.

15  BY MR. CAPONI:

16  Q    With regard to dip financing, Mr. Park, again it's saying

17  you initially started looking at dip financing.  What is your

18  understanding of what is dip financing or what's your

19  definition of dip financing?

20  A    Debtor position financing.  Financing given to a company

21  in Chapter 11 for operational purposes.

22  A    And you reached out to a number of companies that you

23  understood were involved in doing dip financings, correct?

24  A    That is correct.

25  Q    And that includes Truist and Sand --

```
 1  A    Sandton Partners   Yes.  Sandton Capital.

 2            THE COURT:  Can you spell that? Hold on.  How do you

 3  spell what was it?  The second one.

 4            THE WITNESS:  S-A-N-D-T-O-N.

 5            THE COURT:  Okay.  Sorry, Counsel.

 6  BY MR. CAPONI:

 7  Q    And Mr. Park, am I correct you indicated that Truist

 8  decided they did not want to provide dip financing because

 9  there were not sufficient hard assets on the ground, correct?

10  A    That is correct.

11  Q    And with regard to Sandton Partners, they specialize in

12  difficult financing?

13  A    I -- financing.  Yeah.

14  Q    Okay.  So they sort of the more risky dip financing is

15  what that company specializes in?

16  A    Difficult situations.  This is not the -- is not the most

17  difficult one by the way.

18  Q    And neither Truist nor Sandton has expressed an interest

19  in lending dip financing into this estate, correct?

20            MR. ALEXANDER:  I'm going to object.  He hasn't

21  testified regarding this.

22            THE COURT:  He only said Truist.  It was the only one

23  that had declined.

24            MR. CAPONI:  Yes.  I'm missing the point of the

25  objection.  I asked the witness a question.  Am I correct that
```

1   these two companies have expressed no interest?  It's within

2   his knowledge.  He can answer me however he wants to answer me.

3   I'm not sure I have to establish that he knows that there's a

4   specific outcome to my question.

5            MR. ALEXANDER:  He hasn't testified to it.

6            MR. CAPONI:  He's about to.  That's the point of the

7   question.

8            MR. ALEXANDER:  So I thought we were doing cross.

9            THE COURT:  Right.  I mean, okay.  I'll allow it

10  because then you can just, I mean, you guys --

11           MR. ALEXANDER:  Based on how we've agreed --

12           THE COURT:  Yes.

13           MR. ALEXANDER:  Then go right ahead.

14           THE COURT:  Go ahead.

15           MR. ALEXANDER:  I'll withdraw the objection.

16           THE COURT:  Right.  Because he did not on direct say

17  that Sandton had declined.  It doesn't matter.  He's

18  withdrawing his objection.  Answer the question.

19  BY MR. CAPONI:

20  Q    Mr. Sandton (sic), am I correct that neither Truist --

21  sorry.  Mr. Park, that neither Truist nor Sandton Partners have

22  entered into any kind of term sheet or dip financing of the

23  Debtor?

24  A    Neither one have presented timesheets for this Court.

25  Q    And in your efforts today, you're focused on equity

1   financing and the dip financing side of it is on the back

2   burner, correct?

3   A     Define back burner.

4   Q     I believe in your deposition, am I correct, that you

5   testified that you're keeping those entities generally abreast

6   of what you're doing, but it's not your focus.  Raising equity

7   is your focus?

8   A     Equity is my focus.  I do communication for them.  Yes.

9   Q     And you're looking to raise equity and what you testified

10  to is a new legal entity, correct?

11  A     I said NewCo.  What I mean by NewCo in my deposition, I

12  was referring to the fact that NewCo, the way I look at it is a

13  revised or reauthored Stream --

14  Q     If you open the binder in front of you, if you go to the

15  first tab, it's your deposition.

16  A     Okay.

17  Q     If you could turn to page 27.

18          THE COURT:  Wait a minute, do I have that?

19          MR. CAPONI:  Yes, Your Honor.  It's in with the

20  binder.

21          THE COURT:  Hold on a minute.  Okay.

22          MR. CAPONI:  If you go to page 27 to line 17.

23          THE COURT:  Wait a minute.  Tab 1 you said?

24          MR. CAPONI:  Line 17.

25          THE COURT:  What page are these on?

1          MR. CAPONI:  27, Your Honor.

2          THE COURT:  Okay.

3    BY MR. CAPONI:

4    Q    The question I asked you, Mr. Park, was what entity, if

5    this goes forward, would you anticipate these investors

6    investing in?  Can you read me your answer?

7    A    I wrote -- I said the new legal entity.

8    Q    Thank you.

9    A    I was referring --

10   Q    Mr. Park, thank you for answering my question.

11         THE COURT:  Counsel is going to ask you a follow up.

12   Okay?

13   BY MR. CAPONI:

14   Q    And the reason you were raising money -- you're looking to

15   raise money in a new legal entity is because you testified that

16   no one would put entity into this bankrupt debtor, correct?

17         MR. ALEXANDER:  Your Honor, I'm going to object.  I

18   mean, he's not impeaching him and he's talking about out of

19   court statements.  So I mean, if you have a question, you can

20   ask him the question like a direct.

21         MR. CAPONI:  I just asked him a question about what

22   he testified to in his deposition.

23         MR. ALEXANDER:  I'm just making my objection to the

24   Court.  But he's asking what he testified to.  It

25   mischaracterizes his testimony here.

```
 1              THE COURT:  So this --
 2              MR. CAPONI:  You can tell me if I mischaracterized
 3  his testimony.
 4              THE COURT:  Well, lawyer says objection
 5  mischaracterized.  Your question is did you testify -- just re-
 6  ask the question.
 7  BY MR. CAPONI:
 8  Q    Sure.  Mr. Park, the reason you're looking to raise equity
 9  in a new entity is because no one's going to invest equity into
10  this bankrupt debtor, correct?
11              MR. ALEXANDER:  Objection.  Mischaracterizes his
12  deposition.
13              THE COURT:  He's asked a question.  He's not
14  mischaracterizing.  I'm going to overrule.
15              MR. ALEXANDER:  Understood.
16              THE COURT:  He's just asking is this why you're
17  looking for equity?  And it's yes or no.
18              THE WITNESS:  We were looking to raise money for the
19  revised Stream TV networks.
20  BY MR. CAPONI:
21  Q    You're looking, Mr. Park, am I correct, to raise equity
22  into an entity other than the Debtor because no one will invest
23  equity into this bankrupt entity, correct?
24  A    We were looking to raise money for the Debtor.  When I
25  made that -- can I go into detail on this?
```

```
 1   Q    Okay.  Let's look at your deposition --

 2   A    Okay.

 3   Q    -- on Page 48, Mr. Park, at line 9 to 13.

 4        MR. ALEXANDER:  Excuse me.  I didn't hear the page

 5   number.

 6        MR. CAPONI:  Page 48.

 7        THE COURT:  Line 9.

 8        MR. CAPONI:  Line 9 through 13.

 9   BY MR. CAPONI:

10   Q    This is your answer to one of my questions, Mr. Park,

11   could you read lines 9 to 13?

12   A    Sure.  We wouldn't put equity into a bankruptcy situation.

13   But we would put equity in a new legal entity or VSI, for

14   example.  So depending on what approach you wanted to take

15   based on how the bankruptcy regime goes accordingly.

16   Q    So again, do you stand by your deposition testimony that

17   you wouldn't put equity into bankruptcy situation but you would

18   put it into a new legal entity or VSI?

19   A    When I made that comment --

20        THE COURT:  Wait a minute.  But there's the rest of

21   that statement.  That's what you said, right?

22        MR. CAPONI:  For example --

23        THE COURT:  No.  It says depending on what approach

24   we wanted to take based on how the bankruptcy trading goes

25   accordingly.  That's your testimony, right?
```

1          MR. PARK:  Yes.

2          THE COURT:  Okay.

3          MR. CAPONI:  Thank you.

4    BY MR. CAPONI:

5    Q    And you have at least four investors who are interested in

6    investing in this new legal entity, correct?

7    A    Yes -- yes.

8    Q    And just --

9    A    Well, let me, as I stated going -- as I stated, when you -

10   - can you further -- can you repeat that question?  I need more

11   clarity on that.

12   Q    I believe you testified in your deposition as well as on

13   direct here, that you have four companies that you're talking

14   to about being potential investors in this new entity?

15   A    And Stream reorganize going forward --

16   Q    And this new legal entity is going to offer technology

17   that allows 3D viewing without glasses across any type of

18   technology platform, correct?

19   A    Where are you -- where are you reading that?

20   Q    I'm asking you a question.

21   A    Okay.  Can you repeat that again, please?

22   Q    Sure.  And this reorganized entity, new legal entity that

23   you're referring to.

24   A    Yes.

25   Q    Its business is going to be offering technology that

```
 1   allows 3D viewing without glasses across any type of technology

 2   platform, correct?

 3   A    Yes.

 4   Q    And that is the same line of business that Stream was in

 5   pre-bankruptcy, correct?

 6   A    Yes.

 7   Q    And this new legal entity is not Stream, the Debtor,

 8   correct?

 9   A    I revised reorganized Stream is what I'm seeing as the new

10   entity.

11   Q    So we have a debtor that's in bankruptcy, which is Stream.

12   A    Okay.

13   Q    And you're contemplating an entity, post-bankruptcy,

14   correct?  Is that what you're referring to as a new entity or

15   the reorganized entity?

16   A    I'm thinking of the entity Stream coming out of bankruptcy

17   is what I'm thinking.

18   Q    But you're not raising money for Stream in bankruptcy;

19   this Stream?

20   A    Stream in bankruptcy, the -- can you please clarify

21   because let me explain how I'm perceiving the question versus

22   what you say.

23   Q    Let's if we could take a look at page 41 of your

24   deposition.

25        MR. ALEXANDER:  Your Honor, I'm going to object in
```

1  terms of him just having him look at his deposition.  I mean

2  there's no impeachment.  There's nothing.  You don't just get

3  to show --

4          THE COURT:  Hold it right there.  I need another --

5  we'll take a quick break.  Okay.

6          MR. CAPONI:  Your Honor, Mr. Park.

7  BY MR. CAPONI:

8  Q    So when you use NewCo, you do so to express the difference

9  between VSI versus Stream versus NewCo, correct?

10  A    NewCo.  So yes.

11  Q    And NewCo may be VSI, correct?

12  A    NewCo is a revised, reorganized Stream coming out of

13  bankruptcy and VSI could be an investor and a reorganize Stream

14  going forward.

15  Q    But that reorganized entity may be VSI itself, correct?

16  A    In our discussions, it could be.  But are you asking is it

17  going to be?

18  Q    Well, let's start with it could be, correct?

19          MR. ALEXANDER:  Objection.  Calls for speculation.

20  BY MR. CAPONI:

21  Q    Mr. Park, let's take a look at since you answered this

22  question page 21.

23          THE COURT:  Wait a minute.  Wait a minute.  You

24  objected.  What was your objection?

25          MR. ALEXANDER:  Speculation.

1           THE COURT:  Your response.

2           MR. CAPONI:  He's the one raising the money.  I'm

3    asking him what entity he's looking to raise the money into.

4    That's not speculation.  That's his job.

5           MR. ALEXANDER:  Well that wasn't the question.  And

6    you already asked and answered that question.

7           THE COURT:  I'll allow it for what it's worth.  I

8    already heard what he said.  But go ahead.

9    BY MR. CAPONI:

10   Q    So if we can go to page 41 of your deposition.  And

11   actually, if you could start at page 40 and we go to line 22,

12   what my question to you was I think we were talking about

13   compensation.  But with regard to NewCo, has NewCo been formed

14   yet?  Is there a NewCo or is this a concept?  And you answered

15   the way, let me rephrase.  I like to use the word NewCo to

16   express the difference between, you know, even VSI.  I would

17   consider NewCo versus Stream.  So we are contemplating VSI, for

18   example, as one of the legal entities that we will -- we can

19   offer shares into or even a brand new entity.  But right now,

20   the discussion has been about an entity outside the best way to

21   describe an entity outside of Stream.  Did I read your

22   testimony correctly?

23   A    Yes.

24   Q    Okay.  So you're raising capital for money for an entity

25   currently that will be an entity other than Stream.  And his

```
 1  current thinking is it's going to be VSI, correct?

 2  A    Can I clarify that with a question please, sir?

 3           THE COURT:  No questions.  Just answer.  It says what

 4  it says.

 5           MR. PARK:  It says what it says.

 6           THE COURT:  And the question is -- what's the

 7  question?  Is that your testimony?  Is this?  What are we

 8  asking him?

 9  BY MR. CAPONI:

10  Q    So let me ask you this question, Mr. Park.  So your

11  current thinking is that you are likely to use VSI as NewCo,

12  but you may form a new entity or use a different entity other

13  than VSI; is that correct?

14           MR. ALEXANDER:  Your Honor, I'm going to object.  Is

15  he asking him to read what's on the paper?  Is that accurate?

16  I don't understand what the question is.

17           MR. CAPONI:  I just asked him a question.  I didn't

18  ask him to read anything.  I'm not sure what you're --

19           THE COURT:  Well, you.  Listen.  Cut it out.

20           MR. CAPONI:  I'm not, honestly, I'm not sure what the

21  objection --

22           THE COURT:  I'm just telling you guys cut it out.

23  Okay?  You read him the question and you're asking him based on

24  -- what are you ask -- you read his testimony and you're asking

25  him to characterize this question?  What is your question to
```

1   him?

2          MR. CAPONI:  My question is just to be clear, Your

3   Honor.  When I read my outline, I may read my question.  That

4   is still a question.  I'm not reading his transcript.  I can

5   still read his transcript in the question.  My question is, Mr.

6   Park, so your current thinking is that you're likely to use VSI

7   as NewCo but you may form a new entity or use a different

8   entity other than VSI, is that correct?

9          THE COURT:  But he's objecting because you read the

10  transcript.  Are you asking him to interpret what he said on

11  the -- what are you asking him?  I'm kind of confused and he's

12  objecting because maybe they're confused.  You read the

13  transcript.  Are you asking him is that what he meant when he

14  said this or what is the relevance of this transcript?

15  Are you asking him something different or I'm not quite sure

16  what?

17          MR. CAPONI:  All right.  To be clear to everybody --

18          THE COURT:  Okay.

19          MR. CAPONI:  Here's the transcript.

20          THE COURT:  Okay.

21          MR. CAPONI:  Closed.  I put it on the table.

22          THE COURT:  Okay.

23          MR. CAPONI:  So Mr. Park --

24          THE COURT:  Okay.

25          MR. CAPONI:  Your current thinking is that you are

```
 1   likely to use VSI and NewCo, but you may form a new entity or

 2   use a different entity other than VSI; isn't that correct?

 3            MR. PARK:  The way it's worded is tricky for me.

 4            THE COURT:  Well, do you not understand the question?

 5            MR. PARK:  That's why I'm asking.  Can I ask a

 6   question?

 7            THE COURT:  He doesn't understand the question.

 8            MR. CAPONI:  Okay.  Let's go to your transcript.

 9            THE COURT:  Okay.

10            MR. ALEXANDER:  Your Honor, improper impeachment.

11   You can't impeach someone if they don't give an answer and you

12   can't use the transcript as --

13            MR. CAPONI:  I can impeach a witness if he does not

14   know the answer to my question.

15            THE COURT:  Well, he said he didn't understand your

16   question.  Let's try to break it.  Why don't you just -- just

17   try to break the question down and then maybe we can get where

18   he answers and then you can impeach him.

19            MR. CAPONI:  Sure.  So Mr. Park, you're currently

20   contemplating using VSI as the NewCo that you're raising equity

21   into, correct?

22            THE COURT:  It's a yes or no.

23            MR. CAPONI:  I think it is, Your Honor.

24   BY MR. CAPONI:

25   A    Technically, can I have a clarification.  So I would say
```

1   yes.

2   Q    Excuse me.  Did you say yes?

3   A    I will say yes.

4   Q    Okay.  And this NewCo, which may be VSI, may not even

5   acquire any of Stream's assets, correct?

6   A    No.

7   Q    Let's go to your deposition at page 29, line 9 to 16.

8            THE COURT:  Okay.  Hold on.

9   BY MR. CAPONI:

10  Q    Are you there, Mr. Park?

11  A    Yes.

12  Q    Okay.  My question was maybe he misunderstood my question.

13  BY MR. CAPONI:

14  Q    My question was Stream may or not choose to -- sorry.

15  NewCo may or may not to seek to acquire Streams assets; is that

16  fair?  You answered, in other words, the decision will be made

17  as to what they will do.  Yes.  But the way again, the

18  investors are interested in the technology of 3D and the

19  technology of 3D where that relies, that will be resolved with

20  a court matter, I believe.  Is that your answer?

21  A    Yes.

22  Q    Okay.  So am I correct that the NewCo, depending on how

23  this bankruptcy turns out, may or may not acquire Streams

24  assets?

25  A    Yes.

1   Q    Okay.  So you are fundraising capital foreign entity that

2   may never acquire Streams assets, correct?

3           MR. ALEXANDER:  I'm going to Object, Your Honor.

4   Calls for speculation.

5           THE COURT:  Your response. He's objecting.

6           MR. CAPONI:  My response.  I'm sorry.  My response is

7   he's the CFO who's out there raising equity and telling

8   investors why he's raising this equity and you're seeking to

9   have him retained by this Court to raise equity.

10          THE COURT:  We're not retaining anything today.

11          MR. CAPONI:  We're not.  But they proffer him to be

12  the person to be -- strike that.  He's currently working for

13  the company out there raising capital.  I'm entitled to ask him

14  what he's raising capital into, for, and what he's telling

15  people.  That's not speculation.  That's his job.

16          THE COURT:  Just ask him that directly.

17          MR. CAPONI:  I did.

18          THE COURT:  No.  Counsel, just who are you telling

19  people the equity is for and what are you telling them?

20  I mean, can you answer that question because it's to me it's

21  even confusing.  I'll be honest.

22  BY MR. CAPONI:

23  Q    Mr. Park, you are raising capital for NewCo, correct?

24  A    Yes.

25  Q    And NewCo may be VSI, ultimately?

```
 1   A    Last word right there.  I didn't like it.

 2              THE COURT:  What?

 3              MR. PARK:  Ultimately. It's my consideration

 4   BY MR. CAPONI:

 5   Q    Using your current thinking, Mr. Park, is that NewCo will

 6   be VSI, correct?

 7   A    No.

 8   Q    Turn to page 41, line 16 of your deposition.  Question I

 9   understand.  So the current thinking is that you are likely to

10   use VSI as NewCo.  But you may form a new entity or use a

11   different entity other than VSI.  After an objection, your

12   answer was yes, that is correct.  Did I read that correctly?

13   A    Yes.

14   Q    So then currently your current thinking is that you're

15   likely to use VSI as NewCo, correct?

16              MR. ALEXANDER:  Your Honor, I'm going to object.  He

17   already answered the question.  And if Mr. Caponi is going

18   impeach him, it's improper impeachment.  Then he just reads the

19   impeachment that you just read it then you move on.

20              MR. CAPONI:  I read it.  I don't have to move on.  I

21   can ask him a follow up question.  But I don't think move on is

22   an objection.

23              MR. ALEXANDER:  You can't ask him the same question

24   that he already answered.  He just didn't like his answer.  So

25   I'm going to object and say it's asked and answered.
```

1        THE COURT:  He said it was asked and answer.  He just

2   said yes.  This is correct.

3        MR. CAPONI:  Okay.  I'll move on, Your Honor.

4        THE COURT:  All right.  Thank you.

5   BY MR. CAPONI:

6   Q    So we've established, Mr. Park, that your current thinking

7   is that NewCo will be VSI.  I think you testified a few minutes

8   ago, am I correct, that the new entity may or may not ever

9   acquire Stream's assets, correct?

10        MR. ALEXANDER:  We're objecting.

11   Mischaracterization.

12        THE COURT:  Wait a minute.  He said it's a

13   mischaracterization.

14        MR. ALEXANDER: Of a compound question.

15        THE COURT:  Okay.

16   BY MR. CAPONI:

17   Q    Do you understand the question, Mr. Park?

18   A    No.

19        THE COURT:  Wait.  He's objecting.

20        MR. CAPONI:  Okay.  Well, I think if the witness

21   doesn't understand the question, then --

22        THE COURT:  That wasn't his objection.  His objection

23   was that it was a compound question.  And what else?

