## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.<br>and Technovative Media, Inc.,<br><br>       Debtors.[1] | Chapter 11<br><br>Bankr. Case No. 23-10763 (MDC) |
| Stream TV Networks, Inc., *et al.*<br><br>       Plaintiffs<br>   v.<br><br>Shadron L. Stastney, *et al.*<br><br>       Defendants. | Adv.  Case No. 23-00057 (MDC) |

### SEECUBIC, INC.'S MEMORANDUM OF LAW IN RESPONSE TO DEBTORS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEBTORS' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

PRELIMINARY STATEMENT................................................................................... 1

ARGUMENT ................................................................................................................ 4

I.      Debtors Do Not Meet The Legal Standard For A Temporary Restraining Order .............. 4

      A.      Debtors Have Not Established Imminent Irreparable Harm................................... 5

            1.      Debtors Have Not Met Their Burden To Demonstrate Any Purported Harm With Specific Or Documentary Evidence ....................... 6

                  (a)      Debtors Do Not Have Support For The Alleged Risk To The Philips License........................................................................... 7

                  (b)      Debtors Do Not Identify Harm Based On Alleged Loss Of Business Opportunities ................................................................. 7

                  (c)      Debtors Do Not Establish That They Will Be Harmed  By The Appointment Of Mr. Stastney As Director Of SCBV............. 10

                  (d)      Debtors Cannot Identify Harm Based On Alleged Reputational Injury ....................................................................... 17

            2.      Debtors Have Not Met Their Burden To Show That Any Harm They May Suffer Absent Entry Of A TRO Is Imminent ........................... 19

                  (a)      Debtors Have Not Shown That Any Harm Is Imminent............... 20

                  (b)      Debtors' Delayed Filing Weighs Against Their Alleged Need For Immediate Relief........................................................... 21

            3.      Debtors Have Not Met Their Burden To Show That Any Harm They May Suffer Absent Entry Of A TRO Is Irreparable ......................... 24

      B.      Debtors Have Not Established Misappropriation of Trade Secrets ...................... 26

      C.      The Balance Of Hardships And The Public Interest Weigh Against An Injunction ............................................................................................................. 28

II.     Debtors Have Not Met The Prerequisites For Entry Of An Injunction ............................ 31

CONCLUSION............................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Acierno v. New Castle County*,
40 F.3d 645 (3d Cir. 1994) .................................................................................17, 18, 25

*Acosta, Inc. v. Navitsky*,
No. 17-3282, 2018 WL 1251640 (E.D. Pa. Mar. 12, 2018).............................................15

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ...........................................................................................7

*Ahern Rentals, Inc. v. Bilodeau*,
No. 2:21-cv-1503 JCM (EJY), 2021 WL 3777708 (D. Nev. Aug. 25, 2021) .....................9

*Apollo Technologies Corp. v. Centrosphere Industrial Corp.*,
805 F. Supp. 1157 (D.N.J. 1992).....................................................................................25

*Apple, Inc. v. Samsung Electronics Co.*,
678 F.3d 1314 (Fed. Cir. 2012) .......................................................................................22

*ASI Business Solutions, Inc. v. Otsuka Pharmaceuticals, Inc.*,
233 F. Supp. 3d 432 (E.D. Pa. 2017) ...................................................................13, 15, 26

*Atari Games Corp. v. Nintendo of America, Inc.*,
897 F.2d 1572 (Fed. Cir. 1990) .........................................................................................9

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
No. 18-cv-00933-MMC, 2018 WL 2298500 (N.D. Cal. May 21, 2018).........................14

*Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*,
528 F.3d 176 (3d Cir. 2008) .....................................................................................24, 25

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*,
229 F.3d 254 (3d Cir. 2000) ............................................................................................18

*Caldwell Manufacturing Co. North America, LLC v. Amesbury Group, Inc.*,
No. 11-CV-6183T, 2011 WL 3555833 (W.D.N.Y. Aug. 11, 2011) .....................................9

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) ..................................................................................... passim

*CentiMark Corp. v. Lavine*,
No. 11cv0757, 2011 WL 3209106 (W.D. Pa. July 28, 2011)...........................................30

*Continental Group, Inc. v. Amoco Chemicals Corp.*,
 614 F.2d 351 (3d Cir. 1980) .........................................................................20

*CT Install America, LLC v. Boryszewski*,
 No. 22-cv-4557, 2023 WL 3306537 (E.D. Pa. May 8, 2023)...............................5

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
 No. 2:20-CV-00235-KJM-DB, 2020 WL 4937129 (E.D. Cal. Aug. 24, 2020) ................14

*E. I. duPont de Nemours & Co. v. Agfa NV*,
 No. 2:18CV326, 2018 WL 7283319 (E.D. Va. Oct. 30, 2018), *report and
 recommendation adopted, sub nom. E. I. Du Pont D Nemours & Co. v. Agfa NV*,
 No. 2:18CV326, 2019 WL 279989 (E.D. Va. Jan. 22, 2019) ...........................................31

*ECRI v. McGraw-Hill, Inc.*,
 809 F.2d 223 (3d Cir. 1987) .........................................................................19

*Elsevier, Inc. v. Doctor Evidence, LLC*,
 No. 17-cv-5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ...............................15

*Emazing Lights LLC v. De Oca*,
 No. SACV 15-1561 (AG) (Ex), 2016 WL 3658945 (C.D. Cal. Jan. 7, 2016) ..................14

*Fisher Bioservices, Inc. v. Bilcare, Inc.*,
 No. Civ.A. 06-567, 2006 WL 1517382 (E.D. Pa. May 31, 2006).....................................30

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*,
 847 F.2d 100 (3d Cir. 1988) .....................................................................4, 24

*Freedom Medical Inc. v. Whitman*,
 343 F. Supp. 3d 509 (E.D. Pa. 2018) .............................................................11

*Giving Back Fund Inc v. Miami Marketing Group LLC*,
 No. CV 10-9705 GAF (JEMx), 2011 WL 13217774 (C.D. Cal. Jan. 20, 2011)...............24

*Healthcare Services Group, Inc. v. Fay*,
 597 F. App'x 102 (3d Cir. 2015) ...................................................................11

*Herley Industries, Inc. v. R Cubed Engineering, LLC*,
 No. 5:20-cv-02888, 2020 WL 6504588 (E.D. Pa. Nov. 5, 2020) ...............................28, 29

*High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*,
 49 F.3d 1551 (Fed. Cir. 1995) .......................................................................22

*JBF Interlude 2009 Ltd. v. Quibi Holdings, LLC*,
 No. CV20-2299-CAS (SKx), 2020 WL 3963863 (C.D. Cal. 2020) ...................................5

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) .........................................................................4, 29

*Lanin v. Borough of Tenafly*,
    515 F. App'x 114 (3d Cir. 2013) ........................................................................21

*Mallet & Co. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) ..........................................................................31, 32

*Maxlite, Inc. v. ATG Eelctronics, Inc.*,
    No. 8:20-cv-01056-JLS-ADS, 2020 WL 6260007 (C.D. Cal. July 13, 2020).................23

*MCS Industries, Inc. v. At Home Stores, LLC*,
    No. 22-3436, 2022 WL 4110523 (E.D. Pa. Sept. 8, 2022) ...................................... passim

*Middle East Forum v. Reynolds-Barbounis*,
    No. 19-5697, 2021 WL 84054 (E.D. Pa. Jan. 8, 2021)...................................................5, 9

*Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*,
    708 F. Supp. 2d 527 (D. Md. 2010) ..........................................................................9

*National Business Services, Inc. v. Wright*,
    2 F. Supp. 2d 701 (E.D. Pa. 1998) ........................................................................30

*National Metallizing v. Foster*,
    No. 82-3336, 1982 WL 52137 (D.N.J. Dec. 13, 1982)..............................................20, 21

*Pallante v. Those Certain Underwriters At Lloyd's, London*,
    311 F. Supp. 3d 692 (E.D. Pa. 2018)..........................................................................20

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) ..............................................................................5, 15

*Power Integrations, Inc. v. Silane Semiconductors North America, Inc.*,
    No. 19-1292-LPS, 2020 WL 3508078 (D. Del. June 29, 2020) ......................................13

*Razor Technology, LLC v. Hendrickson*,
    No. 18-654, 2018 WL 2063844 (E.D. Pa. May 3, 2018)..............................................6, 12

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ..............................................................................28, 29

*RelaDyne Reliability Services Inc. v. Bronder*,
    No. 2:20cv377, 2020 WL 5745801 (E.D. Va. Aug. 4, 2020)..........................................23

*Robson Forensic, Inc. v. Shinsky*,
No. 5:22-cv-1309, 2022 WL 1198228 (E.D. Pa. Apr. 22, 2022), *appeal dismissed by agreement of the parties*, No. 22-1961, 2022 WL 17037664 (3d Cir. Sept. 12, 2022) ...................................................................................................... passim

*Roman Chariot, LLC v. JMRL Sales & Services, Inc.*,
No. Civ.A. 06–626 MLC, 2006 WL 4483165 (D.N.J. July 11, 2006) ........................17, 18

*Schuylkill Valley Sports, Inc., v. Corporate Images Co.*,
No. 5:20-cv-02332, 2020 WL 3167636 (E.D. Pa. June 15, 2020)................................8, 10

*Static Control Components, Inc. v. Future Graphics, LLC*,
No. 1:06CV00730, 2007 WL 1447695 (M.D.N.C. May 11, 2007) ..................................23

*Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC*,
No. 17-1390-LPS-CJB, 2018 WL 395750 (D. Del. Jan. 8, 2018) .......................................9

