**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>STREAM TV NETWORKS, INC., *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>(Jointly Administered)<br><br>Case No. 23-10763 (MDC) |
| STREAM TV NETWORKS, INC., and<br>TECHNOVATIVE MEDIA, INC.<br><br>       Plaintiffs,<br><br>       v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS VI, LLC, HAWK INVESTMENT HOLDINGS LIMITED, ARTHUR  LEONARD ROBERT "BOB" MORTON, SEECUBIC, INC., ALASTAIR CRAWFORD, KRZYSZTOF KABACINSKI, KEVIN GOLLOP, ASAF GOLA, JOHN DOE(S), JANE DOE(S), DELAWARE and OTHER LAW FIRMS representing and acting in concert with John Doe(s) and/or Jane Doe(s), INVESTMENT BANKS employed by John Doe(s) and/or Jane Doe(s), PATRICK THEUNE, and SEECUBIC B.V.,<br><br>       Defendants. | A.P. No. 23-00057-mdc |

**BRIEF IN SUPPORT OF DEFENDANTS HAWK INVESTMENT HOLDINGS
LIMITED AND ARTHUR LEONARD ROBERT MORTON'S MOTION TO
DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION,
FAILURE TO OBTAIN SERVICE, AND FOR FAILURE TO STATE A CLAIM**

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification number are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 4

      A.      Stream and the Rajans ............................................................................. 4

      B.      Stream Entered Into and Defaulted on the Hawk Notes ........................... 5

      C.      Conversion Agreement ............................................................................ 6

      D.      Stream's Creditors Enter Into the Omnibus Agreement with Stream ................................................................................................... 6

      E.      Delaware Supreme Court Finds the Omnibus Agreement Invalid ........... 7

      F.      Delaware Chancery Court Collateral Estoppel Opinion ........................... 8

      G.      The Chapter 11 Cases, the Adversary Proceeding, and Service ............. 10

      H.      Defendants Hawk and Mr. Morton ........................................................ 11

ARGUMENT ................................................................................................................. 12

  I.      DISMISSAL IS APPROPRIATE BECAUSE PLAINTIFFS HAVE FAILED TO PROPERLY SERVE THE SUMMONS AND COMPLAINT ON HAWK AND MR. MORTON ............................................. 12

      A.      Legal Standard on Motion to Dismiss under Rule 12(b)(5) ................... 12

      B.      Service Was Improper ............................................................................ 13

  II.     DISMISSAL IS APPROPRIATE BECAUSE THE COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER MR. MORTON OR HAWK ................................................................................................... 16

      A.      Standard of Review ............................................................................... 17

      B.      Plaintiff Cannot Demonstrate that Mr. Morton Has Minimum Contacts with Pennsylvania or Purposefully Directed His Contacts to Pennsylvania .................................................................................... 18

      C.      Plaintiff Cannot Demonstrate that Conspiracy Jurisdiction Exists .......... 19

      D.      Hawk's Contacts with Delaware May Not Be Imputed to Mr. Morton ................................................................................................. 21

E.     Plaintiff Cannot Demonstrate a Constitutional Basis to Assert
Jurisdiction over Mr. Morton ................................................... 22

F.     Jurisdiction over Hawk:  Hawk's Filing of a Proof of Claim Does
Not Constitute Consent for Any Cause of Action Alleged Against
It ............................................................................................ 23

III.    DISMISSAL IS APPROPRIATE BECAUSE THE COMPLAINT FAILS
TO STATE A CLAIM AGAINST HAWK AND MR. MORTON ................... 25

A.     Legal Standard on Motion to Dismiss Under Rule 12(b)(6) ................... 25

B.     Plaintiffs Are Collaterally Estopped from Arguing that Defendants
Conspired to Manufacture Defaults Under Debt Documents and
Wrongfully Seize Stream's Assets .......................................... 26

C.     Count I For Turnover and Accounting Fails to State a Claim ................ 29

1.    Legal Standard ............................................................ 30

2.    Analysis ....................................................................... 31

D.     Count II For Injunctive Relief Fails to State a Claim ............................ 33

1.    Legal Standard ............................................................ 33

2.    Analysis ....................................................................... 34

E.     Count III for Disallowance of Claims 11 U.S.C. § 502(d) Fails to
State a Claim ........................................................................ 35

1.    Legal Standard ............................................................ 35

2.    Analysis ....................................................................... 36

F.     Count IV for Equitable Subordination Fails to State a Claim ................ 37

1.    Legal Standard ............................................................ 37

2.    Analysis ....................................................................... 39

G.     Count VII for Tortious Interference with Existing and Prospective
Economic Advantage Fails to State a Claim ............................ 41

1.    Legal Standard ............................................................ 41

2.    Analysis ....................................................................... 42

H.    Count VIII for Recharacterization of Loan as Equity Fails to State
      a Claim .............................................................................................. 44

      1.    Legal Standard ......................................................................... 45

      2.    Analysis .................................................................................... 46

I.    Count X for Breach of Fiduciary Duty Fails to State a Claim ................ 47

      1.    Legal Standard ......................................................................... 47

      2.    Analysis .................................................................................... 48

J.    Count XI for Aiding and Abetting Breach of Fiduciary Duty Fails
      to State a Claim ................................................................................... 49

      1.    Legal Standard ......................................................................... 49

      2.    Analysis .................................................................................... 50

K.    Count XII for Determination of Secured Status, and the Extent of
      Priority of Liens and Interests under 11 U.S.C. § 506(a) Fails to
      State a Claim ....................................................................................... 50

      1.    Legal Standard ......................................................................... 51

      2.    Analysis .................................................................................... 52

L.    Count XIII for Right to Set Off Under 11 U.S.C. § 558 Fails to
      State a Claim ....................................................................................... 53

      1.    Legal Standard ......................................................................... 54

      2.    Analysis .................................................................................... 54

M.    Count XIV for Equitable Disallowance Fails to State a Claim .............. 55

      1.    Legal Standard ......................................................................... 56

      2.    Analysis .................................................................................... 57

N.    Count XV for Objection to Claim Fails to State a Claim ....................... 57

O.    Count XVI for Exemplary Damages Fails to State a Claim ................... 57

      1.    Legal Standard ......................................................................... 58

      2.    Analysis .................................................................................... 59

P.      Count XVII for Misappropriation of Trade Secrets, Defend Trade
Secrets Act, 18 USC § 1832(A)(1) Fails to State a Claim.......................60

1.      Legal Standard ............................................................................60

2.      Analysis.......................................................................................62

Q.      Count XVIII for Misappropriation of Trade Secrets PUTSA, PA.
CONS. STAT. ANN. §§ 5301-5308 (2004) Fails to State a Claim.........64

1.      Legal Standard ............................................................................65

2.      Analysis.......................................................................................65

R.      Count XIX for Lender Liability Fails to State a Claim ..........................66

1.      Legal Standard ...........................................................................66

2.      Analysis.......................................................................................67

CONCLUSION....................................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 31-33 Corp.*,
    100 B.R. 744 (Bankr. E.D. Pa. 1989) ....................................................................30

*Abraham v. Ocwen Loan Serv., LLC*,
    321 F.R.D. 125 (E.D. Pa. 2017).......................................................................33, 34

*Adelphia Gateway, LLC v. Pa. Enviro. Hearing Bd.*,
    No. 21-CV-1241, 2021 WL 5494286 (M.D. Pa. Nov. 23, 2021) ...........................26

*Advanced Fluid Sys., Inc. v. Huber*,
    381 F. Supp. 3d 362 (M.D. Pa. 2019)...................................................................61

*In re After Six, Inc.*,
    177 B.R. 219 (Bankr. E.D. Pa. 1995) ...................................................................38

*Ansel Props., Inc. v. Nutri-Sys. of Fla. Assocs. (In re Nutri/Sys. of Sla. Assocs.)*,
    178 B.R. 645 (E.D. Pa. 1995) ...............................................................................37

*In re Arthur Treacher's Franchise Litig.*,
    92 F.R.D. 398 (E.D. Pa. 1981).............................................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................25, 32

*Asousa P'ship v. Pinnacle Foods, Inc. (In re Asousa P'ship)*,
    264 B.R. 376 (Bankr. E.D. Pa. 2001) ..................................................................30

*Asousa P'ship v. Pinnacle Foods, Inc. (In re Asousa P'ship)*,
    276 B.R. 55 (Bankr. E.D. Pa. 2002) ....................................................................23

*B.D.W. Assocs. v. Busy Beaver Bldg. Ctrs.*,
    865 F.2d 65 (3d Cir. 1989)....................................................................................31

*Barrett v. Catacombs Press*,
    44 F. Supp. 2d 717 (E.D. Pa. 1999) .....................................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................25

*Beloit Liq. Trust v. Beloit Walmsley Ltd. (In re Harnischferger Indus., Inc.)*,
    288 B.R. 79 (Bankr. D. Del. 2003) .......................................................................14

*Bernstein v. Gailey (In re Gailey, Inc.)*,
   119 B.R. 504 (Bankr. W.D. Pa. 1990) .................................................................30

*Billing v. Ravin, Greenberg & Zackin, P.A.*,
   22 F.3d 1242 (3d Cir. 1994) ...............................................................................23

*Bishop v. GNC Franchising LLC*,
   403 F. Supp. 2d 411 (W.D. Pa. 2005) .................................................................57

*In re Butts*,
   350 B.R. 12 (Bankr. E.D. Pa. 2006) ...................................................................15

*Buzzanco v. Lord Corp.*,
   173 F. Supp. 2d 376 (W.D. Pa. 2001) .................................................................27

*Calder v. Jones*,
   475 U.S. 783 (1984) .....................................................................................17, 19

*CanCan Dev., LLC v. Manno*,
   No. 6283-VCL, 2011 WL 4379064 (Del. Ch. Sept. 21, 2011) ...............................54

*Cary Oil, Inc. v. MG Refining & Mktg., Inc.*,
   90 F. Supp 2d 401 (S.D.N.Y. 2000) .....................................................................66

*CitiCorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
   160 F.3d 982 (3d Cir. 1998) ...............................................................................55

*City of Newark v. Unemployment Ins. Appeal Bd.*,
   802 A.2d 318 (Del. 2002) ...................................................................................27

*Appeal of Com. Trust Co. of Pittsburgh*,
   188 A. 200 (Pa. 1936) .......................................................................................54

*Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc.*,
   No. 92-4228, 1993 WL 514496 (E.D. Pa. Dec. 1, 1993) ...............................66, 67

*Daimler AG v. Bauman*,
   571 U.S. 117, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014) ......................................16

*Daniel Adams Assocs., Inc. v. Rimbach Publ'g*,
   360 Pa. Super. 72, 519 A.2d 997 (1987) .............................................................44

*Darien Rowayton Bank v. McGregor*,
   No. 4:22-CV-01394, 2023 WL 2870713 (M.D. Pa. Apr. 10, 2023) ........................17

*Deptula v. Rosen*,
   558 F. Supp. 3d 73 (S.D.N.Y. 2021) ...................................................................12

*Dershaw v. Ciardi (In re Rite Way Elec., Inc.)*,
   510 B.R. 471 (Bankr. E.D. Pa. 2014) ....................................................31

*E.I. DuPont de Nemours & Co. v. Christopher*,
   431 F.2d 1012 (5th Cir. 1970) .............................................................61

*Feldman v. Grand River Ironsands, Inc. (In re Forks Specialty Metals Inc.)*,
   No. 19-00028-MDC, 2023 WL 3239468 (Bankr. E.D. Pa. Apr. 30, 2023)......................17, 22

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)..........................................................................25

*Giuliano v. Mitsubishi Digital Elecs. Am., Inc. (In re Ultimate Acquisition Parts.), L.P.*,
   No. 11-52663, 2012 WL 1556098 (Bankr. D. Del. May 1, 2012)...........................35

*Goldfarb v. Kalodimos*,
   539 F. Supp.3d 435 (E.D.Pa. 2021) .....................................................16

*Goldstein v. BRT, Inc. (In re Universal Marketing, Inc.)*,
   460 B.R. 828 (Bankr. E.D. Pa. 2011) ...................................................36

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989)...........................................................................23

*Grant Heilman Photo., Inc. v. McGraw-Hill Cos.*,
   115 F. Supp. 3d 518 (E.D. Pa. 2015) ...................................................33

*Gregory v. Chehi*,
   843 F.2d 111, 116 (3d Cir. 1988)........................................................26

*Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*,
   2022 WL 17258460 (Del. Ch. Nov. 29, 2022) ...................3, 5, 6, 9, 20, 27, 28, 39, 40, 46, 53

*In re Hercules Offshore, Inc.*,
   565 B.R. 732 (Bankr. D. Del 2016) .....................................................56

*In re Heritage Highgate, Inc.*,
   679 F.3d 145 (3d Cir. 2012)...............................................................51

*Herley Indus. v. R Cubed Eng'g LLC*,
   No. 20-cv-02888, 2021 WL 229322 (E.D. Pa. Jan. 22, 2021)...........................63, 64

*Holber v. Suffolk Const. Co., Inc. (In re Red Rock Servs. Co., LLC)*,
   480 B.R. 576 (Bankr. E.D. Pa. 2012) ...................................................54

*Irish v. Ferguson*,
   970 F. Supp.2d 317, 354 (M.D. Pa. 2013) ..............................................4

*Jones v. GEICO Choice Ins. Co.*,
  617 F. Supp.3d 275 (E.D. Pa. 2022) ............................................................33, 34

*Kee v. Zimmer, Inc.*,
  871 F. Supp. 2d 405 (E.D. Pa. 2012) ...................................................................57

*Keen v. C.R. Bard, Inc.*,
  480 F. Supp. 3d 624 (Bankr. E.D. Pa. 2020) ................................................57, 58

*Kernaghan v. BCI Commc'ns, Inc.*,
  802 F. Supp. 2d 590 (E.D. Pa. 2011) ...................................................................43

*Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*,
  No. 2:18-CV-01290-WSS, 2020 WL 1159439 (W.D. Pa. Mar. 10, 2020).............19

*LabMD Inc. v. Boback*,
  47 F.4th 164 (3d Cir. 2022) ..........................................................................25, 42

*Law v. Siegel*,
  571 U.S. 415 (2014)..............................................................................................56

*Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*,
  284 B.R. 415 (Bankr. E.D. Pa. 2002) ............................................................37, 38

*Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entertainment, LLC)*,
  520 B.R. 455 (Bankr. D. Del. 2014) .....................................................................47

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ...................................................................................49

*Marketing Res. Int'l Corp. v. PTC Corp. (In re Marketing Res. Int'l Corp.)*,
  35 B.R. 353 (Bankr. E.D. Pa. 1984) ...............................................................35, 36

*Marten v. Godwin*,
  499 F.3d 290 (3d Cir. 2007)..................................................................................17

*Med. Corp. v. McGonigle*,
  955 F. Supp. 374 (E.D. Pa. 1997) ........................................................................13

*Miller v. Jannetta (In re Irwin)*,
  509 B.R. 808 (Bankr. E.D. Pa. 2014) ...................................................................30

*In re Museum of Am. Jewish History*,
  No. 20-11285, 2020 WL 7786925 (Bankr. E.D. Pa. Dec. 4, 2020)........................51

*Nelson Brothers Professional Real Estate LLC v. Beau Jaussi et al.*,
  No. 17 Civ. 0158 (DOC), 2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) ..............60

*NTP Marble, Inc. v. Papadopoulos (In re NTP Marble, Inc.)*,
    491 B.R. 208 (Bankr. E.D. Pa. 2013) ......................................................45

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007)....................................................................22

*O'Halloran v. Prudential Savs. Bank (In re Island View Crossing II, L.P.)*,
    604 B.R. 181 (Bankr. E.D. Pa. 2019) ..............................................37, 38

*Official Comm. of Unsecured Creditors of Fedders of N. Am., Inc. v. Goldman*
    *Sachs Cred. Parts. L.P. (In re Fedders N. Am., Inc.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) ................................................47, 48

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet*
    *Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*,
    274 B.R. 71 (D. Del. 2002)......................................................................47

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
    484 U.S. 97, 108 S. Ct. 404, 98 L.Ed.2d 415 (1987)............................12

*In re Papercraft Corp.*,
    127 B.R. 346 (Bankr. W.D. Pa. 1991) ...................................................53

*Par Pharm., Inc. v. Quva Pharma, Inc.*,
    764 F. App'x 273 (3d. Cir. 2019) ...........................................................60

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001)........................................................21, 65, 66

*Pepper v. Litton*,
    308 U.S. 295 (1939).................................................................................55

*Phillips v. Cricket Lighters*,
    883 A.2d 439 (Pa. 2005) .........................................................................58

*Pinto v. St. Paul Fire & Marine Ins. Co.*,
    No. CV 22-3991, 2023 WL 3667610 (E.D. Pa. May 26, 2023) .............16

*Randall v. Bank One Nat'l Assoc. (In re Randall)*,
    358 B.R. 145 (Bankr. E.D. Pa. 2006) ..............................................26, 28

*In re Raytrans Holding, Inc.*,
    573 B.R. 121 (Bankr. D. Del. 2017) .........................................................4

*Salvitti v. Lascelles*,
    578 F. Supp. 3d 712 (E.D. Pa. 2022) ......................................................33

*Soufflas v. Zimmer, Inc.*,
    474 F. Supp. 2d 737 (E.D. Pa. 2007) ...................................................................58

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    271 F. Supp. 3d 835 (E.D. Va. 2017) ...................................................................60

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*,
    2022 WL 4491925 (Del. Ch. Sept. 28, 2022) ....................................................5, 8

*Stream TV Networks, Inc. v. Seecubic, Inc.*,
    2022 WL 3227785, at *1 (Del.Ch. Aug. 09, 2022) ................................................8

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    250 A.3d 1016 (Del. Ch. 2020)................................................................... *passim*

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    279 A.3d 323 (Del. 2022) ...................................................................5, 6, 7, 8, 28

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006)............................................................................45, 46

*Teva Pharms. USA, Inc. v. Sandhu*,
    291 F. Supp. 3d 659 (E.D. Pa. 2018) ..............................................................60, 61

*Thompson Coal Co. v. Pike Coal Co.*,
    488 Pa. 198 (1979)................................................................................................41

*TJS Brokerage & Co. v. Mahoney*,
    940 F. Supp. 784 (E.D. Pa. 1996) .......................................................................18

