**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.<br>and Technovative Media, Inc.,<br><br>Debtors.[1] | Chapter 11<br><br>Bankr. Case No. 23-10763 (MDC) |
| Stream TV Networks, Inc., et al.<br><br>Plaintiffs<br>v.<br><br>Shadron L. Stastney, et al.<br><br>Defendants. | Adv.  Case No. 23-00057 (MDC) |

**SEECUBIC, INC.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

---

[1]      The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..........................................................................................v

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ........................................................................................5

    A.    Stream Fails To Commercialize Its Technology Despite Raising More
        Than $150 Million and Working for More Than a Decade ....................................5

    B.    Stream Pursues "Litigation Chaos" To Avoid Accountability To the
        Secured Creditors—and Multiple Courts—at all Costs ...........................................8

        1.    Stream Seeks To Invalidate the Omnibus Agreement In the Court
            of Chancery: the Omnibus Agreement Action.............................................8

        2.    Stream Uses the Delaware Bankruptcy Court to Evade Judgment
            In the Omnibus Agreement Action: the Bad Faith Bankruptcies ...............9

            (a)    The Delaware Bankruptcy Court Recognizes Stream's
                Abusive Tactics and Dismisses the Voluntary Bankruptcy
                Action..................................................................................10

            (b)    The Delaware Bankruptcy Court Dismisses a Second
                Consecutive Attempt to Avoid the Court of Chancery .................11

        3.    The Delaware Supreme Court Reverses on a Discrete Legal Issue...........12

        4.    Stream Tries Its Conspiracy Theory Again in Delaware Federal
            Court: the Delaware Federal Action ..........................................................14

        5.    The Rajans Personally Embrace the Chaos Strategy to Again
            Relitigate Stream's Conspiracy Theory: the Pennsylvania Actions ..........14

        6.    Hawk Exercises Its Secured Creditor Rights as Stream Seeks to
            Relitigate Its Defaults: the 225 Action......................................................15

            (a)    The Court Reiterates That It Made Final Findings  That
                Estop Stream From Relitigating Numerous Issues ......................16

            (b)    The 225 Action Reaches the Brink of Trial .................................17

        7.    Stream Seeks To Avoid Judgment In the 225 Action: the Third
            Bankruptcy and the Complaint ..................................................................17

ARGUMENT.................................................................................................................19

I.      COUNTS II, XIV, XVI, AND XIX SHOULD BE DISMISSED BECAUSE
        THEY ARE NOT COGNIZABLE CAUSES OF ACTION AS A MATTER OF
        LAW ........................................................................................................20

II.     STREAM'S REDUNDANT FILINGS PREVENT IT FROM LITIGATING
        MANY OF THE CLAIMS AND ISSUES IT RAISES IN THE COMPLAINT ..............21

        A.      Stream Is Collaterally Estopped From Relitigating  Claims and Issues
                Related to the Genesis of the Omnibus Agreement ................................21

        B.      The Complaint Should Be Dismissed  Pursuant to the First-Filed Rule
                Because the Delaware  Federal Action Is on all Fours With the Complaint
                Here........................................................................................................27

                1.      The First-Filed Rule Applies Here Because The Core Facts and
                        Subject Matter Are the Same ....................................................29

                2.      Dismissal Is the Appropriate Remedy ......................................33

        C.      The Injunction Bond Rule Precludes Stream From Recovering on Certain
                of Its Claims...........................................................................................34

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF .................................34

        A.      Debtors Fail to State a Claim Against  SeeCubic for Tortious Interference
                (Count VII)..............................................................................................35

                1.      Debtors' Claims Are Barred by the Statute of Limitations........................35

                2.      In any Event, the Complaint Does Not Sufficiently Plead any of
                        the Elements of Tortious Interference.........................................35

                        (a)     Debtors Fail to Allege an Actual or Prospective Contract............36

                        (b)     Debtors Cannot Allege the Absence Of Justification
                                Because SeeCubic's Actions Were Undertaken Pursuant to
                                a Court Order ...............................................................37

                        (c)     The Complaint Does Not Allege SeeCubic's Conduct Was
                                Intended to Harm Stream ...........................................39

        B.      Debtors Fail to State a Claim Against SeeCubic For Aiding and Abetting
                Breach of Fiduciary Duty (Count XI)....................................................39

        C.      Debtors Fail to State a Claim for Trade Secret Misappropriation Under
                Either Federal or Pennsylvania Law (Counts XVII and XVIII) ...........................41

                1.      There Is No Private Right of Action Under 18 U.S.C. § 1832(A)(1) ........41

iii

2.       Debtors Fail to State a Claim for Trade Secret Misappropriation ............41

         (a)      The Complaint Does Not Identify Debtors' Alleged Trade
                  Secret(s) With Sufficient Specificity ...............................................42

         (b)      The Complaint Does Not Sufficiently Allege
                  Misappropriation Under Either the DTSA or PUTSA Prior
                  to June 15, 2022 ...............................................................................46

         (c)      The Complaint Does Not Allege Reasonable Efforts to
                  Maintain the Secrecy of the Purported Trade Secrets...................46

D.       Debtors Fail to State a Claim Against SeeCubic for Turnover and
         Accounting (Count I) ...........................................................................48

         1.       Debtors Do Not Sufficiently Identify the Property at Issue.....................48

         (a)      Several Interests Cannot Be Considered "Property" ....................49

         (b)      Most of the Property Claimed by the Debtors Is  Not
                  Sufficiently Identified to Establish Debtors' Interests..................50

         2.       Debtors Do Not Sufficiently Plead That  SeeCubic has Possession
                  of Certain Property, And Other Property Is Subject to a Bona Fide
                  Dispute ...................................................................................................51

E.       Debtors Fail to State a Claim Against SeeCubic for Disallowance of
         Claims (Count III)................................................................................53

F.       Debtors Fail to State a Claim Against SeeCubic for Equitable
         Subordination (Count IV) ....................................................................55

G.       Debtors Fail to State a Claim Against SeeCubic for Determination of
         Secured Status and Priority (Count XII)...............................................58

H.       Debtors Fail to State a Claim Against SeeCubic For Right to Setoff
         (Count XIII) .........................................................................................59

I.       Debtors Do Not Properly Object to SeeCubic's Proofs of Claim
         (Count XV) ..........................................................................................60

CONCLUSION.....................................................................................................63

## **<u>TABLE OF AUTHORITIES</u>**

Page(s)

## **CASES**

*Acumed LLC v. Advance Surgical Services, Inc.*,
 561 F.3d 199 (3d Cir. 2009).............................................................................37

*In re ADI Liquidation, Inc.*,
 No. 14-12092 (KJC), 2015 WL 4638605 (Bankr. D. Del. 2015) .....................59

*In re After Six, Inc.*,
 177 B.R. 219 (Bankr. E.D. Pa. 1995) ..............................................................58

*Amelio v. McCabe, Weisberg & Conway, P.C.*,
 No. 14-1611, 2015 WL 4545299 (W.D. Pa. July 28, 2015) ............................19

*Arch Insurance Co. v. Murdock*,
 No. N16C-01-104 EMD CCLD, 2018 WL 1129110 (Del. Super. Mar. 1, 2018) .......23, 25

*Arconic, Inc. v. Novelis Inc.*,
 No. 17-1434, 2018 WL 5660173 (W.D. Pa. Aug. 3, 2018)..............................45

*Arsenal, Inc. v. Ammons*,
 CA No. 14-1289, 2017 WL 4310248 (E.D. Pa. Sept. 28, 2017) ......................36

*Audi of America, Inc. v. Bronsberg & Hughes Pontiac, Inc.*,
 321 F. Supp. 3d 503 (M.D. Pa. 2018), *aff'd*, 816 F. App'x 644 (3d Cir. 2020) ................37

*Austin v. Chisick (In re First Alliance Mortgage Co.)*,
 298 B.R. 652 (C.D. Cal. 2003), *aff'd*, 471 F.3d 977 (9th Cir. 2006)................57

*Baraka v. McGreevey*,
 481 F.3d 187 (3d Cir. 2007)..............................................................................19

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
 No. 18-cv-00933-MMC, 2018 WL 2298500 (N.D. Cal. May 21, 2018)....................44, 45

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)...........................................................................................39

*Bishop v. GNC Franchising LLC*,
 403 F. Supp. 2d 411 (W.D. Pa. 2005), *aff'd*, 248 F. App'x 298 (3rd Cir. 2007)...............20

*BP Environmental Services, Inc. v. Republic Services, Inc.*,
 946 F. Supp. 2d 402 (E.D. Pa. 2013) ...............................................................36

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017)............................................................48

*Caldwell v. Beard*,
    No. 07-726, 2007 WL 2905906 (W.D. Pa. Sept. 28, 2007)..............................19

*City of Newark v. Unemployment Insurance Appeal Board*,
    802 A.2d 318 (Del. Super. Ct. 2002) ..............................................................22

*Clarity Sports International LLC v. Redland Sports*,
    400 F. Supp. 3d 161 (M.D. Pa. 2019) ......................................................36, 39

*Columbia Casualty Co. v. Playtex FP, Inc.*,
    584 A.2d 1214 (Del. 1991) ..............................................................................21

*Concerned Citizens of the Estates of Fairway Village v. Fairway Cap, LLC*,
    256 A.3d 737 (Del. 2021) ................................................................................34

*Connelly v. Lane Construction Corp.*,
    809 F.3d 780 (3d Cir. 2016)............................................................................18

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir. 2000)............................................................................28

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
    No. 20-CV-00235-KJM-DB, 2020 WL 4937129 (E.D. Cal. Aug. 24, 2020)..............44, 45

*Daimler Trust v. Weng*,
    No. 22cv1082, 2023 WL 3740820 (W.D. Pa. May 31, 2023) ..........................35

*Danping Li v. Gelormino*,
    No. 3:18-cv-442, 2019 WL 1957539 (D. Conn. May 2, 2019) ..................43, 46

*Dershaw v. Ciardi (In re Rite Way Electric, Inc.)*,
    510 B.R. 471 (Bankr. E.D. Pa. 2014) ................................................48, 52, 53

*Dubroff v. Wren Holdings, LLC*,
    Nos. 3940–VCN, 6017–VCN, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) ...................41

*Easter v. City of Dallas Probate Division*,
    No. 21-CV-0860-D (BH), 2022 WL 2975349 (N.D. Tex. June 27, 2022).......................38

*Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*,
    540 F. Supp. 3d 491 (E.D. Pa. 2021) ..............................................................42

*Elsevier Inc. v. Doctor Evidence, LLC*,
    No. 17-cv-5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018)...............43

*Emazing Lights LLC v. De Oca*,
    No. SACV 15-1561 (AG) (Ex), 2016 WL 3658945 (C.D. Cal. Jan. 7, 2016)............44, 45

*In re Estate of Wanamaker*,
    460 A.2d 824 (Pa. 1983) ....................................................................................60

*FBI Wind Down Inc. Liquidating Trust v. All American Poly Corp. (In re FBI Wind
    Down, Inc.)*,
    581 B.R. 116 (Bankr. D. Del. 2018) ...................................................................54

*Finkel v. Polichuk (In re Polichuk)*,
    Bankr. No. 08-10783ELF, Adv. No. 10-0031ELF, 2010 WL 4878789
    (Bankr. E.D. Pa. Nov. 23, 2010)..........................................................................51

*Geron v. Peebler (In re Pali Holdings, Inc.)*,
    488 B.R. 841 (Bankr. S.D.N.Y. 2013) ................................................................50

*Glenn v. Point Park College*,
    272 A.2d 895 (Pa. 1971) ....................................................................................39

*Guzzetta v. Service Corp. of Westover Hills*,
    7 A.3d 467 (Del. 2010) .......................................................................................34

*Hassen v. Government of Virgin Islands*,
    861 F.3d 108 (3d Cir. 2017)................................................................................19

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc.*,
    No. 2022-0930-JTL, 2022 WL 17258460
    (Del. Ch. Nov. 29, 2022)......................................5, 13, 16, 17, 22, 23, 24, 32

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del 2016) ...................................................................21

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012)................................................................................59

*Herley Industries, Inc. v. R Cubed Engineering, LLC*,
    No. 5:20-cv-02888, 2021 WL 229322 (E.D. Pa. Jan. 22, 2021).......................42

*Higgins v. Walls*,
    901 A.2d 122 (Del. Super. 2005) .......................................................................26

*Hornibrook v. Richard*,
    171 N.E.2d 725 (Mass. 2021) ............................................................................47

*In re Indian Palms Associates, Ltd.*,
    61 F.3d 197 (3d Cir. 1995)....................................................................................6

*Investment Science, LLC v. Oath Holdings Inc.*,
No. 20 Civ. 8159 (GBD), 2021 WL 3541152 (S.D.N.Y. Aug. 11, 2021) ........................47

*Jacobs v. Law Offices of Leonard N. Flamm*,
No. 04–CV–7607 (DC), 2005 WL 1844642 (S.D.N.Y. July 29, 2005) .............................6

*Jones v. GEICO Choice Insurance Co.*,
617 F. Supp. 3d 275 (E.D. Pa. 2022) ...............................................................................20

*Kernaghan v. BCI Communications, Inc.*,
802 F. Supp. 2d 590 (E.D. Pa. 2011) ...............................................................................37

*In re Kincaid*,
388 B.R. 610 (Bankr. E.D. Pa. 2008) ...............................................................................62

*Kirschenbaum v. Fed. Ins. Co. (In re EMS Fin. Servs., LLC)*,
Bankr. No. 12-71324-ast, Adv. No. 12-8221-ast, 2013 WL 64755
(Bankr. E.D.N.Y. Jan. 4, 2013) ........................................................................................61

*Knox v. Lion Hendrix Cayman Ltd. (In re John Varvatos Enterprises Inc.)*,
No. 21-2766, 2022 WL 2256017 (3d Cir. June 23, 2022) ................................................56

*Koresko v. Nationwide Life Insurance Co.*,
403 F. Supp. 2d 394 (E.D. Pa. 2005) ...............................................................................33

*Laake v. Mooney*,
No. 22-cv-17, 2022 WL 17976326 (W.D. Pa. Dec. 28, 2022) .........................................19

*Laborers' International Union of North America, AFL-CIO v. Foster Wheeler Corp.*,
26 F.3d 375 (3d Cir. 1994)................................................................................................24

*Landau v. Viridian Energy PA LLC*,
274 F. Supp. 3d 329 (E.D. Pa. 2017) ...................................................................27, 28, 33

*LaPoint v. AmerisourceBergen Corp.*,
970 A.2d 185 (Del. 2009) ................................................................................................22

*Law v. Siegel*,
571 U.S. 415 (2014)..........................................................................................................20

*LeCrenier v. Central Oil Asphalt Corp.*,
No. 4927-VCN, 2010 WL 5449838 (Del. Ch. Dec. 22, 2010) .........................................60

*In re Lids Corp.*,
260 B.R. 680 (Bankr. D. Del. 2001) .............................................................................54, 55

*In re M.T.G., Inc. v. Comerica Bank*,
646 B.R. 1 (Bankr. E.D. Mich. 2022) ...............................................................................38

*Marketing Resources International Corp. v. PTC Corp. (In re Marketing Resources International Corp.)*,
35 B.R. 353 (Bankr. E.D. Pa. 1984) ................................................................54

*McTernan v. City of York*,
577 F.3d 521 (3d Cir. 2009)..............................................................................6

*Miller v. D & M Holdings US Inc. (In re Digital Networks North America, Inc.)*,
No. 15-11535 (KG), Adv. Pro. No. 17-50900 (KG), 2018 WL 3869599
(Bankr. D. Del. Aug. 13, 2018).........................................................................52

*Miller v. Jannetta (In re Irwin)*,
509 B.R. 808 (Bankr. E.D. Pa. 2014) ...............................................................49

*MMA Consultants 1, Inc. v. Republic of Peru*,
245 F. Supp. 3d 486 (S.D.N.Y. 2017), *aff'd*, 719 F. App'x 47 (2d Cir. 2017)....................6

*Mountaineer Coal Co. v. Liberty Mutual Insurance Co. (In re Mountaineer Coal Co.)*,
247 B.R. 633 (Bankr. W.D. Va. 2000) ..............................................................55

*Nagy v. Riblet Products Corp.*,
79 F.3d 572 (7th Cir. 1996) ..............................................................................39

*Nelson Bros. Professional Real Estate LLC v. Jaussi*,
No. 17 Civ. 0158 (DOC), 2017 WL 8220703 (C.D. Cal. Mar. 23, 2017) .........................41

*O'Halloran v. Prudential Savings Bank (In re Island View Crossing II, L.P.)*,
604 B.R. 181 (Bankr. E.D. Pa. 2019) ...............................................................57

*Opus Fund Services (USA) LLC v. Theorem Fund Services, LLC*,
No. 17 C 923, 2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) ................................................47

*Philadelphia Plaza-Phase II v. Bank of America National Trust & Savings Ass'n*,
No. 332 May Term 2002, 2002 WL 1472338 (Pa. Ct. Comm. Pl. May 30, 2002) ...........20

*Phillips v. Selig*,
959 A.2d 420 (Pa. Super. 2008).........................................................................36

*Piazza v. EMPI, Inc.*,
No. 07-cv-00954-OWW-GSA, 2008 WL 590494 (E.D. Cal. Feb. 29, 2008) ....................7

*Power Integrations, Inc. v. Silanna Semiconductor N.A., Inc.*,
No. 19-1292-LPS, 2020 WL 3508078 (D. Del. June 29, 2020) ................................44, 45

*Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*,
No. 12CV220 (WWE), 2012 WL 3113162 (D. Conn. July 31, 2012) ............................42

*Prewitt v. Walgreens Co.*,
    No. 12-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013)..................................................28

*Rajan v. Crawford*,
    No. 22-1719, 2022 WL 16646690 (3d Cir. Nov. 3, 2022) .................................................27

*Reiner v. Washington Plate Glass Co.*,
    711 F.2d 414 (D.C. Cir. 1983) ..........................................................................................7

*Sabika, Inc. v. Goshen Sparking Jewelry, LLC*,
    No. 13-00848, 2013 WL 12180994 (S.D. W. Va. July 12, 2013) ......................................7

*Santiago v. Warminster Township*,
    629 F.3d 121 (3d Cir. 2010)...........................................................................................39

*Schubert v. Lucent Technologies Inc. (In re Winstar Communications, Inc.)*,
    554 F.3d 382 (3d Cir. 2009)...........................................................................................56

