# Exhibit A

# AGREEMENT

 THIS AGREEMENT (this "**Agreement**") with an effective date of January 30, 2020 (the "**Effective Date**") regardless of when it is mutually executed, by and between STREAM TV NETWORKS, INC., a Delaware corporation (the "**Company**"), SLS HOLDINGS VI, LLC, a Delaware limited liability company ("**SLS**") and Shad Stastney in his personal and individual capacity separate and distinct from SLS ("**Stastney**"), ( each a "**Party**" and all collectively referred to as the "**Parties**").

# R E C I T A L S

**WHEREAS,** Stastney is Managing Partner of SLS, and

**WHEREAS**, Stastney was a member of the Company's board of directors until he issued to the Company a letter entitled "NOTICE OF CONSTRUCTIVE TERMINATION WITHOUT CAUSE" dated January 30, 2020 (a copy thereof attached hereto as Exhibit A) (the "**Notice**") informing the Company that he was "stepping down" from such position effective immediately, and

**WHEREAS**, Stastney entered into an employment contract on December 1, 2018 with the Company (the "**Employment Contract**") (a copy thereof attached hereto as Exhibit B) to serve as the Company's chief financial officer ("**CFO**"), and

**WHEREAS**, in the Notice Stastney claimed that he was "constructively terminated" as CFO by the Company for various alleged reasons and demanded certain payments and benefits under the Employment Contract and for unpaid expenses; and

**WHEREAS**, the Company and SLS have entered into that certain (i) Securities Purchase Agreement, dated August 8, 2011 (the "**First Securities Purchase Agreement**"); (ii) Securities Purchase Agreement, dated February 8, 2012 (the "**Second Securities Purchase Agreement**", together with the First Securities Purchase Agreement, the "**Purchase Agreements**" and each a "**Purchase Agreement**"); (iii) 5% Senior Secured Note, dated August 8, 2011, in the principal amount of US$3,000,000 ("**SLS Note 1**"); (iv) 5% Senior Secured Note, dated February 8, 2012, in the principal amount of US$1,500,000 ("**SLS Note 2**"); (v) 5% Senior Secured Note, dated May 1, 2012, in the principal amount of US$500,000 ("**SLS Note 3**"); (vi) 5% Senior Secured Note, dated July 5, 2012, in the principal amount of US$500,000 ("**SLS Note 4**"); (vii) 5% Senior Secured Note, dated May 29, 2012, in the principal amount of US$500,000 ("**SLS Note 5**", together with SLS Note 1, SLS Note 2, SLS Note 3 and SLS Note 4, the "**SLS Notes**"); and

**WHEREAS,** the SLS Notes have been amended from time to time for various reasons including extending their maturity dates;

**WHEREAS**, the SLS Notes are secured by certain security agreements dated August 8, 2011 and February 8, 2012 (together, the "**Security Agreements**"); and

**WHEREAS**, Company desires to purchase the SLS Notes (the "**Purchase**)" and SLS desires to sell all of its right, title and interest in and to the SLS Notes to Company (the "**Sale**"), and

**WHEREAS**, the Parties intend to resolve the matters arising from the Notice and the Sale in this single Agreement.

**NOW THEREFORE**, in consideration of the mutual promises made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Resolution of Stastney Individual Claims</u>.  As part of this overall Agreement, Stastney will be paid as follows:
   a. His back accrued salary of $152,500 plus his expenses of $50,000 will be paid on or before the close of business Friday, February 7, 2020.  This entire Agreement and all of the promises herein are null and void if any portion of this payment is delayed for any reason.  That accrued salary lump sum will be with the appropriate payroll and other taxes deducted, pursuant to the withholding preferences currently applicable to Stastney's payroll.
   b. As provided in the Employment Contract, Stastney will be paid his salary from January 15, 2020 until December 31, 2021 under the Company's normal payroll practices ("**Severance**"). Stastney will have no responsibilities to the Company; however, the Company may wish to pay Stastney for twelve (12) months ("**Lump Sum Payment**") at any point and payments made pursuant to this subsection shall be applied toward that Lump Sum Payment of the Severance.
   c. During the period of Severance, Stastney will also be entitled to benefits provided to other executives of the Company.

2. <u>Mutual Waiver</u>. All Parties, for themselves, their subsidiaries and affiliates, their successors, assigns, directors, parents, shareholders, employees, insurers, agents, and representatives, do hereby waive all other Parties, their successors, assigns, directors, parents, shareholders, employees, insurers, agents, and representatives, from any and all claims, controversies, causes of action, judgments, liabilities, losses, damages, costs, expenses, charges, taxes or attorneys' fees, whether direct or indirect, arising from circumstances related in any way to payments and service of Stastney.  The Parties agree and acknowledge that this Agreement is executed for the sole purpose of amicably settling outstanding matters. It is also expressly agreed and acknowledged that the execution or performance of any term of this Agreement shall not constitute or be construed as an admission of any liability or fault or any indication that any of the claims or defenses relating to the outstanding matters have any merit.