24        MR. ALEXANDER:  I believe we also said it was asked

25   and answered and mischaracterizes his prior testimony.

1          THE COURT:  So he says it mischaracterizes prior

2    testimony and already asked and answered.  Compound Mr. Caponi.

3          MR. CAPONI:  Okay.  Compound is not an objection as

4    long as the witness understands the question.  And if the

5    witness believes I mischaracterized his prior testimony, he's

6    free to clarify in his answer.

7          THE COURT:  No.  When it's asked and answered, I say

8    sustain or overruled.

9          MR. CAPONI:  Excuse me, Your Honor.

10         THE COURT:  If somebody objects that it's asked and

11   answered, I either say yes, it has been and move on.

12         MR. CAPONI:  I'm sorry.  I don't believe it's been

13   asked and answered.

14         THE COURT:  All right.  That's the point.

15         MR. CAPONI:  He had three, he had two.

16         THE COURT:  Right.  So you don't believe it's been

17   asked and answered?

18         MR. CAPONI:  Correct.

19         THE COURT:  Okay.  And what is it you believe that

20   was asked and answered?

21         MR. ALEXANDER:  Who the new entity is going to be

22   that's going to have funding post-bankruptcy?

23         THE COURT:  And it's his answer.  Okay.  You said he

24   already asked that question.

25         MR. CAPONI:  That wasn't the thrust of my question.

```
 1  The thrust of my question was am I correct that your current

 2  thinking is to use VSI's NewCo and that that entity may or may

 3  not acquire the Debtor's assets?

 4          THE COURT:  He answered that back a couple of

 5  questions earlier.  I'll allow it for what it's worth.  I have

 6  my notes and he said what he said.  But go ahead.  Do you

 7  understand the question?

 8          MR. PARK:  Can you repeat the question please?

 9  BY MR. CAPONI:

10  Q    Your current thinking, Mr. Park, is you're going to use

11  VSI to be NewCo and NewCo may or may not acquire the Debtor's

12  assets in this estate, correct?

13  A    Can you repeat the question very slowly?

14  Q    Your current thinking is to use VSI as NewCo and NewCo may

15  or may not acquire the Debtors assets?

16  A    No.

17  Q    You say no/  Which part of my question are you --

18  A    That's the point.  I need clarification.

19          THE COURT:  So Mr. Caponi, you said it was not a

20  compound question and then you ask him which part.  So how

21  about we break it down into two parts because by asking him

22  which part, you can see that it was two parts,

23  BY MR. CAPONI:

24  Q    Mr. Park, your current thinking is use VSI as NewCo,

25  correct?
```

```
 1   A    As a scenario.

 2   Q    And NewCo, whether it's VSI or something else may or may

 3   not acquire the Debtors assets, correct?

 4   A    That's as a compound question, too.

 5          THE COURT:  No, it's not.  It may or may not.  It's

 6   not a compound.

 7          THE WITNESS:  All right.  So yes.  It may or may not.

 8   So yes.

 9   BY MR. CAPONI:

10   Q    Thank you.  And you're, Mr. Park, am I correct, you're

11   entitled to a success fee in your role raising capital of the

12   Debtors, correct?

13   A    Yes.

14   Q    And it's your understanding you will receive a three

15   percent success fee for any equity that you raise, correct?

16   A    Yes.

17   Q    And you will receive a one percent success fee for any

18   debt that you raise, correct?

19   A    Yes.

20   Q    But you also believe you're entitled to receive equity

21   compensation from NewCo as well, correct?

22   A    Yes.

23   Q    Could you turn to tab 2 of your binder?

24   A    Yes.

25   Q    Are you familiar with this document?  It's titled Motion
```

1   for the Debtors for entry of an order authorizing the Debtors

2   to enter into an employment agreement with Thomas Jung Ho Park

3   as Chief Financial Officer to the Debtors?

4   A    Yes.

5   Q    Did you review this document before it was filed with the

6   Court?

7   A    Yes.

8   Q    And if we look at paragraph 14 of this document.

9   A    Okay.

10  Q    Which is on page actually page 4.

11  A    Yes.

12  Q    Actually it goes on to page 6.  It lists --

13         THE COURT:  Hold on, counsel.  I'm on my fourth pen.

14  Okay.  Paragraph 14, you said, counsel?

15         MR. CAPONI:  Yes, Your Honor, on page 4 which

16  continues on to page 6 and alphabetically there's sub

17  paragraphs A through S.

18  BY MR. CAPONI:

19  Q    Do you see that, Mr. Park?

20  A    Yes.

21  Q    Do these sub paragraphs accurately describe what your role

22  is or will be with the Debtor?

23  A    That is correct.

24  Q    Okay.  We can turn to --

25         THE COURT:  Hold on one second.  Thank you.  Okay.

1    Go ahead, counsel.

2    BY MR. CAPONI:

3    Q    Turn to paragraph 13 on page 4 under sub paragraph D

4    titled compensation.  Do you see that, Mr. Park?

5    A    Yes.

6    Q    So under the proposal, you will receive $3,250 per week

7    working as a CFO and accrue 1,750 shares of common stock and

8    reorganize debtor.  Do you see that?

9    A    Yes.

10   Q    And then it says post confirmation through effective date,

11   you'll receive $4,000 per week and have a weekly accrual of

12   1,000 shares of common stock and reorganize debtors, correct?

13   A    Yes.

14   Q    And then lastly part of data plan, you're entitled to 1

15   million shares of common stock in the reorganized debtors,

16   correct?

17   A    Yes.

18   Q    There's no reference in here under compensation, Mr. Park,

19   am I correct, to your receiving three percent for raising any

20   equity, correct?

21   A    Yes.  On this paragraph.

22   Q    There's no reference in here either to your receiving one

23   percent for any debt that you raise, correct?

24   A    Yes.

25   Q    Is it your understanding that you will be entitled to the

1  three percent for equity and one percent for debt even though

2  it's not listed in this motion?

3  A    Mr. Caponi, can you repeat that question one more time

4  please?

5  Q    At your deposition in a few minutes ago --

6  A    Yes.

7  Q    You testified that you're entitled -- you believe you're

8  entitled to receive three percent of any equity that you raise

9  in NewCo, correct?

10  A    Yes.

11  Q    And you believe you're entitled to one percent of any debt

12  you raise in NewCo

13  A    That is correct.

14  Q    And but in this motion to employ you by the Debtor under

15  compensation it does not reference three percent or one

16  percent.  Do you agree with me on that?

17  A    Yes.

18  Q    My question is is it your understanding that you will --

19  you're still entitled to the three percent and one percent if

20  you were to raise debt or equity?

21  A    Yes.

22  Q    And when it refers to in the compensation shares of in the

23  reorganized debtor, is that NewCo?

24  A    Yes.

25  Q    And again, the current thinking is may be VSI, correct?

1   A    Could be.  Yes.

2   Q    And with regard to your efforts to raise capital, you

3   don't see a distinction between VSI and Stream, correct?

4   A    I do.

5   Q    If you could take a look at your deposition at page 47,

6   line 14 through 16.  And we'll start at line 7 so you have my

7   question.  Mr. Park, I asked you so at some point, am I

8   correct, that your strategy shifted from --

9             THE COURT:  Wait a minute, counsel.

10            MR. CAPONI:  I'm sorry,

11            THE COURT:  I'm sorry.  What page are we on?

12            MR. CAPONI:  Page 47, line 7 and I'll be going all

13   way through line 16.

14   BY MR. CAPONI:

15   Q    So my question, Mr. Park, was so at some point, am I

16   correct, that the strategy shifted from you being a banker to

17   you becoming CFO and looking to raise money for NewCo: is that

18   correct?  You proceeded to answer when I was offered the CFO

19   position it wasn't just on NewCo.  I would still -- I was still

20   focused on Stream/NewCo the overall entity as I know it as

21   Stream.  There wasn't a bifurcation or delineation between

22   Stream as a legal entity versus VSI as to what I was raising

23   capital for.  Did I read that correctly?

24   A    Yes.

25   Q    Thank you.  So am I correct, based on what we just read

1    that if you raise equity or debt in either Stream or VSI,

2    you're going to be entitled to either your three percent or one

3    percent; is that correct?

4    A    In my discussion with investors, I never mentioned VSI as

5    the source or the place that we offer shares of the new equity.

6    In my conversation with the foreign investment firms, it's

7    always been Stream or revised Stream coming out of bankruptcy.

8    Q    My question, Mr. Park, was if you raise based on your

9    testimony, my question is based on your testimony that there

10    was no delineation between VSI and Stream.  Am I correct that

11    if you were to raise a million dollars in equity for VSI, you

12    would feel that you're entitled to your three percent; is that

13    correct?

14    A    Not VSI, no.

15    Q    So if you raise one percent in debt for VSI, you do not

16    believe you're entitled to your one percent.

17    A    Not for VSI, no.

18    Q    Mr. Park, if you go stay on page 47, and we'll go down to

19    line 17.

20    A    Okay.

21    Q    My question was, "So am I correct that you viewed your

22    role as to bring new money to the table, what entity that would

23    go into, how that money would be deployed was to be

24    determined," question.  And then there were two objections by

25    your counsel, and then you answered, "Okay.  Thank you.

1    Initially, it was through Stream because of DIP financing, as

2    we were looking, as some of those discussions I had with my own

3    people that I brought to the table, the questions started

4    shifting more towards other legal entities that are all related

5    to each other.  Of course, VSI, et cetera.  And the

6    determination was made it's going to be DIP or is it going to

7    be Equity."  Did I read that correctly?

8    A     Yeah.

9    Q     And then you go on to say, "We wouldn't put equity into a

10   bankrupt situation, but we would put Equity in a new legal

11   entity or VSI, for example."  Did I read that correctly?

12   A     Yes.

13   Q     Thank you.  And Mr. Park, you've been on conversations --

14   strike that.  You've been working -- since your time with the

15   Stream, you've been remote, correct?

16   A     Yes.

17   Q     As has Mr. Rajan, correct?

18   A     That is correct.

19   Q     So when you communicate, you're doing it over phone or by

20   video.

21   A     That is correct.

22   Q     Okay.  And during the discussion that you had regarding

23   raising capital in your role here, you've been on conversations

24   with Mr. Rajan where you're discussing both Stream and VSI,

25   correct?

1  A    I would answer yes, but we never made that distinction

2  between the two in terms of when we raise capital.  I want to

3  be very clear on this.  Raise capital, we always said Stream.

4  I never said -- we never said VSI.

5  Q    I think I'll -- we'll move on here.  Do you have any

6  involvement, Mr. Park, with VSI?

7  A    No.

8  Q    So even though VSI is -- a current thinking is to make VSI

9  NewCo, you have not been involved in any planning regarding

10 VSI?

11         MR. ALEXANDER:  I'm going to object.  It misstates

12 the witness's testimony.

13         MR. CAPONI:  I did not mischaracterize his testimony.

14 If he believes counsel did, I think he can address that on

15 redirect.

16         THE COURT:  I'll allow it for what it's worth.  He

17 said what he said in his testimony.  I can read.  I'll allow it

18 for what it's worth, okay?

19         MR. CAPONI:  I'll move on, Your Honor.  It's not that

20 major a point, and I want to make sure everybody makes their

21 plane tonight.  I'm not going to be the one getting yelled at.

22         THE COURT:  Counsel, let me back up a minute.  I

23 don't mean to yell.  I just get a little frustrated, and right

24 now, I'm not frustrated with you guys.  I'm just frustrated

25 overall, okay?  So let's just put that on the table.  And I

1   like probably need to take a break to get something to eat

2   because my sugar is probably dropping.

3            MR. CAPONI:  Then we should take a break, Your Honor.

4   I have no reason --

5            THE COURT:  Right.  Well, let me -- no, let me let

6   you finish with Mr. Park because you said you -- are you almost

7   done with him, or you've got a bit to go?  I'm not rushing you.

8   We have like --

9            MR. CAPONI:  Your Honor, I'm not almost done.  I

10  mean, I'm getting close to the end, but this is a logical

11  breaking point in my --

12           THE COURT:  Right.  Right.  Let's break right now.

13  As I said, my sugar is dropping, so I can get a little antsy,

14  and I apologize for that.  All right.  We'll break.  How time

15  you want, four o'clock?  Back here at four?  That leaves us

16  until 7:30.  That's like another three and a half hours.

17           MR. CAPONI:  We shouldn't take nearly that long.  I

18  don't have that much left, but four o'clock works.

19           THE COURT:  But if you do, you have it.  I just --

20           MR. CAPONI:  I appreciate it, Your Honor.  I may take

21  you up on it.

22           THE COURT:  I just need to get something.

23       (Recess taken)

24           THE COURT:  Please be seated.  Okay.  I think we left

25  with Mr. Caponi cross-examining Mr. Park.

```
 1              MR. CAPONI:  Thank you, Your Honor.

 2   BY MR. CAPONI:

 3   Q    Mr. Park.

 4   A    Yes.

 5   Q    You're currently -- you don't have access to the Debtor's

 6   financial records, bank statements, and bank account

 7   information, correct?

 8   A    Repeat that very carefully.  There's some things I do,

 9   some things I don't.  I want to -- could you clarify that

10   question, please?

11   Q    Sir, although you've been fulfilling the role as CFO, you

12   currently don't have access to the Debtor's financial records,

13   bank statements, and bank account information, correct?

14   A    I have been given reports and the financial statements,

15   but I have not been given direct access to anything of the bank

16   account information itself.

17   Q    So you have not been given -- you've been given reports,

18   and then you've been given --

19   A    Correct.

20   Q    -- those by Mathu Rajan, correct?

21   A    The reports were -- some by Mathu, some by others in

22   the  -- some by other people.

23   Q    Okay.  But you have not been given access to the source

24   information such as bank statements and bank accounts.

25   A    That is correct.
```

1   Q    But you're -- you've been the CFO for almost 60 days,

2   correct?

3   A    I've been for about six weeks and the 60 days, yes.

4   Q    Who are the other people that would have provided you

5   these reports?

6   A    For Stream itself?  Only Mathu.

7   Q    Only Mathu.

8   A    Yes.  Finance reports for Stream, yes.

9   Q    What other reports have you been given?  Sorry.  Strike

10  that.  You said for Stream -- reports for Stream itself.  What

11  financial reports were you given other than reports for Stream?

12  A    I request information on VSI.  Financial reports.

13  Q    And who has been giving you information related to VSI?

14  A    Su Joy (phonetic).

15  Q    And --

16  A    Subi (phonetic).  Excuse me.  Subi Joseph.

17  Q    Subi Joseph?

18  A    Yes.

19  Q    And am I correct that you have not been involved -- strike

20  that.  Are you familiar -- are you aware that the Debtor has to

21  file monthly operating reports with the Court?

22  A    Yes, I'm aware of that.

23  Q    But you have not been involved in preparing those monthly

24  operating reports, correct?

25  A    That is correct.

1   Q    And even though you've been the CFO of the company since

2   May, you did not participate in the May monthly operating

3   report that was filed only a few weeks ago, correct?

4   A    That is correct.

5   Q    Have you ever seen the monthly operating reports?

6   A    I've seen not -- I've -- yes.

7   Q    Okay.  If you could turn to Tab 3 in you binder.

8   A    I'm sorry.  Can you repeat that again?

9   Q    Sure.  If you could turn to Tab 3 in your binder.

10  A    Yes.

11  Q    Which is the most recent operating report for Stream TV

12  Network.  Do you see that, Mr. Park?  Let me see if -- may

13  help, Mr. Park.  At the very top it indicates this was filed on

14  June 21, '23.

15  A    Yeah.

16  Q    So it would be last week.

17  A    Yes.

18  Q    So, Mr. Park, have you seen this document before?

19  A    No.

20  Q    Did you have any involvement in compiling information for

21  this document?

22  A    No.

23  Q    Do you know who would have provided the financial

24  information to compile this document?

25  A    I would not.

1  Q    Stream has -- if you look at the first page of this

2  document, under monthly operating report 1, 2, 3, 4, 5 lines

3  down, it says right before supporting documentation --

4         MR. ALEXANDER:  Your Honor, I'm going to object.  He

5  testified he doesn't recognize this document.

6         MR. CAPONI:  One, Your Honor, the document is

7  admissible as a admission by the Debtor.  It was filed by the

8  Debtor, and therefore it's a -- it's admissible for that

9  purpose.  It's also a business record of the Debtor.  And I'm

10  not asking -- I'm simply asking him a question that he either

11  knows the answer to or he doesn't.

12         MR. ALEXANDER:  But he -- this witness doesn't have

13  any personal knowledge of the document.  He's asking him to

14  read a document.  If he's moving it into evidence, you still

15  need to move it through a witness somehow, and this witness

16  stated that he has no personal knowledge of it.

17         MR. CAPONI:  So I'm going to ask him a question about

18  some of the information in this document.  Either he knows it

19  -- it either comports with his knowledge or it doesn't.  He can

20  let us know.

21         MR. ALEXANDER:  I don't believe that addresses the

22  objection.

23         THE COURT:  The objection is that this isn't into

24  evidence, correct?

25         MR. ALEXANDER:  Well, it's not entered into evidence.

1              THE COURT:  Okay.  And he testified he doesn't know

2      anything about it.

3              MR. ALEXANDER:  Correct.

4              THE COURT:  And therefore, because he doesn't know

5      anything about it, he's going to -- he can't ask him any

6      questions about this document.  He can ask him questions.  He's

7      going to say he doesn't know.  He didn't prepare it.  I'll

8      allow it for what it's worth.

9              MR. CAPONI:  Thank you, Your Honor.

10     BY MR. CAPONI:

11     Q    Mr. Park, it says Debtor's full-time employees as of the

12     date of the order for relief, zero.  Do you see that?

13     A    Yes.

14     Q    And that's consistent with your understanding that the

15     Debtor has no full-time employees, correct?

16     A    That is correct.

17     Q    And that the only person working for the Debtor, or people

18     working for the Debtor at the moment would be yourself and Mr.

19     Rajan.

20     A    Correct.

21     Q    And you said at your deposition last week it was your

22     understanding that the Debtor only has a few thousand dollars

23     in the bank -- its bank accounts, correct?

24     A    That's correct.

25     Q    And the Debtors have no income stream or sources of

1   revenue at this time, correct?

2   A    Correct.

3   Q    And as of May, you had performed a calculation and

4   determined that the Debtor's legal fees in this bankruptcy to

5   date were approximately $750,000, correct?

6   A    Yes, from my -- yes.

7   Q    And that does not include whatever fees have been incurred

8   in June including this week and this proceeding, correct?

9   A    Yes.

10  Q    During your examination by Mr. Vincent, you were asked

11  about purchase orders.  Do you recall that?

12  A    Yes.

13  Q    And I believe you testified that you were not involved in

14  negotiating the purchase orders.  That was Mr. Rajan, correct?

15  A    That is correct.

16  Q    But you -- after the purchase orders were secured, you had

17  communications with the potential buyers regarding the purchase

18  orders; is that correct?

19  A    Not the purchase order.  Not specifically with the

20  purchase order.  That was not the communication.

21  Q    Okay.  Did you speak with the -- so let's refer to the

22  parties in the purchase orders who issued the purchase orders

23  who will be the buyers.  Do you agree with that?

24  A    Okay.  Yes.

25  Q    Did you have communication with those potential buyers?

1   A    Yes.

2   Q    And what were you communicating with them about?

3   A    Getting their financial statements.

4           THE COURT:  Five-minute break.

5           MR. CAPONI:  Sure, Your Honor.

6           THE COURT:  Two-minute.

7       (Recess taken)

8           UNIDENTIFIED SPEAKER:  It always needs your

9   attention, whether you like it or not.

10          THE COURT:  I know.

11          UNIDENTIFIED SPEAKER:  Yeah.

12          THE COURT:  I'm not answering my phone.  I ignored

13  it, but --

14          UNIDENTIFIED SPEAKER:  You can't help it.  You can't

15  help it.

16          THE COURT:  You can't.  All right.  I don't think

17  we'll have any more interruptions today.

18          UNIDENTIFIED SPEAKER:  You're human.  I mean, you

19  can't help it.  You're human.

20          THE COURT:  Well, you can see I have short patience.

21  All right.  Whenever you're ready, Mr. Caponi, we can go back

22  on the record.