*Waters Corp. v. Agilent Technologies, Inc.*,
410 F. Supp. 3d 702 (D. Del. 2019) ...................................................................................4

*Weeks Marine, Inc. v. TDM America, LLC*,
No. Nos. 11-3850 (ES) (CLW), 11-4338 (ES) (CLW), 2011 WL 6217799 (D.N.J. Dec. 14, 2011).................................................................................................................23

*Wells Fargo & Co., v. ABD Insurance and Financial Services, Inc.*,
No. C 12-3856 PJH, 2014 WL 4312021 (N.D. Cal. Aug. 28, 2014) ..........................10, 19

## STATUTES AND RULES

12 Pa. Cons. Stat. § 5302 ...........................................................................................................26

18 U.S.C. § 1839(5) ....................................................................................................................26

Dutch Civil Code § 10:118 .........................................................................................................30

Dutch Civil Code § 10:119 .........................................................................................................30

Fed. R. Civ. P. 65(c) ...................................................................................................................31

Fed. R. Civ. P. 65(d) ..................................................................................................................31

SeeCubic, Inc. ("SeeCubic") respectfully submits this Memorandum of Law in Response to Debtors' Supplemental Memorandum in Support of Debtors' Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction.[2]

## PRELIMINARY STATEMENT

Debtors submitted a Supplemental Memorandum of Law late on Saturday, October 14, 2023—more than two weeks after initially moving for a temporary restraining order ("TRO") or preliminary injunction.[3] The Supplemental Memorandum does not bolster their initial submission, but rather only further demonstrates why Debtors are *not* entitled to a TRO or preliminary injunction.

Relevant here, the Supplemental Memorandum makes three changes to the Debtors' Motion. *First*, in Debtors initial Memorandum of Law (ECF No. 30-1), Debtors failed to specifically identify the causes of action in their Complaint (ECF No. 1) that were the basis for the Motion. Instead, the Debtors made a brief reference to trade secrets but made no attempt to demonstrate one of the key elements of a request for a TRO or preliminary injunction: likelihood of success on the merits. With the Supplemental Memorandum, Debtors identify that their Motion

---

[2]    Debtors' Supplemental Memorandum in Support of Debtors' Motion For a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (the "Supplemental Memorandum"), ECF No. 69, is cited herein as "Supp. Mem."

Debtors' Motion For a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction (the "Motion"), ECF No. 30, and Debtors' Memorandum of Law In Support of Motion For a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, ECF No. 30-1, are cited herein as "Mot."

[3]    At the conclusion of the continued hearing on October 16, 2023, this Court allowed SeeCubic an opportunity to respond to the portions of Debtors' Supplemental Memorandum of Law dealing with trade secret misappropriation, determining that the remainder of the Supplemental Memorandum of Law introduced allegations outside the scope of Debtors' original Motion. SeeCubic limits this response accordingly.

is premised upon their claims for federal and state trade secret misappropriation (Counts XVII and XVIII) and, for the first time, argue that they are likely to succeed on the merits of those claims. *Second*, the Supplemental Memorandum shifts the factual premise of Debtors' Motion: while the Motion initially was concerned with a purported threat to Debtors' Philips license, the Supplemental Memorandum makes non-specific claims of alleged trade secret leakage with nearly no mention of the Philips license. *Third*, the Supplemental Memorandum purports to add to Debtors' showing of harm.

Debtors still fail to meet their burden of proof. *First*, Debtors have not met their burden to establish that any of SeeCubic's actions have caused or will cause imminent, irreparable harm. They allege a wide variety of purported harms, but they do not allege any of them with the requisite degree of specificity or evidentiary support. The Debtors provide no evidence whatsoever that the Philips license is at risk, although claims regarding the Philips license are the focus of the Motion. Similarly, the Debtors offer no specific evidence, documents, or anything other than vague and conclusory testimony, to support their claims about losing customers, revenue, and other business opportunities or about harm to their reputation.

Moreover, Debtors offer only speculation that Mr. Stastney—who is subject to the supervision of the Dutch court (the "Dutch Court") and required to adhere to a written protocol that obligates him to act in the best interests of the Dutch entities—will cause harm to the Debtors by virtue of his position as director of one of the Dutch entities. The Debtors' arguments on this point are grounded in their incorrect position that SeeCubic is their competitor. In fact, SeeCubic is a holding company for the Debtors' Secured Creditors' claims and, as a result, has a vested interest in maintaining and growing the value of the Debtors' business. There is no competition between SeeCubic and the Debtors, nor have the Debtors provided any evidence of actual

2

competition for the same business opportunity.  Rather, the evidence demonstrates that all contracts involving the technology are with *SCBV* as counterparty, and any revenue gained from the business goes to *SCBV*.  **In other words, SeeCubic's commercialization efforts directly benefit the estate, not compete with it**.

Debtors are also unable to define their trade secrets with the specificity required to evaluate whether any trade secret is at risk of misappropriation and causing harm to the Debtors.  Relatedly, Debtors' suggestion that they automatically suffer harm by virtue of Mr. Stastney's directorship—which they perceive inevitably threatens disclosure of the trade secrets—is incorrect as a matter of law.  Debtors cannot conflate the misappropriation and irreparable harm questions; instead, Debtors must show that any alleged possession or misappropriation creates an irreparable harm.

Debtors also fail to demonstrate that any of their alleged harms will befall them imminently in the absence of a TRO.  As with the evidentiary foundation for each of their alleged harms, Debtors cannot establish that any of the harms will actually occur—let alone occur imminently, and their arguments as to urgency are belied by their delay in seeking a TRO.

Debtors' allegations of harm also fail because they can be compensated by money damages—they are not "irreparable."  Debtors attempt to argue that certain of their alleged harms (e.g., loss to reputation and loss of future business) are difficult to quantify, and thus not compensable by money damages.  But this attempt is unsuccessful, as difficulty quantifying a loss does not make it unquantifiable.  Moreover, Debtors must still provide specific evidence supporting such claims.

*Second*, Debtors do not establish misappropriation of their trade secrets.  To the contrary, SeeCubic arranges for SCBV to put the trade secrets, which remain with SCBV, to use in developing SCBV's business.  Mr. Stastney has testified consistently that SeeCubic's goal is the

success of SCBV, and the evidence will show that SeeCubic's efforts have already resulted in tangible benefits to SCBV.

*Third* and finally, Debtors fail to satisfy the remaining elements considered for a TRO. Debtors' proposed order is overbroad and satisfies neither the balance of harms nor the public interest factors.   Of particular concern, the Proposed Order requires this Court to exercise jurisdiction over a Dutch entity on matters of Dutch law regarding the protection of assets in the Netherlands.  The Dutch Court has already issued a ruling on many of the activities the Debtors' Proposed Order seeks to enjoin, and the Debtors should not be permitted to upend that decision using a TRO issued by this Court.

## ARGUMENT

### I.    DEBTORS DO NOT MEET THE LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER

A TRO "is an extraordinary remedy, which should be granted only in limited circumstances."  *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (citation omitted).  Before a court can enter a TRO or preliminary injunction, the moving party "must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).[4]  Debtors fail on all elements.

---

[4]      Ultimately, the moving party must demonstrate a causal connection between a defendant's activity and the alleged harm the moving party incurs.  *See, e.g.*, *Robson Forensic, Inc. v. Shinsky*, No. 5:22-cv-1309, 2022 WL 1198228, at *11 (E.D. Pa. Apr. 22, 2022) (plaintiff did not establish irreparable harm where plaintiff "failed to point to any 'resultant incalculable damage' **connected to** [defendant's] employment with [competitor]" (emphasis added) (citation omitted)), *appeal dismissed by agreement of the parties*, No. 22-1961, 2022 WL 17037664 (3d Cir. Sept. 12, 2022); *Waters Corp. v. Agilent Techs., Inc.*, 410 F. Supp. 3d 702, 713 (D. Del. 2019) (observing that the patentee plaintiff must, as part of the irreparable harm inquiry, establish "a causal nexus between
*(cont'd)*

### A.      Debtors Have Not Established Imminent Irreparable Harm

Debtors bear the burden to prove that an alleged actual or threatened misappropriation will cause them imminent irreparable harm.  *Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 WL 84054, at *5 (E.D. Pa. Jan. 8, 2021) (emphasizing that "irreparable harm will not be presumed merely because elements of a trade secret claim are satisfied"); *CT Install Am., LLC v. Boryszewski*, No. 22-cv-4557, 2023 WL 3306537, at *2 (E.D. Pa. May 8, 2023) ("To obtain a preliminary injunction, a plaintiff must make a 'clear showing of immediate irreparable injury.'" (quoting *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989))).