*Travelers Casualty & Surety Co. of Am. v. Pac. Gas & Electric Co.*,
    549 U.S. 443 (2007)..............................................................................................56

*Trustees of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*,
    332 F.3d 188 (3d Cir. 2003)..................................................................................66

*U.S. v. Marple Comm. Record, Inc.*,
    335 F. Supp. 95 (E.D. Pa. 1971) ..........................................................................14

*U.S. v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983)..............................................................................................32

*United States v. Glaister*,
    2021 WL 1565678 (S.D.N.Y. Apr. 21, 2021).......................................................14

*Viking Metallurgical Corp. v. A. Johnson & Co., Inc.*,
    No. 87-3859, 1987 WL 19241 (E.D. Pa. Oct. 28, 1987) .......................................14

*In re Vital*,
No. 12-11758, 2013 WL 441605 (Bankr. D. Del. Feb. 5, 2013) ......................................51, 52

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
486 U.S. 694 (1988)...................................................................................................................12

*Western Essex Corp. v. Cassio, Inc.*,
674 F. Supp. 8 (W.D. Pa. 1987)............................................................................................58, 59

*In re WorldClass Processing, Inc.*,
346 B.R. 132 (Bankr. W.D. Pa. 2006) ...............................................................................66, 67

**Statutes**

6 *Del. C.* § 9-102(a)(42).............................................................................................................52

6 *Del. C.* § 9-310.......................................................................................................................52

8 *Del. C.* § 225...........................................................................................................................8

12 Pa. Cons. Stat. Ann. §§ 5301-5308 (2004) .................................................................64, 65

42 Pa. Cons. Stat. Ann. § 5524(3) ......................................................................................41

11 U.S.C. § 362(d) .....................................................................................................................10

11 U.S.C. § 363 ..........................................................................................................................30

11 U.S.C. § 502(a) .....................................................................................................................51

11 U.S.C. § 502(b) .....................................................................................................................56

11 U.S.C. § 502(d) ................................................................................................................35, 36

11 U.S.C. § 506 ..........................................................................................................................51

11 U.S.C. § 506(a) ...........................................................................................................50, 51, 52

11 U.S.C. § 506(d) .....................................................................................................................51

11 U.S.C. §  510(c) ....................................................................................................................37

11 U.S.C. § 542.................................................................................................29, 30, 31, 35, 36

11 U.S.C. § 543...........................................................................................................................35

11 U.S.C. § 547...........................................................................................................................34

11 U.S.C. § 548.....................................................................................................................34, 36

11 U.S.C. § 549 .................................................................................................... 30, 36

11 U.S.C. § 550 ................................................................................................ 34, 35, 36

11 U.S.C. § 553 ............................................................................................................ 36

11 U.S.C. § 558 ...................................................................................................... 53, 54

11 U.S.C. § 1104(a) ...................................................................................................... 4

11 U.S.C. § 1112(b) ...................................................................................................... 4

18 U.S.C. 1832 ........................................................................................................ 60, 61

18 U.S.C. 1836 ........................................................................................................ 23, 61

18 U.S.C. 1836(b)(1) ............................................................................................... 59, 60

18 U.S.C. 1839(5)(B) .................................................................................................. 61

18 U.S.C. 1839(6) ........................................................................................................ 61

28 U.S.C. 1738 ............................................................................................................ 26

U.C.C. § 9 (2010) ........................................................................................................ 40

**Other Authorities**

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §
   1353 (3d ed.) ........................................................................................................ 12

Fed. R. Civ. P. 4(f)(1) ................................................................................................ 12

Fed. R. Civ. P. 12(b) .................................................................................................... 1

Fed. R. Civ. P. 12(b)(2) ..................................................................................... 1, 16, 17

Fed. R. Civ. P. 12(b)(5) ....................................................................................... 1, 16

Fed. R. Civ. P. 12(b)(6) ........................................................................................ *passim*

Fed. R. Civ. P. 3001(d) & (f) ..................................................................................... 51

Fed. R. Civ. P. 3001(f) ............................................................................................... 51

Fed. R. Civ. P. 7004 ................................................................................................... 12

Fed. R. Civ. P. 7004(a)(1) .......................................................................................... 12

Fed. R. Civ. P. 7004(e) .............................................................................................. 15

Fed. R. Civ. P. 7012(a) ...............................................................................................15

Fed. R. Civ. P. 7012(b) ...............................................................................................1

Hague Convention on the Service Abroad of Judicial and Extra-Judicial
    documents in Civil and Commercial Matters,
    www.usmarshals.gov/process/hague_service.htm...........................................12, 13

Pa. L.B.R. 5070-1(g) ...................................................................................................4

The Royal Court Civil Rules 2007, (UK),
    https://www.guernseyroyalcourt.gg/CHttpHandler.ashx?id=106365&p=0 .....................13, 14

Service of Process Rules 2019, (UK),
    https://www.jerseylaw.je/laws/enacted/PDFs/RO-091-2019.pdf ...........................................15

Defendants Hawk Investment Holdings Limited ("Hawk") and Arthur Leonard Robert Morton ("Mr. Morton") submit this brief in support (this "Brief") of the *Defendants Hawk Investment Holdings Limited and Arthur Leonard Robert Morton's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, Failure to Obtain Service, and for Failure to State a Claim* (the "Motion") pursuant to Rule 12(b)(2), 12(b)(5), and 12(b)(6) of the Federal Rule of Civil Procedure (the "Rules")[2] to dismiss the complaint [AP Docket No. 1] (the "Complaint") filed by Stream TV Network, Inc. ("Stream") and Technovative Media, Inc. ("Technovative" and, together with Stream, the "Plaintiffs" or "Debtors").

## PRELIMINARY STATEMENT

Plaintiffs allege there exists a wide-ranging conspiracy involving eleven different named individuals and entities, as well as an undefined number of "John and Jane Doe(s)" (collectively, the "Defendants") all conspiring together to steal the Plaintiffs' assets.  The centerpiece of Plaintiffs' conspiracy theory is that the constellation of Defendants conspired together to "manufacture" defaults on certain loans belonging to Stream, so that the Defendants could force Stream to turn over its assets.  Plaintiffs' conspiracy theory culminates with the Omnibus Agreement, which Plaintiffs allege was the mechanism by which the vast array of conspirators wrongfully converted the Plaintiffs' assets.

The reality, however, is far more mundane.  The reality is that Stream borrowed millions of dollars over a ten-year period, became insolvent, and did not repay its secured lenders.  When Stream defaulted on those loans, Stream's secured lenders had every right to take possession of the Plaintiffs' assets as part of their collateral.  Instead, those secured lenders decided to enter into

---

[2] FRCP 12(b) is applicable to this proceeding pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

a friendly foreclosure arrangement with Stream's independent directors, memorialized in the Omnibus Agreement, that would have transferred Stream's assets to a new entity in which Stream's shareholders would have had the opportunity to receive equity.  While the Omnibus Agreement was approved by Stream's Board of Directors, the Rajan brothers, who own a controlling share of Stream's equity, quickly set about invalidating the Omnibus Agreement any way they could.

The Delaware Court of Chancery found the Omnibus Agreement to be valid, and entered a preliminary injunction which prevented Stream from interfering with its enforcement.  On appeal, however, the Delaware Supreme Court overturned the Omnibus Agreement on a technicality, finding it had not been approved by Stream's Class B shareholders—a group dominated by members of the Rajan family.  The Delaware Supreme Court's decision, however, was also significant because it constituted a final order, with issue preclusive effect, that forecloses most of the arguments advanced by Stream in the Complaint.  Specifically, the Delaware Supreme Court's final decision collaterally estops Stream from arguing that it did not default on its debt, or that Hawk and SeeCubic conspired to manufacture Stream's default thereon.

In the aftermath of the Delaware Supreme Court's ruling, Hawk exercised its rights as secured lender, but Plaintiffs refused to acknowledge their obligations or to comply.  Hawk thus initiated an action before the Delaware Court of Chancery to resolve this dispute.  During that case, the Court of Chancery explicitly found that the Delaware Supreme Court's opinion collaterally estopped Stream from contesting several key factual findings: (a) that Stream borrowed money on a secured basis from the secured lenders; (b) Hawk has rights as one such secured lender, including the right to foreclose on the collateral; (c) Stream has defaulted on the secured debt, and (d) that Stream had not converted the secured debt into equity, at least before November 10, 2021.  Just

2

one week before a one-day trial on a paper record in that Chancery Court case, the Plaintiffs initiated the above-captioned bankruptcy cases (the "Chapter 11 Cases") to prevent the Court from issuing a ruling that would have approved of the secured lender's actions, and affirmed that Mr. Stastney was validly appointed the sole director of Technovative.

Five months after commencing the Chapter 11 Cases, Plaintiffs initiated the above-captioned adversary proceeding (the "Adversary Proceeding") recasting the Omnibus Agreement as the lynchpin of a vast conspiracy among the Defendants—closely mirroring allegations that it made in another suit currently pending before the United States District Court for the District of Delaware that Stream instituted in June 2022 (the "Delaware District Court Action"). The Rajans, through Stream, have been fighting tooth and nail in multiple courts to avoid the inevitable implications of Stream's default on its secured debt. Stream now turns to this Court[3] for one last Hail Mary because of its losses in every other court in which it has played its hand. However, no amount of "slippery language, which Stream has a history of deploying," will change the outcome in this litigation. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *16 (Del. Ch. Nov. 29, 2022) (hereinafter the "Chancery Court Collateral Estoppel Opinion"). Collateral estoppel bars nearly every action in this Complaint.

Even if Stream could clear those hurdles, Stream has still failed to establish that it has properly served Hawk and Mr. Morton, or that this Court has jurisdiction over Mr. Morton in these matters. In addition, even if examined on the merits, each of the causes of action asserted against Hawk and Mr. Morton must be dismissed because they fail to state a claim.

---

[3] Though the Plaintiffs were originally adamant that the Bankruptcy Court handle the questions presented in this Complaint, they have also sought a withdrawal of the reference with respect to the Complaint. *Compare* June 26 Hearing Trans., at 221:14–15 ("So, Your Honor, we believe it's most efficient if all the matters stay before this court…."), *with Motion of Debtors for Withdrawal of Reference* [AP Docket No. 4].

3

In short, the Complaint—and its outlandish allegations—must be dismissed in its entirety, and with prejudice.  It is long past the time to end Stream's vexatious litigation tactics.

## FACTUAL BACKGROUND

Hawk and Mr. Morton incorporate the "Factual Background and Procedural History" from *Motion of Hawk Investment Holdings Ltd. (I) Pursuant to Section 1112(b) of the Bankruptcy Code Either (A) (1) to Dismiss the Debtors' Chapter 11 Cases or (2) to Convert Such Cases to Cases Under Chapter 7 or, (B) in the Alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee and (II) to Request Expedited Consideration Pursuant to Local Rule 5070-1(g)* [Bankruptcy Docket No. 83] into this brief.  In addition, Mr. Morton and Hawk also incorporate the below facts which are relevant to the Motion.

### A.        Stream and the Rajans

Plaintiff Stream is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  Complaint ¶ 17.  Stream is a media company that aims to create 3-D display technology that would not require the viewer to wear any special glasses.  *Id.*  Stream formed subsidiaries in the Netherlands, and it is through these operating subsidiaries that Stream hired engineers to develop Stream's technology.  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1022 (Del. Ch. 2020) (hereinafter the "Chancery Court PI Opinion.").[4]  Mathu Rajan controls Stream.  *See* List of Equity Security Holders [Bankruptcy Docket No. 58] (the "List of Equityholders") (stating Mathu Rajan controls the companies that "control 88.86% of [Stream]").

---

[4] This Court is permitted to take judicial notice of other judicial opinions, including opinions from Delaware's state courts. *See, e.g., In re Raytrans Holding, Inc.*, 573 B.R. 121 (Bankr. D. Del. 2017) (taking judicial notice of Delaware state court opinions and dismissing multiple claims in the complaint under doctrine of collateral estoppel); *Irish v. Ferguson*, 970 F. Supp.2d 317, 354 (M.D. Pa. 2013) (finding that a court could take notice of documents from state court proceeding attached to motion to dismiss (rather than complaint) as part of finding of collateral estoppel).

Plaintiff Technovative is a Delaware corporation that is a wholly owned subsidiary of Stream and serves an intermediate holding company that "owns directly or indirectly all of the remaining entities in the Stream global group, which subsidiaries own or hold rights in both propriety and licensed technology." Complaint ¶ 18; *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

### B.      Stream Entered Into and Defaulted on the Hawk Notes

As Stream admits, between 2011 and 2012, SLS loaned Stream $6 million via multiple senior notes, secured against all assets of Stream and its subsidiaries. Complaint ¶ 44. Between 2014 and 2020, Hawk loaned Stream over £50 million plus millions more in USD and Euro through 18 separate notes (the "Hawk Notes") similarly secured by Stream's assets. *Id.* ¶ 45.

By at least February 2020, Stream defaulted on the Hawk Notes. *See, e.g., Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022) ("[B]y the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.") (hereinafter the "Delaware Supreme Court Decision"); *Chancery Court PI Opinion*, 250 A.3d at 1020 ("By the time the Omnibus Agreement was executed, Stream had defaulted on more than $50 million in debt to its secured creditors."); *Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14 ("[T]he doctrine of collateral estoppel prevents Stream from relitigating the following issues: Hawk holds secured debt in Stream; Stream defaulted on that debt…."). In addition, Stream also defaulted on the Hawk Notes when it filed for bankruptcy in February 25, 2021 and by consenting to an involuntary bankruptcy filed on May 23, 2021. *See In re Stream TV Networks, Inc.*, Case No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021) (first bankruptcy); *In re Stream TV Networks, Inc.*, Case No. 21-10848-KBO (Bankr. D. Del. May 23, 2021) (second bankruptcy).

### C.      Conversion Agreement

In 2018, Hawk and Stream executed a debt-to-equity conversion agreement (the "Hawk Conversion Agreement") as a means of facilitating new investments into Stream due to concerns expressed by potential investors.   Complaint ¶ 47.   In the Complaint, the Plaintiffs allege simultaneously that the "conversions [were] to be made at Stream's sole discretion" (*id.* ¶ 47), and that the Hawk Conversion Agreement provided that the "Hawk Notes would convert to equity ***under certain circumstances related to Stream's successful raising of additional capital***" (*id.* ¶ 50) (emphasis added).   Only the latter is correct.   *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at **14–15 (finding conversion requires Stream to raise additional capital).

### D.      Stream's Creditors Enter Into the Omnibus Agreement with Stream

After Stream defaulted on the notes, stakeholders lost trust in management of the Plaintiffs, culminating in the appointment of Mssrs. Kabacinski, Gola, and Gollop to Stream's board and the creation of the Resolution Committee on May 4, 2020.   Complaint ¶ 73.   The directors on the Resolution Committee were Asaf Gola and Kevin Gollop.   *Id.* ¶ 74.

On May 6, 2020, the Resolution Committee approved the Omnibus Agreement in order to settle the defaults under the secured debts.   *Id.*   "By its terms, the Omnibus Agreement transferred all of Stream's assets to SeeCubic in lieu of SLS and Hawk foreclosing on Stream's assets."   *Id.* ¶ 75.   The Omnibus Agreement was put to the full Board of Stream for a vote, and though the Rajan brothers abstained, the three directors who voted in favor of the Omnibus Agreement constituted a quorum of the Stream Board.   *See Delaware Supreme Court Opinion*, 279 A.3d at 328.   The Omnibus Agreement was not, however, approved by Stream's Class B stockholders— a constituency dominated by the Rajan family's holdings.   *See* List of Equityholders (listing the Rajan family trust as owning over 19 million of Stream's 27 million "Class B Voting" shares).

6

As described by the Delaware Supreme Court:

> The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares [for shares in SeeCubic].

*Delaware Supreme Court Opinion*, 279 A.3d at 328 (internal quotations omitted).  This structure allowed other stockholders to salvage some value from their investments in Stream by participating in the new business, providing value to parties other than just the secured lenders.  *See Chancery Court PI Decision*, 250 A.3d at 1026.

### E.      Delaware Supreme Court Finds the Omnibus Agreement Invalid

Almost immediately after the Omnibus Agreement was signed, the Rajans set about to have it invalidated.  *Delaware Supreme Court Opinion*, 279 A.3d at 329.  Stream filed suit on September 8, 2020, in the Delaware Court of Chancery, against SeeCubic, Inc. (the "Omnibus Agreement Litigation").  In the Omnibus Agreement Litigation, Stream sought to invalidate the Omnibus Agreement and moved for a temporary restraining order which barred SeeCubic from enforcing the Omnibus Agreement.  *Id*.  SeeCubic filed counterclaims, and also sought a preliminary injunction to prevent Stream from interfering with the enforcement of the Omnibus Agreement.

The Court of Chancery entered an opinion on December 8, 2020, which in relevant part found that the Resolution Committee had the authority to bind Stream and that the Omnibus Agreement did ***not*** require approval from Stream's Class B shareholders.  *See Chancery Court PI Opinion*, 250 A.3d at 1046 (emphasis added).  The Chancery Court PI Opinion was subsequently entered as a partial final judgment, which Stream appealed to the Delaware Supreme Court.

On June 15, 2022, the Delaware Supreme Court issued an opinion finding that the Omnibus Agreement was not valid because Stream's Class B Shareholders did not vote to approve it.  Complaint ¶ 100.  The Delaware Supreme Court found that approval of the Omnibus Agreement

required approval by Stream's Class B shareholders because the Omnibus Agreement effected an "Asset Transfer" under Stream's charter. *Delaware Supreme Court Opinion*, 279 A.3d at 338.

Despite Plaintiffs' assertions that the "Defendants never had any right to Plaintiff's assets" and that it "was unlawful and void" (Complaint ¶ 100), the Delaware Supreme Court never found that the secured creditors did not have a right to foreclose on Stream's assets. The Delaware Supreme Court decision simply found that the Omnibus Agreement was procedurally deficient.

In fact, on remand, the Delaware Court of Chancery found that Stream's secured creditors retained their rights in the collateral. *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2022 WL 3227785, at *1 (Del.Ch. Aug. 09, 2022) ("Once [the return of Stream's assets contemplated by the Delaware Supreme Court Opinion] has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream."); *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022) ("The court believes that the rights that secure creditors' rights are strong and may well result in Stream having to transfer the Legacy Stream Assets back to SeeCubic in its capacity as Hawk's designee and agent.").