*Secretary United States Department of Labor v. Kwasny*,
    853 F.3d 87 (3d Cir. 2007), *aff'd as modified*, 738 F. App'x 117 (3d Cir. 2018) .............21

*Singleton v. Cannizzaro*,
    372 F. Supp. 3d 389 (E.D. La. 2019), *aff'd in part, appeal dismissed in part*,
    956 F.3d 773 (5th Cir. 2020) ..........................................................................................38

*Slaieh v. Simons*,
    584 B.R. 28 (Bankr. C.D. Cal. 2018)...............................................................................38

*Sprint Communications Co. v. CAT Communications International Inc.*,
    335 F.3d 235 (3d Cir. 2003)...........................................................................................34

*Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.*,
    99 A.3d 936 (Pa. Super. Ct. 2014) ..................................................................................22

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    271 F. Supp. 3d 835 (E.D. Va. 2017) ..............................................................................41

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    250 A.3d 1016 (Del. Ch. 2020)...........................................................6, 7, 8, 9, 22, 23, 25

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    279 A.3d 323 (Del. 2022) ...............................................................................6, 8, 12, 25

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
    No. 2020-0766-JTL, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021) ............................12, 13

*Synthes, Inc. v. Knapp*,
    978 F. Supp. 2d 450 (E.D. Pa. 2013) ..........................................................................28, 33

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*,
       313 B.R. 46 (Bankr. S.D.N.Y. 2004) ............................................................................51

*Tilton v. MBIA Inc. (In re Zohar III, Corp.)*,
       639 B.R. 73 (Bankr. D. Del.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022) ........................57

*Trans World Airlines, Inc v. Summa Corp.*,
       C.A. No. 1607, 1985 WL 11543 (Del. Ch. Feb. 5, 1985) ..................................................24

*Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*,
       549 U.S. 443 (2007) ...........................................................................................................20

*Troy Corp. v. Schoon*,
       959 A.2d 1130 (Del. Ch. 2008) ..........................................................................................26

*United States v. Whiting Pools, Inc.*,
       462 U.S. 198 (1983) ...........................................................................................................50

*U.S. Bank, National Ass'n v. Rosenberg*,
       581 B.R. 424 (E.D. Pa. 2018), *aff'd*, 741 F. App'x 887 (3d Cir. 2018) ...........................59

*Van Products Co. v. General Welding & Fabricating Co.*,
       213 A.2d 769 (1965) ...........................................................................................................48

*Walnut Creek Mining Co. v. Cascade Investment, LLC (In re Optim Energy, LLC)*,
       527 B.R. 169 (D. Del. 2015) ..............................................................................................56

*In re Walt Disney Co. Derivative Litigation*,
       906 A.2d 27 (Del. 2006) .....................................................................................................40

*Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*,
       161 B.R. 107 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1994)...................................57

*West Chester Design Build, LLC v. Moses*,
       No. CA No. 22-1911, 2022 WL 15524950 (E.D. Pa. Oct. 27, 2022) ................................36

*Whitehead v. Allied Signal, Inc.*,
       No. 98-6305, 1998 WL 874868 (10th Cir. 1998) ..............................................................38

*Wireless Discovery LLC v. eHarmony, Inc.*,
       Nos. 22-480-GBW, 22-484-GBW, 2023 WL 1778656 (D. Del. Feb. 6, 2023),
       *appeal filed sub nom. Wireless Discovery LLC v. Meet Group*, No. 23-1582 (Fed.
       Cir. Mar. 15, 2023), *and appeal filed*, No. 23-1586 (Fed Cir. Mar. 16, 2023)...................6

*In re Wolf*,
       556 B.R. 676 (Bankr. E.D. Pa. 2016), *aff'd*, 573 B.R. 179 (E.D. Pa. 2017),
       *aff'd*, 739 F. App'x 165 (3d Cir. 2018)..............................................................................62

## STATUTES

8 Del. C. § 272(c) ............................................................................................................ 12

11 U.S.C. 101(31)(B) ...................................................................................................... 56

11 U.S.C. § 502(b) ........................................................................................................... 20

11 U.S.C. § 502(d) ........................................................................................................... 54

11 U.S.C. § 506(a) ........................................................................................................... 58

11 U.S.C. § 541(a)(1) ...................................................................................................... 49

11 U.S.C. § 542(a) ........................................................................................................... 48

11 U.S.C. § 548(a)(1) ...................................................................................................... 55

11 U.S.C. § 550(a) ........................................................................................................... 55

18 U.S.C. § 1836 ............................................................................................................. 42

42 Pa. C.S.A. § 5524 ....................................................................................................... 35

42 Pa. C.S.A. § 5525 ....................................................................................................... 41

## RULES

Del. Ct. Ch. R. 65(c) ....................................................................................................... 34

Fed. R. Bankr. P. 3007 advisory committee's notes to 2007 amendment ...................... 61

Fed. R. Bankr. P. 3007(d) ............................................................................................... 61

Fed. R. Bankr. P. 3007(d)(1) ........................................................................................... 61

Fed. R. Bankr. P. 3007(e) ............................................................................................... 62

## OTHER AUTHORITIES

Collier on Bankruptcy (16th ed. 2023) ........................................................................... 61

Defendant SeeCubic, Inc. ("SeeCubic") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the complaint (ECF No. 1 in the above-captioned adversary proceeding) (the "Complaint") filed by Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative" and, together with Stream, the "Plaintiffs" or "Debtors").

## PRELIMINARY STATEMENT

This case is the latest chapter in the years-long, ongoing dispute between Stream and its secured creditors Hawk Investment Holdings Ltd. ("Hawk") and SLS Holding VI, LLC ("SLS"; with Hawk, the "Secured Creditors") regarding Stream's 2020 default on secured debt that is now approaching a total, inclusive of penalties and interest, of $200 million. The Complaint marks the initiation of at least the *twelfth* court case—excluding appeals—covering disputes between Stream, its Secured Creditors, and persons affiliated with each. Every court that has examined the merits has concluded that: (i) Stream borrowed tens of millions of dollars from the Secured Creditors secured by all of Stream's assets; (ii) Stream defaulted on the secured debt after failing to commercialize its technology; and (iii) as a result, the Secured Creditors are entitled to exercise their rights and seize the pledged collateral. Ignoring those truths—and binding factual findings from courts—Stream has spent the last three years focused on a single goal: prevent at any cost the Secured Creditors from exercising their rights and seizing the collateral.

With the Complaint, the Debtors assert 19 purported causes of action against the Secured Creditors and 13 other defendants (collectively, "Defendants"), including SeeCubic. The vast majority of the Complaint's factual allegations concern Stream's contention that most of the Defendants—the Secured Creditors, individuals associated with the Secured Creditors, former independent directors of Stream, and certain Stream stockholders—unlawfully bribed and conspired with one another in late 2019 and the Spring of 2020 to manufacture Stream's defaults and take over Stream's assets through the so-called "Omnibus Agreement," a "friendly

foreclosure" to resolve those defaults.  The Complaint's remaining factual allegations contend that after the Delaware Supreme Court invalidated the Omnibus Agreement, Defendants have failed to return Stream's assets to it and continue to improperly use them.

On these purported facts, Debtors contend that Defendants are liable for more than a handful of common law and statutory torts and that Defendants' claims in the underlying bankruptcy proceeding should be disallowed, reduced, or subordinated under either the Bankruptcy Code or common law based on Defendants' allegedly inequitable conduct.  The Complaint often asserts causes of action against "Defendants" generally, or the "Scheme Defendants"—which are defined to wholly overlap with all Defendants.  Frequently, the Complaint alleges that "Defendants" collectively committed some sort of wrongdoing, without differentiating at all among the 15 Defendants or making specific allegations as to each of them. In many instances, the Complaint's assertions that "Defendants" committed some act cannot logically, temporally, or otherwise apply to all 15 of them.  This improper "group pleading" approach is replete with misfires in all directions.  For example, the Complaint frequently asserts that SeeCubic, as one of the Defendants, engaged in wrongful acts *before SeeCubic existed*.  The Complaint also erroneously names multiple *remedies* as purported causes of action—no doubt to make it appear to the Court that Defendants' wrongdoing was more wide-ranging than even Debtors' own alleged facts and *actual* causes of action would seem to suggest.

But the Complaint's inappropriate pleading style is only the beginning of its defects, and the Complaint as to SeeCubic should be dismissed for several, independently dispositive reasons.

*First*, and significantly, Debtors are collaterally estopped under Delaware law from litigating here the alleged conspiracy related to the execution and enforcement of the Omnibus Agreement.  The Complaint conspicuously fails to disclose that on a full factual record, the Court

2

of Chancery *already considered and rejected* the notion of any such conspiracy and confirmed that Stream had defaulted on the secured debt.  While the Delaware Supreme Court later overturned the Court of Chancery on a discrete legal issue related to the Omnibus Agreement,[1] it *did not disturb* the Court of Chancery's factual findings.  Rather, the Delaware Supreme Court *adopted* those factual findings, which were later reiterated by the Court of Chancery on remand.  In other words, Stream *already litigated* to finality—and lost—its conspiracy theory, and it cannot use the Complaint and this Court for a do-over.

*Second*, even if Debtors were not collaterally estopped from relitigating their conspiracy theory here, they are also precluded from relitigating those issues under the first-filed rule, which prohibits the simultaneous litigation of the same subject matter in different courts.  Again, the Complaint conspicuously fails to inform the Court of highly relevant information.  This action is not the first time Stream or individuals affiliated with it have tried to relitigate these findings.  It is at least the *fourth* attempt to relitigate Stream's (debunked) conspiracy theory and its 2020 debt defaults in nearly as many courts.  Particularly noteworthy here, Stream initiated an action in the U.S. District Court for the District of Delaware in 2022 making the same allegations about the genesis of the Omnibus Agreement and seeking to recover against many of the same defendants as are named Defendants here.  That action remains pending.  Under well-settled precedent, Debtors can pursue this action or the Delaware one—but not both.

*Third*, again relating to the Omnibus Agreement, the Complaint essentially seeks damages for the harm allegedly caused to Stream because of the injunction issued by the Court of Chancery in upholding that agreement.  For example, the Complaint alleges that SeeCubic, when it owned

---

[1]    As described below, even the Delaware Supreme Court's holding is of limited utility: the Delaware Legislature quickly abrogated that holding via statute.

Stream's assets pursuant to the Court of Chancery's holdings, damaged Stream's business relationships and caused Stream damages. But under Delaware's injunction bond rule, damages for an improvident injunction must be sought in the court that issued the injunction and are capped at the amount of the mandatory injunction bond.

Collectively, these three doctrines require that to the extent that Debtors' (i) tort claims and (ii) claims and arguments in equity about Defendants' bankruptcy claims against Debtors are premised on allegations that wrongful, unlawful, or inequitable conduct led to, and subsequently resulted from, the execution and enforcement of the Omnibus Agreement, the claims should be dismissed.

*Fourth*, and independently dispositive, the Complaint should be dismissed as to SeeCubic for failure to state a claim—on any theory, whether relating to the Omnibus Agreement or the events after the Delaware Supreme Court Opinion in June 2022. As an initial issue, four of Debtors' purported causes of action should be dismissed because, as a matter of law, they are *not* standalone causes of action. And as set forth more fully below, the Complaint's remaining causes of action against SeeCubic fare no better. Some claims, for example, are factually impossible: the Complaint fails to state a claim against SeeCubic for aiding and abetting a breach of fiduciary duty (Count XI) because *all* of its allegations either (i) relate to alleged breaches of fiduciary duty occurring before SeeCubic even existed or (ii) relate to events occurring at a time when SeeCubic owed no fiduciary duties to Stream. Many of the Complaint's causes of action do nothing more than make vague conclusory allegations simply parroting the elements of their respective causes of action.

For these reasons, discussed more fully below, the Complaint should be dismissed in its entirety as to SeeCubic.

## FACTUAL BACKGROUND[2]

A.    **Stream Fails To Commercialize Its Technology Despite
Raising More Than $150 Million and Working for More Than a Decade**

Stream was founded in 2009 to develop and commercialize technology enabling viewers to watch 3D content without 3D glasses. Stream's operational subsidiaries, primarily Defendant SeeCubic B.V. ("SCBV"), are the research and development engine for the technology. (¶¶ 34–35.)

Stream raised funds via issuing (i) equity to angel investors and (ii) secured debt to the Secured Creditors. Specifically, from 2011 to 2012, SLS loaned Stream an aggregate principal amount of $6 million pursuant to a series of promissory notes (the "SLS Notes"). (¶ 44.) In exchange for those funds, security agreements, and a pledge agreement, Stream granted SLS security interests in the "Collateral." The Collateral includes substantially all of the assets of Stream and its subsidiaries. (*Id.*) From 2014 to 2020, Hawk loaned Stream funds in excess of £50 million and $1.1 million via a series of promissory notes (the "Hawk Notes"). (¶ 45.) In exchange, and pursuant to security and pledge agreements, Stream granted Hawk a security interest in the Collateral. (*Id.*) In the event of a default, the loan documentation authorized the Secured Creditors to levy on and take control of Stream's assets and to vote the shares of Stream's top-level subsidiary, Technovative. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at *2 (Del. Ch. Nov. 29, 2022) (the "Collateral Estoppel Opinion").[3]

---

[2]    Citations to "¶ __" are to the Complaint, ECF No. 1.

[3]    The Collateral Estoppel Opinion and other judicial opinions in related cases between the Parties cited in this Factual Background can be referenced and relied upon because they are subject to judicial notice. Specifically, the Court may take judicial notice of court documents in other cases—including judicial opinions—because they "provide[] competent evidence of certain

*(cont'd)*

Despite the significant funding from the Secured Creditors and other investors, Stream

never evolved beyond a pre-revenue, development stage business.  By late 2019, Stream was

insolvent.  In addition to the debts owed to the Secured Creditors, Stream carried more than $16

million in trade debt and was months behind on payments to suppliers and other third parties.  *See*

*Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1024 (Del. Ch. 2020) (the "Chancery

PI Opinion").  In January 2020, Stream missed payroll.  *See id.*  In February 2020, Stream made

payroll only due to an emergency infusion of capital from Hawk and another investor and by

furloughing employees.  *See id.*  No later than February 2020, Stream defaulted on the SLS Notes

and the Hawk Notes by failing to make payment when payment was due.  *See id.*; *see also Stream*

---

facts—that a specific document was filed, that a party took a certain position, ***that certain judicial
findings, allegations, or admissions were made.*"  *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197,
205 (3d Cir. 1995) (emphasis added); *see also McTernan v. City of York*, 577 F.3d 521, 526 (3d
Cir. 2009) (on motion to dismiss, court "may take judicial notice of a prior judicial opinion").
SeeCubic cites theses opinions herein to establish or identify the (i) ***fact that*** various case events
occurred in those cases (i.e., dismissal, issuance of an order); (ii) ***fact that*** the courts ***made the
findings cited***; (iii) ***positions*** that Debtors took in these litigations; and (iv) the issues litigated in
these prior cases.  *See In re Indian Palms*, 61 F.3d at 205.

    Judicial notice of these opinions—and the fact that other courts issued the rulings and
findings they did—is particularly appropriate here because SeeCubic argues that the Complaint
should be dismissed on the grounds of collateral estoppel.  *See Wireless Discovery LLC v.
eHarmony, Inc.*, Nos. 22-480-GBW, 22-484-GBW, 2023 WL 1778656, at *4 (D. Del. Feb. 6,
2023) (taking judicial notice of judgment in prior action on motion to dismiss to assess collateral
estoppel argument), *appeal filed sub. Nom. Wireless Discovery LLC v. Meet Grp.*, No. 23-1582
(Fed. Cir. Mar. 15, 2023), *and appeal filed*, No. 23-1586 (Fed. Cir. Mar. 16, 2023); *In re Raytrans
Holding, Inc.*, 573 B.R. 121 (Bankr. D. Del. 2017) (taking judicial notice of Delaware state court
opinions and dismissing multiple claims in the complaint under doctrine of collateral estoppel);
*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 499-500 (S.D.N.Y. 2017)
(taking judicial notice of arbitration award opinion because "[w]hen a motion to dismiss is
premised on the doctrine of collateral estoppel," the court would be "unable to assess this
argument" without considering the prior opinion of the other tribunal (alteration in original)
(citation omitted)), *aff'd*, 719 F. App'x 47 (2d Cir. 2017); *Jacobs v. Law Offices of Leonard N.
Flamm*, No. 04–CV–7607 (DC), 2005 WL 1844642, at *3 (S.D.N.Y. July 29, 2005) ("In cases
where some of those factual allegations [made in the complaint] have been decided otherwise in
previous litigation, however, a court may take judicial notice of those proceedings and find that
plaintiffs are estopped from re-alleging those facts.").  This does *not* convert a motion to dismiss
into a motion for summary judgment.  *See MMA Consultants*, 245 F. Supp. 3d at 499-500.

*TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022) (the "Delaware Supreme Court Opinion").

During these difficulties, the Secured Creditors and certain equity investors (who sued the Rajans for fraud and breach of fiduciary duty (¶ 58))[4], engaged in unsuccessful discussions with the Rajans about restructuring Stream. *See Chancery PI Opinion*, 250 A.3d at 1023-24. As part of these discussions, the Rajans—Stream's only controlling stockholders, directors, and officers— appointed four independent Stream directors, non-party Frank Hodgson, and Defendants Kabacinski, Gola, and Gollop (the "Outside Directors"). *See id.* at 1024; ¶ 66. After discussions broke down, SLS provided written notice of default to Stream in March 2020. *Chancery PI Opinion*, 250 A.3d at 1024, ¶ 68.

In April, the Outside Directors resumed negotiations with the Secured Creditors and equity investors. *See Chancery PI Opinion*, 250 A.3d at 1024. On May 6, 2020, Gola and Gollop executed the so-called Omnibus Agreement on behalf of Stream. *See id.* at 1025; ¶ 74. Under the Omnibus Agreement—which the Court of Chancery later described as a "friendly foreclosure" on the Collateral—SLS and Hawk would accept Stream's assets into a to-be formed new entity in satisfaction of its outstanding debts. *Chancery PI Opinion*, 250 A.3d at 1025; ¶ 75. That entity, SeeCubic, was formed on May 20, 2020. (Ex. 1)[5] Stream's minority stockholders received the

---

[4]      *See* Am. Verified Compl., *Crawford v. Rajan*, No. 2020-0004-JTL (Del. Ch. Mar. 25, 2020), ECF No. 8 (the "Investor Lawsuit").