3. <u>Extension of SLS Notes</u>.  Notwithstanding anything to the contrary, SLS agrees to extend its maturity of all its Notes from February 1, to March 1, 2020 contingent on fulfillment of Section 1 above. If Stastney receives a timely payment as provided in 1.a. above, then there will be no declaration of default of the SLS Notes for so long as each future payment required under this agreement and its exhibits is made in full by the date required therefor.

4.   <u>Resolution of SLS Notes and Claims</u>.  Beginning with the fulfillment of Section 1 above, SLS agrees to repayment pursuant to the terms and conditions set forth at Exhibit C hereto.

5.   <u>Contingency of Hawk</u>.  As a condition to this Agreement in its entirety, the receipt by the Company of properly executed extension agreement by the Company and Hawk Investment Holdings Limited ("**Hawk**") agreeing to an extension of the maturity dates of the notes issued by the Company to Hawk on terms satisfactory to the Company.  It is understood that the extension for Hawk will have to be 91 days after the final installment payment has been made in full to SLS hereunder.

6.   <u>Consents</u>. All consents required by the Parties from third parties in relation to the execution of this Agreement have been received by the Parties.

7.   <u>Governing Law</u>.  This Agreement shall be governed exclusively by, and construed in accordance with, the laws of the State of Delaware USA.  Each of the Parties hereto hereby consents to the exclusive jurisdiction of the courts of the State of Delaware USA and any federal court sitting in Wilmington, Delaware USA.

8.   <u>Severability</u>.  In the event any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

9.   <u>Binding Effect</u>.  This Agreement shall be binding upon the Parties hereto, their successors and assigns.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date first above written.

**SLS:**

**SLS HOLDINGS VI, LLC**
a Delaware limited liability company,

By: _____
       Shad Stastney

Its:  Managing Partner

**Stastney:**

By: _____
       Shad Stastney

In his individual capacity

 **COMPANY:**

**STREAM TV NETWORKS, INC.**
a Delaware USA corporation,

By: _____
       Mathu Rajan

Its:  CEO

**EXHIBIT A**

**NOTICE-Letter of Mr. Stastney of January 30, 2020**

**[See attached in PDF]**

## NOTICE OF CONSTRUCTIVE TERMINATION WITHOUT CAUSE

Stream TV Networks, Inc.
Att.: Raja Rajan
2009 Chestnut Street
Philadelphia, PA 19103

Mr. Rajan:

As you know, on December 1, 2018, I entered into an Employment Agreement with Stream TV Networks, Inc., ("the Company") to serve as the Chief Financial Officer for the Company. Under the terms of my Employment Agreement, the Company agreed that I would perform the duties that are customary of chief financial officer in a company of a similar stage in the United States, until December 31, 2021, or until my employment was terminated, with or without cause.

Per Paragraph 7 of my Employment Agreement, a "constructive termination without cause" by the Company occurs if: "[T]he Employee's job requirements are significantly changed to be inconsistent with what would be common in industry for Employee's job title."

From the inception of the contract, and particularly since July 1, 2019, the Company has refused to involve me in communications regarding the Company or provide me the information and access necessary for me to fulfill my basic duties to the Company. The lack of information provided to me, despite repeated requests for such information, has rendered my job meaningless and the role is now completely inconsistent with what is common for a chief financial officer in our industry. Most recently, the Company informed me that it was not appearing at the Consumer Electronics Show, based on the lack of funding, which I had raised as a serious concern. However, the Company surreptitiously arranged to appear at the Consumer Electronics Show, and all employees who knew about that plan were specifically ordered by Mathu Rajan, the Company's CEO, to hide this plan from me.

Based on the Company's conduct, as of January 30, 2020, my position has significantly changed to be inconsistent with what is common for chief financial officers in our industry, and I have therefore been constructively terminated from my employment and any and all positions that I hold as an officer and/or manager of the Company. And as a result, I am hereby demanding the payments and benefits owed to me per Section 7 of my Employment Agreement. Specifically, the Company is contractually required to provide me:

- All pay, benefits, bonuses, and reimbursement for expenses for work performed and expenses submitted to the Company for reimbursement to-date, including without limitation payment for the pay period ending January 30, 2020, accrued but unpaid salary in the amount of $152,500, and unpaid expenses totaling approximately $50,000;
- Twelve (12) months of severance pay at my current base salary of $366,000 across the standard Severance Period (i.e., the twelve month period following the date of my constructive termination without cause);
- Immediate vesting of all stock options previously awarded to me;

- Release of any Restrictive Covenants imposed upon me under Section 8 of my Employment Agreement; and
- The continued ability to participate in the Company's group medical, health, and dental plans on the same terms as the Company's active employees during the Severance Period.