23          MR. CAPONI:  Thanks, Your Honor.

24          THE COURT:  All right.  And I think that's the last

25  interruption we're going to have for today.  I have to put the

1    mean judge hammer down.

2           MR. CAPONI:  I'm not a big believer of conspiracy

3    theories, but everybody seems to have drank all the water.  I

4    think that's the way --

5           THE COURT:  Oh, you need some more water?  You

6    need  --

7           MR. CAPONI:  No, no.  We found some, Your Honor.  But

8    I brought bottles, but someone -- somehow they all disappeared.

9    But --

10          THE COURT:  Do you want -- do we need to get some

11   more?  We can get more water.

12   BY MR. CAPONI:

13   Q    Okay.  Mr. Park.

14   A    Yes.

15   Q    Pick up where we left off.

16          THE COURT:  Okay.

17   BY MR. CAPONI:

18   Q    You spoke to the buyers under the purchase orders

19   regarding her financial information.

20   A    That is correct.

21   Q    And who were the buyers under the purchase orders?

22   A    It was -- the ones that I communicated with?

23   Q    Yes.

24   A    Southern Telecom.

25   Q    Okay.

1              THE COURT:  Who?  Who did you say?

2              THE WITNESS:  Southern Telecom.

3              THE COURT:  Okay.

4    BY MR. CAPONI:

5    Q    And -- but as we sit here today, the Debtors did not have

6    the ability to satisfy those purchase orders, correct?

7    A    Are you asking for my personal opinion or knowledge of the

8    situation?  Would -- I just want to have you clarify that

9    question first.

10   Q    I'm asking -- sure.  I'm asking for your knowledge.

11   A    Okay.

12   Q    As you sit here today, the Debtors don't have the ability

13   to satisfy those purchase orders, correct?

14   A    I can't give a definitive answer on that one.

15   Q    So you say the answer is no?

16             THE COURT:  Can't give a definitive answer on that.

17             MR. CAPONI:  Oh, okay.

18   BY MR. CAPONI:

19   Q    Well, let's turn to Page 77 of your transcript.

20   A    Okay.

21   Q    And want to go to Line 2.  My question to you, Mr. Park,

22   was, "And as we sit here today, does Stream have any funds --

23   strike that."

24             "As we sit here today, does Stream the Debtor have

25   the capacity to fulfill any purchase orders?"  You answered,

1    "The legal entity Stream itself you are seeking, correct?"  My

2    answer -- my -- I responded, "Correct.  Yes, the Debtor."  And

3    you said, "Okay.  The Debtor.  The Debtor right now from my

4    understanding and from what I had seen, okay, would not at this

5    particular moment have the cash to do anything, okay?  To

6    fulfill that PO, because we need to get raising the funds and

7    so forth."  Did I read that correctly?

8    A     Yes, you did.

9    Q     Okay.  And the Debtor does not have, not only the funds.

10   It doesn't have the infrastructure or the employees or the

11   material or the capacity to fulfill those purchase orders,

12   correct?

13   A     Let's go back to -- please repeat that question again,

14   please?

15   Q     Sure.  Stream, the Debtor, as you sit here today, does not

16   have the infrastructure, the employees, the material, capacity,

17   or the cash to fulfill these purchase orders, correct?

18   A     Yes.

19   Q     So just to be clear, when you say yes, yes, you agree with

20   me that Stream does not have the capacity to fulfill the

21   purchase orders, correct?

22   A     Yes.

23   Q     And it's your understanding, am I correct, that VSI has

24   been providing funds and/or satisfying the Debtor's

25   obligations, correct?

1   A    What obligations are you referring to?

2   Q    So Stream's building expenses that are being satisfied, to

3   your knowledge, are being satisfied by the VSI, correct?

4   A    The way you phrased that up, could you clarify that more?

5   The part of the VSI piece, please?

6   Q    I'm not sure I can be more specific, but let me try.  To

7   the extent that debtor is incurring expenses and fees that are

8   being paid, they're being paid by Mr. Rajan's other entity,

9   VSI, correct?

10  A    Yes.

11  Q    As you sit here today, you cannot give me or the Court --

12  you can't quantify how much VSI has been paying of the Debtor's

13  expenses, correct?

14  A    That's correct.

15  Q    And VSI, is your understanding, is an entity that is

16  controlled by Mr. Mathu Rajan, correct?

17  A    That is correct.

18  Q    And if we turn back to Exhibit 3, which is the monthly

19  operating report.

20  A    Yes.

21  Q    If you go to Page 2?

22  A    Yes.

23  Q    Under Part 1, Cash Receipts and Disbursements.

24  A    Yes.

25  Q    Section C, Total Disbursements --

```
 1              THE COURT:  Wait a minute, what?  Which one are we

 2   at?

 3              MR. CAPONI:  Exhibit 3?

 4              THE COURT:  Oh, 3.  I'm at 2.

 5              MR. ALEXANDER:  Tab 3.

 6              MR. CAPONI:  Tab 3.

 7              THE COURT:  Tab 3.

 8              MR. CAPONI:  Sorry, Tab 3.

 9              THE COURT:  Okay.  Which is marked CR-44.

10              MR. CAPONI:  Part 1  --

11              THE COURT:  Yes.

12              MR. CAPONI:  Subsection C.  At the top of the second

13   page.

14   BY MR. CAPONI:

15   Q   And it says, "Total disbursements net of transfers between

16   accounts."  And it says, "Cumulative over the course of the

17   estate, $607."  Do you see that?

18   A   Yes.

19   Q   Do you see any notation on this page that indicates

20   whether any of that money was paid by VSI?

21   A   No.

22   Q   Do you see any indication in this area of the report that

23   indicates any of the money on behalf of the Debtor has been

24   paid by VSI?

25   A   No.
```

1    Q    Okay.  And if you go to the next page, under Part 5,

2    Professional Fees, and Expenses, under III, it says, "U.S.

3    Trustee."  And then it has Paid Cumulative, on the far right

4    column, $500.  Do you see that?

5              THE WITNESS:  Repeat that objection again.

6              MR. ALEXANDER:   Your Honor, I'm just going to object

7    because he's just asking him to read a document.  It's easy to

8    see something on.  I mean, this isn't --

9              THE WITNESS:  No.

10             MR. ALEXANDER:  -- any testimony that Mr. Park has

11   knowledge of.  It's just not relevant.

12             MR. CAPONI:  I'm asking Mr. Park if he sees it and

13   then I will ask the question that will define the relevance.

14             MR. ALEXANDER:  He's trying -- it's a document.

15             THE COURT:  He's asking him, does this document have

16   this on it?  I'll allow it, again, for what it's worth.

17             MR. CAPONI:  Thank you, Your Honor.

18   BY MR. CAPONI:

19   Q    See here where it says $500, Mr. Park?

20   A    Yes.

21   Q    Do you know how fees to U.S. Trustee's office is

22   calculated?

23   A    No.

24   Q    And you're unaware as to whether or not there's any formal

25   arrangement between Stream and VSI for how the VSI will be

1   compensated or repaid for the money it's paying on behalf of

2   Stream, correct?

3   A     Your Honor, no.  I do not know.

4   Q     Thank you.  And what have -- to the extent there is an

5   arrangement between the VSI and Stream for these expenses, that

6   would have been handled by Mathu Rajan, correct?

7              MR. ALEXANDER:  Clear objective, calls for

8   speculation.

9              MR. CAPONI:  To the extent you know.

10             THE COURT:  Move off with the speculation.  Respond.

11  Respond, sir.

12             MR. CAPONI:  Either the witness, it's -- I'm not

13  asking the witness to speculate, I'm asking if the witness

14  knows.

15             THE COURT:  He said he didn't know already, anything

16  about any reimbursement agreement.  And now you're asking him

17  what about that arrangement?

18             MR. CAPONI:  He's saying he's unaware of what the

19  arrangement may be.  I'm asking him if he knows, to the extent

20  there is an arrangement, whether that was produced by Mr.

21  Rajan.

22             THE COURT:  Answer the question if you know.

23             THE WITNESS:  No.  I don't know.

24             MR. CAPONI:  Thank you.

25  BY MR. CAPONI:

1    Q    All right.  Getting near the end here.  You have, am I

2    correct, Mr. -- well, going back to your prior testimony.  When

3    you first joined in May, you were in contact with Mr. Rajan

4    every day up until he became ill, correct?

5    A    Yes.

6    Q    And when did he become ill?

7    A    After his trip.

8    Q    I've no idea when his trip was.  Can you tell us a month?

9    A week?

10   A    It's June.

11   Q    Mid-June?  early June?

12   A    I think towards, my best guess is, like, the second week,

13   first week, second week timeframe.

14   Q    Was it --

15   A    I suspect second week.

16   Q    Before or after, say June 10th?

17   A    I'm not sure when he came back from his trip.  That's when

18   he got injured during his trip.  That was what I was informed.

19   A    Okay.

20   Q    And then you testified that after he became ill, you were

21   talking to him roughly every other day.

22   A    Some days, day-to-day, some days would be a week at a time

23   or not even a week or four or five days.  We're not -- we

24   maintain contact with him.

25   Q    And in advance of your deposition, I believe you testified

1  earlier that you prepared with Mr. Rajan for roughly 90

2  minutes, correct?

3  A    Yes.

4  Q    And your deposition was just last week?

5  A    Yes.

6  Q    Okay.  You were asked questions regarding the potential --

7  well, you were asked questions by Mr. Alexander regarding the

8  term sheet from John Schanne.  Do you recall that?

9  A    Yes.

10  Q    Okay.  And I believe you testified you had no involvement

11  with that term sheet?

12  A    That is correct.

13  Q    Okay.  And at your deposition, am I correct in that you

14  told me that as far as you knew, the company was not

15  progressing --

16         MR. ALEXANDER:  Your Honor, we're going to object.

17  He's asking him about hearsay, an out of court statement.  You

18  know, if you have a question, you can -- he's asking him what

19  his testimony was that was out of court.  If he has a question,

20  just ask the question.

21         MR. CAPONI:  I just did ask him a question.  I'm not

22  sure what the objection --

23         THE COURT:  The objection was that you asked him a

24  question about something he said in his deposition, as opposed

25  to just asking him, and then impeaching him with his

1   deposition.  Is that what you're saying?

2          MR. ALEXANDER:  Yes, Your Honor.

3          MR. CAPONI:  I'm not impeaching him or seeking to

4   impeach him, I am -- it is not hearsay to ask a witness about

5   his own statement because the witness is in court and able to

6   respond to his statement.

7          MR. ALEXANDER:  He's asking him about an out of court

8   statement, which is hearsay.

9          THE COURT:  Could you just rephrase the question?

10         MR. CAPONI:  Sure.

11   BY MR. CAPONI:

12   Q    Mr. Park, were you aware of the term sheet at your

13   deposition?

14   A    Yes.

15   Q    Thanks.  Then why at your deposition, did you tell me that

16   the company was not progressing towards any form of term sheet

17   with an investor?

18   A    At that point in time -- at that point in time, I hadn't

19   -- I had not seen the term sheet to confirm that.  For me, I

20   need to see the term sheet.

21   Q    Let's take a look at Page 34 of your deposition.  Line 25,

22   I think I may be off here.  So my question is starting at Line

23   22.

24          "Q   So am I correct that while the DIP financing

25          opportunities you explored are still -- you were

1              keeping those channels of communication open?  Those

2              -- you are not progressing towards a term sheet or

3              any kind of definitive financing at the moment?"  And

4              you answered:

5              "A   No, not with them.  Term sheets with the new

6              co."

7              Do you see that?

8    A    Yes.

9    Q    Why did you not tell me that it was your understanding

10   that the Debtor may have entered into a $300 million term sheet

11   several weeks before your deposition?

12   A    I was not actually -- I hadn't seen term sheets.  I -- I -

13   - there was a discussion of -- of -- there was a discussion.

14   I'm trying to think if I can arrange --

15            MR. ALEXANDER:  Objection.

16            THE WITNESS:  -- about the possibility --

17            THE COURT:  Whoa, whoa, whoa.  You're objecting about

18   what?  Objecting to his answer?

19            MR. ALEXANDER:  I am going to object.  No, Your

20   Honor, I'm going to object to his answer to the extent that the

21   only basis he knows it is based upon discussions with --

22            THE WITNESS:  Yeah.

23            MR. ALEXANDER:  -- Counsel.

24            MR. CAPONI:  There's nothing in my answer that would

25   implicate a communication with Counsel.

1              THE COURT:  Wait a minute.

2              MR. CAPONI:  My question wouldn't implicate Counsel.

3              THE COURT:  Right.  But he keeps saying that the

4    answer would require, you know, revelation of discussion with

5    Counsel.

6              Is that what you're saying?

7              MR. ALEXANDER:  Yes, Your Honor.

8              MR. CAPONI:  Now, the question was, why did you not

9    tell me about the term sheet?  So Mr. Alexander is suggesting

10   that he was told by his Counsel not to tell me and that -- I'm

11   okay with that.  He can claim privilege over it.

12             MR. ALEXANDER:  I ask if Mr. Caponi has a response,

13   Your Honor.  I think it should be to the Court and not to me.

14             MR. CAPONI:  There's my response, Your Honor.  Mr. --

15   my question was --

16             MR. ALEXANDER:  No.

17             THE COURT:  Okay, he's asserting privilege.  Is that

18   what -- attorney-client privilege?

19             MR. ALEXANDER:  I was asserting attorney-client

20   privilege to the extent that the only basis Mr. Park knew about

21   -- to the extent he knew, and it requires him to answer, I'm

22   instructing him not to answer.  If he independently knows it,

23   outside of discussions from Counsel, then he can answer.

24             MR. CAPONI:  So to make this record abundantly clear,

25   I'm going to make sure I restate my question.

1              THE COURT:  Okay.

2  BY MR. CAPONI:

3  Q    Mr. Park, why at your deposition did you not tell me that

4  you were aware that the Debtor had executed a $300 million term

5  sheet in response to this question here on Page -- we just read

6  on Page 34?

7              MR. CAPONI:  Hold up, please.  I'm uncertain -- I'm

8  not sure if you're going to reassert the objection.

9              THE COURT:  Well, he didn't.

10             MR. CAPONI:  Okay.  Well, I wasn't sure.  I just

11  wanted to make sure,  I didn't want to get --

12             THE COURT:  If he was going to, he would have.  I'm

13  not asserting one.  I don't know, I mean, well, I'm -- I just

14  called the strikes and balls.

15             Go ahead, Mr. Park.  He asked you why did you --

16             THE WITNESS:  I would like to know where that term

17  sheet is at.

18  BY MR. CAPONI:

19  Q    Were you aware -- am I correct, from your testimony, you

20  said, a minute ago, you were aware that a term sheet may have

21  been signed or existed?  Is that correct?

22  A    There were discussions of financing about a 300 number,

23  but I've never seen or heard about a term sheet.  I'd never

24  definitely seen, "Here's a term sheet cover."  No one's ever

25  said that.

1  Q    Well, what were you aware of regarding this potential $300

2  million --

3  A    That the discussions were under -- under -- the

4  discussions were happening, so I was at least notified of that.

5  Q    Okay.  So you're the -- and this term sheet was dated

6  January 6th, correct?

7  A    June.

8  Q    June 6th, correct?

9  A    Yes.

10  Q    Which is more than two weeks -- around two weeks before

11  your deposition, correct?

12  A    Right.

13  Q    And you're the CFO of the company, correct?

14  A    Right.

15  Q    And you're in contact with Mr. Rajan on a regular basis

16  during that -- between June 6th and your deposition, correct?

17  A    Correct.

18  Q    And is your testimony that Mr. Rajan never told you that

19  he had an executed term sheet for $300 million?

20  A    He had only talked about this Chinese company.  That's it.

21  Q    That wasn't my question.  Did Mr. Rajan --

22          THE COURT:  No.

23          MR. CAPONI:  -- tell you --

24          THE COURT:  His answer's he's not.

25          MR. CAPONI:  Okay.

```
 1              THE WITNESS:  He didn't come here.

 2   BY MR. CAPONI:

 3   Q     As you sit here today, are you surprised as the CFO who

 4   spoke to the CEO on a regular basis that he -- and you're in

 5   charge of raising funding, that he didn't tell you that he had

 6   an executed term sheet for $300 million?

 7   A     Am I surprised?

 8   Q     Yes.

 9   A     Well, the way -- no, I'm not surprised, no.

10   Q     So in your experience, in this -- the financial world that

11   you've been in, a company lists debtor's position of being

12   bankrupt with no employees, no source of income, and $2,000 in

13   the bank, it wasn't noteworthy to tell the CFO, in advance of

14   his deposition, that the company secured a $300 million term

15   sheet?

16   A     Term sheets are -- I -- I -- I want to speak for -- term

17   sheets are one of the things I always look for in term sheets

18   is whether it's definitive or not, okay?  So I don't even know

19   how to answer that question because there's some term sheets

20   that are very definitive in terms of what they're for.  So I --

21   I could not answer that question in terms of being surprised or

22   not.  You're also assuming that the dollar amounts internal,

23   okay?  I just -- for me, I actually would like to see something

24   written before I commit to comment about it.  When I infer--

25   I've learned over time in this industry, you have to see it in
```

```
 1   writing first.  So it doesn't surprise me after I see it.

 2   Q    My question was -- well, I'm not sure I understand your

 3   answer.  My question was, given the circumstances, are you

 4   surprised that you're the only other employee -- you're

 5   effective, your comrade in running this company --

 6   A    Right.

 7   Q    There's only two of you.  It doesn't faze you or bother

 8   you that he didn't tell you about the term sheet?

 9         MR. ALEXANDER:  Your Honor, I'm going to object.  I

10   mean, he's in the hospital.

11         THE COURT:  He -- well, now, you asked him was he

12   surprised, and he said no.  So now you're asking him another

13   question -- different.  He said he wasn't surprised.  So now

14   you're asking him, was he bothered by him not telling him that.

15   BY MR. CAPONI:

16   Q    I'm -- well, I'm asking you, why it would not -- why you

17   were not surprised, I guess, is my question.  I'm -- I'm --

18   laying some groundwork here.  I would think in your shoes, a

19   person would kick open the door and be popping champagne.  So

20   how is it that you weren't surprised or troubled that you were

21   not told about this, as the CFO.

22   A    For me, I need to see the term sheet written and then, at

23   the same time, see whether there's a definitive term sheet.

24   The term sheets are dependent on what practice and what part of

25   the world.  I don't out credence to term sheets until I
```

1    actually see what the requirements are.

2    Q    I --

3    A    Can we just give you an example?  I've seen a term sheet

4    for $21 billion.  I didn't buy it.  Okay?  So I -- until I

5    actually read it.  It's all the conditions for the term sheets,

6    Some term sheets have two pages, and some will be four or five.

7    It depends on the nature of the transaction and so forth.  So

8    what I'm saying to you is, until I see it.

9    Q    And are you aware of that the term sheet was filed with

10   the Court less than 24 hours after your deposition?

11   A    Isn't it?  Counsel?

12   Q    I'm asking you, are you aware -- strike that.  You

13   testified that as of the date of your deposition --

14   A    Right.

15   Q    No one had shown you the term sheet.

16          MR. ALEXANDER:  Your Honor?

17   BY MR. CAPONI:

18   Q    You have not seen it, correct?

19   A    That is correct.

20   Q    And that's one of the reasons you didn't tell me about it

21   when we were talking about financing, correct?