Critically, a movant seeking a TRO or preliminary injunction must make a ***specific showing*** of imminent irreparable harm.  Generalized, ill-defined assertions do not suffice.  In *MCS Industries, Inc. v. At Home Stores, LLC*, No. 22-3436, 2022 WL 4110523 (E.D. Pa. Sept. 8, 2022), for example, the Eastern District of Pennsylvania recently denied a motion for a TRO where the plaintiff had alleged that defendants were committing patent infringement by competing with the plaintiff by selling an infringing product.  *See id.* at *1.  In particular, the court found that the plaintiff had failed to establish imminent irreparable harm where the only evidence plaintiff had proffered was its own conclusory, non-specific testimony of harm:

> ***Plaintiff makes only general and vague statements as to other examples of irreparable harm it contends it will suffer in the absence of a TRO***.  For instance, [plaintiff's counsel] avers that '[r]ecently, [plaintiff's] customers have discovered

---

the alleged infringement and the alleged harm" (quoting *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017))); *JBF Interlude 2009 Ltd. v. Quibi Holdings, LLC,* No. CV20-2299-CAS (SKx), 2020 WL 3963863, at *6 (C.D. Cal. 2020) ("[I]ntegral to any preliminary injunction is a 'sufficient causal connection' between the claimed irreparable harm and the alleged misconduct") (citation omitted); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) (plaintiff's claims that defendant had "destroyed [plaintiff's] business model and threatened it with financial ruin," pushing plaintiff towards bankruptcy, did not establish irreparable harm where plaintiff did not demonstrate a "sufficient causal connection between the irreparable harm to [plaintiff's] business and [defendant's actions]"; moreover, plaintiff had "not established that the requested injunction would forestall [a bankruptcy]").

other retailers selling non-authorized over-the-door mirrors utilizing [Plaintiff's] intellectual property. These incidents have resulted in [Plaintiff's] customers expressing discontent and requesting meetings and immediate action to address this issue.' ***Plaintiff has not identified a single customer that has expressed discontent, requested meetings or threatened to stop doing business with Plaintiff because of the Defendants' sales of its over-the-door mirrors.***

*Id.* at *3 (second through fifth alterations in original) (emphasis added) (citation omitted); *see also Robson Forensic, Inc. v. Shinsky*, No. 5:22-cv-1309, 2022 WL 1198228, at *2 (E.D. Pa. Apr. 22, 2022) ("An assertion of irreparable harm must be based on concrete evidence and cannot be sustained 'on the basis of "bald and conclusory statements."'" (quoting *Cornette v. Graver* 473 F. Supp. 3d 437, 476 (W.D. Pa. 2020))). The Debtors fail to make the specific showing necessary to establish any harm, nor do they demonstrate that any such harms are both imminent and irreparable.[5]

### 1.    Debtors Have Not Met Their Burden To Demonstrate Any Purported Harm With Specific Or Documentary Evidence

Debtors generally assert that they will be irreparably harmed absent a TRO for four primary reasons: (a) that they may potentially lose the Philips license; (b) that they will lose revenue, customers, or other business opportunities; (c) that Mr. Stastney, allegedly representing the interests of a competitor, is now the director of the Dutch Entities; and (d) that they will suffer

---

[5]    *See also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("In order to demonstrate irreparable harm . . . [t]he preliminary injunction must be the *only* way of protecting the plaintiff from harm." (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989))); *MCS Indus.*, 2022 WL 4110523, at *2 ("The moving party must demonstrate that it is likely to suffer 'actual or imminent harm which cannot otherwise be compensated by money damages,' or it 'fail[s] to sustain its substantial burden of showing irreparable harm.'" (alteration in original) (quoting *Frank's GMC*, 847 F.2d at 103)); *Razor Tech., LLC v. Hendrickson*, No. 18-654, 2018 WL 2063844, at *8, *11 (E.D. Pa. May 3, 2018) (holding plaintiff "did not demonstrate its harm in losing commissions from one customer [was] irreparable" and that "[i]f Plaintiff's damages can be measured then the harm is not irreparable").

harm to their reputation and their goodwill.  But Debtors do not—and cannot—show with the requisite degree of specificity that *any* of these alleged harms will befall them.

**(a)    Debtors Do Not Have Support For
The Alleged Risk To The Philips License**

Debtors offer only speculation and conjecture that they could potentially lose the Philips license.  Mot. at 2–3, 12 ("The Defendants' interference with both the Philips and the Rembrandt licenses *could* lead the parties to consider the purported sublicenses from SCBV to SCI as a breach of contract." (emphasis added)).  Debtors have not proffered a single piece of evidence suggesting, for example, that Philips has threatened to revoke the license, has the present right to revoke the license based on SeeCubic's future business plans, or otherwise indicated that the license is at risk.  Without such evidence, this theory fails.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("[T]he risk of irreparable harm must not be speculative"); *Robson Forensic*, 2022 WL 1198228, at *2 ("An assertion of irreparable harm must be based on concrete evidence and cannot be sustained 'on the basis of "bald and conclusory statements."' (quoting *Cornette*, 473 F. Supp. 3d at 476)).

**(b)    Debtors Do Not Identify Harm Based
On Alleged Loss Of Business Opportunities**

Debtors' assertions that they will lose customers, revenue, and other business opportunities (e.g., investments) are vague and conclusory.  Debtors do not identify ***any specific*** lost opportunity or lost customer—or any specific opportunity or customer they are about to lose—making only the sweeping, generalized assertion that Defendants "diverted huge amounts of revenue, huge amounts of investment away from the company, and by not giving these things we've had investors and customers get very upset with us . . ."  Oct. 16, 2023 Hr'g Tr. (Rajan) at 106:22–25; *see also id.* at 122:2–3 ("They are taking revenue and investment away from—from Stream TV and Technovative . . ."); *id.* at 201:5–7 ("SeeCubic of Delaware is shifting customers and investment

7

to — away from the Debtor to another company . . .").[6]  The Debtors make related, sweeping

claims about the risk of customer confusion, *see, e.g.*, *id.* at 122:2–4 ("[T]hey're causing mass

confusion in the market . . ."), but the Debtors likewise do not offer any evidence as to whether

any specific customers have actually expressed confusion, whether specific customers have

canceled or are likely to cancel their orders due to such confusion, or the value of any specific at-

risk business deals.  Mot. at 11; Supp. Mem. at 6.  This is precisely the type of vague, unsupported

contention that courts have repeatedly and consistently found to be insufficient to demonstrate

irreparable harm.

In *Schuylkill Valley Sports, Inc., v. Corporate Images Co.*, No. 5:20-cv-02332, 2020 WL

3167636 (E.D. Pa. June 15, 2020), for example, the Eastern District (Leeson, J.) denied a motion

for a TRO in a case alleging misappropriation of trade secrets, among other things.  *Id.* at *1.  The

plaintiff asserted that it would suffer the "potential loss of employees, loss of customers, [ ] loss of

goodwill . . . may be forced to close several of its offices[, and may have] to breach covenants to

senior lenders and risk default."  *Id.* at *16 (alterations in original) (citation omitted).  The court

found that plaintiff had not carried its burden to demonstrate irreparable harm because these

assertions were nothing more than "conclusory assumptions" unsupported by any specific

evidence.  *Id.*  Likewise, in *MCS Industries*, where plaintiff alleged patent infringement, the

Eastern District (Schmehl, J.) found that the plaintiff had not met its burden to show irreparable

harm where its representative testified that plaintiff's "customers have discovered other retailers

selling non-authorized over-the-door mirrors utilizing [plaintiff's] intellectual property.  These

incidents have resulted in [plaintiff's] customers expressing discontent and requesting meetings

---

[6] *See also* Decl. of M. Rajan ¶ 8, ECF No. 30-5; Mot. at 6 ("Defendants' conduct, if not enjoined, imminently threatens to—and does now currently—interfere with and disrupt Stream's market participation, reputation, and investor attractiveness.").

and immediate action to address this issue.'" 2022 WL 4110523 at *3 (citation omitted). The court found this evidence vague and conclusory, noting that "Plaintiff has not identified a single customer that has expressed discontent, requested meetings or threatened to stop doing business with Plaintiff because of the Defendants' sales of its over-the-door mirrors." *Id.*[7] Absent some specific evidence, Mr. Rajan's vague, imprecise, speculative, unsupported, and exaggerated (if not wholly invented) testimony about harms is insufficient to obtain a TRO.

---

[7]     *See also Middle E. Forum v. Reynolds-Barbounis*, No. 19-5697, 2021 WL 84054, at *5–6 (E.D. Pa. Jan. 8, 2021) (finding no irreparable harm where plaintiff failed to provide evidence of specific customers that it was at risk of losing); *Ahern Rentals, Inc. v. Bilodeau*, No. 2:21-cv-1503 JCM (EJY), 2021 WL 3777708, at *3 (D. Nev. Aug. 25, 2021) (finding no irreparable harm because the plaintiff "fail[ed] to provide specific facts which elevate the alleged irreparable harm from possible to likely. For instance, [plaintiff] does not allege that [defendant] is actively soliciting [plaintiff's] customers or disclosing [plaintiff's] confidential information"); *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17-1390-LPS-CJB, 2018 WL 395750 at *14 (D. Del. Jan. 8, 2018) (finding insufficient evidence of irreparable harm because "[a]side from [plaintiff's witness'] insufficient declaration, [plaintiff] does not point the Court to anywhere else in the record—not to any documents, plans, presentations and/or communications—that flesh out its argument that Defendants' blending at PSL will likely cause [plaintiff] to lose future investments or curtail its ability to 'aggressively grow its market share.'"); *Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc.*, No. 11-CV-6183T, 2011 WL 3555833, at *4–6 (W.D.N.Y. Aug. 11, 2011) (finding no irreparable harm where the plaintiff, whose only evidence of harm was a declaration from its vice president of sales and marketing, "has only speculated as to the damages it may suffer from defendant's continued alleged infringement, and has failed to submit evidence of actual lost sales, lost market share or lost goodwill, or evidence demonstrating that such harms are likely"); *Mike's Train House, Inc. v. Broadway Ltd. Imps., LLC*, 708 F. Supp. 2d 527, 533 (D. Md. 2010) ("Here the lone affidavit of [plaintiff's] founder and owner, Michael Wolf, which asserts imprecise and exaggerated potential losses, does not establish irreparable harm. First, Wolf's assertion that [plaintiff] will lose its entire $5.5 million research and $8 million marketing investments if [defendant] is allowed to sell its [infringing product] is speculation. . . . Next Wolf has not quantified the expected loss of HO scale market share but merely asserts that [plaintiff] 'will lose existing customers and potential customers' and its current five percent market share 'will be eroded.' This speculation about possible economic loss is insufficient evidence of irreparable harm." (citation omitted)); *see also*, *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990) ("As a general rule, a preliminary injunction should not issue on the basis of affidavits alone. Moreover, a district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." (citations omitted)).