### F.    Delaware Chancery Court Collateral Estoppel Opinion

On October 17, 2022, Hawk attempted to exercise its secured creditor rights by replacing the directors of Technovative and ordering Technovative to marshal the collateral being held by Technovative. *See* Ex. 1 ¶¶ 5-8.[5]  When Stream and the Rajans refused to comply, Hawk brought suit under 8 *Del. C.* § 225 in the Delaware Court of Chancery, seeking a declaratory judgment that it validly reconstituted the board of Technovative. *See Hawk Investment Holdings, Ltd. v. Stream TV Networks, Inc.*, C.A. No. 2022-0930-JTL (Del. Ch. 2022) (hereinafter the "225 Action.").

---

[5] "Ex. _" refers to the exhibits attached to the Declaration of Steven L. Caponi in Support of Defendants Hawk Investment Holdings Limited and Arthur Leonard Robert Morton's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, Failure to Properly Serve, and Failure to State a Claim filed contemporaneously herewith.

In the 225 Action, Hawk moved for partial summary judgment on the grounds that Stream was collaterally estopped from advancing several arguments that were adjudicated adversely to Stream in the Omnibus Agreement Litigation.  The Court of Chancery granted Hawk's motion for partial summary judgment, and specifically found the following:

> In this case, the doctrine of collateral estoppel prevents Stream from relitigating the following issues:
>
> • Hawk holds secured debt in Stream;
> • Stream defaulted on that debt;
> • Hawk has valid creditor rights;
> • Stream cannot convert that secured debt to equity without raising additional capital; and
> • as of November 10, 2021, Stream had not converted the secured debt.
>
> Each of these issues was litigated in the Omnibus Agreement Litigation and resulted in a final decision on the merits.

*Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14–15.

The Court also noted that "Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement."  *Id*. at *16.  Part and parcel to that ruling, the Court of Chancery explicitly ruled that collateral estoppel prevented Stream from advancing its argument that Stream's defaults were "manufactured" by some sort of conspiracy:

> Evidencing its wily ways with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020," Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage."  *Id*. at 2–3.  That is another way of contending that a default never really occurred.  If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation.  Collateral estoppel bars Stream from advancing that argument now.

*Id*. at *17.  The collateral estoppel effect of the Court's rulings extends to November 10, 2021, the date on which the Court of Chancery entered a partial final summary judgment.  *Id*. at *17.

After the issuance of the Collateral Estoppel Opinion, Stream's only remaining defense in the 225 Action was whether Stream had converted the Hawk debt to equity after November 10, 2021. This question of conversion formed the bulk to the discovery between the parties and was the subject of the competing briefs filed with the Court of Chancery on March 13, 2023, in advance of the one-day trial on a paper record scheduled for March 23, 2023. *See* Ex. 2.

### G.    The Chapter 11 Cases, the Adversary Proceeding, and Service

Such trial never occurred, as the Plaintiffs commenced these Chapter 11 Cases only eight days before the scheduled trial on March 15, 2023 (the "Petition Date"). Within a week of the Petition Date, Hawk sought relief from the automatic stay in order for the parties to return to the Court of Chancery and hold the scheduled one-day oral argument to resolve the vast majority the issues presented in the Complaint. *See Hawk Investment Holdings Ltd.'s Emergency Motion for Relief from the Automatic Stay pursuant to Section 362(d) of the Bankruptcy Code* [Bankruptcy Docket No. 16] ("Motion for Relief"). The Plaintiffs opposed the Motion for Relief, arguing that this Court should resolve the matters that the parties had previously fully litigated.

The Plaintiffs then waited approximately five months to file this Complaint on August 12, 2023. Instead of accomplishing service of the Complaint on Hawk and Mr. Morton pursuant to the strictures of the Hague Convention, however, the Plaintiffs appear to have attempted service on Hawk by mailing a copy of the Complaint to K&L Gates LLP, which serves as counsel to Hawk as part of these Chapter 11 Cases.[6] Moreover, Mr. Morton received the Complaint and Summons by mail on September 19, 2023. It is certain that the Debtors are aware of the requirements and obligations imposed by the Hague Convention, as the Debtors have previously relied upon them

---

[6] Although K&L Gates LLP has appeared on behalf of Hawk during the course of the Chapter 11 Cases, it has made no appearance on behalf of Mr. Morton until the filing of this Brief, and Mr. Morton has played no role in these Chapter 11 Cases. Mr. Morton's relationship to the Plaintiffs and Hawk is discussed in the succeeding section.

during the course of the Chapter 11 Cases defensively, including in order to thwart the taking of a deposition internationally.  *See Debtors' Response in Opposition to Hawk Investment Holdings Limited's Motion and Supplement to Compel Discovery and Impose Sanctions for Failure to Comply*, ¶ 19 [Bankruptcy Docket No. 311]; *Supplement to Debtors' Objection to Hawk Investment Holdings Ltd.'s Emergency Motion to Conduct Deposition and Have Oath Administered Remotely* [Bankruptcy Docket No. 369].

As far as Hawk and Mr. Morton are aware, the Debtors have made no attempt to comply with the requirements of the Hague Convention.

### H.    Defendants Hawk and Mr. Morton

Plaintiffs allege that "[u]pon information and belief, Mr. Morton owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Limited." Complaint ¶¶ 21.  This is not true.  Albany Directors Limited ("Albany") is an independent company and the sole director of Hawk.  Ex. 3 ¶ 1.

Hawk is owned by the Morton Family Trust, and Mr. Morton is not a trustee of the Morton Family Trust.  *Id*. ¶ 2.  Mr. Morton is not a director, officer, or manager of Hawk, and has no decision-making authority at Hawk.  *Id*. ¶ 3.  Mr. Morton is solely an investment advisor to Hawk, and it is Albany that decides what actions Hawk should take.  *Id*. ¶ 4; Ex. 4 at 14:17–15:19 ("I have a consulting agreement, which is with my company called Hawk Consulting Limited …. And I have this contract with Hawk, so they contact me for advice from time to time and I -- I will make recommendations to them in terms of investments and then it's up to them to make a decision as to whether they wish to follow that or not."); Ex. 4 at 17:12–18:2 ("[T]here isn't an investment committee as such, because basically all the investments are made and controlled by the directors of the trust, which is Albany Trustees, and they make all the decisions and they run it.").

11

**ARGUMENT**

I.   **DISMISSAL IS APPROPRIATE BECAUSE PLAINTIFFS HAVE FAILED TO PROPERLY SERVE THE SUMMONS AND COMPLAINT ON HAWK AND MR. MORTON**

 A.   **Legal Standard on Motion to Dismiss under Rule 12(b)(5)**

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104, 108 S. Ct. 404, 98 L.Ed.2d 415 (1987); *see also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1353 (3d ed.) (service of process is "the means by which a federal court gives notice to the defendant and asserts jurisdiction over him"). For that reason, adequacy of service of process must be resolved before any merits-based challenge to the complaint. *Deptula v. Rosen*, 558 F. Supp. 3d 73, 83 (S.D.N.Y. 2021) (quotations omitted).

Under Bankruptcy Rule 7004(a)(1), "[e]xcept as provided in Rule 7004(b)(2), Rule 4(a), (b), (c)(1), (d)(1), (e)-(j), (l), and (m) F. R. Civ. P. applies in adversary proceedings." Fed. R. Bankr. P. 7004. Federal Rule of Civil Procedure 4(f)(1) provides that "an individual … may be served at a place not within any judicial district of the United States … by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents…." If an action involves "service abroad," compliance with the provisions of the Hague Convention is *mandatory*, not optional, with respect to any transmission that Article 1 covers. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988).

As the Complaint states on its face, Mr. Morton "is a resident of Jersey of the United Kingdom Channel Islands," and Hawk "is an entity formed under the laws of Guernsey of the United Kingdom Channel Islands." Complaint ¶¶ 21, 27. Accordingly, both Hawk and Mr. Morton constitute individuals "not within any judicial district of the United States,"

necessitating service be made in accordance with Rule 4(f)(1). Moreover, because the United Kingdom is a signatory to the Hague Convention,[7] service *must* be made in accordance therewith under subpart (1) of Rule 4(a).

### B.     Service Was Improper on Mr. Morton and Hawk

Despite the Plaintiffs' awareness that Mr. Morton and Hawk are foreign defendants, the Plaintiffs did not even attempt to effect proper service pursuant to the Hague Convention.[8]  Under the Hague Convention, service may be made through the Central Authority in Jersey and Guernsey (*see* Arts. 3 and 5), or it may be made by other process authorized by the laws of Mr. Morton's and Hawk's respective jurisdictions (Art. 10).  *See Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 383–84 (E.D. Pa. 1997) (holding that service under the Hague Convention in the United Kingdom need not only be made through the U.K. Central Authority but may also be made in accordance with U.K. law, including by having a local solicitor personally effect service on the defendants).  The Certificate of Service filed by Plaintiffs does not contend that service was made through the Central Authority, so the validity of service rests on whether or not service passes muster under the laws of the jurisdictions where Defendants are: Jersey and Guernsey.

---

[7] The United Kingdom is a signatory to the Hague Convention and the coverage of the convention extends to the Bailiwick of Jersey and the Bailiwick of Guernsey, both British Crown dependencies.  *See* Hague Convention on the Service Abroad of Judicial and Extra–Judicial documents in Civil and Commercial Matters, www.usmarshals.gov/process/hague_service.htm.

[8] At recent hearings, the Plaintiffs have taken the position that Hawk and Mr. Morton's entry into stipulations to extend their response deadline to the Complaint is a concession that they have been served; however, this is patently not the case, as Rule 12(h)(1) provides that a defense under Rule 12(b)(2) through (5)—which includes objections to service and jurisdiction—are not waived unless the defendant fails to raise it by motion or fails to include it in a "responsive pleading" or an amendment.  *See* Fed. R. Civ. P. 12(h)(1); *see also* Fed. R. Civ. P. 12(b) (requiring that Rule 12(b) defenses be raised in "responsive pleadings").

With respect to Hawk, Plaintiffs have failed to satisfy the requirements of Guernsey law. According to Rule 3 of the Royal Court Civil Rules, 2007,[9] in Guernsey, His Majesty's Sergeant must serve a summons in one of three ways:

(1) Service within the jurisdiction of a document on a body corporate shall be effected by the Sergeant-

(a) by leaving the document at the registered office in the Island of the body corporate,

(b) where the body corporate has no such registered office but carries on business in the Island, by leaving the document at any place of business in the Island of the body corporate, or

(c) in accordance with Rules 2(c) or (d), as if the references therein to the individual were references to the body corporate.

Plaintiffs have not offered any affidavit of service from His Majesty's Sergeant or otherwise argued that they complied with Guersney law in serving Hawk.

The Plaintiffs eschewed any attempt at service under the Hague Convention or Guernsey law and, instead, merely mailed a copy of the Complaint to Hawk's counsel and did nothing more. *See* Ex. 5, Certificate of Service [Dkt. No. 3]. Though attorneys may be authorized to accept service on behalf of their clients, "express or implied authority is not conferred upon an attorney simply because he is fulfilling duties normally performed by an attorney." *See Beloit Liq. Trust v. Beloit Walmsley Ltd. (In re Harnischferger Indus., Inc.)*, 288 B.R. 79, 83 (Bankr. D. Del. 2003) (citing *Viking Metallurgical Corp. v. A. Johnson & Co., Inc.*, No. 87-3859, 1987 WL 19241, at *3 (E.D. Pa. Oct. 28, 1987)); *United States v. Glaister*, 2021 WL 1565678, at *2 (S.D.N.Y. Apr. 21, 2021) ("[S]imply representing a client does not constitute authorization (let alone retroactive authorization) to accept service on the client's behalf."). "For service of process to be valid upon

---

[9] The Royal Court Civil Rules, 2007, are available online at
https://www.guernseyroyalcourt.gg/CHttpHandler.ashx?id=106365&p=0.

an agent, it must be shown that he was actually appointed by the defendant for the specific purpose of receiving process." *U.S. v. Marple Comm. Record, Inc.*, 335 F. Supp. 95, 101 (E.D. Pa. 1971). "The burden is on the plaintiff to show that the attorneys were expressly or impliedly authorized to accept service." *Viking Metallurgical*, 1987 WL 19241, at \*3 (citing *Hemmerich Indus., Inc. v. Moss Brown & Co., Inc.*, 114 F.R.D. 31, 32 (E.D. Pa. 1987)).  The Plaintiffs have made no showing that K&L Gates is authorized to accept service on behalf of Hawk—and, indeed, it is not so authorized.

Plaintiffs have done even less to serve Mr. Morton.  Under Jersey law, specifically § 18 of the Services of Process Rules 2019 (the "2019 Rules"),[10] (1) the summons and complaint must be transmitted by the Attorney General's office through the U.S. Embassy in London or other U.S. consular service in the United Kingdom, (2) said consular service will transmit the summons and complaint to the Viscount, an executive officer for courts in Jersey, and (3) the Viscount will serve the defendant in Jersey.  Service by the Viscount is affected by personal service, unless a letter of request specifies a different method of service, in which case the Viscount *may* serve defendant through an alternative method.  *See* 2019 Rules, § 20.

Plaintiffs have not attempted to comply with the 2019 Rules.  A summons was issued on August 14, 2023, which instructed Mr. Morton to respond to the Complaint on or before September 13, 2023, despite the Court never having set a response deadline for foreign defendants as required by Bankruptcy Rule 7012(a).  According to a Certificate of Service filed on September 15, 2023, Mr. Morton was allegedly served by "Registered Mail (1st Class)" on August 30, 2023.[11]

---

[10] The 2019 Rules are available online at https://www.jerseylaw.je/laws/enacted/PDFs/RO-091-2019.pdf.

[11] Here, the Plaintiffs did not even attempt service of the summons on Mr. Morton until 16 days after it was issued. This delayed timing is allowable, as service on a foreign defendant need not be accomplished within 7 days as required by Bankruptcy Rule 7004(e) on domestic defendants.  Part and parcel with this right to delay sending service to foreign defendants, however, is the foreign defendants having additional time to respond to the Complaint, which the Plaintiffs did not afford Mr. Morton in this case.

15

*See* Ex. 6, Certificate of Service [Dkt. No. 14].   Service was clearly deficient, as service by registered mail first class of an individual in Jersey is not permitted.   Mr. Morton must be served personally through the office of the Viscount in Jersey.   This has not happened here.

The Plaintiffs have the burden to demonstrate that they complied with the Hague Convention and properly served process on both Mr. Morton and Hawk.  *See In re Butts*, 350 B.R. 12, 22 n.11 (Bankr. E.D. Pa. 2006), *aff'd*, No. 05-10104, 2007 WL 1722805 (E.D. Pa. June 13, 2007) ("Once the adequacy of service is questioned, the party who made service has the burden of establishing the validity of service.").   Plaintiffs are not able to bypass an international treaty merely because it is inconvenient for them.   Indeed, the Plaintiffs have used the Hague Convention defensively previously in the Chapter 11 Cases; they should not now be allowed to sidestep these requirements merely because of the "frustration over the time it will take to comply with proper … procedures…."  *Debtors' Response in Opposition to Hawk Investment Holdings Limited's Motion and Supplement to Compel Discovery and Impose Sanctions for Failure to Comply*, ¶ 19 [Bankr. Docket No. 311].

The Plaintiffs know the proper procedures for serving Mr. Morton and Hawk; their refusal to comply with such procedures renders service improper, so the Complaint should be dismissed as to Mr. Morton and Hawk in its entirety under Rule 12(b)(5).

## II.    DISMISSAL IS APPROPRIATE BECAUSE THE COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER MR. MORTON OR HAWK

Dismissal of all claims against Mr. Morton and certain claims against Hawk is warranted under Rule 12(b)(2), because this Court does not have any personal jurisdiction over Mr. Morton and has only special jurisdiction over Hawk.

16

### A.    Standard of Review

Plaintiffs have the burden to establish personal jurisdiction over Hawk and Mr. Morton. *Pinto v. St. Paul Fire & Marine Ins. Co.*, No. CV 22-3991, 2023 WL 3667610, at *3 (E.D. Pa. May 26, 2023).  A plaintiff advocating for specific jurisdiction over an out-of-state defendant must demonstrate that the defendant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Goldfarb v. Kalodimos*, 539 F. Supp.3d 435, 451 (E.D.Pa. 2021) (citations and quotations omitted).[12] Typically, that requires showing that: (1) the defendant purposefully established minimum contacts in the forum state, (2) the litigation arose out of or relates to one of the contacts, and (3) exercising personal jurisdiction over the defendant "comport[s] with fair play and substantial justice." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quotation marks and citation omitted).  "Physical presence in the forum is not required for purposeful activities in the forum, but a deliberate targeting of the forum is." *Feldman v. Grand River Ironsands, Inc. (In re Forks Specialty Metals Inc.)*, No. 19-00028-MDC, 2023 WL 3239468, at *11 (Bankr. E.D. Pa. Apr. 30, 2023).  When the plaintiff alleges that the nonresident defendant committed an intentional tort outside the forum, the plaintiff must meet the Supreme Court's "effects test" set forth in *Calder v. Jones*, 475 U.S. 783 (1984).

In addition, where the defendant has moved to dismiss under FRCP 12(b)(2), the plaintiff may not rely on "mere allegations" or "the bare pleadings alone"; it must instead "respond with

---

[12] The Complaint alleges that Hawk is organized under the laws of Guernsey, and Mr. Morton resides in Jersey. Complaint ¶¶ 21, 27. Therefore, there is no colorable basis to consider general jurisdiction over either defendant. *See Daimler AG v. Bauman*, 571 U.S. 117, 137, 134 S. Ct. 746, 760, 187 L. Ed. 2d 624 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home… With respect to a corporation, the place of incorporation and principal place of business are paradig[m] ... bases for general jurisdiction.") (internal quotations omitted).

actual proofs" such as "sworn affidavits or other competent evidence." *Darien Rowayton Bank v. McGregor*, No. 4:22-CV-01394, 2023 WL 2870713, at *2 (M.D. Pa. Apr. 10, 2023); *Forks Specialty Metals*, 2023 WL 3239468, at *9 (same).