[5]      The Court may take judicial notice under Federal Rule of Evidence 201(f) at any stage of the proceeding of the date of a corporation's incorporation through the online records of the state of incorporation or its certificate of incorporation. *See Sabika, Inc. v. Goshen Sparking Jewelry, LLC*, No. 13-00848, 2013 WL 12180994, at *4 n.3 (S.D. W.Va. July 12, 2013) (taking judicial notice of LLC's articles of organization kept by West Virginia Secretary of State for date of organization of LLC); *Piazza v. EMPI, Inc.*, No. 07-cv-00954-OWW-GSA, 2008 WL 590494, at *4 (E.D. Cal. Feb. 29, 2008) (taking judicial notice of company's registration with the California Secretary of State accessed from the Secretary of State's website); *Reiner v. Wash. Plate Glass*
*(cont'd)*

right to exchange their shares in Stream for shares in SeeCubic. *See Chancery PI Opinion*, 250 A.3d at 1025; ¶ 76. Stream also received the right to one million SeeCubic shares. *See id*.

## B. Stream Pursues "Litigation Chaos" To Avoid Accountability To the Secured Creditors—and Multiple Courts—at all Costs

Thereafter, the Rajans caused Stream to attempt to undermine the Omnibus Agreement, including by fraudulently backdating corporate documents. *See Chancery PI Opinion*, 250 A.3d at 1026. Mathu Rajan also incorporated a new entity, Glasses-Free Technologies, Inc., "purport[ing] to grant it a license to use Stream's technology." *Id.* at 1027. When the Rajans' efforts to undermine failed, Stream and the Rajans desperately sought to evade accountability and to prevent the Secured Creditors from exercising their rights to the Collateral, resulting in widespread "litigation chaos." *Delaware Supreme Court Opinion*, 279 A.3d at 329.

### 1. Stream Seeks To Invalidate the Omnibus Agreement In the Court of Chancery: the Omnibus Agreement Action

On September 8, 2020, Stream sought a temporary restraining order in the Court of Chancery to block the Omnibus Agreement. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 2020-07*66-JTL (Del. Ch. 2020) (the "Omnibus Agreement Action"); *Chancery PI Opinion*, 250 A.3d at 1027; ¶ 93. SeeCubic filed its own claims and sought a temporary restraining order. *See Chancery PI Opinion*, 250 A.3d at 1027; ¶ 93. After extensive discovery—which, as the Court of Chancery noted, "did not go smoothly" because of Stream and the Rajans' repeated (mis) conduct—the parties cross-moved for a preliminary injunction. *Chancery PI Opinion*, 250 A.3d at 1027.

---

*Co.*, 711 F.2d 414, 416 (D.C. Cir. 1983) (taking judicial notice of date of incorporation by viewing records of the D.C. Recorder of Deeds Office).

On December 8, 2020, the Court of Chancery found that the Omnibus Agreement was valid

and binding, *see id.* at 1028, having been signed on behalf of Stream by directors Gola and Gollop.

*See Id.* at 1028–34; ¶ 94.   The court also found Stream had (i) issued the secured debt and (ii)

defaulted on that debt.   Importantly here, the Court of Chancery rejected Stream's assertions that

the Omnibus Agreement was invalid because Gola and Gollop breached their fiduciary duties as

part of a conspiracy with the Secured Creditors and equity investors.   *See Chancery PI Opinion*,

250 A.3d at 1045–46.   In particular, the court specifically found that,

> No evidence suggests that either member [Gola and Gollop] of the Resolution
> Committee was interested in the Omnibus Agreement or lacked independence from
> someone who was.   No evidence suggests that the members of the Resolution
> Committee acted in bad faith or for an improper purpose.   The evidence indicates
> that Gola and Gollop believed the Omnibus Agreement to be in the best interests
> of Stream and its stockholders (including the Rajan family) because it prevented
> Stream's creditors from foreclosing on all of its assets and leaving Stream and its
> stockholders with nothing.

*Id.* at 1046.   The court enjoined Stream and the Rajans from interfering with implementation of

the Omnibus Agreement.   (¶ 94.)   Thereafter, consistent with the Omnibus Agreement SeeCubic

took possession of substantially all of the Collateral and continued to run the business built upon

that Collateral.   (¶ 95.)

### 2.  Stream Uses the Delaware Bankruptcy Court to Evade Judgment In the Omnibus Agreement Action: the Bad Faith Bankruptcies

In the Chancery PI Opinion, the Court of Chancery noted that the evidence would support

summary judgment against Stream.   *Chancery PI Opinion*, 250 A.3d at 1046-47.   In early 2021,

SeeCubic filed a motion for summary judgment; Stream and the Rajans each filed briefs in

opposition.   *See Omnibus Agreement Action*, No. 2020-0766-JTL, ECF Nos. 117, 119, 120.

Facing the almost certain prospect of summary judgment against it, Stream made its first attempt

to evade a looming, adverse judicial decision.   Two days before SeeCubic was to file its reply

brief—thereby positioning the Court of Chancery to rule—Stream filed a voluntary chapter 11

bankruptcy petition, automatically halting the Omnibus Agreement Action.  *See In re Stream TV Networks, Inc.*, No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021) (the "Voluntary Bankruptcy Action"); ¶ 96.  See*Cubic, SLS, and, notably, the U.S. Trustee* moved to dismiss.  *Voluntary Bankruptcy Action*, No. 21-10433-KBO, ECF Nos. 46, 84.

### (a)    The Delaware Bankruptcy Court Recognizes Stream's Abusive Tactics and Dismisses the Voluntary Bankruptcy Action

After discovery and a two-day merits hearing, Judge Owens dismissed the Voluntary Bankruptcy Action on May 17, 2021, finding that Stream had no legitimate restructuring purpose, was not motivated by financial distress, and was ***not*** filed with "the hope of preserving [Stream's] business and maximizing its value for the benefit of its creditors and other stakeholders."  *See* May 17 Hr'g Tr. at 13:5–15, *see also Voluntary Bankruptcy Action*, ECF No. 200; ¶ 98.[6]  Instead, the bankruptcy filing was made in bad faith for the purpose of using the automatic stay to evade the Court of Chancery's anticipated order.  May 17 Hr'g Tr. at 13:16–14:1, *Voluntary Bankruptcy Action*, No. 21-10433-KBO, ECF No. 200.  The court further stated that, "Stream did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders."  *Id.* at 15:14–19.  The Voluntary Bankruptcy Action "was designed to stop SeeCubic and [Stream's] secured creditors from fully implementing [the Omnibus Agreement], to unravel it, and to avoid

---

[6]    Indeed, Judge Owens observed that "[i]t is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D Assets from the secured lenders and then through [another company] obtain them at a fraction of what he believed was the assets' value."  May 17 Hr'g Tr. at 14:25–15:4, *Voluntary Bankruptcy Action*, No. 21-10433-KBO, ECF No. 200.

the Chancery Court's order . . . I will not permit the bankruptcy process to be used in such a

fashion." *Id.* at 19:12–18.[7]

### (b)    The Delaware Bankruptcy Court Dismisses a Second Consecutive Attempt to Avoid the Court of Chancery

After dismissal of the Voluntary Bankruptcy Action, Stream made a second attempt to

avoid an adverse judgment from the Court of Chancery.  With the automatic stay lifted because of

the dismissal, briefing complete in the Court of Chancery, and an adverse judgment once again

imminent, on May 23, 2021, three of Stream's unsecured creditors filed an involuntary chapter 7

bankruptcy petition on Stream's behalf—automatically staying the Omnibus Agreement Action

again.  *See In re Stream TV Networks, Inc.*, No. 21-10848-KBO (Bankr. D. Del. May 23, 2021)

(the "Involuntary Bankruptcy Action").  Again, various parties moved to dismiss the petitions as

having been filed in bad faith.  *Involuntary Bankruptcy Action*, No. 21-10848-KBO, ECF No. 5.

Tellingly, Stream aligned itself with the petitioning creditors and objected to the motions to

dismiss.  Relying on the same proposed plan of reorganization Judge Owens rejected in the

Voluntary Bankruptcy Action, Stream encouraged the court to convert the case into a second

chapter 11 case.  *Involuntary Bankruptcy Action*, No. 21-10848-KBO, ECF No. 27.

On June 10, 2021, after hearing argument, the court dismissed the Involuntary Bankruptcy

Action and entered a 12-month bar order on further Stream bankruptcies.  *See Involuntary*

*Bankruptcy Action*, No. 21-10848-KBO, ECF No. 36.  In so doing, the court did not mince words:

> Considering the totality of the facts and circumstances presented . . . it's clear to
> me that this proceeding was filed as ***another attempt by the parties to circumvent***
> ***my dismissal order, gain some sort of litigation leverage over the secured lenders***

---

[7]    Stream's and Mr. Rajan's scheme to misuse the bankruptcy court was so brazen that the court declined to stay its dismissal order, holding that doing so would make it "complicit in the bad faith filing." *Id.* at 22:10–18.  The District Court affirmed Judge Owens's dismissal.  *See* Order ¶ 1, *In re Stream TV Networks, Inc.*, No. 21-00723-RGA (D. Del. Dec. 16, 2021), ECF No. 32.

*and the disputes in the Chancery Court,* and essentially get another bite of the appl[e] to try and pursue the previously submitted plan and theories that are already considered and rejected in the prior Chapter 11 proceeding.

June 10 Hr'g Tr. at 63:18–64:6 (emphasis added).

### 3.    The Delaware Supreme Court Reverses on a Discrete Legal Issue

Once Stream's bad-faith tour through the Delaware Bankruptcy Court concluded, the Court of Chancery entered a summary judgment order and partial final judgment (the "First Chancery Partial Final Judgment"), holding that the Omnibus Agreement was valid and permanently enjoining Stream from interfering with it. *See Omnibus Agreement Action*, No. 2020-0766-JTL, ECF No. 204; ¶ 99.  Stream immediately appealed.  (¶ 99.)  On June 15, 2022, the Delaware Supreme Court vacated the First Chancery Partial Final Judgment *solely* on the narrow legal basis that the Omnibus Agreement itself was required by Stream's certificate of incorporation to be approved by Stream's Class B stockholders notwithstanding that Stream was insolvent.  *See Delaware Supreme Court Opinion,* 279 A.3d at 354-55; ¶ 100.  Significantly, the Delaware Supreme Court adopted the factual findings from the Chancery PI Opinion; indeed, Stream *did not challenge* any of the Court of Chancery's factual findings on appeal.  *See Delaware Supreme Court Opinion*, 279 A.3d at 326-29.[8]

On remand, the Court of Chancery entered a second final partial judgment (the "Second Chancery Partial Final Judgment") on August 7, 2022, declaring the Omnibus Agreement "without

---

[8]      Notably, in direct response to the Delaware Supreme Court Opinion, in 2023, the Delaware Legislature amended the Delaware General Corporation Law to provide that where a corporation is insolvent—as Stream was at the time of the Chancery PI Opinion—no stockholder approval is needed pursuant to 8 Del. C. § 271 to sell the corporation's assets *even if* the corporation's certificate of incorporation provides otherwise.  *See* 8 Del. C. § 272(c).  In other words, after the Delaware Supreme Court Opinion, the Delaware Legislature swiftly codified the *opposite* of what the Delaware Supreme Court held, instead adopting the approach taken by the Court of Chancery in the Chancery PI Opinion.

legal effect" but leaving undisturbed its prior factual determinations, which the Delaware Supreme Court had adopted. *See Stream TV Networks, Inc. v. SeeCubic, Inc.* No. 2020-0766-JTL, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021); ¶ 101. In fact, the Second Chancery Partial Final Judgment explicitly referred to the Chancery PI Opinion for a complete recitation of the relevant factual findings, incorporating those findings in the Second Chancery Partial Final Judgment. *See Stream TV Networks, Inc.*, 2021 WL 5240591, at *1. In doing so, the Court of Chancery reaffirmed that Stream's secured creditors retained their rights to the Collateral. *See Collateral Estoppel Opinion*, 2022 WL 17258460, at *4-5. No timely appeal was taken from the Second Chancery Partial Final Judgment. *Id.*

In light of the reversal, SeeCubic returned the Collateral to Stream. Because of the complexities of the intermingled legacy Stream assets and those created/modified after SeeCubic gained possession of those assets, the return of assets to Stream was a complex dispute, subject to multiple motions by both SeeCubic and Stream. *See Omnibus Agreement Action*, e.g., Dkts. 273, 274, 281, 282, 283, 289, 294. While there remains a dispute over ownership of certain assets, SeeCubic returned the legacy assets to Stream in accordance with the Court of Chancery's orders resolving those motions. *See id.*, e.g., Dkts. 306, 308. Most notably, in October 2022, SeeCubic transferred ownership of the shares of Technovative to Stream. (¶ 106.) Because Technovative is Stream's direct subsidiary—and most of the assets of the business are held in other downstream subsidiaries—transfer of the Technovative shares effectively and practically transferred all of the Collateral back to Stream's corporate structure. *See Omnibus Agreement Action*, No. 2020-0766-JTL, ECF No. 306 at 7.

### 4. Stream Tries Its Conspiracy Theory Again in Delaware Federal Court: the Delaware Federal Action

Stream next tried to relitigate the Court of Chancery's factual findings, adopted by the Delaware Supreme Court in the District of Delaware. Stream brought suit in the District of Delaware on June 22, 2022, against current Defendants here Stastney, Crawford, Gola, Gollop, Kabacinski, Hawk, and Morton, among others. *See* Compl.*, Stream TV Networks, Inc. v. Stastney*, No. 22-cv-00851-CJB (D. Del. June 22, 2022), ECF No. 1 (the "Delaware Federal Action"). The operative complaint in the Delaware Federal Action rests upon Stream's assertions that the Outside Directors, Secured Creditors, and equity investors were engaged in a conspiracy to take over Stream's assets and harm Stream through the Omnibus Agreement—the ***same*** allegations that were rejected by the Court of Chancery and in the Delaware Supreme Court Opinion (and the ***same*** allegations as Stream now makes in the Complaint). *See* pp. 9, 12, *supra*; Second Am. Compl., *Delaware Federal Action*, ECF No. 54 (the "Delaware Federal Complaint"). Asserting that it was damaged by the Omnibus Agreement, Stream seeks damages on seven alleged counts, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, and tortious interference. *See generally* Delaware Federal Complaint. The Delaware Federal Action is still pending, though stayed in light of Stream's current bankruptcy.

### 5. The Rajans Personally Embrace the Chaos Strategy to Again Relitigate Stream's Conspiracy Theory: the Pennsylvania Actions

The re-litigation strategy is not limited to Stream's initiation of repeated, duplicative actions. The Rajans also personally filed suit making the same allegations. On May 27, 2020, the Rajans filed an action in the Philadelphia Court of Common Pleas against Defendant Crawford, a plaintiff in the Investor Lawsuit. *See Rajan v. Crawford*, No. 2000501648 (Phila. Ct. Comm. Pl.). The Rajans allowed this action to linger, without even serving it for nine months. *See* Rule To Show Cause, *id.* (Feb. 5, 2021). Then, ignoring the permanent injunction from the First Chancery

Partial Final Judgment, on February 3, 2021, Raja Rajan filed a second but mostly identical suit. *See Rajan v. Crawford*, No. 2102000269 (Phila. Ct. Comm. Pl.).  Shortly thereafter, the Rajans reinstituted and began to pursue the first action.  After the cases were removed to this District, the Rajans filed separate—but nearly identical—amended complaints.  *Compare* First Am. Compl., *Rajan v. Crawford*, No. 21-1456 (E.D. Pa. Apr. 6, 2021), ECF No. 8 *with* Am. Compl., *Rajan v. Crawford*, No. 21-1150 (E.D. Pa. Apr. 6, 2021), ECF No. 15.

In these cases, the Rajans alleged the same facts that Stream pressed unsuccessfully in the Omnibus Agreement Action and that it now presses in both the Delaware Federal Action and in the Complaint here.  In particular, the Rajans espoused Stream's debunked theory that the Secured Creditors, Outside Directors, and equity investors unlawfully conspired to take over Stream.  Both actions were dismissed for failure to state a claim.  *See* Order, *Rajan v. Crawford*, No. 21-1456 (E.D. Pa. Feb. 16, 2022), ECF No. 37;[9] Order, *Rajan v. Crawford*, No. 2102000269 (Phila. Ct. Comm. Pl. Apr. 19, 2023).

**6.    Hawk Exercises Its Secured Creditor Rights as
Stream Seeks to Relitigate Its Defaults: the 225 Action**

Meanwhile, after the Court of Chancery issued the Second Chancery Partial Final Judgment, Hawk began taking steps to secure the Collateral and pursue a foreclosure sale.  In accordance with its rights under its loan documents and the Uniform Commercial Code, on October 17, 2022, Hawk issued a proxy notice directing that Stream's stock in Technovative be registered in Hawk's name so that Hawk could vote to choose the board of Technovative.  *See*

---

[9]    On appeal, the Third Circuit affirmed the dismissal as to certain counts, but remanded two counts that the District Court had adjudicated prior to the issuance of the Delaware Supreme Court Opinion.  The court remanded for the District Court to consider the effect of that opinion on collateral estoppel.  *See* Opinion, *Rajan v. Crawford*, No. 22-1719 (3d Cir. Nov. 28, 2022), ECF No. 28.  The remanded case is currently stayed pending final resolution of certain of the other actions.  *See* Order, *Rajan v. Crawford*, No. 21-1456 (E.D. Pa. Jan. 11, 2023), ECF No. 57.

Exhibit, *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. Apr. 6, 2023), ECF No. 83-6; ¶ 108. Stream refused to comply, claiming that it had converted the Hawk debt into equity and that Hawk no longer had secured creditor rights (including the proxy right). (¶ 108.) Hawk then filed suit in the Court of Chancery pursuant to 8 Del. C. § 225—a Delaware statute designed to resolve disputes over the makeup of corporate boards. *See* Compl., *Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL (Del. Ch.), ECF No. 1 (the "225 Action").