In addition to the foregoing, I am stepping down from the Company's Board of Directors effective immediately.  In so doing, neither I nor SLS HOLDINGS VI, LLC ("SLS") are waiving any of our rights under any agreements with the Company including, without limitation, SLS's rights to reappoint myself, or another member or members, to the Company's Board of Directors as specified in the Securities Purchase Agreement, dated August 8, 2011, between SLS and the Company and the Securities Purchase Agreement, dated February 8, 2012, between SLS and the Company.

Please confirm payment in full, via wire transfer to my personal account information currently on file with the company, of the payments and benefits owed to me under the terms of my Employment Agreement by February 3, 2020.  If I do not receive such confirmation, I will move forward and plan to pursue any and all claims I have against the Company, including among other things, a breach of contract claim for its failure to comply with the terms of my Employment Agreement.


_____

Shad Stastney

Dated:  January 30, 2020


CC:    Jon Hackbarth, Esq.
       Quarles & Brady
       411 E. Wisconsin Avenue
       Milwaukee, WI 53202

**EXHIBIT B**

**(Employment Contract)**

**[See attached in PDF]**

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "Agreement"), made as of this 1st day of December, 2018, is by and between **STREAM TV NETWORKS, INC.,** a Delaware corporation (the "Company"), and **Shad L. Stastney**, an individual (the "Employee").

## B A C K G R O U N D:

**WHEREAS,** the Company is engaged in the business of developing and marketing glasses-free technologies and electronic devices and related products; and

**WHEREAS,** the employee is one of the early investors in and board members of the Company and the Company has determined that it needs the specific expertise and experience of Employee to fill needs in the business;

**WHEREAS,** the Company desires to employ the Employee as an executive for the Company and the Employee desires to accept such employment on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

1. <u>Employment</u>.  The Company hereby employs the Employee as the Chief Financial Officer of Company and Employee hereby accepts such employment, upon the terms and subject to the conditions hereinafter set forth.

2. <u>Term</u>.  The term of employment of the Employee under this Agreement shall commence on the 1st day of December, 2018 and shall continue, unless earlier terminated in accordance with the provisions of Sections 6 or 7 hereof, until December 31, 2021 the "Initial Term"). This Agreement shall continue in full force and effect for consecutive one-year periods after the expiration of the Initial Term (each, a "Renewal Term"), unless either party shall give the other party at least 120 days prior written notice before the commencement of any such Renewal Term of such party's intention to terminate this Agreement. Notwithstanding anything to the contrary, a party's expression of non-renewal is not a termination of this Agreement. The Initial Term, together with each Renewal Term, is hereinafter referred to as the "Term."

3. <u>Office and Duties</u>.

   (a)  During the Term hereof, the Employee shall serve as Chief Financial Officer for the Company and shall perform such duties as are customary of such a position in a company of similar stage in the United States and such other duties as may from time to time be assigned to him by the Chief Executive Officer or the Board of Directors.

   (b)  During the term hereof, the Employee shall use his best efforts to carry out his duties and responsibilities hereunder.  Provided that such activities do not materially interfere with the performance of Employee's duties hereunder, nothing herein shall prohibit Employee

from (i) engaging in educational, charitable, civil, fraternal or trade group activities; (ii) investing his assets in entities or business ventures other than the Company, with customary oversight thereof; (iii) attending educational classes; and/or (iv) undertaking other consulting projects or serving on the board of other Companies.

(c)  The Employee represents and warrants to the Company that he is not subject to or a party to any employment agreement, non-competition covenant, non-disclosure agreement or other agreement, covenant, understanding or restriction which would prohibit the Employee from executing this Agreement and fully performing his duties and responsibilities hereunder, or which would in any manner, directly or indirectly, limit or affect the duties and responsibilities which may now or in the future be assigned to the Employee.

4.  <u>Compensation</u>.  As compensation for services to be rendered hereunder by the Employee, the Company agrees to pay or provide to the Employee:

(a) <u>Salary</u>.  For his services hereunder, the Company shall pay Employee $360,000 per annum, payable in accordance with the Company's standard payroll procedures and according to the board resolution effectuating this contract.

(b)  <u>Annual Bonus.</u>  The Company will pay an annual target bonus to Employee upon the basis of successful performance and which, if awarded, will be paid in the following year as one third (1/3) on or before March 31, one third (1/3) on or before June 30, and the balance on or before September 30th.  The target bonus shall be fifty percent (50%) of the Employee's cash salary.

(c) <u>Equity Rights.</u>  The Employee maybe granted rights to the Company's equity in stock options, as and when granted to employees after the current grant.  The amount of those grants shall be determined by the Board of Directors.