22   A    That is correct.  Yes.

23   Q    When I asked -- what I'm saying to you, were you aware

24   that less than 24 hours after your deposition, that term sheet

25   was filed with the Court and publicly disclosed to the world?

```
 1   A    Does it make a difference he gave me the information?  I

 2   mean, it came from --

 3   Q    Sir, I'm not asking you who gave you anything.

 4   A    All right.

 5   Q    And that's because I don't want to intrude on the

 6   privilege.  My gosh --

 7   A    My -- I want to in -- assert my client's privilege, that's

 8   where I'm at.

 9   Q    Sure, this term sheet --

10   A    Yes.

11   Q    I'm not asking what you saw.

12   A    All right.

13   Q    I'm telling you, were you aware that the term sheet was

14   disclosed to the public and filed with the Court less than 24

15   hours after your deposition?

16   A    Yes.  Okay.

17   Q    You were aware of that?

18   A    I was aware that it was filed.  Yes.

19   Q    And when did you become aware of that?

20   A    Within a matter of -- after the deposition, that's when I

21   was told about the definitive nature of this term sheet.

22   Q    So the first time someone showed you the term sheet was

23   after your deposition?

24   A    That -- actually, yeah.  That is correct.

25   Q    And who showed you the term sheet?
```

```
 1              MR. ALEXANDER:  I disclosed this to you.  I'm going

 2   to object to the extent that it was based on discussions with

 3   Counsel.

 4              MR. CAPONI:  Well, I'm not asking for any discussion,

 5   just who gave my documents.  I don't think it's a privilege --

 6              THE COURT:  Overruled.  Answer the question.  Who

 7   gave it to you?

 8              THE WITNESS:  My counsel.

 9   BY MR. CAPONI:

10   Q    And then, just to put a finer point on this, you spoke

11   with Mr. Rajan for 90 minutes before your deposition and

12   neither he, nor anyone else, including Counsel, gave you or

13   told you -- gave you the term sheet before your deposition?

14              MR. ALEXANDER:  Your Honor, we'll object.  He asked

15   him specifically what Counsel would have told him prior to his

16   deposition.

17              MR. CAPONI:  Sorry --

18              MR. ALEXANDER:  I'm objecting based on attorney-

19   client privilege because you asked him specifically whether or

20   not he had a -- discussions with Counsel.

21              THE COURT:  Well --

22              MR. CAPONI:  Let me rephrase that.

23              THE COURT:  No, then he --

24              MR. CAPONI:  I meant for discussions.  Let me --

25              THE COURT:  Right.  But he said neither Mr. Rajan or
```

1    Counsel told you --

2         MR. CAPONI:  Well --

3         THE COURT:  -- which would have to mean he'd tell you

4    what his Counsel told him.  We agree.

5         MR. CAPONI:  Sure.

6    BY MR. CAPONI:

7    Q    So you spoke with Mr. Rajan for 90 minutes before your

8    deposition and he didn't tell you or give you the term sheet,

9    nor did Counsel give you the document, the term sheet, before

10   your deposition, correct?

11   A    Yeah, I did have the information printed out.

12   Q    Do you know who negotiated the term sheet on behalf of

13   Stream?

14   A    I do not.

15   Q    Since -- well, strike that.

16        MR. CAPONI:  Your Honor if I could have a five minute

17   recess to --

18        THE COURT:  Well, you can have as many, since I've

19   taken, probably, at least four of them.

20        MR. CAPONI:  Well, if we could take a quick ten

21   minutes and then I think I'll be done but I just want to

22   confirm and make notes.

23        THE COURT:  But I'm going to stay here.

24        MR. ALEXANDER:  Your Honor --

25        THE COURT:  So you don't -- No, no, no, no.  You can

```
 1   have your break.  I'm not going to move so when you come back

 2   and you're ready, you don't have to look for me.

 3            MR. CAPONI:  Thank you, Your Honor.

 4        (Recess taken)

 5            THE COURT:  Please be seated.

 6            MR. CAPONI:  Thank you.  Your Honor, I have no

 7   further questions, Your Honor.  But I did want to move into

 8   evidence Exhibit -- or Binder Tab 2, which was the motion to

 9   employ Mr. Park filed by the Debtor, as well as, the Debtor's

10   monthly operating report for May.

11            THE COURT:  Okay, now, let's start with the

12   application which you said was listed as --

13            THE CLERK:  Tab 2 and which one?

14            THE COURT:  Tab 2.  Which is -- do you have a number

15   on this?  Or you want me to take -- what do you want me to do?

16            MR. CAPONI:  I believe it's admissible as a statement

17   admission by a party opponent.  It's admissible as a business

18   record.  And if we have to -- and it's also admitted that Mr.

19   Park testified that he reviewed it and approved it before it

20   was filed.

21            THE COURT:  Okay.  So you want it admitted.  Then you

22   have to mark it.

23            MR. ALEXANDER:  Your Honor, I object.  I don't

24   believe a motion itself can be admitted evidence.  I mean,

25   that's hearsay.  It's also not a business record.
```

1          THE COURT:  I don't know.  Well, let's start with the

2  business record.  Whose business record?

3          MR. CAPONI:  This will be -- well, one, it was

4  authenticated, testified to, and approved by the witness.

5  Anything can be moved into evidence.  I've never heard the no

6  motion rule to a business record of the Debtor.

7          MR. ALEXANDER:  It's not a business record of the

8  Debtor.  He hasn't established that a motion is kept in the

9  ordinary course of the Debtor's business.

10         THE COURT:  Well, I'm not going to sustain, not as a

11  business record, but that doesn't mean it might not be

12  admissible.  Next, I don't think it's a business record because

13  we have no testimony that it was kept in the ordinary course,

14  who all it is -- I mean, there's a whole litany that you have

15  to have for a business record, and I don't think there's any

16  testimony or the record for that, so.

17         MR. CAPONI:  Not to quibble, Your Honor, but it is --

18  I don't need testimony.  It's on the Court docket.  It's

19  documented.  It documents everything the Debtor files.

20         THE COURT:  Well, it doesn't have to be -- that's not

21  a business record.  Who -- the docket belongs to the Court.

22  It's not the Debtor's business record.  So you're saying it's a

23  business record of the Court?

24         MR. CAPONI:  Oh, I think it qualifies as a business

25  record of the Court or the Debtor in that it's contained --

1          THE COURT:  Because the Court has --

2          MR. CAPONI:  -- in the ordinary course of business.

3          THE COURT:  By who?

4          MR. CAPONI:  Well, the Debtor uploads these -- every

5  motion, everything the Debtor does, the business records of the

6  Debtor, the motions it files, the monthly operating reports is

7  a business activity of the Debtor.  They are filed on the

8  docket as required, and they're maintained on the docket in the

9  ordinary course of business of both the Debtor and the Court so

10 the public can see them, and they qualify as a business record.

11         But nevertheless, Mr. Park testified that he reviewed

12 and approved this document.  How does it not come in?

13         THE COURT:  Counsel, I'm going one by one.

14         MR. CAPONI:  Okay.

15         THE COURT:  I said -- I'm not quite sure dockets are

16 -- I've never had to look at the Court's dockets as business

17 records, because they're not made in the ordinary -- the

18 business records are usually records that are prepared by and

19 maintained by the organization.  The Court never prepared this.

20 We might have made -- so that's no different.

21         Let me tell you how I equate it.  If an appraiser

22 gives an appraisal to a mortgage company, it's not their

23 business records.  It's just they have a copy of it.  The fact

24 that somebody put a motion on the -- the Court didn't prepare

25 it. There's all sorts -- again, just because I have a copy

1  doesn't make it the Court's business records.  There's some

2  things that go onto it.  Now, maybe you believe it's the

3  company's business record and --

4         MR. CAPONI:  Well, Your Honor, if I may.

5         THE COURT:  Mm-hmm.

6         MR. CAPONI:  We don't need to get into a business

7  record.  It's an admission by a party opponent.

8         THE COURT:  All right.  Let's -- all right.  Let's go

9  to the next one.

10        MR. CAPONI:  Right.  So it's an admission by a party

11  opponent.  It's not -- it doesn't even qualify as hearsay.

12  This was drafted and filed by the Debtor -- a representative of

13  the Debtor.  It's a statement by the Debtor.

14        THE COURT:  Okay.  Anyway --

15        MR. CAPONI:  And I don't think even Mr. Alexander can

16  dispute it's a statement by the Debtor because it is a motion

17  by the Debtor making statements.  And that -- it's admissible

18  for that reason alone, which is not hearsay.

19        THE COURT:  All right.  Mr. Alexander?

20        MR. ALEXANDER:  I'm evaluating that, Your Honor.

21        THE COURT:  Okay.

22        MR. ALEXANDER:  Just give me one second.

23        THE COURT:  Well, let's see what statement against

24  entry -- statement -- what are we -- let's look at the rule

25  book.  I think we looked at that before, but I'll look at it

1   again.

2           MR. CAPONI:  It's 801D, Your Honor.

3           THE COURT:  Mm-hmm.  801D?

4           MR. CAPONI:  D as in David, I believe.

5           THE COURT:  D what?

6           MR. CAPONI:  Or maybe B as in boy.  I'm going to

7   doublecheck.

8           THE COURT:  Right.  The statements that are not -- a

9   statement that meets the following conditions is not hearsay.

10  It's a declarant to witness prior statement.  Oh, that's

11  different.  That -- we're not talking about that.  An opposing

12  -- you're talking about D2, right?

13          MR. CAPONI:  I think it would be D2, Your Honor.

14          THE COURT:  Yeah, that's what I just said, D2.  The

15  statement is offered against an opposing party and was made by

16  the party in an individual or representative capacity, is one

17  that the party manifested that is adopted or believe to be

18  true, was made by a person whom the party authorized to make

19  this statement on the subject, was made -- or was made by the

20  party's agent or employee on the matter within the scope of

21  their relationship while it existed, and -- well, we're not

22  going to go to E because we're not talking about

23  coconspirators.  That's typically in a criminal proceeding.

24          MR. CAPONI:  I think it satisfies almost every one of

25  those criteria, Your Honor, and their --

```
 1              THE COURT:  Mr. Alexander?

 2              MR. CAPONI:  So I don't know if Mister --

 3              THE COURT:  Well, I think D and E are or. I don't --

 4    no, I don't know.  It says the statement must be considered but

 5    does not by itself establish the declarant's authority under C,

 6    and the existence of the scope of the relationship under D, and

 7    we're not going to talk about E because we're not talking about

 8    conspiracy.

 9              MR. CAPONI:  Right.

10              THE COURT:  And I think your position --

11              MR. CAPONI:  Yes.

12              THE COURT:  -- the last time we talked about this was

13    that there's no dispute that it was established by -- under the

14    declarant's authority under C or the existence or scope of the

15    relationship under D.

16              MR. CAPONI:  Correct.

17              THE COURT:  If this was made by the party's agent or

18    employee on a matter within the scope of that relationship

19    while it is --

20              MR. ALEXANDER:  I mean, is there a particular part of

21    the document that they're saying is the statement, or are they

22    seeking to move the entire document in?  Because there's legal

23    argument.  I mean, so I'm not --

24              THE COURT:  So what he --

25              MR. ALEXANDER:  -- quite sure what evidence he's
```

 1 | trying to move in.

 2 |          THE COURT:  Right.  Which parts.  So he wants to know

 3 | which statement --

 4 |          MR. CAPONI:  The entire document.

 5 |          THE COURT:  Jurisdiction and all of those things?

 6 |          MR. CAPONI:  They are all the statements of the

 7 | Debtors.

 8 |          THE COURT:  Okay.

 9 |          MR. CAPONI:  Debtor chose to make those statements.

10 | I didn't make Mr. Alexander or anyone else type them up.  They

11 | didn't get in there by someone else's hand.  They're the

12 | statements of the Debtor.

13 |          THE COURT:  Okay.  Mr. Alexander?  This is the first

14 | time I've heard a motion as a statement, but I'm --

15 |          MR. ALEXANDER:  I mean, we'll preserve our objection.

16 |          THE COURT:  I'll look at it again, you know.  I'll

17 | overrule the objection and allow it for what it's worth.

18 |          MR. ALEXANDER:  Understood.

19 |          THE COURT:  I mean --

20 |          MR. CAPONI:  In the same argument, I think what

21 | applied to Tab 3, which is the Debtor's monthly operating

22 | reports -- report for May.

23 |          UNIDENTIFIED SPEAKER:  That's --

24 |          THE COURT:  Well, what did we mark the motion?  Was

25 | it being marked as something?

1          MR. CAPONI:  Excuse me, Your Honor?

2          THE COURT:  Is the motion -- does it have a number on

3   it?  If it's in there, I don't see a CR number.

4          MR. CAPONI:  It's CR222, Your Honor.

5          THE COURT:  Where?

6          MR. CAPONI:  It's not marked on the document.  It's

7   in the exhibit binder, CR222.

8          THE COURT:  All right.  We'll --

9          MR. CAPONI:  We're going to add that to our list.  We

10  have a list typed up for Your Honor of all these.

11         THE COURT:  Well, no, just so that my ESR knows how

12  to -- if we need to look for this, because I'm going to look at

13  this.

14         MR. CAPONI:  Okay.

15         THE COURT:  He just -- you just need to tell him

16  which one it is.

17         MR. CAPONI:  Sure.  This is --

18         THE COURT:  CR what?

19         MR. CAPONI:  222.

20         THE COURT:  All right.

21         MR. CAPONI:  And it is docket entry on this Court

22  docket 234.

23         THE COURT:  Because I'm sure I could have just taken

24  judicial notice, so -- but you're not going to go there.

25         MR. CAPONI:  And Tab 3 --

1          THE COURT:  It's CR44.

2          MR. CAPONI:  -- is CR44, which will be docket entry

3   253 on the Court's docket.

4          THE COURT:  And you believe again this is a statement

5   against interest and it's admissible under that theory?  Oh,

6   no, it's a party statement that's not hearsay, correct?

7          MR. CAPONI:  And I have no further questions.

8          MR. ALEXANDER:  Your Honor, I just had one on the

9   objections.  I just had one clarification.  I believe Mr.

10  Caponi stated that Mr. Park authorized the filing.  I'm not

11  sure if that was his -- I don't believe that was his testimony.

12         THE COURT:  No, he said it was authorized by the

13  Debtor.

14         MR. ALEXANDER:  I don't -- that's not what I believe

15  I heard, but if that's what it was, then that's fine.

16         THE COURT:  Who did you say authorized the filing?

17         MR. CAPONI:  Mr. Park, I believe his testimony, and

18  -- we'll have a transcript.  I believe his testimony was he

19  reviewed this and signed off on it prior to being filed.

20         THE COURT:  But he didn't say he authorized it.  He

21  said he reviewed it and he agreed with it.

22         MR. CAPONI:  Either way, it's an admission of the

23  Debtor.

24         THE COURT:  Right.  But it's a -- it hasn't -- this

25  document, you're not -- have nothing to -- not having anything

```
 1   to do with Mr. Park's testimony, you were relying on this rule

 2   where it said it was signed by a party or their representative

 3   and they made the statement.  That's what I was looking at.

 4              MR. CAPONI:  Yes, Your Honor.

 5              THE COURT:  Not anything to do with Mr. Park's

 6   testimony.

 7              MR. CAPONI:  And Mr. Park -- well, I think Mr. Park's

 8   testimony also goes to the authentication of the document,

 9   because he said that --

10              THE COURT:  Well, then you need to authenticate it if

11   you said it's --

12              MR. CAPONI:  I agree.  Your Honor, Mr. Vincent's

13   going to throw everything at the wall against me, so I'm going

14   to throw every defense I have up that I can think of.

15              THE COURT:  I mean, I can --

16              UNIDENTIFIED SPEAKER:  Your Honor, Mr. Alexander is

17   not going to do that.  And to the extent there's something

18   that's objectionable, I'll object.

19              THE COURT:  Yes, and I don't -- listen.  It is what

20   it is.  You guys make your record.  I'm not saying you can't.

21   You made your record.  You believe that it was not -- that he

22   said Mr. Park authorized it.  And to the extent he did say

23   that, Mr. Park never said he authorized it.  He only said he

24   reviewed it, and he knew what was in it, and the filing was

25   authorized and signed not by Mr. Park but signed by counsel for
```

1    the Debtor from what at least I recall looking at this, so.

2         UNIDENTIFIED SPEAKER:  Actually, Your Honor, it was

3    signed by Mr. Rajan, but Mister -- if you read through it, it's

4    got Mr. Fisher who's counsel for the Debtor as well as Mr.

5    Rajan.

6         THE COURT:  Wait a minute.  Wait a minute.  What are

7    we talking -- we're back on the motion.

8         UNIDENTIFIED SPEAKER:  No, we're talking about -- I

9    thought we were discussing the monthly operating report.

10        THE COURT:  No, because Mr. Alexander said he wanted

11   to go back and object to something in connection with the

12   motion, which was that he believed Mr. Caponi had said that Mr.

13   Park authorized the filing of that motion.  That's -- is that

14   what you were talking about?

15        UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

16        THE COURT:  Right.  And I said he didn't say he

17   authorized it.  He just said he reviewed it.  And my finding

18   that it was admissible was because the motion had been filed by

19   the Debtor through their counsel who signed it.

20        UNIDENTIFIED SPEAKER:  And my apologies, Your Honor,

21   because I couldn't understand how Mr. Park could be authorizing

22   his own retention application.  But I thought --

23        THE COURT:  Okay.  And that's what he was saying,

24   that he didn't authorize, reviewed.  And I said I didn't even

25   admit it under the -- that Mr. Park had authorized it, only

1    that it had been signed by an authorized agent when we went

2    through this.

3              MR. CAPONI:  Correct, Your Honor.

4              THE COURT:  Okay.  Now, we're on CR44.

5              MR. CAPONI:  44, the operating report.

6              THE COURT:  The operating report.  You believe that

7    is a party statement, and this was signed by debtor's counsel,

8    Mr. Fisher.

9              MR. CAPONI:  I think -- also indicated it was signed

10   by Mr. Raja, maybe.  I don't know if that's true or not.

11             MR. ALEXANDER:  It's true.

12             UNIDENTIFIED SPEAKER:  It's true.

13             MR. CAPONI:  It was signed by both.

14             THE COURT:  Where?  Am I blind?

15             UNIDENTIFIED SPEAKER:  Scroll a couple pages.

16             THE COURT:  Couple of pages in?  The first page is

17   signed --

18             UNIDENTIFIED SPEAKER:  Page 9.  Page 9.

19             THE COURT:  Well, nobody -- I mean, again, I don't go

20   perusing through these documents.

21             UNIDENTIFIED SPEAKER:  I'm just trying --

22             THE COURT:  And so, that's why I said why do you see

23   it, because we didn't go beyond the first, second, and third

24   pages.

25             MR. CAPONI:  Correct, Your Honor.

1               THE COURT:  So that's why I said, well, I need to see

2    that.  So thank you for Page 9.  Okay.  And it was signed by

3    Mathu Rajan, director, on June 21st.  Okay.  So any objection

4    to the admission for this monthly operating report?

5               MR. ALEXANDER:  No objection.

6               THE COURT:  Okay.  That's admitted.

7               MR. CAPONI:  We'll end on a high note, Your Honor.

8    I'll take victory, and I'm done.

9               THE COURT:  All right.  Redirect?

10              MR. ALEXANDER:  Yes, please, Your Honor.

11              THE COURT:  All right.  You're not bad.  It's only

12   5:00.  You guys have two and a half hours if you need it.  All

13   right.

14                         REDIRECT EXAMINATION

15   BY MR. ALEXANDER:

16   Q    Mr. Park, do you recall, there was some discussion

17   regarding NewCo, new legal entity with regards to Mr. Caponi's

18   questions?

19   A    Yes.

20   Q    Okay.  What is your understanding of NewCo?

21              MR. CAPONI:  Objection, Your Honor.  I think Mr.

22   Alexander actually successfully raised this objection with me.

23   Asked and answered.  Mr. Park, multiple times, explained what

24   his understanding of NewCo was.

25              MR. ALEXANDER:  It's my question.  I haven't asked it

1  yet.

2          THE COURT:  Well, he's on -- you're saying he can't

3  ask him the same question you asked?

4          MR. CAPONI:  Well, yeah.  Mr. Alexander objected when

5  I asked -- that I asked Mr. Park too many times what his

6  understanding of NewCo was.  He said objection.  Asked and

7  answered.  And then it was sustained, and I'm lodging the same

8  objection.  Mr. -- the testimony is in the record several times

9  from Mr. Park as to his understanding of NewCo.

10          MR. ALEXANDER:  Right.  I don't believe I asked the

11  exact specific question that Mr. Caponi asked.

12          MR. CAPONI:  I don't know how many different ways

13  you're going to ask what you're understanding of NewCo, Your

14  Honor.  In fact, I --

15          THE COURT:  Well --

16          MR. CAPONI:  Mr. Alexander objected several times to

17  it.

18          THE COURT:  I'm not --

19          MR. ALEXANDER:  That's irrelevant.  Your Honor, I'm

20  going to ask another question.