Moreover, Debtors have not shown that any alleged loss of business has been or will be caused by *SeeCubic*. In particular, Debtors have not identified *any* specific instances where SeeCubic, or SCBV, has competed with Debtors or imminently intends to compete with Debtors. Without such evidence, Debtors' argument fails. *See MCS Indus.*, 2022 WL 4110523 at *3 (finding no irreparable harm in intellectual property case where there was no specific or documentary evidence that the plaintiff and defendant were ever forced to bid against each other for particular business); *Schuylkill Valley Sports,* 2020 WL 3167636, at *16 (finding no irreparable harm where "[t]here is no evidence that [d]efendants are soliciting [plaintiff's] customers or have engaged any sales agreements with them.").[8]

### (c)    Debtors Do Not Establish That They Will Be Harmed By The Appointment Of Mr. Stastney As Director Of SCBV

Debtors only offer speculation—not evidence—that Mr. Stastney's position as director of the Dutch entities will harm the Debtors. Debtors assert that because Stream and SeeCubic are competitors who are both seeking to use SCBV to further their own interests, Mr. Stastney's role as director of SCBV is tantamount to a proverbial fox in the henhouse. Mot. at 7 ("[T]he Amsterdam Court appointed Stastney as temporary director of the Stream Dutch Entities, giving him the ability to control Stream's technology and continue marketing it in competition with Stream."). This argument fails for multiple reasons.

---

[8]    *See also Wells Fargo & Co., v. ABD Ins. and Fin. Servs., Inc.*, No. C 12-3856 PJH, 2014 WL 4312021, at *11 (N.D. Cal. Aug. 28, 2014) (determining that although plaintiff demonstrated that it lost business, "it has not shown any connection between that lost business and defendants' use of the [name and trademark]. In fact all of the evidence before the court supports its earlier finding that 'it seems equally (if not more) likely that [plaintiff]'s lost business was the result of each customer's informed choice and whether to do business with [plaintiff] or [defendant].'" (citation omitted)).

*First*, Debtors' argument rests on a false premise: that SeeCubic is a competitor of Stream. It is not. As Mr. Stastney—SeeCubic's CEO—testified months ago, SeeCubic is a holding company for the assets underlying the Debtors' Secured Creditors' claims. *See* June 27, 2023 Hr'g Tr., *Current Chapter 11 Cases*, at 51:9–11. As such, unlike a competitor, SeeCubic has a financial interest in maintaining and growing the value of the Debtors' business—i.e., the collateral on the Secured Creditors' loans to Stream—in order for the Secured Creditors' claims to maintain value. Decl. of Shadron Stastney, ECF No. 47 ¶ 26. In fact, the Dutch Court acknowledged in its decision appointing Mr. Stastney as director of SCBV that Mr. Stastney, rather than the Debtors' candidate, Mr. Park, would preserve the value of SCBV (and thus the value of the business). *See* Summary Judgment Opinion of the Dutch Court, dated September 20, 2023, attached as Exhibit 18 to the Decl. of Shadron Stastney, ECF No. 47 (hereinafter "Dutch Court Opinion, ECF No. 47-18"), at ¶ 5.20 ("In the circumstances now prevailing, [Stastney's] appointment is the only option available to maintain the status quo . . .").

Moreover, as Mr. Stastney has explained, SeeCubic markets the Ultra-D technology on behalf of SCBV. Oct. 6, 2023 Hr'g Tr. (Stastney) at 93:4–6 ("Q: SeeCubic, Inc sells and markets the Ultra D technology to potential clients on behalf of SeeCubic B.V.? A: That's correct."). SCBV is the party with all active contracts with customers or potential customers. Decl. of Shadron Stastney, ECF No. 47 ¶¶ 18–19, 24. As a result, SCBV's success *benefits* the Debtors, as indirect parents of SCBV. *Id.* ¶¶ 26–27.[9] In any event, as described above, Debtors have proffered no

---

[9]     Debtors' cases are distinguishable because they involved *actual* competitors threatening to, or already actively competing with, the plaintiff. *E.g.*, *Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 103–04 (3d Cir. 2015) (finding irreparable harm where plaintiff proved that defendant would likely imminently disclose trade secrets to plaintiff's competitor).

Further, many of the cases Debtors cite in this section actually support *SeeCubic* because the courts refused to issue preliminary injunctions or temporary restraining orders after
                                                                                                          *(cont'd)*

evidence that SeeCubic and Stream are *actually* competing with one another for the same opportunities.  *See* pg. 10, *supra*.

> *Second* and relatedly, Debtors' suggestion that they automatically suffer harm by virtue of Mr. Stastney's directorship—which they perceive inevitably threatens disclosure of the trade secrets—is incorrect as a matter of law.  Supp. Mem. at 4.  In order for Debtors' argument to carry weight, Mr. Stastney would need to be in a position to act in a way that is harmful to the Debtors. He is not.  As an initial matter, as discussed on page 11, *supra*, SeeCubic is not a competitor of the Debtors; rather, their interests in maximizing the value of the Dutch entities are aligned.  And, significantly, Mr. Stastney was appointed by and is operating under the oversight of the Dutch Court.  *See, generally*, Dutch Court Opinion, ECF No. 47-18.  Mr. Stastney is required to adhere to a written protocol that obligates him to act independently and in the best interests of the Dutch entities.  *Id*. ¶ 5.20; Protocol, attached as Exhibit 9 to the Decl. of Shadron Stastney, ECF No. 47 (hereinafter "Protocol, ECF No. 47-9"), at ¶ B ("The independent director is impartial and acting under the supervision of the Dutch court and submits a report to the court."); *id.* at ¶ C ("The independent director acts in the interest of the Dutch companies . . ."); *id.* at ¶ 6 ("Each of the Parties is invited to provide the independent director with advice in writing as to how to enhance and/or protect the business of the companies.  The independent director aims to follow up on such

---

determining that the movant failed to show imminent irreparable harm.  *See Campbell Soup*, 977 F.2d at 91–92 (denying a preliminary injunction because defendant's past misappropriation of trade secrets could not by itself establish a risk of imminent irreparable harm); *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 553 (E.D. Pa. 2018) (finding no injunctive relief was necessary where defendant no longer worked for plaintiff's competitor, meaning defendant would not likely cause future irreparable harm); *MCS Indus.*, 2022 WL 4110523, at *2 (finding no irreparable harm where defendant, plaintiff's competitor, priced its identical and infringing product higher than plaintiff's); *Razor Tech.*, 2018 WL 2063844, at *8, *11 (denying injunctive relief where defendant left plaintiff's business and poached plaintiff's customers for the competitor because the plaintiff could not prove that the revenue lost from that customer is irreparable harm).

advice, if and to the extent in the interest of the companies."). Because the Dutch Court explicitly requires Mr. Stastney to work for the benefit of the Dutch entities, Debtors cannot persuasively assert that they will automatically suffer harm as a result of Mr. Stastney's appointment.[10]

*Third*, the Debtors' argument also rests on the assertion that the trade secrets are at risk of disclosure outside of SCBV. The Debtors cannot make this showing. As a threshold matter, the Debtors fail to identify with any specificity the trade secrets they allege are at risk. In the Complaint, Debtors' definition of "Trade Secrets" is overbroad and unspecified, and is precisely the type that courts find to be insufficient to state a claim—much less demonstrate a likelihood of success on the merits of that claim. Compl. ¶ 249. For example, a definition of "trade secrets" that the District of Delaware recently found "seemingly boundless" and too broad to meaningfully provide the defendants—or the court—with notice of what the alleged trade secrets were, were, *Power Integrations, Inc. v. Silane Semiconductors North America, Inc.*, No. 19-1292-LPS, 2020 WL 3508078, at *3 (D. Del. June 29, 2020), bears remarkable similarities to Debtors' definition of their "Trade Secrets."

| Debtors' "Trade Secrets" | Insufficiently Identified Trade Secrets In *Power Integrations* |
|---|---|
| "The proprietary and trade secret information that Plaintiffs created and developed in connection with the Ultra-D products **includes, but is not limited to**, design files, drawings, **specifications**, manufacturing information, device, component, | Trade secrets "**includ[e] but [are] not limited to product specifications, product forecasts, definitions, designs, research and development, patentable technologies**, particularized costing information, bill of materials, customer acquisition, |

---

[10]    Even in the absence of such direction from the Dutch Court, Debtors' argument is insufficient. As the court explained in *Robson Forensic*, a plaintiff's "purported belief that [defendants] have already misappropriated [plaintiff's] trade secrets and confidential information, without more, does not carry its burden." *Robson Forensic, Inc. v. Shinsky*, No. 5:22-cv-1309, 2022 WL 1198228, at *5 (E.D. Pa. Apr. 22, 2022). *See also ASI Bus. Sols., Inc.*, 233 F. Supp. 3d 432, 441 (E.D. Pa. 2017) ("[E]ven if the Court were to find that [plaintiff] has 'established a risk of irreparable harm'—presumably by finding that Defendant's continuing possession of the items in question could expose [plaintiff's] confidential information to future use or disclosure— [plaintiff] has not shown . . . that any use or disclosure is 'immediate,' or even that there is 'an imminent threat of the allegedly harmful disclosure.").