**B.      Plaintiff Cannot Demonstrate that Mr. Morton Has Minimum Contacts with Pennsylvania or Purposefully Directed His Contacts to Pennsylvania**

The Complaint does not explain the basis for this Court to exercise personal jurisdiction over Mr. Morton.  The Complaint is sparse on specific allegations concerning Mr. Morton. Mr. Morton is not alleged to have ever stepped foot in Pennsylvania.  Plaintiffs do allege that Mr. Morton "personally participated in all the events relevant to the Hawk debt and conversion agreements, and he negotiated those agreements on Hawk's behalf."  Complaint ¶ 50.  This cannot be a basis for jurisdiction, as entering into the underlying debt documents and agreeing to a conversion agreement with Stream (on behalf of Hawk) is not alleged to be a tortious act or a wrongdoing, and the litigation cannot be said to arise out of either agreement.  Even if this were a basis for exercising specific jurisdiction, these actions allegedly undertaken by Mr. Morton were done in his capacity as an agent for Hawk, and not in his individual capacity. *TJS Brokerage & Co. v. Mahoney*, 940 F. Supp. 784, 789 (E.D. Pa. 1996) ("[G]enerally a defendant is not individually subject to personal jurisdiction merely based on his actions in a corporate capacity."). Similarly, Mr. Morton is alleged to have "created" SeeCubic with Mr. Stastney in order to receive Stream's assets.  *See* Complaint ¶ 28, 78.  Again, merely forming SeeCubic is not a tortious act or wrongdoing, and cannot serve as the basis for exercising jurisdiction.

The remaining particularized allegations in the Complaint concerning Mr. Morton largely boil down to Mr. Morton *receiving* a variety of emails from the other defendants (*see* Complaint ¶¶ 57, 65, 69), none of whom is alleged to be a resident of Pennsylvania or otherwise located in Pennsylvania.  Courts in the Third Circuit have found that even where out-of-state defendants have

intentionally sent emails to individuals located in the jurisdiction, such communications may not be a basis for jurisdiction.  *See Barrett v. Catacombs Press*, 44 F. Supp. 2d 717, 729 (E.D. Pa. 1999) ("As minimal correspondence alone will not satisfy minimum contacts, we cannot say that the Defendant's act of initially sending e-mail or the second responsive e-mail to the Plaintiff triggers jurisdiction.").  It is only logical that courts in the Third Circuit would find no purposeful availment, and therefore no personal jurisdiction, where the defendant is only alleged to have received emails from other defendants that are not alleged to have any nexus to Pennsylvania.

Plaintiffs also fail to satisfy the *Calder* effects test.  Under the *Calder* effects test, a defendant may be subject to personal jurisdiction if they engage in an intentional, tortious act, which is expressly aimed at the forum state, and defendant knew that actual harm in the forum state was likely to be the effect of such action.  *Calder v. Jones*, 465 U.S. 783, 789, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804 (1984).  Plaintiffs cannot meet their burden under *Calder.*  First, Plaintiffs have not pleaded that Mr. Morton engaged in any intentional, tortious act that was expressly aimed at the forum state.  The specific allegations in the Complaint concerning Mr. Morton are merely that Mr. Morton negotiated certain agreements on behalf of Hawk, that Mr. Morton created a Delaware entity (SeeCubic), and that Mr. Morton received email communications related to an alleged conspiracy.  Nowhere do Plaintiffs allege that Mr. Morton took an intentional, tortious act which was expressly aimed at Pennsylvania.  Likewise, Plaintiffs also fail to allege that Mr. Morton knew that harm in Pennsylvania was likely to result from any of his purported actions.

### C.    Plaintiff Cannot Demonstrate that Conspiracy Jurisdiction Exists

Plaintiffs' vague allegations in the Complaint also fail to meet the high standard for pleading conspiracy jurisdiction.  In order to demonstrate conspiracy jurisdiction exists, "[d]istrict courts in this circuit have imposed on plaintiffs the burden to prove that a resident coconspirator

1) performed substantial acts in furtherance of the conspiracy within the forum, and 2) the foreign

coconspirator was or should have been aware of those acts." *Kyko Glob., Inc. v. Prithvi Info. Sols.*

*Ltd.*, No. 2:18-CV-01290-WSS, 2020 WL 1159439, at *32 (W.D. Pa. Mar. 10, 2020) (citations

omitted).  In addition, "[m]ere membership in a civil conspiracy does not ipso facto render a

member subject to the jurisdiction of the forum of any other member." *In re Arthur Treacher's*

*Franchise Litig.*, 92 F.R.D. 398, 411 (E.D. Pa. 1981).

Here, the Plaintiffs have failed to allege that any resident coconspirator "performed

substantial acts in furtherance of the conspiracy within the forum."  The Complaint entirely fails

to allege any acts in furtherance of the alleged conspiracy took place in Pennsylvania.  In addition,

there are no allegations that Mr. Morton knew, or should have known, that other defendants were

taking actions in Pennsylvania in furtherance of the alleged conspiracy.  This is fatal to potential

conspiracy jurisdiction.

Further, and as described in greater detail in Section III.B below, collateral estoppel bars

Stream from arguing a conspiracy occurred to manufacture Stream's default on the Hawk Notes

and seize Stream's assets.  The Court of Chancery explicitly ruled that Stream is collaterally

estopped from arguing there was a conspiracy which "manufactured" the defaults.  *Chancery*

*Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *17 ("Stream [contends that it]

nevertheless remains free to litigate its contention that there was an 'unlawful conspiracy that

artificially manufactured the 2020 default events through bribery and internal sabotage.'  That is

another way of contending that a default never really occurred.  If Stream wanted to advance that

argument, it had to do so in the Omnibus Agreement Litigation.") (internal citation omitted).

The Omnibus Agreement itself belies any claims of a conspiracy.  The Omnibus

Agreement was not hidden in any way; it was executed out in the open, and approved by Stream's

outside directors as a preferable alternative to the secured creditors exercising their secured creditor rights.   The Delaware Court of Chancery approved the validity of the Omnibus Agreement, and though it was later overturned by the Delaware Supreme Court on a technicality, it would be unusual for conspirators to seek to enforce their conspiracy by court order.

Stream cannot attempt to raise its conspiracy argument now because of the doctrine of collateral estoppel.   Stream alleges that the defendants' "conspiracy was designed to destroy Stream from the inside [by causing] default events on certain debt instruments that the secured lender conspirators later transferred to their new entity, SeeCubic … and to use those manufactured default events as a pretext" for the Omnibus Agreement.   Complaint ¶ 1.   Stream cannot demonstrate that the defaults under the Notes were "artificially manufactured" as part of a conspiracy to steal Stream's assets, Stream's conspiracy theory collapses like a house of cards.

### D.    Hawk's Contacts with Delaware May Not Be Imputed to Mr. Morton

In the Complaint, Plaintiffs assert in conclusory fashion that "[u]pon information and belief, Morton owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Limited."  Complaint ¶ 21.  Even assuming, *arguendo*, that collateral estoppel was not a complete bar to Plaintiff's conspiracy jurisdiction theory and that Plaintiff could demonstrate that Hawk had sufficient contacts with Delaware to exercise personal jurisdiction, those contacts cannot be imputed to Mr. Morton.

Stream cannot demonstrate that Hawk is an alter ego of Mr. Morton, and therefore Hawk's contacts to Delaware cannot be imputed to Mr. Morton.  In order to find that Hawk is an alter ego of Mr. Morton, Plaintiffs must demonstrate that there has been an "abuse of the corporate form." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001).  Some of the factors typically examined to determine if there has been abuse of the corporate form include: (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4)

insolvency of debtor corporation, (5) siphoning of funds from the debtor corporation by the dominant stockholder, (6) nonfunctioning of officers and directors, (7) absence of corporate records, and (8) whether the corporation is merely a facade for the operations of the dominant stockholder. *See id.* at 484-85. The Complaint does not allege any of these factors are present.

Stream knows that Mr. Morton is not an alter ego of Hawk. Stream sought a deposition of Mr. Morton in the 225 Action, claiming that Mr. Morton was the "principal" of Hawk. In response to Stream's motion, Hawk produced an affidavit from Albany. *See* Ex. 3. The Albany Declaration stated that: (a) Albany is the sole director of Hawk; (b) Hawk is owned by the Morton Family Trust, and Mr. Morton is not a trustee of the Morton Family Trust; (c) Mr. Morton is not a director, officer, or manager of Hawk, and has no decision-making authority at Hawk; and (d) Mr. Morton is solely an investment advisor to Hawk, and it is Albany that decides what actions Hawk should take. Ex. 3 ¶¶ 1–4. Ultimately, Mr. Morton agreed to voluntarily sit for a remote deposition, where he confirmed facts in the Albany Declaration. *See* Ex. 4, at 14:17–15:19; *id.* at 17:12–18:2.

Albany's declaration and Mr. Morton's testimony directly contradict any allegation that Mr. Morton exercises complete domination and control over Hawk. In fact the direct evidence actually contradicts any assertion that Mr. Morton controls Hawk or Albany. Plaintiff has thus failed to meet the standard for demonstrating that Hawk is the alter ego of Mr. Morton.

### E.      Plaintiff Cannot Demonstrate a Constitutional Basis to Assert Jurisdiction over Mr. Morton

Finally, even if Plaintiff could establish a statutory basis for jurisdiction over Mr. Morton or Hawk, this Court cannot exercise jurisdiction over either because it would offend the Due Process Clause. For jurisdiction to be appropriate under the Due Process Clause, three requirements must be satisfied: (1) "the defendant must have purposefully directed its activities at the forum"; (2) "the litigation must arise out of or relate to at least one of those activities"; and

(3) "if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (internal quotations omitted); *Forks Specialty Metals*, 2023 WL 3239468, at *11 (same).  The Complaint does not allege that Mr. Morton purposely directed any activities at the forum, or that the litigation arises out of those activities.  Therefore, exercising personal jurisdiction over Mr. Morton offends the Due Process Clause.

### F.  Jurisdiction over Hawk:  Hawk's Filing of a Proof of Claim Does Not Constitute Consent for Any Cause of Action Alleged Against It

The Court lacks personal jurisdiction over Hawk with respect to several of the causes of action alleged in the Complaint to the extent that such causes of action are wholly unrelated to the Hawk Claims.  Hawk asserts that such matters outside of the Court's jurisdiction include the Plaintiff's allegations related to Tortious Interference, Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, DTSA, and Pennsylvania Trade Secrets.  As such, the Court lacks personal jurisdiction over Hawk to adjudicate any of these causes of action.

At the outset, Hawk acknowledges that by filing the Hawk Claims, it has submitted to the Court's equitable jurisdiction in order to resolve such claims, including with respect to defenses that the Debtors may have thereto.  *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58–59 (1989) (reasoning that by filing a proof of claim against a bankruptcy estate a creditor triggers the process of allowance and disallowance of claims, thereby subjecting itself to the bankruptcy court's equitable power); *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1252 (3d Cir. 1994) (holding that a legal malpractice action was within the court's jurisdiction due to the attorney filing a fee application in the case, submitting itself to the court's jurisdiction).

Courts in Pennsylvania hold "that this Court's equitable jurisdiction is invoked … to the extent it presents claims that could affect the allowance or disallowance of the [claimant's] proof

23

of claim." *Asousa P'ship v. Pinnacle Foods, Inc. (In re Asousa P'ship)*, 276 B.R. 55, 66–67 (Bankr. E.D. Pa. 2002).  Nevertheless, this invocation of jurisdiction is not unlimited; "a creditor who files a claim in the bankruptcy court in this circuit impliedly consents to being sued on counterclaims ***arising out of the same but not unrelated transactions***." *Id.* at 67 (emphasis added).

Accordingly, Hawk may only be considered to have consented to jurisdiction with respect to causes of action that relate specifically to defenses against the proof of claim and arose out of the same transaction giving rise to the proof of claim—the notes, security documents, and remedies pursued with respect to the same.  As noted above, several of the causes of action are wholly unrelated to the notes and antecedent debt and, instead, relate to a conspiracy theory that is wholly unsupported by the facts (and barred by collateral estoppel).  Conspiracies, interference with contracts, and breaches of trade secrets are not contemplated by—or arise out of—the secured debt transactions.  It is true that the Plaintiffs have alleged setoff and various equitable remedies as a means by which these causes of action may constitute some form of defense to the Hawk Claims, but such an allegation "proves too much," as it would justify ***any*** cause of action with a monetary remedy to fall within the Court's jurisdiction.  Merely alleging a setoff right cannot convert all causes of action with a pecuniary element to ones falling under the court's jurisdiction.

Indeed, holding otherwise would place creditors in a "Catch-22."  The Debtors here refused to schedule the Hawk Claims as secured debt and have alleged that Hawk's debt has converted to equity and no longer exists.  Hawk was required to file a proof of claim in order to protect its interests.  To hold that by virtue of Hawk being forced to protect its interests it has consented to *carte blanche* jurisdiction before this Court provides a mechanism for any debtor to manufacture jurisdiction over foreign parties, regardless of the nature of the cause of action the debtor wishes

to pursue.  If the debtor includes a request for setoff or equitable remediation to the claim, then there is jurisdiction, no matter how unrelated the factual circumstances.  This cannot be the case.

There clearly is a limit on the extent of the Court's jurisdiction over a counterparty who files a proof of claim and submits to the claims resolution process.  To punish creditors by holding that such an action subjects them to unfettered jurisdiction would open the door to abuse and manipulation by debtors and/or would have a chilling effect on creditors' participation in the process in general.  The case law makes clear that the defenses/counterclaims must arise out of the same transaction as the proof of claim—several of the causes of action here do not.

## III.   DISMISSAL IS APPROPRIATE BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM AGAINST HAWK AND MR. MORTON

The Complaint lists nineteen purported "causes of action."[13]  Of those nineteen causes of action, sixteen are asserted against Hawk and/or Mr. Morton.  As discussed below in Sections I.B through I.Q, few (if any) state a cause of action against Mr. Morton or Hawk.

### A.     Legal Standard on Motion to Dismiss Under Rule 12(b)(6)

As the Supreme Court has observed, Rule 12(b)(6) is an "important mechanism for weeding out meritless claims."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face," and these facts must "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 555 (2007).  Plaintiffs may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Allegations that are "merely consistent" with unlawful conduct, but are also consistent with lawful conduct, are insufficient.  *See id.*

---

[13] As discussed in greater detail below, in reality three of the supposed causes of action are actually remedies.

Rule 12(b)(6) may be used to jettison causes of action upon which relief cannot be granted for reasons other than insufficient pleading as well.  For example, where a complaint alleges facts sufficient to establish a statute of limitations defense, the court may dismiss the complaint on that ground as well.  *LabMD Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022) ("[T]he law of this Circuit … permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.").  Similarly, where an action is barred by the doctrines of collateral estoppel and/or issue preclusion, Rule 12(b)(6) may also be used to obtain dismissal on such grounds.  *See Adelphia Gateway, LLC v. Pa. Enviro. Hearing Bd.*, No. 21-CV-1241, 2021 WL 5494286, at *3 (M.D. Pa. Nov. 23, 2021) (granting a motion to dismiss and holding plaintiff was "collaterally estopped from relitigating the issue of … jurisdiction after unsuccessfully pressing its case before [Pennsylvania's] Commonwealth Court.").[14]

In other words, a defendant may utilize Rule 12(b)(6) to obtain dismissal of any cause of action on which relief cannot be granted as a matter of law.

> **B.** **Plaintiffs Are Collaterally Estopped from Arguing that Defendants Conspired to Manufacture Defaults Under Debt Documents and Wrongfully Seize Stream's Assets**

At the outset, the vast majority of the counts and causes of action included in the Complaint are barred by the doctrine of collateral estoppel.  "The doctrine of collateral estoppel bars the re-litigation of an issue that has already been litigated in a court of competent jurisdiction if:

---

[14] Moreover, "[w]hile federal common law has developed its own set of preclusion principles, if the decision allegedly precluding a later action was issued by a state court, then the federal courts must apply the preclusion principles developed by that state." *Randall v. Bank One Nat'l Assoc. (In re Randall)*, 358 B.R. 145, 164 (Bankr. E.D. Pa. 2006); *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir. 1988) ("A federal court applying preclusion principles is bound by the Full Faith and Credit statute, 28 U.S.C. § 1738, and must give a prior state judgment the same effect as would the adjudicating state.") (internal footnote omitted).

(1) the issue decided in the prior adjudication is identical to the one presented in the later action;

(2) there was a final judgment on the merits;

(3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication;

(4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination in the prior proceeding was essential to the judgment.

*Buzzanco v. Lord Corp.*, 173 F. Supp. 2d 376, 384 (W.D. Pa. 2001); *see also City of Newark v. Unemployment Ins. Appeal Bd.*, 802 A.2d 318, 324 (Del. 2002) (listing the elements of collateral estoppel under Delaware law as "(1) the issue previously decided is identical to the issue at bar; (2) the prior issue was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action").

Over the course of the litigation history preceding the case at bar before this Court, Stream has litigated several issues extensively—all the way up to the Delaware Supreme Court. As part of this litigation history, courts of competent jurisdiction within the state of Delaware have had occasion to consider several disputes relevant to the Complaint, and, in fact, the Delaware Court of Chancery has already conducted the collateral estoppel analysis related to such matters.

The Court of Chancery conclusively found that as part of the Omnibus Agreement Litigation, the Delaware Supreme Court entered a final judgment on the merits that found that Hawk holds secured debt in Stream; Stream defaulted on that debt; Hawk has valid creditor rights; Stream cannot convert that secured debt to equity without raising additional equity capital; and as of November 10, 2021, Stream had not converted the secured debt. *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at **14–15; *see also Stream TV Networks, Inc. v.*

27

*SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022).  As part of this analysis, the Delaware Court of Chancery also determined that Stream is collaterally estopped from arguing that the secured creditors (and their affiliates) manufactured defaults under their debt documents as part of a conspiracy to seize Stream's assets wrongfully.  *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *16 ("Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement.").  The Court of Chancery explicitly underscored this conclusion, stating:

> Evidencing its wily ways with words, Stream argues that although it purportedly is not challenging the court's prior finding that "a default event on the Hawk notes occurred in early 2020," Stream nevertheless remains free to litigate its contention that there was an "unlawful conspiracy that artificially manufactured the 2020 default events through bribery and internal sabotage."  That is another way of contending that a default never really occurred.  If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement Litigation.  Collateral estoppel bars Stream from advancing that argument now.