### (a)    The Court Reiterates That It Made Final Findings That Estop Stream From Relitigating Numerous Issues

Hawk moved for summary judgment on whether Stream defaulted on the Hawk Notes and sought a ruling that Stream was collaterally estopped from relitigating several issues that had already been litigated—or could have been litigated—in the Omnibus Agreement Action. On November 29, 2022, the Court of Chancery granted Hawk's motion, holding that Stream was collaterally estopped from relitigating several issues from the Omnibus Agreement Action as a result of the Second Chancery Partial Final Judgment, including "(i) the validity of the debt reflected by the Hawk Notes; (ii) Stream's default on the Hawk Notes; (iii) the validity of Hawk's creditor rights; and (iv) the condition predicate that Stream must satisfy to convert the Hawk Notes into equity." *Collateral Estoppel Opinion*, at *14.

With regard to Stream's conspiracy theory, the court also noted that "Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement" in the Omnibus Agreement Action. *See id.* at *16. Indeed, Stream *did raise* the conspiracy allegations—at least in part—which the Court of Chancery responded to in finding, for example, that the Secured Creditors had no connection to the Outside Directors. *See* pg. 9, *supra*. Nonetheless, the Court of Chancery made clear that collateral estoppel barred Stream from

16

arguing that its defaults were "manufactured" in a conspiracy between the Outside Directors,

Secured Creditors, and equity investors:

> Evidencing its wily way with words, Stream argues that although it purportedly is
> not challenging the court's prior finding that 'a default event on the Hawk notes
> occurred in early 2020,' Stream nevertheless remains free to litigate its contention
> that there was an 'unlawful conspiracy that artificially manufactured the 2020
> default events through bribery and internal sabotage.' That is another way of
> contending that a default never really occurred. If Stream wanted to advance that
> argument, it had to do so in the Omnibus Agreement [Action]. Collateral estoppel
> bars Stream from advancing that argument now.

*Id.* at *17.

### (b)    The 225 Action Reaches the Brink of Trial

Thereafter, the parties engaged in extensive discovery on remaining issues in the 225

Action, including whether Stream had converted the Hawk Notes to equity after November 2021

(and, as a result, whether Hawk still had secured creditor rights to exercise its proxy and control

Technovative). The matter was set for a one-day bench trial on March 23, 2023, with a pre-trial

conference on March 16. *See* Stipulation and [Proposed] Pre-Trial Order, *225 Action*, ECF

No. 178.

### 7.    Stream Seeks To Avoid Judgment
### In the 225 Action: the Third Bankruptcy and the Complaint

Having lost on most of its defenses in the 225 Action and facing trial only on its remaining

long-shot defense, Stream made its third attempt to evade a negative ruling from the Court of

Chancery. One week before trial in the 225 Action, on March 15, 2023, Stream again filed for

bankruptcy. (¶ 121.) Since the Delaware Bankruptcy Court was plainly familiar with Stream's

bad-faith abuse of the bankruptcy system, Stream went shopping for a new court and filed in the

Eastern District of Pennsylvania. *See In re Stream TV Networks, Inc.*, No. 23-10763-MDC (Bankr.

E.D. Pa.) (the "Third Bankruptcy"). In the early days of the Third Bankruptcy, Hawk filed (i) a

motion for relief from stay, seeking the court's permission to complete trial in the 225 Action; and

(ii) a motion to dismiss, convert the case to chapter 7, or appoint a chapter 11 trustee.  *See* Emergency Motion for Relief from Stay, *Third Bankruptcy*, ECF No. 16; Emergency Motion Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases, et al., *id.*, ECF No. 83 (the "Hawk Motions").

Months later, with the Hawk Motions still subject to an ongoing hearing on the merits, on August 12, 2023, Stream and Technovative filed the Complaint.  The Complaint is the latest maneuver in Stream's duplicative approach.  The Complaint's factual allegations can be broadly grouped into two categories.  *First*, Stream once again pushes its debunked claims of conspiracy and illegality in the events leading up to the execution and enforcement of the Omnibus Agreement—claims the Court of Chancery has rejected multiple times *and* that Stream is *also attempting to relitigate* in the Delaware Federal Action.  *Second*, Stream alleges that Defendants have caused it harm since the entry of the Delaware Supreme Court Opinion in June 2022 by not retuning Stream's assets and using Stream's intellectual property.

On these facts, the Complaint takes a "throw everything at the wall approach," asserting 19 alleged causes of action against 15 defendants—including one of the Debtors' *own indirect subsidiaries*.  These causes of action likewise can be simplified into two groups.  *First*, Stream asserts tort and intellectual property claims, e.g., tortious interference, breach of fiduciary duty, and misappropriation of trade secrets.  *Second*, Stream asserts several claims concerning the Debtors' assets, the secured debt, and the claims filed by SeeCubic and the Secured Creditors, e.g., equitable subordination, objection to claim, and turnover and accounting.  Because of the high volume of both claims and Defendants, a summary of Debtors' claims in the Complaint is attached hereto as **Appendix A** for ease of reference.

18

## **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While the court must accept as true well-pleaded factual assertions, it need not accept "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *Hassen v. Gov't of Virgin Islands*, 861 F.3d 108, 115 (3d Cir. 2017) (citation omitted); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (Courts need not accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]." (citations omitted)).  The Court also need not "accept as true any anything in the complaint which contradicts facts of which the court may take judicial notice." *Caldwell v. Beard*, No. 07-726, 2007 WL 2905906, at *2 (W.D. Pa. Sept. 28, 2007); *see also Laake v. Mooney*, No. 22-cv-17, 2022 WL 17976326, at *3 (W.D. Pa. Dec. 28, 2022) ("[T]he Court need not accept as true allegations that are directly contradicted by indisputably authentic documents on which the complaint relies or matters of public record." (citation omitted)); *Amelio v. McCabe, Weisberg & Conway, P.C.*, No. 14-1611, 2015 WL 4545299, at *4 (W.D. Pa. July 28, 2015) (The Court "need not accept allegations that are internally inconsistent[.]").

Here, the Complaint's claims against SeeCubic are deficient in almost every way imaginable.  *First*, in a transparent attempt to make the Complaint's allegations look more expansive than they actually are, certain Counts—II, XIV, XVI, and XIX—should be dismissed because they are not standalone causes of action.  *Second*, the doctrines of collateral estoppel, the first-filed rule, and Delaware's injunction bond rule preclude Debtors from relitigating issues

19

surrounding the execution and enforcement of the Omnibus Agreement and the existence of the

secured debt—most of the Complaint—here. *Third*, the Complaint fails to state a claim under any

of its causes of action.[10]

## I.   COUNTS II, XIV, XVI, AND XIX SHOULD BE DISMISSED BECAUSE THEY ARE NOT COGNIZABLE CAUSES OF ACTION AS A MATTER OF LAW

Counts II (Injunctive Relief), XVI (Exemplary Damages), and XIX (Lender Liability)

should be dismissed because they are *not* recognized as standalone causes of action under

Pennsylvania or federal law; rather, they are remedies. *See Jones v. GEICO Choice Ins. Co.*, 617

F. Supp. 3d 275, 287 (E.D. Pa. 2022) ("[T]he count for injunctive relief must also be dismissed

because injunctive relief is a remedy, not an independent cause of action[.]"), *aff'd sub nom.*

*Berardi v. USAA Gen. Indem. Co.*, No. 22-231, 2023 WL 4418219 (Jul. 10, 2023); *see also Bishop*

*v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 425 (W.D. Pa. 2005) ("Punitive damages, however,

do not constitute an independent cause of action. . . .  Therefore, the Court will dismiss plaintiffs'

claim for punitive damages claim, with prejudice."), *aff'd*, 248 F. App'x 298 (3d Cir. 2007); *Phila.*

*Plaza-Phase II v. Bank of Am. Nat'l Trust & Savings Ass'n*, No. 332 May Term 2002, 2002 WL

1472338, at *7 (Pa. Ct. Comm. Pl. May 30, 2002) ("Lender liability itself is not the basis for a

separate claim").

Similarly, Count XIV (Equitable Disallowance) fails because it is not a cause of action

under the Bankruptcy Code.  In 2014, the Supreme Court established that a bankruptcy court's

equitable powers are limited to those specifically identified in the Code.  *See Law v. Siegel*, 571

---

[10]   While Technovative is named as a Plaintiff in the Complaint, the Complaint's factual allegations center entirely on actions taken by, harm to, and other facts and events impacting Stream only.  The only claims that are arguably asserted by Technovative as well as Stream in the Complaint concern the proofs of claim filed by SLS, Hawk, and SeeCubic and not any of the tort or other non-bankruptcy claims.

U.S. 415, 421 (2014) ("[W]hatever equitable powers remain the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.") (citations omitted).  Bankruptcy Code Section 502(b) identifies nine bases for disallowance, none of which includes that the claim is "inequitable."  11 U.S.C. § 502(b) (The bankruptcy court "shall allow" a claim "except to the extent" it falls within one of the nine bases for disallowance.); *see also Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007) (holding that a claim could not be disallowed on a basis falling outside of section 502(b)'s nine grounds); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 760 (Bankr. D. Del 2016) ("The 'equitable disallowance' claim is not typically recognized by bankruptcy courts…. [B]ankruptcy courts routinely reject equitable disallowance as a remedy under the Code.").  Because equitable disallowance is not contemplated by the Bankruptcy Code, Count XIV is not a permissible cause of action and should be dismissed.

## II.     STREAM'S REDUNDANT FILINGS PREVENT IT FROM LITIGATING MANY OF THE CLAIMS AND ISSUES IT RAISES IN THE COMPLAINT

### A.     Stream Is Collaterally Estopped From Relitigating Claims and Issues Related to the Genesis of the Omnibus Agreement

To the extent that Debtors' claims are premised on facts concerning the genesis and enforcement of the Omnibus Agreement, they should be dismissed for the independently dispositive reason that Stream is collaterally estopped from relitigating those issues here.[11]

Delaware law determines the preclusive effect of the prior findings in the Omnibus Agreement Action.  *See Sec'y United States Dep't of Lab. v. Kwasny*, 853 F.3d 87, 94 (3d Cir. 2007), *aff'd as modified*, 738 F. App'x 117 (3d Cir. 2018).  Under Delaware law, "the doctrine of

---

[11]     Rule 12(b)(6) may also be used to obtain dismissal on collateral estoppel/issue preclusion grounds.  *See Adelphia Gateway, LLC v. Pa. Enviro. Hearing Bd.*, No. 21-CV-1241, 2021 WL 5494286, at *3 (M.D. Pa. Nov. 23, 2021) (granting a motion to dismiss and holding plaintiff was "collaterally estopped from relitigating the issue of . . . jurisdiction after unsuccessfully pressing its case before [Pennsylvania's] Commonwealth Court.").

collateral estoppel provides repose by preventing the relitigation of an issue previously decided. In addition, by putting an end to litigation, it conserves judicial resources." *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1216 (Del. 1991). "Where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action." *Id.*

The doctrine of collateral estoppel thus bars re-litigation where: (i) "the issue previously decided is identical to the issue at bar"; (ii) "the prior issue was finally adjudicated on the merits"; (iii) "the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication"; and (iv) "the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *See City of Newark v. Unemployment Ins. Appeal Bd.*, 802 A.2d 318, 324 (Del. Super. Ct. 2002). Preclusion "extends to all issues which *migh*t have been raised and decided in the first suit, as well as to all issues that actually *were* decided." *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191-92 (Del. 2009) (emphases added).[12] All elements are present here.

*First*, the Debtors' allegations concerning the genesis and enforcement of the Omnibus Agreement are identical to issues that were raised (or could have been raised) in the Omnibus Agreement Action. The fundamental premise underlying claims in the Complaint based on the Omnibus Agreement is that Stream's defaults on the SLS Notes and Hawk Notes were illegitimate and orchestrated through a conspiracy and purported bribery. (¶¶ 57–60.) However, the

---

[12]    The Court of Chancery's factual findings have the same preclusive effect in Pennsylvania as they would in Delaware because Pennsylvania gives a judgment "the same res judicata effect the judgment would have been afforded in the state in which it was rendered." *Standard Chartered Bank v. Ahmad Hamad Al Gosaibi & Bros. Co.*, 99 A.3d 936, 941 (Pa. Super. Ct. 2014) (quoting *Wilkes ex rel. Mason Irrevocable Tr. v. Phoenix Home Life Mut. Ins. Co.*, 902 A.2d 366, 376 (Pa. 2006)).

legitimacy of Stream's debt, its defaults on the SLS Notes and Hawk Notes, and this purported conspiracy are the very same allegations at issue in the Omnibus Agreement Action. *See Collateral Estoppel Opinion*, 2022 WL 17258460, at *14 (describing Stream's indebtedness and holding "[e]ach of these issues has been decided against Stream by the Second [Chancery] Partial Final Judgment"). *Compare,* e.g., *Chancery PI Opinion*, 250 A.3d at 1024, 1027 (finding Outside Directors not connected to Secured Creditors and holding that they did not breach their fiduciary duties) *with* (¶¶ 66–67, 1196–98 (alleging Outside Directors were agents of Secured Creditors and breached their fiduciary duties)).[13]

*Second*, the issues were finally adjudicated on the merits. "[F]inality is neither a precise nor a rigid concept" under Delaware law, encompassing "any prior adjudication of an issue in another action that is determined to be sufficiently firm." *Arch Ins. Co. v. Murdock*, No. N16C-01-104 EMD CCLD, 2018 WL 1129110, at *6 (Del. Super. Mar. 1, 2018) (alteration in original) (citation omitted). Indeed, it "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Id.* (citation omitted). Here, the factual findings made by the Court of Chancery on a full factual record in the Chancery PI Opinion were adopted by the Delaware Supreme Court after Stream *did not appeal them*. Those factual findings were also relied upon in and incorporated into the Second

---

[13]    In rehashing the Omnibus Agreement-related allegations and seeking to relitigate those issues here, the Complaint displays a disappointing level of contempt for the Court of Chancery. For example, though the Court of Chancery considered hundreds of exhibits—including on this very issue—the Complaint baselessly asserts that the Court of Chancery "speculated" that the documentation Stream attempted to use to undermine the Omnibus Agreement was backdated. *Compare* (¶ 81) *with Chancery PI Opinion*, 250 A.3d at 1033 ("*The evidence indicates* that the Rajan brothers did not execute the May Stockholder consent until the evening of May 8 at the earliest." (emphasis added)).

Chancery Partial Final Judgment, which was never appealed and thus became final. *See Collateral Estoppel Opinion*, 2022 WL 17258460 at *4–5.

Debtors may argue that the Delaware Supreme Court Opinion vacating the First Chancery Partial Final Judgment renders the Court of Chancery's factual findings non-binding, illegitimate, overturned, or otherwise not final for purposes of collateral estoppel. **Not so.** Those factual findings were incorporated into the Second Chancery Partial Final Judgment, which was not appealed. *See id.* In any event, as a matter of law, issues not appealed retain their preclusive effect where a judgment was appealed and reversed on other grounds.

*Trans World Airlines, Inc v. Summa Corp.*, C.A. No. 1607, 1985 WL 11543 (Del. Ch. Feb. 5, 1985), is instructive. There, TransWorld Airlines ("TWA") brought suit in the Delaware Court of Chancery against its majority stockholder, Hughes, for breaching its fiduciary duties to TWA's minority stockholders, seeking damages. *See id.* at *1. TWA also brought suit against Hughes in the Southern District of New York alleging violations of federal anti-trust law. *See id.* In the federal case, the court entered judgment against Hughes and assessed the proper measure of TWA's damages, including whether TWA was entitled to damages for loss of goodwill and how to measure such damages. *See id.* at *1-2. The district court held that TWA was not entitled to damages for lack of goodwill and rejected the comparative profitability method. *See id.* TWA appealed the district court's decision. *See id.* at *2. TWA did not, however, appeal the district court's rejection of its comparative profitability goodwill damages, instead focusing on issues such as whether expert witness fees were recoverable and the amount of interest. *See id.* at *3.

Back in the Court of Chancery, TWA prevailed on its claim for breach of fiduciary duty against Hughes and pursued claims for damages related to that claim. *See id.* at *2. Among other things, TWA sought damages for loss of goodwill. *See id.* Hughes argued that TWA was

24

collaterally estopped by the district court's findings from recovering damages for loss of goodwill; TWA countered that collateral estoppel did not apply because the district court's opinion was reversed and vacated by the Second Circuit. *See id.* at *3.  The Court of Chancery agreed with Hughes, holding that "the portion of the [d]istrict [c]ourt's judgment not appealed by TWA became final notwithstanding the reversal on appeal and the subsequent vacation of the judgment," thereby maintaining its preclusive effect. *See id.* at *4.  *See also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (finding that a "district court's order affirming the arbitrator's findings of fact" has preclusive effect despite being vacated on appeal because the party did not specifically "contest those points on appeal" and the appellate court vacated the orders on other grounds).

Likewise here, Stream did not appeal any of the Court of Chancery's factual findings and instead focused on the legal issue of whether the approval of Stream's Class B stockholders was necessary to effectuate the Omnibus Agreement.  The court's factual findings are undisturbed by Stream's appeal.  Moreover, the unappealed factual findings were expressly *adopted* by the Delaware Supreme Court.  *See Delaware Supreme Court Opinion*, 279 A.3d at 328.  That Delaware's highest court adopted and recited these findings renders them more than "sufficiently firm" to consider them final for purposes of collateral estoppel, and Debtors cannot provide any "really good reason for permitting [them] to be litigated again." *Arch Ins. Co.*, 2018 WL 1129110 at *6.[14]

---

[14]     Tellingly, the Complaint accepts as true certain of the Court of Chancery's findings while simultaneously attempting to relitigate others.  On the one hand, for example, in the Omnibus Agreement Action, Stream vehemently argued that the Outside Directors were not actually directors of the company.  *See Chancery PI Opinion*, 250 A.3d at 1026.  In the Complaint, however, Stream appears to have no issue agreeing with the Court of Chancery, asserting that the Outside Directors were directors.  (E.g., ¶ 73 (acknowledging Kabacinski, Gola, and Gollop to be directors).)  On the other hand, in the Omnibus Agreement Action, Stream argued that the Outside
*(cont'd)*

*Third*, it is indisputable that preclusion applies to Debtors here: Stream is the *same party* against whom the Court of Chancery made the factual findings Debtors now seeks to relitigate.[15]

*Fourth*, Stream had a full and fair opportunity to litigate these issues in the Omnibus Agreement Action.  Stream initiated that action (¶ 93), was represented by counsel, took discovery, submitted extensive briefing, and presented arguments to the Vice Chancellor.  E.g., *Omnibus Agreement Action*, ECF No. 33 (notices of service of interrogatories and requests for production served by Stream); ECF No. 37 (notice of service of Stream's objections and responses to SeeCubic's interrogatories, requests for production, and requests for admission); ECF No. 41 (notice of service of Stream subpoena to third party); ECF No. 43, 47, 62 (Stream motions for commission to obtain out of state subpoenas for other third parties and order granting request); Dkts. 48, 51 (notice of service for Stream's supplemental responses to discovery); ECF No. 87, 103 (Stream's briefing on preliminary injunction motions).