(d). <u>Change of Control</u>.  Upon the occurrence of a Change of Control, (i) all warrants, equity grants and/or restricted Units granted to Employee by the Company which have not vested will immediately vest and become exercisable, and (ii) and all amounts of accrued but unpaid salary will become immediately due and payable. For the purposes of this provision, a Change of Control will mean the occurrence of any of the following events: (i) an acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation but excluding any merger effected exclusively for the purpose of changing the domicile of the Company), or (ii) a sale of all or substantially all of the assets of the Company (collectively, a Merger), so long as in either case (x) the Company's members of record immediately prior to such Merger will, immediately after such Merger, hold less than 50% of the voting power of the surviving or acquiring entity, or (y) the Company's members of record immediately prior to such Merger will, immediately after such Merger, hold less than 60% of the voting power of the surviving or acquiring entity and a majority of the members of the Board of Directors or Managers of the surviving or acquiring entity immediately after such Merger were not members of the Board of Directors of the Company immediately prior to such Merger.  Notwithstanding anything to the

Stastney Employment Agreement

contrary herein, any third party capital investment into the Company, an initial public offering, or any other capitalization effort by the Company shall not be deemed a change of control.

(a) Medical.  Upon commencement of employment hereunder, the Employee shall be entitled to coverage under the Company's group medical, health and dental insurance plans in accordance with the terms and practices then in effect including the requirements of the Company's provider.  The Employee shall be entitled to elect family coverage for eligible family members at such time as coverage is made available by the Company for its employees and under such terms to employees in the same category as Employee.

(b) Other Benefits.  The Employee will be eligible to participate in the Company's 401(k) plan and any other benefit plans when they are developed and offered to other employees.   Employee will be entitled to personal, sick and holiday time in accordance with company policies.

5.  Expenses.  It is contemplated that in connection with employment hereunder, the Employee may be required to incur reasonable business, entertainment and travel expenses other than what is covered by the car and gas expense allowance.  The Company agrees to reimburse the Employee in full for such reasonable and necessary business, entertainment and travel expenses incurred or expense by him in connection with the performance of his duties hereunder; provided, the Employee submits to the Company vouchers or expense statements satisfactorily evidencing such expenses as may be reasonably required by the Company, and such expenses are in accordance with any corporate policy with respect thereto. All necessary business, entertainment and travel expenses must be approved prior to incurring them as provided in the Company's policy. All such expenses will be reimbursed to Employee according to its practices applicable to all other senior executive officers of the Company.

6.  Death and Disability.

(a) The term of employment of the Employee shall terminate immediately upon the death of the Employee.  At the option of the Company, in the event of any physical or mental incapacity or disability which has rendered the Employee unable, with reasonable accommodation, to perform the services required of him under this Agreement (the "Disability") for a period of 60 days during any period of 12 consecutive months, the Company shall have the right to terminate the Employee's employment upon 30 days' prior written notice to the Employee at any time after the end of such 60-day period.  If requested by the Company, such Disability shall be subject to verification by a qualified physician (Board certified to the extent certification is available in light of the nature of the Employee's Disability) reasonably selected by the Company.  During any period of Disability prior to termination, the Employee shall continue to be compensated as provided herein (less any payments due the Employee under Disability benefit programs paid for by the Company including social security disability, worker's compensation disability or retirement benefits).

(b) In the event of the death of the Employee during the period of employment or in the event of the termination of this Agreement by the Company because of the Disability of the Employee, the Employee shall be entitled to receive the compensation specified in Paragraph 4 earned by the Employee through the date of death or termination, bonus compensation to

which the Employee is entitled for and in respect of the preceding fiscal year if not theretofore paid, and any benefits referred to in Paragraph 4 hereof to which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted. The Company thereafter shall have no further obligations under this Agreement except for its obligation to pay any vested Employee benefits referred to in Paragraph 4 hereof.

    7.   Termination of Employment.

      (a) The Company may terminate this Agreement with cause immediately upon written notice to the Employee. "Termination for cause" shall mean discharge by the Company on the following grounds:

      (i)   The Employee's conviction in a court of law of any felonious crime or offense, which conviction makes him unfit for continuing employment, prevents him from effective management of the Company or materially adversely affects the reputation or business activities of the Company.

      (ii)   Dishonesty or willful misconduct which materially adversely affects the reputation or business activities of the Company and which continues after written notice thereof to the Employee, substance abuse for which the Employee fails to undertake and maintain treatment within 15 days after requested by the Company, or willful misappropriation of the Company's funds.

      (iii)   The Employee's (a) refusal to perform his duties in accordance with the terms of this Agreement or to carry out in all material respects the lawful directives of the Company or (b) breach of any of the express covenants herein including those of confidentiality or non-competition; provided that discharge pursuant to this subparagraph (iii) shall constitute discharge for cause only if the Employee has first received written notice from the Company stating with specificity the nature of such failure or refusal, the Employee has failed to cure such failure or refusal to perform within thirty (30) days after receiving such notice and, if requested by the Employee within 10 days after the expiration of such 15 day period, the Employee is afforded a reasonable opportunity to be heard before the Board.