21          THE COURT:  I'll allow it for what it's worth --

22          MR. ALEXANDER:  No, it's -- Your Honor, we'll move on

23  to another question.

24          THE COURT:  Okay.

25  BY MR. ALEXANDER:

1   Q    Mr. Park, is it your understanding that any plan proposed

2   by the Debtor must be approved by the Court?

3   A    That is correct.

4   Q    Is it also your understanding that your retention in this

5   case also must be approved by the Court?

6   A    That is correct.

7   Q    Do you still have the binder in front of you with respect

8   to Tab 2?

9   A    Yes.

10  Q    Mr. Caponi pointed you to Paragraph 13 and asked that --

11  the terms of your employment; do you recall that?

12  A    Yes.

13          THE COURT:  What, Paragraph 13 in Exhibit 2?

14          THE WITNESS:  Page 4.  I think I had Page 4.

15          THE COURT:  Hold on.  I'm in the wrong -- I'm on the

16  wrong page.  Okay.  Okay.  Okay.  What -- Paragraph 13.  Okay.

17  BY MR. ALEXANDER:

18  Q    Is that a complete description of your employment or a

19  summary?

20  A    It's missing a piece.

21  Q    Okay.  And if we take a look -- which piece is it missing?

22  A    The compensation related to raising capital.

23  Q    And if you turn to -- does the footnote also say that it's

24  the summary of the employment agreement?

25  A    Yes, at the footnote, there's a summary of employment

1    agreement.

2    Q    And it says that for a complete list of the terms, you

3    should look at the employment agreement.  Do you see that as

4    well?

5    A    That is correct.  Yes, I see that.

6    Q    And if you look at Exhibit B, which is Page 10 of 10 --

7    A    Yes.

8    Q    -- of your employment agreement, it says Docket 234-2 at

9    the top.

10   A    Yes.

11          THE COURT:  Okay.  And what page?  What are we

12   looking for?  It says -- one minute.

13          MR. ALEXANDER:  It'll say 234-2 at the top, Page 10

14   of 10.

15          THE WITNESS:  This is ten of ten, maybe.

16          UNIDENTIFIED SPEAKER:  There's pages --

17          THE COURT:  Okay.  I see them.  I see one of ten

18   starting --

19          UNIDENTIFIED SPEAKER:  Yeah.

20          THE COURT:  Okay.

21          MR. ALEXANDER:  It's the same ten of ten at the

22   bottom and top.

23          THE COURT:  Oh, okay.  Yeah.  Well, one of ten?  Two

24   of ten?

25          THE WITNESS:  Ten of ten, Your Honor.

1              THE COURT:  Am I in the wrong place?  Oh, Page 10 of

2    10.  Okay.  Page 10 of 10.  Okay.

3    BY MR. ALEXANDER:

4    Q    Does that document describe what your investment success

5    fee would be?

6    A    Yes, it does.

7    Q    And where does it describe that?

8    A    It describes it and points the following shares of stock,

9    of common stock and of reorganized company equal to 18 percent

10   of the equity issued to the investor if the investor's share

11   price is greater than a dollar per share or be three shares for

12   every $100 invested -- of invested in investor share parts

13   equal to or lesser and valid to share.

14   Q    And that's part of the agreement that you're --

15   A    Yes, sir.

16   Q    -- seeking approval from the Court, correct?

17   A    Those are my updates there, as well.

18   Q    Is Stream attempting to raise money via debtor or equity

19   in order to finance this bankruptcy case?

20   A    Yes.

21   Q    And when you talk about financing the bankruptcy case,

22   what's your understanding of that?

23   A    I was -- anything related with Stream is what I was

24   informed.  That's what I say to investors.

25   Q    Okay.  Is it prior to confirmation or before confirmation?

```
 1   A    It's in total.  That's -- I'd always assume that it's

 2   during.  That's what I've mitigated to.

 3   Q    So it's your understanding that the Debtor is attempting

 4   to obtain financing as --

 5   A    Absolutely.  In fact, the bonus is tied to that, actually.

 6   Going forward, I didn't expect to be paid if I didn't -- if

 7   I -- after -- post-bankruptcy, I don't expect to have a

 8   success fee.  That's all part of the responsibility of a CFO to

 9   raise capital.  This is related to try to get the Debtor out of

10   bankruptcy.

11   Q    Are you employed by VSI?

12   A    No.

13   Q    Do you have any agreement with VSI?

14   A    None.

15   Q    Does your -- do your shares under the employment agreement

16   relate solely to the reorganized debtor?

17   A    Yes, Stream only.

18   Q    Are you in charge of the Debtor's business operations?

19   A    No.  I -- once I'm confirmed, yes, I will be.  But until

20   then, I'm not.

21   Q    And who's currently in charge of the business operations?

22   A    It'll be -- at this moment.

23   Q    So you're the primary person responsible for raising

24   equity at the time of -- well, as of June 6th, 2023.

25   A    I was at the primary.  There was several others involved.
```

1   Q    Do you anticipate -- your goal, once Mr. Rajan is

2   available, is to have discussions with Mr. Rajan to get the

3   debt --

4   A    In great detail, yes.

5   Q    At this time, are you responsible for determining the

6   structure of Stream's Chapter 11 plan?

7   A    I am not solely responsible.

8   Q    Is that something that Stream is still in the process of

9   formulating?

10  A    Yes.  With Mathu when he's back.

11          MR. ALEXANDER:  Your Honor, I have no further

12  questions of Mr. Park.

13          THE COURT:  Any recross?

14                          RECROSS-EXAMINATION

15  BY MR. CAPONI:

16  Q    Mr. Park, you testified a little earlier that you received

17  financial information about VSI from Subi Joseph, correct?

18          MR. ALEXANDER:  Your Honor, I'm going to object.

19  This is outside of redirect.

20          THE COURT:  I'm laying the groundwork to make --  put

21  it inside redirect. Don't let ground work to be inside the

22  redirect.

23          MR. ALEXANDER:  You don't lay groundwork to be inside

24  the redirect; it needs to be in the redirect.

25          MR. CAPONI:  I am in a redirect.  It will be known to

1   Mr. Alexander how and why when I get my next question out.

2         THE COURT:  Okay.  I'll allow it.

3         THE WITNESS:  Repeat the question, please.

4   BY MR. CAPONI:

5   Q    You received financial information from VSI from Mr. Subi

6   Joseph?

7   A    At my -- at my -- at my direction.

8   Q    And you received that information so you could create a

9   consolidated financial statement?

10   A    To make an attempt at what a consolidated financial

11   statement would look like.

12   Q    And that would be a consolidated financial statement of

13   VSI and the Debtor stream, correct?

14   A    For his -- confirmation so that any investor looking at it

15   would have a -- a educated opinion of what a -- what a view

16   would be.

17   Q    Right  And the reason you wanted to provide an educated in

18   invest -- investor, you want to educate the investor as to what

19   a combined Stream --

20         MR. ALEXANDER:  Your Honor, I'm going to object.

21   This is out -- this is all outside of what we were doing on --

22         THE COURT:  The only thing --

23         MR. ALEXANDER:  -- redirect.

24         THE COURT:  -- on redirect was about equity, business

25   operation, and attempt at financing.  Is that what you're

1  saying -- he talked about his bonus.  He actually withdrew a

2  question.  He talked about the bonus, talked about the business

3  operations, who was involved in raising equity, and the Chapter

4  11 plan.

5          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6          THE COURT:  So what you're saying is related to one

7  of these redirect topics?

8          MR. CAPONI:  Mr. Park just testified that he compiled

9  the financial information --

10         THE COURT:  No, no, no, no.

11         MR. CAPONI:  Oh.

12         THE COURT:  It was -- my question to you was anything

13 about compiling financial redoing anything on redirect?

14 Because if it's not, it's outside of redirect.  So you got to

15 tell me which one of these topics does it fall under because

16 Mr. Alexander asked him on redirect.  Let me make sure I didn't

17 skip a page.  He asked him on redirect about -- that his

18 retention has to be approved by the court.  The plan has to be

19 approved by the court.

20         MR. CAPONI:  It relates to that.

21         THE COURT:  Okay.  The plan has to be re -- approved.

22 That's all he asked.  And that there was a missing piece about

23 the summary.  He talked about his success fee.

24         MR. CAPONI:  Relates to that.

25         THE COURT:  Okay.  And financing the bankruptcy.

```
 1              MR. CAPONI:  Relates to that.

 2              THE COURT:  And his bonus is tied to that and he's

 3  not --

 4              MR. CAPONI:  To that.

 5              THE COURT:  -- in charge of business operations and

 6  he is -- several others were involved in raising equity.

 7              MR. CAPONI:  Relates to that.

 8              THE COURT:  And that he's not the only person in

 9  charge of the Chapter 11 claim.  So you believe that asking

10  him about consolidated financial records re -- relates to all

11  of these questions in this area?

12              MR. CAPONI:  Yes, it does, Your Honor.  Which will

13  become clear when Mr. Park answers my question.

14              THE COURT:  Mr. Alexander.

15              MR. ALEXANDER:  I believe the objection remains

16  valid, Your Honor.  It's outside of the scope.  So --

17              THE COURT:  I'll allow it for what it's worth.

18              UNIDENTIFIED SPEAKER:  So Mr. --

19              THE COURT:  So it's not just VSR (sic), it's all

20  entities associated with Stream.  Okay.

21  BY MR. CAPONI:

22  Q    Mr. Park, I wasn't sure where we left off before the

23  interruption.

24  A    Okay.

25  Q    So let me  -- You -- you obtained financial information
```

1   regarding VSI from Mr. Subi Joseph to create consolidated

2   financial sheets showing a combined VSI and Stream, correct?

3        MR. ALEXANDER:  Your Honor, I'm going to object --

4   and he's asking him a question because what is that relating

5   to?  It's outside of the scope of what was done?

6        THE COURT:  Well, he said he --

7        MR. CAPONI:  I'm relaying -- making sure what we

8   got -- we got interrupted here.  I'm trying to reset the

9   conversation.

10        THE COURT:  No, no, no, no, no, I get that.  But

11   where on redirect did he ask him anything about obtaining

12   financial records from Subi or whoever regarding VSI?

13        MR. CAPONI:  He asked him about raising capital, what

14   the reorganized entity would look like, and how his bonus was

15   calculated.  And I'm like --

16        THE COURT:  I don't know -- I don't recall him asking

17   what the reorganized debtor would look like.  He asked about

18   the bo -- that his bonus was tied to the Debtor coming out of

19   bankruptcy.

20        MR. CAPONI:  Your Honor, if you would like to have a

21   side bar, so I don't tell the witness what the answer to the

22   question is, I'm happy to explain to counsel, but if I say it

23   here, what is the point of me asking the question?

24        THE COURT:  Counsel, I get it, but I'm trying to

25   figure out how is -- a top -- how is that related to any of the

1   matters that were on redirect?

2          MR. CAPONI:  And I will be happy to explain that at a

3   sidebar.

4          MR. ALEXANDER:  And Your Honor, it's not just how it

5   has to be related to it, it has to be with respect to the

6   answers that were given.  Otherwise anything's related to the

7   Debtor and he'd be able to ask any question he wants.  So

8   that's broader than what you're allowed to do on recross.

9          MR. CAPONI:  It relates -- relate to the topics

10  covered, not to the answer.

11         THE COURT:  No, no, no, no, no.  It has to be --

12  Counsel, it's not.  If he asked him a specific question and you

13  want to -- you want to recross him on that question.  You're

14  telling me that if he asked him, what the -- he said the Debtor

15  planned to -- the Debtor's plan to reorganize.  That that would

16  open the door to say -- and it might -- to ask him anything

17  about the plan for reorganization.  You believe he could?

18         MR. ALEXANDER:  No, he can't.  Because there was one

19  specific question.  Is the Debtor still in the process of re

20  formulating a plan?

21         THE COURT:  And you believe he couldn't ask him what

22  that plan is?

23         MR. ALEXANDER:  Well, to the extent that it would

24  disclose attorney client privilege, then no.

25         THE COURT:  Counsel --

```
 1                    MR. ALEXANDER:  But if he has something in general --

 2                    THE COURT:  -- you're talking in general.  In

 3      general.

 4                    MR. ALEXANDER:  Then I do not -- I would not object

 5      to that question.

 6                    THE COURT:  Okay.  So he's saying the question that

 7      he's asking somehow comes out of this -- one of these topics

 8      that you ask -- you did on redirect.  I'm going to give him

 9      some leeway.  Go ahead.  But I'm telling you if I think it's

10      outside the scope, I'm going to cut you off.

11                    MR. CAPONI:  All right.

12                    THE COURT:  Go ahead.

13      BY MR. CAPONI:

14      Q    Again, I'm asking this question just to reset the

15      conversation since we were interrupted, Mr. Park.  You again

16      received financial information about VSI from Subi Joseph to

17      create a consolidated financial statement of VSI and Stream,

18      correct?

19      A    Now, with everything else we just talked about, that's

20      what the answer is.

21                    THE COURT:  Yes or no --

22                    THE WITNESS:  For myself at my discussion, yeah.

23      BY MR. CAPONI:

24      Q    Okay.  And -- but a minute ago you testified that you were

25      doing that in order to give potential investors a view into
```

1   what the consolidated company would look like, correct?

2   A     Yeah.

3   Q     And the reason you were giving investors a view into a

4   consolidated Stream, VSI, is because that's what you were

5   asking them to invest in, correct?  A consolidated Stream, VSI?

6   A     I was asking -- for my part, I was asking for a reorg, or

7   a revise, or reincorp -- whatever language you want about

8   Stream.  And also currently did -- what -- with Stream that's

9   in bankruptcy, the Debtor in bankruptcy.

10  Q     Mr. Park, you -- you -- you said that you were giving the

11  consolidated financial statement of the assigned Stream to

12  invest -- potential investors, correct?

13          THE COURT:  He never said that --

14          MR. ALEXANDER:  I object as to redirect.

15          THE WITNESS:  I never said that.

16          THE COURT:  He never said that, Counsel.

17          MR. CAPONI:  He can tell me, Your Honor.  I think --

18  I think he did, but --

19          THE COURT:  But I don't care -- Counsel, it's not

20  what you think --

21          MR. CAPONI:  Okay.

22          THE COURT:  -- it's what the record -- listen, I'm --

23  I'm --

24          MR. CAPONI:  I'm not understanding.  We can only --

25          THE COURT:  Counsel, you cannot ask a question based

```
 1   on something he did not say.  He did not say he gave it to

 2   anyone.  That's what you want him to say.

 3             MR. CAPONI:  No.

 4             THE COURT:  So ask him and -- and Mr. Park, please

 5   try to answer exactly what he is asking you because your answer

 6   was not to what his question was, and his question was, did you

 7   prepare the consolidated statement and that is the -- what you

 8   were giving to investors when you were seeking investors.

 9             THE WITNESS:  The answer is no.

10   BY MR. CAPONI:

11   Q    Why did you create the consolidated financial statements?

12   A    For my understanding of what this actual view should be.

13   Because you have a company that had no employees, right?  So I

14   needed to see what this looked like.

15   Q    A few minutes ago on redirect, you said you created the

16   financial statements, and you -- you alluded to it had

17   something to do with investors.  Am I wrong about that?

18   A    In the process of creating documentation for investors.

19   Q    Okay.

20   A    You would go through a lot of iterations of spreadsheets

21   to get to a point where you could say this is what we

22   represent, that's the iteration exercise that I wanted to go

23   through.

24   Q    So you were creating documentation for investors?

25   A    I was creating documentation for myself, determine what
```

1   should be used to in order to show investors.

2   Q    And you --

3   A    From a -- from the it -- for looking at a situation where

4   post-bankruptcy.  Okay?  Because you have to look at a couple

5   of years.  Debtor bankruptcy is purely just get from whatever

6   documentation you want to provide.  But when you're talking

7   about a post-bankruptcy, it's a different type of analysis.

8   Q    And so you were talking, am I correct, to investors about

9   what a post-bankruptcy combined VSI, Stream, would look like?

10  A    That was my intent, but I didn't.

11  Q    Could you say that again?  I'm sorry, I didn't catch that.

12  A    That was the intention, but I never did.

13  Q    Thank you.

14          MR. CAPONI:  No questions, Your Honor.

15          THE COURT:  Okay.  What are we doing?  Mr. Callahan,

16  do you have any -- oh, you're just observing, right?

17          MR. CALLAHAN:  Pardon, Your Honor?

18          THE COURT:  You don't have any questions, right?

19          MR. CALLAHAN:  No.  Thank you.

20          THE COURT:  All right.

21          MR. ALEXANDER:  Your Honor, I have no further

22  questions of Mr.  Park.

23          THE COURT:  Are you releasing him or you reserving

24  because --

25          MR. ALEXANDER:  I -- I'm going to reserve for

1    rebuttal in terms of the case in chief of the Debtor.

2              THE COURT:  So you may step down.

3              THE WITNESS:  Okay.

4              THE COURT:  You're done for today, in case they want

5    to call you.  Do we have any other witnesses that we're calling

6    or are we done with the witness from the movant's standpoint?

7              MR. CAPONI:  Your Honor, no, other than I would ask

8    the Court to take note that in the Debtors -- during the

9    process that we had approved by the court to exchange identity

10   of potential witnesses, the Debtors had disclosed a

11   representative from Jhong Zheng Company that had filed this --

12   sheet.  We had asked for that deposition and asked for

13   documents related to that and the Debtor neither produced any

14   documents nor a witness.  And we asked for a witness to be here

15   for trial.  The Debtor did not respond to produce a witness.

16             So I have no other witnesses to call, but I would

17   like it noted for the record that the Debtor thwarted our

18   opportunity to depose a witness from that entity.

19             THE COURT:  Well, were you presented some subpoena

20   today?

21             MR. CAPONI:  WE issued a deposition notice, Your

22   Honor.  Yes.

23             THE COURT:  What did you issue?

24             MR. CAPONI:  Well, I mean -- you know, we're talking

25   about this company is in China, so I couldn't compel them to be

 1    here.  I just wanted it noted for the record that the Debtor

 2    identified this entity as on their list of witnesses.  And so

 3    we said okay, we want to depose them.  They deposed our

 4    witnesses; they never produced this company.

 5              THE COURT:  Okay.  Mister --

 6              MR. ALEXANDER:  Your Honor, I'm not sure what the

 7    point of that was, other than to just let Your Honor know that

 8    that didn't occur, but that has no factual bearing on anything

 9    in this case.  With respect to the order --

10              THE COURT:  I --

11              MR. ALEXANDER:  -- indicated that to the extent the

12    party wants to present somebody at the trial, they need to make

13    them available for deposition.  We're not presenting a

14    representative at -- for Jhong Zheng at this time at trial.  So

15    it says people you may call.  So I don't understand the point

16    of that.

17              MR. CAPONI:  The Debtor thwarted our discovery.  They

18    identified --

19              THE COURT:  Whoa, whoa.

20              MR. ALEXANDER:  Mr. Caponi mischaracterizes things --

21              MR. CAPONI:  That's not --

22              THE COURT:  Wait a minute.  Would the two of you --

23    cut it out.  You asked, they didn't.  That didn't stop you from

24    doing anything else.  How did they stop you from taking

25    whatever effort you could have exercised to depose that

1   witness?  You said he tworted (sic) you.  How did he stop you?

2   He just said, no, I'm not producing him.

3            MR. CAPONI:  Well, I -- you -- Your Honor, my humble

4   opinion as the party, as the Debtor, who listed this party as a

5   witness that they intended to call, they had an obligation to

6   make that party available during discovery.  The way I had an

7   obligation to make my witnesses available during discovery.

8   And when we repeatedly asked, the Debtor said they were

9   speaking to the company and they would get his dates, and then

10  they never did.  And then we said, well, we, you know, because

11  if we had that deposition, I wouldn't need to call him for

12  trial, I could rely upon the deposition.