| | |
|---|---|
| application, and configuration information (including with respect to displays for TVs, tablets, laptops, PCs, phones, automobiles, accessories, etc.), device packaging information, development roadmaps and plans, plans for the development and delivery of features and displays to individual clients, marketing plans, market analyses, **future product plans and designs such as product specifications, product forecasts, definitions, research and development, patentable technologies**, source code, **cost information**, **existing and potential business opportunities and strategies**, client lists, sales and customer information, sales prospect pipelines as well as details regarding the prospects, sales playbook, **marketing and sales projections**, financial information, and **business plans relating to existing and future products, customers**, and markets." Compl. ¶ 249 (emphasis added). | **business opportunities and strategies, marketing and sales projections, and business plans relating to Power Integrations' new and future products."** *Power Integrations*, 2020 WL 3508078, at *3 (emphasis added) (citation omitted).[11] |

The Motion does nothing to limit the Complaint's expansive definition of the purported "Trade Secrets" or identify what among this list is at risk such that a TRO may be necessary. Further, with an opportunity to better define their trade secrets in the Supplemental Memorandum, Debtors actually broaden the categories of purported trade secrets. In particular, Debtors now ask the Court for an injunction to protect "Debtors' *Confidential Information* and Trade Secrets." Supp. Mem. at 3 (emphasis added). But "just because a document is confidential does not mean

---

[11]    *See also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, No. 2:20-CV-00235-KJM-DB, 2020 WL 4937129, at *5 (E.D. Cal. Aug. 24, 2020) (dismissing with leave to amend trade secret claims containing "overbroad 'includes but not limited to' language"); *Becton, Dickinson & Co. v. Cytek Biosciences Inc.,* No. 18-cv-00933-MMC, 2018 WL 2298500, at *2–4 (N.D. Cal. May 21, 2018) (dismissing claim where trade secrets were "too broadly stated" because of terms used and inclusion of "other . . . products"); *Emazing Lights LLC v. De Oca,* No. SACV 15-1561 (AG) (Ex), 2016 WL 3658945, at *2 (C.D. Cal. Jan. 7, 2016) (dismissing claim; holding "trade secrets" not sufficiently defined where "'include[s] but [is] not limited to'" language was used (alterations in original)).

that it is a trade secret." *Acosta, Inc. v. Navitsky*, No. 17-3282, 2018 WL 1251640, at *8 (E.D. Pa. Mar. 12, 2018); *see id.* at *8–9 & n.9 (denying preliminary injunction where plaintiff had "neither identified specific trade secrets nor affirmatively argued through the elements for an alleged trade secret"; instead, plaintiff had "pointed to a group of documents and alleged, generally, that they [were] trade secrets"); *see also Elsevier, Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *6–7 (S.D.N.Y. Jan. 23, 2018) (dismissing trade secret claims where pleading conflated the narrow concept of "trade secret" with the broad concept of "confidential information"). Misappropriation of confidential information does not support issuance of a TRO or injunction, and courts regularly deny requests for injunctive relief where the plaintiff does not distinguish between confidential information and trade secrets. *See, e.g.*, *ASI Business Solutions, Inc. v. Otsuka Americas Pharmaceuticals, Inc.* 233 F. Supp. 3d 432, 434 (E.D. Pa. 2017) (denying a preliminary injunction after observing that "[plaintiff] has failed to explain exactly what makes its confidential information—in particular, the installation packages, backup tapes, and hard-copy documentation currently at issue—so 'special' or 'peculiar' as to warrant injunctive relief at this time.").

Without identifying a specific trade secret at risk of misappropriation, or how, Debtors cannot demonstrate that Mr. Stastney's appointment is the cause of any related purported harm. *See, e.g.*, *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) (plaintiff's claims that defendant had "destroyed [plaintiff's] business model and threatened it with financial ruin," pushing plaintiff towards bankruptcy, did not establish irreparable harm where plaintiff did not demonstrate a "sufficient causal connection between the irreparable harm to [plaintiff's] business and [defendant's actions]"; moreover, plaintiff had "not established that the requested injunction would forestall [a bankruptcy]").

*Fourth* and finally, the evidence actually affirmatively indicates that Mr. Stastney will *not* put the Debtors' trade secrets at risk.  Mr. Stastney was appointed by a court in the Netherlands, which was presented with evidence at a hearing in which Mr. Rajan actively participated and presented his own candidate for the directorship.  Dutch Court Opinion, ECF No. 47-18 ¶ 1.  As discussed previously, Mr. Stastney is subject to the supervision of the Dutch Court and is required to adhere to a written protocol that obligates him to act in the best interests of the Dutch entities. *See* pg. 12, *supra*; Oct. 6, 2023 Hr'g Tr. (Stastney) at 157:6–24.[12]  And Mr. Stastney is working with Dutch counsel to modify the protocol to address concerns regarding his independence.  *Id.* at 178:17–179:24.[13]  Lastly, the Dutch Court itself suggested that Mr. Stastney, rather than putting

---

[12]      Q: Mr. Stastney, what's your understanding of how this protocol applies to you?
A: According to the court's decision in Amsterdam, I am bound to abide by this during my time as director of the Netherlands entities and until a qualifying event occurs, which would remove this from the court's jurisdiction.
Q: Okay.  And what does it require you to do or not to do?
A: Quite a bit.  Generally speaking, to continue to operate the business in the best interests of the Dutch entities.  To continue operating generally in the ordinary course.  To continue to work to fund the entities sufficiently.  To conduct all relationships between any of the parties only at arm's length.  To treat both stakeholders of Stream and SeeCubic equally in terms of access to the human resources of SeeCubic BV based on the merit of the projects proposed.  And to entertain projects from both entities and assess them based on merit to determine how to allocate those human resources.
Q: And do you intend to abide by that protocol?
A: Yes, I do.

[13]      Q: And if the Debtors have projects that they want you to propose, then they would have to propose those to you, correct?
A: Or as directed by me, and – and the process that we've planned to put in place and we'll seek approval from the Dutch court for that, is that they'll go to the employees, to the extent that a name is needed, it will be given only to the staff of the BV, and I won't receive that name.  I'll receive the details and the analysis of the project to determine its feasibility, but not the name.
Q: Where does it state that in this protocol?
A: It doesn't.
Q: What's that based on then?

*(cont'd)*

the Debtors' trade secrets at risk, would better protect the business than would the Debtors' candidate for the directorship. *See* Dutch Court Opinion, ECF No. 47-18, ¶ 5.18 ("In the light of all Rajan's attempts to attract the assets and activities to Stream and/or VSI, his disinterest in the (financing of) the Dutch Companies and his refusal to want to take the protocol drawn up by the independent director as a starting point, it requires too much naivety to expect that the director Park appointed by him will take as a starting point to maintain the status quo as much as possible."). Indeed, the evidence will show that, to the contrary of harming the Debtors, under SeeCubic's direction, SCBV—and, indirectly, the Debtors—has already realized tangible benefits.

### (d)    Debtors Cannot Identify Harm
### Based On Alleged Reputational Injury

In seeking redress for alleged trade secret misappropriation, Debtors cannot establish harm by relying on purported injury to their reputation and goodwill. As a threshold matter, the Third Circuit has determined that "showing some potential harm to reputation is usually insufficient to support a conclusion that irreparable harm exists." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 654 (3d Cir. 1994). Indeed, the Third Circuit has held that potential reputational harm is considered irreparable in *trademark* cases. *Id.* at 653–54 & n. 11 (distinguishing the decision to grant an

---

A: That's based on – this protocol was set up for the independent director. That's based on Dutch counsel's advice on how best to effectuate the spirit of the protocol, understanding that I am with one of the parties.

Q: Right. And so I guess my question to you, or my point was that this protocol to the extent that – would you agree that there were certain provisions in this protocol that made more sense whenever there was independent director involved as opposed to essentially the chairman and CEO of one of the two parties?

A: Yeah. There are certain provisions that have to be modified to effectuate the spirit, and we're in the process of doing that.

Q: Where in the process have you been doing that?

A: In discussions with Dutch counsel about what's going to be sufficient for the Court, and then we'll propose it to the Court.

injunction in *Opticians Association of America*, 920 F.2d 187 (3d Cir. 1990) because of the "special problem of confusion that exists in cases involving trademark infringement and unfair competition."). Since the Third Circuit identified that distinction, courts have rejected attempts to establish irreparable harm in *trade secret* cases with assertions of loss to goodwill or reputation. In *Roman Chariot, LLC v. JMRL Sales & Services, Inc.* No. Civ.A. 06–626 MLC, 2006 WL 4483165 (D.N.J. July 11, 2006), for example, the District of New Jersey rejected a trade secret plaintiff's reliance on "loss of control of reputation, loss of trade, and loss of good will" cases because those precedents dealt with "harm to their reputation or good will resulting from the defendants' use of their *trademarks*, not the defendants' use or misappropriation of their *trade secrets* or other confidential information." *Id.* at *7 (emphasis added) (citation omitted). The court emphasized that "[t]rademark infringement cases, unlike trade secret cases, are concerned with the confusion that results from the misuse of another's mark." *Id.* (citing *Acierno*, 40 F.3d at 654).[14]

Even if loss of goodwill or reputation arguments were applicable to this case—they are not—Debtors fail to proffer any *specific* evidence in support of their assertion that they have

---

[14]     The Debtors cite *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) in support of their argument on this point. In *BP Chems*, the Third Circuit held that the district court did not clearly err in crediting testimony about the damage that would result to the plaintiff's reputation to support the court's finding that the plaintiff would suffer irreparable injury absent an injunction. *See id.* at 263–64. The case is unique on its facts—BP, a well-known, large corporation, sought to enjoin the defendant from exporting chemical process vessels for use in a chemical plant in Taiwan. *Id.* at 257. Where BP would not be able to secure relief in Taiwan "in the event that the equipment were allowed to leave the country," the Third Circuit upheld the finding that the action at issue, involving potential disclosure of trade secrets, would give rise to the "public perception that [the plaintiff] was unable to protect its proprietary trade secrets." *Id.* at 263. Debtors' citation to *BP Chems* is inapposite. Debtors face no immediate threat of harm, and Debtors have "not provided sufficient evidence that [they] enjoy[] a particular reputation, name recognition, or good will among [potential customers]," let alone that this reputation will be irreparably harmed. *Roman Chariot, LLC v. JMRL Sales & Services, Inc.* No. Civ.A. 06–626 MLC, 2006 WL 4483165, *8 (D.N.J. July 11, 2006). While *BP Chems* was an outlier, the present case falls into the Third Circuit's general view that potential harm to reputation is not enough. *See Acierno*, 40 F.3d at 654.

suffered or are reasonably likely to imminently suffer any such loss.  Instead, Debtors assert that

SeeCubic's conduct threatens "current and ongoing irreparable harm to Stream's marketplace

reputation, credibility, customer goodwill, and future business opportunities."  Supp. Mem. at 6.