*Id*. at *17 (internal citations omitted).  The collateral estoppel effect of the Court of Chancery's rulings extends to November 10, 2021, the date on which the Court of Chancery entered a partial final summary judgment.  *See id*. at *17.

   As noted above, the Court of Chancery has already conducted an analysis of the collateral estoppel effect of the Delaware Supreme Court's decision a part of the Omnibus Agreement Litigation under Delaware law, which is controlling in this context.  *See Randall*, 358 B.R. at 164 ("While federal common law has developed its own set of preclusion principles, if the decision allegedly precluding a later action was issued by a state court, then the federal courts must apply the preclusion principles developed by that state.").  Thus, the Court of Chancery's holding in the *Chancery Court Collateral Estoppel Opinion* endures and the Plaintiffs cannot re-litigate the issues decided by the Delaware Supreme Court—namely, Stream borrowed the money on a secured

basis; Stream defaulted; the secured creditors have robust rights; and the debts were not converted

as of November 10, 2021, and cannot be converted with an additional equity capital raise.

To the extent the Court believes federal principles of collateral estoppel apply here, though,

it should reach the same conclusion.  Stream litigated the Omnibus Agreement Litigation, and

there is no serious argument that Technovative is not in privity with Stream.  Technovative is

wholly-owned subsidiary of Stream (Complaint ¶ 18), and both are controlled by Mathu Rajan.

Stream had a full and fair opportunity (and every incentive) to raise every argument that would

have questioned the validity of the Omnibus Agreement in the Omnibus Agreement Litigation.

Finally, determining the above facts was essential to the Delaware Supreme Court's opinion.

Thus, the doctrine of collateral estoppel prevents Plaintiffs from re-litigating the conduct

at the heart of the Complaint.  Nearly all of the factual allegations included in the Complaint relate

to prior to November 10, 2021, at which time the secured debts remained outstanding.  The

Plaintiffs cannot argue the debts did not exist, the defaults did not occur, and the secured creditors

do not have valid rights to foreclose on the Collateral and exercise their remedies in good faith.

These findings alone bar Counts I,[15] II, III, IV, VII, VIII, X, XI, XIII, XIV, XVI, XVII, XVIII, and

XIX.  The only Counts remaining would be Counts I (with respect to turnover of estate property

only), XII, and XV, but even these remaining counts cannot rely on the lack of validity of the

secured nature of the debts and the secured creditors' remedies related to the same.

### C.      Count I For Turnover and Accounting Fails to State a Claim

In the Complaint, the Plaintiffs allege that the Defendants have obtained possession of

certain of the Plaintiffs' assets and usurped the Plaintiffs' ownership of SCBV and, accordingly,

---

[15] Count I would be barred related to the Plaintiff's request related to SCBV and the legal proceedings in the Netherlands.  Any property of the estate possessed by the Defendants (if any) would not be barred by collateral estoppel.

demand turnover of such assets and an accounting for the same under section 542 of the Bankruptcy Code. Complaint ¶ 130. In addition to the "disgorgement" of assets traditionally subject to an action under section 542, the Plaintiffs also demand the abandonment of certain causes of action pending in the Netherlands as well as the surrender of customer contracts and information. *Id.* ¶¶ 134, 135. As set forth below, based on the information alleged in the Complaint, the Plaintiffs are entitled to no such relief from Mr. Morton or Hawk.

### 1.    *Legal Standard*

Section 542(a) of the Bankruptcy Code provides that "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title … shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). In order to prevail on an action under section 542(a), a movant must establish that (a) the defendant is in possession, custody, or control, (b) of property that may be used, sold, or leased under section 363 of the Bankruptcy Code, (c) during the pendency of the case, and (d) such property is not of inconsequential value. *See Miller v. Jannetta (In re Irwin)*, 509 B.R. 808, 815–16 (Bankr. E.D. Pa. 2014).

Bankruptcy courts within Pennsylvania require that a defendant must have actual possession, custody, or control of such estate property "on the date of the filing of the petition." *See In re 31-33 Corp.*, 100 B.R. 744, 747 (Bankr. E.D. Pa. 1989) (contrasting section 549 turnover actions for postpetition transfers with section 542 turnover actions related to transfers occurring prior to the petition date); *Bernstein v. Gailey (In re Gailey, Inc.)*, 119 B.R. 504, 514 (Bankr. W.D. Pa. 1990) ("Actual or constructive possession by a defendant is required as a predicate to a turnover action."). Thus, courts have found that although a defendant had possession of estate property at

one time, if such property was disbursed or distributed prior to the petition date, "no action for turnover of the funds could have been brought against [defendant]." *Gailey*, 119 B.R. at 514.

Moreover, "[t]urnover under 11 U.S.C. § 542 is a remedy available to debtors to obtain what ***is acknowledged to be*** property of the bankruptcy estate." *Asousa P'ship v. Pinnacle Foods, Inc. (In re Asousa P'ship)*, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (emphasis added). Section 542 "cannot be used to determine the rights of parties in legitimate contract disputes." *Id.* As such, courts in the Eastern District of Pennsylvania "have held that turnover is not proper where a bona fide dispute exists." *Dershaw v. Ciardi (In re Rite Way Elec., Inc.)*, 510 B.R. 471, 484 (Bankr. E.D. Pa. 2014). A "bona fide dispute" exists when there is "a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assocs. v. Busy Beaver Bldg. Ctrs.*, 865 F.2d 65, 66 (3d Cir. 1989). Accordingly, to the extent there is a dispute over the title or ownership of property, a claim for turnover under section 542(a) is improper and should be dismissed as not stating a claim upon which relief can be granted. *See Right Way*, 510 B.R. at 485 ("By definition there is a dispute over the ownership of that asset [subject to a plaintiff's 542 action]. Without belaboring the merits of the question the Court holds simply that no turnover claim is stated on these facts.").

### 2.    *Analysis*

Based on the allegations included in the Complaint, the Debtors have failed to state a claim upon which any relief can be granted against Hawk or Mr. Morton in Count I. Specifically, there are no allegations included in the Complaint that either Hawk or Mr. Morton directly or constructively held or controlled any assets of the estate as of the Petition Date. Furthermore, to the extent the action in the Netherlands may constitute either Hawk or Mr. Morton "possessing" or "controlling" SCBV, control of SCBV is subject to a bona fide dispute and, therefore, any claim demanding turnover of such property is not properly the subject of an action under section 542.

31

As to the physical assets—or as used in the Complaint, "Stream's Bankruptcy Assets"—the Complaint only alleges that either SCBV, Theune, or SeeCubic ever obtained possession of such assets, either pursuant to the transactions under the Omnibus Agreement or by virtue of such assets residing with SCBV.  *See* Complaint, ¶¶ 75 ("By its terms, the Omnibus Agreement transferred all of Stream's assets to [SeeCubic]…."), 111 (alleging Theune has caused SCBV to withhold from the Plaintiffs "the Google Lenses," "phone-size, tablet-size, and 8K-resolution demonstrators"); *see also id.* ¶¶ 80, 95, 113, 126.    There is no allegation[16] that any of these assets were ever transferred to the possession of Hawk or Mr. Morton, and, indeed, neither Hawk nor Mr. Morton ever obtained or possessed any of Stream's Bankruptcy Assets at any time.

Related to the action pending before the Amsterdam Court, injunctive relief of the type demanded—*i.e.*, ordering the Defendants to petition the Amsterdam Court to restore Mr. Rajan as director of SCBV—is not a remedy authorized by section 542(a).  Section 542(a) provides a mechanism only for the turnover of property—not equitable remedies.  *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983).  Moreover, even assuming this type of remedy may be available under section 542(a), the matter pending before the Amsterdam Court represents a bona fide dispute as to the proper control and possession of the director position at SCBV.  Accordingly, such "property" subject to a bona fide dispute is not ripe for a section 542(a) action and cannot survive a challenge under Rule 12(b)(6).

Accordingly, Count I fails to state a claim upon which any relief may be granted against Mr. Morton or Hawk and, therefore, should be dismissed.

---

[16] For good measure, the Plaintiffs conclusively provide a list of assets that supposedly are property of "Stream's bankruptcy estate … and which assets Defendants are either in unlawful possession of or are attempting to interfere with Stream's lawful use and possession…."  *Id.* ¶ 128.  These types of "threadbare" recitals of elements of a cause of action—here, possession of property of the estate—without more cannot overcome a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.  The Plaintiffs never alleged that Hawk or Mr. Morton ever received any of the property constituting Stream's Bankruptcy Assets in the first instance, all of which apparently were transferred to SeeCubic.

### D.        Count II For Injunctive Relief Fails to State a Claim

Count II alleges the Plaintiffs are entitled to temporary and permanent injunctive relief prohibiting Defendants from "using, transferring, selling, assigning, dissipating, concealing, encumbering, impairing, or otherwise disposing of Stream's Bankruptcy Assets." Complaint ¶ 138. Ultimately, this count must be dismissed, however, as it is a remedy rather than a cause of action for which affirmative relief may be granted, and the Plaintiffs cannot establish they are entitled to such a remedy related to any other action alleged in the Complaint.[17]

### 1.        *Legal Standard*

First and foremost, "[c]laims for injunctive relief are remed[ies], not … independent cause[s] of action." *Salvitti v. Lascelles*, 578 F. Supp. 3d 712, 723 (E.D. Pa. 2022) (internal quotation marks and citations omitted) (alterations in original). Accordingly, the requested injunctive relief must be tied to a specific cause of action—for example, a breach of contract or breach of fiduciary duty action. *See id.* Any stand-alone claim for an injunction, however, is not a claim upon which relief can be granted, and, therefore, courts dismiss such causes of action outright. *See Jones v. GEICO Choice Ins. Co.*, 617 F. Supp.3d 275, 287 (E.D. Pa. 2022) ("Likewise, under Count VI, the plaintiffs seek injunctive relief…. But, as with the plaintiffs' count for return of premiums, the count for injunctive relief must also be dismissed because injunctive relief ***is a remedy, not an independent cause of action***.") (emphasis added).

In order to obtain permanent injunctive relief, courts consider "(1) whether the moving party has shown actual success on the merits; (2) whether denial of injunctive relief will result in irreparable harm to the moving party; (3) whether granting the permanent injunction will result in

---

[17] After filing the Complaint, the Plaintiffs also filed their *Motion for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction* [AP ECF No. 27] (the "TRO Motion"), requesting relief identical to the relief requested as part of Count II. This Count is wholly duplicative of the request in the TRO Motion and therefore should similarly fall if the Court denies the TRO Motion.

even greater harm to the defendant; and (4) whether the injunction serves the public interest." *Grant Heilman Photo., Inc. v. McGraw-Hill Cos.*, 115 F. Supp. 3d 518, 536 (E.D. Pa. 2015). In other words, "the issuance of a permanent injunction is appropriate where (1) the plaintiff successfully proves the merits of the case, (2) no available remedy at law exists, and (3) the balance of the equities favors granting such relief." *Abraham v. Ocwen Loan Serv., LLC*, 321 F.R.D. 125, 171–72 (E.D. Pa. 2017) (internal citations and quotation marks omitted). For a temporary injunction, the test is the same, "except the first element—success on the merits—focuses on the 'likelihood of success on the merits.'" *Id.* at 172 (quoting *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 215 n.9 (3d Cir. 2014)).

### 2.   *Analysis*

Here, the Count II must be dismissed, because it is a remedy improperly pled as a cause of action. *See GEICO*, 617 F. Supp. 3d at 287.

Even if for some reason the Court declines to dismiss this cause of action outright, the Plaintiffs have also failed to establish any element set forth above. First, there has been no demonstration of actual success on the merits of any of the causes of action—each of which should be dismissed, as set forth throughout this Brief. Second, denial of the relief would cause no harm to the Plaintiffs, as they remain protected by the automatic stay which already enjoins any action against the Plaintiffs' property interests. Moreover, any purported violations can be remedied by monetary damages. Third, the requested injunction would be overbroad and would restrict the secured creditors' ability to maintain the value of the assets if they are successful in completing a foreclosure process. Finally, societal interests would be harmed by granting the injunction, as it would undercut other secured creditor's ability to protect their collateral, and it is likely the Debtors would pursue only their own interests if they obtain this relief.

### E.    Count III for Disallowance of Claims 11 U.S.C. § 502(d) Fails to State a Claim

Count III of the Complaint provides a list of proofs of claim filed by Hawk, SLS, and SeeCubic and concludes that "Hawk, SLS, and [SeeCubic] are all liable to the Plaintiffs pursuant to 11 U.S.C. §§ 542, 548, and 550."  Complaint ¶¶ 143–49.  Because Hawk, SLS, and SeeCubic allegedly are liable to the Plaintiffs, Count III demands that the proofs of claim be disallowed until such parties turn over Stream's Bankruptcy Assets or comply with any other judgments entered against them in the Adversary Proceeding.  Considering Hawk's liability to the Plaintiffs, Count III fails to state a claim against Hawk on which relief can be granted and should be dismissed.

### 1.    *Legal Standard*

Section 502(d) of the Bankruptcy Code provides that "the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, [or] 550 … of this title or that is a transferee of a transfer avoidable under section … 548 of this title, unless such entity or transferee has paid the amount, or turned over any such property…."  11 U.S.C. § 502(d).  As Collier explains:

> Section 502(d) is generally operative: (1) when the trustee has secured an order to the claimant for a turnover of property under section[] 542 … ; (2) when the trustee, having successfully avoided transfers under the sections dealing with the trustee's avoidance powers (including sections 522, 547 and 548), may recover under section 550; and (3) when a set off has been found avoidable and the amount of the property thus set off is recoverable to the estate.

4 Collier on Bankruptcy ¶ 502.05[i] (16th ed. 2023).

In order for a request under section 502(d) to sustain, however, the debtor must have an order providing for the avoidance, disgorgement, or setoff of the underlying transaction— otherwise the request is premature.  *See Marketing Res. Int'l Corp. v. PTC Corp. (In re Marketing Res. Int'l Corp.)*, 35 B.R. 353, 356 (Bankr. E.D. Pa. 1984).  "Section 502(d) embraces the situation where the debtor or the trustee ___*successfully prosecutes*___ an action against a party under one of the

sections designated in that section…." *Id.* (emphasis added); *see also Giuliano v. Mitsubishi Digital Elecs. Am., Inc. (In re Ultimate Acquisition Parts.), L.P.*, No. 11-52663, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) ("The Court finds that the Trustee's 502(d) claim should be dismissed.  A debtor or trustee wishing to avail itself of the benefits of section 502(d) must first obtain a judicial determination on the preference complaint.").  Accordingly, without an actual order granting the underlying action justifying disallowance under section 502(d), there is no claim upon which relief can be granted.  *See Goldstein v. BRT, Inc. (In re Universal Marketing, Inc.)*, 460 B.R. 828, 839 (Bankr. E.D. Pa. 2011) (considering a 502(d) "derivative" of the avoidance and turnover actions, and finding "[i]f Counts I through IV [including actions for avoidance and recovery under sections 547, 548, 549, and 550] all had been dismissed, Counts V through VIII [including an action for disallowance under section 502(d)] would fail as well").

### 2.    *Analysis*

Count III must be dismissed as failing to state a claim against Hawk.  In short, this action is premature, as there has been no order entered adjudicating Hawk liable under any of the predicate theories as required by the statute.  There is no order requiring turnover of estate property under section 542; no order finding that a setoff is proper under sections 553 or 558; and the Plaintiffs did not allege Hawk is liable for fraudulent conveyance or preferential transfer.   Thus, as in the *Marketing Resources* case, "§ 502(d) is not yet operative since no judgment has been entered on the debtor's claims." *Marketing Res.*, 35 B.R. at 356.

Moreover, as set forth throughout the balance of this Brief, the Plaintiffs' actions against Hawk under section 542 (Court I, as discussed above) and 558 (Count XIII, addressed below), each fail as a matter of law.  Even if the Court does not dismiss Count III and allows it to exist contemporaneously with Counts I and XIII, because those two counts should be dismissed, Count III must similarly fail.  This claim must be dismissed.

### F.      Count IV for Equitable Subordination Fails to State a Claim

Count IV alleges that Hawk's claims should be "equitably subordinated," but the Complaint does not specify to whose claims (or to what class of claims) Hawk's claims should be so subordinated.  The Plaintiffs merely alleged, "Defendants have engaged in inequitable conduct, including … civil conspiracy, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and breach of contract."  Complaint ¶ 152.  Plaintiffs allege the Defendants have "serve[d] their own interests and unjustly enrich[ed] themselves" resulting "in injury to Stream's general unsecured creditors, its enterprise and going concern value, its current and prospective business relationships … and conferred an unfair advantage on Defendants." *Id.* ¶¶ 154–55.

Once again, with respect to Hawk, this count fails to state a claim and must be dismissed.

#### 1.      *Legal Standard*

Section 510(c) of the Bankruptcy Code authorizes the Court "under principles of equitable subordination, [to] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim…."  11 U.S.C. § 510(c)(1).  In general, courts require the movant establish (1) the claimant has engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the estate or conferred an unfair advantage on the claimant; and (3) subordination of the claim must not be inconsistent with the Bankruptcy Code. *Ansel Props., Inc. v. Nutri-Sys. of Fla. Assocs. (In re Nutri/Sys. of Sla. Assocs.)*, 178 B.R. 645, 657 (E.D. Pa. 1995).  Nevertheless, courts warn that "equitable subordination is an unusual remedy which should only be applied in limited circumstances." *Id.*

"The purpose of equitable subordination is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Lichtenstein v. MBNA Am. Bank, N.A. (In re Computer Personalities Sys., Inc.)*, 284 B.R. 415, 427 (Bankr. E.D. Pa. 2002) (internal quotations marks and citations omitted).

37

Importantly, equitable subordination "is remedial, not penal," with the aim of "correct[ing] harms, not … provid[ing] a windfall to uninjured creditors." *O'Halloran v. Prudential Savs. Bank (In re Island View Crossing II, L.P.)*, 604 B.R. 181, 204 (Bankr. E.D. Pa. 2019).

The inequitable conduct that justifies equitable subordination depends upon the relationship between the debtor and the claimant whose claim is subject to attack.  "Where the claimant is an insider or fiduciary of the debtor, the trustee must present evidence of unfair conduct," after which time the burden shifts to the insider to prove the fairness of the transaction. *See Computer Personalities*, 284 B.R. at 427–28.  For non-insiders and non-fiduciaries, "the plaintiff must establish that the claimant engaged in gross or egregious misconduct, such as fraud, spoliation or overreaching."  *Id.* at 428 (internal citations and quotation marks omitted).  Such conduct need not fall into one of those three buckets; any "very substantial misconduct involving moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage can justify subordination."  *Island View*, 604 B.R. at 203 (internal quotation marks and citations omitted).