In other words, Stream was an active participant in the Omnibus Agreement Action it initiated.  *See Troy Corp. v. Schoon*, 959 A.2d 1130, 1135-36 (Del. Ch. 2008).  Any limitations in discovery or Stream's briefing and arguments in the Omnibus Agreement Action that it may raise

---

Directors were not independent and breached their fiduciary duties (a contention rejected by the Court of Chancery).  *See Chancery PI Opinion*, 250 A.3d at 1024.  In the Complaint, Stream repeats that same (debunked) theory.  (¶¶ 66-–7, 1196–98.)  Stream cannot pick and choose the factual findings that it agrees with to consider settled and final, but continually dispute those it disagrees with.

[15]     While Technovative is a party to the Complaint, there are no real substantive allegations made by or that apply to Technovative other than as it relates to proofs of claim filed by SLS, Hawk, and SeeCubic.  For purposes of collateral estoppel, the Court of Chancery's findings should also bind Technovative, which has aligned itself fully with Stream, is a wholly owned subsidiary of Stream, and whose interests were represented adequately by Stream in the Omnibus Agreement Action.  *See Higgins v. Walls*, 901 A.2d 122, 138 (Del. Super. 2005) (Collateral estoppel applies to non-party to earlier suit if it was in privity with a party, meaning that "the relationship . . . is such that a judgment involving one of them may justly be conclusive on the others[.]").

now were the result of its own litigation strategy—not limitations placed on it by the Court of Chancery. Stream made its choices, and it is bound by their result. *See id.* at 1136-37 ("Instead, Troy pressed forward with its information-sharing allegations on the basis of the discovery it had. Troy ultimately lost. It is not for this court to rectify Troy's litigation choices by now refusing to apply the doctrine of collateral estoppel.").[16]

Accordingly, to the extent Debtors' claims are premised on the facts that have already been finally adjudicated against them by the Court of Chancery, they should be dismissed.[17]

**B.    The Complaint Should Be Dismissed
Pursuant to the First-Filed Rule Because the Delaware
Federal Action Is on all Fours With the Complaint Here**

Even if collateral estoppel did not apply here—though it does—the Complaint should still be dismissed to the extent it relies upon allegations concerning the Omnibus Agreement under the first-filed rule. That doctrine provides that "when two courts possess the same case at the same time, 'the court which first has possession of the subject must decide it.'" *Landau v. Viridian Energy PA LLC*, 274 F. Supp. 3d 329, 332 (E.D. Pa. 2017) (quoting *Crosley Corp. v. Hazeltine*

---

[16]    Debtors may cite two decisions that they contend hold that the doctrine of collateral estoppel does not prevent Stream from relitigating the Omnibus Agreement and surrounding issues. In both these cases, *Rajan v. Crawford*, No. 22-1719, 2022 WL 16646690 (3d Cir. Nov. 3, 2022) and *Rajan v. Crawford*, No. 210200269 (Opinion, Apr. 19, 2023), the Third Circuit and Court of Common Pleas, respectively, held that the final element of collateral estoppel (final judgment) was not satisfied because the *First* Chancery Partial Final Judgment had been vacated by the Delaware Supreme Court Opinion. Neither acknowledged or considered the Second Chancery Partial Final Judgment, which, as described above, is a final judgment incorporating the Court of Chancery's factual findings. Moreover, as noted above, "finality" for purposes of collateral estoppel under Delaware law is a flexible concept. It is difficult to imagine a more "final" determination of facts than what exists here, where the Delaware Supreme Court stated at length—and relied on—the factual findings at issue.

[17]    This touches virtually every one of Debtors' claims: the Omnibus Agreement-related allegations underlie *all* of Debtors' common law claims *and* are essentially the entire basis for Debtors' equitable arguments against SeeCubic's and the Secured Creditors' proofs of claim. The *only* issues in the Complaint not subject to issue preclusion are those that post-date June 2022.

*Corp.*, 122 F.2d 925, 929 (3d. Cir. 1941)). The first-filed rule is designed to promote "sound judicial administration and comity among federal courts of equal stature" by ensuring the parties avoid "vexation of multiple litigations covering the same subject matter." *Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 455 (E.D. Pa. 2013).

Though the textbook example of the first-filed rule "encompasses cases involving the same parties and the same transaction," courts in this District have embraced a "broader, close-enough-for-government-work approach to the rule and applied it to 'disputes involving *similar*, concurrent actions.'" *Landau*, 274 F. Supp. 3d at 332-33 (quoting *Palagano v. NVIDIA Corp.*, No. 15-1248, 2015 WL 5025469, at *2 (E.D. Pa. Aug. 25, 2015)); *see also Synthes*, 978 F. Supp. 2d at 457 ("We agree with those decisions holding that the rule's application is not cabined to proceedings involving identical parties and identical issues, but extends to cases where there is a substantial overlap of the subject matter."). "Because one of the cases involves claims that are not asserted in the other does not necessarily preclude application of the first-filed rule where the core facts are similar and the causes of action in both arise out of the same . . . relationship and conduct. To hold otherwise would ignore the rationale for the rule—comity and efficient judicial administration." *Synthes*, 978 F. Supp. 2d at 456.

Stated differently, the first-filed rule applies even if the two actions do *not* involve identical parties and identical claims; if the core facts and subject matter are the same, the first-filed rule prohibits a plaintiff from pursuing in a second suit causes of action that were brought—or *could have* been brought—in the first-filed suit. *See Prewitt v. Walgreens Co.*, No. 12-6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) ("The claims the plaintiff seeks to add were available to him at the time he filed his first complaint and nothing occurred thereafter which would enable him to avoid the necessary implications of preclusion doctrines."); *see also Curtis v. Citibank*,

*N.A.*, 226 F.3d 133, 140 (2d Cir. 2000) (dismissing claims, holding that plaintiff was barred by the rule against duplicative litigation from asserting claims in a second suit that could have been brought in first-filed suit).

**1.      The First-Filed Rule Applies Here Because
The Core Facts and Subject Matter Are the Same**

Here, t first-filed rule applies because of the Delaware Federal Action, which renders the Complaint here superfluous—and properly dismissed.  Even a cursory review of the Delaware Federal Complaint demonstrates that the allegations in the Complaint here, though not identical, are rooted in the same operative facts and transactions, all surrounding the secured debt, Omnibus Agreement, and the ultimate invalidation thereof.

*First,* the factual allegations underpinning the Complaint and the Delaware Federal Complaint relate to all of the same transactions, contracts, and disputes.  In general, the Delaware Federal Complaint is based upon actions taken by the defendants there in executing and seeking to enforce the Omnibus Agreement.  In particular, the Delaware Federal Complaint alleges that: (i) Stream raised millions of dollars from investors, including substantial sums from its Secured Creditors, Hawk and SLS.  (*See* Delaware Federal Complaint, ¶¶ 38, 49, 50); (ii) Hawk and SLS executed conversion agreements but did not honor them after Stream tried to effect a conversion of their debts (*id.* ¶ 51); (iii) Morton, Stastney, Gola, Gollop, Kabacinski, and others conspired to manufacture defaults by Stream in order to "steal" the Debtors' assets under the Omnibus Agreement and a "secret" letter agreement (*id.* ¶¶ 65, 66, 71); (iv) the Court of Chancery upheld the Omnibus Agreement but the Delaware Supreme Court found that it was procedurally defective due to Stream's Class B shareholders not having approved it (*id.* ¶ 111); and (v) while the Court of Chancery's injunction was in place and SeeCubic controlled the assets, defendants interfered with Stream's purported business opportunities with Alphabet (i.e., Google) (*id.* ¶¶ 149–51).

29

Based on these alleged facts, the Delaware Federal Complaint seeks to recover under theories of conspiracy, conversion, breach of fiduciary duty, and tortious interference, among others.  *See generally id.*  These are *exactly* the same facts Stream assets in the Complaint.  (¶¶ 35, 44, 45, 57, 68, 78, 94, 100, 111, 282.)

Indeed, based on these same facts, certain of the cause of action in both complaints are the same—and involve nearly verbatim factual allegations in support thereof.  For example, both this Complaint and the Delaware Federal Complaint assert claims for tortious interference and aiding and abetting breach of fiduciary duty:

| Complaint | Delaware Federal Complaint (Compared To Complaint) |
|---|---|
| *Count VII (Tortious Interference):*<br><br>"Defendants had knowledge of and were aware of Plaintiffs' relationship with Google and the anticipated business relationship that would result.  Defendants took purposeful actions that were designed to intentionally harm, interfere with, and disrupt the Google relationship, including triggering Stream's default and creating the Omnibus Agreement as a way to convert and appropriate Stream's assets."  (¶ 170.) | *Count VI (Tortious Interference):*<br><br>"Defendants ~~had knowledge of and~~ were aware of ~~Plaintiffs'~~ Plaintiff's relationship with ~~Google~~ Alphabet and the anticipated business relationship that would result.  Defendants took ~~purposeful~~ intentional actions that were designed to ~~intentionally harm,~~ interfere with,~~and~~ disrupt the ~~Google~~ Alphabet relationship, including ~~triggering Stream's~~ manufacturing Stream TV's default and creating the Omnibus Agreement as a way to convert and appropriate ~~Stream's~~ Stream TV's assets."  (Delaware Federal Complaint ¶ 150.) |
| *Count XI (Aiding and Abetting Breach of Fiduciary Duty):*<br><br>"Upon information and belief, Defendants knew that Gola and Gollop were on Stream's Board and that Gola and Gollop owed fiduciary duties to Stream as directors, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties. | *Count V (Aiding and Abetting Breach of Fiduciary Duty):*<br><br>"Upon information and belief, Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75 knew that Gola and Gollop were on ~~Stream's Board~~ Stream TV's board and that Gola and Gollop owed fiduciary duties to Stream ~~as directors~~ TV, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties. |

| Complaint | Delaware Federal Complaint (Compared To Complaint) |
|---|---|
| Defendants acted with knowledge of Gola's and Gollop's breaches of fiduciary duties to Stream and knowingly participated in those breaches of fiduciary duties by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in SCI in return for their actions (at least because Stastney, Crawford, and Morton had offered Gola and Gollop these benefits.)" (¶¶ 206-07.) | Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75 acted with knowledge of Gola's and Gollop's breaches of fiduciary ~~duties~~ duty to Stream TV and ~~knowingly~~ actively participated in those breaches of fiduciary ~~duties~~ duty by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in ~~SCI~~ SeeCubic in return for their actions (at least because Stastney, Crawford, and Morton had offered Gola and Gollop these benefits.)" (Delaware Federal Complaint ¶¶ 144-45.) |

*Second*, the key players are the same in both actions. The Delaware Federal Complaint includes Stream as a plaintiff and (a) **Shadron L. Stastney**, (b) **Mr. Morton**, (c) **Alastair Crawford**, (d) **Asaf Gola**, (e) **Kevin Gollop**, (f) **Krzysztof Kabacinski**, (g) Patrick Miles, (h) Robert Petch, (i) **Hawk**, and (j) John Does 1–75, as defendants. *See generally* Delaware Federal Complaint. Similarly, this Complaint includes (a) **Mr. Stastney**, (b) SLS, (c) **Hawk**, (d) **Mr. Morton**, (e) SeeCubic, (f) **Mr. Crawford**, (g) **Mr. Kabacinski**, (g) **Mr. Gollop**, (h) **Mr. Gola**, (i) Patric Theune, (j) SCBV, and (k) John/Jane Doe law firms and investment banks, as defendants. Even parties not directly named as defendants in one of the complaints still play a role in the facts alleged in the other complaint.[18]  (*See* ¶ 58 (referencing actions taken by "Patrick 'Paddy' Miles"); *id.* ¶ 74 (referencing actions taken by Robert Petch); Delaware Federal Complaint ¶ 14 ("Stastney is also the Managing Member of SLS Holdings VI, LLC . . . ."); *id.* ¶ 6 ("The point

---

[18]     SCBV, as noted above, is Stream's own indirect subsidiary. Theune and SCBV have only recently drawn the ire of the Debtors due to SCBV's skepticism of Stream's intentions, a result of the Rajans' and Stream's history of mismanagement of SCBV prior to the Omnibus Agreement.

of the conspiracy was . . . to sign over all assets of Stream TV to a shell company, SeeCubic Inc.").)
In other words, all of the "main characters" are the same in both narratives.

*Third*, the remedies in both actions would overlap.  By virtue of the Delaware Federal
Action, Stream sought to "setoff" the amounts it owed to the Secured Creditors as a defense in the
225 Action.  *See Collateral Estoppel Opinion*, 2022 WL 17258460, at *17 (noting Stream's
attempts to allege conspiracy as a defense in the 225 Action).  These same arguments are employed
as bases to reduce the Secured Creditors' proofs of claim filed in these Chapter 11 Cases.  *See*
Compl., Counts III (Disallowance of Claims Pursuant to 11 U.S.C. § 502(d)), IV (Equitable
Subordination), VIII (Recharacterization), XII (Determination of Secured Status), XIII (Setoff),
XIV (Equitable Disallowance), and XIX (Lender Liability).  In short, if either this Court or the
Delaware District Court were to rule on any one of the several causes of action alleged in the
Complaint and Delaware Federal Complaint, respectively, such ruling would have direct
consequences on the other's ability to issue a ruling.  For example, this Court cannot rule that the
Secured Creditors were engaged in inequitable activities justifying equitable subordination or
disallowance without effectively ruling that the Secured Creditors engaged in a conspiracy to
takeover Stream's assets, which may impact the Delaware District Court's ability to rule on the
parallel facts and causes of action in that case.  Similarly, if the Delaware District Court finds that
no such conspiracy existed, such finding would impact this Court's ability to entertain Debtors'
claims for setoff, equitable subordination, equitable disallowance, and several more.

*Finally*, even where the Complaint is not expressly based upon the Omnibus Agreement-
related allegations, it should still be barred by the First-Filed Rule because there is overlap in the
allegations and what could be litigated in the Delaware Federal Action.  The Complaint's purported
claims for federal and state trade secret misappropriation (Counts XVII and XVIII) are part of the

same subject matter already at issue in the Delaware Federal Action.  The Complaint's trade secret claims allege that "Defendants," including SeeCubic, have been unlawfully using and continue to unlawfully use Stream's purported trade secrets after the Delaware Supreme Court Opinion. (¶ 263.)  The Delaware Federal Action—filed after that opinion and amended in February of this year—alleges that the defendants there have violated and are violating Stream's intellectual property rights.  (*See* Delaware Federal Complaint at ¶¶ 9, 65, 119, 154.)

### 2.   Dismissal Is the Appropriate Remedy

Where the first-filed rule applies, courts are to dismiss, transfer, or stay the action, absent exceptional circumstances.  *See Landau*, 274 F. Supp. 3d at 333 ("In cases where two actions arise out of an integrated dispute, transfer, stay, or dismissal of the later-filed action should be required in the absence of exceptional circumstances."); *see also Koresko v. Nationwide Life Ins. Co.*, 403 F. Supp. 2d 394, 403 (E.D. Pa. 2005).  Exceptions to the application of the rule are rare and include: "(1) the existence of rare or extraordinary circumstances; (2) the first-filer engaged in inequitable conduct; (3) he acted in bad faith; (4) he engaged in forum shopping; (5) the later-filed action has developed further than the first-filed action; and (6) the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in a less favorable forum."  *Synthes*, 978 F. Supp. 2d at 455.  These exceptions make clear that the first-filed rule often applies when opposing parties file competing actions over the same subject matter in order to obtain the upper hand over each other.

That is not the case here: the Debtors have initiated **both** actions that form the basis for the first-filed rule in a clear effort to shop for the forum Debtors believe will be most favorable to them.  This should not be countenanced.  Debtors should not be permitted to restart the same litigation here while the Delaware Federal Action remains pending in order to sow further confusion or cause additional delays and expense to the Defendants.  Because Stream filed the

Delaware Federal Action first, the Delaware Federal Action should be the one that remains, and this Complaint should be dismissed.

### C.  The Injunction Bond Rule Precludes Stream From Recovering on Certain of Its Claims

Delaware Court of Chancery Rule 65 requires a court issuing an injunction to set a bond. *See* Del. Ct. Ch. R. 65(c).  This requirement: (i) "assures the enjoined party that it may readily collect damages from the funds posted or the surety provided in the event that it was wrongfully enjoined"; and (ii) provides "the limit of the damages the [enjoined party] can obtain for a wrongful injunction, . . . provided the plaintiff was acting in good faith." *Concerned Citizens of the Estates of Fairway Village v. Fairway Cap, LLC*, 256 A.3d 737, 744 (Del. 2021) (citation omitted) (second alteration in original); *Sprint Commc'ns Co. v. CAT Commc'ns Int'l Inc.*, 335 F.3d 235, 240 (3d Cir. 2003) (second alteration in original).  As such, under this so-called "injunction bond rule," a party's sole recourse for harm caused by a wrongful injunction is against the bond posted.  *See Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 469 (Del. 2010).  To recover against the bond, a party may either file a motion in the original case *or* file a separate action against the bond's surety or principal.  *See* Del. Ct. Ch. R. 65.1.

Here, to the extent Stream's claims are premised upon the Omnibus Agreement-related allegations, they are barred by the injunction bond rule.  If Stream wishes to seek monetary recovery from SeeCubic related to the issuance of the Court of Chancery's injunction and SeeCubic's ownership and control of the Collateral between that time and the Delaware Supreme Court Opinion, it is required to do so in the Court of Chancery.

## III.  THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

The Complaint should also be dismissed as to SeeCubic for the independently dispositive reason that it fails to state a claim upon which relief can be granted.

A.    **Debtors Fail to State a Claim Against**
      **SeeCubic for Tortious Interference (Count VII)**

Debtors' tortious interference claim is premised upon the alleged interference by "Defendants" with three purported business relationships: (i) ToJoy (¶¶ 71–72); (ii) Google (¶¶ 40, 124); and (iii) Bosch (¶¶ 41, 122).