      (iv)   Upon such termination for cause, the Employee shall lose all right, title and interest in and to all payments required to be made in accordance with the provisions of this Agreement, and the Company shall have no further obligation to the Employee hereunder, except for compensation pursuant to Paragraph 4 to which the Employee is entitled through the date of termination, bonus compensation to which the Employee is entitled for and in respect of the preceding fiscal year if not theretofore paid, and any benefits referred to in Paragraph 4 hereof to which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted. However, if the termination is under 7(iii)(a) above only, Employee shall be entitled to 60 days of payment of "salary" in effect at the time pursuant to section 4 (a) above.

    The Company may terminate the Employee without cause at any time subject to the advance notice provisions contained herein, and which may be waived by either party hereto in exchange for full pay to the Employee for such period. In the event of termination of the Employee

without cause at any time prior to the end of the then current Term, the Company shall pay or provide to the Employee (in addition to the Base Salary, bonus and other compensation to which the Employee shall have earned and the benefits the Employee shall be entitled to pursuant to Paragraph 4 hereof through the date of such termination and any benefits referred to in Paragraph 4 hereof in which the Employee has a vested right under the terms and conditions of the plan or program pursuant to which such benefits were granted), (i) the base salary then in effect pursuant to the provisions of Paragraph 4(b) hereof for an additional twelve (12) month period (except, in the case of such a termination within 12 months before or after a Change of Control, in which case base salary shall be paid for the greater of (i) an additional twelve (12) month period, or (ii) the remaining Term, payable in accordance with the Company's normal payroll practices ("Severance"), and (ii) the benefits referred to in Paragraphs 4 (c) relating to equity rights for the entire balance of the Term shall accelerate to immediate vesting. Additionally, during this period of Severance, Employee shall be entitled to continue participating in the Company's group medical, health and dental plans on the same terms as though he was an active employee. Upon the expiration of such Severance period, Employee shall then be entitled to elect COBRA continuation coverage under the relevant plans maintained by the Company at that time. For purposes of this section, it shall be deemed a "termination without cause" if the Company relocates its operations for which Employee is responsible and causes Employee to travel more than one (1) additional hour of travel to work and does not make arrangements for Employee to work remotely. It shall be deemed a constructive "termination without cause" if the Employee's job requirements are significantly changed to be inconsistent with what would be common in industry for Employee's job title. Severance shall also be paid for the cash salary for Employee and the right to elect continuing coverage of health insurance in the manner it was being carried by Employee for twelve (12) months after any non-renewal on the Initial Term or Renewal Term herein. Non-renewal at the election of the employee shall not give entitlement to Severance.

8.   Restrictive Covenants and Confidentiality; Injunctive Relief.

(a) The Employee agrees, as a condition to the Company agreeing to employ the Employee and to the performance by the Company of its obligations hereunder, particularly its obligations under Paragraph 4 hereof, that during the Term of this Agreement and three thereafter, the Employee shall not, without prior written approval of the Company, directly or indirectly through any other person, firm or corporation, whether individually or in conjunction with any other person, or as a director, officer, employee, agent, consultant, representative, partner or holder of any interest in any other person, firm, corporation or other association:

(i)    solicit, entice or induce any person who presently is or at any time during the term hereof shall be an employee of the Company to become employed by any other person, firm or corporation or to leave their employment with the Company, and the Employee shall not approach any such employee for such purpose or authorize or knowingly approve the taking of such actions by any other person, or

(ii)    compete with, or encourage or assist others to compete with, or solicit orders or otherwise participate in business transactions in competition with, the business engaged in by the Company at any time during the term of the Employee's employment (unless

such business shall have been abandoned by the Company). The restriction contained in this subparagraph 8(a)(iii) shall apply anywhere within the United States and Canada.

Nothing in the foregoing shall prohibit the Employee from engaging in any business that is not in competition with the Company, or investing in the securities of any corporation having securities listed on a national securities exchange or traded on the NASDAQ automated quotation system, provided that such investment does not exceed 5% of any class of securities of any Company engaged in business in competition with the Company, and provided that such ownership represents a passive investment and that neither the Employee nor any group of persons including him, in any way, either directly or indirectly, manages or exercises control of any such corporation, guarantees any of its financial obligations, otherwise takes any part in its business, other than exercising his rights as a shareholder, or seeks to do any of the foregoing.