13           I think this Court is entitled to take notice,

14  whether it's an -- spoliation, or some other related part, that

15  there was evidence out there, and that the --

16           THE COURT:  Spoliation.

17           MR. CAPONI:  Spoliation.  When the party makes --

18  takes steps to prevent evidence from coming to light, the

19  Court's entitled to take --

20           THE COURT:  But Counsel, the fact that they did not

21  produce them does not mean that I'm going to conclude they took

22  steps to stop you from deposing them, from subpoenaing them,

23  from coming to this court and said, they listed -- they don't

24  want to produce them, order them to produce.  You can't just

25  make conclude that.  I'm -- So that's what I'm saying.

```
 1              MR. CAPONI:  I --

 2              THE COURT:  Yes, I'm -- I'm not --

 3              MR. CAPONI:  I'm asking.  You, I understand the

 4    Court's position.  I just want the rec -- for whatever it's

 5    worth --

 6              THE COURT:  You can put it on the record --

 7              MR. CAPONI:  -- I just want it in the record what

 8    happened.

 9              THE COURT:  All right.  And Mr. Alexander, you can be

10    -- but I don't know why you guys think I'm going to do anything

11    with you.

12              MR. ALEXANDER:  Your Honor, my only response is I'd

13    like to strike everything Mr. Caponi said, because it's not

14    evidence, there's nothing before your court with respect to any

15    of those communications.  So none of that should be considered

16    by the Court or come in.

17              If they wanted to subpoena somebody, they could have

18    subpoenaed them.  If they wanted documents, there's a procedure

19    to issue documents, and there's rules that -- that com -- that

20    you're required to comply with, with the issuance of documents

21    and responses.  They haven't alleged that we violated any rule

22    and we're not required to produce another party to appear,

23    legally.

24              So anything that Mr. Caponi would like this Court to

25    consider, there's no factual basis for it before this Court.
```

```
 1   So we ask that you not consider it.

 2           THE COURT:  Well, I -- it's nothing for me to

 3   consider.  I -- that's what I'm like.  I don't know why you

 4   guys are telling me this.  If you had a discovery dispute, you

 5   bring it to me.  I don't want to hear it.  It has nothing to do

 6   with this.  If you had a dispute, you file it, you don't file

 7   it, you don't tell me anything about it.  I don't want to hear

 8   it.  You need to -- you need to file something and you ask me

 9   to resolve it.  You can't ask me to determine they're the bad

10   guy because they didn't respond.

11           Now, if you tell me they had a legal obligation and

12   they failed to do so, then I make a -- make a decision.  But

13   anything else, I -- I really don't want to get involved in

14   that.  And if you believe that they were obligated and they

15   didn't -- this hearing isn't done.  You still can file to

16   compel.  But to tell me all of this and I can't do anything

17   with it.  It's a waste of time and it's the two of you just

18   bickering.  Because that's all I see this.

19           MR. CAPONI:  Well, Your Honor, I appreciate -- the

20   reason I'm now going to raise it because you gave me guidance.

21           THE COURT:  I'm not --

22           MR. CAPONI:  If you're still open, I will -- I will

23   move forward to take steps to compel because -- any other

24   witnesses.

25           THE COURT:  Right.
```

```
 1              MR. CAPONI:  The reason I don't, and I will take
 2    steps to do that.
 3              THE COURT:  Right.  But the point of the matter is,
 4    it's a third party.  So I don't know what you're going to do
 5    with that.
 6              MR. CAPONI:  Well --
 7              THE COURT:  But I'm just telling you, if you guys
 8    have a dispute, just bring it to me.  Don't just tell me about
 9    it.  And then I can resolve it and you don't have to say he
10    tworted (sic) and he doesn't have to say you mischarac -- none
11    of that.  Okay?
12              MR. CAPONI:  I understand your guidance, Your Honor.
13    We're going to follow it.
14              THE COURT:  You guys are all experienced litigators,
15    very experienced, and you know how to get witnesses.  And if
16    you guys think this is any way going to -- see sometimes -- a
17    little bit -- I get a little bit offended because I think you
18    guys don't think that I know how this stuff works, but that's
19    how I take it.  Maybe that's not how it's intended and I get
20    offended that you guys think that I somehow don't figure this
21    game or know what's going on, or I don't have whatever.
22              And I don't have to prove anything to anybody.  But
23    I'm going to tell you right now, you guys don't waste my time
24    with this nonsense.  Because at some point, yes, I may lose my
25    temper because I get a little low in sugar.  But trust me, you
```

1   guys do not want me to start getting really -- and doing more

2   than just, you know, being a little testy.  I'll be throwing

3   out some Rule 11 -- at some point if you guys don't cut it out.

4           I didn't want to go there, and I'm -- I'm pretty sure

5   I don't, but this last little bit is just uncalled for.  I

6   expect better from experienced counsel.  You guys can go bicker

7   in the hall, you can bicker when I'm not here, we're not going

8   to do it on the record.  Okay?

9           And this is meant for everybody.  I'm not singling

10  out anyone.  Okay?

11          So please, if you have an issue, there's rules,

12  there's a procedure, engage in that.  Okay?

13          Now, with that being said, you reserve the right, Mr.

14  Caponi, to bring another witness in, correct?

15          MR. CAPONI:  Correct.  Get a hold of this witness.

16  Yes.

17          THE COURT:  Yes.  All right.  So you're not resting

18  yet because you may have a witness, right?  And I still -- they

19  still -- they still have -- we still have an open with respect

20  to Mister -- oh, Mister --

21          MR. CAPONI:  Mathu.

22          THE COURT:  -- Mathu Rajan, right?  There's two

23  Rajan's, right?

24          MR. CAPONI:  Your Honor, with regard to the motion

25  for an -- to file, and the motion to stay resting; with regard

1     to the motion for dismissal slash appointment of a trustee,

2     that one we're keeping open.

3              THE COURT:  And with respect to the --

4              MR. CAPONI:  Yes.  Okay.  So you're resting on the --

5     the issue of the authority to file --

6              MR. CAPONI:  Correct.

7              THE COURT:  -- correct?  And you're resting on the

8     motion for relief, correct?

9              MR. CAPONI:  Correct.

10             THE COURT:  Okay.  Now, Mr. Alexander, do you intend

11    to present evidence in opposition, other than Mr. Park?  Or

12    what was Mr. Park -- what is your response with respect to the

13    authority to file?

14             MR. ALEXANDER:  We intend to put on the evidence of

15    Mr. Rajan.

16             THE COURT:  Okay.  And well, with respect to the

17    motion for release?

18             MR. ALEXANDER:  We're going to put on the evidence of

19    Mr. Rajan.

20             THE COURT:  Okay.  And obviously the -- the motion to

21    dismiss is, they're not resting.  Okay.  All right.  Let me

22    tell you guys where I am on this.  Okay?  Let me --

23             I wrote some notes, so I want to go through with.

24    Clearly the record is still open.  You know, I find that they

25    have made sufficient case to go -- to meet their burden with

1   respect -- well, let me back up a little bit.  They've made a

2   record with respect to the -- okay.  They -- they -- they

3   believe that Mister -- they've they made the case that they've

4   asserted in the 225 litigation that Mr. Mathu Rajan did not

5   have the authority to file for Technovative.  There's no issue

6   with respect to the Stream.  The ultra vires is only with

7   respect to Technovative, correct?

8            MR. CAPONI:    Correct, Your Honor.

9            THE COURT:  All right.  There're been no definitive

10  determination as to who has the authority.  That's going on in

11  the Section 225, okay?

12           So they've made the case that we believe, based on

13  some litigation that nobody's decided yet, which is why they

14  want relief to go back and get a decision.  I can't really rule

15  on that because I don't know who has the authority to file.

16  Because I don't know who the director is, okay?  And so that

17  would mean, at some point, you guys got to go -- somebody got

18  to determine who was director was.

19           And so they're resting.  And you want to come back?

20  I'm not quite sure what Mister -- you know, I guess the

21  testimony is going to be, you know -- I'm not.  In some ways,

22  you guys had a little mini litigation about who the director

23  was.  Because that would require me to figure that out in order

24  to find out that was ultra vires.  How else am I going to

25  figure that out unless I know who the director is?  So that

 1   would either require me to decide that or send you guys back

 2   over to change the recording and let them figure it out.  I

 3   don't know yet.

 4            Now, with respect to the motion for relief, they're

 5   asking me for relief to go back to Chancery Court and have

 6   certain issues resolved.  One of which is who -- well, I think,

 7   my understanding of the 225, that is, when the parties dispute

 8   as to who's in control of the company.  And in order for Vice

 9   Chancellor Laster to make that decision, there's some

10   underlying issues having to do with that pledge conversion,

11   whatever.  I get it.  I understood that.  And so, in order for

12   me to even say, "Okay, does it make sense for me to try to

13   resolve that?"  I'll see you guys back over to Chancery Court

14   to resolve that.

15            Mr. Ross -- Mr. Rajan has not testified or has not --

16   I can't deprive him of his opportunities to defend against

17   those two.  So I'm saying with respect to the ultra vires,

18   they're saying we -- Mr. Stastney was actually the director.

19   And he was director because under the pledge agreement -- oh,

20   yeah, it hadn't been  -- we, meaning Hawks, because Hawks sent

21   to terminate the notice to transfer the shares, that -- and put

22   them in Hawk's name, and -- which authorized Hawk to be in

23   control of Technovative.  That -- you guys all fighting over in

24   Chancery Court about that.  I'm not quite sure how I even get

25   to do anything with that, unless I decide, "Well I'm going to

1   hear it and I'll make the decision."

2           So I'm trying to figure out, if you bring Mr. Rajan

3   to testify, am I going to be anywhere more than where I am

4   today?  Because that's what those -- that's what you're telling

5   me is that, somebody's got to decide who's the director.

6           MR. ALEXANDER:  Your Honor, I don't know if you're

7   opening up for questions, but at the point you do --

8           THE COURT:  Yeah.

9           MR. ALEXANDER:  I'd like to --

10          THE COURT:  So that's sort of what I'm trying to lead

11  you guys to where I am.  So those things ultimately have to be

12  decided by somebody, and even in the -- in their request to

13  dismiss for ultra vires, somebody has to decide who has the

14  authority to do that.  And it's either me, or Vice Chancellor

15  Laster, but I can't on the record say who definitively was, so

16  I can't even get to that, whether Mr. Rajan testifies or not.

17  I don't know how I get there.  I don't know if you guys thought

18  this out, but I don't know how I get there.

19          But next is the motion for relief, which is, let us

20  go back over there and decide who has authority and to let that

21  litigation finish.  I think that was all you were asking for in

22  your motion for relief, right?

23          MR. CAPONI:  Correct, Your Honor.  Just to finish

24  that one day trial.

25          THE COURT:  But it also, which I'm a little confused,

1  is what was that trial for?  Because my understanding of a 225

2  is just to resolve who's in charge.  I've heard all sorts of

3  what we going to do the claims litigate.  We're going to figure

4  out who is what.  Is that part of it?  Now I'm not an expert in

5  225s litigation.  Is that part and parcel to determine how much

6  the debt is or is it just who's in charge?

7       MR. CAPONI:  The ultimate question is who's in

8  charge.  The Debtor's defense to why the proxy was ineffective

9  was that the debt had been converted.  So in order to ultimate

10 -- to resolve the ultimate question, the Court needs to decide

11 that defense and was the debt converted at a high level.

12 That's the issue.

13      THE COURT:  Right.  But determining how much is owed?

14      MR. CAPONI:  It's not, I'm sorry, how much is, it's

15 just if any of the debt --

16      THE COURT:  I get that.

17      MR. CAPONI:  -- was bought back.

18      THE COURT:  I get that, but there was testimony that

19 we want to go back to -- from Mr. Stastney, we want to go back

20 to the -- so that the Vice Chancellor Laster can determine how

21 much is owed.  He said that.

22      MR. CAPONI:  Well, I can only tell you as a lawyer, I

23 think when the Court -- if the Court determines some or all or

24 none of the --

25      THE COURT:  I get it.

1            MR. CAPONI:  -- that was converted, there may be a

2    number so that --

3            THE COURT:  There is --

4            MR. CAPONI:  -- isn't a final number but we know --

5            THE COURT:  Yes.  Right.  And that I completely

6    understand.

7            MR. CAPONI:  Yeah.  I agree but it's also a certain

8    file so no problem.

9            THE COURT:  But I also think there's a dispute over

10   what, I think he said, make or something there was a dispute

11   about what was supposed to be done.  I think Mr. Alexander's

12   question about what that -- what their definition.  Mr.

13   Stastney had his.  I'm assuming they have theirs.  And the

14   Court's going to figure out what he thinks is the -- what the

15   meaning is and what it's supposed to mean.

16           Now if the Court says it means all in one, and he

17   will look at it and figure out, or he says it's over time, and

18   I expect that he would say how much.  But that will have

19   nothing to do with me because this, ultimately, only will allow

20   that Court to decide who the director is, okay?

21           Once that decision is made, I'll be honest, I don't

22   know how you got -- whoever loses is going to appeal.  It's --

23   I'm -- I mean, I see you guys are spending -- you said $3

24   million fighting over this.  You're going to appeal; somebody.

25   What does that do for me?  Because, ultimately, somebody has to

```
 1  tell me who the director is.  And if I don't have a final

 2  answer, I'm -- we're going to be sitting here in limbo.  So

 3  even if I send you back and say, you know, after we get through

 4  testimony and say, "Okay, you've got to go back over there,

 5  and, like, let Vice Chancellor Laster decide," you only can

 6  come back here with a final decision.

 7          And I don't know enough about Delaware, and I've done

 8  my own research about what -- because you said that, you know,

 9  they don't have a right to post the bond.  Well, I've looked at

10  Delaware law myself and I've got my own interpretation of what

11  I think they can -- the Court can do and then what they shall

12  do: two different provisions on post-judgment appeal bonds or

13  whatever you call them.

14          MR. ALEXANDER:  Supersedeas bonds.

15          THE COURT:  Well, there was a section that has to do

16  with how you do it, who sets it, and then this may, and this

17  one shall.

18          I'm not trying to be a deal -- I mean, I was at one

19  time, but I'm not anymore, and I'm not trying to get it.  But

20  all I'm telling you is from my perspective, I will not be able

21  to do anything until I get a final order.  I get a final order

22  saying who's the director, then I'll say okay, then, if it's

23  Mr. Stastney, okay.  Then you guys will come here and say,

24  "Ultra vires."  If it's not him, then that would answer that

25  question.  And then the same -- so that has to do with the
```

1  ultimate whether this -- whether I would grant the motion for

2  ultra vires for Technovative.

3       MR. ALEXANDER:  Your Honor, we'd just also like to

4  remind the Court that there is a legal issue as to the impact

5  of the filing of the Stream bankruptcy with respect to the

6  stock in Technovative --

7       THE COURT:  Ah, ah, ah.

8       MR. ALEXANDER:  -- what rights --

9       THE COURT:  I get all that.

10       MR. ALEXANDER:  Look at that because that could get

11  rid of --

12       THE COURT:  But --

13       MR. ALEXANDER:  -- the gateway issue because it'd be

14  irrelevant.

15       THE COURT:  But guess what?  You guys are asking

16  other person, Judge Laster, to -- because what Jeff -- Vice

17  Chancellor Laster, if he decides that Mr. Stastney is the

18  director, is the issue before him also -- well, for him to be

19  the director, that he would have to conclude that the demand to

20  -- with respect to the stock was affected.

21       MR. ALEXANDER:  In terms of the transfer of ownership

22  of the stock?

23       THE COURT:  Well, I --

24       MR. ALEXANDER:  Because Mr.--

25       THE COURT:  Because that's --

1          MR. ALEXANDER:  Well, they're just trying to

2     exercise, saying under a proxy, they had the authority to

3     appoint the director.  So assuming they have the authority to

4     do that under the proxy, our argument is that you still have

5     the bankruptcy property of the estate to do.

6          THE COURT:  Okay.  Well, that's still for me.

7          MR. ALEXANDER:  Okay.

8          THE COURT:  That's the --

9          MR. ALEXANDER:  Understood.

10         THE COURT:  I'm parsing out Technovative.

11         MR. ALEXANDER:  No, but that -- it directly impacts

12    Technovative because --

13         THE COURT:  Who did it --

14         MR. ALEXANDER:  -- if it affects their rights are

15    with the stock, and we can --

16         THE COURT:  Well, okay.

17         MR. ALEXANDER:  -- see if we can begin part of it.

18         THE COURT:  I'm not right.

19         MR. ALEXANDER:  Okay.

20         THE COURT:  That Stream's argument, that even if they

21    did all these things, they still have time.

22         MR. ALEXANDER:  Correct.

23         THE COURT:  But they back to us.

24         MR. ALEXANDER:  Correct.

25         THE COURT:  That's the issue I have to figure out.

1           MR. ALEXANDER:  Understood.

2           THE COURT:  But I'm just talking as an initial, even

3   getting to that --

4           MR. ALEXANDER:  Well --

5           THE COURT:  Because I don't even get to that until I

6   get at least an answer as to who was the director.

7           MR. ALEXANDER:  No, I --

8           THE COURT:  You think it's separate and apart?

9           MR. ALEXANDER:  We disagree.  We believe it's

10  separate because --

11          THE COURT:  Okay.  Then who --

12          MR. ALEXANDER:  -- even if Mr. Stastney was the

13  director and they hadn't foreclosed, the argument is that those

14  rights would have come back to the Tech- -- I'm sorry, to the

15  Stream estate --

16          THE COURT:  Okay.  Well, you're right.

17          MR. ALEXANDER:  -- upon the rights to filing.

18          THE COURT:  But I feel --

19          MR. ALEXANDER:  So that's --

20          THE COURT:  That's another issue.

21          MR. ALEXANDER:  Okay.  I just wanted --

22          THE COURT:  So ultimately --

23          MR. ALEXANDER:  -- to mention the issue so it

24  wouldn't go by.

25          THE COURT:  -- ultimately, I still need to figure out

1    if Mr. -- you're saying, well, I get it.  You're saying there's

2    a point where it really wouldn't matter what the Vice

3    Chancellor said.

4            MR. ALEXANDER:  Correct.

5            THE COURT:  Because if it comes back -- so maybe

6    you're saying I decide that first.  Because if -- and I did,

7    you know, I heard the arguments about Judge Silverstein's

8    decision, about when you went out and it was -- what happened

9    when they sent out a notice saying -- exercising their voting

10   rights.  Totally different situation, not the same.  So I'm not

11   quite sure how much that would help me.

12           But what I'm getting to is that -- this is not going

13   to happen tomorrow.  I'm not going to have an answer from --

14   even if I send you back to the Chancery Court.  I'm not going

15   to have an answer for a bit.  What do you guys think is

16   supposed to happen in the interim?  We're supposed to sit here?

17           MR. ALEXANDER:  The Debtor intends to propose a plan,

18   Your Honor.

19           THE COURT:  Well, I'm a little concerned about that.

20   The Debtor's been in here since March, okay?  I haven't seen --

21   I'm concerned about the progress in this case.  Let me just --

22   I want to make sure I'm going to -- I wrote some notes.

23           MR. ALEXANDER:  Well, debtor's goal is to file the

24   plan during the initial exclusivity period.

25           THE COURT:  I get that, Counsel, but that's more than

 1  what I'm concerned about.  Where's my notes?  Oh, I just had

 2  this.  Oh, I hope I didn't delete it.  Did I want them to talk

 3  once again?  Mm-mm-mm.  Oh, okay.

 4         I'm a little concerned about the direction of this

 5  case here.  And as far as this docket, nothing's happened, but

 6  you guys fighting.  I haven't seen a plan.  I haven't seen

 7  this.  I heard some testimony.  I haven't seen anything.  And

 8  one of the remedies that you've asked for is appointment of a

 9  trustee.  Well, I can't do anything, at least until I give the

10  Debtor an opportunity to respond to that.  I'm not going to let

11  this case just sit around while you guys go back and fight

12  somewhere else.  It's not going to happen.

13         So with that being said, and it's the best interest

14  of creditors that I have to look at, at this point.  So you

15  know, I'm not sure I'm going to wait 45-60 days for Mr. Mathu

16  Roger to come here and testify.  You know, I'm going to set a

17  shorter date, maybe the beginning of August.  And you guys need

18  to figure out who you want to bring here to tell me what I need

19  to do because this case isn't moving.

20         In terms of moving toward -- you said, yeah, you're

21  going to file a plan.  You're going to do all these different

22  things.  I am concerned by the testimony I've heard over the

23  course of these few days, that we need to start moving with

24  respect to this case.  And that the ultimate decision with

25  respect -- this is just with respect to Stream.  What is it

1    going to -- what are -- oh, you want to reorganize.  We're

2    going to do all these things.  We need to get moving.  And I

3    get there's moving the parts here, parts there, about

4    financing, equity.  We need to get moving with respect to the

5    Debtor making some progress in this case.  And I am not

6    inclined to wait 45 to 60 days.  Because even if you file a

7    plan, who is -- I don't know Mr. Rajan's health.  Well, Mr.