Assertions precisely like these have been found to be insufficient.  In *Wells Fargo & Co., v. ABD*

*Ins. and Fin. Servs., Inc.*, No. C 12-3856 PJH, 2014 WL 4312021 (N.D. Cal. Aug. 28, 2014), for

example the Northern District of California denied a motion for preliminary injunction on the

grounds that, among other things, the plaintiff failed to demonstrate irreparable harm.  *Id.* at *9.

The court held that the plaintiff's assertions that (i) the defendant "caused [plaintiff] to lose control

over [its] goodwill and reputation," (ii) plaintiff "has lost and continues to lose much of the

goodwill it purchased" and "lost the benefit of the association it forged with the ABD name," and

(iii) defendant's actions have "'diminished,' 'undermined,' 'devalue[d],' and 'taint[ed]'" plaintiff's

reputation and goodwill were insufficient.  *Id.* at *9–10 (second, third, and fourth alterations in

original (citations omitted)).[15]

### 2.    Debtors Have Not Met Their Burden To Show That Any Harm They May Suffer Absent Entry Of A TRO Is Imminent

Debtors fail to carry their burden of showing that any possible harm stemming from the

alleged misappropriation of their trade secrets is imminent.  "Establishing a risk of irreparable

harm is not enough."  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).  "The requisite

for injunctive relief has been characterized as a clear showing of immediate irreparable injury, or

---

[15]    To the extent Debtors are actually suffering some sort of reputational harm in the
marketplace, that is the result of the Debtors' own conduct: Debtors have defaulted on more than
$100 million dollars in debt and have been in bankruptcy *three* times in less than three years, with
prior bankruptcies being dismissed for bad faith.  If the Debtors have a reputation for inability to
meet obligations, it was Debtors who created that reputation.  *Cf. Wells Fargo*, 2014 WL 4312021,
at * 9 ("[I]t seems equally (if not more) likely that Wells Fargo's lost business was the result of
each customer's informed choice and whether to do business with Wells Fargo or ABD." (citation
omitted)).

a *presently existing actual threat*." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359

(3d Cir. 1980) (emphasis added) (trade secret case) (citations omitted).  In other words, "[t]he harm

sought to be averted must not be an abstract or potential harm." *Nat'l Metallizing v. Foster*, No. 82-

3336, 1982 WL 52137, at *3 (D.N.J. Dec. 13, 1982); *see also Pallante v. Those Certain

Underwriters At Lloyd's, London*, 311 F. Supp. 3d 692, 694 (E.D. Pa. 2018) ("Any irreparable

harm must be immediate.  It does not include harm which may occur 'only in the indefinite

future.'" (citation omitted)).

#### (a)   Debtors Have Not Shown That Any Harm Is Imminent

Here, Debtors have not shown that any alleged harm is imminent such that a TRO is

appropriate.  As described above, Debtors fail to identify any specific, non-speculative harm;

rather, they provide only speculation of *potential* harm that *may* occur sometime in the future.

Supp. Mem. at 4 ("Defendants are *likely* to harm Debtors" (emphasis added)); *id.* at 7 ("Debtors

*may* be harmed by having their Confidential Information and Trade Secrets used by Defendants

and/or revealed to their competitors." (emphasis added)).   Debtors attempt to remedy this

deficiency with a series of arguments, none of which has merit.

*First*, Debtors attempt to demonstrate imminence by suggesting that SCBV's possession

of the trade secrets is probative of immediate future misappropriation.  Supp. Mem. at 4.  As the

court explained in *Robson Forensic*, however, a plaintiff's "purported belief that [defendants] have

already misappropriated [plaintiff's] trade secrets and confidential information, without more,

does not carry its burden" to show imminent, prospective harm.  *Robson Forensic, Inc. v. Shinsky*,

No. 5:22-cv-1309, 2022 WL 1198228, at *5 (E.D. Pa. Apr. 22, 2022) (citation omitted).  Indeed,

while the Debtors offer speculation that immediate harm will befall them, the evidence shows

otherwise.  Mr. Stastney testified that SCBV is at least months away from completing simple proof

of concept units—and is even further away from potential commercial discussions.  *See* Oct. 6,

2023 Hr'g Tr. (Stastney) at 136:3–20 (testifying that proof of concept units are not likely to be completed until the end of 2023 or early 2024 and that commercial discussions may occur at some indefinite point thereafter).  In similar circumstances, courts have found preliminary relief to be inappropriate.  *See, e.g.*, *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91–92 (3d Cir. 1992) (vacating preliminary injunction because defendant was nowhere near ready to commercialize or market a product that allegedly misappropriated plaintiff's trade secrets).

*Second*, Debtors assert that Mr. Stastney's recent appointment by the Dutch Court as director of the Dutch entities makes misappropriation—and harm—imminent.  Supp. Mem. at 4.  As discussed above, Mr. Stastney is, in fact, obligated to work for the benefit of the Dutch entities—and thus, indirectly, the Debtors—as a matter of law.  *See* pgs. 12–13, *supra*.  Moreover, Debtors do not offer any evidence that Mr. Stastney will imminently obtain access to any new trade secret information by virtue of his court-appointed position.  Debtors have not, for example, pointed to *any* specific pending or forthcoming projects that they wish to submit to SCBV that could even possibly reveal new trade secret information to Mr. Stastney.  As such, Debtors have identified only a hypothetical *risk* of harm—not any actual, threatened, and imminent harm.  *Nat'l Metallizing*, 1982 WL 52137 at *2.[16]

### (b)   Debtors' Delayed Filing Weighs Against Their Alleged Need For Immediate Relief

Debtors' delay in seeking a TRO also undermines any argument that harm is imminent.  A preliminary injunction may be granted only where "there is an urgent need for speedy action to protect the plaintiffs' rights."  *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117–18 (3d Cir.

---

[16]   While Debtors reference the two purchase orders they have with VSI, Debtors have affirmatively told the Court that they have made alternate arrangements—without SCBV—to fulfill those orders.  *See* Oct. 16, 2023 Hr'g Tr. (Rajan) at 250–51.

2013) (citation omitted).  "Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." *Id.* (alteration in original) (citation omitted); *see also High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("The district court correctly noted that delay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement.").

Here, most of the conduct that Debtors complain of—SeeCubic's future sublicensing business model, the alleged "risk" to the Philips license, and SeeCubic's alleged retention and use of Stream's assets—has been known to Debtors for years.  For example, Debtors themselves submitted an exhibit to the Court—a Q2 2022 private placement memorandum issued by SeeCubic—that sets out SeeCubic's future sublicensing business model.  As another example, even in the Current Chapter 11 Cases, Debtors have been complaining for months that SeeCubic has unlawfully retained and continues to use Stream's assets.  *See, e.g.,* Emergency Motion for Entry of an Order Enforcing the Automatic Stay and for Sanctions for Willful Stay Violation, *Current Chapter 11 Cases*, ECF No. 49 (filed March 28, 2023); Amended Emergency Motion for Entry of an Order (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations, *Current Chapter 11 Cases*, ECF No. 76; Debtors' Supplement to Amended Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations, *Current Chapter 11 Cases*, ECF No. 90.  Simply put, Debtors waited months—and indeed, years—to seek equitable relief from a court on the basis that

22

SeeCubic has and will continue to use Debtors' alleged trade secrets or risk Debtors license with Philips.