Importantly, "[t]he exercise of contractual rights is not inequitable, even if the rights are exercised harshly and cause harm to other creditors."  *Id.*  "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for their lack of 'good faith.'"  *Id.* (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)).  Relatedly, a creditor's alleged failure to put other creditors' interests ahead of its own cannot constitute "inequitable conduct"— even if such "interests were contrary to those of other creditors."  *In re After Six, Inc.*, 177 B.R. 219, 232 (Bankr. E.D. Pa. 1995).

### 2.    *Analysis*

With respect to Hawk, Claim IV must be dismissed, as there is no allegation whatsoever of inequitable conduct on Hawk's part—let alone such egregiously inequitable conduct that it justifies equitable subordination of a non-insider/non-fiduciary.  Moreover, as noted above, the Delaware Court of Chancery has determined that the Plaintiffs may not assert any conspiratorial or bad faith theories to attempt to claim the secured creditors have "manufactured" debts.[18]  *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *17.  This appears to be the "inequitable" conduct justifying subordination alleged in the Complaint, yet the Plaintiffs are collaterally estopped from arguing such conspiratorial intention given their failure to do so previously.  *See id.*

If such a theory is not collaterally estopped, the claim still fails.  First, Hawk is a secured lender of the Debtors, which the Debtors have admitted (*see* Complaint ¶ 27), but there is no basis to find that Hawk is an insider of the Plaintiffs or owes the Plaintiffs fiduciary duties.  There are certain allegations that certain of the Defendants are insiders or fiduciaries of the Plaintiffs, but no such allegations implicate Hawk, which acted merely as a secured lender.  As explained further below, lenders do not owe borrowers fiduciary duties, as the relationship is inherently adversarial.

Because of Hawk's lack of fiduciary or insider status, the Plaintiffs must allege egregious conduct that has directly harmed the other creditors—they have failed to do so.  There is no allegation that Hawk has advanced its priority relative to other creditors, because it is now (and

---

[18] If the Court determines that the Plaintiffs are able to argue their theory that the Defendants' allegedly "manufactured" defaults in bad faith, nowhere in the Complaint do the Plaintiffs allege that Hawk was involved with causing any defaults or interfering with business relationships.  The Complaint alleges that certain individuals acted on Hawk's behalf, but there is no evidence that any individual was directed by Hawk or was actually acting as Hawk's agent in doing so.  *See, e.g.,* Complaint ¶ 67 (alleging "Gollop admitted that he was or at minimum felt obligated to act on behalf of Hawk" but never stating that Hawk directed—or even intended—him to do so), ¶ 72 (alleging "Kabacinski interfered on behalf of Hawk to sabotage the deal" but not that Hawk directed him or enticed him to do so).  Indeed, there is no allegation that Hawk even knew any of these alleged facts had occurred.

always has been) Stream's second-lien creditor.    Instead, aside from the "conspiratorial" allegations discussed above, the only remaining allegations against Hawk relate to (a) its attempts to foreclose on its collateral, including pursuant to the Omnibus Agreement (*see* Complaint ¶ 100), and (b) its refusal to acknowledge any debt-to-equity conversion under the Hawk Conversion Agreement (*see id.* ¶ 51).  Such actions, however, are not "inequitable" for the purpose of a claim of equitable subordination, but they relate to Hawk's specifically negotiated contractual rights.

Considering first the Omnibus Agreement, the Omnibus Agreement was a "friendly foreclosure"—*i.e.*, a remedy to which the secured creditors were entitled to enforce their security interests.  *See* Complaint ¶¶ 44, 45 (acknowledging the Plaintiffs pledged all assets of Stream and its subsidiaries as security for the loans).  Indeed, far from being "prejudicial" to the other unsecured creditors, the Omnibus Agreement actually afforded other stakeholders an opportunity to participate in the secured creditors' recovery and salvage some of their investments.  *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *3 ("Without the Omnibus Agreement, SLS and Hawk had the ability to levy on all of Stream's assets, leaving Stream and its stockholders with nothing.  By agreeing to the Omnibus Agreement, a majority of Stream's directors achieved an outcome in which Stream's stockholders received something.").  In other words, the Omnibus Agreement actually was more accommodating to the stakeholders than any traditional foreclosure and Article 9 process would have been.

Considering the Hawk Conversion Agreement, a bona fide dispute exists between the secured creditors and the Plaintiffs as to the proper understanding, mechanism, and conditions precedent before any conversion may occur.[19]  Nevertheless, any dispute over whether Hawk

---

[19] Moreover, the Complaint admits that the Plaintiffs have not met the conditions required to fully convert the Hawk debt even under the Plaintiffs' preferred reading of the Hawk Conversion Agreement.  *See* Complaint ¶ 71 ("As Stream worked to secure the ToJoy funding, Kabacinski … worked to undermine the investment ***which would have enabled Stream to fully convert the Hawk debt to equity***.") (emphasis added).

40

should have converted its debt to equity under the Hawk Conversion Agreement is an action for *breach of contract*, not equitable subordination.  The Plaintiffs have not asserted an action against Hawk for breach of the Hawk Conversion Agreement in this Adversary Proceeding—an issue the parties were actively litigating in the 225 Action.   Nevertheless, under the Hawk Conversion Agreement, the Plaintiffs have a mechanism by which to subordinate Hawk's claims to the other creditors by contractual right—if they can prove they are entitled to such relief.  Therein lies the reason why the Plaintiffs have refused to pursue an action for breach of the Hawk Conversion Agreement to date—they cannot prevail.  Instead, they are relegated to these tangential attacks to seek the relief to which they are not otherwise entitled.

In sum, the Plaintiffs have alleged no inequitable conduct on the part of Hawk that prejudiced the unsecured creditors or advanced Hawk's position relative to them—Hawk was always ahead of all other creditors other than SLS, and it remains in that same position today.

### G.    Count VII for Tortious Interference with Existing and Prospective Economic Advantage Fails to State a Claim

In Count VII, Plaintiffs allege that all of the Defendants tortiously interfered with Stream's alleged contracts with Google, Robert Bosch GmbH, and ToJoy.  *See* Complaint ¶¶ 170, 174, 176. Plaintiffs' cause of action for tortious interference fails for the simple reason that the majority of the alleged "interference" occurred outside of the applicable statute of limitations among other defects with the Complaint.

#### 1.    *Legal Standard*

Under Pennsylvania law, a claim for tortious interference has four elements: (1) a prospective contractual relation or a contract; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring or from preventing performance under the contract; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual

damage resulting from the defendant's conduct.  *See Thompson Coal Co. v. Pike Coal Co.*, 488 Pa.

198, 207–09 (1979).  In addition, under a tortious interference with prospective business cause of

action, the prospective contractual relation cannot be a "mere hope."  *Id.*

A cause of action for tortious interference with contract must be brought within two years

under Pennsylvania law.  *See* 42 Pa. C.S.A. § 5524(3).  While typically raised as an affirmative

defense, a court may grant a Rule 12(b)(6) motion where it is apparent on the face of the complaint

that the action has not been brought within the applicable limitations period.  *LabMD Inc. v.

Boback*, 47 F.4th 164, 179 (3d Cir. 2022) ("[T]he law of this Circuit … permits a limitations

defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in the statement

of a claim shows that the cause of action has not been brought within the statute of limitations.").

## 2.    *Analysis*

Based on the allegations in the Complaint, Count VII must failed as a matter of law,

because the statute of limitations bars such allegations with respect to the Google and ToJoy

arrangements (as well as potentially with the Bosch arrangement), and there are no allegations

included in the Complaint that Hawk or Mr. Morton ever intentionally or knowingly disrupted any

such relationships—with any such inadvertent interference occurring only as the result of Hawk

exercising its valid rights under its contractual arrangements.

First, with respect to the statute of limitations, Plaintiffs allege that Stream had a lucrative

contract lined up with Google, but that Google cancelled its contract with Stream in February 2021

due to Defendants' tortious interference.  Complaint ¶ 124.  Thus, on the face of the Complaint,

the statute of limitations expired in February 2023, and no action for tortious interference with the

Google contract may endure.  Similarly, Plaintiffs allege that Stream was close to an investment

with Beijing ToJoy Shared International Consulting Co., Ltd. ("ToJoy") in March 2020 that would

have brought in $50 million.  *See id.* at ¶ 71.  But according to the Complaint, due to defendant

Kabacinski's interference in April 2020, ToJoy abandoned its proposed investment. *See id.* at ¶ 72. Once again, the statute of limitations for this tortious interference claim expired in April 2022, and such claim must fail.

Finally, the Complaint alleges that Stream had a co-development agreement with Bosch that was "canceled less than a year after the PI Order gave SCI control of Stream's assets." *See id.* at ¶ 123. The Complaint is vague as to the specific timing of the cancellation of the Bosch agreement, so it is possible that the Plaintiffs' allegations for tortious interference here also fail by operation of the statute of limitations. Even if not barred by the statute of limitations, however, such allegations with respect to the Bosch arrangement nevertheless fail as a matter of law.

First, the Complaint contains no specific allegations demonstrating how Hawk or Mr. Morton interfered with the Bosch contract—or any of the other arrangements, for that matter.

Second, the Plaintiffs have not pleaded a purpose or intent by any of the Defendants to harm or undermine the Bosch contract. According to the Complaint, when SeeCubic obtained Stream's assets pursuant to the Omnibus Agreement and the Court of Chancery's PI Order, SeeCubic "attempt[ed] to renegotiate terms of the agreement," failed to provide certain product samples, and ultimately led Bosch to back out of the Bosch contract due to its "poor management." Complaint ¶ 123. Thus, even taking the allegations in the Complaint at face value, Plaintiffs have only pleaded that it was poor management ***on the part of SeeCubic*** that led to the cancellation of the Bosch contract—not an intent to harm Plaintiffs or interfere with the relationship in general. As pleaded, the Plaintiffs have only alleged incompetence—not the scienter required for tortious interference with contractual relationships.

Third, the Defendants could not have tortiously interfered with the Bosch contract to cause its cancellation with the Plaintiffs, because at the time that Bosch cancelled the contract, SeeCubic

had assumed the Bosch contract pursuant to the Omnibus Agreement. Stream was no longer a party to the Bosch Agreement—the counterparties to the Bosch contract were SeeCubic and Bosch. A party cannot tortiously interfere with its own contract, and Stream cannot claim it suffered such damages when SeeCubic actually bore them. *Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 597 (E.D. Pa. 2011) ("Under Pennsylvania law, a claim for tortious interference will survive only if a defendant is not a party to the contract alleged to have been tortiously interfered with."). By the same token, to the extent other Defendants are alleged to have acted on SeeCubic's behalf as its agent in order to scuttle the Bosch contract, the action still fails, as agents and their principals are deemed "one" and no such action could lie against them. *See, e.g., Daniel Adams Assocs., Inc. v. Rimbach Publ'g*, 360 Pa. Super. 72, 519 A.2d 997, 1000–02 (1987) (holding a tortious interference claim must be dismissed against a corporate officer of a publisher where the underlying agreement was between the publisher and a sales representative because "the corporation and its agent are considered one so that there is no party against whom a claim for contractual interference will lie").

Indeed, the concept of tortious interference makes little sense in this case, as the Plaintiffs' primary arguments relate to the Defendants' alleged desire to abscond with the Plaintiffs' valuable assets. Assuming *arguendo* such allegations and intentions were true, the Defendants would have had little reason to sabotage the value of the assets they purportedly were pursuing. The Defendants simply would not intentionally disrupt any of the contractual relationships or it would have frustrated their own interests as alleged by the Plaintiffs.

Thus, Count VII must be dismissed in its entirety for failure to state a claim.

### H.      Count VIII for Recharacterization of Loan as Equity Fails to State a Claim

In Count VIII, the Plaintiffs allege that Hawk's debt should be "recharacterized" as an equity investment, based on the "substance and character of the … Hawk loan[], as well as the

conversion agreement[]" rendering the Hawk loan "one of an equity interest rather than a debt

claim." Complaint ¶ 181.  Thereafter, the Plaintiffs allege that the "parties intended all conversion

agreements to be an equity interest [sic]," and the parties all signed the conversion agreements

"with the intent of treating the loans as an equity interest." *Id.* ¶ 183.

The Plaintiffs acknowledge the parties intended to enter into debt transactions, so

Count VIII must be dismissed.

### 1.   *Legal Standard*

Recharacterization is an equitable doctrine wherein courts consider the "substance" of a

transaction over its "form" to discern the intention of the parties in consummating the provision of

financing.  "[T]he focus of the recharacterization inquiry is whether a debt actually exists, or, put

another way, [the court] ask[s] what is the proper characterization in the first instance of an

investment." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006).  Recharacterization

and its related tests are "a court's attempt to discern whether the parties called an instrument one

thing when in fact they intended it as something else." *Id.* at 456.

Courts infer such intent from the terms included in the relevant agreement and how the

parties treated it.  Courts within the Eastern District of Pennsylvania consider the following factors

as indicative of the parties' intent in this regard:

> (a) names given to the instruments, if any, evidencing the indebtedness;
> (b) presence or absence of a fixed maturity date and a schedule of payments; (c) no
> fixed rate of interest and interest payments; (d) whether repayment depended on
> success of the business; (e) inadequacy of capitalization; (f) identity of interests
> between creditor and stockholder; (g) security, if any, for the advances; (h) ability
> to obtain financing from outside lending institutions; (i) extent to which the
> advances were subordinated to the claim of outside creditors; (j) the extent to which
> the advances were used to acquire capital assets; (k) presence or absence of a
> sinking fund; (*l* ) presence or absence of voting rights; and (m) other considerations.

*NTP Marble, Inc. v. Papadopoulos (In re NTP Marble, Inc.)*, 491 B.R. 208, 212 (Bankr. E.D. Pa.

2013) (quoting *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*,

473 B.R. 252, 572–73 (Bankr. D. Del. 2012)).  No factors are necessary and none are alone sufficient to establish the parties' intent, but the courts consider the totality of the circumstances to divine this intention.  *See SubMicron*, 432 F.3d at 456.

> **2.      *Analysis***

As is obvious from the foregoing explanation of the doctrine of recharacterization and its accompanying factors, the Plaintiffs have not stated a claim and this count must be dismissed.  In short, the Plaintiffs do not assert that Hawk and Stream intended the Hawk notes to actually evidence equity investments "in the first instance"—they, instead, acknowledge the debt nature of the transactions but argue that considering the conversion agreements, the parties intended the loans to convert to equity at such later date.  Indeed, the Court of Chancery has specifically found that these transactions resulting in the creation of secured debt.  *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at **14–15.

Moreover, the Plaintiffs cannot argue that the parties intended the Hawk Notes to be equity investments, because they have none of the hallmarks of equity investments.  The Hawk Notes (a) are called "Notes," (b) include fixed maturity dates (that were only changed via formal amendments), (c) with fixed interest rates, (d) with repayments not based on financial performance of the business, (e) securitization of the advances, (f) with priority to other creditors (other than SLS), and (g) without control/voting rights based on the loan.  Though some of the factors considered may indicate an equity investment—such as undercapitalization of Stream, inability to obtain financing elsewhere, and acquisition of capital assets with the loan—those factors are common in the context of loans to "start-up" companies, such as the Plaintiffs.  *See SubMicron*, 432 F.3d at 457 (noting that the import of certain factors are context specific).

Moreover, the Plaintiffs' argument is entirely self-defeating.  For example, if the Hawk notes were always intended to be equity investments, there would be no reason for the parties to

execute the Hawk Conversion Agreement in the first place.  Similarly, if the Hawk Conversion Agreement itself sought to render conversion a *fait accompli*, the parties would not have included conditions precedent with respect to equity financing raises or other procedural steps for the Plaintiffs to complete prior to conversion.  *See* Complaint ¶ 50 (listing at least three "contractual obligations under the Hawk Conversion Agreement" as conditions precedent to conversion, including "***rais[ing] the required capital, extinguish[ing] any purported liens, and sen[ding] stock certificates to Hawk***….") (emphasis added).

It is clear all parties considered the Hawk debt to be just that—debt.  The Plaintiffs are not actually asserting a cause of action to recharacterize the Hawk debt; instead, this claim represents another attempt to litigate a breach of contract action under the Hawk Conversion Agreement, without actually asserting such a cause of action.  As Hawk explained above, the Plaintiffs have not pursued such a breach of contract action, because they cannot prevail thereon.

## I.      Count X for Breach of Fiduciary Duty Fails to State a Claim

Count X of the Complaint alleges that Hawk breached its fiduciary duties to Stream by engaging in a conspiracy to steal Stream's assets and transfer them to SeeCubic.  Even accepting the facts alleged in the Complaint as true, Count X, because the Plaintiffs have not alleged that Hawk holds no role that gives rise to it owing fiduciary duties to either Plaintiff.

### 1.      *Legal Standard*

In order to state a claim for breach of fiduciary duty, a plaintiff must demonstrate that the defendant had a fiduciary duty to plaintiff, and that defendant breached that duty.  *See Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Entertainment, LLC)*, 520 B.R. 455, 470 (Bankr. D. Del. 2014) ("The elements of a breach of fiduciary duty claim are (1) that the fiduciary duty exists and (2) that the fiduciary breached that duty.").

"For a fiduciary duty to exist, there must first be a fiduciary relationship." *Id.* "Under Delaware law, fiduciary duties are owed only by directors, officers, or [in some cases] controlling shareholders." *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 93 (D. Del. 2002); *see also Official Comm. of Unsecured Creditors of Fedders of N. Am., Inc. v. Goldman Sachs Cred. Parts. L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (explaining that fiduciary relationships arise under Delaware law "where there is a separation of legal control from beneficial ownership, equity imposes fiduciary duties upon those in control to protect the beneficiaries who are not in a position to protect themselves").

### 2.   *Analysis*

Stream and Technovative are both Delaware corporations.  Complaint ¶¶ 17–18.  Hawk is not now—nor have the Plaintiffs alleged Hawk to be—a director, officer, or controlling stockholder of either Plaintiff.  No are there any allegations that Hawk filled any sort of other role that would give rise to a fiduciary relationship between the parties—*i.e.*, one where there is a "separation of legal control [by Hawk] from beneficial ownership" of Stream.  *See Fedders*, 405 B.R. at 539.