1.    **Debtors' Claims Are Barred by the Statute of Limitations**

Debtors' claims for tortious interference are barred by Pennsylvania's two-year statute of limitations.  *See* 42 Pa. C.S.A. § 5524; *see also Daimler Trust v. Weng*, No. 22cv1082, 2023 WL 3740820, at *6 (W.D. Pa. May 31, 2023) ("Pennsylvania courts apply the two-year statute of limitations of 42 Pa. C.S.A. § 5524(3) to tortious interference with contractual relations claims.").

On its face, the Complaint's allegations demonstrate that Debtors' claims are untimely: (i) as to ToJoy, the Complaint alleges the interference occurred and ToJoy abandoned the project in **April 2020** (¶ 72); (ii) as to Google, the Complaint alleges that the purported contract was terminated in **February 2021** (¶ 124); and (iii) as to Bosch, the Complaint alleges that the agreement was "canceled less than a year after" the Court of Chancery's injunction, which was issued in December 2020 (i.e., it was canceled by **December 2021** at the latest) (¶¶ 94, 123).  The Complaint was filed in August 2023, well-after the limitations period expired for Stream's claims related to ToJoy, Google, and Bosch in April 2022, February 2022, and December 2022, respectively.  It is therefore time-barred and should be dismissed.

2.    **In any Event, the Complaint Does Not Sufficiently**
      **Plead any of the Elements of Tortious Interference**

As an initial matter, SeeCubic cannot be liable for any purported interference with Stream's prospective relationship with ToJoy: the Complaint alleges that the ToJoy interference occurred in April 2020—and *only* by Defendant Kabacinski—which is *before* SeeCubic even existed. (¶¶ 71, 72; Ex. 1.)  As to Google and Bosch, the Complaint fails to state a claim.  To state a claim

in Pennsylvania for tortious interference with prospective contractual relations, a plaintiff must allege (i) the existence of a prospective relationship, (ii) purposeful action by the defendant specifically intended to prevent a prospective relation from occurring, (iii) the absence of privilege or justification on the part of the defendant; (iv) damage to the plaintiff, and (v) a reasonably likelihood that the relationship would have occurred but for defendants interference.  *See Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 178 (M.D. Pa. 2019).  "A prospective contractual relation 'is something less than a contractual right, something more than a mere hope.'" *W. Chester Design Build, LLC v. Moses*, No. CA No. 22-1911, 2022 WL 15524950, at *3 (E.D. Pa. Oct. 27, 2022) (citation omitted).  The Complaint fails in multiple respects.

### (a)   Debtors Fail to Allege an Actual or Prospective Contract

Debtors do not sufficiently allege a prospective contractual relation that goes beyond a "mere hope" that was objectively "reasonably likely to" materialize into contractual relations.

As to Google, Stream alleges that Google placed a purchase order for *two* sample units and had only "commenced negotiations" for an actual, contractual engagement.  (¶ 40.)  But a past contractual relationship (e.g., the two sample units) is *not* sufficient to plead a future expectancy. *See Phillips v. Selig*, 959 A.2d 420, 428-29 (Pa. Super. 2008); *see also BP Environ. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 412 (E.D. Pa. 2013) (holding that an allegation that the plaintiff had a prior "exclusive, ten (10) year relationship" with the third-party was insufficient). Likewise, the existence of preliminary negotiations is insufficient.  *See Arsenal, Inc. v. Ammons*, CA No. 14-1289, 2017 WL 4310248, at *9-10 (E.D. Pa. Sept. 28, 2017).

As to Bosch, the Complaint does not allege that *Debtors*—Stream or Technovative—had any existing or prospective agreement with Bosch.  Rather, the Complaint concedes that a different company, Stream TV International, B.V., was the signatory to the prior contract.  (¶ 41.). Moreover, at the time Bosch cancelled the contract, SeeCubic had assumed the contract pursuant

to the Omnibus Agreement. A party cannot tortiously interfere with its own contract, so any damages resulting from the contract's cancellation would have fallen on SeeCubic, not Stream TV International, B.V. *See Kernaghan v. BCI Commc'ns, Inc.*, 802 F. Supp. 2d 590, 597 (E.D. Pa. 2011) ("Under Pennsylvania law, a claim for tortious interference will survive only if a defendant is not a party to the contract alleged to have been tortiously interfered with.").

### (b)    Debtors Cannot Allege the Absence Of Justification Because SeeCubic's Actions Were Undertaken Pursuant to a Court Order

Unlike in many jurisdictions, where privilege or justification is an affirmative defense to tortious interference, Pennsylvania law requires *plaintiffs* to affirmatively plead and prove the absence of such privilege or justification. *See Acumed LLC v. Advance Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

As to both Google and Bosch, Debtors fail to sufficiently plead the absence of privilege or justification. To the extent Debtors' claim is that SeeCubic acted without privilege or justification in seeking to enforce the Omnibus Agreement and taking over those relationships in the first instance, such an argument fails. Courts "accord substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern." *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 321 F. Supp. 3d 503, 518-19 (M.D. Pa. 2018), *aff'd*, 816 F. App'x 644 (3d Cir. 2020). A defendant's enforcement of its contractual rights—here, the Omnibus Agreement, which had not been found to be invalid at the time of the events Debtors complain of—is generally justified and privileged. *See id.* at 518–22.

Moreover, for purposes of intentional torts and similar claims, actions taken in conformance with a court order have repeatedly been held to be privileged, justified, and *not* unlawful. E.g., *Easter v. City of Dallas Probate Div.*, No. 21-CV-0860-D (BH), 2022 WL 2975349, at *11 (N.D. Tex. June 27, 2022) (property transferred pursuant to court order could not

be subject of conversion claim); *Singleton v. Cannizzaro*, 372 F. Supp. 3d 389, 411 (E.D. La. 2019) (no Fourth Amendment violation by prosecutors for meeting with a witness when the meeting was held pursuant to a court order), *aff'd in part, appeal dismissed in part*, 956 F.3d 773 (5th Cir. 2020); *Slaieh v. Simons*, 584 B.R. 28, 42-43 (Bankr. C.D. Cal. 2018) (no violation of California unfair competition statute related to bankruptcy trustee's sale of estate property where sale was done pursuant to order from the bankruptcy court).[19]  This is so ***even if,*** as here, the relevant court order is later vacated.  *See In re M.T.G., Inc. v. Comerica Bank*, 646 B.R. 1, 178-79 (Bankr. E.D. Mich. 2022) (no violation of automatic stay where the actions complained up "were authorized by the Court's order *at the time they took such actions*.  The actions of Taunt and his attorneys did not retroactively become stay violations when the Court vacated these orders many years later")[20]

In light of this, the Complaint conclusively pleads only that "Defendants' actions to interfere with the [Google and Bosch relationships] were intentional, purposeful, and without any justification on the part of the Defendants."  (¶¶ 171, 175.)  This is precisely the type of "formulaic recitation of the elements of a cause of action" that is insufficient to state a claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Santiago v. Warminster Tp.*, 629 F.3d 121, 128 (3d Cir. 2010).

---

[19]     *See also Whitehead v. Allied Signal, Inc.*, No. 98-6305, 1998 WL 874868, at *2 (10th Cir. 1998) ("It is a general rule of tort law that court orders validate actions that would otherwise constitute intentional property torts such as conversion and trespass.").

[20]     Additionally, SeeCubic's assumption of Stream's relationships with both Google and Bosch occurred *after* the Court of Chancery issued its preliminary injunction holding the Omnibus Agreement to be valid and facilitating the transfer of Stream's assets to SeeCubic.  (¶¶ 123–24.) While Stream may disagree with how SeeCubic managed those relationships and projects, at the time of the conduct Stream complains of, those relationships and contracts belonged to SeeCubic to manage as it saw fit.

**(c)   The Complaint Does Not Allege
SeeCubic's Conduct Was Intended to Harm Stream**

The Complaint does not allege that any actions SeeCubic took with respect to Google or

Bosch were intended specifically to harm Stream.  *See Clarity Sports Int'l*, 400 F. Supp. 3d at 178;

*Genn v. Point Park College*, 272 A.2d 895, 899-900 (Pa. 1971) ("It must be emphasized that the

tort we are considering is an intentional one: the actor is acting as he does For [sic] the purpose of

causing harm to the plaintiff.").

Again, the Complaint largely relies on the conclusory assertion that SeeCubic, together

with the other Defendants, intended to interfere with and harm Stream's business relationships.

This is not enough.  Neither, however, are the Complaint's few more specific allegations.  For

example, while the Complaint alleges that SeeCubic tried to renegotiate the contract with Bosch

and delivered what Stream deems to be samples of unacceptable quality (¶ 123), nowhere does the

Complaint allege *facts* to support the notion that those actions were undertaken to harm Stream.

*See Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 575-76 (7th Cir. 1996) (affirming dismissal where

there was nothing that "suggests that [defendants] acted for any reason other than the proper one

of increasing the corporation's profits and prospects").  Likewise, as to Google, Stream asserts that

there was "poor customer management" via SeeCubic's efforts to obtain information about Stream

but Debtors' speculation as to the reason for this information-gathering is insufficient to plead an

intent to harm Stream.  (¶ 124.)

**B.   Debtors Fail to State a Claim Against SeeCubic
For Aiding and Abetting Breach of Fiduciary Duty (Count XI)**

The Complaint fails to state a claim against SeeCubic for aiding and abetting breach of

fiduciary duty (Compl. Count XI).  The Complaint alleges that SeeCubic aided and abetted

breaches of fiduciary duty by Outside Directors Kabacinski, Gola, and Gollop for their role in the

execution of the Omnibus Agreement on Stream's behalf.  (¶¶ 206–07.)  As the Complaint itself

pleads, the Omnibus Agreement was signed on May 6, 2020. (¶ 74.) SeeCubic did not *exist* until May 20, 2020. Ex. 1. It is facially impossible that SeeCubic aided and abetted any alleged breach of fiduciary duty relating to the genesis of the Omnibus Agreement.

Similarly, it is impossible that SeeCubic could have aided and abetted Stastney's alleged breaches of fiduciary duty. The Complaint alleges that SeeCubic aided and abetted Stastney's purported breaches of fiduciary duty by (i) "initiating the Crawford Lawsuit"; (ii) "insisting that Stastney be named CFO of Stream"; and (iii) "suggesting Stream expand its Board of Directors." (¶ 205.) Again, the Complaint itself pleads that all of these events happened *months* before SeeCubic's May 20, 2020 formation. (¶ 58 (the Crawford lawsuit was filed on January 3, 2020)); (¶ 62 (Mr. Stastney was named Chief Financial Officer on December 1, 2018)); (¶ 66 (Stream expanded its board of directors in February 2020.))

SeeCubic also could not have aided and abetted Stastney's alleged fiduciary breaches of (i) "intimidating and threatening McCarthy" in 2021 (which the Complaint *does not actually allege* Stastney participated in (¶¶ 98, 205)); (ii) "restricting access to the Company's servers" in 2020; and (iii) "seizing Stream's assets" (¶ 205) because, as the Complaint recognizes (¶ 63), Stastney ceased being an officer or director of Stream *prior to* those events and thus did not owe Stream any fiduciary duties at that time. *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 51 (Del. 2006) ("Just as Delaware law does not require directors-to-be to comply with their fiduciary duties, former directors owe no fiduciary duties, and [after his termination], Ovitz could not breach a duty he no longer had." (citation omitted)).

In any event, to the extent premised on these events, Stream's aiding and abetting breach of fiduciary duty claim also fails for the independent reason that it is barred by the statute of limitations. Regardless of whether Delaware's three-year period, *see Dubroff v. Wren Holdings,*

*LLC*, Nos. 3940-VCN, 6017-VCN, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011), or Pennsylvania's two-year period, *see* 42 Pa. C.S.A. § 5524, applies, Debtors' claims are untimely. Each of these events, other than the purported intimidation of McCarthy that Debtors do not allege Stastney participated in, occurred in 2019 and the first half of 2020.  (¶¶ 28, 58, 62, 66, 255, 259.) The Complaint was not filed until August 12, 2023.

### C.    Debtors Fail to State a Claim for Trade Secret Misappropriation Under Either Federal or Pennsylvania Law (Counts XVII and XVIII)

The Complaint fails to plausibly claim trade secret misappropriation by SeeCubic under the federal Defend Trade Secrets Act ("DTSA") or Pennsylvania's Uniform Trade Secrets Act ("PUTSA").

### 1.    There Is No Private Right of Action Under 18 U.S.C. § 1832(A)(1)

For the DTSA claim, Debtors assert that "Defendants" violated 18 U.S.C. § 1832(A)(1). (Compl. at 62.)  This is a *criminal* provision with no private right of enforcement.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 842–43 (E.D. Va. 2017); *Nelson Bros. Pro. Real Estate LLC v. Jaussi*, No. 17 Civ. 0158 (DOC), 2017 WL 8220703, at *6 (C.D. Cal. Mar. 23, 2017).  Count XVII should be dismissed on those grounds alone.

### 2.    Debtors Fail to State a Claim for Trade Secret Misappropriation

Even if Debtors had brought suit under the provision of the DTSA that concerns private civil actions, both the DTSA and PUTSA claims should be dismissed because the Complaint fails to state a claim.  To plead a claim of trade secret misappropriation under the DTSA, 18 U.S.C. § 1836, a plaintiff must provide plausible factual allegations "(1) that they own a trade secret and (2) that the defendant misappropriated the trade secret."  *Ecosave Automation, Inc. v. Del. Valley Automation, LLC*, 540 F. Supp. 3d 491, 500 (E.D. Pa. 2021) (citation omitted).  To plead a claim for trade secret misappropriation under PUTSA, a plaintiff must provide plausible factual

allegations to support "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Id.* (citation omitted). "The alleged trade secret must be particular to [the plaintiff] and not to the industry itself and must not be available through an independent source." *Id.*

### (a)    The Complaint Does Not Identify Debtors'
### Alleged Trade Secret(s) With Sufficient Specificity

To adequately plead the existence of a trade secret, "[a] plaintiff must identify the trade secret with enough particularity as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." *Herley Indus., Inc. v. R Cubed Eng'g, LLC*, No. 5:20-cv-02888, 2021 WL 229322, at *4 (E.D. Pa. Jan. 22, 2021) (citation omitted). Generally, "vague references to products and information will not suffice" to meet a plaintiff's pleading burden. *Id.* (citation omitted).[21] This is because "[t]rade secrets are a *narrow category* of confidential information; to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value." *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) (emphasis added). A complaint that provides "no hint at what the relevant trade secrets might be," or one that fails to allege that a party "actually succeeded in misappropriating any trade secrets" is inadequate. *Danping Li v. Gelormino*, No. 3:18-cv-442, 2019 WL 1957539, at *8 (D. Conn. May 2, 2019).

---

[21]    As one court explained, the reason for requiring that trade secrets be pleaded with certain particularity is that in trade secret cases, "a plaintiff, seeking to disadvantage the defendant competitor, might make broad and unspecified charges of misappropriation, obtain full disclosure of the defendants' processes, and then tailor its own claims accordingly." *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12CV220 (WWE), 2012 WL 3113162, at *2 (D. Conn. July 31, 2012).

In support of their trade secret claims, Debtors allege that they "developed breakthrough glasses-free 3D display technology that they market and sell under the brand name 'Ultra-D'." (¶ 249.)  Debtors then define the "Trade Secrets" that they contend "Defendants" collectively misappropriated in an "everything-but-the-kitchen-sink" approach:

> The *proprietary and trade secret* information that Plaintiffs created and developed in connection with the Ultra-D products *includes, but is not limited to*, design files, drawings, specifications, manufacturing information, device, component, application, and configuration information (including with respect to displays for TVs, tablets, laptops, PCs, phones, automobiles, accessories, etc.), device packaging information, development roadmaps and plans, plans for the development and delivery of features and displays to individual clients, marketing plans, market analyses, future product plans and designs such as product specifications, product forecasts, definitions, research and development, patentable technologies, source code, cost information, existing and potential business opportunities and strategies, client lists, sales and customer information, sales prospect pipelines as well as details regarding the prospects, sales playbook, marketing and sales projections, financial information, and business plans relating to existing and future products, customers, and markets.

(*Id.* (emphasis added).)  This is insufficient to plead a trade secret for multiple reasons.

*First*, it is unclear what among this laundry-list of items is simply "proprietary" and what is a "trade secret."  Even if Debtors keep all of this information *confidential*, it is their burden to specifically allege *trade secrets*.  *See Elsevier*, 2018 WL 557906, at *4–6 (dismissing trade secret claims where pleading conflated narrow concept of trade secret with broad concept of confidential information).  As defined, Debtors' list expressly includes "proprietary and trade secret information" with no attempt to discern between the two.  (¶ 249.)