(b) The Employee acknowledges that during the term of his employment, he will have access to confidential information of the Company, including information about "Developments" (as defined in Paragraph 9 below), business plans, costs, customers, profits, markets, sales, products, software, key personnel, pricing policies, operational methods and other business affairs and methods and other information not available to the public or in the public domain (hereinafter referred to as "Confidential Information").  In recognition of the foregoing, the Employee covenants and agrees that, except as required by his duties to the Company, the Employee will keep secret all Confidential Information of the Company and will not, directly or indirectly, either during the term of his employment hereunder or at any time thereafter while such Confidential Information remains confidential, disclose or disseminate to anyone or make use of, for any purpose whatsoever except for the benefit of the Company in the course of his employment, any Confidential Information, and upon termination of his employment, the Employee will promptly deliver to the Company all tangible materials and objects containing Confidential Information (including all copies thereof, whether prepared by the Employee or others) which he may possess or have under his control.  The term "Confidential Information" shall not include any information which can be demonstrated (i) to be generally known in the industry or to the public other than through breach of the Employee's obligations hereunder, (ii) to have been in the Employee's possession prior to his employment with the Company and not assigned to the Company, or (iii) to have been disclosed to the Employee by an independent third party not under any obligation of confidentiality.  Notwithstanding anything to the contrary, Employee shall be entitled to provide confidential information to a government body or in a legal proceeding pursuant to and the extent as required by a lawful subpoena or Court order.

(c) The Employee acknowledges that the restrictions contained in this Paragraph 8 are reasonable and necessary to protect the legitimate business interests of the Company and that the Company would not have entered into this Agreement in the absence of such restrictions. By reason of the foregoing, the Employee agrees that if he violates any of the provisions of this Paragraph 8, the Company would sustain irreparable harm and, therefore, irrevocably and unconditionally (i) agrees that in addition to any other remedies which the Company may have under this Agreement or otherwise, all of which remedies shall be cumulative, the Company shall be entitled to apply to any court of competent jurisdiction for preliminary and permanent injunctive relief and other equitable relief, (ii) that such relief and any other claim by the Company pursuant hereto may be brought in the United States District Court for the Eastern District of Pennsylvania, or if such court does not have subject matter jurisdiction or will not

accept jurisdiction, in any court of general jurisdiction in Pennsylvania; (iii) consents to the non-exclusive jurisdiction of any such court in any such suit, action or proceeding, and (iv) waives any objection which the Employee may have to the laying of venue of any such suit, action or proceeding in any such court.  The Employee also irrevocably and unconditionally consents to the service of any process, pleadings, notices or other papers in a manner permitted by the notice provisions hereof.  In the event that any provisions of this Paragraph 8 hereof should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable law.

(d) The Employee agrees that the Company may provide a copy of this Paragraph 8 to any business or enterprise (i) which the Employee may directly or indirectly own, manage, operate, finance, join, control or participate in the ownership, management, operation, financing, or control of, or (ii) with which he may be connected as an officer, director, employee, partner, principal, agent, representative, consultant or otherwise, or in connection with which he may use his name or permit his name to be used; provided, however, that this provision shall not apply as to subparagraph (a) or (b) after expiration of the time periods set forth therein or with respect to any activities, entities or persons excluded by the terms hereof.  The Employee will provide the names and addresses of any of such persons or entities as the Company may from time to time reasonably request.

(e) In the event of any breach or violation of the restriction contained in subparagraph (a) above, the period therein specified shall abate during the time of any violation thereof and that portion remaining at the time of commencement of any violation shall not begin to run until such violation has been fully and finally cured.

9. Ownership of Inventions and Ideas.  The Employee acknowledges that the Company shall be the sole owner of all the results and proceeds of the Employee's service hereunder, including but not limited to, all patents, patent applications, patent rights, formulas, copyrights, inventions, developments, discoveries, other improvements, data, documentation, drawings, charts, and other written, audio and/or visual materials relating to equipment, methods, products, processes, or programs in connection with or useful to the Company's business (collectively, the "Developments") which the Employee, by himself or in conjunction with any other person, may conceive, make, acquire, acquire knowledge of, develop or create during the term of the Employee's employment hereunder, free and clear of any claims by the Employee (or any successor or assignee of him) of any kind or character whatsoever other than the Employee's right to compensation hereunder.  The Employee acknowledges that all copyrightable Developments shall be considered works made for hire under the Federal Copyright Act.  The Employee hereby assigns and transfers his right, title and interest in and to all such Developments, and agrees that he shall, at the request of the Company, execute or cooperate with the Company in any patent applications, execute such assignments, certificates or other instruments, and do any and all other acts, as the Board of Directors of the Company from time to time reasonably deems necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend the Company's right, title and interest in or to any such Developments.

10. <u>Survival</u>.  The provisions of Paragraphs 8 and 9 shall survive the termination of this Agreement for any reason whatsoever.

11. <u>Miscellaneous</u>.

(a)  Any notice authorized or required to be given or made by or pursuant to this Agreement shall be made in writing and shall be deemed given upon  receipt if delivered personally or by facsimile transmission and followed promptly by mail, or three days after the date mailed by registered or certified  mail (return receipt requested), postage prepaid, to the parties  at the following addresses (or at such other address for a party  as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

> If to Employee:
> Shad Stastney
> 392 Taylors Mills Road
> Marlboro, NJ 07746


> If to the Company:
> Stream TV Networks, Inc.
> Att : Raja Rajan
> 2009 Chestnut Street
> Philadelphia, PA 19103


or to any other address or addressee as any party entitled to receive notice under this Agreement shall designate, from time to  time, to the other in the manner provided in this subparagraph (a) for the service of notices.  Any notice delivered to the party hereto to whom it is addressed shall be deemed to have been given and received on the day it was received; provided, however, that if such day is not a business day then the notice shall be deemed to have been given and received on the business day next following such day.