8    Park, you need to get up to speed.  You guys need to do

9    something.  You can't just think I'm going to let this languish

10   here.  It's not happening.

11        MR. ALEXANDER:  That's not the intention, Your Honor.

12   The intention is get Mister --

13        THE COURT:  I get what the intent is.

14        MR. ALEXANDER:  And he's getting up to speed.  And he

15   will be of good health.

16        THE COURT:  I get that.  But that's not what I have

17   today.  Intentions are all fine and well, but I got to go with

18   what I have.  And I don't see much on that document except the

19   parties burning up money, fighting.  Because at the end of the

20   day, their position is going to be -- is part and parcel of

21   what we add to our debt.  And you're going to say, "No."  And

22   then it's going to be whatever.  Because at the end of the day,

23   this is where we are.

24        Yes, Mr. Caponi, you're going to stand.

25        MR. CAPONI:  Your Honor, I look at there's a lot of

```
 1   validity to what you're saying.  You're not the first jurist in

 2   the first jurisdiction to ask what these parties are doing.

 3   Each side -- each dog's got a piece of the bone and no one's

 4   letting go.  And I agree, there's going to be -- if the Debtor

 5   loses -- again, I'm going back, I'm confident, we're going to

 6   win it.  If debtor loses, yes, there's going to be an appeal,

 7   absolutely.  I'm going to be shocked if there wasn't.  The only

 8   way it's going to stop is if somebody runs out of money.  But

 9   we can at least get started.  And, I think, we're talking about

10   a one day oral argument.  If Vice Chancellor Laster provides

11   minimal guidance to this Court, he may answer a tremendous

12   number of questions and relieve the Court of tremendous burden

13   or he may not.  I think he will.  It's one day.

14             THE COURT:  I get that, Counselor.

15             MR. CAPONI:  We could probably get that done before

16   this August date.  I mean, now look, Your Honor, I understand

17   you want to push it in August.  I'd like it, like, second week

18   in July.

19             THE COURT:  Not happening on my --

20             MR. CAPONI:  But if we're going to having to --

21             THE COURT:  I'm out the last two weeks of July.

22             MR. CAPONI:  Can we start -- I think there's a fair

23   possibility the Vice Chancellor Laster could hear that argument

24   and get close to resolving this issue before we come back in

25   the beginning of August.
```

```
 1              THE COURT:  The problem is, I can't deprive the

 2    Debtor of their opportunities to defend against your motion.

 3    They get a right to do that.  I'm just cutting off how much

 4    time they're going to get to do it.

 5              MR. CAPONI:  Well, Your Honor, I think on our motion

 6    there's nothing Mr. Rajan can say that would impact, I think,

 7    this is my position, take it for what it's worth.  We've

 8    established that we're one oral argument away from resolving a

 9    slew of issues.  The Debtor is saying, "No," which means the

10    Debtor wants to relitigate all those issues here.

11              THE COURT:  We're not going --

12              MR. CAPONI:  How's it possible that relitigating

13    those issues here is more effective to the creditors then a one

14    day oral argument.  I -- unless Mr. Rajan is going to come in

15    and testify he's going to donate millions of dollars to

16    everybody, it would be far more expensive and take a lot more

17    time here, then go back all afternoon.

18              THE COURT:  I --

19              MR. CAPONI:  Like, you can't change the equation.

20              THE COURT:  I get that, Counsel, but I cannot deprive

21    them of their due process right to defend.  You're asking me to

22    say, "We made our case.  Don't listen to anything they have to

23    say."  And I can't do that.

24              MR. CAPONI:  I -- look, Your Honor, I appreciate your

25    position.  I hope you appreciate mine I've got to ask.
```

1          THE COURT:  Yes, you can ask --

2          MR. CAPONI:  I --

3          THE COURT:  -- but I can't.  Because the first thing

4  is, the district court or the Third Circuit will tell me is,

5  "They had a right and you cut them off."

6          MR. CAPONI:  Right.

7          THE COURT:  And listen, I've been reversed before, so

8  I'm not concerned about that.  It doesn't mean anything.

9          MR. CAPONI:  Well, Your Honor, our --

10          THE COURT:  But I don't want the parties to be in a

11  position, because once, assuming I granted it, you need relief

12  from stay.  You know, it's still a 14-day time period, unless

13  somebody waived it, and then they would be entitled to ask for

14  a stay and go to the district court, file an appeal, and go to

15  the district court.  This is not going to happen tomorrow.

16  It's -- even if I granted your motion today, relief from the

17  stay has a 14-day time period, unless I waived it, and I don't

18  know where I would, nobody's asking to, and I'm not

19  volunteering to do that.  So now you have 14-days on the --

20  What is it?  On 362A, whatever, I know the number, but it's 14

21  days.  And then, now they have a right for consideration.

22  That's it.  Trust me, I know people play this game all out

23  until it's like 35 -- a long time.

24          So that's what I'm saying -- so that's why I'm like,

25  listen, give them their rights.  Let them, you know, let them

1   put whatever, but we're not doing it 45 or 60 days out.  That

2   is not happening.  I can't say 30 days because 30 days would be

3   July 30th, which I know is a Saturday, is it not?  Or a Sunday

4   because I'm coming back from vacation on the 30th.

5            THE COURT REPORTER:  Sunday, Your Honor.

6            THE COURT:  Sunday.  So the soonest would be the 1st

7   and you guys don't even want to see my August calendar because

8   all my trials are in August.  So I want to get it done as soon

9   as possible.  And I want to put on the table, and put the

10  Debtor on notice, I'm seriously considering a Chapter 11

11  trustee to the extent one is required.  They need to get

12  moving.  I want everybody to understand, I'm not going to let

13  this case languish.  I'm -- you guys can fight all you want.

14  I'm not going to put up with that here.

15           So it's still that and that still does not mean I

16  have not -- I'm ignoring your bad faith argument.  That's still

17  on the table.  But I'm just saying if I can't -- if all of this

18  is going to take time when we're talking 45-50 days,

19  something's got to give here.

20           MR. CAPONI:  Your Honor, we --

21           THE COURT:  And these will respect to Stream.

22           MR. CAPONI:  We would be very supportive of the

23  trustee in any fashion, even if it's interim between now and

24  August.  It's --

25           THE COURT:  Well, but they haven't had a chance to

1  defend on my case.  That's the problem.

2          MR. CAPONI:  So, I think Your Honor has --

3          THE COURT:  I can't -- I know --

4          MR. CAPONI:  -- inherent powers to manage that --

5          THE COURT:  Well, I already looked that up.

6          MR. CAPONI:  Okay.

7          THE COURT:  Okay?  And the Third Circuit has says, I

8  can sue a sponte, but I got to give the Debtor a response, a

9  time to response to my sua sponte.

10          MR. CAPONI:  I'll yield the podium right now because

11  I think that --

12          THE COURT:  Counsel, I'm --

13          MR. CAPONI:  -- I'll get out of the way.

14          THE COURT:  I'm one step, believe it or not, I do

15  think about these things.

16          MR. CAPONI:  I do appreciate that, Your Honor.

17          THE COURT:  And I do have a Third Circuit case that

18  says even if I wanted to sua sponte, I'd have to give this

19  debtor an opportunity to respond to my sua sponte on the 1104

20  and 105 in combination.  But the date of that case, let me just

21  tell you what that case is.  It's called -- it's a 2004 case,

22  so I don't know how much 105 has any value, given recent

23  Supreme Court cases that kind of say we shouldn't be using 105.

24  But the Third Circuit in an unpublished opinion, so I don't

25  know what precedential value, but it's called United States

1   Mineral Products Company, and it's at 105 State Appendix 428.

2   They talked about bankruptcy court's ability to sua sponte

3   appoint a Chapter 11.

4        I've done it in another case, but again, I gave you

5   the Debtors an opportunity to defend as to why I shouldn't.  So

6   I want it out on the table.  I don't want anybody to be

7   surprised about what I'm thinking.  I'm telling everybody what

8   I am thinking.  That is with respect to Stream.  Because if

9   there is some assets, if there is some ability for creditors to

10  make recovery, that's what bankruptcy is for.

11       The other issues with respect to Technovative, that's

12  a whole different ball of wax.  That's something I have to --

13  that gets figured out separately, okay?

14       So that's where I am.  I just want to let you guys

15  know where I am because, obviously, we're not finished with

16  this.  So I don't know if you guys can consult and come up with

17  something.  I don't know.  I have no clue.  I had suggested

18  earlier that the parties try to work cooperatively, but it

19  seems to me, from my observation, that will never happen.

20  Simply because Mr. Rajan is asserting that he owns it.  Mr.

21  Stastney is.  And frankly, neither one -- never mind.  Neither

22  one of them is standing up, in my opinion, as to their -- well,

23  I haven't heard anything from Mr. Rajan.  I don't know his

24  prior involvement in the case.  I wasn't too pleased with that

25  and I'm, you know, some of the things I've heard Mr. Stastney

1   say, calls question for me for him, too.  I'm telling you guys

2   what I'm thinking.  I'm putting it right on the table.  So I'm

3   not -- nobody's looking good from my perspective in these

4   cases.

5          So, putting that aside, I want you guys to know what

6   my thoughts are.  We need -- so what I'm going to do is I'm

7   going to let you guys consult.  Come up with days and I'm going

8   to have my courtroom deputy give you some days in August.

9          Mr. Alexander, you're going to have to figure out

10  what you're doing.  I'm not waiting 60 days.  There is no way.

11  That's not happening, cannot happen.  Particularly in -- and

12  that's the next issue, you said before we began, that the Dutch

13  Court had removed Mr. Rajan as the director of SeeCubic, B.V.

14  Was he the only listed director?  Was there a dispute?  Was he

15  the only one with Mr.--

16         MR. CAPONI:  I know there were a lot -- well, Your

17  Honor, I'm not -- I know there -- I think there was a -- I

18  think Mr. Rajan had said he had replaced Mr. Stastney.  And I'm

19  not -- there probably is a disagreement between the two of them

20  as to who was what.  But bottom line; it's in Dutch?  I don't

21  know what it's in.  But the order, it'll get translated at some

22  point.  But it was --

23         THE COURT:  Right and I want to --

24         MR. CAPONI:  An independent has been --

25         THE COURT:  I get that, but I want to know how that

 1   happened.

 2          MR. CAPONI:  Meaning?

 3          THE COURT:  How does an independent director come to

 4   be appointed?

 5          MR. CAPONI:  The, I believe that the Dutch court is

 6   requiring Mr. Rajan to -- in the Dutch registry, appoint list

 7   -- withdraw himself and list the -- this independent which I

 8   believe is a lawyer, a Jones Day, and the Dutch was --

 9          THE COURT:  Well, was that -- I'm trying to figure

10   out, was the judge -- did the Court just do that on its own?

11   Did someone ask the Court to do it?  How did it come to be?

12          MR. CAPONI:  So --

13          THE COURT:  If you know.

14          MR. CAPONI:  Yeah, I believe it was -- they wanted

15   Mr. Rajan not recognized as the director --

16          THE COURT:  Who wanted them to --

17          MR. ALEXANDER:  Is the question who filed something

18   to initiate the -- Your Honor?

19          THE COURT:  Yes.

20          MR. CAPONI:  Yes.

21          MR. ALEXANDER:  It was filed by Mr. Stastney.

22          THE COURT:  When?

23          MR. ZAHRALDDIN:  And Mister -- and Hawk.

24          THE COURT:  Wait a minute.

25          MR. ALEXANDER:  After the bankruptcy case was filed.

1              MR. ZAHRALDDIN:  Yes, ma'am.

2              THE COURT:  You guys better go back and look at what

3    I said on that first day about actions in the Netherlands.  I -

4    - and I had hoped because I actually went and read the

5    transcript.  Believe it or not, I do do things when I go back

6    there other than yell about people calling me.  I read the

7    transcript.  I actually have it in front of me.  And I said you

8    guys better not do anything in the Netherlands; nothing's going

9    to happen.  Don't do anything.  Did they file a new action?  Or

10   did they continue in the one that was existing at the time?

11             MR. ALEXANDER:  I don't know the answer to that, Your

12   Honor.

13             THE COURT:  I'm asking if there was --

14             MR. CAPONI:  I don't know, Your Honor.  What I know

15   is the --

16             THE COURT:  Well, then, I want an answer.  I want on

17   the docket how that order came to be entered.

18             MR. CAPONI:  Sure.

19             THE COURT:  I'm hoping it was just the Court on its

20   own decided to do that.  And I want everybody to know that, if

21   it was not, there are going to be some serious consequences.

22   Because I was clear that nothing was to go before that --my --

23   if that Court, I understand that the Netherlands have control

24   over all of their corporations.  And they can -- and I

25   understood that they could, on their own, say, "Hey, we're

 1    going to -- we're going to take over these companies."  Because

 2    you're not filing your reports, you're not doing this, you're

 3    not doing whatever.  That was what was represented to me on the

 4    first date or whenever we had the little hearing.  And I --

 5    which was to stay the action in the Chancery Court and that I

 6    understand in the pleadings the Debtor had said there was a

 7    pending action in there.  And I said, "Don't do anything in

 8    there.  It is a stay.  Don't do anything."  So that's why I'm

 9    trying to figure out how this order came to be.  That's all.

10    It could have been the Court just decided on its own that this

11    stuff was in here and I'm going to rule.  I don't know what

12    happened.  I just want somebody to tell me what --

13              MR. CAPONI:  We'll get you an answer.  I have to talk

14    to Dutch counsel, and we'll get you an explanation.

15              THE COURT:  Right.

16              MR. CAPONI:  But I know both parties were there and,

17    you know, it's been going on.  But I haven't been involved in

18    it.

19              THE COURT:  I don't know who both parties was,

20    wasn't --

21              MR. CAPONI:  Sorry, Mr. Zahraldddin.

22              THE COURT:  All I know is what I said.

23              MR. CAPIONI:  Understood, Your Honor.

24              THE COURT:  And if it has anything to go against what

25    I said, I'm going to be very unhappy.

1          MR. CAPIONI:  Understood.

2          THE COURT:  And if they did it on their own, okay.

3  But what you told me at the beginning was because there was a

4  whole new director and Mr. Rajan wasn't there.  Stream had no

5  involvement now in running SeeCubic B.V.  And that

6  automatically set off something from me.  And again, I went

7  back, and I pulled the transcript off and I have it right in

8  front of me.  I'm not going to go read it, but I just wanted to

9  make sure what I said, which is a totally different issue.

10         MR. CAPONI:  Yeah.  We'll get you an answer on that.

11  I don't have it now, but we'll get it.  I don't recall saying

12  Stream has nothing to do with running B.V.

13         THE COURT:  You did.

14         MR. CAPONI:  And the director's in charge.

15         THE COURT:  You did --

16         MR. CAPONI:  I think that person makes the decision.

17         THE COURT:  Right.

18         MR. CAPONI:  But --

19         THE COURT:  But it is what it is.  He's there by

20  virtue of some connection with Stream or whatever.  It didn't

21  matter.  I said don't do anything, when they did, consequences.

22  If they didn't, and the Judge -- the Court just on its own, sua

23  sponte, it is what it is.

24         MR. CAPONI:  Okay, Your Honor.

25         THE COURT:  So, also Mister -- this is for Mr.

1    Alexander.  I think you also need to, when we have a new

2    hearing with respect to how this case is proceeding, I'm going

3    to need some testimony on funding and how this is really going,

4    and who knows what.  Because apparently Mr. Park really has no

5    information, and if I -- I'm going to need from -- if I don't

6    get it, it is what it is.

7            I'm just telling you guys what the lay of the land,

8    okay?

9            MR. ALEXANDER:  Understood, Your Honor.  We'll be

10   prepared for that.

11           THE COURT:  All right.  So what I'm going to do,

12   obviously this is the, you know, the movant has rested.  We now

13   will move at the -- in the next few weeks to the response on --

14   or at least two of them, because you still kept open your issue

15   on this dismissal.

16           MR. ALEXANDER:  Correct, Your Honor.

17           THE COURT:  Okay.  So we, you know, we need -- what I

18   need for you guys to do, and I'm sure Mr. Alexander, and Mr.

19   Caponi, and Mr. Colby, you guys can come up with some dates.

20   Once -- what I -- what you can do is say how much time you

21   think you need, and then reach out to my courtroom deputy, and

22   say we need two days, three days, and I will endeavor to do

23   exactly what we did.  You might not get a full day, but I can

24   probably -- and I'm saying that with all kind of confidence

25   without looking at how many trials I have in August.  You know,

```
 1   you can, you know, if it has to be spread over a week, we'll

 2   spread it over a week and come in at 12:30 to 7:30 or 7:00.

 3   That's seven hours.  Five days is 35 hours.  I can't think that

 4   you guys have 30 worth of stuff.  Maybe you do, maybe you

 5   don't.  I don't know.

 6           But let me just take a peek at my calendar.  In

 7   August --

 8           MR. ALEXANDER:  Your Honor?  May I be excused for a

 9   brief minute?  Mr. Zahralddin is still here.  I just need to go

10   change my flight.

11           THE COURT:  Oh my.  What time's your flight?

12           MR. ALEXANDER:  6:45.

13           THE COURT:  You'll never make that.

14           MR. ALEXANDER:  No, no.  That's what I'm saying.

15           THE COURT:  All right.

16           MR. ALEXANDER:  I just need cancel.

17           THE COURT:  All right, so --

18           MR. ALEXANDER:  It's not going through the wi-fi.

19           THE COURT:  All right.  So we'll be in recess.

20           Mr. Zahralddin, you can talk to Mr. Caponi and Mr.

21   Colby.  I've got some briefs I'm reading.  I'm looking at all

22   this.

23           The first week, the first day I'm back, I think

24   there's daylight.  Oh, I have a trial on the 1st.  Nothing on

25   the 2nd.  Nothing on the 3rd.  A trial on the 4th.  So write
```

 1   this down, I have the 2nd, and did I say the 3rd?  I-I-I-I.

 2   Nope.  The 2nd, the 3rd, the 7th, the 9th, and the 11th.  And

 3   the next week, trial on the 14th, 15th is open, 17th is open.

 4   And that's as far as I'm going to go, okay?  So you guys can

 5   think about that, figure it out.

 6            MR. ZAHRALDDIN:  You said the 15th, Your Honor?

 7            THE COURT:  Did I say the 15th?  Okay.

 8            MR. ZAHRALDDIN:  I just -- that's fine.  I just

 9   couldn't hear you then.

10            THE COURT:  Oh.  Hold on.  I've got to go back.  Did

11   I?  14th?  Wait a minute, the 14th, that's a Thursday.  I-I-I.

12   The 15th is, actually --

13            MR. CAPONI:  Your Honor?

14            THE COURT:  Yes.  The 15th is a free day.

15            MR. CAPONI:  We're good the second and third.

16            THE COURT:  Okay.  All right.

17            MR. CAPONI:  If --

18            THE COURT:  So why don't you -- because you may want

19   to get the other witnesses because, remember, we got to get --

20            MR. CAPONI:  Well, Your Honor, I think at this -- up

21   to this point, I think the Debtors have to produce someone the

22   first day the Court has available.

23            MR. ZAHRALDDIN:  Yes.

24            MR. CAPONI:  The second and third, they produce their

25   witness.  I mean if I had --

```
 1              THE COURT:  And then --

 2              MR. CAPONI:  The fact that Mr. Rajan is healthy or

 3  not or it was Mr. Park --

 4              THE COURT:  Somebody.

 5              MR. CAPONI:  I think -- I don't think we need to

 6  schedule a date that works for everybody.  I think the Court

 7  should set the date and they come --

 8              THE COURT:  I'm just saying I don't know what Counsel

 9  consulting their calendar, Mr. Alexander's not here.  Those are

10  the dates.  You guys tell me what dates you have, and you can

11  reach -- you can just send them to Miss Godfrey.

12              MR. CAPONI:  Okay, we will.

13              THE COURT:  And then I will just say, "Okay, this is

14  what we're doing."

15              MR. CAPONI:  Thank you, Your Honor.

16              THE COURT:  Okay?

17              MR. CAPONI:  Okay.  Thank you, Your Honor.  We'll

18  work it out.

19              THE COURT:  All right.  Well, with that being said,

20  well, look, it's only 6:10.

21              MR. CAPONI:  Take the night off.

22              THE COURT:  No, I don't.

23              MR. CAPONI:  Thank you, Your Honor.  I'm -- I know,

24  well, at least my side of the table, I'm sure I speak for the

25  other side, your indulgence, the time you spent, going late in
```

1    the evening, going straight through was much appreciated.  Not

2    everyone does that and it got this process done a lot more

3    quickly and we appreciate it.