The *only* "new" event is Mr. Stastney's appointment to serve as director of the Dutch entities by the Dutch Court. As an initial matter, "[t]imeliness of an emergency request for temporary restraining order is measured from when a plaintiff receives notice of the alleged harm." *RelaDyne Reliability Servs. Inc. v. Bronder*, No. 2:20cv377, 2020 WL 5745801, at *2 (E.D. Va. Aug. 4, 2020). Debtors here allege "harm" that they have known about for months; they cannot point to purported harm dating back months and simultaneously start the clock for timeliness at a recent event. Even if Mr. Stastney's appointment were the relevant "new" event that precipitated their notice of harm, Debtors waited *weeks* after the Dutch Court appointed Mr. Stastney as a director of SCBV to allege similar purportedly imminent harms stemming from the same trade secret claims. While Debtors may argue that such a lapse in time is not significant, a TRO is only effective for 14 days, meaning Debtors waited longer than the length of a potential TRO to argue that Mr. Stastney's appointment necessitated such a remedy. Courts repeatedly recognize that a delay of weeks can undermine a showing of irreparable harm. *See Weeks Marine, Inc. v. TDM Am., LLC*, No. Nos. 11-3850 (ES) (CLW), 11-4338 (ES) (CLW), 2011 WL 6217799, at *9 (D.N.J. Dec. 14, 2011) (noting that "an unexplained three to four-week delay, as here, hardly counts in Plaintiffs' favor" for a preliminary injunction (citation omitted)); *Static Control Components, Inc. v. Future Graphics, LLC*, No. 1:06CV00730, 2007 WL 1447695, *2–3 (M.D.N.C. May 11, 2007) (finding that an employer's eight-week delay in seeking to prevent a former employee from working for a competitor weighed against a finding of irreparable harm); *Maxlite, Inc. v. ATG Elecs., Inc.*, No. 8:20-cv-01056-JLS-ADS, 2020 WL 6260007, at *2 (C.D. Cal. July 13, 2020) (denying TRO in a trade secret case because "a delay of months, or even weeks, in filing this Ex

Parte Application would belie Maxlite's claim of imminent irreparable harm requiring emergency relief"); *Giving Back Fund Inc v. Miami Mktg. Grp. LLC*, No. CV 10-9705 GAF (JEMx), 2011 WL 13217774, at *4 (C.D. Cal. Jan. 20, 2011) (collecting cases where delays as short as eighteen days showed a "lack of urgency and irreparable harm" (citation omitted)).

### 3.   Debtors Have Not Met Their Burden To Show That Any Harm They May Suffer Absent Entry Of A TRO Is Irreparable

To demonstrate irreparable harm, the movant has the burden of identifying a potential harm that cannot be "redressed by a legal or an equitable remedy following a trial." *Campbell Soup*, 977 F.2d at 91 (citations omitted) ("The preliminary injunction must be the only way of protecting the plaintiff from harm.").  "The requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* at 91–92 (internal quotation marks and citation omitted).

Throughout both the Motion and testimony, Debtors quantify the harm they face in monetary terms.  Mot. at 3, 6, 10; Oct. 16 Hr'g Tr. (Rajan) at 106:19–22 ("[T]hey have caused hundreds of millions of dollars of damages . . .").  By their own descriptions, Debtors' purported harm is not irreparable because they can be compensated by money damages.  *See Frank's GMC*, 847 F.2d at 102 (3d Cir. 1988) ("The availability of adequate monetary damages belies a claim of irreparable injury.").  Debtors attempt to overcome this determination in two ways.  Neither is successful.

*First*, Debtors attempt in their Supplemental Memorandum to mask the fact that their alleged harm is quantifiable—and thus not irreparable—by improperly invoking alleged harm to their reputation and goodwill.  Mot. at 11; Supp. Mem. at 6.  According to Debtors, SeeCubic's alleged interference with the Philips license will prevent Stream from fulfilling its initial purchase orders—which, notably, are with Debtors' insider VSI and not a true customer—impacting its

24

market reputation and goodwill with customers.  Mot. at 10-11.  Debtors assert that this type of harm is difficult to quantify and thus not compensable by money damages.  But difficulty quantifying a loss does not make it unquantifiable.  *See Campbell Soup Co.*, 977 F.2d at 92 ("In order to demonstrate irreparable harm . . . [t]he preliminary injunction must be the *only* way of protecting the plaintiff from harm." (citation omitted)).

In any event, the Third Circuit has rejected attempts to convert monetary harm into irreparable harm by re-casting it as reputational harm.  In *Bennington Foods LLC v. St. Croix Renaissance, Group, LLP*, 528 F.3d 176 (3d Cir. 2008), for example, the plaintiff argued that defendant's breach of contract prevented plaintiff from timely satisfying its obligations to its customers.  *Id.* at 179.  The plaintiff asserted that such failure harmed its reputation as a business that timely performs on its obligations.  *Id.*  The Third Circuit rejected this argument and found no irreparable harm, asserting that "a plaintiff in a breach of contract case cannot convert monetary harm into irreparable harm simply by claiming that the breach of contract has prevented it from performing contracts with others and that this subsequent failure to perform will harm the plaintiff's reputation."  *Id.* at 178–79.

*Second*, Debtors attempt to argue that the harm they face is not compensable by money damages because they cannot quantify the value of lost *future* business.  Mot. at 12; Supp. Mem. at 6; Oct. 16 Hr'g Tr. (Rajan) at 106:19–22 ("They diverted huge amounts of revenue, huge amounts of investment away from the company, and by not giving these things we've had investors and customers get very upset with us . . .").  Courts have repeatedly rejected this argument because loss of customers or profits is compensable by damages.  *E.g.*, *Apollo Techs. Corp. v. Centrosphere Indus. Corp.*, 805 F. Supp. 1157, 1209 (D.N.J. 1992) ("[L]oss of *potential* business opportunities, profits, customers or contracts is compensable by money damages and does not constitute

irreparable injury." (emphasis added)); *ASI Bus. Sols., Inc.*, 233 F. Supp. 3d at 440 ("Even

assuming that [plaintiff] might argue that it could be difficult to quantify in monetary terms the

value of the trade secrets contained in these items, '[a]n inability to precisely measure financial

harm does not make that harm irreparable or immeasurable.'" (alteration in original) (quoting

*Acierno*, 40 F.3d at 655)).[17]

### B.    Debtors Have Not Established Misappropriation of Trade Secrets

To prevail on their claims of trade secret misappropriation under the Defend Trade Secrets

Act (the "DTSA") (Count XVII) and Pennsylvania's codification of the Uniform Trade Secrets

Act (the "PUTSA") (Count XVIII), the Debtors must still establish that SeeCubic misappropriated

or will imminently misappropriate those trade secrets.  Debtors fail to do so.  "The standard for

'misappropriation' . . . is identical under both the DTSA and PUTSA." *Robson Forensic,* 2022

WL 1198228, at *4 (citing 18 U.S.C. § 1839(5)(B); 12 Pa. Cons. Stat. § 5302 (definition of

"Misappropriation")).  Under both statutes, "misappropriation" generally involves disclosing or

using the trade secret of another despite knowledge that there is no permission to disclose or use

such information or that such information was obtained improperly.  *See* 18 U.S.C. § 1839(5); 12

Pa. Cons. Stat. § 5302 (definition of "Misappropriation").

To support their request for a TRO, Debtors hang their hat on an argument of inevitable

disclosure—that through his court-appointed position as director of the Netherlands subsidiaries,

---

[17]    The District of Delaware applied this reasoning in its denial of the motion, filed in the
summer of 2023, of non-party Rembrandt 3d Holdings Ltd. ("Rembrandt"), for a TRO against
SeeCubic, among parties, based on similar allegations.  On August 1, 2023, the court denied
Rembrandt's motion, finding that Rembrandt had not met its burden to show that it would be
irreparably harmed absent preliminary relief.  In particular, the court found that the injury asserted
by Rembrandt could be remedied by monetary compensation, such as through the purchase of a
license from Rembrandt by SeeCubic.  *See* Exhibits 5 and 6 to the Decl. of Shadron Stastney, ECF
No. 47.

Mr. Stastney "would likely use the specialized and confidential knowledge and information at his job at [SeeCubic] and/or in his role as director of [SeeCubic, B.V.]." Supp. Mem. at 7. Aside from the problems this argument faces under the irreparable harm analysis (*see* Part I.A.1.c, *supra*) this type of "likely" inevitable disclosure is ***not*** enough to show likelihood of success on the merits: a "general assertion that [defendant] is conspiring to steal [plaintiff's] trade secrets" does not establish misappropriation. *Robson Forensic*, 2022 WL 1198228, at *5; *see id.* at *6 (denying motion for TRO).

As mentioned previously, Mr. Stastney testified that SCBV is at least months away from completing simple proof of concept units—and is even further away from potential commercial discussions. *See* Oct. 6, 2023 Hr'g Tr. (Stastney) at 136:3–20 (testifying that proof of concept units are not likely to be completed until the end of 2023 or early 2024 and that commercial discussions may occur at some indefinite point thereafter). Moreover, although the Debtors expressed concern regarding the protection of the intellectual property in SCBV's possession, the evidence will show that SCBV, under Mr. Stastney's direction, has the same protections in place as the Debtors. And Mr. Robertson himself testified that a third party would not be able to copy the technology just by seeing a demonstration of it. *See* Oct. 16, 2023 Hr'g Tr. (Robertson) at 82:5–14.[18]

In addition, SeeCubic arranges for SCBV to put the trade secrets, which remain with SCBV, to use in developing SCBV's business. Mr. Stastney has described extensively that SeeCubic's goal is the success of SCBV. *See, e.g.*, Decl. of Shadron Stastney, ECF No. 47 ¶ 26 ("SeeCubic

---

[18]    Q: Would a party be able to copy the chip or optical lens designed just by seeing a demo of the Ultra-D Glasses-Free 3D technology?
A: By seeing a demo, no – by having a demo, potentially. I should correct that – have [a] demo unit in – in their possession.

has an incentive to ensure that SCBV succeeds right now *regardless of business model or ownership*.")  And the evidence will continue to show that his efforts have already resulted in tangible benefits to SCBV.

Lastly, as discussed previously, *see* pgs. 16–17, *supra*, the Dutch Court recognized the value that would inure to SCBV under the directorship of Mr. Stastney.  The Dutch Court evaluated the alternatives—Mr. Stastney or the Debtors' recommendation, Mr. Park—and determined that Mr. Stastney would be more likely to protect SCBV's assets.  According to the Dutch Court,

> In the light of all Rajan's attempts to attract the assets and activities to Stream and/or VSI, his disinterest in the (financing of) the Dutch Companies and his refusal to want to take the protocol drawn up by the independent director as a starting point, it requires too much naivety to expect that the director Park appointed by him will take as a starting point to maintain the status quo as much as possible.