Plaintiffs instead allege that Hawk has a fiduciary duty to Plaintiffs "by virtue of their status as secured lenders that operated with complete control over the Debtors."  Complaint ¶ 199. Defendants have been unable to locate any authority indicating that fiduciary duties may be imposed on a secured lender by virtue of their status as secured lenders.  Indeed, considering the purpose of fiduciary duties under Delaware law, fiduciary duties between lender and borrower simply would make no sense, as their interests are inherently adversarial (especially after a default).  Fiduciary duties are necessary when there is a separation of legal control from beneficial ownership which requires the imposition of fiduciary duties to protect those who cannot protect

themselves.  *See Fedders*, 405 B.R. at 539.  Lenders do not ordinarily have control over their

borrowers, and borrowers are able to exercise their own rights to protect their own interests—

indeed, the Plaintiffs have continued to exercise their own rights to protect their interests during

the entirety of the relationship between the parties.

To the extent that Plaintiffs allege that Hawk "operated with complete control over the

Debtors" and "directed the Debtors' business decisions," this is simply not true, and belied by the

Complaint.  Hawk never possessed or controlled the Plaintiffs or their assets, and the Plaintiffs

have not alleged that it ever did so.  Under the Omnibus Agreement, Stream's assets were

transferred to SeeCubic, which took control of such assets and established its own business.

Complaint ¶ 75 ("By its terms, the Omnibus Agreement transferred all of Stream's assets to SCI

in lieu of SLS and Hawk foreclosing on Stream's assets.").  Hawk never took control of Stream,

which continued to exist under Mathu Rajan's control while the Omnibus Agreement was in force.

Thus, this Count entirely fails to state a claim.

**J.**  **Count XI for Aiding and Abetting Breach of Fiduciary Duty Fails to State a Claim**

Count XI of the Complaint alleges that Hawk and Mr. Morton aided and abetted the

breaches of fiduciary duty of Director Defendants Kabacinski, Stastney, Gollop, and Gola.

*See* Complaint ¶ 204.

**1.**    *Legal Standard*

Under Delaware law, in order to survive a motion to dismiss, the Complaint must allege

facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary

relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the

defendants, and (4) damages proximately caused by the breach.  *See Malpiede v. Townson*,

780 A.2d 1075, 1096 (Del. 2001).  If no fiduciary relationship exists, however, there can similarly

be no claim for aiding and abetting a breach thereof.  *See id.*

> 2.  *Analysis*

Hawk and Mr. Morton cannot be found liable for aiding and abetting the Director

Defendants' breach of fiduciary duties because the Director Defendants did not violate their

fiduciary duties to Stream by entering into the Omnibus Agreement.  Hawk and Mr. Morton

expressly incorporate the arguments expressed by Mr. Stastney in Mr. Stastney's Motion to

Dismiss, which describes the legal basis for finding that Plaintiffs have failed to demonstrate a

breach of the Director Defendants' fiduciary duties. In addition, the complaint does not plead any

facts asserting that Hawk and Mr. Morton knowingly participated in any breaches of the Director

Defendants' fiduciary duties.

> ### K.  Count XII for Determination of Secured Status, and the Extent of Priority of Liens and Interests under 11 U.S.C. § 506(a) Fails to State a Claim

Count XII requests the Court disallow some portion of Hawk's proofs of claim (the "Hawk

Claims") under section 506(a) of the Bankruptcy Code, arguing the provision "provides that an

allowed secured claim is only secured to the extent of the value of the secured creditor's interest

in the estate's interest in such property."  Complaint ¶ 212.  Though there are no factual allegations

in the Complaint addressing the documentation attached to the Hawk Claims, it baldly and

conclusively states, "many of the attachments by Hawk … as referenced herein were ineffectual,

and that many of the attachments did not reach Stream's accounts receivable." *Id.* ¶ 213.

Importantly, the Plaintiffs made no allegation as to the insufficiency of Hawk's secured

documentation and they made no allegation that Hawk is undersecured.  As such, there is no basis

for the Court to bifurcate Hawk's claim or disallow any liens related to the same.

1.      *Legal Standard*

Section 506(a) provides, in relevant part, that an "allowed claim of a secured creditor by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such claim." 11 U.S.C. § 506(a)(1).  The purpose of section 506(a) is rooted in hornbook principles:  it provides that a lien only attaches to collateral to the extent the debtor has equity in the collateral.  *See* 4 Collier ¶ 506.03[4][a].  Section 506(a) does not provide a mechanism by which a lien may be avoided; instead, it merely provides a basis for a court to bifurcate a secured claim, after which time section 506(d) avoids a lien on the unsecured portion thereof.  *See* 11 U.S.C. § 506(d).

The Third Circuit has embraced a burden-shifting framework with respect to allowance and amount of claims, including with respect to valuation disputes under section 506(a).  *In re Heritage Highgate, Inc.*, 679 F.3d 145, 140 (3d Cir. 2012).  Because section 502(a) and Bankruptcy Rule 3001(f) "grant prima facie effect to the validity and amount of a properly filed claim," any such claim filed with all supporting documentation is valid until the debtor overcomes such presumptive validity.  *See id.*; *see also* Fed. R. Bankr. P. 3001(d) & (f) (requiring a claim to "be accompanied by evidence that [an alleged] security interest has been perfected" and providing that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim").  Under this framework, "the debtor bears the initial burden of proof to overcome the presumed validity and amount of the creditor's secured claim, but the ultimate burden of persuasion is upon the creditor to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing the claim."  *Id.* (citing *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)); *In re Museum of Am. Jewish*

*History*, No. 20-11285, 2020 WL 7786925, at *15 (Bankr. E.D. Pa. Dec. 4, 2020) (applying the burden shifting framework).

Thus, to present a claim under section 506(a), the movant must produce some evidence of valuation in order to suggest that the creditor's claim is undersecured. *In re Vital*, No. 12-11758, 2013 WL 441605, at *5 (Bankr. D. Del. Feb. 5, 2013) (finding that "implicit reference to Debtors' own valuation, with no supporting evidence, is insufficient to allow the Court to decide whether the claims are secured or unsecured under § 506"). When a movant has supplied "no appraisals or other evidence, or references thereto, tending to show" that the creditor is undersecured, such allegations alone are insufficient to carry the burden under § 506(a). *See id.* at *4.

**2.    *Analysis***

In the case at bar, the Plaintiffs' claim to determine secured status under section 506(a) must be dismissed because the Plaintiffs have provided no evidence tending to show that Hawk is undersecured—whether due to collateral valuation, improper perfection, or otherwise.

Instead, the Plaintiffs have made unsupported conclusory allegations that certain of the documentation Hawk provided with its claim is insufficient to "reach Stream's accounts receivable." Complaint ¶ 213. There are no factual allegations identifying the purportedly ineffectual documentation or the defect therewith. In fact, the Complaint specifically states, with respect to the SLS debt, that such debt was "secured by all assets of Stream and its subsidiaries," and with respect to the Hawk debt, "Stream also pledged its assets for those instruments subject to SLS's senior security interest...." *Id.* ¶¶ 44–45. Stream has made no allegation in the Complaint— or in any other of the myriad litigation between the parties—that the secured creditors' debts were

not properly secured, and, indeed, the Delaware Court of Chancery has expressly found the

contrary.[20]  *See Chancery Court Collateral Estoppel Opinion*, 2022 WL 17258460, at *14–15.

Because the Plaintiffs have failed to produce any evidence to indicate a defect—or even

allege any defect exists—with respect to the Hawk Claims, it cannot carry its burden to overcome

the Hawk Claims' prima facie validity.  Accordingly, the Plaintiffs' only argument to bifurcate the

Hawk Claims is that the Plaintiffs' interest in the collateral renders Hawk undersecured.  The only

evidence as to the value of the Plaintiffs' assets they have provided is included in their schedules,

where Stream lists its assets totaling over $210 million—*i.e.*, approximately $40 million *more* than

that included in the Hawk Claims.  *See* Schedule A [Bankruptcy Docket No. 52], at line 92.

Accordingly, the Plaintiffs have made no factual allegation alleging the Hawk Claims do

not include proper or sufficient documentation; they have produced no evidence to indicate the

Hawk Claims were not perfected or correctly documented; and they have not alleged that the

collateral is of insufficient value, thereby rendering the claims undersecured.  In short, Count XII

must be dismissed.

### L.        Count XIII for Right to Set Off Under 11 U.S.C. § 558 Fails to State a Claim

By Count XIII, the Plaintiffs allege that they are entitled to offset debts they owe to Hawk,

SLS, and SeeCubic based on a debt "in excess of $ 8,342,059 for legal fees and services."

---

[20] The Hawk proof of claim expressly includes the various security agreements and UCC financing statements providing for the creation of its liens on the Plaintiffs' property as well as the perfection of such liens.  Section 1.2(d) of the security agreements specifically includes as part of the "Collateral" all "Accounts and documents relating to Accounts" as well as "general intangibles (including without limitation payment intangibles ….), promissory notes, contract rights, chattel paper, documents, letter-of-credit rights and instruments…."   Moreover, the financing statements include the exact same collateral descriptions to identify and perfect Hawk's interest in such collateral. "Accounts receivable" and "Accounts" are considered "general intangibles" under the UCC, and the perfection of such interests is accomplished by the filing of a financing statement.  *See* Del. Gen C., tit. 6, § 9-102(a)(42) (defining general intangibles to include payment intangibles), § 9-310 (describing when perfection by financing statement is sufficient)

Complaint ¶ 217.  The Plaintiffs have alleged no facts to support these amounts nor have they provided the basis for such supposed obligations.  Accordingly, Count XIII must be dismissed.

### 1.    *Legal Standard*

At the outset, the Bankruptcy Code itself does not "create" the right to setoff and, instead, merely preserves any right to setoff a debtor may have had under otherwise applicable law.  *See* 11 U.S.C. § 558 ("The estate shall have the benefit of any defense available to the debtor against any entity…."); *see also In re Papercraft Corp.*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) ("Section 558 preserves to the Debtor its prepetition [non-bankruptcy] defenses to cause of action").  Accordingly, to state a cause of action for setoff, the debtors must have the right to effect a setoff under applicable law—whether state or federal law, contract, or otherwise.

It is unclear what "applicable law" the Plaintiffs rely upon in asserting their right to setoff, but in general (and as admitted in the Complaint), state common law requires "mutuality" of obligations in order to effectuate a setoff—*i.e.*, that "the debts [are] in the same right and between the same parties, standing the same capacity."  *See Holber v. Suffolk Const. Co., Inc. (In re Red Rock Servs. Co., LLC)*, 480 B.R. 576, 614 (Bankr. E.D. Pa. 2012).  Moreover, such mutuality is destroyed if the relevant debts are not yet due.  *See*, *e.g.*, *Appeal of Com. Trust Co. of Pittsburgh*, 188 A. 200, 202 (Pa. 1936) ("A claim not yet due is, moreover, incapable of becoming the subject matter of a proper set-off."); *CanCan Dev., LLC v. Manno*, No. 6283-VCL, 2011 WL 4379064, *5 (Del. Ch. Sept. 21, 2011) ("A contingent or unmatured obligation which is not presently enforceable cannot be the subject of set-off.").

### 2.    *Analysis*

The Complaint fails to state a claim upon which relief can be granted with respect to setoff under section 558, because it does not allege any legally cognizable right to setoff or "applicable law" authorizing such setoff, and the Bankruptcy Code does not establish that right on its own.

The only allegations supporting the right to setoff in the Complaint are that "the Defendants" owe the Plaintiffs amounts related to attorneys' fees.  Complaint, ¶ 217.  This is insufficient.

The Plaintiffs have not alleged specific facts demonstrating their entitlement to these attorneys' fees.  There is no allegation that mutuality exists, and, in fact, the allegations in the Complaint would suggest there is no mutuality, because the "Defendants" did not—and could not have—jointly and severally acted as lenders to the Plaintiffs.  Hawk was a lender; SLS was a lender; Hawk and SLS contributed the right to pursue recovery of such debts to SeeCubic, but under no theory could all three be equal participants in such lending transaction, because SeeCubic did not exist throughout most of the Plaintiffs' existence and neither SLS nor Hawk extended additional loans to the Plaintiffs after SeeCubic's creation.  Thus, "the Defendants," as alleged in the Complaint, owing the Plaintiffs attorneys' fees cannot be mutual with the debts alleged in the various proofs of claim.

Without any allegation as to the alleged basis for payment, right to payment, or obligator on such payment, the Plaintiffs have failed to state a claim against Hawk.

**M.      Count XIV for Equitable Disallowance Fails to State a Claim**

In Count XIV, the Plaintiffs assert that the Hawk Claims[21] should be disallowed under the doctrine of "Equitable Disallowance," because Hawk "engaged in inequitable conduct, including, without limitation, a civil conspiracy, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, lender liability, and breach of contract."   Complaint ¶ 221.   Disregarding the factual inaccuracies alleged in support of this count, it must be dismissed, because "equitable disallowance" is not a claim at all within the Third Circuit.

---

[21] Count XIV also alleges Mr. Morton should be subject to equitable disallowance, but Mr. Morton has not appeared in these Chapter 11 Cases and has not filed a claim against the Plaintiffs, so there is no claim to so disallow.

1.      *Legal Standard*

The concept of equitable disallowance is rooted in the Supreme Court case *Pepper v. Litton*, 308 U.S. 295 (1939).  Although some courts have suggested that the concept of equitable disallowance endures after the passage of the Bankruptcy Code, "no court has actually disallowed a claim pursuant to equitable disallowance, and there is significant disagreement as to the theory's validity."  4 Collier ¶ 502.03.  No courts within the Eastern District of Pennsylvania have even mentioned the concept of equitable disallowance, and within the Third Circuit more broadly, there is no discussion of the remedy of equitable disallowance other than a passing mention in a footnote providing, "[w]e find it unnecessary here to resolve the issue as to whether equitable 'disallowance' remains an available remedy."  *CitiCorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n.7 (3d Cir. 1998).

Many courts have found that the concept of equitable disallowance has been abrogated by the Bankruptcy Code.  *See In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del 2016) ("The 'equitable disallowance' claim is not typically recognized by bankruptcy courts…. [B]ankruptcy courts routinely reject equitable disallowance as a remedy under the Code.").  Specifically, these courts have found that equitable disallowance would provide an alternative means by which claims may be disallowed—in direct contravention of section 502(b), which provides the exclusive circumstances under which disallowance may be accomplished.  *See* 11 U.S.C. § 502(b) (listing nine grounds for disallowance and *not* including "inequitable conduct).  This position is bolstered by the fact that the Supreme Court has stated that bankruptcy courts may not use equity as a means to expand the grounds enumerated by the Bankruptcy Code for disallowance.  *See Travelers Casualty & Surety Co. of Am. v. Pac. Gas & Electric Co.*, 549 U.S. 443, 449–50 (2007); *see also Law v. Siegel*, 571 U.S. 415, 427–28 (2014) (concluding that

section 105(a) of the Bankruptcy Code provides no authority to exercise a remedy that is not included in the Bankruptcy Code's enumerated remedies).

        **2.**    *Analysis*

Equitable disallowance is not a recognized doctrine within the Third Circuit, and its application is directly antithetical to the provisions of the Bankruptcy Code. Any holding allowing the equitable disallowance of claims would be creating remedies excluded from—and contradicting the terms of—the Bankruptcy Code. Accordingly, Court XIV should be dismissed.

**N.**    **Count XV for Objection to Claim Fails to State a Claim**

Count XV alleges that certain of the claims filed in the Chapter 11 Cases are duplicative of other claims. Though Hawk acknowledges that there may be claims that cover similar subject matter and amounts that is has included in the Hawk Claims,[22] the Hawk Claims are not duplicative of any other claims filed in these cases. Thus, there is no basis to disallow the Hawk Claims as being duplicative, and this Count must fail.

**O.**    **Count XVI for Exemplary Damages Fails to State a Claim**

Plaintiffs allege in Count XVI that they are entitled to the *remedy* of "exemplary damages," asserting the Defendants' actions were "willful and malicious acts in their scheme against Plaintiffs…." Complaint ¶ 244. The Plaintiffs allege any damages to which they are entitled should be augmented in order to punish the Defendants "and to serve as notice to the community that similar conduct will not be tolerated." *Id.* ¶ 247. This action fails as a matter of law.

---

[22] Though Hawk acknowledges this Count main endure against other claims filed on the docket, the Debtors have not identified which specific claims they seek to disallow hereunder. To the extent the Debtors seek to disallow the Hawk Claims, Hawk reserves all rights with respect to its defenses to this count.

1.    ***Legal Standard***

A request for "exemplary damages" is not an independent "cause of action;" it is a remedy that must be alleged in connection with other specific causes of action.   *See Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 425 (W.D. Pa. 2005) ("Finally, plaintiffs set forth punitive damages as a separate claim for relief.   Punitive damages, however, do not constitute an independent cause of action…   Therefore, the Court will dismiss plaintiffs' claim for punitive damages claim, with prejudice.").   Instead, plaintiffs "may include a demand for punitive damages within her demand for relief, not as a separate claim."   *Kee v. Zimmer, Inc.*, 871 F. Supp. 2d 405, 413 (E.D. Pa. 2012).

Exemplary or punitive damages are available under Pennsylvania law only in "extreme" cases and in "only the most exceptional matters."   *Keen v. C.R. Bard, Inc.*, 480 F. Supp. 3d 624, 646 (Bankr. E.D. Pa. 2020).   Plaintiffs "must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amount to intentional, willful, wanton or reckless conduct."   *Id.* (quoting *Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) (internal quotation marks and citations omitted)).   "Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Cricket Lighters*, 883 A.2d at 445 (internal quotation marks and citations omitted).

Because of the factual nature of this remedy, "the court should decide the viability of a punitive damages claim 'only when no reasonable inference from the facts alleged supports a punitive award.'"   *Keen*, 480 F. Supp. 3d at 646 (quoting *Soufflas v. Zimmer, Inc.*, 474 F. Supp. 2d 737, 756 (E.D. Pa. 2007)).   Yet, when there is "simply no evidence of any evil motive" by the defendant, the court may dismiss the claim.   *See Soufflas*, 474 F. Supp. 2d at 756.   Moreover, punitive damages may only be awarded in connection with certain causes of action.   For example,

punitive damages are not available for breach of contract claims, and may only maintain for independent tort actions. *See Western Essex Corp. v. Cassio, Inc.*, 674 F. Supp. 8, 9 (W.D. Pa. 1987) (citing *Daniel Adams Assocs. V. Rimbach Pub. Inc.*, 429 A.2d 726, 728 (Pa. Super. 1981)).