*Second*, Debtors' non-exhaustive list cannot satisfy their burden to identify the alleged trade secrets with sufficient particularity.  District courts inside and outside the Third Circuit have *repeatedly* held that similar, non-exhaustive descriptions of trade secrets—using phrases like

Debtors do here of "including, but not limited to," "etc.," and the like—fail because they do not

sufficiently put the defendant on notice of the boundaries of the alleged secrets.[22]

For example, a definition of "trade secrets" that the District of Delaware recently found

"seemingly boundless" and too broad to meaningfully provide the defendants—or the court—with

notice of what the alleged trade secrets were, *Power Integrations, Inc. v. Silanna Semiconductor

N.A., Inc.*, No. 19-1292-LPS, 2020 WL 3508078, at *3 (D. Del. June 29, 2020), bears remarkable

similarities to Debtors' definition of their "Trade Secrets."

| Debtors' "Trade Secrets" | Insufficiently Identified Trade Secrets In *Power Integrations* |
|---|---|
| "The proprietary and trade secret information that Plaintiffs created and developed in connection with the Ultra-D products **includes, but is not limited to**, design files, drawings, **specifications**, manufacturing information, device, component, application, and configuration information (including with respect to displays for TVs, tablets, laptops, PCs, phones, automobiles, accessories, etc.), device packaging information, development roadmaps and plans, plans for the development and delivery of features and displays to individual clients, marketing plans, market analyses, **future product plans and designs such as product specifications, product forecasts, definitions, research and development, patentable technologies**, source code, **cost information**, **existing and potential business opportunities and strategies**, client lists, sales and customer information, sales prospect pipelines as well as details regarding the prospects, sales playbook, | Trade secrets "**includ[e] but [are] not limited to product specifications, product forecasts, definitions, designs, research and development, patentable technologies**, particularized costing information, bill of materials, customer acquisition, **business opportunities and strategies**, **marketing and sales projections, and business plans relating to Power Integrations' new and future products**." *Power Integrations*, 2020 WL 3508078, at *3 (emphasis added) (citation omitted). |

---

[22]     *See also Cutera, Inc. v. Lutronic Aesthetics, Inc.*, No. 20-CV-00235-KJM-DB, 2020 WL 4937129, at *5 (E.D. Cal. Aug. 24, 2020) (dismissing trade secret claim relying on phrase "includes, but is not limited to" (citation omitted)); *Becton, Dickinson & Co. v. Cytek Biosciences Inc.,* No. 18-cv-00933-MMC, 2018 WL 2298500, at *3 (N.D. Cal. May 21, 2018) (dismissing claim, holding trade secrets were "too broadly stated" because of terms used and inclusion of "other . . . products" (citation omitted)); *Emazing Lights LLC v. De Oca*, No. SACV 15-1561 (AG) (Ex), 2016 WL 3658945, at *2 (C.D. Cal. Jan. 7, 2016) (dismissing claim, holding trade secrets not sufficiently defined where "include[] but are not limited to" language was used (citation omitted)).

| Debtors' "Trade Secrets" | Insufficiently Identified Trade Secrets In *Power Integrations* |
|---|---|
| **marketing and sales projections**, financial information, and **business plans relating to existing and future products, customers**, and markets." (Compl. ¶ 249 (emphasis added).) | |

Moreover, while the definition of "Trade Secrets" is already exceedingly broad and undefined, Debtors attempt to sweep in even more undefined information by including a catch-all allegation for other confidential information. (¶ 280.) Such an allegation unquestionably does not pass muster on a motion to dismiss. *See Arconic, Inc. v. Novelis Inc.*, No. 17-1434, 2018 WL 5660173, at *2 (W.D. Pa. Aug. 3, 2018) ("The Special Master recommends that the three purported catch-all categories of trade secrets be stricken from the Trade Secret Identification Chart because they do not state with reasonable particularity what trade secrets are claimed. . . .").

Even where the Complaint attempts to make specific allegations of certain incidents of misappropriation, the alleged trade secrets involved remain insufficiently amorphous and undefined. For example, Debtors allege that SeeCubic employees (who were formerly employed by Stream) "retained hundreds of gigabytes of Plaintiffs' trade secret information regarding designs, functions, and implementation." (¶ 256.) Debtors do not identify what of these exceedingly broad categories—"designs, functions, and implementation"—are allegedly trade secrets and not just confidential information. Likewise, the Complaint alleges that SeeCubic has "presented demonstrator units containing Stream's Trade Secrets." (¶¶ 261, 264.) Given how broadly "Trade Secrets" is defined, these allegations are near meaningless.

Because the Complaint fails to sufficiently identify any trade secrets, Counts XVII and XVIII should be dismissed in their entirety.

**(b)**     **The Complaint Does Not Sufficiently Allege Misappropriation Under Either the DTSA or PUTSA Prior to June 15, 2022**

Even if Debtors had adequately identified any trade secrets (they do not), Counts XVII and XVIII also fail to allege misappropriation, which includes the improper acquisition, use, or disclosure of the purported trade secret. *See Danping Li*, 2019 WL 1957539, at *8-9. The Complaint's assertions that SeeCubic misappropriated Debtors' alleged trade secrets between December 2020 (when the Court of Chancery issued its injunction) and June 2022 (when the Court of Chancery's injunction was vacated), *see,* e.g., ¶¶ 257–62, fail because SeeCubic obtained and used the Collateral—which includes Debtors' intellectual property—by virtue of the Court of Chancery's December 8, 2020 preliminary injunction and order. (¶ 94.) As described (*see* pp. 37-38, *supra*), the acquisition, possession, use, or other activity with respect to property is *not* unlawful or improper where it was in conformance with or pursuant to a court order. The purported trade secrets belonged to SeeCubic, which could not have misappropriated its own property.[23]

**(c)**     **The Complaint Does Not Allege Reasonable Efforts to Maintain the Secrecy of the Purported Trade Secrets**

Independently dispositive, Debtors fail to adequately allege that they took reasonable measures to protect the purported trade secrets. Courts have dismissed trade secret claims where the allegations of reasonable protection do not differentiate between measures taken to protect trade secret information and measures to protect mere confidential corporate information. E.g., *Inv. Sci., LLC v. Oath Holdings Inc.*, No. 20 Civ. 8159 (GBD), 2021 WL 3541152, at *4 (S.D.N.Y.

---

[23]     For the same reason, Debtors' alternative argument that "Defendants" are liable for conversion if Debtors' purported trade secrets are *not* actually found to be trade secrets under PUTSA (¶ 280), fails. Ample authority holds that there can be no conversion where property was obtained via court order. (*See* pp. 37-38, *supra*; *see also Hornibrook v. Richard*, 171 N.E.2d 725, 734 (Mass. 2021) (plaintiff could not sustain claim for conversion where house at issue was sold pursuant to order of the probate court).)

Aug. 11, 2021) (granting motion to dismiss, holding that the complaint did not allege "a reasonable measure because it fails to differentiate from a protective measure that is used to safeguard any other corporate information"); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018) (granting motion to dismiss where plaintiff did "nothing to differentiate its protective measures for the alleged proprietary trade secrets from those imposed on any other corporate information").

Here, Debtors make the conclusory assertion that they "have undertaken that are reasonable under the circumstances to maintain the secrecy of Stream's Trade Secrets." (¶ 253; *see also* ¶ 273). Debtors' other allegations—of, for example, the use of passwords and encryption, the use of non-disclosure agreements, and employee confidentiality policies—speak only to standard business practices used to protect general corporation information. Debtors' list, in fact, expressly recognizes that these measures apply to general "confidential information." (¶ 253.) The ill-defined scope of the purported trade secrets (*see* pp. 42-45, *supra*) only compounds the issue: it is impossible to discern what protective measures applied to the subset of material that Debtors intend to assert is *actually* entitled to protection as a trade secret.

Moreover, where the owner of an alleged trade secret "discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished" and there can be no claim for misappropriation. *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (citation omitted). Here, Debtors expressly allege that they *publicly displayed* products embodying the alleged trade secrets at trade shows. (¶ 251.) Any alleged trade secrets discernible to the public from those displays cannot form the basis of Debtors' misappropriation claims. E.g., *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 778–79 (1965) (Manufacturer's know-how

was not trade secret protected from use by former employee where product had been sold on the open market and its features had been the subject of advertising material and extensive coverage in trade press.).  Again, Debtors' non-exhaustive, ill-pleaded list of purported trade secrets renders it impossible to determine which alleged trade secrets may have been publicly displayed and which remain secret, further underscoring that dismissal is appropriate.

### D.    Debtors Fail to State a Claim Against SeeCubic for Turnover and Accounting (Count I)

Turnover is an appropriate remedy for a debtor "to obtain what is acknowledged to be property of the bankruptcy estate" held by another entity during the chapter 11 case.  *Dershaw v. Ciardi (In re Rite Way Elec., Inc.)*, 510 B.R. 471, 484 (Bankr. E.D. Pa. 2014) (citation omitted); *see* 11 U.S.C. § 542(a).  To state a claim for turnover under section 542(a), the Complaint must establish each of the following elements with respect to each property: "(1) the defendant is in possession, custody, or control; (2) of property that may be used, sold, or leased under § 363; (3) during the case; and (4) the property is not of inconsequential value or benefit to the estate."  *Miller v. Jannetta (In re Irwin)*, 509 B.R. 808, 815 (Bankr. E.D. Pa. 2014) (citing *Zazzali v. Minert* (*In re DBSI, Inc.*), 468 B.R. 663, 669 (Bankr. D. Del. 2011)).  The Complaint fails to make this showing.

### 1.    Debtors Do Not Sufficiently Identify the Property at Issue

The Debtors' description of the relevant property is so generalized and haphazard that it is near impossible to ascertain exactly what the Debtors are requesting to be turned over.  The Complaint identifies no fewer than 22 types of property, which can generally be categorized as: (i) interests that cannot be defined as "property"; and (ii) property described too vaguely to provide any basis for concluding that it is part of the Debtors' estates.  None of these satisfies the standard for turnover under Section 542.

### (a)    Several Interests Cannot Be Considered "Property"

The core of a turnover claim is that the property at issue is property of the debtor's estate. Under the Bankruptcy Code, an estate's property includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As a result, in order for something to be considered property of the estate, it has to be something in which it is possible to have legal or equitable title.

In the Complaint, the Debtors seek items—and even intangible concepts—that cannot be considered "property." For example, the Complaint seeks turnover of "details of all current SCBV activities and projects" (¶ 136) and "Stream's global business relationships with customers, investors, strategic partners, manufacturers, vendors, and other companies." (¶ 128). Debtors also puzzlingly seek turnover of orders from this Court—orders that are not yet issued nor even considered by the Court—related to proceedings involving non-debtor subsidiaries in the Netherlands multiple levels down in the corporate structure. (¶¶ 134, 136.) Simply put, Debtors attempt to expand the turnover remedy to cover things it simply cannot and does not. *See Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 851 n.39 (Bankr. S.D.N.Y. 2013) ("[T]he turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable."). In addition, Section 542(a) provides a mechanism only for the turnover of property—not equitable remedies. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983). Ordering Defendants to petition the Amsterdam Court to restore Mr. Rajan as director of SCBV would be an equitable remedy not authorized by section 542(a). The Court should dismiss the turnover claim with respect to Debtors' attempts to obtain turnover of items or concepts that cannot and are not "property" and that cannot be redressable by 542(a).

49

**(b)**     **Most of the Property Claimed by the Debtors Is**
**Not Sufficiently Identified to Establish Debtors' Interests**

As with the purported "Trade Secrets," most of the property that is the subject of Debtors'

turnover claim is described either too broadly or too vaguely to sufficiently show any factual basis

on which to assert that such property is property of the Debtors' estates.

Such property includes, but is not limited to, "technology demonstrator units of every kind"

(¶ 133); "business computers" (*id.*); "books and records" (*id.*); "all customer contracts" (¶ 135);

"customer and prospective customer data" (*id.*); "investor and prospective investor data" (*id.*);

"strategic partner data" (*id.*); and "all other assets relating to and derived from use of Debtors'

assets by Defendants and their affiliates." (*Id.*). Each of these pieces of property raises basic, but

critical, follow-up questions: which business computers? Whose books and records? What

strategic partners and what data?

Debtors do not point to specific items that are their property; rather, they are asserting

generalized and catch-all categories in an attempt to cast as wide a net as possible. This is not a

permissible use of the turnover remedy. *See Finkel v. Polichuk (In re Polichuk)*, Bankr. No. 08-

10783ELF, Adv. No. 10-0031ELF, 2010 WL 4878789, *3 n.13 (Bankr. E.D. Pa. Nov. 23, 2010)

("[T]o the extent that the Trustee seeks turnover of any other property, the Complaint does not

identify the property at issue with any specificity and any bankruptcy estate ownership claim is in

dispute."); *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 67 (Bankr. S.D.N.Y.

2004) (dismissing a count for accounting and turnover where "[t]he Court is left to guess as to

which property the Trustee specifically seeks").

50

Moreover, Debtors' claim regarding "all other assets relating to and derived from use of Debtors' assets" is a particularly egregious catch-all attempt.[24]  As the Debtors are aware, following execution of the Omnibus Agreement, SeeCubic legally ran the business for 18 months, resulting in "incremental value that [SCI] conferred." (¶ 103.)  That incremental value may very well be derived from assets the Debtors assert are theirs; but the Chancery Court acknowledged that the incremental value belongs to SeeCubic.  (*Id.*)  The Debtors offer no basis for their assertion that such derivative "assets" **are** property of their estate.

### 2.    Debtors Do Not Sufficiently Plead That SeeCubic has Possession of Certain Property, And Other Property Is Subject to a Bona Fide Dispute

Debtors also fail to sufficiently plead several other elements of their turnover claim.  *First*, in some instances, Debtors do not plead sufficient facts to demonstrate that SeeCubic possesses the alleged property.  For example, Stream seeks turnover of "Stream's subsidiary companies . . . including but not limited to SCBV." (¶ 128.)  Stream does not plead, however, that SeeCubic is in possession, custody, or control of those subsidiaries.  Nor could it: Stream is the ultimate owner of those companies, and the Complaint itself acknowledges that SeeCubic does not control the Dutch subsidiaries.  (¶¶ 33, 34.)

As another example, Stream seeks turnover of the Bonding Equipment.  The Debtors acknowledge, however, that the Bonding Equipment is "currently held in a China warehouse leased by SCBV"—Debtors' *own* indirect subsidiary.  (¶ 109.)  As a result, the Bonding Equipment

---

[24]    Debtors do provide two examples of such assets: "content, creation, conversion and special effects service contracts procured by SeeCubic India Pvt Ltd." and "casino and automotive projects initiated by Defendants and currently being managed by SCBV." (¶ 135.)  However, the Debtors' description of such assets does not at all suggest that they are property of the Debtors' estates.  The Debtors suggest only that the assets were "procured" by SeeCubic India and are managed by SCBV, respectively.  These facts are not sufficient to justify a turnover claim.

is not in SeeCubic's "possession" or "custody." The Debtors' assertion that "Stream has been unable to access this critical asset, and Stream's CEO has been told directly by the China warehouse landlord that [SeeCubic] owns the equipment, which cannot be released to Stream without the approval of 'the Shanghai lawyer,' who in turn stated he needs 'approval from the U.S. lawyers'" (*id*.) does not rescue their defective allegation. Rather than pleading that SeeCubic "controls" the Bonding Equipment, this assertion only pleads that Debtors lack control and that the Chinese landlord and some amorphous lawyers are the obstacle to Debtors' control.

*Second*, as to certain property, Debtors cannot maintain a claim for turnover because there is a bona fide dispute over title to the property. In applying only to "property of the bankruptcy estate," turnover is not applicable where a bona fide dispute exists as to the title of the property at issue. *In re Rite Way Elec.*, 510 B.R. at 484 (citation omitted); *see also Miller v. D&M Holdings US Inc. (In re Digit. Networks N. Am., Inc.)*, No. 15-11535 (KG), Adv. Pro. No. 17-50900 (KG), 2018 WL 3869599, at *5 (Bankr. D. Del. Aug. 13, 2018) ("[A] properly pleaded complaint asserting a claim for turnover must allege an undisputed right to recover the claimed debt. Turnover is not appropriate where there is a legitimate dispute over ownership of the property." (citation omitted).) A bona fide dispute exists where there is "a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *In re Rite Way Elec.*, 510 B.R. at 484 (quoting *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs. Inc.*, 865 F.2d 65, 66 (3d Cir. 1989)).

Here, multiple items of property for which the Debtors seek turnover are subject to a bona fide dispute. Chief among them is the Bonding Equipment, which Debtors now claim belongs to Stream (¶37), although elsewhere in the Complaint Debtors suggest that title transferred to SeeCubic. (¶189.) And at other points Debtors (as well as SeeCubic and the Secured Creditors)

have asserted that the Bonding Equipment belongs to SCBV. *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. Apr. 7, 2023), ECF No. 90, at 8. SeeCubic also claims title to the Bonding Equipment. *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. May 8, 2023), ECF No. 194, at 20. Likewise, demonstrator units designed and created by SeeCubic after the Court of Chancery's injunction or those that pre-existed but were improved by SeeCubic are subject to dispute: Debtors disagree, but SeeCubic (correctly) claims that these items are SeeCubic's physical and intellectual property. *See Omnibus Agreement Action*, No. 2020-0766-JTL, ECF No. 308, at 3-4. And, even assuming board seats/control can be considered "property," control of the board seats of SCBV and the other Dutch subsidiaries—again, none of which are debtors or direct subsidiaries of the Debtors—has been the subject of legal proceedings in the Netherlands for months. (¶¶ 113–117.)

### E.   Debtors Fail to State a Claim Against SeeCubic for Disallowance of Claims (Count III)

Count III (Disallowance of Claims, 11 U.S.C. § 502(d)) should be dismissed because the Debtors are unable to establish the required predicate claim for disallowance under Section 502(d). Pursuant to Section 502(d), only claims recoverable under Sections 542, 543, 550, or 553 or avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) are disallowable. *See* 11 U.S.C. § 502(d). Moreover, pursuant to its plain language, Section 502(d) is ***not*** applicable unless and until there is a judicial finding—with which a defendant has not complied—under one of the predicate claims. *See,* e.g., *Mktg. Res. Int'l Corp. v. PTC Corp. (In re Mktg. Res. Int'l Corp.)*, 35 B.R. 353, 356 (Bankr. E.D. Pa. 1984) ("Section 502(d) embraces the situation where the debtor or the trustee successfully prosecutes an action against a party under one of the sections designated in that section . . ."); *In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001) ("To disallow a claim under section 502(d) requires a judicial determination that a claimant is liable.");

*FBI Wind Down Inc. Liquidating Trust v. All Am. Poly Corp. (In re FBI Wind Down, Inc.*), 581 B.R. 116, 146 (Bankr. D. Del. 2018) ("If a debtor or trustee has not received a judicial determination, the party cannot avail itself of the benefits of section 502(d).") (citations omitted).[25] As a result, without an actual order granting the underlying action justifying disallowance under section 502(d), a plaintiff fails to make a claim for disallowance under section 502(d).

Of the potential predicate claims identified in Section 502(d), the Complaint purports to ground its disallowance claim in Sections 542, 548, and 550. (¶ 149 ("Together Defendants Hawk, SLS, and [SeeCubic] are all liable to the Plaintiffs pursuant to 11 U.S.C. §§ 542, 548, and 550").)[26] Each of these purported liabilities fails to provide the requisite judicial determination for disallowance.

*First*, notwithstanding Debtors' assertion of liability against SeeCubic pursuant to Sections 548 and 550 (*id.*), Debtors do not allege—nor could they—that they have obtained a judicial determination of SeeCubic's liability under these sections and that SeeCubic has failed to comply with that judgment. *See In re Lids Corp.*, 260 B.R. at 684 ("The fact that the Debtor states that it is confident that it will be successful in the preference action is immaterial. Until the Debtor obtains a judgment against [defendant] upon which [defendant] is liable for a preference, section 502(d) is not applicable."). Debtors do not even purport to *allege* a claim against SeeCubic pursuant to Sections 548 or 550: the Complaint invokes Sections 548 and 550 in seeking recovery

---

[25]    *See also see also In re Mountaineer Coal Co., Inc.*, 247 B.R. 633, 641 (Bankr. W.D. Va. 2000) (Section 502(d) "would not appear applicable unless and until a finding under one of the cited sections had been made and then the claimant had failed to comply with such ruling . . .").