(b) This Agreement cancels and supersedes any and all prior agreements and understandings between or among any or all of the parties hereto with respect to the employment by or obligations of the Employee to any thereof.  This Agreement constitutes the entire agreement among the parties with respect to the matters herein provided, and no modification or waiver of any provision hereof shall be effective unless in writing and signed by the parties hereto.

(c)  All of the terms and provisions of this Agreement shall be binding and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, except that the duties and responsibilities of the Employee hereunder are of a personal nature and shall not be assignable or delegable in whole or in part by the Employee.

(d) If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such

invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

      (e)  No remedy conferred upon any party by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity. No delay or omission by any party in exercising any right, remedy or power hereunder or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by the party possessing the same from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

      (f)  This Agreement may be executed in several counterparts, each of which is an original.  It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

      (g) In the event of a lawsuit by either party to enforce any provisions of this Agreement, the prevailing party shall be entitled to recover reasonable costs, expenses and attorneys' fees from the other party.

      (h) The validity, interpretation, construction, performance and enforcement of this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

9

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first written above.

STREAM TV NETWORKS, INC.

By:_____

Name:    Mathu Rajan

_____

Shad L. Stastney

**EXHIBIT C**

**Resolution with SLS**

**[See attached in PDF]**

## AGREEMENT FOR SALE AND PURCHASE OF NOTES

THIS AGREEMENT (this "**Agreement**") with an effective date of January 31, 2020 (the "**Effective Date**") regardless of when it is mutually executed, by and between STREAM TV NETWORKS, INC., a Delaware corporation (the "**Company**"), SLS HOLDINGS VI, LLC, a Delaware limited liability company ("**SLS**"), (all collectively may be referred to as the "**Parties**").

### R E C I T A L S

**WHEREAS**, the Company and SLS have entered into that certain (i) Securities Purchase Agreement, dated August 8, 2011 (the "**First Securities Purchase Agreement**"); (ii) Securities Purchase Agreement, dated February 8, 2012 (the "**Second Securities Purchase Agreement**", together with the First Securities Purchase Agreement, the "**Purchase Agreements**" and each a "**Purchase Agreement**"); (iii) 5% Senior Secured Note, dated August 8, 2011, in the principal amount of US$3,000,000 ("**SLS Note 1**"); (iv) 5% Senior Secured Note, dated February 8, 2012, in the principal amount of US$1,500,000 ("**SLS Note 2**"); (v) 5% Senior Secured Note, dated May 1, 2012, in the principal amount of US$500,000 ("**SLS Note 3**"); (vi) 5% Senior Secured Note, dated July 5, 2012, in the principal amount of US$500,000 ("**SLS Note 4**"); (vii) 5% Senior Secured Note, dated May 29, 2012, in the principal amount of US$500,000 ("**SLS Note 5**", together with SLS Note 1, SLS Note 2, SLS Note 3 and SLS Note 4, the "**SLS Notes**"); and

**WHEREAS,** the SLS Notes have been amended from time to time for various reasons including extending their maturity dates;

**WHEREAS**, the SLS Notes are secured by certain security agreements dated August 8, 2011 and February 8, 2012 (together, the "**Security Agreements**"); and

**WHEREAS**, Company desires to now purchase the SLS Notes (the "**Purchase**)" and SLS desires to sell all of its right, title and interest in and to the SLS Notes to Company (the "**Sale**").

**NOW THEREFORE**, in consideration of the mutual promises made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Purchase of the SLS Notes**.  Beginning with the execution of this Agreement, the Company hereby agrees to pay to SLS the full repayment (the "**Purchase Price**") in the installments listed below. As of the Effective Date the principal and accrued interest total approximately USD $9,000,311. However, another USD $600,000 will be paid as a penalty if any installment is not paid by the due dates mentioned below.

2. **Installment.** The Purchase Price shall be paid in monthly installments (each, an "**Installment**") as set forth at **Schedule 1 – Installment Schedule** to the Agreement:

The initial monthly installment (the "**Initial Installment**") shall be paid by the Company to SLS on or before March 1, 2020. The second monthly installment date shall be paid by the Company to SLS on or before April 1, 2020 (the "**Second Installment**"). The next Installment following the Second Installment

shall be paid by the Company to SLS on or before May 1, 2020. The final monthly installment (the "**Final Installment**") will be made on or before June 1, 2020.  The Parties agree that from and after the Effective Date, the maturity dates of the SLS Notes shall be as provided in the Installment Schedule.