4         MR. ZAHRALDDIN:  I can only take judicial notice that

5    that's the last time he'll speak for me, but I agree with

6    everything he said.

7         THE COURT:  Okay.  Well, thank you.  And thank you

8    guys for indulging my little -- hopefully, we won't have breaks

9    every now and then but it is what it is without going into my

10   own personal issues.

11        So thank you for your indulgence.  And again,

12   Counsel, thank you for being prepared.  Thank you for

13   presenting this and making this easy for me.  Other than a few

14   little hiccups, I think we're doing pretty good.

15        Okay?

16        Yes, Mr. Colby?

17        MR. COLBY:  Your Honor, just a quick question with

18   respect to exhibits, if it's okay with you rather than take up

19   everybody's time.  I think we have agreements with the other

20   side as to what's been admitted and on what basis.  We could

21   just submit a written list.  You recall, we had that big group

22   of loan documents.

23        THE COURT:  Right.

24        MR. COLBY:  So we were just going to put them all on

25   one list and provide it to Miss Godfrey and John if that works.

1          THE COURT:  That would make sense.  In terms of your

2    actual -- all these binders, if you want to just leave them in

3    the jury without having to take them, send them all over there.

4    The likelihood that I'm going to have another -- I have another

5    -- no, I do have another trial, but --

6          THE COURT REPORTER:  I'll take them.

7          THE COURT:  Not with a jury.  So you can put all your

8    documents over in the jury area, and then we'll put ours --

9    we'll just put them somewhere.  Okay?

10          MR. COLBY:  Thank you.

11          THE COURT:  Thank you.

12          MR. ZAHRALDDIN:  Thank you, Your Honor.

13          THE COURT:  All right.  Enjoy -- oh, wait, it's not

14    Friday.

15          MR. COLBY:  I'm off.

16          THE COURT:  Enjoy the rest of the week.

17      (Proceedings adjourned)

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


/s/
_____
John Buckley, CET-623
Digital Court Proofreader

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

# EXHIBIT D

Attorneys Notaries

Tax Advisors

**DE BRAUW
BLACKSTONE
WESTBROEK**

**BY E-MAIL: kortgedingciviel.rb-ams@rechtspraak.nl**

Amsterdam District Court

location

Attn: team summary

proceedings Parnassusweg 280

1076 AV AMSTERDAM

Avenue Claude Debussy
80
P.O. Box 75084
1070 AB Amsterdam

T +31 20 577 1771
F +31 20 577 1775

Date September 12, 2023mr

Our ref.

. D.I.J. van der Nat
E daniel.vandernat@debrauw.com
M41126599/1/20726406T +31 20 577 1874

Subject: Ultra-D Cooperative U.A. c.s. / Ultra-D Cooperative U.A. c.s.

(SeeCubic c.s. / Rajan c.s.);

case and summary proceedings number: C/13/738449 KG ZA

23/772 Dear ladies, gentlemen,

Herewith I send you in duplicate the deed containing the production of productions and
increase of claim on behalf of plaintiffs in the above-mentioned case, with the kind
request that they be considered as filed during the oral hearing in summary proceedings
to be held on September 13, 2023.

Copies of this letter, as well as the deed aforesaid, I am also sending digitally to
defendants' attorneys.

Sincerely,
De Brauw Blackstone Westbroek N.V.

**Daniel van der Nat**
Associate | Lawyer

De Brauw Blackstone Westbroek N.V. is based in Amsterdam and registered in the Commercial Register under no. 27171912.

All services and (other) work are performed pursuant to an agreement for services with De Brauw Blackstone Westbroek N.V. The agreement
i s s u b j e c t   t o  the General Terms and Conditions, which have been filed at the Registry of the District Court in Amsterdam and which
i n c l u d e   a limitation of liability. Quality account notaries ING Bank IBAN NL83INGB0693213876 BIC INGBNL2A.

GE BRAU'W
       BLAC KST0
NE WESTB R0
EK

Rechtbank      Amsterdam,      location Amsterdam  Case  number:  C/13/738449 KG  ZA  23/772  Session:  September  13, 2023 at 13:30 hours

DEED CONTAINING PRODUCTION AND CLAIM INCREASE

*concer ning.*

the cooperative
Ultra-D Cooperative,
as validly represented by Shadron Lee Stastney, domiciled in Amsterdam, the Netherlands

the private company with limited liability Stream TV International B.V.,
as duly represented by Shadron Lee Stastney, having its registered office in Amsterdam, the Netherlands

the private limited liability company
**SeeCubic B.V.,**
as validly represented by Shadron Lee Stastney, having its registered office in Eindhoven, the Netherlands

the legal entity under foreign law
SeeCubic Inc,
incorporated in Wilmington, Delaware, United States of America

the foreign-law legal entity Hawk
**Investment Holdings Limited,**
incorporated in Wilmington, Delaware, United States of America

the foreign legal entity SLS Holdings VI
LLC,
incorporated in Wilmington, Delaware, United States of America

THE BREW
BLAC KSTONE
WESTBROEK

Mr. Shadron Lee Stastney,

Residing in Marlboro, United States of America


collectively "Plaintiffs" or "SeeCubic et al."

attorneys: mr. E.R. Meerdink, R. G. Kloppenburg, S. Vlassak and D.I.J. van der Nat

again
st:

the cooperative
Ultra-D Cooperative,
as previously purportedly represented by Mathu Rajan, domiciled in Amsterdam


the private limited liability company
**Stream TV International B.V.,**
as previously purportedly represented by Mathu Rajan, having its registered office in Amsterdam, the Netherlands


the private company with limited liability SeeCubic B.V.,
as previously purportedly represented by Mathu Rajan, having its registered office in Eindhoven, the Netherlands

Mr. Mathu Rajan
residing at 1105 William Penn Dr., 19020 Bensalem, Pennsylvania,
United States of America


collectively "Defendants" or "Rajan et al."

lawyers: mr. A.W. van der Veen, T.J.A. Zuijderland and A.R.T. Kroon

THE BREW
BLACKSTONE
WESTBROEK

1      ADVERTISEMENT

1.     Herewith, Plaintiffs introduce additional exhibits 29 through 36 below in further support of their contentions. In addition, this deed contains a claim increase.

2.     Capitalized terms not defined in this deed shall have the meanings given to them in the summons dated August 28, 2023 2023 (the "Summons").

2      **PRODUCTIONS**

**Production 29**     **Request from Hawk for an early conclusion of the** debate in the U.S. Bankruptcy proceedings of Sept. 5, 2023

To give a complete picture of the latest status of the U.S. bankruptcy proceedings, Production 29 contains the last filed litigation document dated September 5, 2023. This contains a proposal by Hawk to reach a conclusion of these as-yet-unresolved proceedings as soon as possible. Further, this Hawk litigation document provides an overview of Stream's (and thus Rajan's) conduct in the U.S. Bankruptcy proceedings:

"8. *Simply put, this Court, like the Secured Creditors and so many other courts, is a victim of Stream's tenacious litigation gamesmanship. It must end.*

*11. The obvious signs of a bad faith filing have continued during the course of the bankruptcies and are exemplified by the word "No." For example there have been:"*

| | |
|---|---|
| No Emlaloyees | No First Day h4otions |
| No Income | **No** Insurance |
| fi'o h4eaningful e-l-Cl1c1imres | **No** DIP Financing |
| Ü'0 C Clitracts for the sale of gooch, other than to an insicler | Trans{aarency |
| | Fundine of sul sidiary |

BE PFAUW
BLACKS1 ONE
WE STBRO EK

*15. Lastly, no further delays should be tolerated, because Mr. Rajan has exploited
ev'ery opportunity presented to him to muddy the record and cause distractions
with unsubstantiated and implausible "developments." For example, on the eve of
every potentially dispositive hearing in these cases, the Debtors have "disclosed" a
new arrangement, transaction, or development, including.*

- (i) *Purchase Orders [ECF No. 114j with VSI (Mr. Rajan's other entity)
allegedly totaling $154 million on April 13 - i.e., one day before the
initial hearing on Hawk's Motion to Dismiss.*

- (ii) *Term Sheet (ECF No. 258) with Zhongsheng allegedly fOF a $300 mlIllOFI
investment on June 23-i.e., one business day before the hearings on
June 26 through 29.*

- (iii) *VSI Financing3 allegedly in the amount of $100 million, which the
Debtors disclosed during the hearing on Hawk's Motion in Limine on
August* `.e.,` *one day gel'ore the continued hearings on August
15.*

- (iv) *Rembrandt Licensing Covenant, 4 dated and provided to Hawk on
August 14, whereby the Debtors agreed to pay Rembrandt $3.6 million
in exchange for Rembrandt agreeing not to license its IP to the
Secured Creditors and Stream's own subsidiaries.*

- (v) *Rembrandt Settlement Agreement, 5 dated August 12 and provided
to Hawk on August 16, whereby the Debtors agreed to pay
Rembrandt over $2.5 million as settlement for certain alleged IP
license infringements."*

Production 30         Summary of funding provided by SeeCubic Inc. and
**payments made** by Dutch SeeCubic **Entities since the
Judgment**

In support of the contention that Plaintiffs are still funding all crucial payments to
this day, Production 30 contains a summary of these payments since the
Judgment. Defendants have simultaneously yet to contribute a single penny, but
only made implausible and unsubstantiated promises in advance.

It also follows that Plaintiffs do not make the provision of financing conditional
upon the ownership of the Dutch SeeCubic Entities being vested in them, contrary
to what Rajan et al. state in their conclusion of

answer.[1] . It is precisely Rajan et al. who make this condition.[2] This production also makes Rajan et al.'s unsupported assertion that Plaintiffs *"are willing to provide financing only when projects are undertaken for the benefit of Hawk et al."* demonstrably false. Rajan et al. also had the opportunity to propose projects - to which the Plaintiffs never objected
- but he again failed to do so.[3]

Production 31        Email from Stastney to Berkenbosch regarding
                     Rembrandt's IP claim of Aug. 9, 2023

Production 31 contains an email from Stastney to Berkenbosch dated August 9, 2023, in which he explains and substantiates his position that Rembrandt's claim is unfounded.

Production 32        Email from Stream's attorney to Rembrandt dated Oct.
                     19, 2018

Production 32 contains an email from Stream's law firm that handled Rembrandt's asserted claim in 2018. It clearly follows that Stream was convinced by the end of 2018 that there was no meritorious claim by Rembrandt.

Production 33        Order Delaware Court of Chancery dated February 4, 2023
                     regarding a USD 1.5 million *cash bond*

Production 33 contains the decision of the Delaware Court of Chancery, from which it follows that Stream was required to pay a *cash bond* (guarantee sum) of USD 1.5 million as security for the *bonding equipment*. This *bond* was never posted.

Production 34        Hearing transcript of interrogation of Chris Michaels, *patent
                     attorney* at Rembrandt 3D Corp. dated Aug. 16, 2023,
                     pages 1 to 35

In this witness examination, Mr. Michaels discusses Rembrandt's U.S. proceedings against SeeCubic Inc., Hawk and Technovative over a

---

CoA, margin 163.
See, for example, Mr. Berkenbosch's e-mail to Stream dated July 29, 2023 regarding Stream's proposed financing conditions (Production 21): "*Consequently, I cannot agree to a number of conditions you proposed, in particular 9 and 10, because it would mean a] de facto decision to give full control to Stream. Whereas the judge considered in his decision of 29 Jane such conditions are not acceptable under the given circumstances (the 'fish'example)."*
Protocol to operate SeeCubic BV & Ultra-D Cooperative U.A.Stream TV BV (Production 9).

THE flRAUW
BI AChSTONE
WE*TPR0E I"

alleged infringement of Rembrandt's IP rights. It follows from the pages submitted that the only allegation Rembrandt can make against Technovative is that Technovative is the *holding company* of Dutch companies (the Dutch SeeCubic Entities) that are alleged to be IP infringers.

*"Q. Okay. So tell me everything that you are aware of that Technovative has done that you argue infringes or potentially infringes on Rembrandt's intellectual property.*
*A. To our knowledge, it is our understanding that Technovative has been managing its -- the entities under -- that it controls to have products and services offered for sale." [...] Basically projects and services were being provided by its subsidiaries, and it's our understanding that Technovative controls those subsidiaries. I think there's 100 percent ownership of all of those things."*

Rembrandt did not bring the proceedings against Stream. This while Stream could be blamed for exactly the same thing, and suing Stream would make more sense now that, according to Rembrandt's own statements, Stream is the only one that does have a license to Rembrandt's technology.

This Rembrandt claim is the only debt recorded in Technovative's (voluntarily filed) bankruptcy, as Mr. Michaels confirmed (p. 33):

*"Q. So as far as you know, Technovative listed only one creditor when it filed for bankruptcy, and that's Rembrandt?*
*A. Yes, that's my understanding."*

With that, these proceedings were clearly designed to facilitate Technovative's bankruptcy filing in order to get the nearly completed collateral enforcement by Hawk in the *Section* 225 proceedings suspended.

**Production 35        Hearing transcript of interrogation of Mathu Rajan of 15**
                    August 2023, page 200

Production 35 contains a page from a witness examination of Rajan in the U.S. Bankruptcy proceedings dated August 15, 2023, from which it follows that Stream and he completely subordinate the interest of the Dutch SeeCubic Entities and its employees to that of Stream:

*"[THE COURTj: And Stream TV owns its own, separate from what is in the Netherlands?*
*THE WITNESS. Yeah, we made our own.*

L'E BRALiW
BLAC KSTONE
WESTBROLK

*THE COURT: You made your own?*
*THE WITNESS: Yep.*
*THE COURT. Okay. Okay.*
*BY MR. ALEXANDER:*
*Q Mr. Rajan, do you believe that going forward, Stream TV is able to operate*
*without SeeCubic B.V.?*
*A We can operate without SeeCubic B.V.. We don't want to, because they were our*
*original inventors. We don't want to cut them out. We feel a moral obligation to*
*include them, but they are really just meant to be consultants. They're not*
*electronics guys. They're not production guys.*
*THE COURT: So that is no, or you can operate without them?*
*THE WITNESS: We can operate without them. Yes, we can."*

Production 36        Statement by the management of SeeCubic B.V. (Patrick
                     Theune and Bart Barenburg) dated September 12, **2023**

In response to Rembrandt's intellectual property claim, the management of
SeeCubic B.V. had already informed Mr. Berkenbosch Ithat already since 2020 no
use has been made of Rembrandt's technology.[4] Production 36 contains a
statement from the management of SeeCubic B.V. in the person of Mr. Patrick
Theune and Bart Barenburg of Sept. 12 confirming this. This statement also
confirms the need for an independent director from management's perspective:

"Cone/tzsion
*Given the above, we conclude that SCBV in no way violates trade secrets of*
*Rembrandt 3D. Our position is that we are innocent until proven guilty. This should*
*be determined in the ongoing court case (see under 3).*

*Furthermore we respectfully request the judge to take the following into*
*consideration:*
*- Given the above and the fight on the assets that is ongoing in the US, an*
*independent Director is very necessary for SCBV. We* were *very happy with the*
*installment of objective and independent directors in the past.*

---

[4]        See Emails from Berkenbosch to Stream's attorney dated July 25, 2023 regarding a
           remedy for the alleged infringement of Rembrandt's IP right (Production 14).
           "*Furthermore, I was advised by the company that the IP which Rembrandt claims to*
           *have a patent on,* is *not used in this product."*

DI hRAL-W
BLAC KSTUN L
WES-. BP0 Fh

*- As dedicated engineers who are most knowledgeable about and working on improving this technology towards a great success since 2004, we are really not happy and even frustrated we are accused of infringing trade secrets which has not even been discussed with us upfront before going to court or signing any agreement with Rembrandt 3D."*

**3        CLAIM INCREASE**

3.      It appears from Defendants' CoA that on August 20 and 21, 2023, Rajan attempted to appoint Mr. Thomas Park as Director A at the Dutch SeeCubic Entities. At the time the Summons was issued, this was not known to the Plaintiffs.[5] These appointments are contrary to the Judgment, and moreover invalid for the same reasons as why the earlier attempts to appoint Rajan as a director were invalid (in particular, the failure to hear the only incumbent director, Mr. Stastney).

4.      Moreover, Mr. Park is a stooge of Rajan. This follows from the fact that he has been put forward as Stream's intended CFO since May 1, 2023. As such, he is essentially an (intended) employee of Rajan, and thus will be accountable to him. Mr. Park himself has admitted to being completely dependent on Rajan for his information. He has not shown in any way that he will act independently of Rajan and thus lead the Dutch SeeCubic Entities. In this way, Rajan would thus still gain control of the Dutch SeeCubic Entities while the court order suspending Rajan is still in effect and has not been appealed.

5.      Thus, the purported appointment of Mr. Park is in no way in the best interests of the SeeCubic Entities. Plaintiffs will explain this in more detail at the hearing. Thus, Plaintiffs also seek the suspension of the resolutions allegedly appointing Mr. Park, as well as his suspension as an alleged director. Plaintiffs thus increase their claim as follows:

---

Mr. Park is also not registered in the commercial register until the time of writing.

Our ref. M40749323/1/20726406

### <u>ON THE BASIS OF WHICH PLAINTIFFS CLAIM:</u>

That the Interim Injunction Judge by judgment, to the extent legally possible, be provisionally enforceable:

(a)    during the period set forth in Recital 5.5 of the Judgment,

<u>primary</u>:

(i)    appoint an independent third party to be designated by the interim relief judge as director A of the Dutch SeeCubic Entities;

<u>in the alternative</u>:

(ii)    Stastney appointed as director A of Dutch SeeCubic Entities;

(b)    suspended the resolutions for the purported appointment of Mr. Thomas Park as director A of Dutch SeeCubic Entities, and suspended Mr. Park as a purported director thereof;

(c)    Mathu Rajan enjoins (i) not later than one day after the award, to notify Stastney in writing of all (alleged) (legal) acts which Mathu Rajan, or any other natural or legal person on behalf of or for Mathu Rajan, has done which directly or indirectly affect the Dutch SeeCubic Entities and (ii) on the instruction of Stastney or the director appointed pursuant to the allocated provision under (a), to cooperate in the undoing of all (legal) acts referred to under (i) and the consequences thereof, in both cases under penalty of a fine of EUR 500.000 for each violation of the injunction, to be increased by a penalty of EUR 50,000 for each day or part of a day that such violation continues;

(d)    during the period set forth in recital 5.5 of the Judgment, prohibits Ultra-D Coöperatief U.A. from suspending, dismissing and appointing directors in SeeCubic B.V. and Stream TV International B.V. (other than the appointment by the new owners to the

DE BRAUW
BLACKSTONE
WESTBROEK

situation as described in consideration 5.5 of the Judgment) and perform acts that have the effect of disposing of, encumbering or encumbering the shares in SeeCubic B.V. or Stream TV International B.V;

(e)     enjoins the Dutch SeeCubic Entities, to the extent necessary, to register Stastney or any other independent third party determined by the Interim Injunction Judge and appointed as director in the Commercial Register and to register any other necessary changes in the Commercial Register; and

(f)     Ordered Mathu Rajan to pay the costs of the proceedings, as well as the usual subsequent costs (both without and with service of process), to be increased by the statutory interest referred to in Section 6:119 of the Civil Code from fourteen days after the date of the judgment.

Duly noted!

Mr. E.R. Meerdink
attorney

This case will be handled by Mr. E.R. Meerdink, Mr. R.G. Kloppenburg, Mr. S. Vlassak and Mr. D.I.J. van der Nat, T +31 20 577 1779, F +31 20 577 1775, E eelco.meerdink@debrauw.com, De Brauw Blackstone Westbroek N.V., P.O. Box 75084, 1070 AB Amsterdam