Dutch Court Opinion, ECF No. 47-18, ¶ 5.18.  The Dutch court's decision is an endorsement of the fact that SeeCubic is acting to preserve, and, ideally, maximize, the value of SCBV. Distributing trade secrets outside of the business benefits neither SCBV nor SeeCubic, and the Debtors have provided no evidence in support of such allegations.

## C.     The Balance Of Hardships And The Public Interest Weigh Against An Injunction

Debtors have not satisfied their burden with respect to either (i) likelihood of success on the merits or (ii) irreparable harm.  Because "a movant for preliminary equitable relief *must* meet the threshold for the first two 'most critical' factors," the Court can and should deny the motion without going further.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (emphasis added) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see Herley Indus., Inc. v. R Cubed Eng'g, LLC*, No. 5:20-cv-02888, 2020 WL 6504588, at *4 (E.D. Pa. Nov. 5, 2020) ("[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result

in the denial of a preliminary injunction." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689

F.2d 1137, 1143 (3d Cir. 1982))).

If the Court reaches balance of harms, "[t]he question is whether, and to what 'extent[,] . . .

the defendants will suffer irreparable harm if the preliminary injunction is issued.'" *Kos Pharms.,*

369 F3d at 727 (second and third alterations in original) (quoting *Opticians Ass'n of Am. v. Indep.*

*Opticians of Am.,* 920 F.2d 187, 192 (3d Cir. 1990)).  In other words, "the court should . . . 'ensure

that the issuance of an injunction would not harm the [defendant] more than a denial would harm

the [plaintiff].'"  *Id.* (quoting *Opticians*, 920 F.2d at 197).  In addition, Courts "should consider the

effect of the issuance of a preliminary injunction on other interested persons and the public

interest."  *Reilly*, 858 F.3d at 176 (citations omitted).

Here, while Debtors face no real emergency, SeeCubic faces an overbroad restraining order

that will actually hurt the Dutch entities and potentially therefore the Debtors' estates.  Debtors ask

the Court to enjoin SCBV from, among other activities, "entering into any contractual agreements

with customers, strategic partners, or any other entity without the express written approval of

Stream" and "continuing to use Ultra-D demonstration samples to secure investment or customer

contracts for either themselves, their subsidiaries, or any direct or indirect subsidiary of Stream."

Proposed Order, ECF No. 71 ¶¶ O, B.  And not only would the Debtors stop SCBV from marketing

to or contracting with customers, but they also seek to prohibit Defendants, including SCBV

director Mr. Stastney, from communicating with SCBV at all.  *Id.* ¶ D (enjoining all Defendants

from "contacting employees of Stream, Stream's Netherland subsidiaries, including . . .

SCBV[.]").  Lastly, Debtors ask that the Court appoint a retired Philadelphia judge or a "party

proposed by Stream" to serve SCBV's director.  *Id.* ¶ L.

Debtors' requested relief requires this Court to exercise jurisdiction on matters of Dutch law regarding the protection of Dutch assets. But the Dutch Court already adjudicated these issues when it appointed Mr. Stastney to serve as director of the Dutch subsidiaries. The Dutch Court determined that Mr. Stastney would better protect the value of SCBV and would permit the operations of SCBV to continue according to the status quo. Dutch Court Opinion, ECF No. 47-18, ¶ 5.12 ("[T]he status quo is better preserved if Stastney is allowed to run the Companies for the time being."). In contrast, the Dutch Court concluded that the Debtors' nomination for director, Mr. Park, would assist Mr. Rajan with divesting SCBV of its assets and diverting them to VSI. *Id.* ¶ 15.4 ("In fact, Rajan has insisted on handing over the machine and other assets to him. He wants to transfer the assets to VSI, a company that is a Stream shareholder in which Rajan has a 70% interest and control.").

Not only would SeeCubic and Debtors be irreparably harmed by the depletion in value the Proposed Order would cause to SCBV,[19] but the public interest weighs in favor of recognizing the authority and jurisdiction of the Dutch Court.[20] Dutch entities, and their assets, are under Dutch— not U.S.—jurisdiction, even if their parent entities are U.S. companies. According to Dutch private

---

[19] The three cases Debtors rely on for the balance of harms analysis all deal with employees under enforceable non-compete employment agreements. *See Fisher Bioservices, Inc. v. Bilcare, Inc.*, No. Civ.A. 06-567, 2006 WL 1517382, at *21 (E.D. Pa. May 31, 2006) (restrictive employment agreement; court enforced only "to a more narrowly defined set of customers"); *Nat'l Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701 (E.D. Pa. 1998) (employee under binding non-compete for a year); *CentiMark Corp. v. Lavine*, No. 11cv0757, 2011 WL 3209106, at *5 (W.D. Pa. July 28, 2011) (non-compete). These cases are wholly irrelevant to the present request for a TRO. As the Court recognized, the employment agreement arguments in Debtors' Supplemental Memorandum were outside the scope of their original Motion and thus excluded.

[20] Debtors also aim in their Proposed Order to broadly enjoin numerous parties, many of whom have not even been served and about whom Debtors make *no* effort to demonstrate will cause them any potential injury. Oct. 6, 2023 Hr'g Tr. (Kodosky) at 11:21–12:2 ("Based on our view, it doesn't look like they've been properly served. It's a little hard to see how we could proceed on a TRO motion against them where they haven't been properly served.").

30

international law, Dutch law applies to SCBV because of its Dutch statutory seat.  Dutch Civil

Code § 10:118.  Dutch law also applies to questions of who is authorized to represent the entity.

*Id.* § 10:119.  As such, a Dutch Court would not recognize a foreign court judgment suspending,

dismissing, or appointing a director in a Dutch company.  The Debtors' Proposed Order seeks to

use a TRO to upend the Dutch Court's decision.  The Court should not permit this.[21]

## II.   DEBTORS HAVE NOT MET THE PREREQUISITES FOR ENTRY OF AN INJUNCTION

Under Fed. R. Civ. P. 65(d), "[e]very order granting an injunction and every restraining

order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in

reasonable detail—and not by referring to the complaint or other document—the act or acts

restrained or required."  *Id*.  If a district court does issue an injunction, "[t]he description of the

conduct enjoined should be narrowly tailored to reach only those acts that closely relate to the

unlawful conduct giving rise to an entitlement to injunctive relief."  *Mallet & Co. v. Lacayo*, 16

F.4th 364, 389 (3d Cir. 2021) (vacating preliminary injunction in trade secret case).  Here, Debtors'

requested relief is not narrowly tailored for the task.  Debtors' expansive, vague Proposed Order

is both unsupportable and unnecessary.   SeeCubic, therefore, reserves the right to submit a

competing proposed order if the Court holds that a TRO or preliminary injunction are appropriate.

Debtors must also post a supersedes bond in connection with any TRO or preliminary

injunction.  *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary

---

[21]      "When preliminary factors are established to support an injunction affecting a foreign
litigation, the Court 'must consider principles of comity.'" *E. I. duPont de Nemours & Co. v. Agfa
NV*, No. 2:18CV326, 2018 WL 7283319, at *42 (E.D. Va. Oct. 30, 2018), *report and
recommendation adopted sub nom. E. I. Du Pont D Nemours & Co. v. Agfa NV*, No. 2:18CV326,
2019 WL 279989 (E.D. Va. Jan. 22, 2019) (quoting *BAE Sys. Tech. Sol & Servs., Inc. v. Republic
of Korea's Def. Acquisition Program Admin.*, 195 F. Supp. 3d 776, 787 (D. Md. 2016)).

restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").  "The injunction bond serves as a deterrent to 'rash applications for interlocutory orders; the bond premium and the chance of liability on it causes plaintiff to think carefully beforehand.'"  *Mallet*, 16 F.4th at 391 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989)).  Debtors' flurry of filings even since the filing of the Motion— a motion for expedited discovery, the Supplemental Memorandum, etc.—indicate that they are taking a throw-everything-at-the-wall approach in this action, and a form of deterrence is warranted.

Debtors' Proposed Order states that "[n]o bond shall be set in this case because the relief requested has no likelihood of unlawfully restraining Defendants' rights."  Supp. Mem. at 5 ¶ 2. This is incorrect.  As explained above, Debtors' Proposed Order is untenably broad and seeks to prevent SeeCubic and SCBV, among others, from conducting business and participating in the marketplace.  The lack of bond request is also worrisome, because Debtors' submissions to the Court raise doubts as to whether Debtors would be able to post a bond—or compensate SeeCubic should the equitable relief later be found to have been improvidently entered.  SeeCubic respectfully requests that the Court enforce the bond requirement if a preliminary injunction is to issue in this case.

## CONCLUSION

Debtors have not shown a risk of imminent irreparable harm nor a likelihood of success on the merits.  Moreover, the balance of hardships and the public interest weigh in favor of denying Debtors' request for an injunction.  Accordingly, Debtors' Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should be denied as to SeeCubic.

Dated: October 27, 2023

Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 206047)
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Justin M. Winerman (admitted *pro hac vice*)
Rebecca L. Ritchie (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0549
Facsimile: (312) 407-8641

- and -

Eben P. Colby (admitted *pro hac vice*)
Marley Ann Brumme (admitted *pro hac vice*)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Facsimile: (617) 573-4822

*Counsel for SeeCubic, Inc.*