### 2. *Analysis*

In this case, the Plaintiffs' cause of action for exemplary damages should be dismissed. First, a request for exemplary damages is not an independent claim, so this count should be dismissed as not representing a cause of action upon which relief can be granted independently.

Second, as set forth throughout this Brief, the Plaintiffs have failed to state a claim for any cause of action that may maintain an award of exemplary damages. Not only is every cause of action subject to dismissal under Rule 12(b) as set forth herein, but nearly every cause of action is actually rooted in contract—whether the Omnibus Agreement, the Hawk Conversion Agreement, or otherwise. Though the Plaintiffs do not allege any breach of contract action with respect to Hawk or Mr. Morton, a cursory review of the allegations related to every cause of action relates either to (a) alleged conspiratorial conduct in executing and effectuating the Omnibus Agreement (which is barred by collateral estoppel) or (b) alleged inequitable conduct by refusing to honor the Hawk Conversion Agreement. These are not independent actions that can sustain an award of exemplary damages in the first instance. *See Western Essex*, 674 F. Supp. at 9.

Third, if any causes of action survive this Brief, there is simply no evidence of "evil" motive on behalf of any of the Defendants. Instead, the allegations merely establish that (a) the Plaintiffs borrowed millions of dollars from the Defendants, secured by all of the Plaintiffs' assets; (b) the Plaintiffs defaulted on those obligations; and (c) the secured creditors attempted to foreclose on those assets in a manner that was ultimately deemed legally defective. There was no malice or wanton conduct, as illustrated by the fact that the Delaware Court of Chancery originally

determined that the Omnibus Agreement was valid.  It would be a rare instance where the Court of Chancery blesses an actors' "evil" motives.

It simply makes no sense that conduct originally blessed as a valid exercise of secured creditor rights by a court of competent jurisdiction could later be determined to constitute conduct so wanton that it justifies exemplary damages.  The secured creditors exercised their rights in good faith by foreclosing on the collateral—rights that the parties expressly negotiated for.  There simply are no facts alleged indicating that Hawk or Mr. Morton acted in any manner other than good faith in their dealings with the Plaintiffs.  Accordingly, Count XVI must be dismissed.

### P.    Count XVII for Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 USC § 1832(A)(1) Fails to State a Claim

Count XVII must be dismissed for the simple reason that it is a criminal statute for which Congress did not provide a private cause of action.  To the extent the Complaint refers to 18 U.S.C. section 1836(b)(1) of the Defend Trade Secrets Act (the "DTSA"), the Plaintiffs have failed to establish that they have any trade secrets or that Hawk or Mr. Morton "misappropriated" such information (if they possessed it at all).

### 1.    *Legal Standard*

Count XVII purports to state a cause of action against Defendants for violation of 18 U.S.C. § 1832(A)(1).  At the outset, it is important to note that title 18 of the U.S. Code is titled "Crime and Criminal Procedure, and 18 U.S.C. § 1832 proscribes imprisonment and criminal fines for violators.  This provision, however, says nothing of a private cause of action, and courts have held that private citizens do not have the right to enforce the DTSA's criminal provision.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 842–43 (E.D. Va. 2017); *Nelson Brothers Professional Real Estate LLC v. Beau Jaussi et al.*, No. 17 Civ. 0158 (DOC), 2017 WL 8220703, at *6 (C.D. Cal. Mar. 23, 2017).

It appears the Plaintiffs intended to claim misappropriation of trade secrets under 18 U.S.C. § 1836(b)(1), which provides a civil right of action if the "trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1). In order to sustain a claim under this provision, a plaintiff must "demonstrate (1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret."  *Par Pharm., Inc. v. Quva Pharma, Inc.*, 764 F. App'x 273, 278 (3d. Cir. 2019); *see also Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 674 (E.D. Pa. 2018) (reasoning that to state a claim under the DTSA, the plaintiff must show (1) ownership of a trade secret and (2) that defendant misappropriated such trade secret).

As to the first prong, the DTSA provides four factors for courts to consider in determining whether something constitutes a "trade secret":  (1) the owner used "reasonable means" to keep the information secret; (2) the information derives actual or potential "independent economic value" from being a secret; (3) the information is not "readily ascertainable by proper means;" and (4) others, who cannot access the information, would derive "economic value from its disclosure or use."  *See Teva Pharms.*, 291 F. Supp. 3d at 675 (citing 18 U.S.C. § 1839(3)).  Plaintiffs must identify purported trade secrets with enough particularity "as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade."  *Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 386 (M.D. Pa. 2019).

Once the plaintiff establishes the existence of a trade secret, it then must also establish that such trade secret was misappropriated.  "Misappropriation" includes "disclosure or use of a trade secret of another without express or implied consent by a person who … use improper means to

acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(B).  As used in the DTSA, "improper

means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to

maintain secrecy, or espionage through electronic or other means; and … does not include …

reverse engineering, independent derivation, or any other lawful means of acquisition…."  *See id.*

at § 1839(6).  Though "improper means" can be otherwise lawful conduct, such conduct must be

in a manner specifically with the intention to obtain the trade secret in a deceitful manner.  *See*,

*e.g.*, *E.I. DuPont de Nemours & Co. v. Christopher*, 431 F.2d 1012 (5th Cir. 1970) (considering a

party using an aerial flyover as a means of spying to constitute "improper means").

### 2.    *Analysis*

Here, the Plaintiffs cannot establish that they have any right to bring an action pursuant to

18 U.S.C. § 1832, and the statute on its face is a criminal statute with no private right of action.

Considering section 1836, however, Court XVII still fails to allege an action on which relief can

be granted, because the Plaintiffs have failed to establish that they have any specific trade secrets

or that Hawk or Mr. Morton "misappropriated" such trade secrets.

First, the Plaintiffs have failed to allege that Hawk or Mr. Morton ever possessed any trade

secrets in the first instance.  As the Complaint admits, Stream's assets were transferred to SeeCubic

under the Omnibus Agreement.  *See* Complaint ¶ 75.  The Complaint never alleges that Hawk or

Mr. Morton obtained any of Stream's assets, let alone any trade secrets, despite the myriad

conclusory statements and allegations wherein the Plaintiffs merely include Hawk and Mr. Morton

based on nothing in their recitation of facts whatsoever.  *See*, *e.g.*, *id.* at ¶¶ 260–62 (asserting baldly

that Hawk and Mr. Morton have, for example, "presented demonstrator units" and "sold products"

using the alleged trade secrets).  These statements are completely unsupported by anything in the

factual record and should be dismissed out of hand.  To the extent any of the Defendants ever

"possessed" any of the purported trade secrets of the Plaintiffs, it would only be SeeCubic, which

assumed the role of continuing Stream's operations during the effectiveness of the Omnibus

Agreement. As such, Hawk and Mr. Morton expressly incorporate the arguments expressed by

SeeCubic's Motion to Dismiss, which describes the legal basis for finding that Plaintiffs have

failed to demonstrate misappropriation of trade secrets.

Second, the Plaintiffs have failed to establish that they have any trade secrets protectable

by the DTSA, instead merely making conclusory allegations that include a laundry list of supposed

information and physical items that the Plaintiffs then define as "Stream's Trade Secrets." *See*

Complaint ¶ 249. The Plaintiffs have made no allegations that any of the alleged trade secrets

were not known within the industry, other than reciting the elements of the definition—*e.g.*, that

such information was "not readily ascertainable by proper means by, another person who can

obtain economic value from their disclosure or use of the information." *See* Complaint, ¶ 252.

Moreover, where the Plaintiffs' do provide more information, for example that they kept

the information on encrypted and password protected computers (*see id.* at ¶ 251), there is no

delineation amongst the *dozens* of individual items included in the defined term "Stream's Trade

Secrets." There are no specific facts alleged to establish that any particular piece of the information

was in fact unknown, that they took steps to protect any particular piece of information, or that any

particular subset of the defined term "Stream's Trade Secrets" actually has independent value. The

Plaintiffs merely list everything they can conjure and made blanket statements thereafter using the

defined term "Stream's Trade Secrets" to apply to everything. Courts have held that vague

references to information is insufficient to render something a "trade secret," as "what makes a

trade secret distinguishable from other information is the degree to which the information is

otherwise generally known within the trade." *See Herley Indus. v. R Cubed Eng'g LLC*, No. 20-

cv-02888, 2021 WL 229322, at *6 (E.D. Pa. Jan. 22, 2021) (citing *Advanced Fluid Sys.*, 381 F.

Supp. 3d at 386).  In the Complaint, the Plaintiffs have not provided information to make such a showing for the purposes of constituting a "trade secret" under the DTSA.

Moreover, and more importantly, even if the Court finds that this information constitutes "trade secrets," there is no allegation that Hawk or Mr. Morton "misappropriated" any such information.  Specifically, Plaintiffs have not pleaded that the Defendants obtained any of the alleged "trade secrets" by "improper means."  The allegations appear to relate to information obtained by the Defendants pursuant to the Omnibus Agreement.  Once again, the Omnibus Agreement was a voluntary agreement by which Hawk and SLS entered into a friendly foreclosure with Stream, and Stream transferred its assets to SeeCubic in a transaction that retired Stream's substantial debt.  There was no deceitful or dishonest intention to obtain the alleged trade secrets in executing the Omnibus Agreement.  While the Delaware Supreme Court ultimately invalidated the Omnibus Agreement due to a technicality, the Omnibus Agreement was not "improper" as contemplated by the DTSA.  The creditors had valid secured creditor rights as determined (and thereafter reiterated) by the Delaware Court of Chancery, and they used those rights to foreclose on their collateral.  As explained above related to the Plaintiffs' claim for "exemplary damages," the Delaware Supreme Court's later invalidation of the Omnibus Agreement cannot constitute "willful and malicious" violations of the Plaintiffs' rights or interests, as they allege.  *See* Complaint ¶ 266.

For the foregoing reasons, Count XVII must be dismissed.

### Q.      Count XVIII for Misappropriation of Trade Secrets PUTSA, PA. CONS. STAT. ANN. §§ 5301-5308 (2004) Fails to State a Claim

In Count XVIII, Plaintiffs allege that the Defendants violated the terms of Pennsylvania's Uniform Trade Secrets Act, 12 Pa. Cons. Stat. Ann. §§ 5301 *et seq.* ("PUTSA"), alleging "under fraudulent circumstances, acquired Stream's Trade Secrets for their own use and then unlawfully

retained them despite a Delaware Supreme Court order" to return the assets. Complaint ¶ 271. This count fails to state a claim upon which relief can be granted for the same reasons as explained above related to Count XVII—there is no allegation that Hawk or Mr. Morton ever possessed the trade secrets or that any party obtained them improperly.

### 1. *Legal Standard*

As with the DTSA, the PUTSA imposes liability in parties who "misappropriate" trade secrets. In fact, the provisions of DTSA and PUTSA are nearly identical, so courts generally consider them together. *See*, *e.g.*, *Herley Indus*, 2021 WL 229322, at **3–4 ("Both the DTSA and PUTSA define 'trade secret' similarly, providing four factors for putative trade secrets to be evaluated against …."); *Teva Pharmas.*, 291v F. Supp. 3d at 675 ("Although DTSA and PUTSA use different wording to define a trade secret, they essentially protect the same type of information."); *see also Herley Indus*, 2021 WL 229322, at *4 ("The standard for 'misappropriation' applicable to the present case is identical under both DTSA and PUTSA.").

### 2. *Analysis*

As explained above with respect to Count XVII, the Plaintiffs have failed to establish that any of the information alleged actually constitutes a "trade secret" subject to protection under the PUTSA, that any of the Defendants "misappropriated" any of the purported trade secrets, or that Hawk or Mr. Morton ever obtained, used or controlled any such purported trade secrets. Accordingly, the Plaintiffs have also failed to state a claim under Count XVIII as well. Once again, Hawk and Mr. Morton expressly incorporate the arguments expressed by SeeCubic's Motion to Dismiss, which describes the legal basis for finding that Plaintiffs have failed to demonstrate misappropriation of trade secrets.

### R.        Count XIX for Lender Liability Fails to State a Claim

In Count XIX, the Plaintiffs amorphously argue that Hawk and Mr. Morton "caus[ed]
Plaintiffs to enter into loan agreements and conversion agreement then reneg[ed] on their
agreements …."  Complaint ¶ 282.  As such, Plaintiffs allege Hawk participated in a conspiracy
to control the Plaintiffs' operations and management (*id.* ¶ 285) and sabotaged the Plaintiffs from
the inside (*id.* ¶ 286) by firing insiders (*id.* at ¶ 287) and destroying business relationships (*id.* at
¶ 288).  Plaintiffs allege that because of these actions, Hawk and Mr. Morton had certain duties
and obligations to the Plaintiffs and breached them.

The Plaintiffs have failed to allege any cause of action with respect to this count, because
(to the extent "lender liability" even constitutes a valid cause of action) the Plaintiffs have not
established that they would have standing to bring such an action.

### 1.      *Legal Standard*

The term "lender liability" is generally not considered an independent cause of action.
*Pearson v. Component Tech. Corp.*, 247 F.3d 471, 492 (3d Cir. 2001).  To the extent courts have
considered it a viable cause of action, however, the concept of "lender liability" relates to instances
"where third parties seek to impose liability on major lenders on the theory that the lenders have
so controlled the borrowing corporation that the corporation was functionally being run by the
lenders, or solely for the lenders' benefit, to the detriment of other creditors."  *Id.*  For example,
lender liability "may be predicated on, *inter alia*, breach of contract, breach of fiduciary duty,
common law fraud, duress, tortious interference with contract, defamation or negligence."  *Cary
Oil, Inc. v. MG Refining & Mktg., Inc.*, 90 F. Supp 2d 401, 418 (S.D.N.Y. 2000).  In these
situations, the test usually applied is some iteration of a veil-piercing test in order to hold the lender
liable to a third party for the borrower's unlawful acts.  *See Pearson*, 247 F.3d at 492.

To establish such an alter ego relationship between a lender and borrower, the Third Circuit requires the movant establish that the borrower was "functionally being run by the lenders, or solely for the lenders' benefit, to the detriment of other creditors." *Id.* at 491. "Essentially, the control inquiry is whether the corporation is 'little more than a legal fiction,'" because the lender exerts "total control" over the borrower. *In re WorldClass Processing, Inc.*, 346 B.R. 132, 141 (Bankr. W.D. Pa. 2006) (quoting *Trustees of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003)). Moreover, the movant must demonstrate "[f]undamental unfairness" exists by the allegedly tortious actions. *Id.* As such, "[l]ender liability specifically relates to the situation where a duty exists between lenders and third parties," and does not contemplate liability from the lender to the borrower. *Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc.*, No. 92-4228, 1993 WL 514496, at *1 n.1 (E.D. Pa. Dec. 1, 1993).

### 2.    *Analysis*

The Complaint fails to state a claim against Hawk or Mr. Morton under a theory of "lender liability" for several reasons, including that the Plaintiffs lack standing to bring such an action and there are no allegations that Hawk or Mr. Morton engaged in any control over the Plaintiffs to harm third parties.

First, the Plaintiffs do not have standing to assert any cause of action under such a theory, as such an action must be brought by an aggrieved creditor *of the Plaintiffs*. *See Combustion Sys.*, 1993 WL 514496, at *1 n.1. This requirement intuitively makes sense, because an allegation of lender liability requires that the *borrower* committed some unlawful act that may be imputed to the lender based on its control of the borrower. *See WorldClass Processing*, 346 B.R. at 141. Here, the Complaint does not identify any legally cognizable harm to third parties and no third parties have asserted any such causes of action against the Plaintiffs. The Complaint, instead, focuses on alleged inequities worked on the Plaintiffs and their insiders because of remedies

pursued by their secured creditors after the Plaintiffs (admittedly) defaulted on their secured debts. Such allegations cannot establish a claim for "lender liability," even if the Plaintiffs had standing to bring such a claim.

Additionally, assuming the Plaintiffs may assert such a claim in their own right, there is no allegation that *any* Defendant exercised *any* control over *any* of the Plaintiffs—let alone sufficient control to justify a finding that the Plaintiffs were their alter egos. The allegations in the Complaint claim that the Defendants controlled certain of the Plaintiffs' assets, but never that they exercised direct control over Stream to cause it to violate any contractual relationship, commit any fraud, or engage in any other unlawful act. To the extent the Plaintiffs' argument relates to control over Technovative, the "Defendants'" control over Technovative (really, "SeeCubic's" control of Technovative) was as *100% owner* of Technovative's stock—not as *lender*. Indeed, neither Hawk nor SLS lent Technovative any money. The Complaint appears to conflate "lender liability" with "successor liability" or combine the two, without identifying any predicate cause of action and harm to third parties.

With respect to Hawk and Mr. Morton specifically, the Complaint includes no allegation that they exercised such control, even at the Technovative level. Instead, Hawk served merely as a lender to Stream, where the parties negotiated at arm's length over the various loan advances, extensions of maturity dates, amendments to interest rates, etc. Even more remote is Mr. Morton's role who serves as an investment advisor to Hawk and nothing more. *See* Ex. 4 at 14:17–15:19. SeeCubic's operation of the business after the Omnibus Agreement cannot provide a basis for lender liability, because Stream (as borrower) was not involved with the operations at that time.

## **CONCLUSION**

Defendants Hawk and Mr. Morton respectfully request that the claims in the Complaint asserted against them be dismissed in their entirety, with prejudice.

Dated: November 13, 2023                **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
Megan E. O'Connor, Esq.
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email:  steven.caponi@klgates.com
          megan.oconnor@klgates.com

- and -

Margaret R. Westbrook, Esq.
Aaron S. Rothman, Esq.
Jonathan N. Edel, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email:  margaret.westbrook@klgates.com
          aaron.rothman@klgates.com
          jon.edel@klgates.com

- and –

Thomas A. Warns
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 536-4009
Email: tom.warns@klgates.com

*Attorneys for Defendants Hawk Investment*
*Holdings Limited and Arthur Leonard Robert*
*Morton*