[26]    Debtors do not raise any of the other nine bases for disallowing a claim under section 502(d) in their allegations regarding this Count.

for fraudulent conveyance against the Director Defendants (Count IX), which is not defined to include SeeCubic.  (¶¶ 189–90.)[27]

*Second*, and similarly, Debtors do not allege—nor could they—that they have obtained a judicial determination of SeeCubic's liability under Section 542 with which SeeCubic has failed to comply.  This is fatal to Debtors' claim.  *See* pp. 53-54, *supra*.  Though Debtors assert a claim against SeeCubic in the Complaint for turnover under Section 542, these are merely allegations—and defective ones at that.  *See* Part III.D, *supra*.

### F.    Debtors Fail to State a Claim Against SeeCubic for Equitable Subordination (Count IV)

Equitable subordination is an extraordinary remedy "applied sparingly."  *Walnut Creek Mining Co. v. Cascade Inv. LLC* (*In re Optim Energy, LLC*), 527 B.R. 169, 175 (D. Del. 2015) (citation omitted).  To establish a claim for equitable subordination, a plaintiff must plead and prove that: (1) defendant engaged in some type of inequitable conduct; (2) the inequitable conduct resulted in injury to other creditors or conferred an unfair advantage upon defendant; and (3) equitable subordination is not inconsistent with provisions of the Bankruptcy Code.  *See,* e.g., *Knox v. Lion Hendrix Cayman Ltd. (In re John Varvatos Enters. Inc.)*, No. 21-2766, 2022 WL 2256017, at *2 (3d Cir. June 23, 2022).  Debtors cannot satisfy the threshold inquiry—

---

[27]    Debtors could not state a claim under either section 548 or 550 in any event.  Section 548 permits a debtor to avoid any transfer of a debtor's property or any obligation incurred by the debtor as long as the debtor made or incurred such transfer or obligation within two years of the petition date (among other statutory requirements).  11 U.S.C. § 548(a)(1).  The only transfer involving SeeCubic would be the transfer of Stream's assets to SeeCubic in 2020 pursuant to the Omnibus Agreement and Court of Chancery's injunction.  (¶¶ 74–75, 94.)  The Debtors filed these Chapter 11 Cases on March 15, 2023, more than two years later.  (¶ 121.)  As a result, a claim against SeeCubic under Section 548 is not available, nor is a claim under Section 550, which contemplates recovery of property avoided under the Bankruptcy Code's avoidance provisions (which include Section 548).  *See* 11 U.S.C. § 550(a).

demonstrating egregious inequitable conduct—and their equitable subordination claim should be dismissed.

Where a defendant is not an insider of the debtor—such as here[28]—a plaintiff bears a heavy burden to establish inequitable conduct: the plaintiff must prove that the inequitable conduct rises to the level of gross and egregious conduct. *See Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("[I]f the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary." (quoting *Fabricators, Inc. v. Tech. Fabrications, Inc. (In re Fabricators*, *Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991))).  This requires a showing of fraud, overreaching, or other egregious misconduct that must be proven with particularity. *See Waslow v. MNC Com. Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 118 (E.D. Pa. 1993) ("[T]he trustee must prove more egregious conduct such as fraud, spoliation or overreaching, and prove it with particularity.") (citations omitted), *aff'd*, 37 F.3d 1487 (3d Cir. 1994).  Accordingly, this standard required to equitably subordinate a non-fiduciary, non-insider "is rarely if ever met." *Austin v. Chisick (In re First All. Mortg. Co.)*, 298 B.R. 652, 667 (C.D. Cal. 2003), *aff'd*, 471 F.3d 977 (9th Cir. 2006).

This Complaint merits no exception.  Once again, the Debtors offer only vague legal conclusions as evidence of inequitable conduct.  (¶ 153 ("Defendants have engaged in inequitable conduct, including, without limitation, a civil conspiracy, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and breach of contract.").)  As an initial matter, the Debtors fail to state a claim with respect to each of those allegations, as described herein.  *See* pp. 39-40,

---

[28]     The Debtors do not allege that SeeCubic is an insider of the Debtors, nor would such an allegation be successful.  *See* 11 U.S.C. 101(31)(B) (defining insiders of a corporation).  In fact, the Debtors assert throughout the Complaint that SeeCubic is a "competitor" of the Debtors.  (¶¶ 5, 112, 126, 276.)

*supra.* Regardless, the Debtors allege no facts to support a finding that SeeCubic's conduct was egregious. Much of the conduct the Complaint identifies concerns conduct authorized by the Omnibus Agreement—and the Court of Chancery's order upholding the Omnibus Agreement—or SeeCubic's attempts to enforce its contractual rights under the Omnibus Agreement. (*See,* e.g. ¶ 75 (The Omnibus Agreement transferred Stream's assets to SeeCubic, which "wrongfully took possession" of them.); ¶ 87 (SeeCubic cited the Omnibus Agreement as authorizing its actions at the Dutch subsidiaries).) Such conduct is not inequitable. *See,* e.g., *Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 113 (Bankr. D. Del.) (reflecting that pursuing legal rights, including contractual rights, is not grounds for equitable subordination), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022); *O'Halloran v. Prudential Savs. Bank (In re Island View Crossing II, L.P.)*, 604 B.R. 181, 203 (Bankr. E.D. Pa. 2019) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the greatest discomfort of their trading partners, without being mulcted for their lack of 'good faith.'" (citation omitted)).

To the extent the Debtors believe that SeeCubic's conduct as it related to Google and Bosch was inequitable, there, too, they are mistaken. As discussed above, pg. 38, *supra*, while Stream may disagree with how SeeCubic managed those relationships and projects, which were transferred to SeeCubic pursuant to the Omnibus Agreement, those relationships and contracts *belonged to SeeCubic* to manage as it saw fit.[29]

---

[29]    Although the absence of inequitable conduct dooms the Debtors' equitable subordination claim, Debtors' claim would also fail with respect to the harm prong. The harm the Debtors allege with any specificity generally involves conduct related to the Omnibus Agreement. *See, e.g.*, the Debtors' allegation that SeeCubic's "poor management" with respect to the Bosch project injured Debtors to the tune of (a hypothetical) $2.5 million plus ongoing annual royalty payments. (¶ 123.) However, because acting in accordance with the Omnibus Agreement is not inequitable, the harm related to such conduct is insufficient for purposes of proving equitable subordination. *See In re After Six, Inc.*, 177 B.R. 219, 232 (Bankr. E.D. Pa. 1995) (a creditor's alleged failure to put other

*(cont'd)*

### G.    Debtors Fail to State a Claim Against
### SeeCubic for Determination of Secured Status and Priority (Count XII)

Under Section 506(a), a court can evaluate a secured creditor's claim and determine that such claim is secured to the extent of the value of the creditor's interest and unsecured to the extent that the value of the creditor's interest is less than the amount of such allowed claim. *See* 11 U.S.C. § 506(a). Given that Debtors granted all-asset liens to secure the SLS Notes and the Hawk Notes (¶¶ 44–45), the Debtors gain nothing from an argument that the amount of the SLS and Hawk claims exceeds the value of the liens. As a result, the Debtors are left with an argument that challenges whether SLS and Hawk (and, consequently, SeeCubic (¶¶ 237-38)) are secured in the first place. The Debtors cannot satisfy the burden of proof required to do so under Section 506(a), and the claim must be dismissed.

The Third Circuit applies a burden-shifting framework to the valuation of collateral "to decide the extent to which claims are secured pursuant to § 506(a)." *See In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012). This framework acknowledges that a properly filed proof of claim is *presumed* to be valid as to both the claim and the amount. *Id.* at 139-40 (referencing 11 U.S.C. § 502(a) and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure). As a result, the movant, as the party challenging that presumption, bears the initial burden. *Id.* at 140. If the movant makes a sufficient initial demonstration, the burden shifts to the creditor to demonstrate "both the extent of its lien and the value of the collateral securing its claim." *Id.* (citations omitted).

Debtors fail to satisfy the initial burden under the Third Circuit's burden-shifting framework. In support of their claim, Debtors state only that "many of the attachments by Hawk, [SeeCubic], and SLS as referenced herein were ineffectual, and that many of the attachments did

---

creditors' interests ahead of its own cannot constitute "inequitable conduct"—even of such "interests were contrary to those of other creditors.").

not reach Stream's accounts receivable." (¶ 213.)  In fact, there are no attachments discussed—let alone referenced—in the Complaint.  The Complaint's consideration of the creditors' secured status is limited to identifying that they received all-asset liens. (¶¶ 44–45.)  The Debtors do not provide any factual basis whatsoever to support a challenge to the creditors' secured status.

**H.      Debtors Fail to State a Claim Against
SeeCubic For Right to Setoff (Count XIII)**

Debtors purport to assert a claim for setoff pursuant to Bankruptcy Code section 558. Section 558 provides broadly that a debtor has the benefit of any defenses available against any other entity and thus preserves a debtor's right to effectuate setoffs under state law.  *See In re ADI Liquidation, Inc.*, No. 14-12092 (KJC), 2015 WL 4638605 at *11 (Bankr. D. Del. May 5, 2015). Pennsylvania recognizes a common law right to setoff.  *See U.S. Bank, Nat'l Ass'n v. Rosenberg*, 581 B.R. 424, 428 (E.D. Pa.), *aff'd*, 741 F. App'x 887 (3d Cir. 2018).  To state claim for setoff, the Debtors must (i) identify a debt that SeeCubic owes them and (ii) prove that "the debts between the creditor and the debtor are mutual."  *Id.* (citation omitted).

Debtors grasp at straws to identify a debt SeeCubic owes them, asserting merely that "Defendants owe a debt to Debtors in an amount in excess of $8,342,059 for legal fees and services." (¶ 217.)  This is entirely conclusory.  Not only do the Debtors fail to specify how much of that amount, if any, SeeCubic in particular allegedly owes, but the Debtors provide *no evidence whatsoever* supporting either (i) the amount or (ii) the conclusion that they are owed attorneys' fees in the first place.  For example, Debtors cite no statutory or contractual provision that would allow them to recover attorneys' fees from SeeCubic.  And, as a general matter, under both Delaware and Pennsylvania law—where the various disputes between Debtors and SeeCubic have played out—attorneys' fees are typically not awarded absent such a right or exceptional circumstances.  *See LeCrenier v. Cent. Oil Asphalt Corp*., No. CIV.A. 4927-VCN, 2010 WL

5449838, at *5 (Del. Ch. Dec. 22, 2010) ("[T]ypically litigants must pay their own attorneys' fees and expenses under the American Rule.  Only rarely do Delaware courts deviate from this standard." (footnotes omitted)); *see also id.* (denying request for fees); *In re Estate of Wanamaker*, 460 A.2d 824, 825 (Pa. 1983) ("The general rule is that each party to adversary litigation is required to pay his or her own counsel fees. . . .  In the absence of a statute allowing counsel fees, recovery of such fees will be permitted only in exceptional circumstances.").  Debtors identify no such circumstances here.

### I.       Debtors Do Not Properly Object to SeeCubic's Proofs of Claim (Count XV)

Debtors attempt to use the Complaint to assert an omnibus objection to SeeCubic's Proof of Claim No. 14 in Case No. 23-10763-mdc and Proof of Claim No. 3 in Case No. 23-10764-mdc (as well as to four other proofs of claim filed by Hawk and SLS).  (¶¶ 229–42.)  As an initial matter, Debtors generally may not join objections to different claims unless such joined objection is based solely on one of the grounds enumerated in Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "FRBP").  Fed. R. Bankr. P. 3007(d).  The grounds identified in Rule 3007(d) are intended to describe objections that "often can be resolved without material factual or legal disputes." Fed. R. Bankr. P. 3007 advisory committee's notes to 2007 amendment; *see also* 9 Collier on Bankruptcy ¶ 3007.04 (16th ed. 2023) (same).

On its face, the Complaint appears to fall within the parameters of an omnibus objection because the Debtors assert that SeeCubic's proofs of claim "duplicate the claims filed by Hawk." (¶ 239.)  *See* Fed. R. Bankr. P. 3007(d)(1).  A more detailed examination of Count XV reveals, however, that the basis for the Debtors' objection is not just that the claims are duplicative.  Instead, the bulk of the objection is that SeeCubic cannot raise these claims against Debtors because SeeCubic assigned its enforcement rights to Hawk. (¶ 238.)  Resolving Debtors' objections will

60

require material legal and factual inquiries, exactly the opposite of what the FRBP Advisory Committee Notes contemplate as justification for filing a joint objection to proofs of claim. *See* Fed. R. Bankr. P. 3007 advisory committee's notes to 2007 Amendment. As a result, Debtors may not file these objections jointly, as they attempt to do here. Improper joinder of objections is grounds for dismissal of the objections. *See Kirschenbaum v. Fed. Ins. Co. (In re EMS Fin. Servs., LLC)*, Bankr. No. 12-71324-ast, Adv. No. 12-8221-ast, 2013 WL 64755, at \*9 (Bankr. E.D.N.Y. Jan. 4, 2013) (granting a motion to dismiss because, among other issues, debtor's objections to claims were improperly joined).

To the extent the Court concludes that Debtors may join objections to these proofs of claim, Count XV should be dismissed because Debtors fail to meet their substantive burden for objecting to a proof of claim. A proof of claim "shall constitute prima facie evidence of the validity and amount of the claim" if the proof of claim is filed in accordance with FRBP 3007. Fed. R. Bankr. P. 3007(e); *see also In re Wolf*, 556 B.R. 676, 680 (Bankr. E.D. Pa. 2016); *see also id.* ("[A] proof of claim that complies with the rules of court serves as both a pleading and as trial evidence, even in the face of an objection to the claim") (quoting *In re Henry*, 546 B.R. 633, 634–35 (Bankr. E.D. Pa. 2016)), *aff'd*, 573 B.R. 179 (E.D. Pa. 2017), *aff'd*, 573 B.R. 179 (E.D. Pa. 2017), *aff'd*, 739 F. App'x 165 (3d Cir. 2018); *see also* Fed. R. Bankr. P. 3007(e). Debtors do not allege—because they could not—that SeeCubic failed to file the proofs of claim pursuant to the procedural requirements of FRBP 3001. As a result, the burden shifts to the Debtors to provide "evidence in support of [their] objection which must be of probative force equal to that of the allegations of the creditor's proof of claim." *In re Kincaid*, 388 B.R. 610, 613 (Bankr. E.D. Pa. 2008).

Debtors do not meet this burden. As discussed above, Debtors devote the entirety of their substantive argument to attempting to evidence that SeeCubic's proofs of claim are duplicative.

61

But as SeeCubic's proof of claim makes clear, SeeCubic is owed amounts in addition to what may be determined to be its portion of the secured debt.  Such amounts include, but are not limited to, the value SeeCubic conferred to the Debtors while SeeCubic was running the business (including a number of payments on behalf of the business in an amount not less than $37,000,000) as well as a payment of $917,171 SeeCubic made to a Chinese landlord on Stream's behalf.  *See, generally*, Proof of Claim 14 in Case No. 23-10763 and Proof of Claim 3 in Case No. 23-10764.

Debtors do not acknowledge, let alone try to refute, these bases of SeeCubic's proof of claim.  As a result, the Debtors do not offer evidence "of probative force equal to that of the allegations of [SeeCubic's] proof of claim."  *Kincaid*, 388 B.R. at 613.  Debtors do not satisfy their burden, and Count XV of the Complaint should be dismissed.

[*Remainder of page intentionally left blank.*]

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed as to SeeCubic.

Dated: November 13, 2023

Respectfully submitted,

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

*/s/  Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 206047)
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Justin M. Winerman (admitted *pro hac vice*)
Rebecca L. Ritchie (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0549
Facsimile: (312) 407-8641

- and -

Eben P. Colby (admitted *pro hac vice*)
Marley Ann Brumme (admitted *pro hac vice*)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Telephone: (617) 573-4800
Facsimile: (617) 573-4822

*Counsel for SeeCubic, Inc.*

## APPENDIX A: SUMMARY OF COMPLAINT

| | | SeeCubic | Stastney | SLS | Hawk | Morton | Crawford | Kabacinski | Gollop | Gola | Theune | SCBV | Various John/Jane Does |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Turnover & Accounting | X | X | X | X | X | X | X | X | X | X | X | X |
| 2 | Injunctive Relief | X | X | X | X | X | X | X | X | X | X | X | X |
| 3 | Disallowance of Claims (11 U.S.C. § 502(d)) | X | | X | X | | | | | | | | |
| 4 | Equitable Subordination | X | | X | X | | | | | | | | |
| 5 | Breach of Contract | | X | | | | | | | | | | |
| 6 | Negligence | | X | | | | | | X | X | X | | |
| 7 | Tortious Interference | X | X | X | X | X | X | X | X | X | X | X | X |
| 8 | Recharacterization of Loan as Equity | | | X | X | | | | | | | | |
| 9 | Fraudulent Conveyance | | X | | | | | | X | X | X | | |
| 10 | Breach of Fiduciary Duty | | X | X | X | | | | X | X | X | | |
| 11 | Aiding and Abetting Breach of Fiduciary Duty | X | X | X | X | X | X | X | X | X | X | X | X |
| 12 | Determination of Secured Status and Priority (11 U.S.C. § 506(a)) | X | | X | X | | | | | | | | |
| 13 | Set-Off (11 U.S.C. § 558) | X | | X | X | | | | | | | | |
| 14 | Equitable Disallowance | X | X | X | X | X | X | X | X | X | X | X | X |
| 15 | Objection to Claim | X | | X | X | | | | | | | | |
| 16 | Exemplary Damages | X | X | X | X | X | X | X | X | X | X | X | X |
| 17 | DTSA (18 U.S.C. § 1832(A)(1)) | X | X | X | X | X | X | X | X | X | X | X | X |
| 18 | PA Trade Secrets Pa. C.S.A. §§ 5301-5308 | X | X | X | X | X | X | X | X | X | X | X | X |
| 19 | Lender Liability | X | X | X | X | X | X | X | X | X | X | X | X |

**EXHIBIT 1**