3.  **Purchase.**   As of each payment made under the Installment Schedule, a pro rata portion of the SLS Notes will be retired, in reverse order of initial funding.  Upon payment in full of the Final Installment, SLS Note 1 will be retired, and the remainder of the Purchase Agreements deemed satisfied in full.

4.  **Board Seat.**   Notwithstanding anything to the contrary, as of the payment in full of the Initial Installment, SLS will not have any right or entitlement to appoint a member of the Company's board of directors.

5.  **Observer Seat.**   Notwithstanding anything to the contrary, as of the payment of the Final Installment, SLS will not have any right or entitlement to appoint an observer to the Company's board of directors.

6.  **Limitation on Board Members**. Notwithstanding anything to the contrary, the limitation set forth in the Purchase Agreements on the expansion of the number of directors of the Company beyond five (5) members without the prior written consent of SLS for so long as the SLS Notes are outstanding and there has not been a Qualified Public Offering is eliminated as of payment in full of the Initial Installment.

7.  **Liens.**   Notwithstanding anything to the contrary, as of the payment in full of the Final Installment,  SLS (i) agrees to submit for recording among the financing statement records of the appropriate state government office a UCC-3 termination statement to terminate the financing statements of record perfecting the security interests granted in connection with the SLS Notes, and (ii) hereby authorizes, the Company, at the Company's sole expense, to submit such other UCC-3 termination statements necessary or required to terminate the financing statements of record perfecting the security interests granted in connection with the applicable SLS Notes naming the Company, as debtor, and SLS, as secured party, in the appropriate state government filing office.  Upon payment of the Final Installment, SLS shall promptly return to the Company the original documents evidencing the SLS Notes marked "paid in full" or "canceled.

8.  **SLS's Representations and Warranties**. In conjunction with the Purchase and the Sale, SLS represents and warrants that:

(i)    SLS is the owner and holder of the SLS Notes; and

(ii)    SLS has the right, power and authority to execute the Sale; and

(iii)    SLS is a limited liability company duly organized and validly existing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted.

9. **Company's Representations and Warranties**. In conjunction with the Purchase and the Sale, the Company represents and warrants that:

(i)  The Company has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(ii)  The consummation of the Purchase contemplated hereby is authorized by, and will not result in a violation of, state law or its charter or other organizational documents.

(iii)  The Company is a corporation duly organized and validly existing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted.

(iv)  The execution and delivery of this Agreement has been duly authorized by all necessary action and this Agreement has been duly executed and delivered on behalf of the Company.

(v)  The Company represents that the execution and delivery of this Agreement will not violate or be in conflict with any order, judgment, injunction, agreement or controlling document to which the Company is a party or by which it is bound.

10. **Elimination of Certain Rights of SLS.**  In conjunction with the Purchase and the Sale, the Parties agree to the following:

Notwithstanding anything to the contrary in any other document including but not limited to a certain put option agreement made and entered into as of January 29, 2018, by and between the Parties, upon the payment in full of the Final Installment, SLS shall waive all future rights with respect to the Company except for its rights under this Agreement and its rights with respect to the shares of stock and warrants issued to it by the Company in the past.

11. **Prepayment**.  The Company may prepay any amount due under the SLS Notes at any time, without penalty or premium.

12. **Consents**. All consents required by the Company from third parties in relation to the execution of this Agreement have been received by the Company.

13. **Governing Law**.  This Agreement shall be governed exclusively by, and construed in accordance with, the laws of the State of Delaware USA.  Each of the Parties hereto hereby consents to the exclusive jurisdiction of the courts of the State of Delaware USA and any federal court sitting in Wilmington, Delaware USA.

14. **Severability**.  In the event any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

15. **Binding Effect**.  This Agreement shall be binding upon the Parties hereto, their successors and assigns.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date first above written.

**SLS:**

**SLS HOLDINGS VI, LLC**

a Delaware limited liability company,

By: Shad Stastney

Its:  Managing Partner

**COMPANY:**

**STREAM TV NETWORKS, INC.**

a Delaware USA corporation,

By: Mathu Rajan

Its:  CEO

**SCHEDULE 1**
**INSTALLMENT SCHEDULE**

| Payment Date | Payment | Balance | New Accrual | Cumulative |
|---|---|---|---|---|
| 31-Jan-20 | | $9,000,311 | | |
| 1-Mar-20 | $2,500,000 | $6,500,311 | $133,155 | $133,155 |
| 1-Apr-20 | $2,500,000 | $4,000,311 | $99,375 | $232,530 |
| 1-May-20 | $2,500,000 | $1,500,311 | $59,183 | $291,713 |
| 1-Jun-20 | | | | |
| Bal of note | $1,500,311 | $0 | $22,936 | $314,649 |
| New interest | $314,649 | New Interest Rate | | 18% |
| Total final installment | $1,814,960 | | | |